## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| ASSOCIATION OF AMERICAN PHYSICIANS AND SURGEONS, INC., *et al.*,              )<br>)<br>)<br>)<br>Plaintiffs,   )<br>)<br>v.         )<br>)<br>FOOD & DRUG ADMINISTRATION, )<br>*et. al.*,        )<br>)<br>Defendants.   )<br>) | Civil Action No. 07-668 (RCL) |

### <u>DEFENDANTS' MOTION TO DISMISS</u>

Defendants, the United States Food and Drug Administration ("FDA"), Andrew C. von Eschenbach, Commissioner of Food and Drugs, and the United States of America, respectfully move for the dismissal of this case pursuant to Rules 12(b)(1) and (6) of the Federal Rules of Civil Procedure. In short, plaintiffs lack standing to bring any claim, and the claims are otherwise without merit. The grounds for this motion are set forth fully in the accompanying Memorandum of Points and Authorities in Support of Motion to Dismiss.

Undersigned counsel did not consult with counsel for plaintiffs because this is a potentially dispositive motion. <u>See</u> Local Civil Rule 7(m).

Dated: June 29, 2007.

Respectfully submitted,

_____
JEFFREY A. TAYLOR, D.C. BAR # 498610
United States Attorney

/s/
RUDOLPH CONTRERAS, D.C. BAR #434122
Assistant United States Attorney

/s/
JANE M. LYONS, D.C. Bar. # 451737
Assistant United States Attorney
555 Fourth St., N.W. - Room E4822
Washington, D.C.  20530
Phone: (202) 514-7161

OF COUNSEL:
DANIEL MERON
General Counsel

SHELDON T. BRADSHAW
Associate General Counsel, Food and Drug Division

ERIC M. BLUMBERG
Deputy Chief Counsel, Litigation

KAREN E. SCHIFTER
Associate Chief Counsel, Litigation
U.S. Dept. of Health & Human Services
Office of the General Counsel

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

---

ASSOCIATION OF AMERICAN )
PHYSICIANS AND SURGEONS, INC., )
*et al*., )
          )
          Plaintiffs, )
          )
          v. )         Civil Action No. 07-668 (RCL)
          )
FOOD & DRUG ADMINISTRATION, )
*et. al.*, )
          )
          Defendants. )

---

## DEFENDANTS' MEMORANDUM OF POINTS AND AUTHORITIES
## IN SUPPORT OF MOTION TO DISMISS

### INTRODUCTION

In July 1999, the United States Food and Drug Administration ("FDA") approved a new drug application ("NDA") for prescription marketing of "Plan B," an emergency contraceptive drug product currently marketed by Duramed Research, Inc. ("Duramed"), a wholly owned subsidiary of Barr Pharmaceuticals, Inc ("Barr"). In August 2006, FDA approved Barr's supplemental new drug application ("SNDA"), which requested permission to market Plan B without a prescription ("non-Rx" or "OTC") to consumers age 18 and over while remaining prescription only ("Rx-only") for consumers under the age of 18. Plaintiffs, four organizations concerned about health care and reproductive issues, seek to vacate FDA's August 2006 decision so that Plan B will again be available only by prescription. They allege that FDA's SNDA approval decision and the procedures FDA employed in making it violated the Federal Food, Drug, and Cosmetic Act ("FDCA") and the Administrative Procedure Act ("APA").

The FDCA provides authority to FDA to approve drug applications when the data submitted to the agency show, *inter alia*, the drug product is safe and effective for use under the conditions described in the proposed labeling. 21 U.S.C. § 355(c), (d). It further provides that a drug product should be dispensed by prescription if it is safe for use only under the supervision of a licensed healthcare professional. 21 U.S.C. § 353(b)(1). FDA applied these standards and its expertise to determine that the data Barr submitted to the agency demonstrated that Plan B is safe for use, without the supervision of a licensed healthcare professional, by women 18 years of age and older, and therefore the option of obtaining Plan B non-Rx should be available to consumers in that age group.

FDA's approval decision means only that adult women have the option of purchasing the product without a prescription from pharmacies that stock it. Nothing in the FDCA either compels a woman to forego the opportunity to consult with a health care professional before purchasing Plan B, or compels any pharmacist to stock and sell Plan B. Because the non-Rx purchase of Plan B is a voluntary act, plaintiffs essentially are seeking to eliminate the availability of Plan B non-Rx as an option for women who are not members of plaintiffs' organizations and are not before this Court.

Plaintiffs, however, cannot establish standing to seek such relief. Plaintiffs allege standing on behalf of the organizations themselves on the ground that they suffered a "procedural injury" in that they were not able to comment on FDA's SNDA approval decision; however, members of the general public have no right to participate directly in a drug application proceeding, and plaintiffs failed to submit a citizen petition to the agency as provided by FDA's regulations. Plaintiffs also allege standing on behalf of women, physicians, and pharmacists within their membership, but, as

detailed below, their allegations are insufficient to establish the elements of standing on behalf of any of these subgroups or individuals.

Similarly, plaintiffs have also failed to allege a cause of action as to which the Court has jurisdiction. Federal question jurisdiction is lacking, and plaintiffs are unable to identify a clear duty that FDA owes to them that could allow them to establish mandamus jurisdiction. There is no right under the FDCA for members of the general public to challenge or participate in a drug application proceeding. Nor is there any cause of action under the APA for persons who are not injured by the agency action that they seek to challenge.

Even if there were jurisdiction to review plaintiffs' claims, and plaintiffs had standing to bring them, the claims themselves are defective. In Counts II and IV, plaintiffs claim that FDA was barred under the FDCA from approving the SNDA application because 1) FDA was not permitted to approve Rx and OTC versions of the drug to be marketed simultaneously, and 2) FDA was not permitted to approve a "third class" of drug. In Counts V and VI, plaintiffs claim that FDA was required, under the APA and FDCA respectively, to undertake rulemaking to approve Barr's SNDA. Plaintiffs' theories underlying these claims are wrong as a matter of law, and these claims should be dismissed. With regard to the remainder of the Complaint, Counts I, III, and VII fail because FDA's actions were plainly reasoned, reasonable, and procedurally proper.[1]

---

[1]        The administrative record in this case has not yet been served on plaintiffs. In January 2005, a group of reproductive rights advocates and educational groups sued FDA in Federal District Court for the Eastern District of New York seeking a mandatory injunction to require FDA to approve Plan B as an OTC product for all women. *See Tummino v. von Eschenbach*, No. 05-CV-366 (ERK/VVP). FDA prepared and served an administrative record in connection with that lawsuit, but portions of that record contain Barr's confidential commercial information. As a result, the record was produced subject to a protective order negotiated among the *Tummino* plaintiffs, Barr, and the government. Because the parties have not taken comparable steps in this case, FDA has not yet produced the record here.

Finally, plaintiffs have named the Commissioner of Food and Drugs, Andrew C. von Eschenbach, in his individual capacity, apparently in the mistaken belief that such an allegation is necessary to avoid litigation over sovereign immunity. *See* Compl. ¶ 19. Plaintiffs, however, do not seek any relief against Commissioner von Eschenbach in his individual capacity. The allegations are therefore improper and that aspect of the complaint should also be dismissed.

## BACKGROUND

### I.    Statutory and Regulatory Scheme

Under the FDCA, a new drug product cannot be marketed in the United States until the drug's sponsor submits an NDA to FDA and obtains the agency's approval. 21 U.S.C. § 355(a), (b). FDA approval of an NDA requires the sponsor to establish to FDA's satisfaction that the drug is safe and effective for its intended uses. Thus, FDA is required to reject an NDA if, *inter alia*, the data fail to show that the product is "safe for use under the conditions prescribed, recommended, or suggested in the proposed labeling," and "that the drug will have the effect it purports or is represented to have." 21 U.S.C. § 355(d).

A drug product will be approved for prescription only dispensing when, "because of its toxicity or other potentiality for harmful effect, or the method of its use, or the collateral measures necessary to its use, [it] is not safe for use except under the supervision" of a licensed health care professional. 21 U.S.C. § 353(b)(1). Some drugs are initially approved as $R_x$-only, but are later "switched" to OTC status when the agency finds that dispensing the drug by prescription is

> not necessary for the protection of the public health by reason of the drug's toxicity or other potentiality for harmful effect, or the method of its use, or the collateral measures necessary to its use, and [the agency] finds that the drug is safe and effective for use in self-medication as directed in proposed labeling.

21 C.F.R. § 310.200(b); *see also* 21 U.S.C. §§ 353(b)(3), 355(c)&(d).  The FDCA authorizes two administrative mechanisms for FDA to switch an Rx-only drug to non-Rx status: by rulemaking and by approving a drug application that is submitted by the drug sponsor and requests such a switch. 21 C.F.R. § 310.200(b); *see also infra* at 39-40.

## II.    Statement of Facts

On July 28, 1999, FDA approved an NDA for Plan B.  *See* Compl. ¶¶ 41, 48.  Plan B contains levonorgestrel, a synthetic progestin. *See* Compl. ¶ 40.  It is an "emergency contraceptive," to be taken "as soon as possible . . .after unprotected sex." *See* Def. Ex. 1.[2/]

The sponsor of Plan B began discussing a potential Rx-OTC switch application with FDA in 2001.  Early in that process, the drug sponsor explained that "in most pharmacies, the OTC version of Plan B may eventually be kept behind-the-counter in part out of respect for community values and in part to avoid losses through shoplifting." Def. Ex. 2 at 1.  In April 2003, the sponsor of Plan B submitted an SNDA to FDA requesting the Rx-OTC switch.  Compl. ¶ 50.

On December 16, 2003, FDA convened a one-day joint public meeting of its Non-Prescription Drugs Advisory Committee and its Advisory Committee for Reproductive Health Drugs–two panels of medical and scientific experts–to make recommendations to agency decision-makers as to the safety and effectiveness of nonprescription use of Plan B.  *See* 68 Fed. Reg. 66113

---

[2/]        When subject matter jurisdiction is challenged under Fed. R. Civ. P. 12(b)(1), the Court may consider evidentiary material outside of the pleadings without treating the motion as one for summary judgment. *Land v. Dollar*, 330 U.S. 731, 735 n. 4 (1947); *Coalition for Underground Expansion v. Mineta*, 333 F.3d 193, 198 (D.C. Cir. 2003)*; Herbert v. National Academy of Sciences*, 974 F.2d 192, 197-98 (D.C. Cir. 1992); *Bonterra America, Inc. v. Bestmann*, 907 F. Supp. 4, 5 n.1 (D.D.C. 1995).  In addition, the excerpts attached to this memorandum were all filed on the public record in *Tummino*, No. 05-CV-366 docket no. 248, and many are available on FDA's website: http://www.fda.gov/cder/drug/infopage/planB/default.htm.

(Nov. 25, 2003). The joint advisory committee voted to recommend to FDA that Plan B be allowed to be sold without a prescription. Def. Ex. 3.

After FDA communicated to Barr some concerns about the adequacy of the data on OTC use by younger women, Barr submitted to FDA, on March 11, 2004, a proposal to market Plan B as a non-Rx product to consumers age 16 and over, while maintaining the product's Rx-only status for consumers under age 16. Def. Ex. 4. Under this proposal, both Rx and non-Rx Plan B would be marketed in the same package and would be distributed from behind pharmacy counters with proof of age required. *Id.*

By letter dated May 6, 2004, Dr. Steven Galson, then the Acting Director (now the Director) of FDA's Center for Drug Evaluation and Research ("CDER"), informed Barr that the SNDA was "not approvable at this time" because Barr had not provided adequate data to show that Plan B was safe for OTC use by young adolescent women, and because Barr's March 11, 2004, proposal seeking to limit the OTC switch to women 16 and older was too preliminary to permit FDA review. Def. Ex. 5 at 1-2; Compl. ¶ 51. Dr. Galson advised Barr that, before its SNDA for Plan B could be approved, Barr would have to either: (1) submit data demonstrating that the product could be used safely by girls under 16 years of age without professional supervision by a licensed practitioner, or (2) provide information in support of its dual-marketing proposal. *Id.* at 2; Compl. ¶ 51.

Barr opted for the second of the two choices, and, on July 21, 2004, Barr filed an amended SNDA, formally proposing to market Plan B as a non-Rx product for consumers age 16 and older and as an Rx-only product for girls under age 16. Def. Ex. 6 at 1; Compl. ¶ 52. On August 26, 2005, Dr. Galson completed an internal memorandum regarding Barr's revised SNDA. Def. Ex. 6. He concluded that the studies and other data Barr provided with its SNDA showed that consumers age

17 and older could use Plan B safely and effectively for emergency contraception in a non-Rx setting.

Def. Ex. 6 at 2, 12.  Specifically, he concluded:

> Plan B provided pursuant to a prescription has previously been proven to be effective for emergency contraception and had a well-documented safety profile. In a label comprehension study and in an actual use study submitted with the supplemental NDA, the sponsor has demonstrated that women of childbearing-potential age 17 and older can use Plan B safely and effectively for emergency contraception in the OTC setting.  The data submitted by Barr demonstrate that Plan B is safe and effective without the supervision of a practitioner licensed by law for women age 17 and older in self-medication as directed in the proposed labeling.  The [citizen] petition [urging FDA to switch Plan B and any similar products to OTC status] and many of the comments on that petition also support this view.
>
> * * *
>
> The safety and effectiveness of Plan B in all women age 17 years of age and older has been demonstrated in the actual use and labeling comprehension studies submitted with this supplemental application.  I find, therefore, . . . that the safety and effectiveness of Plan B in the relevant pediatric population (ages 17-18) has been demonstrated, and the requirements of [the Pediatric Research Equity Act] have been met.
>
> * * *
>
> In conclusion, I find that as a matter of science, Barr's July 21, 2004 proposal to switch Plan B to OTC status meets the statutory standards for approval of an NDA supplement set forth in 21 U.S.C. 355(d) for women age 17 and older.

*Id.*  Dr. Galson also concluded, however, that Barr's data were insufficient to demonstrate that the

population under age 17 could use this product safely without a prescription.  Def. Ex. 6 at 4, 12.

Also on August 26, 2005, then-FDA Commissioner Dr. Lester Crawford wrote to Barr and,

while he acknowledged and adopted Dr. Galson's findings regarding the scientific data, he explained

that the agency had not yet resolved all outstanding issues regarding the application.  Def. Ex. 7;

Compl. ¶ 52.  On the same day, FDA announced its intention to issue an advance notice of proposed

rulemaking ("the ANPRM") soliciting public comment on whether rulemaking was necessary to

resolve and clarify certain Rx-only to non-Rx switch issues. 70 Fed. Reg. 52050 (Sept. 1, 2005);

Compl. ¶ 53.

After FDA reviewed the comments on the ANPRM, FDA informed Barr, on July 31, 2006, that it was proceeding with further evaluation of its SNDA without first engaging in rulemaking, and invited Barr to further discuss its application.  Def. Ex. 8.  In August 2006, Barr filed an amended SNDA which sought non-prescription availability of Plan B only for consumers age 18 and older.  *See* Def. Ex. 9 & 10.  In its application, Barr explained that, given that Plan B will have both $R_x$-only and non-$R_x$ labeling, Barr would only distribute the product to licensed pharmacies and health care clinics and would not make it available for purchase at convenience stores, gas stations, and the like.  Similarly, because it would be inappropriate to place a product with $R_x$ labeling on open store shelves, it would direct the pharmacies that retail the drug to keep it "behind the counter."  *See* Def. Ex. 9 at 4-7, & Def. Ex. 10 at 36-46.

On August 24, 2006, FDA approved the amended SNDA, thereby permitting non-$R_x$ access to Plan B for consumers 18 years of age and older.  Def. Ex. 10; Compl. ¶ 60.  In separate memoranda to the SNDA file, then Acting FDA Commissioner (and defendant) Dr. Andrew C. von Eschenbach and CDER Director Dr. Galson reaffirmed and adopted Dr. Galson's earlier conclusions that the scientific data showed that Plan B may be safely used without a prescription by women age 17 and older, but that the data were insufficient to demonstrate safety in non-$R_x$ use by children under age 17.  Def. Ex. 9 & 11.  Dr. von Eschenbach found that age 18 (rather than 17) was the appropriate age cut-off to "help ensure safe and effective use of the product."  Def. Ex. 11.  Dr. Galson, in a separate memorandum to the file, concurred in that conclusion and otherwise found that all requirements for approval of the amended SNDA were met.  Def. Ex. 9.

## III.    The Instant Case

Plaintiffs, Association of American Physicians and Surgeons, Inc. ("AAPS"), Concerned Women for America, Family Research Council, and Safe Drugs for Women, seek to vacate FDA's August 2006 SNDA approval decision. In their complaint, they raise the following claims: 1) FDA's approval decision was arbitrary and capricious because the data in the SNDA were insufficient to show safety and effectiveness for adult OTC use; 2) FDA's approval decision violated the FDCA in allowing Plan B to be marketed in both an Rx and non-Rx versions; 3) FDA's age-based decision violated the FDCA; 4) FDA violated the FDCA in creating a "third class" of drug; 5) FDA violated the APA by not engaging in rulemaking ; 6) FDA violated the FDCA by not engaging in rulemaking; and 7) FDA was improperly influenced by political pressure. Compl. at ¶¶ 77-109. They brought this action against FDA, the United States, and FDA Commissioner Andrew C. von Eschenbach, in both his official and individual capacities. They seek only declaratory and injunctive relief. *Id*. at 110.

## ARGUMENT

Plaintiffs bear the burden of establishing subject matter jurisdiction, including the elements of standing. *Northeastern Fla. Chapter, Associated Gen. Contractors of Am. v. City of Jacksonville*, 508 U.S. 656, 663 (1993); *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992); *FW/PBS, Inc. v. City of Dallas*, 493 U.S. 215, 231 (1990). Standing cannot be "inferred argumentatively from averments in the pleading," but, rather, plaintiffs "must allege facts essential to show jurisdiction." *FW/PBS, Inc*., 493 U.S. at 231 (citations omitted). Where, as here, "the parties invoking federal jurisdiction are not 'the object of the government action or inaction' they challenge," "standing is 'substantially more difficult to establish.'" *Public Citizen, Inc. v. Nat'l Highway Traffic Safety*

*Admin.*, No. 05-1188,  2007 WL 1713334, 2007 U.S. App. LEXIS 14016 (D.C. Cir. June 15, 2007)

(quoting *Lujan*, 504 U.S. at 562).

On the merits, the factual allegations "must be enough to raise a right to relief above the

speculative level," and that a plaintiff must make "a 'showing,' rather than a blanket assertion, of

entitlement to relief.'" *Bell Atlantic Corp. v. Twombly*, --- U.S. —, 127 S. Ct. 1955, 1964-65 (2007).

Thus, although the factual allegations of the complaint must be taken in the light most favorable to

plaintiffs, and all ambiguities or doubts in the factual allegations must be resolved in favor of the

pleader, *id*., the complaint must set forth sufficient factual information to suggest that there exists

some recognized legal theory upon which relief can be granted.  *Caudle v. Thomason*, 942 F. Supp.

635, 638 (D.D.C. 1996).

## I.    PLAINTIFFS LACK STANDING TO CHALLENGE FDA'S AUGUST 2006 SNDA APPROVAL DECISION.

### A.    <u>Requirements for Standing.</u>

In the federal courts, jurisdiction must be established as a threshold matter.  *Steel Co. v.*

*Citizens For a Better Env't*, 523 U.S. 83, 94-95 (1998).  To invoke federal subject matter

jurisdiction, a party must establish the existence of a "justiciable controversy" with the adverse party

– one that is "definite and concrete, touching the legal relations of parties having adverse legal

interests." *Aetna Life Ins. Co. v. Haworth*, 300 U.S. 227, 240-41 (1937).  Thus, plaintiffs bringing

suit in federal courts must demonstrate that they have standing to seek the relief sought in the

complaint. *See Allen v. Wright*, 468 U.S. 737, 751 (1984).

To establish constitutional standing, a plaintiff must satisfy three requirements:  First, a

plaintiff must show an "injury-in-fact,"  which is defined as "an invasion of a legally protected

interest that is (a) concrete and particularized [meaning that the injury must affect the plaintiff in a

-10-

personal and individual way], and (b) actual or imminent, not conjectural or hypothetical." *Lujan*, 504 U.S. at 560 & n.1(citations and quotation marks omitted); *see also Warth v. Seldin*, 422 U.S. 490, 508 (1975); *Sierra Club v. Morton*, 405 U.S. 727, 740-41 n.16 (1972). Second, the plaintiff must demonstrate a "causal connection between the injury and the conduct complained of." *Lujan*, 504 U.S. at 560. This means that the injury has to be "fairly . . . trace[able] to the challenged action of the defendant, and not . . . th[e] result [of] the independent action of some third party not before the court." *Simon v. Eastern Ky. Welfare Rights Org.*, 426 U.S. 26, 41-42 (1976). Third, the injury in question must be redressable by the relief sought by the complaint. This means that it "must be 'likely,' as opposed to merely 'speculative,' that the injury will be 'redressed by a favorable decision.'" *Lujan*, 504 U.S. at 561 (quoting *Simon*, 426 U.S. at 38); *see also Allen*, 468 U.S. at 750-51.

In addition to the constitutional requirements for standing, the Court must consider whether any prudential limitations should restrain it from exercising its judicial power. *See Gladstone Realtors v. Village of Bellwood*, 441 U.S. 91, 99 (1979). Among the prudential limitations identified by the Supreme Court are the doctrines that (1) a plaintiff cannot rest his claim to standing on the rights and interests of third-parties, *Lujan*, 504 U.S. at 562; *Simon*, 426 U.S. at 44-45; *Warth*, 422 U.S. at 499; (2) the plaintiff must be in the zone of interests meant to be protected by the statute in question, in order to have standing to challenge the government's application of the statute, *Office of Workers' Compensation Programs v. City of Newport News*, 514 U.S. 122, 127 (1995); and (3) a plaintiff cannot rely on a generalized grievance shared by a large segment of the populace in order to establish standing to raise the grievance, *Gladstone Realtors*, 441 U.S. at 100; *Warth*, 422 U.S.

-11-

at 499.  *See also McKinney v. United States Dep't of Treasury*, 799 F.2d 1544, 1550-51 (Fed. Cir. 1986).[3/]

There are two ways for an organization to establish standing to bring suit.  First, to have organizational standing, plaintiff organizations must satisfy the same standing requirements that apply to individuals.  *See American Legal Found. v. FCC*, 808 F.2d 84, 89 (D.C. Cir. 1987) (citing *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 378-79 (1982)); *see also Village of Arlington Heights v. Metropolitan Housing Dev. Corp.*, 429 U.S. 252, 260-64 (1977).  Thus, each organizational plaintiff must demonstrate that it has suffered an injury-in-fact as a body corporate, that the injury is fairly traceable to the challenged action, and that the injury will likely be redressed by a favorable decision.  *Havens Realty Corp.*, 455 U.S. at 378-79.  Second, to have representational standing, an organizational plaintiff must demonstrate that its "members would otherwise have standing to sue in their own right; [that] the interests at stake are germane to the organization's purpose; and [that] neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit."  *See Friends of the Earth, Inc. v. Laidlaw Envt'l Servs., Inc.*, 528 U.S. 167, 180-81 (2000); *accord American Legal Found. v. FCC*, 808 F.2d 84, 89 (D.C. Cir. 1987) (quoting *Hunt v. Washington State Apple Advertising Comm'n*, 432 U.S. 333, 343 (1977));

---

[3/]    In the context of action by federal agencies, the Supreme Court has emphasized that judicial review of broad legislative mandates, such as protection of public health, is limited:

> The principal purpose of the APA limitations we have discussed . . . is to protect agencies from undue judicial interference with their lawful discretion, and to avoid judicial entanglement in abstract policy disagreements which courts lack both expertise and information to resolve.  If courts were empowered to enter general orders compelling compliance with broad statutory mandates, they would necessarily be empowered, as well, to determine whether compliance was achieved – which would mean that it would ultimately become the task of the supervising court, rather than the agency, to work out compliance with the broad statutory mandate, injecting the judge into day-to-day agency management.

*Norton v. Southern Utah Wilderness Alliance*, 542 U.S. 55, 66-67 (2004).

-12-

*see also Communities Against Runway Expansion, Inc. v. FAA*, 355 F.3d 678, 684 (D.C. Cir. 2004).

Under the first prong of this test, an association must have "members," as opposed to "mere

supporters." *American Legal Found.*, 808 F. 2d at 89-90. Further, at least one of those members

must be able to personally demonstrate all of the elements of Article III standing: (1) an

injury-in-fact; (2) traceable to the challenged action of the defendant; and (3) redressable by a

favorable decision. *Friends of the Earth, Inc.*, 528 U.S. at 180-81; *see also Hunt*, 432 U.S. at 343;

*Warth*, 422 U.S. at 511.

### B.    The Plaintiff Organizations Fail to Allege Any Legally Cognizable Injury.

Plaintiffs allege both organizational and representational standing. Compl. ¶¶ 12-17. With

respect to organizational standing, plaintiffs allege only that they have suffered a "procedural

injury:" that FDA impermissibly approved Barr's amended SNDA requesting a partial $R_x$-OTC

switch without conducting rulemaking, and plaintiffs' inability to submit comments on the drug

approval constitutes a procedural injury. Compl. ¶ 12.

This alleged injury is not legally cognizable for standing purposes for several reasons. First,

the legal premise is incorrect: the FDCA authorizes FDA to approve drug applications without

rulemaking. As described in greater detail below, *see infra* at 39-40, there are two ways that FDA

can approve an $R_x$-OTC switch – by initiating rulemaking pursuant to 21 U.S.C. § 353(b)(3), or by

approving a drug application, pursuant to 21 U.S.C. § 355, that is submitted by the manufacturer of

the drug and that requests such a switch. *See* 21 C.F.R. § 310.200(b). FDA's review of a drug

application is an informal adjudication and does not require rulemaking. *See* 21 U.S.C. §§ 355(c),

(d) (describing procedures applicable to drug application proceeding); 21 C.F.R. § 314.71 (providing

that drug application procedures apply to supplemental drug applications). *See also Apotex, Inc. v.*

*FDA*, No. 06-5060, 2007 U.S. App. LEXIS 4270 (D.C. Cir. Feb. 23, 2007) (noting that FDA drug application approval letters represent "informal adjudications"); *Am. Bioscience, Inc. v. Thompson*, 243 F.3d 579, 582 (D.C. Cir. 2001) (FDA consideration of a drug application is an "informal adjudication").

Nothing in the language of 21 U.S.C. § 353(b)(3) forecloses FDA from approving an Rx-OTC switch in the context of drug application proceedings, and FDA regulations, 21 C.F.R. § 310.200(b), specifically provide for it.  In practice, FDA has been approving drug applications, including applications requesting Rx-OTC switches, without rulemaking for decades.  Indeed, the novel assertion that FDA must engage in rulemaking to approve a drug application, if true, would slow the work of the agency in conflict with Congress' expectations for timely review.[4/]  Thus, because FDA was not required to conduct rulemaking to approve an Rx-OTC switch, plaintiffs were not "denied . . . procedural rights conferred by Congress."  Compl. ¶ 12.

Furthermore, plaintiffs failed to avail themselves of the procedural right that was available to them:  to "petition the Commissioner . . . to take or refrain from taking any . . . form of administrative action." 21 C.F.R. § 10.25.  Plaintiffs never filed a citizen petition with FDA seeking to bar or withdraw OTC approval status for Plan B.  *See* 21 C.F.R. § 10.45(b).  It is a bedrock principle of administrative law that agencies have an opportunity to consider the kind of arguments

---

[4/]        Congress enacted in 1992, and has reauthorized every five years thereafter, legislation to require user fees for many drug applications, which are intended to enable FDA to expend more resources on the review of drug applications to speed the process.  *See* Pub. L. No. 102-571, Title I,  1992 U.S.C.C.A.N. (106 Stat.) 4491 § 102(2) ("the public health will be served by making additional funds available for the purpose of augmenting the resources of the [FDA] that are devoted to the process for review of human drug applications"); H.R. Rep. No. 102-895 at 8-9 (1992) ("The public interest is served by more rapid approval of safe and effective drugs.  Therefore, the FDA should have more resources to apply to the new drug approval process.  In recent years, that has not been a viable option due to pressures that make it impossible as a practical matter to give significant budgetary increases to regulatory agencies and most other governmental programs.").  Nothing in that legislation indicates that Congress contemplated that review of drug applications would proceed by rulemaking, which process would likely lengthen the review period.

-14-

plaintiffs seek to raise in this litigation in the first instance administratively.  *Burt Lake Band of Ottawa & Chippewa Indians v. Norton*, 217 F. Supp. 2d 76, 78 (D.D.C. 2002) ("In cases where Congress has allocated decision-making responsibility to the Executive branch, petitioning parties are required to exhaust all available administrative remedies before seeking judicial relief.") (citation omitted).  While plaintiffs may regard the citizen-petition avenue as inefficient or unsatisfactory, that is irrelevant because "section 704 [of the APA] does not require an equally effective remedy, only an adequate one."  *American Disabled For Attendant Programs Today v. Department of Housing & Urban Dev.*, 170 F.3d 381, 390 (3d Cir. 1999).  Consequently, plaintiffs cannot complain that they have been injured by a lack of opportunity to participate in an administrative proceeding when they failed to partake of the administrative process available to them.  *Vermont Yankee Nuclear Power Corp. v. Natural Resources Defense Council, Inc.*, 435 U.S. 519, 525, 553 (1978) (holding that agencies have authority to "fashion their own rules of procedure" for handling and resolving challenges to administrative actions even when a statute does not specify what process to use and courts have limited power to insist on particular procedures).

Even if plaintiffs had been deprived of a procedural right, their standing allegation still would fail because a procedural injury by itself is insufficient to confer standing.  It is well established that "[t]he grant of a procedural right cannot serve as the basis for Article III standing unless 'the procedures in question are designed to protect some threatened concrete interest of [plaintiffs'] that is the ultimate basis of his standing.'"  *Fund Democracy, LLC v. SEC*, 278 F.3d 21, 28 (D.C. Cir. 2002) (quoting *Lujan*, 504 U.S. at 573 n.8).[5/]  Here, plaintiffs make no other specific

---

[5/]        Similarly, to the extent plaintiffs purport to allege an injury separate from the procedural injury, *see* Compl. ¶ 12, a plaintiff must allege an invasion of a "legally protected interest" in order to show injury-in-fact. *Lujan*, 504 U.S. at 560.

allegations of injury to the organizations as organizations, and instead rely on alleged injuries to groups of their members. *See* Compl. ¶ 12. As detailed below, however, plaintiffs have failed to show a threatened concrete injury to any legally protected interest of any of their members. Thus, without a threatened concrete injury that is legally cognizable for standing purposes, the plaintiff organizations cannot rely solely on an alleged procedural injury to establish standing. *Florida Audubon Soc'y v. Bentsen*, 94 F.3d 658, 668 (D.C. Cir. 1996) (*en banc*).

Because plaintiffs "have not identified a procedural right sufficient for standing" and "because of the absence of a related, concrete injury," plaintiffs have failed to establish standing. *See AAPS v. HHS*, 2006 U.S. Dist. LEXIS 73020 at *16-21 (D.D.C. Oct. 6, 2006) (rejecting standing of AAPS, one of the four plaintiffs here, on similar standing claims).

## C.    FDA Did Not Cause Any Concrete Injury to Women, Girls, or Parents of Girls.

Plaintiffs claim that their membership includes "women, girls, and parents of girls" and these girls "will receive inadequate health care, drug-labeling information, and counseling" by being able to purchase Plan B OTC. Compl. ¶ 13. Plaintiffs do not elaborate on the nature of this alleged injury which, on its face, is illogical and nonsensical. First, because FDA approved the OTC marketing of Plan B only for consumers 18 years of age and older under a marketing plan that requires proof of age, girls under 18 must obtain a prescription to purchase Plan B, as before FDA's August 2006 SNDA approval decision. These girls therefore will presumably obtain the same health care, drug-labeling information, and counseling that they received before the August 2006 decision.

Thus, because there has been no change, there is no injury to "girls" and "parents of girls" from FDA's SNDA approval decision.[6/]

There is likewise no injury to women 18 years of age and older. After FDA's SNDA approval decision, adult women now have the *option* of purchasing Plan B OTC. However, there is nothing in FDA's OTC approval decision that prevents these women from choosing to speak to a medical doctor before purchasing Plan B. Any woman who is concerned about her health care or who desires counseling can consult a physician for those purposes, just as she might chose to consult a physician regarding arthritis or acid reflux, even though there are OTC treatments available for those conditions as well. In short, plaintiffs cannot show that FDA caused an injury to women by making an option available that women can choose to forego.

Accordingly, plaintiffs have failed to allege an injury in fact from FDA's SNDA approval decision suffered by women, girls, and parents of girls.

D.    **FDA's SNDA Approval Decision Did Not Injure Physicians.**

Plaintiffs allege two types of standing on behalf of member physicians: economic injury from loss of business from women obtaining Plan B OTC, and third party standing on behalf of their patients. Compl. ¶¶ 12, 13, Ex.1. Neither allegation is sufficient to confer standing on the physicians.

---

[6/]    Plaintiffs allege incorrectly (as a matter of law) that the FDCA "does not prohibit someone 18 or older from purchasing Plan B and giving it to someone younger than 18." Compl. ¶ 76. FDA considers the act of providing Plan B to a minor under such circumstances to be dispensing a prescription drug without a prescription in violation of 21 U.S.C. § 353(b)(1). Although the government indicated in the *Tummino* case that, as a matter of enforcement discretion, it was unlikely to initiate any enforcement action against a parent who provides his or her child with access to Plan B, FDA has never indicated that it held the same view regarding purchases by "older friends, siblings and others." *See* Compl. ¶ 76. Furthermore, plaintiffs attempt to draw comparisons to purchases of alcohol and cigarettes, *see id.*, but purchases of those products are not subject to the same limitations as in Barr's marketing plan, nor are they regulated by FDA. Thus, the allegation of "widespread" access by minors to Plan B, *id.*, is pure speculation.

### 1.    The Alleged Economic Injury is Speculative and Not Within the Zone of Interests under the FDCA.

Plaintiffs allege that at least one physician will suffer economic injury in the form of increased competition from pharmacists because potential patients can now obtain Plan B directly from pharmacies and will not need to seek a medical appointment to obtain Plan B.  Compl. ¶ 12 (referencing Ex. 1); Compl. Ex. 1 ¶¶ 6-8.  In spite of the fact that FDA approved OTC marketing of Plan B in 2006, plaintiffs have failed to allege any concrete economic damages that have already been incurred.  Instead, one physician claims that he "face[s] increased competition" which "will cause [him] to lose revenue."  Compl. Ex. 1 ¶¶ 6,8.  As in this Court's evaluation of AAPS' similar standing claims in *AAPS v. HHS*, "the economic injuries . . . are far too speculative to support standing."  2006 U.S. Dist. LEXIS 73020 at *23.

Moreover, it is well established that "the economic injury which results from lawful competition cannot, in and of itself, confer standing on the injured business."  *Hardin v. Kentucky Utilities Co.*, 390 U.S. 1, 5-6 (1968).  Plaintiffs must also be within the "zone of interests" to be protected or regulated by the statute to establish standing.  *Investment Co. Institute v. Federal Deposit Ins. Corp.*, 815 F.2d 1540, 1543-44 (D.C. Cir. 1987), *cert. denied*, 484 U.S. 847 (1987). The D.C. Circuit has described this test as follows:

> Under this "zone of interests" test, the "essential inquiry is whether Congress 'intended for [a particular] class [of plaintiffs] to be relied upon to challenge agency disregard of the law.'" *Clarke v. Securities Indus. Ass'n*, 479 U.S. 388, 399, 93 L. Ed. 2d 757, 107 S. Ct. 750 (1987) (quoting *Block v. Cmty. Nutrition Inst.*, 467 U.S. 340, 347, 81 L. Ed. 2d 270, 104 S. Ct. 2450 (1984)).  While the "zone of interests" test is not meant to be "especially demanding," it will deny standing to one claiming to be a "suitable challenger" when "plaintiff's interests are so marginally related to or inconsistent with the purposes implicit in the statute that it cannot reasonably be assumed that Congress intended to permit the suit." *Id.*

-18-

*Cement Kiln Recycling Coalition v. EPA*, 255 F.3d 855, 870-71 (D.C. Cir. 2001).

The FDCA's "overriding purpose is to protect the public health." *United States v. Article of Drug, Bacto-Unidisk*, 394 U.S. 784, 798 (1969). The core objective of the FDCA's drug regulation provisions is to promote public health by regulating drugs for safety and effectiveness. *See* 21 U.S.C. § 393(b)(2) (defining the FDA's mission as including "ensuring that . . . drugs are safe and effective"); *Whitaker v. Thompson*, 239 F. Supp. 2d 43, 50 (D.D.C. 2003) ("There is no question that the legislative intent behind enactment of the original FDCA was to protect the public from unsafe drugs.") (citing *United States v. Undetermined Quantities of Veterinary Drug*, 22 F.3d 235, 238 (10th Cir.1994)), *aff'd*, 353 F.3d 947 (D.C. Cir. 2004), *cert. denied*, 543 U.S. 925 (2004); *In re Establishment Inspection of Wedgewood Vill. Pharmacy, Inc.*, 270 F. Supp. 2d 525, 549 (D.N.J. 2003) ("Congress intended that the FDCA, both in its original form and as amended, allow the FDA broad enforcement powers to fulfill its mandate that it protect the public from unsafe medication."), *aff'd sub nom. Wedgewood Village Pharmacy, Inc. v. U.S.*, 421 F.3d 263 (3d Cir. 2005).

The FDCA does not purport to protect the economic interests of physicians. Rather, it is the archetypal consumer protection statute. By controlling the drug products and medical devices that are allowed into the marketplace, the FDCA protects consumers from the harms associated with access to dangerous drugs and devices. Thus, the provisions governing Rx-OTC switches, 21 U.S.C. §§ 353, 355, provide that a drug may be made available OTC when the agency finds that the product is safe and effective for such use. A physician's purported interest in keeping drugs that are safe for OTC use as prescription drugs only to protect his or her economic interests in requiring patients to make doctors' appointments to obtain the drug is antithetical to the public health purposes of the FDCA. Such economic interest is therefore so "inconsistent with the purposes implicit in the statute

that it cannot reasonably be assumed that Congress intended to permit the suit." *Cement Kiln Recycling Coalition*, 255 F.3d at 871.

### 2.    Plaintiffs Cannot Establish Third Party Standing.

Plaintiffs also allege that the member physicians seek to protect the "patient-physician relationship and the FDCA-granted rights to adequate health care, drug-labeling information, and counseling on Rx drugs on behalf of their patients." Compl. ¶ 13.  In this allegation, plaintiffs do not allege injury to the physicians themselves, but instead are attempting to establish the elements of third-party standing.  The third party standing doctrine, however, merely allows one party that already has standing to assert the substantive right of another party; the first party is not relieved of the obligation to satisfy the core requirements for constitutional standing in his own right simply because he is also alleging third-party standing.  *See Powers v. Ohio*, 499 U.S. 400, 411 (1991); *American Immigration Lawyers Ass'n v. Reno*, 199 F.3d 1352, 1361 n.13 (D.C. Cir. 2000). Accordingly, alleging third-party standing will not cure plaintiffs' inability to establish standing on the part of physicians.

In addition, the third party standing doctrine has other requirements that cannot be met here. The Supreme Court has explained that parties are normally the best proponents of their own rights, so that third party standing is permitted only where there is a genuine obstacle to the assertion of that right. *Singleton v. Wulff*, 428 U.S. 106, 114-16 (1976).  Thus, plaintiffs must establish that there is some hindrance to the third party's ability to protect her own interests. *Powers*, 499 U.S. at 411. Plaintiffs, however, have alleged in their Complaint that women patients are members of plaintiff organizations and have asserted their interests.  Compl. ¶ 13.  They are therefore already before the Court, so that there is no hindrance to their protecting their own interests.  Furthermore, implicit in

the Supreme Court's discussion of third party rights is the assumption that the third party would herself have had standing if before the court. *See, e.g., Singleton*, 428 U.S. at 114-16. As set forth above, *see supra* at 16-17, plaintiffs have failed to demonstrate any injury in fact suffered by women patients who, as a consequence of FDA's SNDA approval decision, have simply the option of purchasing Plan B OTC.[7/]

Accordingly, plaintiffs cannot rely on their physician members to establish standing to bring this suit. *See Colwell v. HHS*, No. 04CV1748 BTM (RBB), 2005 U.S. Dist. LEXIS 6556, 21-22 (S. D. Cal. March 7, 2005) (holding that AAPS lacked representational standing to sue on behalf of physicians who had themselves failed to establish standing to challenge an HHS guidance document relating to providing interpretive services).

### E.    FDA's Decision Did Not Injure Pharmacists.

Plaintiffs allege that their membership includes practicing pharmacists who are subject to the following injuries: they "face expanded legal liability from the removal of the otherwise-applicable protections afforded to pharmacists who dispense an R drug," Compl. ¶ 14; they "face added expense and administrative burdens . . . via requirement not applicable to either OTC or R drugs," *id*. ¶ 15; and they "are subject to compelled speech to further a customer's use of Plan B in violation of these pharmacists' conscience-based objections to Plan B," *id*. ¶ 16.

---

[7/]      Furthermore, the D.C. Circuit has found that the application of third party standing is appropriate where the "government has directly interfered with the litigant's ability to engage in conduct together with the third party, for example, by putting the litigant under a legal disability with criminal penalties." *American Immigration Lawyers Ass'n*, 199 F.3d at 1360 (quoting *Haitian Refugee Center v. Gracey*, 809 F.2d 794, 808 (D.C. Cir. 1987)). Where, however, plaintiff organizations faced no legal sanction from the government's action, and the harm claimed was an "indirect effect" of that action, there was no standing. *Id*. at 1361. Otherwise, "allowing standing for unintended side effects of programs would involve the court in the continual supervision of more governmental activities than separation of powers concerns should permit." *Id*. (quoting *Haitian Refugee Center*, 809 F.2d at 809-10). Here, the government did not directly interfere with the doctor/patient relationship by placing any legal sanction on that relationship; it merely permitted the option of foregoing a doctor's appointment before making a drug purchase. Thus, plaintiffs are unable to satisfy the *Haitian Refugee Center* test for third party standing.

The speculative nature of these allegations fail to "clearly demonstrate" an "injury in fact" that is "concrete in both a qualitative and temporal sense," and "distinct and palpable." *Whitmore v. Arkansas*, 495 U.S. 149, 155 (1990). There is no allegation that any pharmacist member has in fact experienced "expanded legal liability" from FDA's SNDA approval, only that they allegedly "face" such a possibility. "Allegations of possible future injury do not satisfy the requirements of [Article] III. A threatened injury must be 'certainly impending' to constitute injury in fact." *Whitmore*, 495 U.S. at 158 (quoting *Babbitt v. Farm Workers*, 442 U.S. 289, 298 (1979)). If the injury has not already occurred, plaintiffs must demonstrate a "credible threat" of imminent future injury, *see, e.g., Presbyterian Church (USA) v. United States*, 870 F.2d 518, 528-29 (9th Cir. 1989), and that threat must be real and immediate. *See Golden v. Zwickler*, 394 U.S. 103, 109 (1969). Similarly, plaintiffs have failed to specify the added expense, administrative burdens, and compelled speech that have been the direct result of FDA's SNDA approval. Admittedly, pharmacists will have to request proof of age in order to sell Plan B OTC, but this requirement is a *de minimis* burden at most. In the absence of the OTC approval, pharmacists would be processing prescriptions for every Plan B purchase, so that requesting proof of age simply replaces one administrative task for another. Accordingly, plaintiffs' allegations do not constitute "distinct and palpable" injuries that are "concrete in both a qualitative and temporal sense." *Whitmore v. Arkansas*, 495 U.S. 149, 155 (1990).

These allegations also fail to demonstrate that the conduct of defendants, and not the conduct of a third party or plaintiffs themselves, is responsible for the alleged injury. *See Lujan*, 504 U.S. at 560; *Simon*, 426 U.S. at 41-42; *Public Citizen, Inc.*, 2007 U.S. App. LEXIS 14016, at ** 25-26 (tire manufactures lacked standing to challenge safety regulation regarding tire pressure monitoring

in cars; allegation that agency's under-regulation of automakers will lead to increased liability of tire manufacturers too attenuated to establish causation for standing purposes). To be sure, there are aspects of the FDCA that apply to pharmacists and pharmacies, such as the prohibition on dispensing a prescription drug without a valid prescription. But states and pharmacy boards have primary responsibility for regulating most aspects of the practice of pharmacy. The FDCA does not require pharmacies to sell particular drug products simply because FDA has approved those products for sale with or without a prescription, and FDA does not compel any speech by pharmacists in connection with the sale of OTC drugs; absent some directive from state law, any pharmacist is at liberty to decide what products to offer for sale. Thus, any pharmacist who is concerned about any legal liability or compelled speech associated with the OTC sale of Plan B could simply choose not to sell it, and such a decision would not violate the FDCA.

Furthermore, FDA did not dictate the terms of sale of Plan B; the marketing plan to limit distribution of Plan B to retail pharmacies in a "behind the counter" setting was proposed by Barr. WCC advised FDA as early as November 2001 that "in most pharmacies, the OTC version of Plan B may eventually be kept behind-the-counter in part out of respect for community values and in part to avoid losses through shoplifting." Def. Ex. 2 at 1. Barr first submitted a dual-marketing proposal on March 11, 2004; under this proposal, both Rx and non-Rx Plan B would be marketed in the same package and would be distributed from behind pharmacy counters with proof of age required prior to dispensing the drug without a prescription. Def. Ex. 4. In subsequent filings, Barr elaborated on its marketing plans in its Convenient Access Responsible Education ("CARE") Program, which was designed to limit the availability of Plan B to pharmacies and clinics, to educate healthcare professionals and consumers regarding the responsible use of Plan B, and to monitor sales of Plan

B to ensure that it is being sold and used in a medically appropriate manner.  *See* Def. Ex. 9 at 4-7; *see also* Def. Ex. 10 at 36-46.  In other words, it was *Barr* that developed the CARE proposal, and it is *Barr* that is implementing it.

Because nothing in the FDCA prohibits a sponsor from voluntarily limiting distribution of a product it manufactures to certain types of retail outlets, with or without notice to FDA, FDA was entitled to accept that proposal as long as it was reasonable and lawful, which it is.  And nothing in the FDCA prevents a manufacturer from instructing retail outlets to stock a product behind the counter.  Accordingly, because FDA does not regulate most aspects of the practice of pharmacy, and because Barr developed and implemented its marketing plan, the "links in the chain of causation between the challenged Government conduct and the asserted injury are far too weak" to establish standing.  *Public Citizen, Inc.*, 2007 U.S. App. LEXIS 14016, 25-26 (quoting *Allen*, 468 U.S. at 759).  *See also Simon*, 426 U.S. at 41-42; *Nat'l Wrestling Coaches Ass'n v. Dep't of Educ.*, 366 F.3d 930, 938-40 (D.C. Cir. 2004), *cert. denied*, 545 U.S. 1104 (2005).

Finally, the alleged injury to pharmacists, and their purported interest in preventing an OTC switch approval, is not within the zone of interests of the FDCA.  The factors that FDA considers in approving an OTC switch do not include the alleged economic and administrative burdens placed on pharmacists in selling a particular drug.  As with the physicians' allegations, the interests that pharmacists purportedly have in preventing an OTC drug approval are antithetical to the public health purposes of the FDCA, and therefore so "inconsistent with the purposes implicit in the statute that it cannot reasonably be assumed that Congress intended to permit the suit."  *Cement Kiln Recycling Coalition*, 255 F.3d at 871.

-24-

Accordingly, the pharmacist members of plaintiff organizations lack standing to pursue this lawsuit.

## II.    THIS COURT LACKS SUBJECT MATTER JURISDICTION TO REVIEW FDA'S APPROVAL OF BARR'S AMENDED SNDA.

Plaintiffs allege federal question jurisdiction under 28 U.S.C. § 1331 and jurisdiction under the Mandamus Act, 28 U.S.C. § 1361.  Neither of these provisions alone, however, is sufficient to establish jurisdiction.  Section 1331 requires that the case "aris[e] under" federal law.  28 U.S.C. § 1331.  "A case 'aris[es] under' federal law within the meaning of § 1331 . . . if 'a well-pleaded complaint establishes either that federal law creates the cause of action or that the plaintiff's right to relief necessarily depends on resolution of a substantial question of federal law.'"  *Empire HealthChoice Assur., Inc. v. McVeigh*, 126 S. Ct. 2121, 2131 (2006) (quoting *Franchise Tax Bd. of Cal. v. Construction Laborers Vacation Trust for Southern Cal.,* 463 U.S. 1, 27-28 (1983)).  "The vast majority of cases brought under the general federal-question jurisdiction of the federal courts are those in which federal law creates the cause of action."  *Merrell Dow Pharmaceuticals, Inc. v. Thompson*, 478 U.S. 804, 808 (1986).[8/]  Thus, plaintiffs' "well-pleaded" complaint must establish a cause of action under federal law.  *See, e.g., Holmes Group, Inc. v. Vornado Air Circulation Sys.*, 535 U.S. 826, 830 (2002).

Similarly, section 1361 requires plaintiff to establish that the federal agency has "a duty owed to the plaintiff."  28 U.S.C. § 1361.  Jurisdiction under section 1361 is "strictly confined" and

---

[8/]    Courts have recognized a limited exception, not applicable here, to the federal cause of action requirement "where the vindication of a right under state law necessarily turned on some construction of federal law."  *Merrell Dow Pharmaceuticals, Inc. v. Thompson*, 478 U.S. at 808 (quoting *Franchise Tax Bd.*, 463 U.S. at 28).

the legal support for the alleged duty owed to plaintiffs must be "clear," "compelling," and "indisputable." *In re Cheney*, 406 F.3d 723, 729, 731 (D.C. Cir. 2005).

Plaintiffs cannot establish a cause of action under federal law or an indisputable duty owed to them by the federal government. Plaintiffs allege that their case arises out of "ongoing [FDCA], APA and Due-Process violations." Compl. ¶ 8. It is doubtful that this vague allegation satisfies the well-pleaded rule that the complaint must establish the elements of federal question jurisdiction. *See Holmes Group, Inc.*, 535 U.S. at 830. Furthermore, plaintiffs have failed to allege a cause of action under federal law or a duty that FDA owes to plaintiffs. Because there is no cause of action that permits a member of the public to challenge an FDA decision on a drug application, these plaintiffs cannot obtain judicial review of FDA's decision-making process with regard to Barr's SNDA, and this Court lacks jurisdiction to review this challenge.

A.    **There is No Private Cause of Action under the FDCA for Members of the General Public to Challenge FDA Review of a Drug Application and this Court Lacks Jurisdiction to Review Such a Challenge.**

Plaintiffs, as individuals and organizations who are clearly unaffiliated with Barr, do not have a private right of action to challenge FDA's decision-making on Barr's application. The statutory provisions and regulations that govern the filing of an SNDA provide the drug sponsor, *to the exclusion of the general public,* with particularized rights and procedural remedies. Therefore, it is the sponsor, and not members of the public, who has a "right to judicial relief." *Warth*, 422 U.S. at 499.

Under the FDCA, the filing of drug applications is governed by 21 U.S.C. § 355, a lengthy provision setting forth the administrative procedures by which *sponsors* of drug products apply for approval from FDA to market new drugs:

- Subsection (b) specifies in detail all of the material which *the applicant* is required to submit with its application and authorizes several different types of meetings which may take place between FDA officials and the applicant at various stages of the process (but which are not open to public participation) in order to help identify additional studies which the applicant must conduct in support of its application and to resolve any outstanding issues involving that application.  21 U.S.C. § 355(b).

- Subsection (c) provides *the applicant* with an opportunity for hearing on the approvability of the application.  21 U.S.C. § 355(c)(1).

- Subsection (d) of section 355 sets forth the grounds for refusing a drug sponsor's drug application.  It provides that if FDA "finds, after due notice *to the applicant* in accordance with subsection (c) of this section and giving *him* an opportunity for a hearing, in accordance with said subsection," that any one of seven specified conditions applies, then FDA "shall issue an order refusing to approve the application."  21 U.S.C. § 355(d) (emphasis added).  On the other hand, if, "after such notice and opportunity for hearing," FDA finds that the seven conditions "do not apply, [it] shall issue an order approving the application."  *Id.*

- Subsection (h) of section 355 provides that "an appeal may be taken *by the applicant* from an order of [FDA] refusing or withdrawing approval of an application under this section.  Such appeal shall be taken by filing in the United States court of appeals for the circuit wherein *such applicant* resides or has his principal place of business, or in the United States Court of Appeals for the District of Columbia Circuit, within sixty days after the entry of such order, a written petition praying that the order of [FDA] be set aside."  21 U.S.C. § 355(h) (emphasis added).

These provisions demonstrate that section 355 does not provide a right to judicial relief to members of the general public.  *See, e.g., Cowan v. United States*, 5 F. Supp. 2d 1235, 1238 (D. Okla. 1998) ("numerous courts have held standing is conferred only upon those involved in the statutory application process"); *Duncan v. United States*, 590 F. Supp. 39, 42 (W.D. Okla. 1984)

("The Plaintiffs have not filed an NDA and do not have standing to seek review of a decision on the NDA of another").[9]

Indeed, the FDCA permits judicial review only of a final agency decision "refusing or withdrawing approval" of an SNDA. 21 U.S.C. § 355(h). There is no statutory basis for judicial review of an SNDA which, like Barr's amended SNDA, has been *approved*. *See Bradley,* 483 F.2d at 413 n.1. There is likewise no regulatory basis for a member of the general public to challenge a drug approval outside the citizen petition process. And there is certainly no statutory basis for a member of the public to challenge a manufacturer's distribution and marketing plans that formed part of the application approved by FDA. Now that FDA has issued a final decision approving Barr's amended application, not even Barr could challenge FDA's final decision on its SNDA.

No other provision of the FDCA provides a cause of action for the general public to challenge a drug approval. Accordingly, the FDCA does not provide a jurisdictional basis for this challenge.

### B.    **Plaintiffs Have Failed to Allege Any Other Legitimate Cause of Action or to Otherwise Establish Jurisdiction.**

In the absence of a private right of action under section 355, plaintiffs have no other legitimate basis to establish a cause of action to seek judicial review of FDA's actions on Barr's amended SNDA or a duty that FDA owes to plaintiffs in order for the Court to exercise jurisdiction

---

[9]    Nor can plaintiffs claim to be in the "zone of interests" meant to be protected by the administrative procedures set forth in section 355. Where a statute provides certain rights to an applicant, a third-party is not within the zone of interests. *Cf. Hitachi Metals, Ltd. v. Quigg,* 776 F. Supp. 3, 11 (D.D.C. 1991) ("Members of the public do not have such a right, and neither the regulation nor the Patent Statute confer this procedural right on third-party protestors . . . . Plaintiff's claims are not within the 'zone of interests' protected by 37 C.F.R. § 1.56 because plaintiff is not a patent applicant. Section 1.56 addresses itself to patent applicants, prescribing the manner in which reissue applications will be handled by the PTO and detailing the duty of disclosure imposed on reissue applicants."). The only entity that ever had standing or a cause of action to challenge the legality of FDA's actions on the SNDA was Barr. Barr did not, however, raise any challenge to FDA's action with regard to its SNDA, nor does it purport to do so now.

under 28 U.S.C §§ 1331 and 1361. First, plaintiffs have failed to allege a valid cause of action under the APA.[10/] The APA provides a cause of action for a "person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute." 5 U.S.C. § 702. As this Court recently found:

> The failure to establish Article III standing is separately fatal to plaintiffs' ability to state a claim for review under the APA, which has its own standing requirement. *See* 5 U.S.C. § 702. *See also Sierra Club v. Morton*, 405 U.S. 727, 739-40, 92 S. Ct. 1361, 31 L. Ed. 2d 636 (1972) ("[A] mere 'interest in a problem,' no matter how longstanding the interest and no matter how qualified the organization is in evaluating the problem, is not sufficient by itself to render the organization 'adversely affected' or 'aggrieved' within the meaning of the APA. The Sierra Club is a large and long-established organization, with a historic commitment to the cause of protecting our Nation's natural heritage from man's depredations. But if a 'special interest' in this subject were enough to entitle the Sierra Club to commence this litigation, there would appear to be no objective basis upon which to disallow a suit by any other bona fide 'special interest' organization, however small or short-lived. And if any group with a bona fide 'special interest' could initiate such litigation, it is difficult to perceive why any individual citizen with the same bona fide special interest would not also be entitled to do so.").

*Friends of the Earth v. United States DOI*, 478 F. Supp. 2d 11, 22 n.13 (D.D.C. 2007).

Here, defendants have already established above that plaintiffs have failed to demonstrate any legally cognizable injury, *see supra* at 13-24; they likewise cannot establish that agency action has caused them to "suffer[ a] legal wrong" within the meaning of section 702. In addition, plaintiffs cannot rely on their values or political perspective to establish a "legal wrong" because "disagreement with government action or policy, however strongly felt, does not, standing alone, constitute an 'injury' in the Constitutional sense which is cognizable in the federal courts and susceptible of remedy by the judicial branch; it is a matter properly addressed to the Congress or the

---

[10/]    It is well established that "the APA does not afford an implied grant of subject-matter jurisdiction permitting federal judicial review of agency action." *Trudeau v. FTC*, 456 F.3d 178,183 (D.C. Cir. 2006) (quoting *Califano v. Sanders*, 430 U.S. 99 (1977)).

Executive." *Evans v. Hills*, 537 F.2d 571, 598 (2d Cir. 1976), *cert. denied*, 429 U.S. 1066 (1977); *see also Sierra Club v. Morton*, 405 U.S. at 739-40.  Similarly, plaintiffs cannot rely on a generalized grievance regarding FDA's handling of Barr's Plan B SNDA to bring a claim in this court under the APA.  *See Valley Forge Christian College v. Americans United for Separation of Church and State, Inc.*, 454 U.S. 464, 473 (1982) (federal courts do not serve as "merely publicly funded forums for the ventilation of public grievances or the refinement of jurisprudential understanding."); *So. Utah Wilderness*, 542 U.S. at 66-67.  As with *Sierra Club*, plaintiffs' "special interest" in the subject matter cannot establish standing or a cause of action under the APA.

Nor can plaintiffs establish that they have been "adversely affected or aggrieved by agency action within the meaning of a relevant statute."  5 U.S.C. § 702.  "[T]o be 'adversely affected or aggrieved . . . within the meaning' of a statute, the plaintiff must establish that the injury he complains of (his aggrievement, or the adverse effect upon him) falls within the 'zone of interests' sought to be protected by the statutory provision whose violation forms the legal basis for his complaint."  *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 883 (1990).  Here, as again demonstrated above, plaintiffs cannot claim to be adversely affected or aggrieved within the meaning of the FDCA, because the FDCA does not provide any right to members of the general public to participate in or challenge the approval of a drug application, and because plaintiffs have failed to demonstrate any cognizable injury from the approval of the OTC option for adults.  Accordingly, plaintiffs have failed to state a claim under the APA.

Second, plaintiffs' vague allegations of "Due-Process violations," without identifying any particular right or interest which has been impaired, do not establish a cause of action.  *See* Compl. ¶¶ 8, 23, 104, 109.  Only if plaintiff can identify a cognizable property or liberty interest need the

-30-

Court even address the question of "how much process is due." *Cleveland Bd. of Education v. Loudermill*, 470 U.S. 532, 541 (1985); *Brock v. Roadway Exp., Inc.*, 481 U.S. 252, 260 (1987) ("Respondents' federal constitutional claim depends on their having had a property right. . ."). Plaintiffs do not have any cognizable right to have the approval status of Plan B changed, or to require the agency to conduct rulemaking in connection with its review of a drug application. *Cf. Board of Regents v. Roth*, 408 U.S. 564, 577 (1978) ("[t]o have a property interest in a benefit, a person clearly must have more than an abstract need or desire for it.  He must have more than a unilateral expectation of it.  He must, instead, have a legitimate claim of entitlement to it."). Because plaintiffs have failed to identify any cognizable right that has been violated, the "Due-Process" allegation fails to comply with the well-pleaded complaint rule.

Accordingly, this Court lacks jurisdiction over plaintiffs' challenge and the complaint should be dismissed.

## III.    PLAINTIFFS HAVE FAILED TO STATE A CLAIM THAT FDA UNLAWFULLY APPROVED Rx AND OTC VERSIONS OF PLAN B AND UNLAWFULLY CREATED A THIRD CLASS OF DRUGS.

Because plaintiffs lack standing and have failed to establish that this Court has jurisdiction to review their claims, the Court need not reach the substance of plaintiffs' claims.  Were the Court to nevertheless reach them, Counts II and IV should be dismissed as a matter of law.  Plaintiffs allege in Court II that FDA exceeded its statutory authority when it approved Barr's proposal, in its amended SNDA, to have Plan B available without a prescription to consumers in one age group while retaining the prescription requirement for another age group.  They allege that the FDCA prohibits the simultaneous distribution of the same drug as both Rx and OTC, so that FDA's approval of Barr's SNDA violated the FDCA.  Compl. ¶¶ 83-84.  Similarly, or perhaps alternatively, plaintiffs

allege in Count IV that FDA unlawfully created a "third class of drugs," in addition to the Rx and OTC "classes of drugs."  Compl. ¶¶ 94-98.  Because FDA reasonably construed the FDCA consistent with the structure and purpose of the statute, plaintiffs' arguments regarding FDA's statutory authority are without merit, and Counts II and IV should be dismissed for failure to state a claim.

## A.    The Court Should Defer to FDA's Reasonable Construction of the Statute.

Where, as here, the Court is reviewing an agency's construction of statutory provisions, the two-step analysis of *Chevron U.S.A., Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837 (1984), governs.  First, the Court must inquire "whether Congress has directly spoken to the precise question at issue;" if Congress's intent is clear, the Court "must give effect to [such] unambiguously expressed intent."  *Id*. at 842-43.  Second, if Congress has not "directly" addressed "the precise question at issue," the Court may not "impose its own construction on the statute."  *Chevron*, 467 U.S. at 843.  Rather, it must determine if the agency's interpretation is based on "a permissible construction of the statute."  *Id*.

*Chevron* deference applies where, as here, "Congress delegated authority to the agency generally to make rules carrying the force of law."  *Gonzales v. Oregon*, 126 S. Ct. 904 (2006) (quoting *United States v. Mead Corp.*, 533 U.S. 218, 226-27 (2001)).  "Delegation of such authority may be shown in a variety of ways."  *Mead Corp.*, 533 U.S. at 227.  With the FDCA, Congress has authorized and directed FDA to decide what drugs may lawfully enter the marketplace, and when and how they may enter.  *See, e.g.*, 21 U.S.C. §§ 353, 355, 355c.  Further, the Supreme Court has explained that *Chevron* deference is appropriate when "the interstitial nature of the legal question, the related expertise of the Agency, the importance of the question to administration of the statute,

the complexity of that administration, and the careful consideration the Agency has given the question over a long period of time all indicate that Chevron provides the appropriate legal lens through which to view the legality of the Agency interpretation here at issue." *Barnhart v. Walton*, 535 U.S. 212, 222 (2002). Thus, deference is appropriate in the drug approval context because of "the complexity of the statutory regime" and "FDA's expertise." *Mylan v. Thompson*, 389 F.3d 1272, 1280 (D.C. Cir. 2004).

Accordingly, the D.C. Circuit has repeatedly given *Chevron* deference to FDA's interpretation of the FDCA, as well as the agency's own implementing regulations. *See, e.g., Novartis Pharmaceuticals Corp. v. Leavitt*, 435 F.3d 344, 349 (D.C. Cir. 2006) ("We have held on a number of occasions that FDA interpretations of the FDCA receive deference, as do its interpretations of its own regulations unless plainly erroneous or inconsistent with the regulations."); *Mylan v. Thompson*, 389 F.3d at 1281; *Purepac Pharm. Co. v. Thompson*, 354 F.3d 877, 883 (D.C. Cir. 2004); *Serono Labs., Inc. v. Shalala*, 158 F.3d 1313, 1319, 1320 (D.C. Cir. 1998) (citing *Auer v. Robbins*, 519 U.S. 452, 461 (1997)).[11] Furthermore, *Chevron* deference extends to administrative determinations that are not embodied in rulemaking or formal adjudication, including, as in this case, the documents supporting a drug application approval decision. *See Apotex, Inc. v. FDA*, No. 06-5060, 2007 U.S. App. LEXIS 4270 (D.C. Cir. Feb. 23, 2007) ("the district judge's opinion, which grants Chevron deference to the FDA's statutory interpretation of 21 U.S.C. § 355(j)(5)(B)(iv) embodied in FDA approval letters (i.e., informal adjudications), is supported by the Supreme Court's

---

[11]      *See also Apotex, Inc. v. Thompson*, 347 F.3d 1335, 1352 (Fed. Cir. 2003) ("Deference is due to an administrative agency's regulations particularly when the subject matter of the regulatory authority is a 'highly detailed' regulatory program to which the agency has brought its 'specialized expertise,' . . . a characterization that aptly describes the FDA's role.") (quoting *Mead*, 533 U.S. at 235, 121 S. Ct. at 2175).

post-*Mead* decision in *Barnhart v. Walton*, 535 U.S. 212, 222 (2002), as well as our own decision in *Mylan Laboratories, Inc. v. Thompson*, 389 F.3d 1272, 1279-80 (D.C. Cir. 2004)").

### B.   FDA's Reasonably Found Dual-Marketing Permissible under the FDCA.

FDA has reasonably construed the FDCA to permit approval of both an Rx-only version and a non-Rx version of a product with the same active ingredient when there is a material distinction between the two versions of the drugs. The FDCA does not explicitly address simultaneous approval of Rx-only and non-Rx versions of the same product. The relevant provision of the statute provides that a drug product will be approved for prescription only dispensing when, "because of its toxicity or other potentiality for harmful effect, or the method of its use, or the collateral measures necessary to its use, [it] is not safe for use except under the supervision" of a licensed health care professional. 21 U.S.C. § 353(b)(1). FDA has construed that provision to mean that there can be simultaneous marketing of Rx-only and non-Rx versions of the same drug so long as one version requires the supervision of a licensed health care professional and the other version does not. Thus, as long as there is a distinction between the two versions – *e.g.* intended use, strength, route of administration, dosage form, or patient population – that requires professional supervision for one version of the drug, but does not require such supervision for the other version, the simultaneous existence of Rx and non-Rx versions of the drug product is permissible.

For example, FDA has approved Rx and non-Rx versions of the following active ingredients or drug products: loperamide (Rx for chronic diarrhea/non-Rx for acute diarrhea); ibuprofen (Rx at a higher dose for the relief of the signs and symptoms of rheumatoid arthritis and osteoarthritis; non-Rx at a lower does for temporary relief of minor aches and pain and temporary reduction of fever); H2

-34-

blockers (R̵ at a higher dose for peptic ulcer disease; non-R̵ at a lower dose for heartburn); nicotine products (R̵ when administered through inhalers and nasal sprays; non-R̵ when administered through gums, lozenges, and patches); orlistat (R̵ at 120 mg three times a day for obesity; non-R̵ at 60 mg three times a day for weight loss); omeprazole (R̵ for erosive esophagitis, active benign gastric ulcer, and for the treatment of heartburn and other symptoms associated with GERD; non-R̵ for frequent heartburn); terbinafine (R̵ for tinea veriscolor; non-R̵ for athlete's foot, ring worm, jock itch). *See* http://www.accessdata.fda.gov/scripts/cder/drugsatfda/index.cfm.

Here, FDA approved Barr's request for both an R̵ version and a non-R̵ version of Plan B after Dr. Galson found that adult women could safely use Plan B without a prescription, while the R̵ restrictions should remain for safe use of the drug by minor women. This distinction in FDA's conclusions on the data on safety justifies classifying Plan B for adults as non-R̵, while classifying Plan B for persons under 18 years of age as R̵-only. FDA's approval of the two versions is consistent with the language of 21 U.S.C. § 353(b)(1), which distinguishes between R̵ and non-R̵ use based primarily on a determination of safe use under professional supervision.

Contrary to plaintiffs' suggestion, Compl. ¶ 33, the FDCA does not prohibit the marketing of the R̵ version and the non-R̵ version of Plan B in the same box. The FDCA prohibits the dispensing of a prescription drug without the "R̵ only" legend on its label. 21 U.S.C. § 353(b)(4)(A). It further prohibits a product that is sold only as an OTC product from falsely containing the "R̵ only" legend on its label. 21 U.S.C. § 353(b)(4)(B). FDA's SNDA approval decision requires Plan B to bear labeling that "R̵ only for age 17 and younger." Compl. ¶ 61. Nothing in section 353(b)(4) prohibits a product that is being sold *both* as an R̵ and OTC product from bearing labeling that accurately reflects its approval status.

Indeed, by its literal terms, the prohibition on an OTC product having the "R only" legend on its label does not apply to Plan B. 21 U.S.C. § 353(b)(4)(B). Subsection (B) of section 353(b)(4) states that it applies only to drug products that are not subject to paragraph (1) of section 353(b). Paragraph (1) of section 353(b) defines the prescription requirement. Because Plan B is a prescription drug in part, it is subject to paragraph (1). Accordingly, subsection (B) of 353(b)(4) does not apply to Plan B.

Moreover, FDA's Plan B approval decision is consistent with Congress' overall purpose in enacting the Durham Humphrey Amendments to the FDCA in 1951:  "to deal more directly and realistically with the labeling and dispensing of drugs."  S. Rep. No. 82-946, at 1 (1951).  Prior to the enactment of these amendments, manufacturers made the determination regarding whether a prescription was necessary for the products they manufactured.  H.R. Rep. No. 82-700, at 3-6 (1951).  The lack of uniformity in the application of these standards led to confusion and the inadequate protection of the public health.  *Id*.  The purpose of the labeling requirements was to "eliminate confusion," "by requiring that drugs be so labeled [prescription or OTC] as to indicate to the retail druggist and to the general public into which of these two classes they fall."  *Id*. at 3.


Nothing in the legislative history indicates that Congress contemplated dual-status packaging in discussing the distinct labeling requirements for separate R and OTC products, or intended to bar a dual-marketing arrangement.  Rather, Congress intended to create a uniform standard that was clearly and accurately reflected in the labeling.  Because FDA's SNDA approval decision requires Plan B to bear labeling that accurately describes its approval status, "R only for age 17 and younger," Compl. ¶ 61, the decision is consistent with the overall purposes of the Durham-

-36-

Humphrey Amendments of providing clear notice of the drug approval status in the labeling of the product.

At the very least, FDA's approval of the dual marketing of Plan B, and the marketing of both versions of the product in a single box containing the labeling required for both versions, reflects a permissible construction of the FDCA. The agency found that Barr's proposal was in the interests of the public health and permissible under the FDCA. This Court should defer to that conclusion. *See e.g., Novartis Pharmaceuticals Corp.*, 435 F.3d at 349 ("FDA interpretations of the FDCA receive deference"); *Purepac Pharm. Co. v. Thompson*, 354 F.3d at 883 (same); *Mylan v. Thompson*, 389 F.3d at 1281 (FDA's construction of FDCA was "permissible . . . and therefore satisfies *Chevron*).

### C.    FDA Did Not Create a Third Class of Drugs.

Plaintiffs appear to be alleging in Count IV that FDA created a third class of drug by approving Barr's CARE program. *See* Compl. ¶¶ 94-97. Plaintiffs' contention is incorrect: FDA approved an R-only version of Plan B and a non-R version of Plan B; it did not approve a "third class" of drug. As explained above, FDA has reasonably construed the FDCA to permit approval of both an R-only version and a non-R version of a product with the same active ingredient when there is a material distinction between the two versions of the drugs.

To the extent plaintiffs are alleging that FDA lacks authority to approve marketing restrictions on drug products, they are incorrect. As noted above, *see supra* at 23-24, FDA did not mandate specific distribution channels for Plan B or direct the specific conditions under which it would be sold: it was *Barr* that developed the CARE proposal, and it is *Barr* that is implementing it. Nothing in the FDCA prohibits a sponsor from voluntarily limiting distribution of a product it

manufactures to certain types of retail outlets, or from directing other marketing conditions of the type contained in the CARE program, with or without notice to FDA.[12/]

Because FDA did not create a "third class" of drug as a matter of law, Count IV should be dismissed.

## IV. PLAINTIFFS HAVE FAILED TO STATE A CLAIM THAT FDA VIOLATED THE APA AND FDCA IN APPROVING BARR'S SNDA WITHOUT CONVENING RULEMAKING.

Plaintiffs allege that FDA was prohibited, on two grounds, from approving Barr's SNDA without convening rulemaking. First, plaintiffs assert in Count V that, in approving the SNDA, FDA amended a "rule" regarding the criteria for an OTC switch. As such, the APA requires FDA to conduct a rulemaking. Compl. ¶¶ 63, 100-101. Second, plaintiffs assert in Count VI that, under the FDCA, FDA may approve an OTC switch only through rulemaking. Compl. ¶¶ 103-104. Neither contention is correct as a matter of law, and Counts V and VI should be dismissed.

### A. FDA's Decision-Making Did Not Require Notice and Comment Rulemaking under the APA

---

[12/]    FDA regulations provide "If FDA concludes that a drug product shown to be effective can be safely used only if distribution or use is restricted, FDA will require such postmarketing restrictions as are needed to assure safe use of the drug product." 21 C.F.R. § 314.520(a). Although not explicitly relied on here, there are several other FDA-approved drugs that are distributed under restricted marketing plans that address a variety of safety concerns. For example, Accutane (isotretinoin), which is indicated for the treatment of severe acne, but may cause birth defects if ingested while pregnant, is marketed under a risk management program in which wholesalers, pharmacies, doctors, and patients must be registered in a computer-based system to participate in the distribution, prescribing, and dispensing of the drug, and a female patient must have a negative pregnancy test confirmed in that system before she can obtain the drug. See http://www.fda.gov/cder/drug/infopage/accutane/ accutane. Trovan (trovafloxacin/alatrofloxacin), an antibiotic used to treat many different types of infections, can cause serious liver disease. Distribution is restricted to pharmacies in inpatient health care facilities (i.e., hospitals and long-term nursing care facilities). See http://www.fda.gov/cder/news/trovan/default.htm. Xyrem (sodium oxybate or gamma hydroxybutyrate, also known as GHB) is approved for the treatment of narcolepsy and cataplexy, but it had serious side effects and had been abused as a recreational drug. Its marketing is subject to comprehensive risk management program that includes limited distribution through a single centralized pharmacy, physician education, patient education, the creation of a patient and physician registry, and detailed patient surveillance. See http://www.fda.gov/bbs/topics/ANSWERS/ 2002/ANS01157.html. These examples demonstrate that FDA has exercised its authority in regulating the safety of drugs to approve marketing plans that are far more restrictive than the one proposed by Barr here.

Plaintiffs allege that FDA amended a "rule" in allowing the age of the patient population to be the distinguishing feature between the Rx and OTC versions of the same product. Compl. ¶ 100. Plaintiffs acknowledge that FDA has previously approved the simultaneous marketing of Rx and OTC versions of drug products with the same active ingredient. Compl. ¶ 36. Plaintiffs allege that the previous approvals were based on five "parameters:" active ingredient, indication, strength, route of administration, and dosage form. *Id*. Plaintiffs maintain that, before FDA added patient population to the list of parameters, it was required to engage in rulemaking. Compl. ¶¶ 36, 100-101.

Plaintiffs are incorrect. Plaintiffs have failed to identify any document or documents issued by the agency that purportedly constitute either the original rule being amended or the amendment itself. As noted above, the agency, in approving Barr's amended SNDA, was not engaged in rulemaking, but rather was evaluating a drug application, which the D.C. Circuit has found to be an informal adjudicatory proceeding. *See Apotex, Inc.*, No. 06-5060, 2007 U.S. App. LEXIS 4270; *Am. Bioscience, Inc.*, 243 F.3d at 582. Thus, the resulting approval decision constitutes an order, not a rule. *See General Motors Corp. v. Ruckleshaus*, 742 F.2d 1561, 1565 (D.C. Cir. 1984) (en banc) (agency's characterization of its action is relevant to determining nature of action), *cert. denied*, 471 U.S. 1074 (1985)*; see also Cent. Tex. Tel. Coop. v. FCC*, 402 F.3d 205, 210 (D.C. Cir. 2005) ("It is fair to ask why both sides assume that we are even dealing with the making of a rule, whether of the legislative or interpretive variety. Agencies often have a choice of proceeding by

adjudication rather than rulemaking). Adjudicatory determinations may establish "broad principles" that are not considered "rules." *Id.* at 210.[13]

Here, FDA applied the FDCA, in particular 21 U.S.C. §§ 353(b) & 355, to the facts and data presented in the SNDA, and made an adjudicatory determination. Accordingly, there was no requirement that FDA conduct notice-and-comment proceedings.

**B.    The FDCA Does Not Mandate Rulemaking to Approve a Drug Application Seeking an OTC Switch.**

The FDCA authorizes two administrative mechanisms for FDA to switch an ℞-only drug to non-℞ status. First, FDA may promulgate a regulation changing the status of a drug product from ℞-only to non-℞. See 21 U.S.C. § 353(b)(3) ("The Secretary may by regulation remove drugs from the requirements of [℞-only restrictions] when such requirements are not necessary for the protection of the public health."). Under this rulemaking mechanism, the Commissioner may *sua sponte* initiate a proceeding to switch a drug product from ℞-only to non-℞ status. 21 C.F.R. § 310.200(b); *see also* 21 U.S.C. § 353(b)(3). A request to initiate rulemaking may also be made by any "interested person" by filing a citizen petition. 21 C.F.R. § 310.200(b).

Second, the FDCA provides FDA with the authority to approve and reject drug applications, 21 U.S.C. § 355(c),(d), which authority FDA has reasonably construed to apply to supplements to approved drug applications. 21 C.F.R. § 314.71(c). Furthermore, FDA regulations explicitly provide that an OTC switch may be accomplished through a drug's sponsor's submission of a supplement to its NDA (*i.e.*, an SNDA), requesting the ℞-only to non-℞ switch. 21 C.F.R. § 310.200(b).

---

[13]    It should also be noted that not all rules require notice and comment rulemaking under the APA. *See* 5 U.S.C. § 553(b)(3)(A). Agency rules that "clarify or explain existing laws or regulations" do not require rulemaking. *National Medical Enterprises, Inc. v. Shalala*, 43 F.3d 691, 697 (D.C. Cir. 1995).

Plaintiffs ignore this latter option and instead appear to allege that section 353(b)(3), which provides that "[t]he Secretary may by regulation" remove the $R$-only designation for an approved drug "when such [prescription] requirements are not necessary for the protection of the public health," is the exclusive authority for making an OTC switch.  However, nothing in the literal language of the statute requires this result.  Section 353(b)(3) does not provide that it is the "only" mechanism for an OTC switch, and it does not in any way preclude the normal operation of drug approvals under section 355.  Thus, it is reasonable and permissible for FDA to approve $R$-OTC switches through the approval of supplemental drug applications.

## V.    PLAINTIFFS HAVE IMPROPERLY NAMED COMMISSIONER VON ESCHENBACH IN HIS PERSONAL CAPACITY

Plaintiffs have no basis for naming Commissioner von Eschenbach in his personal capacity. All of the substantive claims at issue in this case, and all of the relief sought, relate to official actions by FDA.  *See Feit v. Ward*, 886 F.2d 848, 858 (7th Cir. 1989) (claims brought against defendants in individual capacities to challenge actions taken in official capacities were properly dismissed). Defendant Commissioner von Eschenbach plainly lacks the authority to grant or deny a drug application in his individual capacity.   Nor can plaintiffs obtain the requested declaratory or injunctive relief against the Commissioner in his personal capacity.  *See Feit*, 886 F.2d at 858 (individual capacity claims properly dismissed where "the equitable relief [plaintiff] requests -- a declaration that the policy is unconstitutional and an injunction barring the defendants from implementing the policy in the future -- can be obtained only from the defendants in their official capacities, not as private individuals"); *In re Iraq & Afg. Detainees Litig.*, 479 F. Supp. 2d 85, 93-94 (D.D.C. 2007).

-41-

Nor have plaintiffs asserted a constitutional tort, which can establish a basis for naming a government official in his or her personal capacity under *Bivens v. Six Unknown Federal Agents*, 403 U.S. 388 (1971).[14/]  Plaintiffs have affirmatively disavowed any intention to seek monetary damages as a form of relief in the Complaint.  Compl. ¶ 7 ("Defendant von Eschenbach is not sued in his individual capacity for monetary or punitive damages.").  And even if plaintiffs had alleged a claim for damages against Commissioner von Eschenbach in his personal capacity, he would be entitled to qualified immunity from such claims.  *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982) (government officials sued in personal capacity entitled to qualified immunity unless their conduct violates "clearly established statutory or constitutional rights of which a reasonable person would have known."); *see Anderson v. Creighton*, 483 U.S. 635, 640 (1987); *Barham v. Ramsey*, 434 F.3d 565, 572 (D.C. Cir. 2006).[15/]  Because, as noted above, plaintiffs have failed to identify a cognizable liberty or property interest or otherwise properly plead a constitutional violation, plaintiffs cannot even begin to meet the standard for overcoming qualified immunity.

---

[14/]     In *Bivens*, the Supreme Court recognized an action for money damages against a federal officer in his or her individual capacity who abuses his or her constitutional authority.  *See Corr. Servs. Corp. v. Malesko*, 534 U.S. 61, 66 (2001); *Thompson v. Pope*, 397 F. Supp. 2d 28, 32 (D.D.C.2005).  *Bivens* claims are asserted against individual government actors in their personal capacities and allow for the award of monetary damages for violations only of clearly-established constitutional rights.  *See Butz v. Economou*, 438 U.S. 478, 504 (1978).

[15/]     In deciding whether certain allegations are sufficient to defeat a qualified immunity defense, the Court applies a two-part analysis of (1) whether a constitutional right was violated on the facts alleged; and (2) assuming the violation is established, whether the right was clearly established.  *Saucier v. Katz*, 533 U.S. 194, 200 (2001).  "The contours of the right" must be sufficiently clear so that a reasonable official would understand that his conduct violated an individual's rights.  *Anderson*, 483 U.S. at 640; *Barham*, 434 F.3d at 572.  Where plaintiffs fail to demonstrate a clear violation of a constitutional or statutory right, or where the individual official was not on notice that his conduct was unlawful, the qualified immunity defense will be sustained.  *See Spagnola v. Mathis*, 809 F.2d 16, 30 (D.C. Cir. 1986); *Briscoe v. Potter*, 355 F. Supp. 2d 30, 47 (D.D.C. 2004).

Plaintiffs are apparently under the mistaken belief that the personal capacity claim is necessary to avoid a sovereign immunity defense.[16] The APA, 5 U.S.C. § 702, operates as a waiver of sovereign immunity for any suit seeking non-monetary relief against a United States agency or officer acting in an official capacity, including claims seeking mandamus for alleged *ultra vires* acts. *See Chamber of Commerce of the United States v. Reich*, 74 F.3d 1322, 1328 (D.C. Cir.1996); *see also Washington Legal Foundation v. U.S. Sentencing Comm'n*, 89 F.3d 897, 901 (D.C. Cir. 1996). The sovereign immunity waiver applies even if the cause of action is not brought under the APA. *Chamber of Commerce*, 74 F.3d at 1328. Although plaintiffs invoke the Court's equity jurisdiction to address what they describe as the Commissioner's *ultra vires* approval of the SNDA, *see* Compl. ¶¶ 19-20, resort to equity jurisdiction is unnecessary.[17] Assuming *arguendo* that plaintiffs had standing to bring, and the court had jurisdiction to review, the claims in this case, all the claims here should have been brought under the APA, and the proper defendant under the APA is the United States, the agency, or the head of the agency in his or her official capacity only. 5 U.S.C. § 703; *see Estes v. Federal Bureau of Prisons*, 273 F. Supp. 2d 1301, 1304 (S.D. Ala. 2003) (finding agency head in official capacity and agency were proper defendants under APA). Accordingly, the claims against the Commissioner in his personal capacity should be dismissed.

---

[16] Defendants note that plaintiffs rely upon a law review article that predates the passage of the APA. Compl. ¶ 20.

[17] Although the Court must accept as true the well-pleaded facts put forth by plaintiffs, the Court is not bound by their characterization of their claims. *See Twombly*, 127 S. Ct. at 1964-65; *Kowal v. MCI Communications Corp.*, 16 F.3d 1271, 1276 (D.C. Cir. 1994); *Kivanc v. Ramsey*, 407 F. Supp. 2d 270, 277 (D.D.C. 2006).

## CONCLUSION

Accordingly, for all the reasons provided above, this case should be dismissed.

Dated: June 29, 2007.

<div style="margin-left: 40%;">

Respectfully submitted,

_____
JEFFREY A. TAYLOR, D.C. BAR # 498610
United States Attorney

 /s/
_____
RUDOLPH CONTRERAS, D.C. BAR #434122
Assistant United States Attorney

 /s/
_____
JANE M. LYONS, D.C. Bar. # 451737
Assistant United States Attorney
555 Fourth St., N.W. - Room E4822
Washington, D.C.  20530
Phone: (202) 514-7161

</div>

OF COUNSEL:
DANIEL MERON
General Counsel

SHELDON T. BRADSHAW
Associate General Counsel, Food and Drug Division

ERIC M. BLUMBERG
Deputy Chief Counsel, Litigation

KAREN E. SCHIFTER
Associate Chief Counsel, Litigation
U.S. Dept. of Health & Human Services
Office of the General Counsel

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| ASSOCIATION OF AMERICAN PHYSICIANS AND SURGEONS, INC., *et al.*, )<br><br>Plaintiffs, )<br><br>v. )<br><br>FOOD & DRUG ADMINISTRATION, *et. al.*, )<br><br>Defendants. ) | Civil Action No. 07-668 (RCL) |

## NOTICE REGARDING BULKY EXHIBITS

The exhibits supporting Defendants' Motion to Dismiss are quite bulky and are being maintained in the Clerk's Office on a CD-Rom.  These documents are available for public viewing and copying in the Clerk's Office between the hours of 9:00 a.m. and 4:00 p.m. Monday through Friday.  A duplicate copy of the CD-Rom with the exhibits is being served on counsel for Plaintiffs on June 29, 2007 by first class United States mail.

Dated: June 29, 2007.


Respectfully submitted,


_____
JEFFREY A. TAYLOR, D.C. BAR # 498610
United States Attorney


_____
RUDOLPH CONTRERAS, D.C. BAR # 434122
Assistant United States Attorney


/s/_____

JANE M. LYONS, D.C. BAR # 451737
Assistant United States Attorney
Civil Division
555 4th Street, N.W. - Room E4822
Washington, D.C.  20530
(202) 514-7161