**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

_____
                                                          )
ASSOCIATION OF AMERICAN                )
PHYSICIANS & SURGEONS, INC.,            )
                                                          )
CONCERNED WOMEN FOR                      )
AMERICA,                                                 )
                                                          )
FAMILY RESEARCH COUNCIL,               )
                                                          )
               and                                        )          Civil Action No. 07:0668
                                                          )
SAFE DRUGS FOR WOMEN,                     )          ORAL ARGUMENT REQUESTED
                                                          )
               *Plaintiffs*,                             )
                                                          )
               *v.*                                        )
                                                          )
FOOD & DRUG ADMINISTRATION,        )
                                                          )
ANDREW C. VON ESCHENBACH,            )
        COMMISSIONER OF FOOD & DRUGS,  )
                                                          )
               and                                        )
                                                          )
UNITED STATES OF AMERICA,              )
                                                          )
               *Defendants*.                           )
                                                          )
-------------------------------------------------------------)
                                                          )
DURAMED PHARMACEUTICALS, INC.,    )
                                                          )
               *Defendant Intervenor*.               )
_____)

**MOTION BY DURAMED PHARMACEUTICALS, INC. TO INTERVENE**

Duramed Pharmaceuticals, Inc. ("Duramed") hereby moves to intervene as of right under

Fed. R. Civ. P. 24(a)(2), or, in the alternative, for permissive intervention under Fed. R. Civ. P.

24(b)(2).  Attached hereto as Exhibit A in support of this motion is the Declaration of Amy

Niemann.  Pursuant to Local Civil Rule 7(j), attached hereto as Exhibit B in support of this

motion is Duramed's Motion to Dismiss.

Pursuant to Local Civil Rule 7(m), counsel for Duramed conferred with counsel for each

party about Duramed's proposed intervention prior to filing this motion.  Defendants consent to

Duramed's motion to intervene; plaintiffs do not.

A Memorandum of Points and Authorities and Proposed Order are filed herewith.  Oral

argument is respectfully requested.

Respectfully submitted,


By:  /s/ Richard M. Cooper
     Richard M. Cooper (# 92817)
     Ana C. Reyes (# 477354)

     WILLIAMS & CONNOLLY LLP
     725 Twelfth Street, N.W.
     Washington, DC 20005
     (tel.) (202) 434-5466
     (fax)  (202) 434-5470
     rcooper@wc.com
     areyes@wc.com

     *Counsel for Defendant Intervenor*
     *Duramed Pharmaceuticals, Inc.*

Dated:  June 29, 2007.

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

_____

ASSOCIATION OF AMERICAN                )
PHYSICIANS & SURGEONS, INC., *et al.*, )
                                       )
            *Plaintiffs*,              )    Civil Action No. 07:0668
                                       )
            *v.*                       )
                                       )
FOOD & DRUG ADMINISTRATION, *et al.*,  )
                                       )
            *Defendants.*              )
------------------------------------------------)
                                       )
DURAMED PHARMACEUTICALS, INC.,         )
                                       )
            *Defendant Intervenor.*    )
_____)

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF
DURAMED PHARMACEUTICALS, INC'S MOTION TO INTERVENE**

Plaintiffs Association of American Physicians & Surgeons, Inc., *et al.* (together, "plaintiffs") ask this Court to overturn an approval by the defendants (together, "FDA" or "defendants") of a supplemental new drug application ("sNDA") submitted to FDA by movant Duramed Pharmaceuticals, Inc. ("Duramed").  By refusing to consent to Duramed's intervention, plaintiffs made this motion a contested one.  Among plaintiffs' many meritless claims is a claim that FDA denied plaintiffs a right to be heard with respect to Duramed's sNDA.  Plaintiffs evidently see no irony in their attempt to deny Duramed the right to be heard in defense against plaintiffs' attack on the approval Duramed received.

Duramed is the manufacturer of Plan B, an emergency contraceptive pill, and the sponsor of an sNDA that sought the right to have  Plan B dispensed over-the-counter ("OTC"), *i.e.*, without a prescription, for consumers age 18 and older and by prescription ("Rx") for women 17

and younger.  FDA approved the Plan B sNDA on August 24, 2006 – an approval that Duramed invested millions of dollars, and other resources, in obtaining.  Duramed has spent additional millions of dollars marketing Plan B with dual OTC/Rx labeling.

Plaintiffs seek vacation of FDA's approval of the sNDA, and an injunction that would prohibit dispensing of Plan B over-the-counter.  That extraordinary request imperils Duramed's multi-million dollar investment in the Plan B sNDA.  Duramed, therefore, moves to intervene as a defendant as of right pursuant to Federal Rule of Civil Procedure 24(a)(2), or, in the alternative, for permissive intervention pursuant to Rule 24(b).

Defendants consent to Duramed's motion to intervene; plaintiffs do not.[1]

## FACTUAL BACKGROUND

Plan B (levonorgestrel) is the only FDA-approved emergency contraceptive composed of progestin-only tablets.  *See* Declaration of Amy Niemann, an officer of Duramed (hereinafter, "Niemann Decl."), ¶ 6.  The initial new drug application ("NDA") for Plan B was approved in 1999.  *Id.* ¶ 16.  Plan B reduces the risk of pregnancy by up to 89% when taken within 72 hours after contraceptive failure or otherwise unprotected sexual intercourse.  *Id.* ¶ 7.  However, Plan B is more effective the sooner it is taken, especially within the first 24 hours after unprotected intercourse.  *Id.* ¶ 8.  Plan B is manufactured and marketed by Duramed, a subsidiary of Barr Pharmaceuticals, Inc. ("Barr Pharma").  *Id.* ¶¶ 5, 25.

On August 24, 2006, FDA approved an sNDA filed by Duramed for dispensing of Plan B OTC for consumers age 18 and older, while maintaining the prescription requirement for women

---

[1]     Pursuant to Local Civil Rule 7(m), counsel for Duramed conferred with counsel for each party about Duramed's proposed intervention prior to filing this motion.

17 and younger. Niemann Decl. ¶ 35.[2] Duramed introduced a dual OTC/Rx version of Plan B

on November 1, 2006, and currently markets it pursuant to the approved sNDA. *Id.*

¶¶ 36, 38.

Duramed has invested millions of dollars, and substantial resources, to obtain partial

OTC approval for Plan B. Niemann Decl. ¶ 11. Duramed made this investment for three

primary reasons. *Id.* First, Duramed was and is committed to enhancing the timely availability

of emergency contraception for those who choose to use it. *Id.* ¶ 12. Second, Duramed was and

is committed to advancing women's health. In fact, Duramed's work in making Plan B available

OTC to consumers age 18 and older has garnered it a well-earned reputation among pharmacists,

physicians, and health-care professionals as a company that is committed to women's health. *Id.*

¶ 13. Third, because drugs are more readily available to consumers OTC than by Rx, Duramed

expected to derive, and does derive, an economic benefit from the approval of its sNDA. *Id.* ¶

14.

The process leading to approval of Plan B began on February 25, 1997, when FDA

requested submission of NDAs for combined oral contraceptives for use as emergency

contraception. Niemann Decl. ¶ 15. In response, the Women's Capital Corporation ("WCC") –

now a wholly owned subsidiary of Duramed – submitted to FDA an NDA for approval of Plan B

as a prescription drug. *Id.* ¶ 16. FDA granted such approval on July 28, 1999. *Id.* On April 22,

2003, WCC submitted to FDA an sNDA to switch Plan B from Rx to OTC status for all women

---

[2]    A district court is to accept as true the non-conclusory allegations made in support of a
motion to intervene. *See Foster v. Gueory*, 655 F.2d 1319, 1324 (D.C. Cir. 1981) ("there is no
requirement that the district court make findings of fact and conclusions of law in ruling on a
motion to intervene" and "motions to intervene are usually evaluated on the basis of well pleaded
matters in the motion, the complaint, and any responses of opponents to intervention").

who would use the drug.  *Id.* ¶ 17.  By statute, FDA was required to act on WCC's application

within 180 days of its filing.  *See* 21 U.S.C. § 355(c) (2000 & Supp. IV 2006).

On December 16, 2003, FDA held a joint meeting of its Nonprescription Drugs Advisory

Committee and its Reproductive Health Drugs Advisory Committee to review the scientific and

medical evidence concerning Plan B and to make recommendations on how FDA should act on

the sNDA to switch Plan B from Rx to OTC status.  Niemann Decl. ¶ 18.  The members of the

two committees voted unanimously that Plan B is safe for use without a prescription, voted 23 to

4 in favor of the Rx to OTC switch, and voted 27 to 1 that the Actual Use Study data submitted

in the sNDA are generalizable to the overall population of potential users of OTC Plan B.

*Id.* ¶ 24.[3]

In February 2004, Duramed acquired the Plan B sNDA and the rights to Plan B as a result

of Barr Pharma's acquisition of 100% of the outstanding shares of WCC.  Niemann Decl. ¶ 25.

On May 6, 2004, notwithstanding the medical advisory committees' recommendations,

FDA issued a Not Approvable Letter as to Duramed's sNDA, on the asserted ground that there

was a lack of adequate data regarding safe use of Plan B OTC by younger adolescents.  Niemann

Decl. ¶ 26.  Although Duramed disputed FDA's analysis – Duramed maintained (and maintains)

that the record shows that Plan B is safe and effective OTC for all women who would use it – on

July 21, 2004, Duramed submitted an amended sNDA, which was filed on July 22, 2004, seeking

OTC status for Plan B when purchased by women age 16 and over and Rx status when

purchased by women under age 16.  *Id.* ¶ 27.  Duramed submitted proposed dual-status OTC/Rx

labeling in this amended sNDA.  *Id.*  The deadline for FDA to act on the Plan B amended sNDA

---

[3]      Emergency contraceptive pills are available without a prescription in over thirty countries
world-wide.  Niemann Decl. ¶ 10.

was January 20, 2005.  *Id.* ¶ 27.  FDA missed that statutory deadline for formal action on the amended sNDA.

On January 21, 2005, a group of plaintiffs filed an action relating to Plan B against FDA in the Eastern District of New York.  The current complaint in that action alleges that Plan B is safe and effective for OTC use by all women who would use it, alleges that FDA exceeded its authority in approving dual OTC/Rx distribution of Plan B, and seeks an injunction commanding FDA to make Plan B available as an OTC drug without age or other restrictions.  *See* Exhibit ("Ex") 1 hereto (Fifth Amended Complaint in *Tummino, et al. v. Von Eschenbach*, CV-O5-0366 (E.D.N.Y. 2005)).  FDA has denied the allegations in that complaint.  *See* Ex. 2 hereto (Answer to Fifth Amended Complaint in *Tummino*).[4]

The leading medical organizations in the United States supported (and continue to support) the efficacy and safety of Plan B as an over-the-counter product.[5]

By letter dated August 26, 2005, FDA informed Duramed that FDA's Center for Drug Evaluation and Research had completed its review of Duramed's amended sNDA, and had found that "the available scientific data are sufficient to support the safe use of Plan B as an OTC product" for women age 17 and older.  Niemann Decl. ¶ 28 & Ex. 2 thereto.  Despite this scientific finding, FDA, in the August 26, 2005 letter, again refused to take final action on Duramed's sNDA, and, indeed, delayed final action indefinitely.  *Id.* ¶ 29.  FDA stated that the sNDA presented the agency with the question whether and, if so, how to permit the distribution

---

[4]    The action remains pending.  Currently, the parties are briefing cross motions for summary judgment.  Duramed did not seek to intervene in that action.

[5]    These organizations include, *inter alia*, the American Medical Association, American Medical Women's Association, American College of Obstetricians and Gynecologists, American Academy of Pediatrics, American Public Health Association, and American Association of Family Physicians.  Each organization's statement is attached at Ex. 3.

of one and the same pharmaceutical product to different populations for OTC and Rx use, and indicated it would seek comments on whether to initiate rulemaking to resolve those issues. *Id.*

On September 1, 2005, FDA published in the *Federal Register* an Advance Notice of Proposed Rulemaking ("ANPRM") (Docket No. 2005N-0345), which sought public comment on whether to initiate rulemaking regarding dual OTC/Rx marketing. *See* 70 Fed. Reg. 52,050 (Sept. 1, 2005). The publication of that ANPRM invited the inference that, despite FDA's conclusion that OTC use of Plan B is safe for women age 17 and older, final action on Duramed's sNDA was years in the future. Although it strongly disagreed with FDA's refusal to approve the sNDA at that time, Duramed submitted timely comments in response to the ANPRM. Duramed's comments contended that the issues FDA raised were readily resolvable, that rulemaking was unnecessary, and that it was time to approve the sNDA. Niemann Decl. ¶ 31 (attaching as Exhibit 3 Duramed's comments filed in response to the ANPRM).

FDA's non-approvable decision in August of 2005 was seen by some as ignoring the scientific evidence and as politically motivated. *See* Ex. 1 (alleging in ¶¶ 138-161 unreasonable agency delay in acting on the sNDA, and that FDA's non-approval was politically motivated).

On July 31, 2006, FDA wrote to Duramed that it had reviewed the comments received in response to the ANPRM and determined that rulemaking would not be necessary to resolve the regulatory issues raised by the sNDA. Niemann Decl. ¶ 32.

On August 8, 2006, FDA and Duramed representatives met to address dual OTC/Rx distribution of Plan B. Niemann Decl. ¶ 33. Thereafter, Duramed amended its sNDA again on August 17, 18 and 23, 2006, to propose revisions to the drug's labeling and to an educational program for use in conjunction with OTC distribution of Plan B. *Id.* ¶ 34. Finally, on August 24, 2006, more than three years after the filing of the initial sNDA, FDA approved OTC access

to Plan B for consumers age 18 and older, and retained the prescription requirement for women 17 and younger. *Id.* ¶ 35. Further, due to the clinical studies conducted by Duramed to support the approval of OTC distribution, FDA, under 21 U.S.C. § 355(c)(3)(E)(iv) and (j)(5)(F)(iv), granted Duramed a three-year marketing exclusivity period for its Plan B OTC/Rx product, which is effective until August 24, 2009. *Id.* ¶ 37.

Duramed began marketing of the dual OTC/Rx Plan B product on November 1, 2006. Niemann Decl. ¶ 36. Currently, there is only one Plan B package, which contains labeling that makes clear that Plan B is to be dispensed Rx for use by women age 17 and younger and otherwise OTC. *Id.* ¶ 38. Vacation of the approval of the sNDA probably would require Duramed to recall all Plan B packages currently on the U.S. market because they would bear an incorrect prescription legend ("Rx only for women age 17 and younger."). Duramed would then have to repackage, relabel, and re-issue Plan B as solely an Rx drug. *Id.* ¶ 39. The cost of those actions is estimated to be in excess of ten million dollars. *Id.*

Duramed has invested millions of dollars in marketing Plan B with its dual status and educating healthcare professionals and consumers about Plan B. Niemann Decl. ¶ 45. Duramed has implemented and promoted the Convenient Access, Responsible Education ("CARE") program to provide healthcare professionals and consumers information regarding appropriate distribution and use of Plan B and monitoring for compliance with the prescription-age requirement. *Id.* ¶ 40.[6] As part of this program, Duramed's 226-person Women's Healthcare Sales Force has promoted OTC/Rx Plan B to professional audiences that include pharmacists,

---

[6]     As part of the CARE program, Duramed has been working, and continues to work, closely with retail pharmacies and drug wholesalers to ensure that they understand and follow FDA's prescription-age requirement for dispensing Plan B. Niemann Decl. ¶ 43. For example, Duramed has funded a continuing education course on emergency contraception which, to date, over 44,000 pharmacists throughout the U.S. have completed. Among other things, the course educates them on the revised prescription requirement for Plan B. *Id.*

physicians, and other healthcare providers. *Id.* ¶ 41. The program also includes a comprehensive educational program for healthcare professionals and consumers. In addition, Duramed has initiated a variety of continuing education programs for pharmacists and other healthcare practitioners, and a publication plan that includes journal advertising. *Id.* ¶¶ 42-44. To date, Duramed has invested more than fifteen million dollars in marketing Plan B for dual OTC/Rx dispensing, educating healthcare professionals and consumers about emergency contraception, and promoting the CARE program. *Id.* ¶ 45.

Sales of Plan B have increased since November 2006, when it became available OTC to consumers age 18 and older. Niemann Decl. ¶¶ 46-49. Sales of Plan B in 2007 are expected to be at least double what they were in 2006. *Id.*

## ARGUMENT

"The right of intervention conferred by Rule 24 implements the basic jurisprudential assumption that the interest of justice is best served when all parties with a real stake in a controversy are afforded an opportunity to be heard." *Hodgson v. United Mine Workers of Am.*, 473 F.2d 118, 130 (D.C. Cir. 1972). That is the case here.

The very subject matter of this civil action is Duramed's approval (the approval by FDA of Duramed's sNDA). Plaintiffs seek to deprive Duramed of that approval. With the sNDA approval, Duramed currently distributes Plan B for OTC dispensing (for consumers age 18 and older) and Rx dispensing (for women age 17 and younger). Without that approval, Duramed could lawfully distribute Plan B only for Rx dispensing (for all women who would use it). Duramed has invested millions of dollars in obtaining that approval, and over fifteen million dollars more in marketing dual OTC/Rx Plan B after obtaining it. No party – neither plaintiffs, nor FDA – has a greater interest than Duramed in this action.

8

The interest of justice, numerous decisions of the D.C. Circuit and this Court applying Rule 24, and common sense all compel the conclusion that Duramed should be granted full intervention.

## I.    DURAMED IS ENTITLED TO INTERVENE AS OF RIGHT.

Rule 24(a) provides:

> Upon timely application anyone shall be permitted to intervene in an action: . . . when the applicant claims an interest relating to the property or transaction which is the subject of the action and the applicant is so situated that the disposition of the action may as a practical matter impair or impede the applicant's ability to protect that interest, unless the applicant's interest is adequately represented by existing parties.

Fed. R. Civ. P. 24(a)(2).

The D.C. Circuit has held that, in deciding a motion for intervention as of right under this Rule, four factors are determinative:  (1) the timeliness of the motion; (2) whether the applicant "claims an interest relating to the property or transaction which is the subject of the action;" (3) whether "the applicant is so situated that the disposition of the action may as a practical matter impair or impede the applicant's ability to protect that interest;" and (4) whether the applicant's interest is not "adequately represented by existing parties."  *Fund for Animals, Inc. v. Norton*, 322 F.3d 728, 731 (D.C. Cir. 2003) (quotations omitted).[7]  The party seeking intervention must also have Article III standing.  *Id.* at 732.

Duramed easily fulfills each of these requirements.  This motion, filed within the time period for defendants' response to plaintiffs' Complaint, is timely.  Duramed has property and economic interests in Plan B and the approval of the sNDA, and disposition of this action could quite seriously impede its ability to protect those interests.  Duramed's interests are not protected

---

[7]    The allocation of the burden of proof on adequacy of representation is unclear.  *Fund for Animals*, 322 F.3d at 736 n.7.  The movant bears the burden of proof on the other factors.

by plaintiffs or defendants:  plaintiffs' interests are directly contrary to Duramed's; and, as the

D.C. Circuit and this Court have repeatedly held in cases discussed *infra*, governmental parties

are unable to protect a private party's interest because doing so would conflict with the

governmental parties' legal duty to protect the public's interest.  Finally, Duramed has Article III

standing to protect its interests in this litigation.

**A.    Duramed's Motion Is Timely.**

Whether "a motion to intervene is timely made is to be determined from all the

circumstances, including the purpose for which intervention is sought . . . and the improbability

of prejudice to those already in the case."  *Foster v. Gueory*, 655 F.2d 1319, 1324 (D.C. Cir.

1981) (internal quotations omitted).

Duramed's motion is timely.  Duramed moved to intervene within the time period the

defendants had to respond to plaintiffs' Complaint.  Moreover, plaintiffs have not moved for

preliminary injunction or other emergency relief.  Thus, the parties are not prejudiced by the

timing of the filing of this motion.

**B.    Duramed Has a Substantial Interest in the Plan B sNDA.**

Rule 24 requires that the intervenor claim "an interest relating to the property or

transaction which is the subject of the action."  Fed. R. Civ. P. 24(a)(2).  This requirement is

primarily a test for judicial economy and fairness in litigation, as it assists in "disposing of

lawsuits by involving as many apparently concerned persons as is compatible with efficiency and

due process."  *Nuesse v. Camp*, 385 F.2d 694, 700 (D.C. Cir. 1967).

This factor can also be readily dispatched.  The D.C. Circuit has held that "[a]n

intervenor's interest is <u>obvious</u> when he asserts a claim to property that is the subject matter of

the suit."  *Foster*, 655 F.2d at 1324 (emphasis added).  The D.C. Circuit has also held that a

party's economic interest in the outcome of the litigation is a direct, significant legally

protectable interest sufficient to satisfy Rule 24(a)(2). *See Smuck v. Hobson*, 408 F.2d 175, 178-79 (D.C. Cir. 1969) (economic interest in the outcome of litigation is sufficient, but not necessary, to show interest pursuant to Rule 24(a)).

Duramed's interest here is "obvious" because it has both a property interest and an economic interest in Plan B, the Plan B NDA and sNDA, and the approval put at issue by plaintiffs' Complaint. Niemann Decl. ¶¶ 5, 25. Duramed is the manufacturer of Plan B, the owner of the sNDA that is the subject matter of this lawsuit, and the recipient of the approval that plaintiffs seek to overturn. *Id*. Pursuant to FDA's approval of Duramed's sNDA, Duramed markets Plan B with dual OTC/Rx labeling, and derives an economic benefit from doing so. *Id.* ¶¶ 38, 39, 46-49. Duramed is currently the only drug manufacturer with the right to market an emergency contraceptive OTC, and has the exclusive right to do so through August 24, 2009. *Id.* ¶ 37. Duramed receives an economic benefit from this marketing exclusivity. *Id.* ¶ 51. If approval of Duramed's sNDA were overturned, the economic value of Duramed's property interest as owner of Plan B and of the Plan B NDA (to which the sNDA is a supplement) would be materially diminished. *Id.* ¶ 50.

Duramed indisputably has a substantial, legally cognizable, and financial interest in "the property or transaction which is the subject of the action."

### C.    Disposition of this Action in Favor of Plaintiffs Would Impair Duramed's Ability To Protect Its Interests in Plan B and the sNDA.

The third element of the test for intervention as of right follows the guidance of the Rule 24 advisory committee notes, which state: "[i]f an absentee would be substantially affected in a practical sense by the determination made in an action, he should, as a general rule, be entitled to intervene." Fed. R. Civ. P. 24 advisory committee's notes, 1996 Amend. A court looks to the

"'practical consequences' of denying intervention, even where the possibility of future challenge to the [action] remain[s] available." *Fund for Animals*, 322 F.3d at 735.[8]

The question whether litigation concerning an absent manufacturer's marketing rights has the potential to "impair" or "impede" its interest is not new. The D.C. Circuit has squarely held that a drug manufacturer that "was in danger of losing market share" due to a denial of a preliminary injunction satisfied the third factor under Rule 24(a)(2). *See Mova Pharm. Corp. v. Shalala*, 140 F.3d 1060, 1076 (D.C. Cir. 1998); *see also Fund for Animals*, 322 F.3d at 735 (citing *Mova* on this point favorably).

Plaintiffs' suit implicates Duramed's interests in Plan B, the NDA and sNDA, FDA's approval of the sNDA, and Duramed's marketing of Plan B because plaintiffs seek a return to the time when Plan B was available only Rx. Duramed would be prohibited from marketing Plan B for OTC and Rx dispensing, and would lose both the investment it has made to obtain the right to such marketing and the future revenues and profits it would earn from continuing such marketing. Niemann Decl. ¶¶ 46-51. Further, because Plan B is currently marketed in a single package with dual OTC/Rx labeling, Duramed would also probably be compelled to recall all Plan B units in the distribution chain throughout the United States as of the date of the Court's order granting relief, at a cost to Duramed of over ten million dollars. *Id.* ¶ 39. Thus, such an order would have an immediate and continuing substantial adverse economic impact on Duramed.

The waste of judicial resources, the expense, and the burden of forcing Duramed to seek to vindicate its rights in a separate lawsuit if plaintiffs were to prevail against FDA further weigh

---

[8]    Thus, even if, *arguendo*, Duramed "could reverse an unfavorable ruling by bringing a separate lawsuit," intervention should be granted where "the task of reestablishing the status quo if [plaintiffs] succeed" would be "difficult and burdensome." *Fund for Animals*, 322 F.3d at 735.

strongly in favor of granting this motion. So, too, does the possibility that this action might have a *stare decisis* effect in any future lawsuit Duramed would bring if it could not intervene now. *See, e.g.*, *Nuesse*, 385 F.2d at 702. Finally, extraordinary confusion would result among healthcare professionals and the public regarding whether Plan B was, or was not, available OTC if plaintiffs were to succeed and if Duramed, to protect its interest in the approval of its sNDA, were to bring a new lawsuit to try to change that outcome. Niemann Decl. ¶ 53.

### D.      Duramed's Interest Is Not Represented by Any of the Existing Parties.

The fourth factor for this Court to consider is whether "the applicant's interest is adequately represented by existing parties." Fed. R. Civ. P. 24(a)(2). An applicant's interest is not adequately represented if that interest "may be" inadequately represented by the existing parties. *Fund for Animals,* 322 F.3d at 735 (emphasis added) (*quoting Trbovich v. United Mine Workers of Am.*, 404 U.S. 528, 538 n.10 (1972)). The burden of this showing is "minimal," and "not onerous." *Id.* (emphases added) (quotations omitted); *see also Dimond v. District of Columbia*, 792 F.2d 179, 192 (D.C. Cir. 1986) (fourth Rule 24 factor is not onerous; and government may not adequately protect private party's interests); *Hodgson*, 473 F.2d at 130 (same).

Of course, plaintiffs do not adequately represent Duramed's interests because their asserted interests are directly contrary to Duramed's.

The question whether FDA adequately represents Duramed's interests is also not difficult. Under the minimal standard set by Rule 24, the D.C. Circuit has "often concluded that governmental entities do not adequately represent the interests of aspiring intervenors." *Fund for Animals*, 322 F.3d at 736. They do not do so because governmental entities, such as FDA, are "charged by law with representing the public interest." *Id.* at 737 (*quoting Dimond*, 792 F.2d at 192-93)). Private parties, such as Duramed, seek "to protect a more narrow and 'parochial'

financial interest not shared by the citizens [of the U.S.]." *Id.* Were FDA to advance Duramed's "narrower interest at the expense of its representation of the general public interest," it would be "shirking its duty." *Id.* In fact, "for governmental agency to protect both [the] public and private interests is [an] 'impossible' task." *Dimond*, 792 F.2d at 193 (emphasis added) (*quoting Nat'l. Farm Lines v. ICC*, 564 F.2d 381, 384 (10th Cir. 1977)). "The cases correctly hold that this kind of a conflict satisfies the minimal burden of showing inadequacy of representation." *Nat'l Farms Lines*, 564 F.2d at 384.[9]

The D.C. Circuit has been faced with this type of situation numerous times, and generally has ruled that the interests of private parties may not adequately be represented by governmental agencies. In *Natural Resources Defense Council v. Costle*, 561 F.2d 904 (D.C. Cir. 1977), the court permitted rubber and chemical companies to intervene in support of the EPA because their interest "is more narrow and focused than EPA's" and, "[g]iven the acknowledged impact that regulation can be expected to have upon their operations, appellants' participation in defense of EPA decisions that accord with their interest may also be likely to serve as a vigorous and helpful supplement to EPA's defense." 561 F.2d at 912-13 (emphasis added) (footnote omitted). In *Smuck*, the court held that a school board did not adequately represent the interests of intervening parents because the "board represents all parents," while the intervenors "may have more parochial interests centering upon the education of their own children." 408 F.2d at 181.

---

[9]    Under this standard, an applicant seeking to intervene need not show an actual conflict between it and the governmental agency that is already a party. The "potential conflict" that would be created if the agencies were to try to represent both the public interest and the intervenor's private interest (if intervention were denied) is sufficient to show that the agency does not represent the private party's interest for purposes of the intervention analysis. *Dimond*, 792 F.2d at 192-193.

Accordingly, this Court has routinely permitted drug manufacturers to intervene as defendants in actions filed against FDA.[10] *See, e.g.*, *Biovail Corp. v. FDA*, __ F. Supp. 2d __, No. 06-1487, 2007 WL 891365, *2 (D.D.C. March 22, 2007) (generic drug manufacturer and distribution company permitted to intervene in action challenging FDA's approval of generic drug); *Collagenex Pharm., Inc. v. Thompson*, No. Civ. A. 03-14-5, 2005 WL 256561 (D.D.C. Jan. 19, 2005) (pharmaceutical companies permitted to intervene in action potentially affecting their rights to market their products); *Teva Pharm., Indus. Ltd. v. FDA*, 355 F. Supp. 2d 111 (D.D.C. 2004) (same), *aff'd sub nom. Teva Pharm. Indus., Inc. v. Crawford*, 410 F.3d 51 (D.C. Cir. 2005); *Purepac Pharm. Co. v. Thompson*, 238 F. Supp. 2d 191 (D.D.C. 2002) (same), *aff'd sub nom.*, *Purepac Pharm. Co. v. TorPharm, Inc.*, 354 F.3d 877 (D.C. Cir. 2004); *Mylan Pharm., Inc. v. Shalala*, 81 F. Supp.2d 30, n.6 (D.D.C. 2000) (same); *Bristol-Myers Squibb Co. v. Shalala*, 923 F. Supp. 212, 213 (D.D.C. 1996) (same); *Berlex Labs., Inc. v. FDA*, 942 F. Supp. 19, 22 (D.D.C. 1996) (same); *see also Appleton v. FDA*, 310 F. Supp. 2d 194, 197 (D.D.C. 2004) (holding that manufacturers that submitted to FDA NDAs that allegedly contained trade secrets had right to intervene in action requesting records under FOIA).  This case is not different. Duramed will emphatically "serve as a vigorous and helpful supplement to FDA's defense" – probably why plaintiffs are so keen to prevent or limit Duramed's intervention.

Moreover, the history of FDA's treatment of the sNDA provides ample evidence of the potential for divergence between FDA's interests and Duramed's in this litigation.  FDA and Duramed seriously disagree about the safety and effectiveness of Plan B for OTC use by women 17 and younger.  Duramed's view is that Plan B is safe and effective for OTC use by all women who would use it, whereas FDA's view is that Plan B is safe and effective for OTC use only by

---

[10]    The decisions do not address the intervention analysis, but simply note that intervention was granted.

women age 18 and older.  Those differing views will obviously influence FDA's and Duramed's respective defenses to plaintiffs' claims.

If plaintiffs were to succeed on the argument that dual OTC/Rx labeling is impermissible, the question of a remedy would arise.  Duramed would argue that the remedy should be, not to make Plan B Rx only, but to make it OTC only.  To make that argument, Duramed would need to have full participation in defending against plaintiffs' claim that Plan B is not safe and effective for OTC use by any woman, because FDA's defense would be centered on its belief that Plan B is safe and effective for OTC use only by women age 18 and older.

This contrariety leads to a second difference between the defendants and Duramed.  Defendants have no commercial or financial interest in the marketing of Plan B, and therefore no such interest in the outcome of this case.  Duramed, however, has an independent commercial and financial interest in the marketing of Plan B and, therefore, in the outcome of this case.

Thus, even though there is partial congruence between FDA and Duramed in defending FDA's approval decision, there is also contrariety between them.  The D.C. Circuit has held:

> [P]artial congruence of interests . . . does not guarantee the adequacy of representation.  As we have recognized, "interests need not be wholly 'adverse' before there is a basis for concluding that existing representation of a 'different' interest may be inadequate." *Nuesse*, 385 F.2d at 703.  Moreover, even a "shared general agreement . . . does not necessarily ensure agreement in all particular respects." *Natural Res. Def. Council*, 561 F.2d at 912.

*Fund for Animals*, 322 F.3d at 737.

### E.    Duramed Has Standing To Defend the Approval of Its sNDA.

To establish standing under Article III, a prospective intervenor must show:  (1) injury-in-fact, (2) causation, and (3) redressability.  *See Fund for Animals*, 322 F.3d at 732-33 (citing *Lujan v. Defenders of Wildlife,* 504 U.S. 555, 560-61 (1992); *Sierra Club v. EPA*, 292 F.3d 895, 898 (D.C. Cir. 2002)).  This requirement applies to a party that seeks to intervene as a defendant

even though, in that circumstance, the requirement "runs into the doctrine that the standing inquiry is directed at those who invoke the court's jurisdiction." *Roeder v. Islamic Rep. of Iran*, 333 F.3d 228, 233 (D.C. Cir. 2003). The D.C. Circuit has stated that, in that circumstance, the matter "may be purely academic," because "any person who satisfies Rule 24(a) will also meet Article III's standing requirement." *Id.* Because Duramed satisfies Rule 24(a)(2), *see* pp. 8-16, *supra*, it also satisfies the standing requirement. *Id.*

Independent of the holding in *Roeder,* Duramed has standing. As to injury-in-fact, Duramed would suffer imminent injury if plaintiffs' request for relief from this Court were granted. As discussed *supra*, Duramed has devoted extensive time, money, and other resources to obtain the partial OTC approval for Plan B and to market Plan B for OTC and Rx dispensing. Niemann Decl. *passim*.

Causation and redressability are also plainly present. The relief requested by plaintiffs would deprive Duramed of the right to market Plan B for OTC dispensing to consumers age 18 and older. Injury to Duramed would be prevented if plaintiffs are denied relief.

## II.    IN THE ALTERNATIVE, DURAMED SHOULD BE PERMITTED TO INTERVENE PURSUANT TO RULE 24(b).

Rule 24(b) provides:

> Upon timely application anyone may be permitted to intervene in an action: . . . when an applicant's claim or defense and the main action have a question of law or fact in common. . . .  In exercising its discretion the court shall consider whether the intervention will unduly delay or prejudice the adjudication of the rights of the original parties.

Fed. R. Civ. P. 24(b)(2).

In the D.C. Circuit, "to litigate a claim on the merits under Rule 24(b)(2), the putative intervenor must ordinarily present:  (1) an independent ground for subject matter jurisdiction; (2)

a timely motion; and (3) a claim or defense that has a question of law or fact in common with the main action." *EEOC v. Nat'l. Children's Ctr., Inc.*, 146 F.3d 1042, 1046 (D.C. Cir. 1998).

Even if the Court rules that Duramed cannot intervene as of right, *but see supra* Part I, it should order permissive intervention under Rule 24(b). First, since plaintiffs are suing under a number of federal statutes, there is independent ground for subject matter jurisdiction against Duramed in the federal courts. Second, as discussed at pages 9-10, *supra*, this motion is timely. Third, Duramed seeks to intervene in order to defend against the entire Complaint, as shown by the motion to dismiss filed with the motion for intervention. Thus, Duramed's defenses and the main action will have in common questions of fact and questions of law. Finally, intervention by Duramed will not delay or prejudice the adjudication of the rights of the original parties.

**CONCLUSION**

For the reasons stated herein, this Court should allow Duramed to intervene as of right, and as a full participant, pursuant to Federal Rule of Civil Procedure 24(a)(2). In the alternative, this Court should exercise its discretion under Federal Rule of Civil Procedure 24(b)(2) to permit Duramed to intervene as a full participant.

Respectfully submitted,


By:  /s/ Richard M. Cooper
Richard M. Cooper (# 92817)
Ana C. Reyes (# 477354)

WILLIAMS & CONNOLLY LLP
725 Twelfth Street, N.W.
Washington, DC 20005
(tel.) (202) 434-5466
(fax)  (202) 434-5470
rcooper@wc.com
areyes@wc.com

*Counsel for Defendant Intervenor*
*Duramed Pharmaceuticals, Inc.*

Dated:  June 29, 2007.

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NEW YORK

-----------------------------------------------------------------------X

ANNIE TUMMINO, in her individual capacity, as Vice-Chair
of the Women's Liberation Birth Control Project, as
Coordinator of the Morning-After Pill Conspiracy, and on
behalf of women who need Emergency Contraception;
ERIN T. MAHONEY, in her individual capacity, as Chair of
the Women's Liberation Birth Control Project, as
Coordinator of the Morning-After Pill Conspiracy, and on
behalf of women who need Emergency Contraception;
CAROL GIARDINA, in her individual capacity, as
Coordinator of the Morning-After Pill Conspiracy, and on
behalf of women who need Emergency Contraception;
KELLY MANGAN, in her individual capacity, as President of
the University of Florida Campus Chapter of the National
Organization for Women, as Coordinator of the Morning-
After Pill Conspiracy, and on behalf of women who need
Emergency Contraception; STEPHANIE SEGUIN, in her
individual capacity, as Chair of the Florida National
Organization for Women Young Feminist Task Force, as
Coordinator of the Morning-After Pill Conspiracy, and on
behalf of women who need Emergency Contraception;
LORI TINNEY, in her individual capacity, as President of the
Gainesville Chapter of the National Organization for
Women, as Coordinator of the Morning-After Pill
Conspiracy, and on behalf of women who need Emergency
Contraception; JENNIFER BROWN, in her individual
capacity, as Coordinator of the Morning-After Pill
Conspiracy, and on behalf of women who need Emergency
Contraception; CANDACE CHURCHILL, in her individual
capacity, as Coordinator of the Morning-After Pill
Conspiracy, and on behalf of women who need Emergency
Contraception; and FRANCIE HUNT, in her individual
capacity, as Coordinator of the Morning-After Pill
Conspiracy, and on behalf of women who need Emergency
Contraception; ASSOCIATION OF REPRODUCTIVE HEALTH
PROFESSIONALS, on its own behalf and on behalf of its
members and women who need Emergency Contraception;
and NATIONAL LATINA INSTITUTE FOR REPRODUCTIVE

CV-05-0366 (ERK/VVP)

HEALTH, on its own behalf and on behalf of women who
need Emergency Contraception; ROBERT JAFFE; AURORA
DEMARCO; ANGELICA JAFFE; CATHERINE LEDERER-
PLASKETT; ALIZA LEDERER-PLASKETT; JONATHAN MARKS;
GABRIELLE MARKS,

        Plaintiffs,

v.

ANDREW C. VON ESCHENBACH, in his official capacity as
acting commissioner of the Food and Drug Administration,

        Defendant.

------------------------------------------------------------------------X

## FIFTH AMENDED COMPLAINT

Plaintiffs, by and through their undersigned attorneys, bring this complaint against the

defendant, his agents and successors in office, and in support thereof aver the following:

1.   This is a challenge under the Administrative Procedures Act (APA) and the United

States Constitution to the denial by the Food and Drug Administration (FDA) of a Supplemental

New Drug Application (SNDA) and a citizen petition ("citizen petition") seeking to switch the

emergency contraception ("EC") drug Plan B from prescription-only availability to unrestricted

over-the-counter status[1] ("OTC switch") and to the establishment by the FDA of an age-

restricted, behind-the-pharmacy-counter, dual prescription/nonprescription regime for Plan B

("BTC regime").  Plaintiffs claim that the BTC regime and the denial of the OTC switch violate

their rights and the rights of women who need Plan B to privacy and equal protection under the

Fifth Amendment, and that the BTC regime and the denial of the OTC switch violate their rights

---

[1] Plaintiffs will use the term "unrestricted OTC status" to mean over-the-counter availability without a requirement
that the drug be kept behind the pharmacist's counter, without a restriction on the types of venues where the product
may be distributed, and without an age restriction.  In other words, "unrestricted status" is used to mean the status of
numerous other drugs and devices, such as aspirin, condoms, dextromethorphan, ibuprofen, acetaminophen, etc.

and the rights of women who need Plan B because it exceeds the statutory authority of the FDA

and is arbitrary and capricious. Plaintiffs seek injunctive relief requiring the defendant to

approve the OTC switch for women of all ages, or such other equitable relief as the Court may

deem appropriate, and a declaratory judgment that the FDA's denial violates the APA and

violates the constitutional rights of women who need Plan B.

I. **Jurisdiction and Venue**

2. This Court has jurisdiction under 28 U.S.C. § 1331 because this case arises under the

Constitution and laws of the United States.

3. Venue is proper in this district under 28 U.S.C. § 1391(d) because one of the

plaintiffs resides in this district and the defendant is an officer of the United States acting in his

official capacity.

II. **The Parties**

A. **Plaintiffs**

4. Plaintiff Annie Tummino is a resident of Brooklyn, New York. She sues on her own

behalf, in her individual capacity as Vice-Chair of the Women's Liberation Birth Control Project

and as Coordinator of the Morning-After Pill Conspiracy ("MAP Conspiracy"), and on behalf of

women who need Plan B.

5. Plaintiff Erin T. Mahoney is a resident of New York, New York. She sues on her

own behalf, in her individual capacity as Chair of the Women's Liberation Birth Control Project

and as Coordinator of the MAP Conspiracy, and on behalf of women who need Plan B.

6.   Plaintiff Carol Giardina is a resident of New York, New York.  She sues on her own behalf, in her individual capacity as Coordinator of the MAP Conspiracy, and on behalf of women who need Plan B.

7.   Plaintiff Kelly Mangan is a resident of Gainesville, Florida.  She sues on her own behalf, in her individual capacity as President of the University of Florida Campus Chapter of the National Organization for Women, as Coordinator of the MAP Conspiracy, and on behalf of women who need Plan B.

8.   Plaintiff Stephanie Seguin is a resident of Gainesville, Florida.  She sues on her own behalf, in her individual capacity as Chair of the Florida National Organization for Women Young Feminist Task Force and as Coordinator of the MAP Conspiracy, and on behalf of women who need Plan B.

9.   Plaintiff Lori Tinney is a resident of Gainesville, Florida.  She sues on her own behalf, in her individual capacity as President of the Gainesville Chapter of the National Organization for Women, Gainesville, FL and as Coordinator of the MAP Conspiracy, and on behalf of women who need Plan B.

10. Plaintiff Jennifer Brown is a resident of Gainesville, Florida.  She sues on her own behalf, in her individual capacity as Coordinator of the MAP Conspiracy, and on behalf of women who need Plan B.

11. Plaintiff Candace Churchill is a resident of Gainesville, Florida.  She sues on her own behalf, in her individual capacity as Coordinator of the MAP Conspiracy, and on behalf of women who need Plan B.

12. Plaintiff Francie Hunt is a resident of Nashville, Tennessee.  She sues on her own behalf, in her individual capacity as Coordinator of the MAP Conspiracy, and on behalf of women who need Plan B.

13. The MAP Conspiracy is a coalition of feminist organizations leading the grassroots movement to make the Morning-After Pill an over-the-counter drug by raising public consciousness about the ways that women have to conspire to obtain it.  Since February 2004, the MAP Conspiracy has organized speak-outs where women publicly testify from their own experience about their need for the Morning-After Pill and the obstacles they face obtaining it. Members of the MAP Conspiracy also testified at the December 2003 FDA public hearings on the Barr application for approval of over-the-counter status for Plan B.

14. Each of the individual plaintiffs listed in paragraphs 4-13 above has access to one or more doses of Plan B, and each of them intends, plans, and has pledged to provide Plan B to friends or other women of any age -- including women under the age of 18 and women over 18 who lack government issued identification or who lack timely access to a pharmacy or health clinic -- whom they learn need Plan B to prevent pregnancy.  None of the individual plaintiffs listed in paragraphs 4-13 above is licensed or authorized by law in any state to prescribe or dispense drugs.  Consequently, unless unrestricted OTC status for Plan B is implemented, each of the individual plaintiffs listed in paragraphs 4-13 above risks violating federal and state criminal statutes if she carries through on her plan to provide Plan B to women of all ages who need it to prevent pregnancy.  *See*, *e.g.*, 21 U.S.C. §§ 353(b)(1), 333(a), 333(b) (2005);  § 465.015, Fla. Stat. (2004).

15. Each of the individual plaintiffs listed in paragraphs 4-13 above objects to the requirement contained in the BTC regime that she must disclose her name, address and age to a

5

pharmacist and/or pharmacy employee in order to obtain Plan B. In addition, each individual plaintiff listed in paragraphs 4-13 above objects to the disclosure of information to third parties about her personal sexual activity that will occur because, in order to obtain Plan B without a prescription, she is required to present identification to a pharmacist or pharmacy employee.

16. Plaintiff Association of Reproductive Health Professionals (ARHP) is a non-profit membership association composed of experts in reproductive health. These professionals include physicians, advanced practice clinicians (nurse practitioners, nurse midwives, physician assistants), researchers, educators, pharmacists, and other professionals in reproductive health, some of whom have authority to prescribe drugs and some of whom do not. ARHP and its members provide reproductive health services and education, conduct reproductive health research, and influence reproductive health policy. Specifically, ARHP works to improve the reproductive health of women by reducing the number of unintended pregnancies among women. ARHP, along with Princeton University's Office of Population Research (OPR), manages the *Emergency Contraception Hotline* (1-888-Not-2-Late) and *Website* (www.not-2-late.com), which aim to prevent unintended pregnancy by providing women of all ages and their partners information about, and rapid access to, emergency contraception. Both the *Hotline* and *Website* are highly utilized tools, currently receiving an average of 60,000 calls and 650,000 unique website visits per year. These calls and visits include calls and visits by women under the age of 18, women over 18 who lack government issued identification, and women who lack timely access to a pharmacy or health clinic. The *Hotline* is an automated, toll-free, 24-hour, confidential service available in both English and Spanish that gives callers general emergency contraception information and a list of the five emergency contraception providers nearest to them (including a list of pharmacists in states where pharmacists are permitted by state law to

dispense Plan B to those who require a prescription).  It is available from any phone in the United States, Puerto Rico, U.S. Virgin Islands, British Columbia, and the Yukon Territory.  The *Website*, available in English, French, Spanish, and Arabic, is the most comprehensive emergency contraception clearinghouse in the world available to anyone via the World Wide Web.  It features frequently asked questions about emergency contraception, a publications bibliography, a Plan B materials database, and a searchable database of Plan B providers across the country, Puerto Rico, Guam, U.S. Virgin Islands, and British Columbia.  The full directory of providers can be searched by city, state, area code, and zip code.  The NOT-2-LATE database also lists pharmacists in Alaska, California, Washington State, New Mexico, and British Columbia.  ARHP and OPR work closely with local pharmaceutical associations to sign up pharmacists who dispense Plan B behind the counter.  Vermont has recently become the ninth state—joining Alaska, California, Hawaii, Maine, Massachusetts, New Hampshire, New Mexico, and Washington—to allow direct dispensation of Plan B by pharmacists.  FDA admitted on June 9, 2006 that it had denied ARHP's petition to the FDA to switch Plan B to OTC status for women of all ages.  The BTC regime and the denial of unrestricted OTC status interfere with ARHP's ability to educate health care providers and the public about emergency contraception, interfere with ARHP's efforts to reduce the number of unintended pregnancies and its efforts to use the *Emergency Contraception Hotline* and *Website* to achieve that goal, and interfere with its members' ability to accomplish the goal of improving the reproductive health of women.  ARHP sues on its own behalf, on behalf of its members who lack prescribing authority and their patients and clients who seek Plan B who are under 18, are over 18 and lack government issued identification, lack timely access to a pharmacy or health clinic, or are over 18 and object to

showing identification in order to obtain Plan B, and on behalf of the women who utilize the Hotline and Website to obtain access to Plan B.

17. Plaintiff National Latina Institute for Reproductive Health (NLIRH) is a non-profit organization formed under section 501(c)(3) of the Internal Revenue Code. NLIRH conducts a Plan B education and outreach project which seeks to educate providers of Plan B and potential users of Plan B about what Plan B is, how to use it, and how to obtain it and, for providers, how to incorporate it into their practice. NLIRH has conducted such an education and outreach project in the Bronx, and plans additional such projects at several locations in Brooklyn and the Bronx through June of 2005. NLIRH's Plan B education outreach projects are impeded by the age-restricted behind-the-counter dual prescription/nonprescription status for Plan B. If Plan B is switched to OTC for women of all ages, NLIRH will be able to improve access to Plan B by enhancing its Plan B educational programs for both the health care providers and the public participants involved in those projects. NLIRH sues on its own behalf and on behalf of the women participants in its Plan B projects who are of childbearing age, including women who are under 18, are over 18 and lack government issued identification, lack timely access to a pharmacy or health clinic, or are over 18 and object to showing identification in order to obtain Plan B.

18. Plaintiff Robert Jaffe is a resident of Brooklyn, New York and is the father of a 13-year-old daughter, Angelica Jaffe. He sues on behalf of himself and his daughter because he wants his daughter to be able to obtain Plan B without a prescription and without any restriction on its point of sale so as to maximize the likelihood that she will avoid unwanted pregnancy.

19. Plaintiff Aurora DeMarco is a resident of Brooklyn, New York and is the mother of a 13-year-old daughter, Angelica Jaffe. She sues on behalf of herself and her daughter because she

wants her daughter to be able to obtain Plan B without a prescription and without any restriction on its point of sale so as to maximize the likelihood that she will avoid unwanted pregnancy.

20. Plaintiff Angelica Jaffe is a resident of Brooklyn, New York and is a 13-year-old young woman. She sues on her own behalf because she wants to be able to obtain Plan B without a prescription and without any restriction on its point of sale so as to maximize the likelihood that she will avoid unwanted pregnancy.

21. Plaintiff Catherine Lederer-Plaskett is a resident of Hartsdale, New York and is the mother of a 16-year-old daughter, Aliza Lederer-Plaskett. She sues on behalf of herself and her daughter because she wants her daughter to be able to obtain Plan B without a prescription and without any restriction on its point of sale so as to maximize the likelihood that she will avoid unwanted pregnancy.

22. Plaintiff Aliza Lederer-Plaskett is a resident of Hartsdale, New York and is a 16-year-old young woman. She sues on her own behalf because she wants to be able to obtain Plan B without a prescription and without any restriction on its point of sale so as to maximize the likelihood that she will avoid unwanted pregnancy.

23. Plaintiff Jonathan Marks is a resident of Brooklyn, New York and is the father of a 13-year-old daughter, Gabrielle Marks. He sues on behalf of himself and his daughter because he wants his daughter to be able to obtain Plan B without a prescription and without any restriction on its point of sale so as to maximize the likelihood that she will avoid unwanted pregnancy.

24. Plaintiff Gabrielle Marks is a resident of Brooklyn, New York and is a 13-year-old young woman. She sues on her own behalf because she wants to be able to obtain Plan B

without a prescription and without any restriction on its point of sale so as to maximize the likelihood that she will avoid unwanted pregnancy.

25. Each woman who is (1) under 18 years of age and needs Plan B; (2) over 18 but lacks adequate proof of age to obtain Plan B without a prescription; (3) over 18 but lacks timely access to a pharmacy or health clinic so as to maximize the effectiveness of Plan B; or (4) must present identification including proof of age to a pharmacist or health clinic and thereby disclose at least her name and possibly her address to third-parties to obtain Plan B, is irreparably injured as a direct result of the FDA's age-restricted behind-the-counter dual prescription/nonprescription regime for Plan B. Each of the Plaintiffs listed in paragraphs 4-13, 16, and 17 above wants to and intends to try to make Plan B available to women in each of these categories, and asserts third-party standing to assert their interests.

26. Each of the plaintiffs is aggrieved on a continuing and ongoing basis by the FDA's rejection of the OTC switch of Plan B for women of all ages.

27. Each of the plaintiffs is injured on a continuing and ongoing basis by the FDA's rejection of the OTC switch for women of all ages, and the FDA's rejection is the cause of that injury.

28. The relief sought in this complaint will redress the injury suffered by each of the plaintiffs that is caused by the FDA's rejection of unrestricted OTC status for Plan B.

### B.     Defendant

29. Andrew C. von Eschenbach is the acting commissioner of the FDA. Von Eschenbach is responsible for protecting the public health by assuring the safety, efficacy, and security of human and veterinary drugs, biological products, medical devices, our nation's food supply, cosmetics, and products that emit radiation. He is also responsible for advancing the public

health by helping to speed innovations that make medicines and foods more effective, safer, and more affordable; and helping the public get the accurate, science-based information they need to use medicines and foods to improve their health.  He is sued in his official capacity.

### III.    Statutory and Regulatory Background

30. Under FDA regulations, "[a]ny drug limited to prescription use . . . shall be exempted from prescription-dispensing requirements when the Commissioner finds such requirements are not necessary for the protection of the public health by reason of the drug's toxicity or other potentiality for harmful effect, or the method of its use, or the collateral measures necessary to its use, and he finds that the drug is safe and effective for use in self-medication as directed in proposed labeling."  21 C.F.R. § 310.200(b) (2005); *see also* 21 U.S.C. § 353(b)(3) (2005) ("The Secretary may by regulation remove drugs subject to sections 352(d) and 355 of this title from the requirements of paragraph (1) of this subsection when such requirements are not necessary for the protection of the public health.").

31. The FDA views OTC status as the "default" status for drugs.  *See* http://www.fda.gov/cder/Offices/OTC/FDA-CHPA%20seminar%20Oct%202/tsld013.htm (attached as Exhibit U).

32. An approved drug is suitable for OTC use when: (1) the drug is safe for self-medication, 21 C.F.R. § 310.200(b); 21 C.F.R. § 330.10(a)(4)(i); (2) the drug is effective when self-administered, 21 C.F.R. § 310.200(b); 21 C.F.R. § 330.10(a)(4)(ii); (3) the condition to be treated is self-diagnosable; and (4) the drug's labeling is tailored to self-administration, 21 C.F.R. § 310.200(b); 21 C.F.R. § 330.10(a)(4)(v).

33. The FDA has developed its own internal criteria for assessing OTC switch applications, known as the "Peck criteria" after former CDER Director Carl Peck.  These criteria

are: 1.) Does the product have an acceptable margin of safety based on prior prescription marketing experience; 2.) Does the product have low misuse and abuse potential; 3.) Can the condition be adequately self-recognized and successfully self-treated with minimal health care provider intervention; 4.) Do the benefits from the switch to non-prescription status clearly outweigh the risks; and 5.) Is the self-treatment product safe and effective during consumer use. Plan B meets each of these criteria.

34. By statute, the manufacturer of a prescription drug may file a supplemental new drug application with the FDA seeking to switch the drug to OTC status. 21 U.S.C. § 355(b). Such an application must be acted upon by the FDA within 180 days of its filing. 21 U.S.C. § 355(c).

35. In addition, FDA regulations explicitly authorize the use of a citizen's petition to seek a switch from prescription to OTC status: "A proposal to exempt a drug from the prescription-dispensing requirements of section 503(b)(1)(C) of the act may be initiated by . . . any interested person . . . fil[ing] a petition . . . pursuant to Part 10 of this chapter . . . ." 21 C.F.R. § 310.200(b). Once a citizen's petition has been filed, the FDA is required by its regulations to either approve the petition, deny the petition, or "[p]rovide a tentative response, indicating why the agency has been unable to reach a decision on the petition, e.g., because of the existence of other agency priorities, or a need for additional information." 21 C.F.R. § 10.30(e)(2).

36. During the process of considering an application for an OTC switch, the FDA typically receives the advice of the FDA's OTC advisory committee meeting together with the FDA's advisory committee that has specific expertise in the product under consideration. In the case of Plan B, the latter committee is the Advisory Committee for Reproductive Health Drugs. These advisory committees are authorized by, *inter alia*, 21 U.S.C. § 355(n) (2005).

37. The FDA lacks the statutory authority to restrict the types of businesses that can sell OTC drugs.

38. Dispensing a prescription drug other than by prescription is an act of "misbranding" under federal law. 21 U.S.C. § 353(b)(1). Introducing a misbranded drug into interstate commerce is a "prohibited act," 21 U.S.C. § 331(a), punishable by not more than one year imprisonment or a fine of up to $1000 or both. 21 U.S.C. § 333(a)(1).

## IV. Factual Allegations

### A. Making Plan B Available OTC to Women of All Ages Would Improve the Public Health and Enable Women to Reduce their Risk of Unplanned Pregnancies.

39. Unintended pregnancy is a significant public health problem in the United States. The United States has one of the highest rates of unintended pregnancy compared to other developed countries. The rate of teen pregnancy in the United States is also one of the highest among developed countries. Wider access to Plan B will reduce unintended pregnancies, including among teenagers.

40. The risks of pregnancy and childbirth, including maternal death, can be serious and far exceed the risks associated with Plan B.

41. Plan B is a drug used only by women, and every woman of childbearing age is a potential user of Plan B.

42. Plan B (Levonorgestrel) is an emergency contraceptive drug in tablet form that can be used to prevent pregnancy following an act of intercourse in which no contraceptive was used or the contraceptive method used failed.

43. When taken within 72 hours of unprotected intercourse, Plan B reduces the risk of pregnancy by approximately 89 percent after a single act of unprotected sex. As the interval

between intercourse and the start of treatment increases, Plan B's effectiveness declines, and the risk of pregnancy increases. Plan B does not interfere with an established pregnancy.

44. Switching Plan B to OTC status for women of all ages will promote public health because Plan B is only effective for a short time after unprotected sex, and it works most effectively if used within twenty-four hours of unprotected sex. Because contacting a physician and obtaining and filling a prescription hinder women from obtaining Plan B in a timely fashion, making Plan B available OTC will allow more women to use the treatment, and enable more women to prevent unwanted pregnancies, to the benefit of public health.

45. Limiting Plan B to prescription use is not necessary for the protection of public health.

46. Plan B is safe for self-medication because it is not toxic to the woman (or to the embryo or fetus if a pregnancy had been previously established in the woman).

47. Plan B has a low risk of abuse or overdose, and if overdose occurs is unlikely to lead to serious consequences.

48. Plan B's side effects are well-known and minor.

49. Plan B is effective when self-administered. Its administration is simple and relies only on assessments as to time elapsed since sexual intercourse that can be independently made by the woman, and any interaction between Plan B and other drugs would be nonfatal and unlikely to seriously affect Plan B's efficacy.

50. The condition Plan B treats — contraceptive failure or failure to use contraception during intercourse — is one that is readily diagnosable by a woman.

51. Plan B has no contraindications that would pose a danger to the patient.

52. The existing patient labeling for Plan B is tailored to self-administration in that it is simple, clear, comprehensive and easy to follow.

53. The American Medical Association and the American College of Obstetricians and Gynecologists both support switching Plan B to OTC status for women of all ages. *See* Dec. 5, 2000 Statement of American Medical Association; February 14, 2001 Statement of the American College of Obstetricians & Gynecologists. In addition, the American Academy of Pediatrics supports switching Plan B to OTC status for women of all ages. (Attached hereto as Exhibit T).

**B.** **Public Health Organizations Filed Two Citizen Petitions with the FDA Seeking to Increase Access to Emergency Contraception.**

54. On November 23, 1994, the Center for Reproductive Law and Policy (now the Center for Reproductive Rights) submitted a Citizen Petition (Docket No. 94P-0427) on behalf of the American Women's Health Association, the American Public Health Association, and Planned Parenthood of New York City, asking the FDA to require two drug manufacturers to amend the labeling and package inserts of certain of their oral contraceptive products to include information regarding the use of these products as emergency contraception. On May 22, 1995, the FDA issued an "interim response" indicating that the request was "still under consideration" and that the agency required more time to "thoroughly evaluate[] the issues raised" in the petition and to finalize its decision. (Letter of Janet Woodcock, M.D., Director, CDER, dated May 22, 1995 (attached hereto as Exhibit A).)

55. On May 9, 1996, the FDA issued a letter denying the 1994 Citizen Petition because "[a]lthough FDA agrees in principle that it has discretion to require that certain conditions of use be included in a product's labeling . . . we decline to exercise our discretion to require the relabeling of these products in the manner you suggest." (Letter of Janet Woodcock, M.D., Director, CDER, dated May 9, 1996 (attached hereto as Exhibit B).) However, the agency

determined "that it would be appropriate to discuss the issue of the safety and effectiveness of oral contraceptives for postcoital emergency use with the Reproductive Health Drugs Advisory Committee at its June 28, 1996 meeting. [The Center for Reproductive Law and Policy] will be invited to present [its] views at that meeting." *See id.*

56. On February 24, 1997, the Center for Reproductive Law and Policy received notice from FDA Deputy Commissioner Mary K. Pendergast that "today the Food and Drug Administration placed on public display a Federal Register notice concluding that certain combined oral contraceptives . . . are safe and effective for use as postcoital emergency contraception. The notice requests submission of new drug applications for this use . . . ." (Letter of Mary K. Pendergast, Deputy Commissioner, Senior Advisor to the Commissioner, FDA, dated February 24, 1997 (attached hereto as Exhibit C); *see also* Prescription Drug Products; Certain Combined Oral Contraceptives for Use as Postcoital Emergency Contraception (Docket No. 96N-0492) (attached hereto as Exhibit D).)

57. FDA Federal Register Notice stated that "[t]his notice is intended to encourage manufacturers to make this additional contraceptive option available." Ex. D at 1. The agency agreed with the unanimous conclusion of the Advisory Committee, which met on June 28, 1996 to consider this issue, that several regimens of oral contraception were safe and effective for postcoital emergency contraception. *Id.* at 3. The agency concluded that "[b]ecause of the publicly available safety and effectiveness data documenting the drugs' use, the safety and effectiveness requirements of § 314.50 may be met by citing the published literature listed in the references in section III. of this document." *Id.* at 8.

58. In 1999, the FDA approved Plan B as a prescription drug. Since that date, Plan B has been prescribed many thousands of times.

59. On February 14, 2001, a group of citizen organizations, including Plaintiff ARHP, filed a petition ("the Citizen Petition") with FDA asking the agency to switch Plan B (and another drug, Preven, that has since been removed from the market for reasons unrelated to safety and effectiveness) to OTC status for women of all ages.

60. The FDA's consideration of the Citizen Petition was inextricably intertwined with its consideration of the application by the manufacturer of Plan B to switch Plan B to OTC status, described below.

61. On June 9, 2006, the FDA issued a letter directly prompted by this lawsuit in which it acknowledges that it has denied the Citizen Petition. (*See* Exhibit V.)

62. In that letter, the FDA alleges: "Soon after [the] petition was filed, [FDA] made a preliminary determination that your petition and its supporting information did not provide sufficient data to satisfy the statutory requirements to approve an OTC switch for emergency contraceptives, as documented in memoranda dated February 28, 2001 and April 12, 2001." (*See* Exhibit V at 1.)  However, this determination was not communicated to the petitioners until June 9, 2006.  Rather, the FDA gave a tentative response to the Citizen Petition on September 6, 2001, stating the FDA "has not yet resolved the issues raised in your Citizen Petition because it raises significant issues requiring extensive review and analysis by Agency officials."

**C.   Barr Laboratories Filed a Supplemental New Drug Application Seeking OTC Status for Plan B, Which Was Not Approved by the FDA Contrary to the Overwhelming Consensus of the Review Staff and Advisory Committee in Support of Approving the Application.**

63. On April 16, 2003, Women's Capital Corporation, the former owner of Plan B, filed a supplemental new drug application (SNDA) asking the agency to approve Plan B for OTC sale. Plan B was subsequently sold to Barr Laboratories, which maintained the SNDA.  The SNDA

17

contains no scientific data whatsoever on the safety or effectiveness of Plan B for any medically approved use for men.

64. On April 21, 2003, FDA Commissioner McClellan held a teleconference with Jay Lefkowitz, Deputy Assistant to the President for Domestic Policy at the White House, regarding WCC's submissions to the FDA on Plan B. Commissioner McClellan continued to have periodic discussions with White House staff regarding the Plan B SNDA.

65. Prior to the submission of the manufacturer's OTC switch application, but after the FDA became aware of the manufacturer's intent to file such an application, three new members were appointed to the Advisory Committee for Reproductive Health Drugs at the insistence of the FDA Commissioner's Office and despite strongly voiced concerns from FDA's career scientists about their qualifications. In addition, despite the usual practice by which members of the advisory committees are proposed by career scientists with relevant expertise, these three members were proposed by political appointees. Each of the three voted contrary to the majority vote of the Committee on one or more votes taken regarding Plan B.

66. On December 16, 2003, FDA's Non-prescription Drugs Advisory Committee and Advisory Committee for Reproductive Health Drugs held a joint session to discuss possible OTC status for Plan B.

67. The advisory committees, comprised of 28 members, voted as follows:

(1) Does the Actual Use Study (AUS) demonstrate that consumers used [Plan B] as recommended in the proposed labeling?

Yes – 27      No – 1

(2) Are the AUS data generalizable to the overall population of potential non-Rx users of Plan B?

Yes – 27      No – 1

(3) Based on the AUS and literature review, is there evidence that non-Rx availability of Plan B leads to substitution of emergency contraception for the regular use of other methods of contraception?

Yes – 0        No – 28

(4) Do the data demonstrate that Plan B is safe for use in the non-prescription setting?

Yes – 28        No – 0

68. According to the Manual of Policies and Procedures (MAPP) of the FDA's Center for Drug Evaluation and Research (CDER), the authority to approve a product for initial OTC marketing and for initial Rx-to-OTC switch for the first in a class of products is delegated to the office director level. MaPP 6020.5 at 13 (MaPP 6020.5 is attached hereto as Exhibit S). The authority to not approve an OTC switch for a drug is the responsibility of the "Specific Subject Matter Review Division" that approved it as a prescription drug. MaPP 6020.5 at 15. The FDA violated these policies in its actions regarding the Plan B SNDA and the Citizen Petition.

69. The composition of the Joint Advisory Committee was likewise determined in a manner that departed from the normal process because nominations to the Committee were made by FDA political appointees rather than FDA career scientists.

70. During late December of 2003 or early January of 2004, Drs. Janet Woodcock (Director of CDER and acting Deputy Commissioner of the FDA) and Steven Galson (acting Director of CDER) informed Drs. John Jenkins and Sandra Kweder (Director and Deputy Director of CDER's Office of New Drugs) that Commissioner McClellan had made a determination that the Plan B SNDA would not be approved. This decision also constructively denied the Citizen Petition.

71. The FDA decided by January 2004 at the latest to require an age restriction in any possible nonprescription approval for Plan B.

19

72. The determination by the Commissioner described in ¶ 70 that the Plan B SNDA would not be approved was made by the Commissioner (1) without attending the Joint Advisory Committee meeting; (2) before scientific reviews of the Plan B SNDA were completed by the FDA's scientific review staff; and (3) without any direct discussions with the FDA's scientific review staff conducting the review of the Plan B SNDA.

73. On January 15, 2004, Dr. Galson informed FDA scientists conducting the agency's review of the Plan B SNDA that the Commissioner's position was that the application could not be approved. At this same meeting Dr. Galson conveyed that one option that might lead to approval was an age restriction on Plan B that would keep it as a prescription drug for women under 18, even though he only invoked alleged deficiencies in data for women under 16. This option was proposed before scientific reviews of data submitted with the Plan B SNDA were complete.

74. On or about January 16, 2004, Dr. Woodcock informed the Director of the Office of Drug Evaluation III that the non-approval action directed by Commissioner McClellan was the only course of action that would appease the Presidential administration's constituents and that might lead eventually to approval.

75. On February 19, 2004 Dr. Janet Woodcock stated at a meeting that both she and the Commissioner were concerned about the possibility of OTC Plan B acquiring 'urban legend' status and leading to extreme promiscuous behaviors, such as the development of sex based cults centered around the use of Plan B. At that meeting, Dr. Galson indicated that he shared Dr. Woodcock's concerns.

76. All but one scientific staff member below the Center Director level within CDER who reviewed the OTC switch application expressed the view based on scientific and medical

data that the OTC switch should be approved for women of all ages.  The one staff member who disagreed believed the application was "approvable."

77. By memorandum dated April 22, 2004 and signed electronically on April 28, 2004, Dr. John Jenkins wrote a memorandum summarizing his "review, conclusions, and recommendations regarding" the OTC switch for Plan B (attached hereto as Ex. E) ("the Jenkins memorandum").  This memorandum states: "[The FDA] has not heretofore distinguished the safety and efficacy of Plan B and other forms of hormonal contraception among different ages of women of childbearing potential and I am not aware of any compelling scientific reason for such a distinction in this case."  (Ex. E at 30898.)  After a review of the record evidence supporting OTC use by women of all ages, the Jenkins memorandum accordingly concludes "that the available data clearly support a conclusion that Plan B meets the statutory and regulatory requirements for availability without a prescription for all age groups.  Such a conclusion is consistent with how the Agency has made determinations for other OTC products, including other forms of contraception available without a prescription."  (*Id.* at 30899.)

78. The Jenkins memorandum further states that "[o]ther senior officials within the Agency, including the former Commissioner (Dr. McClellan) and the Acting Center Director (Dr. Galson), have expressed concerns about the potential for unsafe, ineffective, or inappropriate use of Plan B by adolescents if it were to be made available without a prescription.  These concerns appear to have been based primarily on the limited number of adolescent women included in the sponsor's label comprehension and actual use studies."  (*Id.* at 30897.)

79. Though Jenkins said that he "[is] sensitive to and respect[s] the concerns that some may have regarding non-prescription access to Plan B by adolescents," (*Id.* at 30898), he stated that "[p]roducts that are indicated for uses related to sexual activity in adolescents raise concerns

for some people that go beyond a finding based on clinical trial data that the product is safe and effective for its intended use in adolescents. These concerns derive from individual views and attitudes about the morality of adolescent sexual behavior and also overlap with concerns about the role for parents and health care professionals in decisions about contraceptive use in adolescents." (*Id*. at 30898-99.) He concluded: "While OTC access to Plan B for adolescents may be controversial from a societal perspective, I cannot think of any age group where the benefit of preventing unplanned pregnancies and abortion is more important and more compelling." (*Id*. at 30899.)

80. On May 6, 2004, CDER Acting Director Steven Galson issued a "non-approvable" letter (attached hereto as Ex. F) ("the Galson letter") to Barr rejecting the OTC switch for Plan B. That action also constructively denied the Citizen Petition.

81. The Galson letter asserts that Barr's SNDA could not be approved because Barr had "not provided adequate data to support a conclusion that Plan B can be used safely by young adolescent women for emergency contraception without the professional supervision of a practitioner licensed by law to administer the drug." (Ex. F at 10796.) This assertion is not supported by the agency record.

82. In November of 2004, FDA's Office of Counter-Terrorism and Pediatric Drug Development concluded that the data submitted by the manufacturer reflected the age distribution, including among younger adolescents, of actual prescription users of the product.

83. In about January 2005, Steven Galson was prepared to approve Plan B for OTC status for women ages 17 and over, but his authority to do so was removed by the Commissioner of the FDA. Indeed, Dr. Galson had asked the Director of the Office of New Drugs to draft approval letters for him.

84. At least one of the FDA scientists who supported OTC status for Plan B fears retaliation from the Agency for her truthful testimony in this lawsuit.

85. Dr. Galson was concerned that if he did not implement or disagreed with the decision of the Office of the Commissioner to reject unrestricted OTC status for Plan B, his career at the FDA would be jeopardized.

**D.    Barr Laboratories Filed an Amended Supplemental New Drug Application Seeking Age-Restricted OTC Status for Plan B, Which Also Was Not Approved, Contrary to the Overwhelming Consensus among Agency Reviewers in Favor of Approving the Application.**

86. On July 22, 2004, Barr filed an amended SNDA seeking the OTC switch only for women aged 16 and higher.  By statute, the defendant was required to act on Barr's amended SNDA within 180 days after it was filed.  *See* 21 U.S.C. § 355(c)(1).  On January 21, 2005, the FDA announced a delay of its decision on Barr's application beyond this statutory time limit.

87. The reviewing divisions and offices of FDA reviewed Barr's amended application and examined the concerns raised by senior officials to support their decision to issue a non-approvable letter for OTC use of Plan B, but found that scientific evidence did not support these concerns.  (Excerpts from Mem. of Donna J. Griebel, M.D., dated January 12, 2005 (attached hereto as Exhibit G) at 31033.)

88. In its review of Barr's amended SNDA, the FDA review staff unanimously agreed that despite Barr's application for limited OTC status for Plan B for women 16 and older, that the drug was suitable for -- and thus should be approved for -- full OTC access for women of all ages.  (Review of Complete Response by Daniel Davis, M.D., dated January 12, 2005 (attached hereto as Exhibit H) at 1; Mem. Add. of Curtis J. Rosebraugh, M.D., dated January 12, 2005 (attached hereto as Exhibit I) at 2; Ex. G at 31031-33; Mem. of John Jenkins, M.D., dated

January 14, 2005 (attached hereto as Exhibit J) at 31096-98; *see also* Mem. of Steven Galson, M.D., dated August 26, 2005 (attached hereto as Exhibit K) at 1.)

89. The Director and Deputy Director of the Division of OTC Drug Products and the Director of the Office of Drug Evaluation V stated that Plan B meets the criteria for unrestricted OTC access, that data to the contrary was lacking, and that because of the strength of the data before the agency, it is "unclear what additional data could be provided on adolescent use that would be sufficient to lift the age restriction in the future." (Ex. I at 205.) Under the FDA's own policies, these FDA employees would ordinarily have made the final decision to approve the OTC switch.

90. FDA documents indicate that prior to January 21, 2005, the review staff at FDA were actively reviewing Barr's application for split-label access to Plan B. FDA has disclosed approximately sixteen documents that were placed in the Plan B docket during the month of January 2005. After January 21, 2005 and prior to August 2005, only two additional documents were submitted.

91. On July 13, 2005, the Secretary of Health and Human Services Michael O. Leavitt assured United States Senator Michael Enzi that "the FDA will act on this application [regarding OTC status for Plan B] by September 1, 2005." (*See* Letter of M. O. Leavitt, dated July 13, 2005 (attached hereto as Exhibit L).) Counsel for the Government submitted the Leavitt letter to the Court and requested that the Court delay the judicial proceedings: "[g]iven the agency's commitment to take action on the pending Plan B application within the next 45 days, we respectfully submit that the most appropriate course of action would be to suspend the current briefing schedule and stay this case until the FDA takes the anticipated action. . . ." (Def.'s Letter to the Court, dated July 25, 2005 (attached hereto as Exhibit M), at 2.)

92. Instead of the promised action, on August 26, 2005, FDA Commissioner Lester Crawford issued a letter to Joseph A. Carrado, stating that "the Agency is unable at this time to reach a decision on the approvability of the application because of unresolved issues that relate to your NDA . . . ." (*See* Letter of Lester Crawford, M.D., dated August 26, 2005 (attached hereto as Exhibit N) at 5.) The letter indicated that "[t]he Center for Drug Evaluation and Research (CDER) has completed its review of this application, as amended, and has concluded that the available scientific data are sufficient to support the safe use of Plan B as an OTC product, but only for women who are 17 years of age and older." (*Id.*) In this letter, FDA further stated that age-restricted OTC access would not be available for Plan B before the agency reaches a decision on "unresolved issues" regarding the feasibility of approving split-label access. (*Id.*)

93. At or around the time of the August 26, 2005, Crawford decision, Deputy Commissioner Woodcock expressed her concern that the agency's handling of Plan B had the potential to damage her professional credibility.

94. United States Senator Enzi wrote to Commissioner Crawford after Crawford's August 26, 2005, letter, stating that he was "deeply disappointed that your announcement did not comport with the agreed-upon deadline for a decision."

95. FDA sought public comment on "whether we should initiate a rulemaking to codify our interpretation of section 503(b) regarding when an active ingredient can be simultaneously marketed in both a prescription drug product and an OTC drug product." (Ex. N at 2.)

96. The FDA made the unusual decision to outsource to a private contractor the task of collecting and reviewing comments submitted to the FDA regarding Plan B.

97. On August 31, 2005, Dr. Susan F. Wood, assistant FDA commissioner for women's health and director of the Office of Women's Health announced that she was resigning from her post in reaction to the agency's decision to continue to limit access to Plan B, stating: "I can no longer serve as staff when scientific and clinical evidence, fully evaluated and recommended for approval by the professional staff here, has been overruled." *See* Marc Kaufman, *FDA Official Quits Over Delay on Plan B*, WASH. POST., Sept. 1, 2005, at A08 (attached hereto as Exhibit O) at 1 (quoting Susan F. Wood).

98. On September 27, Dr. Wood appeared on the ABC television news program *Nightline* to discuss the failure of the agency to act in accordance with the scientific consensus in favor of approving Plan B for OTC use. *See* ABC News transcript, dated September 27, 2005 (attached hereto as Exhibit P) at 4-6 (citing "consensus . . . amongst the scientists and health professionals there that it should be approved," and the fact that "all of the scientific and professional staff who normally are the part of the decision-making at the agency . . . were cut out of the decision.").

99. Dr. Wood also stated that she was concerned about the lengthy delay that she anticipated as a result of the upcoming rule-making:

> Dr. Wood: . . . But I would argue that the decision to delay approval of this product over-the-counter is, in fact, a denial. And this is, again, in part why I resigned. Because by couching it as a delay and a non-decision, in fact denied women of all ages, not just teens but women of all ages access to timely use of this product.

> Ted Koppel: (Off Camera) If you had thought that it was a brief delay, in other words, if you thought it was only going to be a delay of a couple of months, you wouldn't have resigned.

> Dr. Wood: Probably not.

> Ted Koppel: (Off Camera) So, you obviously think that what we're talking about here is not really a delay but a way of shelving it and not dealing with the issue.

Dr. Wood: Right. The mechanism is a rather bureaucratic one to potentially open it up to rulemaking. Which, to make a long story short, means opening up to a process that usually takes many months to years, if in fact that's the way they go.

(*See* Ex. P at 6-7.)

100. Dr. Frank Davidoff, a member of the Advisory Committee for Reproductive Health Drugs, which considered the OTC switch application for Plan B, resigned from the advisory committee due to the FDA's lack of "rational science-based decision-making." He is the only person ever to resign from an FDA advisory committee in protest of an agency action.

**E. The Government Accountability Office Investigated FDA's May 2004 Decision Not to Approve Plan B for Full OTC Status and Found that the FDA's Review Process Regarding Plan B Was "Unusual."**

101. The Government Accountability Office commenced an investigation for the United States Congress into why the FDA rejected the OTC switch on May 6, 2004.

102. On November 14, 2005, the Government Accountability Office issued a report to members of Congress examining the FDA's May 6, 2004 issuance of a "non-approvable" letter with regard to Barr Laboratory's SNDA request that Plan B be made available over-the-counter. (attached hereto as Exhibit Q, also available at http://www.gao.gov/new.items/d06109.pdf).

103. The report, titled "Food and Drug Administration Decision Process to Deny Initial Application for Over-the-Counter Marketing of the Emergency Contraceptive Drug Plan B Was Unusual," found that FDA's review process was "unusual" in four aspects:

*First*, the Directors of the Offices of Drug Evaluation III and V, who would normally have been responsible for signing the Plan B action letter, disagreed with the decision and did not sign the not-approvable letter for Plan B. The Director of the Office of New Drugs also disagreed and did not sign the letter. *Second*, FDA's high-level management was more involved in the review of Plan B than in those of other OTC switch applications. … *Third*, … there are conflicting accounts of whether the decision to not approve the application was made before the reviews were completed. *Fourth*, the rationale for the Acting Director of CDER's decision was novel and did not follow FDA's traditional

practices. Specifically, the Acting Director was concerned about the potential impact that the OTC marketing of Plan B would have on the propensity for younger adolescents to engage in unsafe sexual behaviors because of their lack of cognitive maturity compared to older adolescents. He also stated that it was invalid to extrapolate data from older to younger adolescents in this case. FDA review officials noted that the agency has not considered behavioral implications due to differences in cognitive development in prior OTC switch decisions and that the agency has considered it scientifically appropriate to extrapolate data from older to younger adolescents. [Emphasis added]

(Ex. Q at 5.)

104.    In summary, the GAO found that the decision-making process was "not typical," was unlike all of the 67 other OTC switch applications filed between 1994 and 2004, and that the Plan B OTC switch application was the only one during that 10 year time period that "was not approved after the joint committee voted to recommend approval of the application." *Id.* The GAO Report concludes that the FDA's decision-making process was unusual and that high-level officials were reported to be involved in the decision-making process.

105.    Former FDA Commissioner Mark McClellan provided only an evasive and non-responsive written statement to detailed written questions submitted by the GAO regarding the decision to issue a non-approvable letter to Barr in May 2004 (questions and non-response attached as Exhibit W).

106.    Former FDA Commissioner Mark McClellan improperly deleted electronic correspondence related to the OTC application for Plan B. *See* Letter of United States Congressman Henry Waxman, dated November 15, 2005 (attached hereto as Exhibit R).

107.    Former FDA Commissioner Lester Crawford also declined to be interviewed by the GAO in conjunction with their report.

**F.** **Government Documents Confirm the Findings of the GAO Report that Upper Level Management Were Unusually Active in the Decision-Making Process Regarding the OTC Switch Application for Plan B, and that Upper Level Management Overrode the Recommendations of the Review Staff.**

108.     The administrative record compiled by the agency confirms that as early as January 15, 2004, upper level management at FDA had decided that the OTC switch for Plan B would not be approved, and that this decision was made before the scientific review of the OTC switch application was complete.

109.     The administrative record compiled by the agency confirms that the Office of the Commissioner was involved in the agency's review of the OTC switch application for Plan B since at least December 10, 2003, and that the concerns about adolescent use of Plan B expressed by Dr. Galson in his May 2004 non-approvable letter, as well as the concerns about adolescent use of Plan B expressed by Dr. Galson in his August 26, 2005 memorandum, echo and reflect the concerns of the Office of the Commissioner expressed in January of 2004.

110.     Documents show that both the Commissioner of the FDA and the Deputy Commissioner of Operations played an unusually active role in the decision to issue a non-approvable letter, as well as in subsequent agency action on Plan B. The Directors of the Offices of Drug Evaluation III and V told GAO investigators that they were asked by high level management to draft and sign a non-approvable letter for Plan B, but that they declined to do so because they did not agree with that action. The Director of the Office of New Drugs was then asked to review the Plan B application. Involving the Director of the Office of New Drugs in issuing such a letter is very rare and, according to FDA policy and procedure manuals, is limited to situations where there is disagreement between the two reviewing offices. (Ex. Q at 20). The Director of the Office of New Drugs also declined to sign a non-approvable letter based on his disagreement with the decision. *Id.*

111. The FDA's Deputy Director of the Office of Drug Evaluation V stated in a memorandum that the issues raised by FDA political appointees concerning adolescents' access to Plan B "spuriously raise the review standard for approval of this product and indeed any contraceptive product," and are not supported by the data nor the medical literature.

112. In the past ten years, except in the case of Plan B and certain nicotine-related drugs, the FDA has never requested additional data regarding adolescents to be submitted by manufacturers seeking OTC switches.

113. The non-approvable letter in May 2004 and the August 26, 2005 decision to further withhold approval of Plan B for OTC use were opposed by the scientific review staff that would normally be responsible for making decisions approving drugs for OTC use. CDER reviewers in the Divisions of Reproductive and Urologic Drug Products and the Division of Over-the-Counter Drug Products, the Deputy Directors of the Offices of Drug Evaluation III and V, and the Director of the Office of New drugs all recommended that Plan B should be switched OTC for women of all ages.

**G.     Barr Laboratories Was Asked to File Another Amended Supplemental New Drug Application Seeking Further Arbitrary Age-Restricted OTC Status for Plan B, which Resulted in Plan B Remaining Behind-the-Counter and Available Without a Prescription Only For Some Persons 18 and Older.**

114. On July 31, 2006, the day before Dr. Andrew von Eschenbach's Senate confirmation hearing, the FDA announced that it would work with Barr Pharmaceuticals to allow for OTC sales to persons 18 and older, hoping to "wrap[] up the process in a matter of weeks." (FDA Statement, dated July 31, 2006, http://www.fda.gov/bbs/topics/NEWS/2006/ NEW01421.html).

115. Also on July 31, 2006, von Eschenbach wrote to Barr Pharmaceuticals and stated that while he would not approve Barr's request for OTC sales for those 16 and over, he would

reconsider allowing nonprescription sale of Plan B to persons 18 and older if the company met certain restrictions. This letter offered no explanation for the scientific or policy reasoning to support the line being drawn at the age of 18. (Letter from Andrew von Eschenbach M.D. to Joseph A. Carrado, dated July 31, 2006, http://www.fda.gov/oc/planb/duramed073106.html).

116. On August 8, 2006, personnel from the Center for Drug Evaluation and Research met with Barr to discuss the restrictions outlined in von Eschenbach's July 31 letter, specifically with regard to nonprescription packaging for purchasers 18 and over.

117. On August, 17, 18 and 23, 2006, Barr amended its application to reflect changes in compliance with von Eschenbach's proposed restrictions, specifically with regard to labeling and the Convenient Access Responsible Education (CARE) Program.

118. In light of Barr's revised SNDA, the FDA again reviewed Plan B and again its medical reviewers confirmed that an age restriction for Plan B as an OTC drug is medically and scientifically unsupported.

119. On August 22, 2006, Julie Beitz, M.D., Acting Director of the Center for Drug Evaluation and Research, stated: "This memo documents my view that there are sufficient data on the safety and effectiveness of Plan B to approve its use in the OTC setting without age-restriction. In the absence of new data to support an age-restriction, my conclusions as stated in my previous memos, dated April 2, 2004, and January 12, 2005, remain unchanged."

120. On August 22, 2006, Charles J. Ganley, M.D., Director of the Office of Nonprescription Products (ONP), stated: "Previous reviews from the Division of Over-the-Counter Drug Products (DOTCDP) and Office of Drug Evaluation V (ODE V), signed by Dr. Rosebraugh and Dr. Bull, recommended the sale of Plan B over-the-counter without restrictions. DOTCDP and ODEV have evolved into the ONP. No new data was provided to suggest the

restriction based on age is necessary.  Based on the previous findings . . . ONP continues to believe that restriction on access is not necessary."

121.    On August 22, 2006, John K. Jenkins, M.D., Director of the Office of New Drugs, stated: "As documented in my reviews dated April 28, 2004, and January 18, 2005, I believe the available data are adequate to support a conclusion that Plan B can be safely and effectively marketed as a nonprescription product for all women of child-bearing potential . . . I am not aware of any new data that supports an age restriction for OTC marketing of Plan B . . . I continue to recommend that Plan B be approved for OTC marketing without an age restriction."

122.    On August 23, 2006, von Eschenbach issued a memorandum that outlined his conclusions regarding the appropriateness of 18 as a cut-off age for OTC usage of Plan B.

123.    The August 23, 2006 von Eschenbach memorandum begins by stating that Barr Pharmaceuticals amended its SNDA to make the OTC switch applicable only to those 18 and older.

124.    The August 23, 2006 von Eschenbach memorandum states that in response to "the difficulty of enforcing an age-based restriction . . . I have concluded that 18 (rather than 17) is the more appropriate cutoff point . . ."

125.    There are no scientific or health related reasons for choosing 18 as a cutoff age. The only asserted basis for choosing 18 is because dispensers of Plan B " . . . (as well as society as a whole) are more familiar with 18 as a cutoff age."

126.    The August 23, 2006 memorandum purports to justify the 18 year old age cutoff by analogy to tobacco products.   Tobacco products have proven and severe harmful health effects, including hundreds of thousands of deaths annually, on persons of all ages.  There is no

scientific evidence that Plan B has any serious side effects whatsoever, nor is any such evidence cited in this or any other FDA memorandum.

127.     The August 23, 2006 memorandum also purports to justify the 18 year old age cutoff by analogy to products containing pseudoephedrine.  Such products have a demonstrated record of abuse, specifically as a compound used by illegal drug traffickers to manufacture methamphetamines, which are controlled substances.  There is no evidence or even plausible scientific basis to believe that Plan B can be or is used to manufacture controlled substances, or that Plan B is abused in any way by any women, nor is any such evidence cited in this or any other FDA memorandum.

128.     On August 24, 2006, Steven Galson issued an approval letter to Barr, granting limited approval for nonprescription sales of Plan B to those who could provide government issued proof that they are 18 years of age or older, and adopting von Eschenbach's stated rationale for the age 18 cutoff.

129.     The FDA has therefore at long last admitted that it has rejected OTC status for Plan B.

130.     In March 1991, the FDA stated: "Some health professional organizations have petitioned FDA to establish a third class of drugs that would be available without prescription, but only through a pharmacist.  Pharmacists would advise consumers about proper use of the drug and serve to identify problems that might arise.  In 1974, in connection with an FDA monograph on OTC antacids, some pharmacy organizations commented that such a third class of drugs should be created.  Others, including the Department of Justice, objected to a third class of drugs, stating that it would restrain competition, inconvenience the consumer, depart from U.S. economic policy, and cause price increases for the consumer with no attending benefit.  FDA

concluded that 'no controlled studies or other adequate research data have been supplied to support the position that any class of OTC drugs must be dispensed only by pharmacists in order to ensure their safe use. . . . There is at this time no public health concern that would justify the creation of a third class of drugs to be dispensed only by a pharmacist or in a pharmacy." *See* "Rx to OTC: The Switch Is On," http://www.fda.gov/bbs/topics/CONSUMER/CN00012c.html.

131.    In its review of Barr's amended SNDA for limited OTC status for Plan B for women 16 and older, the FDA review staff, in addition to finding that the scientific data supported full OTC access for women of all ages, expressed strong concern over the regulatory precedent that approval of a dual prescription/nonprescription regime for Plan B would set and the possible unintended consequences of such a regime.  (Ex. I at 31026-27; Ex. G at 31031-32; Mem. of Julie Beitz, M.D., dated January 12, 2005 (attached hereto as Exhibit X) at 31085-31087; Ex. J at 31096-98).

132.    Plan B is the only nonprescription drug required by the FDA to be kept behind the pharmacy counter.  Prior to August 24, 2006, "behind-the-counter" status was not mandated by the FDA for any drug.  Thus, Plan B is the first nonprescription drug the FDA has ever mandated to be kept behind the counter.

133.    In Canada, where levonorgestrel is available behind-the-counter from pharmacists, some pharmacists exploited the behind-the-counter status of the drug to ask women invasive questions about their sexual activity before providing the drug.

134.    Numerous over-the-counter drugs available off the shelf in gas stations, convenience stores, drug stores, supermarkets and other points of sale have established records of misuse, abuse (including use as a means of committing suicide by overdose), and serious side effects.  In no case does the FDA mandate age-restricted sales or proof of age.

135.    Nicotine-replacement products are restricted as nonprescription products to persons over the age of 18, yet even these products, with proven harmful effects and serious side effects for certain high-risk populations, are not kept behind the pharmacy counter.

136.    Contrary to the stated policy concerns regarding enforceability of an age cutoff, the requisite labeling included in a package of Plan B, which states the actual scientific findings of the FDA, makes clear that there is no data evidencing a danger of overdosage or drug dependence with regard to Plan B.  (FDA Labeling, dated August 24, 2006, http://www.fda.gov/cder/foi/label/2006/021045s011lbl.pdf).

137.    The labeling for Plan B states:  "Pediatric Use: Safety and efficacy of progestin-only pills have been established in women of reproductive age for long-term contraception. Safety and efficacy are expected to be the same for postpubertal adolescents under the age of 16 and for users 16 years and older.  Use of Plan B & emergency contraception before menarche is not indicated."  (FDA Labeling, dated August 24, 2006, http://www.fda.gov/cder/foi/label/2006/021045s011lbl.pdf).

**H.    FDA's Failure to Approve Plan B for Full OTC Use Constitutes Bad Faith and Improper Agency Action, and Treats Plan B Differently than Other Drugs Without Any Medical or Scientific Basis for that Differential Treatment.**

138.    The FDA applied a different and higher standard to Plan B's OTC switch than it has applied to OTC switches of other drugs.

139.    In the past ten years, Plan B is the only drug as to which the FDA has rejected advisory committee recommendations in favor of approving a drug for OTC status.

140.    In the past ten years, Plan B is the only drug as to which the FDA has requested additional data regarding adolescents.

141.    In the past five years, the FDA has approved several OTC switch applications without any label comprehension studies or actual use studies that included adolescents.

142.    There is no medical or scientific basis for the FDA's application of a different and higher standard to Plan B's OTC switch for women of all ages.

143.    The FDA's failure to approve Plan B for OTC use by women of all ages is based in part on outmoded stereotypes of women and girls.

144.    For example, the FDA routinely extrapolates from data from one age group to draw conclusions about another age group.  Indeed, prior to the manufacturer's 2003 submission of its OTC switch application, FDA informed the manufacturer that it would not obtain an extension of its patent for Plan B by conducting extra pediatric studies, for such studies were rendered unnecessary because information about adolescents could be extrapolated from data for adults.  But Galson and his supervisors refused to implement this routine method as to Plan B.

145.    In addition, the FDA rejected the manufacturer's pediatric exclusivity for Plan B, specifically informing the manufacturer in April of 2002 that it could conduct its "proposed trials [of Plan B] in the adult population and the results extrapolated to the postmenarcheal pediatric population."  The FDA's subsequent rejection of extrapolation from studies in adult populations constitutes improper and bad faith agency action.

146.    The FDA's application of a different and higher standard to Plan B's OTC switch was the result of factors that fall outside the FDA's statutory mandate, including impermissible ideological factors, such as appeasement of the President's constituents.

147.    The FDA's rejection of the OTC switch for women of all ages is not supported by medical or scientific evidence and not supported by the agency record.

148.    The fact that upper-level management at FDA removed the decision of whether to approve Plan B's OTC application from the hands of the professional review staff, that upper-level management dictated the outcome of the review process, and that upper-level management

deviated from the standard practices and policies set forth in their own manuals and handbooks, suggests that the FDA impermissibly held the Plan B OTC switch application to a higher standard than other drugs, and that doing so constitutes bad faith and improper agency action.

149.    Where upper level agency management made decisions regarding the status of the Plan B application before the scientific review process has been completed, such premature decision-making constitutes bad faith and improper action by an agency dedicated to promoting and protecting public health.

150.    The former FDA Commissioner Mark McClellan's destruction of email correspondence and refusal to cooperate with the GAO's investigation constitute bad faith and improper agency action.

151.    The record indicates that Barr's application was not actively reviewed after January of 2005, causing the seven month delay between the conclusion of the scientific review and any further agency action.  This was unreasonable and constituted bad faith and improper agency action.

152.    The fact that the Secretary of Health and Human Services (HHS) submitted a letter to the Senate assuring Senators that FDA would act on the OTC application for Plan B by September 1, 2005, but that the only action subsequently taken by the agency was to invite public comment on a proposed rulemaking proceeding, constitutes bad faith and improper agency action.

153.    The FDA's June 9, 2006 letter denying the Citizen Petition is evidence of bad faith and improper agency behavior.  First, it asserts that the FDA made a determination in 2001 that the Citizen Petition could not be approved, but this determination was never communicated to the petitioners.  Second, it asserts that the Citizen Petition filers cannot use evidence submitted

by Barr to support their Petition, but then relies on the Barr submissions extensively. Third, the letter contradicts statements made to the Court in December of 2005 by counsel for the Defendant to the effect that the Citizen Petition was still under active consideration by the FDA. Fourth, the letter is on its face a litigation document issued in direct response to this lawsuit rather than agency action taken in the ordinary course of agency business. For these and other reasons, the June 9, 2006, letter admitting denial of the Citizen Petition is evidence of improper and bad faith agency action.

154.   The FDA's decision imposing "behind-the-counter" status for Plan B and controlling the point of sale of Plan B is unprecedented and discriminates against Plan B because it is a contraceptive drug and because it is used only by women without serving any compelling, significant, or even legitimate governmental interest. Indeed, by comparison to numerous OTC drugs available off the shelf and without any point-of-sale restriction, the FDA's restrictions on Plan B are invidious and contrary to public health. The selective imposition of a behind-the-counter regime for Plan B demonstrates improper agency action and bad faith.

155.   The assertion by the Defendant that the FDA was adopting the "infrastructure" used by states to regulate tobacco products and applying it to Plan B demonstrates improper agency action and bad faith both because this adoption lacks any scientific or medical basis, and because the FDA's restrictions on Plan B have nothing other than the age of 18 in common with the infrastructure of state regulation of tobacco products.

156.   The FDA's requirement of a prescription for Plan B for women aged 17 demonstrates improper agency action and bad faith because it lacks any scientific or medical basis and contradicts prior public statements by the FDA acknowledging the safety of Plan B as an OTC drug for women 17 and over.

157.    The FDA's August 24, 2006, action rejecting OTC status for Plan B and instead imposing the BTC regime for Plan B specifically permits men 18 and over to buy Plan B without a prescription even though there is no FDA-approved use of Plan B for men, and no scientific data whatsoever about actual use or label comprehension by men is contained in the agency record.  Permitting men 18 and over to buy Plan B without a prescription, even though there is no medical evidence supporting any use by men of Plan B, while denying nonprescription status for women under 18 despite extensive supporting scientific data, demonstrates that the FDA's August 24, 2006 decision is based on stereotypes of young women and is utterly irrational.  It also demonstrates that the FDA's recent action establishing an age-restricted behind-the-counter dual prescription/nonprescription regime for Plan B is improper and was done in bad faith.

158.    The behind-the-counter regime is demeaning to and discriminates invidiously against women of all ages because it poses unique barriers to access for a very safe drug that can be used safely and effectively without a prescription by all women of childbearing age while numerous other over-the-counter drugs are not subject to any such barriers, including many for which use without a prescription is discouraged for persons below a certain age because safe over-the-counter use by such younger age groups has never been established.

159.    No drug used only by men and no drug used by both sexes is subject to the same behind-the-counter regime as Plan B.

160.    The timing of the FDA's August 24, 2006 age-restricted behind-the-counter dual prescription/nonprescription regime for Plan B to coincide with the Senate confirmation hearing of the acting commissioner of the FDA evinces improper and bad faith agency action.

161.    At his Senate confirmation hearing on August 1, 2006, the Defendant demonstrated improper agency behavior and bad faith by misleading the Senate Committee on

Health, Education, Labor and Pensions in testifying that the age 18 cutoff he was requiring for

Plan B was based on inadequate data about OTC use of Plan B for 17-year-olds and based on

public comments submitted in response to the advanced notice of proposed rulemaking. His

August 23, 2006 memorandum and a review of the comments submitted contradict these bases

for the age 18 cutoff.

## V.   Causes of Action

### FIRST CAUSE OF ACTION: ARBITRARY AND CAPRICIOUS

162.    Plaintiffs hereby incorporate by reference ¶¶ 1-161 above.

163.    FDA's denial of the OTC switch for women of all ages and imposition of the

BTC regime are arbitrary, capricious, an abuse of discretion and otherwise not in accordance

with law, in violation of 5 U.S.C. § 706(2)(a) (2005) in that the FDA required evidence of safety

and efficacy beyond that required for approval of any other drugs and was improperly motivated

by factors other than medicine and science, and because the evidence of safety and efficacy

before the FDA demonstrates that it should be made available without prescription without any

further restriction.

### SECOND CAUSE OF ACTION: EXCEEDS STATUTORY AUTHORITY

164.    Plaintiffs hereby incorporate by reference ¶¶ 1-163 above.

165.    FDA's denial of the OTC switch for women of all ages and its imposition of the

BTC regime exceed its statutory authority in violation of 5 U.S.C. § 706(2)(c) in that they were

improperly motivated by factors other than medicine and science and in that the FDA lacks

authority to control the point of sale of nonprescription drug products.

## THIRD CAUSE OF ACTION: RIGHT TO PRIVACY

166.    Plaintiffs hereby incorporate by reference ¶¶ 1-165 above.

167.    FDA's denial of the OTC switch for women of all ages and its imposition of the BTC regime violate the Fifth Amendment to the United States Constitution and 5 U.S.C. § 706(2)(b) in that it infringes the right to privacy of women who need Plan B without serving or being tailored to serve any compelling, significant, or legitimate governmental interest.


## FOURTH CAUSE OF ACTION: EQUAL PROTECTION

168.    Plaintiffs hereby incorporate by reference ¶¶ 1-167 above.

169.    FDA's denial of the OTC switch for women of all ages and its imposition of the BTC regime violate the Fifth Amendment to the United States Constitution and 5 U.S.C. § 706(2)(b) in that it discriminates on the basis of sex without serving or being tailored to serve any compelling, significant, or legitimate governmental interest.

170.    FDA's denial of the OTC switch for women of all ages and its imposition of the BTC regime violate the Fifth Amendment to the United States Constitution and 5 U.S.C. § 706(2)(b) in that it discriminates on the basis of the exercise of the fundamental right to privacy to obtain contraception and to keep certain personal information private without serving or being tailored to serve any compelling, significant, or legitimate governmental interest.


## FIFTH CAUSE OF ACTION: INFORMATIONAL PRIVACY

171.    Plaintiffs hereby incorporate by reference ¶¶ 1-170 above.

172.    FDA's denial of the OTC switch for women of all ages and its imposition of the BTC regime violate the right to informational privacy for women who are required by the government to disclose their name, age, and address to private parties in order to obtain Plan B. This requirement does not serve and is not tailored to serve any compelling, significant, or legitimate governmental interest.


## VI.    Prayer for Relief

WHEREFORE, Plaintiffs ask this Court:

A.  To issue an injunction ordering Defendant to approve Plan B as an over-the-counter drug without age or point of sale restriction for women of all ages;

B.  To enter judgment declaring the denial of OTC status of Plan B to women of all ages in violation of the United States Constitution and 5 U.S.C. § 706; and

C.  To grant such other and further relief as this Court should find just and proper, including attorneys' fees and costs.


Dated: October 10, 2006.                    Respectfully submitted,


                                        /s Simon Heller
                                        SIMON HELLER (SH-8760)
                                        NAN STRAUSS (NS-3501)
                                        VIVIEN LABATON (VL-1747)
                                        SANFORD COHEN (SC-6601)
                                        Center for Reproductive Rights
                                        120 Wall Street, 14th Fl.
                                        New York, NY 10005
                                        Telephone: (917) 637-3600
                                        Facsimile: (917) 637-3666

                                        ATTORNEYS FOR ALL PLAINTIFFS

ANDREA COSTELLO (AC-6197)*
SHELBI D. DAY (SD-2627)*
Southern Legal Counsel
1229 N.W. 12th Avenue
Gainesville, FL 32601
(352) 271-8890

ATTORNEY FOR PLAINTIFFS
TUMMINO, MAHONEY, GIARDINA,
MANGAN, SEGUIN, TINNEY, BROWN,
CHURCHILL AND HUNT

*Admitted pro hac vice

## <u>CERTIFICATE OF SERVICE</u>

I, Simon Heller, hereby certify that on October 10, 2006, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which sent notification via electronic mail to F. Franklin Amanat.

Dated: October 10, 2006.

Respectfully submitted,

/s Simon Heller
SIMON HELLER (SH-8760)
NAN E. STRAUSS (NS-3501)
VIVIEN LABATON (VL-1747)
SANFORD COHEN (SC-6601)
Center for Reproductive Rights
120 Wall Street, 14th Floor
New York, NY 10005
(917) 637-3600

ATTORNEYS FOR ALL PLAINTIFFS

ANDREA COSTELLO (AC-6197)*
SHELBI D. DAY (SD-2627)*
Southern Legal Counsel, Inc.
1229 N.W. 12th Avenue
Gainesville, FL 32601
(352) 271-8890

ATTORNEY FOR PLAINTIFFS
TUMMINO, MAHONEY, GIARDINA,
MANGAN, SEGUIN, TINNEY, BROWN,
CHURCHILL AND HUNT

*Admitted pro hac vice

UNITED STATES DISTRICT COURT            FA6117
EASTERN DISTRICT OF NEW YORK        SW5431

| | |
|---|---|
| Annie TUMMINO, *et al.*,         ) | |
| ) | |
|        *Plaintiffs*,    ) | **No. 05-CV-366 (ERK/VVP)** |
| *v.*                  ) | |
| ) | **(Korman, C.J.)** |
| Andrew C. von ESCHENBACH, as   ) | **(Pohorelsky, M.J.)** |
| Commissioner of Food and Drugs,  ) | |
| ) | |
|        *Defendant*.    ) | |
| ) | |

## DEFENDANT'S ANSWER
## TO FIFTH AMENDED COMPLAINT

Defendant Dr. Andrew C. von Eschenbach, in his official capacity as Commissioner of

Food and Drugs, by his undersigned counsel of record, upon information and belief, hereby

answers and avers in response to the allegations and averments contained in the correspondingly

numbered and unnumbered paragraphs of plaintiffs' Fifth Amended Complaint, as follows:

1.      This paragraph states the legal opinions and conclusions of plaintiffs, including

a characterization of their purported causes of action, as to which no answer is required. To the

extent that this paragraph contains factual allegations which may require an answer, those

allegations are denied, except to admit that, on June 9, 2006, the United States Food and Drug

Administration ("FDA") denied a citizen petition (the "Citizen Petition") submitted by the

Center for Reproductive Law & Policy on behalf of more than 60 organizations requesting that

FDA initiate rulemaking to allow emergency contraceptive drug products to be sold without a

prescription to all consumers. Defendant specifically denies that FDA denied the Supplemental

New Drug Application ("SNDA") sponsored by Duramed Research, Inc. ("Duramed"), a wholly-

owned subsidiary of Barr Pharmaceuticals, Inc ("Barr"), and denies that FDA "establish[ed]" a "BTC regime" for Plan B.

1A.    Footnote 1 on page 1 of the Fifth Amended Complaint sets forth plaintiffs' intention to use a particular term in a particular manner; accordingly, no response is required. To the extent footnote 1 can be construed to contain factual allegations, to which a response may be deemed to be required, Defendant denies all such allegations.

2.    This paragraph states the legal opinions and conclusions of plaintiffs, including a statement as to the purported jurisdiction of this Court, as to which no answer is required; to the extent that this paragraph contains factual allegations which may require an answer, all such allegations are denied.

3.    This paragraph states the legal opinions and conclusions of plaintiffs, including a statement as to the propriety of venue in this District, as to which no answer is required. Defendant denies knowledge or information sufficient to form a belief as to the truth or falsity of the allegation that one of the plaintiffs resides in this District. Defendant admits that he is an officer of the United States acting in his official capacity.

4.    Defendant denies knowledge or information sufficient to form a belief as to the truth or falsity of the allegations set forth in this paragraph.

5.    Defendant denies knowledge or information sufficient to form a belief as to the truth or falsity of the allegations set forth in this paragraph.

6.    Defendant denies knowledge or information sufficient to form a belief as to the truth or falsity of the allegations set forth in this paragraph.

7.    Defendant denies knowledge or information sufficient to form a belief as to the truth or falsity of the allegations set forth in this paragraph.

8. Defendant denies knowledge or information sufficient to form a belief as to the truth or falsity of the allegations set forth in this paragraph.

9. Defendant denies knowledge or information sufficient to form a belief as to the truth or falsity of the allegations set forth in this paragraph.

10. Defendant denies knowledge or information sufficient to form a belief as to the truth or falsity of the allegations set forth in this paragraph.

11. Defendant denies knowledge or information sufficient to form a belief as to the truth or falsity of the allegations set forth in this paragraph.

12. Defendant denies knowledge or information sufficient to form a belief as to the truth or falsity of the allegations set forth in this paragraph.

13. Defendant denies knowledge or information sufficient to form a belief as to the truth or falsity of the allegations set forth in this paragraph, except Defendant admits that one or more of the named individual plaintiffs who are described in the Fifth Amended Complaint as having an affiliation with "the MAP Conspiracy" testified at the December 2003 public hearings conducted by the two advisory committees that participated in the agency's administrative process with respect to the sponsor's SNDA seeking to approve Plan B for over-the-counter dispensing, and Defendant denies that women face obstacles in obtaining Plan B or "have to conspire to obtain it."

14. Defendant denies knowledge or information sufficient to form a belief as to the truth or falsity of the allegations set forth in the first two sentences of this paragraph, except Defendant admits that each of the individual plaintiffs listed in paragraphs 4-12 has access to one or more doses of Plan B. The third and fourth sentences of this paragraph state the legal

opinions and conclusions of plaintiffs, as to which no answer is required; to the extent these sentences can be construed to contain factual allegations, all such allegations are denied.

15. This paragraph sets forth the personal opinions and objections of the individual plaintiffs, to which no answer is required; to the extent this paragraph can be construed to contain factual allegations, including allegations as to "requirements" and as to "disclosure of information . . . that will occur," all such allegations are denied.

16. Defendant denies knowledge or information sufficient to form a belief as to the truth or falsity of the allegations set forth in the first fourteen sentences of this paragraph. The fifteenth sentence of this paragraph states the legal opinions and conclusions of plaintiffs, as to which no response is required. As to the sixteenth sentence, Defendant admits that on June 9, 2006, FDA denied the Citizen Petition and that plaintiff ARHP was one of the organizations that had submitted the Citizen Petition; all other allegations in this sentence, including the implication that FDA had denied the citizen petition prior to June 9, 2006, are denied. The seventeenth sentence of this paragraph is denied. The eighteenth sentence of this paragraph states a characterization of the plaintiffs' purported causes of action and the capacity in which plaintiff purports to sue, as to which no answer is required; to the extent this sentence contains factual allegations, Defendant denies knowledge or information sufficient to form a belief as to their truth or falsity.

17. Defendant denies knowledge or information sufficient to form a belief as to the truth or falsity of the allegations set forth in the first three sentences of this paragraph. The fourth and fifth sentences of this paragraph are denied. The sixth sentence of this paragraph states a characterization of the plaintiffs' purported causes of action and the capacity in which plaintiff purports to sue, as to which no answer is required; to the extent this sentence contains

factual allegations, Defendant denies knowledge or information sufficient to form a belief as to their truth or falsity.

18.     Defendant denies knowledge or information sufficient to form a belief as to the truth or falsity of the allegations set forth in this paragraph.

19.     Defendant denies knowledge or information sufficient to form a belief as to the truth or falsity of the allegations set forth in this paragraph.

20.     Defendant denies knowledge or information sufficient to form a belief as to the truth or falsity of the allegations set forth in this paragraph.

21.     Defendant denies knowledge or information sufficient to form a belief as to the truth or falsity of the allegations set forth in this paragraph.

22.     Defendant denies knowledge or information sufficient to form a belief as to the truth or falsity of the allegations set forth in this paragraph.

23.     Defendant denies knowledge or information sufficient to form a belief as to the truth or falsity of the allegations set forth in this paragraph.

24.     Defendant denies knowledge or information sufficient to form a belief as to the truth or falsity of the allegations set forth in this paragraph.

25.     The first sentence of this paragraph is denied.  The second sentence of this paragraph states the legal opinions and conclusions of plaintiffs, including a characterization of their purported causes of action, as to which no answer is required; to the extent this sentence can be construed to contain factual allegations, all such allegations are denied, except Defendant denies knowledge or information sufficient to form a belief as to the truth or falsity of the allegations relating to the plaintiffs' desires and intentions.

26.     Denied.

27.   Denied.

28.   Denied.

29.   As to the first sentence of this paragraph, Defendant admits that he is the Commissioner of Food and Drugs.  The second and third sentences of this paragraph purport to describe the responsibilities of the Commissioner of Food and Drugs; such responsibilities are defined by statute and are set forth at 21 U.S.C. § 393, which statutory provision speaks for itself.  To the extent the second and third sentences describe responsibilities other than what is set forth in the referenced statute, they are denied.  The final sentence describes the capacity in which Dr. von Eschenbach is sued, and no response to that sentence is required.

30.   This paragraph states the legal opinions and conclusions of plaintiffs, as to which no answer is required; insofar as an answer may be deemed to be required, Defendant respectfully refers the Court to the referenced regulation and statute for a full and complete statement of their content.

31.   The first sentence of this paragraph is vague and uses undefined terminology.  The second sentence is a citation to which no answer is required. To the extent plaintiffs purport to state legal conclusions regarding the statutory scheme, no response is required; insofar as an answer to this sentence may be deemed to be required, Defendant refers the Court to the relevant statutes for a full and complete statement of their contents and denies any factual allegations which may be included in this paragraph.

32.   This paragraph states the legal opinions and conclusions of plaintiffs, as to which no answer is required; insofar as an answer may be deemed to be required, Defendant respectfully refers the Court to the referenced regulations for a full and complete statement of their content.

33.   The first two sentences of this paragraph state the legal opinions and conclusions of plaintiffs, as to which no answer is required; to the extent these sentences can be construed to contain factual allegations, all such allegations are denied.  As to the third sentence of this paragraph, FDA avers that, based on the evidence before the agency, Plan B has been approved for dispensation without a prescription to consumers age 18 and over but continues to require a prescription for dispensation to consumers under the age of 18.

34.   The first sentence of this paragraph states the legal opinions and conclusions of plaintiffs, as to which no answer is required; insofar as an answer to this sentence may be deemed to be required, Defendant respectfully refers the Court to the referenced statute for a full and complete statement of its content.  The second sentence of this paragraph is denied.

35.   This paragraph states the legal opinions and conclusions of plaintiffs, as to which no answer is required; insofar as an answer may be deemed to be required, Defendant respectfully refers the Court to the referenced regulations for a full and complete statement of their content.

36.   As the first sentence of this paragraph is vague and uses undefined terminology, Defendant denies knowledge or information sufficient to form a belief as to the truth or falsity of the allegations set forth in the sentence.  As to the second sentence, Defendant admits that the FDA's Advisory Committee for Reproductive Health Drugs was one of two advisory committees that participated in the agency's administrative process with respect to the sponsor's application to approve Plan B for OTC dispensing.  The third sentence states the legal opinions and conclusions of plaintiff, as to which no answer is required; insofar as an answer may be deemed to be required, Defendant respectfully refers the Court to the referenced statute for a full and complete statement of its content.

37.    This paragraph states the legal opinions and conclusions of plaintiffs, as to which no answer is required.

38.    This paragraph states the legal opinions and conclusions of plaintiffs, as to which no answer is required; insofar as an answer may be deemed to be required, Defendant respectfully refers the Court to the referenced statute for a full and complete statement of its content.

38A.    To the extent that the caption to part IV.A. of the Fifth Amended Complaint can be construed to contain factual allegations, to which a response may be deemed to be required, Defendant denies all such allegations but avers that, based on the evidence before the agency, Plan B has been approved for dispensation without a prescription to consumers age 18 and over but continues to require a prescription for dispensation to consumers under the age of 18.

39.    Defendant admits the first sentence of this paragraph.  The second and third sentences are vague, use undefined terminology, and purport to cite unspecified statistics; accordingly, Defendant denies knowledge or information sufficient to form a belief as to the truth or falsity of the allegations set forth in these sentences.  The fourth sentence sets forth the opinions and speculations of the plaintiffs rather than allegations of fact; accordingly, no response is required.  To the extent a response to the fourth sentence may be required, the allegations are denied.

40.    Defendant admits the first twelve words of this paragraph.  The allegations in the remainder of this paragraph set forth the opinions and speculations of the plaintiffs rather than allegations of fact; accordingly, no response is required.  To the extent a response to these allegations may be required, Defendant has not made such a comparison because it is not necessary to any statutory determination.

41.    Defendant admits the portion of this paragraph prior to the comma; Defendant denies the allegations in the remainder of the paragraph.

42.    Admitted.

43.    The first two sentences are admitted, based on information available to FDA to date.  As to the final sentence of this paragraph, Defendant admits that, based on information available to FDA to date, Plan B is unlikely to affect an established pregnancy.

44.    Defendant denies the allegations in the first sentence of this paragraph, except to admit, based on information available to FDA to date, that Plan B is more effective the sooner treatment is started following unprotected sexual intercourse.  The remainder of this paragraph sets forth the opinions and speculations of the plaintiffs rather than allegations of fact; accordingly, no response is required.  To the extent a response may be required, Defendant denies the remainder of this paragraph but avers that, based on the evidence before the agency, Plan B has been approved for dispensation without a prescription to consumers age 18 and over but continues to require a prescription for dispensation to consumers under the age of 18.

45.    This paragraph sets forth the opinions and speculations of the plaintiffs rather than allegations of fact; accordingly, no response is required.  To the extent a response may be required, denied, but Defendant avers that, based on the evidence before the agency, Plan B has been approved for dispensation without a prescription to consumers age 18 and over but continues to require a prescription for dispensation to consumers under the age of 18.

46.    This paragraph sets forth the opinions and speculations of the plaintiffs rather than allegations of fact; accordingly, no response is required.  To the extent a response may be required, Defendant avers that, based on the evidence before the agency, Plan B has been

approved for dispensation without a prescription to consumers age 18 and over but continues to require a prescription for dispensation to consumers under the age of 18.

47.   This paragraph sets forth the opinions and speculations of the plaintiffs rather than allegations of fact; accordingly, no response is required.  To the extent a response may be required, denied, but Defendant avers that, based on the evidence before the agency, Plan B has been approved for dispensation without a prescription to consumers age 18 and over but continues to require a prescription for dispensation to consumers under the age of 18.

48.   This paragraph sets forth the opinions and speculations of the plaintiffs rather than allegations of fact; accordingly, no response is required.  To the extent a response may be required, denied, but Defendant avers that, based on the evidence before the agency, Plan B has been approved for dispensation without a prescription to consumers age 18 and over but continues to require a prescription for dispensation to consumers under the age of 18.

49.   This paragraph sets forth the opinions and speculations of the plaintiffs rather than allegations of fact; accordingly, no response is required.  To the extent a response may be required, denied, but Defendant avers that, based on the evidence before the agency, Plan B has been approved for dispensation without a prescription to consumers age 18 and over but continues to require a prescription for dispensation to consumers under the age of 18.

50.   This paragraph sets forth the opinions and speculations of the plaintiffs rather than allegations of fact; accordingly, no response is required.  To the extent a response may be required, denied, but Defendant avers that, based on the evidence before the agency, Plan B has been approved for dispensation without a prescription to consumers age 18 and over but continues to require a prescription for dispensation to consumers under the age of 18.

51.   Denied.

52.  This paragraph sets forth the opinions and speculations of the plaintiffs rather than allegations of fact; accordingly, no response is required.  To the extent a response may be required, denied, but Defendant avers that, based on the evidence before the agency, Plan B has been approved for dispensation without a prescription to consumers age 18 and over but continues to require a prescription for dispensation to consumers under the age of 18.

53.  This paragraph sets forth the purported opinions and positions of organizations that are not parties to this action, rather than allegations of fact; accordingly, no response is required.  The documents referenced in this paragraph and annexed to the complaint speak for themselves as to their contents, and Defendant denies plaintiffs' characterization of the documents.

53A.  To the extent that the caption to part IV.B. of the Fifth Amended Complaint can be construed to contain factual allegations, to which a response may be deemed to be required, Defendant denies all such allegations, except admits that FDA has received at least four citizen petitions relating to emergency contraception.

54.  As to the first sentence of this paragraph, Defendant admits only that, on November 29, 1994, FDA received a petition from the Center for Reproductive Law & Policy on behalf of the American Medical Women's Association, the American Public Health Association, and Planned Parenthood of New York City, seeking "to mandate relabeling of certain oral contraceptives to indicate appropriate directions for use as postcoital emergency contraception."  The second sentence of this paragraph purports to describe the contents of a letter attached to the Fifth Amended Complaint; Defendant avers that the referenced document speaks for itself as to its contents, and denies plaintiffs' characterization of the document.

55.    This paragraph purports to describe the contents of a letter attached to the Fifth Amended Complaint; Defendant avers that the referenced document speaks for itself as to its contents, and denies plaintiffs' characterization of the document.

56.    This paragraph purports to describe the contents of a letter attached to the Fifth Amended Complaint; Defendant avers that the referenced document speaks for itself as to its contents, and denies knowledge or information sufficient to form a belief as to when the Center for Reproductive Law and Policy received the letter.

57.    This paragraph purports to describe the contents of a Federal Register Notice attached to the Fifth Amended Complaint; Defendant avers that the referenced document speaks for itself as to its contents, and denies plaintiffs' characterization of the document.

58.    Admitted.

59.    Denied, except Defendant admits that on February 14, 2001, a group of entities including Plaintiff ARHP filed the Citizen Petition requesting that FDA make a rule allowing emergency contraceptives to be sold without a prescription to consumers of all ages.  Defendant specifically denies the parenthetical allegation regarding the reasons for the withdrawal of Preven.

60.    Denied.

61.    Defendant admits that on June 9, 2006, it denied the Citizen Petition and that plaintiff ARHP was one of the organizations that had submitted the Citizen Petition; all other allegations in this sentence, including the implication that FDA had denied the Citizen Petition prior to June 9, 2006, and the implication that the decision was "directly prompted by this lawsuit," are denied.

62.     The first sentence of this paragraph purports to describe the contents of a document attached to the Fifth Amended Complaint; Defendant avers that the referenced document speaks for itself as to its contents, and denies plaintiffs' characterization of it. The second sentence is denied. As to the third sentence, Defendant avers that FDA's response to the Citizen Petition is fully set forth in the administrative record produced by the agency, avers that said record speaks for itself as to its contents and as to the dates of the documents contained within it, and denies plaintiffs' characterization of those contents.

62A.   To the extent that the caption to part IV.C. of the Fifth Amended Complaint can be construed to contain factual allegations, to which a response may be deemed to be required, Defendant denies all such allegations, except admits that the sponsor of Plan B filed an SNDA which initially asked FDA to approve Plan B for sale without a prescription but which the sponsor subsequently amended to request non-prescription status only as to consumers age 18 and over.

63.     The first sentence of this paragraph is admitted. The second sentence is denied, except Defendant admits that the rights to Plan B were sold to Barr and are currently held by Duramed. The third sentence contains allegations which are irrelevant and immaterial to the causes of action asserted in the complaint and which are beyond the Court's subject matter jurisdiction; accordingly, no response is required. To the extent a response is required, defendant avers that there is no medically approved use of Plan B for men.

64.     This paragraph contains allegations which are irrelevant and immaterial to the causes of action asserted in the complaint and which are beyond the Court's subject matter jurisdiction; accordingly, no response is required. To the extent a response is required, denied.

65. This paragraph contains allegations which are irrelevant and immaterial to the causes of action asserted in the complaint and which are beyond the Court's subject matter jurisdiction; accordingly, no response is required. To the extent a response is required, denied.

66. Admitted.

67. Denied, except Defendant admits that this paragraph accurately reflects the votes on four of the six questions considered by the advisory committees.

68. The first four sentences of this paragraph either purport to describe the contents of a document attached to the Fifth Amended Complaint, or are the citations thereto; Defendant avers that the referenced document speaks for itself as to its contents, and denies plaintiffs' characterization of the document. Defendant denies the fifth sentence.

69. This paragraph contains allegations which are irrelevant and immaterial to the causes of action asserted in the complaint and which are beyond the Court's subject matter jurisdiction; accordingly, no response is required. To the extent a response is required, denied.

70. The first sentence of this paragraph contains allegations which are irrelevant and immaterial to the causes of action asserted in the complaint and which are beyond the Court's subject matter jurisdiction; accordingly, no response is required. To the extent a response is required, denied. The second sentence of this paragraph is denied.

71. This paragraph contains allegations which are irrelevant and immaterial to the causes of action asserted in the complaint and which are beyond the Court's subject matter jurisdiction; accordingly, no response is required. To the extent a response is required, denied.

72. This paragraph contains allegations which are irrelevant and immaterial to the causes of action asserted in the complaint and which are beyond the Court's subject matter jurisdiction; accordingly, no response is required. To the extent a response is required, denied.

73.    This paragraph contains allegations which are irrelevant and immaterial to the causes of action asserted in the complaint and which are beyond the Court's subject matter jurisdiction; accordingly, no response is required.  To the extent a response is required, denied.

74.    This paragraph contains allegations which are irrelevant and immaterial to the causes of action asserted in the complaint and which are beyond the Court's subject matter jurisdiction; accordingly, no response is required.  To the extent a response is required, denied.

75.    This paragraph contains allegations which are irrelevant and immaterial to the causes of action asserted in the complaint and which are beyond the Court's subject matter jurisdiction; accordingly, no response is required.  To the extent a response is required, denied.

76.    This paragraph contains allegations which are irrelevant and immaterial to the causes of action asserted in the complaint and which are beyond the Court's subject matter jurisdiction; accordingly, no response is required.  To the extent a response is required, denied.

77.    This paragraph purports to describe the contents of a memorandum contained in the administrative record; Defendant avers that the referenced document speaks for itself as to its contents, and no response to this paragraph is therefore necessary.

78.    This paragraph purports to describe the contents of a memorandum contained in the administrative record; Defendant avers that the referenced document speaks for itself as to its contents, and no response to this paragraph is therefore necessary.

79.    This paragraph purports to describe the contents of a memorandum contained in the administrative record; Defendant avers that the referenced document speaks for itself as to its contents, and no response to this paragraph is therefore necessary.

80.    The first sentence of this paragraph purports to describe the contents of a letter attached to the complaint and contained in the administrative record; Defendant avers that the

referenced document speaks for itself as to its contents, and denies plaintiffs' characterization of the document. The last seven words of the first sentence ("rejecting . . . Plan B.") are specifically denied. The second sentence is denied.

81. The first sentence of this paragraph purports to describe the contents of a letter attached to the complaint and contained in the administrative record; Defendant avers that the referenced document speaks for itself as to its contents, and denies plaintiffs' characterization of the document. The last sentence of this paragraph is denied.

82. This paragraph contains allegations which are irrelevant and immaterial to the causes of action asserted in the complaint and which are beyond the Court's subject matter jurisdiction; accordingly, no response is required. To the extent a response is required, denied.

83. This paragraph contains allegations which are irrelevant and immaterial to the causes of action asserted in the complaint and which are beyond the Court's subject matter jurisdiction; accordingly, no response is required. To the extent a response is required, denied.

84. This paragraph contains allegations which are irrelevant and immaterial to the causes of action asserted in the complaint and which are beyond the Court's subject matter jurisdiction; accordingly, no response is required. To the extent a response is required, denied.

85. This paragraph contains allegations which are irrelevant and immaterial to the causes of action asserted in the complaint and which are beyond the Court's subject matter jurisdiction; accordingly, no response is required. To the extent a response is required, denied.

85A. To the extent that the caption to part IV.D. of the Fifth Amended Complaint can be construed to contain factual allegations, to which a response may be deemed to be required, Defendant denies all such allegations, except admits that Duramed filed an amended supplemental new drug application.

86.    As to the first sentence of this paragraph, Defendant admits that Duramed filed an amended SNDA on July 22, 2004, and avers that the referenced application speaks for itself as to its contents and as to the agency action sought.  The second sentence is denied.  The third sentence contains a legal citation as to which no answer is required.  The final sentence is denied.

87.    This paragraph contains allegations which are irrelevant and immaterial to the causes of action asserted in the complaint and which are beyond the Court's subject matter jurisdiction; accordingly, no response is required.  To the extent a response is required, FDA has produced the final versions of all memoranda evaluating the Plan B SNDA by CDER review divisions. Defendant avers that the documents speak for themselves as to their contents, and denies plaintiffs' characterization of the documents.

88.    This paragraph contains allegations which are irrelevant and immaterial to the causes of action asserted in the complaint and which are beyond the Court's subject matter jurisdiction; accordingly, no response is required.  To the extent a response is required, FDA has produced the final versions of all memoranda evaluating the Plan B SNDA by CDER review divisions. Defendant avers that the documents speak for themselves as to their contents, and denies plaintiffs' characterization of the documents.

89.    The first sentence of this paragraph (and its succeeding parenthetical citation) contains allegations which are irrelevant and immaterial to the causes of action asserted in the complaint and which are beyond the Court's subject matter jurisdiction; accordingly, no response is required.  To the extent a response is required, FDA has produced the final versions of all memoranda evaluating the Plan B SNDA by CDER review divisions. Defendant avers that the documents speak for themselves as to their contents, and denies plaintiffs' characterization of the documents.  The final sentence of this paragraph is denied.

90.     This paragraph contains allegations which are irrelevant and immaterial to the causes of action asserted in the complaint and which are beyond the Court's subject matter jurisdiction; accordingly, no response is required.  To the extent this paragraph purports to describe the record produced thus far in this case, Defendant avers that the documents in the record speak for themselves as to their contents, and denies plaintiffs' characterization of said documents.

91.     This paragraph contains allegations which are irrelevant and immaterial to the causes of action asserted in the complaint and which are beyond the Court's subject matter jurisdiction; accordingly, no response is required.  To the extent a response is required, the first sentence of this paragraph purports to describe the contents of a document attached to the Fifth Amended Complaint; Defendant avers that the referenced document speaks for itself as to its contents, and denies plaintiffs' characterization of the document.  The second sentence of this paragraph purports to describe the contents of a letter submitted by counsel for Defendant to the Court in the course of this lawsuit, stating Defendant's legal arguments; Defendant avers that the referenced letter speaks for itself as to its contents, and denies plaintiffs' characterization of the letter.

92.     This paragraph contains allegations which are irrelevant and immaterial to the causes of action asserted in the complaint and which are beyond the Court's subject matter jurisdiction; accordingly, no response is required.  To the extent a response is required, the first five words of this paragraph are denied.  The remainder of this paragraph purports to describe the contents of a document attached to the Fifth Amended Complaint and contained in the administrative record; Defendant avers that the referenced document speaks for itself as to its contents, and denies plaintiffs' characterization of the document.

93.     This paragraph contains allegations which are irrelevant and immaterial to the causes of action asserted in the complaint and which are beyond the Court's subject matter jurisdiction; accordingly, no response is required.  To the extent a response is required, denied.

94.     This paragraph contains allegations which are irrelevant and immaterial to the causes of action asserted in the complaint and which are beyond the Court's subject matter jurisdiction; accordingly, no response is required.  To the extent a response is required, this paragraph purports to describe the contents of a document that Defendant produced in discovery in this case.  Defendant avers that the referenced document speaks for itself as to its contents, and denies plaintiffs' characterization of the document.

95.     This paragraph contains allegations which are irrelevant and immaterial to the causes of action asserted in the complaint and which are beyond the Court's subject matter jurisdiction; accordingly, no response is required.  To the extent a response is required, this paragraph purports to describe the contents of a document that Defendant published in the Federal Register.  Defendant avers that the referenced document speaks for itself as to its contents, and denies plaintiffs' characterization of the document.

96.     This paragraph contains allegations which are irrelevant and immaterial to the causes of action asserted in the complaint and which are beyond the Court's subject matter jurisdiction; accordingly, no response is required.  To the extent a response is required, denied.

97.     This paragraph contains allegations which are irrelevant and immaterial to the causes of action asserted in the complaint and which are beyond the Court's subject matter jurisdiction; accordingly, no response is required.  To the extent a response is required, denied, except Defendant admits that Dr. Susan F. Wood was Assistant FDA Commissioner for

Women's Health and Director of the Office of Women's Health at FDA until she resigned from the agency on August 31, 2005.

98.    This paragraph contains allegations which are irrelevant and immaterial to the causes of action asserted in the complaint and which are beyond the Court's subject matter jurisdiction; accordingly, no response is required.  To the extent a response is required, Defendant denies knowledge or information sufficient to form a belief as to whether and when Dr. Wood appeared on *Nightline* or as to the contents of her statements during any such appearance.  Defendant denies that FDA "fail[ed] . . . to act in accordance with the scientific consensus in favor of approving Plan B for OTC use."

99.    This paragraph contains allegations which are irrelevant and immaterial to the causes of action asserted in the complaint and which are beyond the Court's subject matter jurisdiction; accordingly, no response is required.  To the extent a response is required, Defendant denies knowledge or information sufficient to form a belief as to the accuracy of the quotations and characterizations contained in this paragraph, as to the content of Dr. Wood's subjective beliefs and opinions, and as to the reasons for her resignation from FDA.  Dr. Wood's purported statements regarding FDA's decision-making process are denied.

100.  This paragraph contains allegations which are irrelevant and immaterial to the causes of action asserted in the complaint and which are beyond the Court's subject matter jurisdiction; accordingly, no response is required.  To the extent a response is required, denied.

100A.        To the extent that the caption to part IV.E. of the Fifth Amended Complaint can be construed to contain factual allegations, such allegations are irrelevant and immaterial to the causes of action asserted in the complaint and are beyond the Court's subject matter jurisdiction; accordingly, no response is required.  To the extent a response is required,

Defendant admits that the Government Accountability Office (GAO) conducted a study regarding FDA's issuance of a letter to Duramed dated May 6, 2004.

101.  This paragraph contains allegations which are irrelevant and immaterial to the causes of action asserted in the complaint and which are beyond the Court's subject matter jurisdiction; accordingly, no response is required.  To the extent a response is required, denied, except Defendant admits that the GAO conducted a study at the request of certain members of the Congress regarding FDA's issuance of a letter to Barr dated May 6, 2004.  The portion of the paragraph after the word "why" is specifically denied.

102.  This paragraph contains allegations which are irrelevant and immaterial to the causes of action asserted in the complaint and which are beyond the Court's subject matter jurisdiction; accordingly, no response is required.  To the extent a response is required, denied, except Defendant admits that the GAO conducted a study at the request of certain members of the Congress regarding FDA's issuance of a letter to Barr dated May 6, 2004, avers that the GAO's report to certain members of Congress speaks for itself as to its contents, and denies plaintiffs' characterization of the document.  To the extent that plaintiffs purport to allege the truth of any findings or conclusions purportedly reached by the GAO investigators, Defendant denies all such allegations.

103.  This paragraph contains allegations which are irrelevant and immaterial to the causes of action asserted in the complaint and which are beyond the Court's subject matter jurisdiction; accordingly, no response is required.  To the extent a response is required, denied, except Defendant admits that the GAO conducted a study at the request of certain members of the Congress regarding FDA's issuance of a letter to Barr dated May 6, 2004, avers that the GAO's report to certain members of Congress speaks for itself as to its contents, and denies

plaintiffs' characterization of the document. To the extent that plaintiffs purport to allege the truth of any findings or conclusions purportedly reached by the GAO investigators, Defendant denies all such allegations.

104. This paragraph contains allegations which are irrelevant and immaterial to the causes of action asserted in the complaint and which are beyond the Court's subject matter jurisdiction; accordingly, no response is required. To the extent a response is required, denied, except Defendant admits that the GAO conducted a study at the request of certain members of the Congress regarding FDA's issuance of a letter to Barr dated May 6, 2004, avers that the GAO's report to certain members of Congress speaks for itself as to its contents, and denies plaintiffs' characterization of the document. To the extent that plaintiffs purport to allege the truth of any findings or conclusions purportedly reached by the GAO investigators, Defendant denies all such allegations.

105. This paragraph contains allegations which are irrelevant and immaterial to the causes of action asserted in the complaint and which are beyond the Court's subject matter jurisdiction; accordingly, no response is required. To the extent a response is required, denied.

106. This paragraph contains allegations which are irrelevant and immaterial to the causes of action asserted in the complaint and which are beyond the Court's subject matter jurisdiction; accordingly, no response is required. To the extent a response is required, denied.

107. This paragraph contains allegations which are irrelevant and immaterial to the causes of action asserted in the complaint and which are beyond the Court's subject matter jurisdiction; accordingly, no response is required. To the extent a response is required, denied.

107A. To the extent that the caption to part IV.F. of the Fifth Amended Complaint can be construed to contain factual allegations, such allegations are irrelevant and

immaterial to the causes of action asserted in the complaint and are beyond the Court's subject matter jurisdiction; accordingly, no response is required. To the extent a response is required, Defendant denies all such allegations.

108. This paragraph contains allegations which are irrelevant and immaterial to the causes of action asserted in the complaint and which are beyond the Court's subject matter jurisdiction; accordingly, no response is required. To the extent a response is required, denied.

109. This paragraph contains allegations which are irrelevant and immaterial to the causes of action asserted in the complaint and which are beyond the Court's subject matter jurisdiction; accordingly, no response is required. To the extent a response is required, denied, except Defendant admits that the Office of the Commissioner had been briefed on the Plan B supplemental new drug application by December 10, 2003, and avers that the referenced communications from Dr. Galson speak for themselves as to their contents.

110. This paragraph contains allegations which are irrelevant and immaterial to the causes of action asserted in the complaint and which are beyond the Court's subject matter jurisdiction; accordingly, no response is required. To the extent a response is required, denied, except Defendant admits that the Director of the Office of New Drugs reviewed the Plan B SNDA. To the extent that plaintiffs purport to allege the truth of any findings or conclusions purportedly reached by the GAO investigators, Defendant denies all such allegations.

111. This paragraph contains allegations which are irrelevant and immaterial to the causes of action asserted in the complaint and which are beyond the Court's subject matter jurisdiction; accordingly, no response is required. To the extent a response is required, this paragraph purports to describe the contents of a vaguely-identified document; Defendant avers

that such document, if it exists, and if properly identified and authenticated, would speak for itself as to its contents, and denies plaintiffs' characterization of the document.

112. This paragraph contains allegations which are irrelevant and immaterial to the causes of action asserted in the complaint and which are beyond the Court's subject matter jurisdiction; accordingly, no response is required. To the extent a response is required, denied, except Defendant admits that many original supplemental new drug applications from sponsors seeking OTC approval of their drug products contain data relating to adolescent use, and that FDA has, in the last ten years, after examining the data in the original application, requested *additional* data relating to adolescent use for Plan B and several nicotine products.

113. This paragraph contains allegations which are irrelevant and immaterial to the causes of action asserted in the complaint and which are beyond the Court's subject matter jurisdiction; accordingly, no response is required. To the extent a response is required, FDA has produced the final versions of all memoranda evaluating the Plan B SNDA by CDER review divisions. Defendant avers that the documents speak for themselves as to their contents, and denies plaintiffs' characterization of the documents. Defendant specifically denies plaintiffs' characterization of the August 26, 2005, letter as a "decision to further withhold approval of Plan B for OTC use" and denies plaintiffs' characterization of unnamed and unidentified "scientific review staff" as individuals "that would normally be responsible for making decisions approving drugs for OTC use."

113A. To the extent that the caption to part IV.G. of the Fifth Amended Complaint can be construed to contain factual allegations, such allegations are irrelevant and immaterial to the causes of action asserted in the complaint and are beyond the Court's subject matter jurisdiction; accordingly, no response is required. To the extent a response is required,

Defendant denies all such allegations, except avers that Duramed filed an amended SNDA in August 2006 and that, based on the evidence before the agency, Plan B has been approved for dispensation without a prescription to consumers age 18 and over but continues to require a prescription for dispensation to consumers under the age of 18.

114. This paragraph purports to describe the contents of a public announcement made by FDA, which is published on the Internet. Defendant avers that the referenced announcement speaks for itself as to its contents, and denies plaintiffs' characterization of the document.

115. This paragraph purports to describe the contents of a document which is published on the Internet. Defendant avers that the referenced document speaks for itself as to its contents, denies plaintiffs' characterization of the document, and specifically denies the penultimate (i.e., the last non-citation) sentence in this paragraph.

116. Denied, except Defendant admits that FDA representatives met with Duramed representatives on August 8, 2006, to discuss unresolved issues related to Duramed's SNDA for Plan B.

117. Denied, except Defendant admits that on August 17, 18, and 23, 2006, Duramed filed an amended SNDA, which document speaks for itself as to its contents and as to the agency action requested from FDA.

118. This paragraph contains allegations which are irrelevant and immaterial to the causes of action asserted in the complaint and which are beyond the Court's subject matter jurisdiction; accordingly, no response is required. To the extent a response is required, the final versions of all memoranda evaluating the Plan B SNDA by CDER review divisions are available on the Internet. Defendant avers that the documents speak for themselves as to their contents, and denies plaintiffs' characterization of the documents.

119. This paragraph contains allegations which are irrelevant and immaterial to the causes of action asserted in the complaint and which are beyond the Court's subject matter jurisdiction; accordingly, no response is required. To the extent a response is required, the final versions of all memoranda evaluating the Plan B SNDA by CDER review divisions are available on the Internet. Defendant avers that the documents speak for themselves as to their contents, and denies plaintiffs' characterization of the documents. Defendant also denies that Dr. Beitz was Acting Director of CDER on August 22, 2006, or on any other date.

120. This paragraph contains allegations which are irrelevant and immaterial to the causes of action asserted in the complaint and which are beyond the Court's subject matter jurisdiction; accordingly, no response is required. To the extent a response is required, the final versions of all memoranda evaluating the Plan B SNDA by CDER review divisions are available on the Internet. Defendant avers that the documents speak for themselves as to their contents, and denies plaintiffs' characterization of the documents.

121. This paragraph contains allegations which are irrelevant and immaterial to the causes of action asserted in the complaint and which are beyond the Court's subject matter jurisdiction; accordingly, no response is required. To the extent a response is required, the final versions of all memoranda evaluating the Plan B SNDA by CDER review divisions are available on the Internet. Defendant avers that the documents speak for themselves as to their contents, and denies plaintiffs' characterization of the documents.

122. Denied, except Defendant admits that on August 23, 2006, he issued a memorandum regarding Plan B, which document speaks for itself as to its contents.

123. Denied, except Defendant admits that on August 23, 2006, he issued a memorandum regarding Plan B, which document speaks for itself as to its contents.

124. Denied, except Defendant admits that on August 23, 2006, he issued a memorandum regarding Plan B, which document speaks for itself as to its contents.

125. The first sentence is denied. The second sentence purports to describe the contents of a memorandum issued by Defendant on August 23, 2006; Defendant avers that the document speaks for itself as to its contents, and denies plaintiffs' characterization of the document.

126. The first sentence purports to describe the contents of a memorandum issued by Defendant on August 23, 2006; Defendant avers that the document speaks for itself as to its contents, and denies plaintiffs' characterization of the documents. The second sentence is admitted. The third sentence is denied.

127. The first sentence purports to describe the contents of a memorandum issued by Defendant on August 23, 2006; Defendant avers that the document speaks for itself as to its contents, and denies plaintiffs' characterization of the documents. The second and third sentences contains allegations which are irrelevant and immaterial to the causes of action asserted in the complaint and which are beyond the Court's subject matter jurisdiction; accordingly, no response is required. In any event, as those sentences are vague and use undefined terminology, Defendant denies knowledge or information sufficient to form a belief as to the truth or falsity of the allegations set forth in the sentences.

128. Defendant admits that on August 24, 2006, Dr. Steven Galson issued a memorandum regarding Plan B, which document speaks for itself as to its contents; no response to this paragraph is therefore necessary.

129. Denied.

130. This paragraph purports to describe the contents of a public announcement made by FDA, which is published on the Internet. Defendant avers that the referenced announcement speaks for itself as to its contents, and denies plaintiffs' characterization of the document.

131. This paragraph contains allegations which are irrelevant and immaterial to the causes of action asserted in the complaint and which are beyond the Court's subject matter jurisdiction; accordingly, no response is required. To the extent a response is required, the final versions of all memoranda evaluating the Plan B SNDA by CDER review divisions have been included in the administrative record. Defendant avers that the documents speak for themselves as to their contents, and denies plaintiffs' characterization of the documents.

132. The first sentence is denied. The second sentence is admitted. The third sentence is denied. Defendant denies that Plan B is a nonprescription drug, and denies that FDA has mandated that it be kept "behind the counter."

133. This paragraph contains allegations which are irrelevant and immaterial to the causes of action asserted in the complaint and which are beyond the Court's subject matter jurisdiction; accordingly, no response is required. To the extent a response is required, Defendant denies knowledge or information sufficient to admit or deny the allegations.

134. This paragraph contains allegations which are irrelevant and immaterial to the causes of action asserted in the complaint and which are beyond the Court's subject matter jurisdiction; accordingly, no response is required. To the extent a response is required, Defendant denies knowledge or information sufficient to admit or deny the allegations in this paragraph, which is vague and uses undefined terminology.

135. This paragraph contains allegations which are irrelevant and immaterial to the causes of action asserted in the complaint and which are beyond the Court's subject matter jurisdiction; accordingly, no response is required. To the extent a response is required, denied.

136. This paragraph contains allegations which are irrelevant and immaterial to the causes of action asserted in the complaint and which are beyond the Court's subject matter jurisdiction; accordingly, no response is required. To the extent a response is required, Defendant avers that the package labeling for Plan B speaks for itself as to its contents, and denies plaintiffs' characterization of said labeling; Defendant denies the portion of this paragraph prior to the first comma and the portion between the second and third commas.

137. This paragraph contains allegations which are irrelevant and immaterial to the causes of action asserted in the complaint and which are beyond the Court's subject matter jurisdiction; accordingly, no response is required. To the extent a response is required, Defendant avers that the package labeling for Plan B speaks for itself as to its contents, and denies plaintiffs' characterization of said labeling.

137A. To the extent that the caption to part IV.H. of the Fifth Amended Complaint can be construed to contain factual allegations, such allegations are denied.

138. Denied.

139. This paragraph contains allegations which are irrelevant and immaterial to the causes of action asserted in the complaint and which are beyond the Court's subject matter jurisdiction; accordingly, no response is required. To the extent a response is required, denied, except Defendant admits that, in the past ten years, after an FDA advisory committee has voted in favor of recommending approval of a sponsor's application to market its drug OTC, FDA has either approved the application, or has not yet taken final action on the application..

140. This paragraph contains allegations which are irrelevant and immaterial to the causes of action asserted in the complaint and which are beyond the Court's subject matter jurisdiction; accordingly, no response is required. To the extent a response is required, denied.

141. This paragraph contains allegations which are irrelevant and immaterial to the causes of action asserted in the complaint and which are beyond the Court's subject matter jurisdiction; accordingly, no response is required. To the extent a response is required, denied, but Defendant admits that the data necessary to meet the statutory and regulatory standards for approval will vary from product to product, depending, among other things, whether the efficacy and safety of OTC use can be shown by prior OTC approval or an established monograph, whether there is a new OTC indication, whether there is a new method of use for the OTC drug, whether there is a new OTC warning, whether there are new OTC medical follow-up recommendations, and whether there are specific concerns about self-medication.

142. Denied.

143. Denied.

144. This paragraph contains allegations which are irrelevant and immaterial to the causes of action asserted in the complaint and which are beyond the Court's subject matter jurisdiction; accordingly, no response is required. To the extent a response is required, denied, except Defendant admits that FDA has extrapolated data in other contexts, including data regarding the physiological effects of Plan B, from adults to adolescents, and did not request that Barr conduct pediatric studies on the physiological effect of Plan B. Defendant specifically denies that extrapolation is "routine."

145. This paragraph contains allegations which are irrelevant and immaterial to the causes of action asserted in the complaint and which are beyond the Court's subject matter

jurisdiction; accordingly, no response is required. To the extent a response is required, the first sentence purports to describe and characterize an unspecified document from the administrative record; that document speaks for itself as to its contents, and Defendant denies plaintiffs' characterization of said labeling. The second sentence is denied.

146. Denied.

147. Denied.

148. This paragraph contains allegations which are irrelevant and immaterial to the causes of action asserted in the complaint and which are beyond the Court's subject matter jurisdiction; accordingly, no response is required. To the extent a response is required, denied.

149. This paragraph contains allegations which are irrelevant and immaterial to the causes of action asserted in the complaint and which are beyond the Court's subject matter jurisdiction; accordingly, no response is required. To the extent a response is required, denied.

150. This paragraph contains allegations which are irrelevant and immaterial to the causes of action asserted in the complaint and which are beyond the Court's subject matter jurisdiction; accordingly, no response is required. To the extent a response is required, denied.

151. This paragraph contains allegations which are irrelevant and immaterial to the causes of action asserted in the complaint and which are beyond the Court's subject matter jurisdiction; accordingly, no response is required. To the extent a response is required, denied.

152. This paragraph contains allegations which are irrelevant and immaterial to the causes of action asserted in the complaint and which are beyond the Court's subject matter jurisdiction; accordingly, no response is required. To the extent a response is required, denied.

153. The first sentence is denied. The portion of the second sentence after the final comma is denied. The remainder of the second sentence describes the June 9, 2006, FDA

decision denying the Citizen Petition; that decision speaks for itself as to its contents, and Defendant denies plaintiffs' characterization thereof. The portion of the third sentence after the final comma is denied. The remainder of the third sentence describes the June 9, 2006, FDA decision denying the Citizen Petition; that decision speaks for itself as to its contents, and Defendant denies plaintiffs' characterization thereof. The fourth, fifth, and sixth sentences are denied.

154. Denied.

155. Denied.

156. Denied.

157. Denied, except Defendant admits that FDA's August 24, 2006 approval letter states that the SNDA is approved to allow sales of Plan B to consumers 18 years of age and older.

158. Denied.

159. This paragraph contains allegations which are irrelevant and immaterial to the causes of action asserted in the complaint and which are beyond the Court's subject matter jurisdiction; accordingly, no response is required. To the extent a response is required, denied.

160. Denied.

161. Denied.

162. Defendant repeats and reiterates his answers to ¶¶ 1-161 above.

163. Denied.

164. Defendant repeats and reiterates his answers to ¶¶ 1-163 above.

165. Denied.

166. Defendant repeats and reiterates his answers to ¶¶ 1-165 above.

167. Denied.

168. Defendant repeats and reiterates his answers to ¶¶ 1-167 above.

169. Denied.

170. Denied.

171. Defendant repeats and reiterates his answers to ¶¶ 1-170 above.

172. Denied.

173. The final unnumbered paragraph beginning with "WHEREFORE" is a prayer for relief to which no answer is required; to the extent that an answer is deemed required, Defendant denies this paragraph.

174. Defendant denies each and every allegation in the Fifth Amended Complaint, including each and every allegation which may be found in the headers or captions to any portion of the pleading, which has not previously been admitted or otherwise qualified.

## DEFENSES

1. This Court lacks subject matter jurisdiction to entertain the plaintiffs' complaint.

2. The plaintiffs lack standing to pursue the claims they have articulated in their complaint.

3. The allegations in the complaint fail to state a claim upon which relief may be granted.

4. Plaintiffs' claims are moot.

5. The Court lacks the authority to grant the relief requested.

WHEREFORE, Defendant Dr. Andrew C. von Eschenbach, in his official capacity as Commissioner of Food and Drugs, respectfully demands judgment dismissing the Fifth Amended

Complaint in its entirety and granting such other and further relief as the Court deems just and equitable.

Dated: Brooklyn, New York
March 5, 2007

ROSLYNN R. MAUSKOPF
United States Attorney
Eastern District of New York
One Pierrepont Plaza, 14th Floor
Brooklyn, NY 11201-2776

By: /s/ {FILED ELECTRONICALLY}
F. FRANKLIN AMANAT (FA6117)
STEVEN M. WARSHAWSKY (SW5431)
Assistant United States Attorneys
Eastern District of New York
(718) 254-6024/6060

## CERTIFICATE OF SERVICE

I, F. Franklin Amanat, hereby certify under penalties of perjury that on this 5th day of March, 2007. I did cause true and correct copies of the above and foregoing instrument, Defendant's Answer to the Fifth Amended Complaint, to be served by electronic mail on the following counsel of record for the plaintiffs in this action:

> Simon Heller, Esq.
> Nan E. Strauss, Esq.
> Center for Reproductive Rights
> sheller@reprorights.org
> nstrauss@reprorights.org
>
> Andrea Costello, Esq.
> Center for Constitutional Rights
> acostello@ccr-ny.org

> By: /s/ {FILED ELECTRONICALLY}
> F. FRANKLIN AMANAT (FA6117)
> Assistant United States Attorney
> Eastern District of New York
> (718) 254-6024



Doctor Finder | Join/Renew | MyAMA | Site

**Home**  **Member Center**  **AMA Agenda**  **Newsroom**  **Professional Resources**  **Med School & Residency**  **About A**

**Bookstore**

AMA Home > PolicyFinder

Policy Finder
Search Tips
About AMA Policy
Download Policy Finder
Principles of Medical
Ethics
AMA Strategic Plan and
Vision
AMA History

## D-75.997 Access to Emergency Contraception

Our AMA will: (1) intensify efforts to improve awareness and understanding about the availability of emergency contraception in the general public; and (2) support and monitor the application process of manufacturers filing for over-the-counter approval of emergency contraception pills with the Food and Drug Administration (FDA). (CMS Rep. 1, A-00)



◄ **prev / next**
**Policy number** ►

**Search Tips | New Search**

© Copyright 1995-2005 American Medical Association. All rights reserved.

American Medical Women's Association

The Vision and Voice of Women In Medicine

# AMWA

| Welcome | About Us | Donate Now | Contact Us | Join AMWA | Go |

- About AMWA›
  - o Leadership
  - o Mission & History
  - o News Releases & Announcements
- Advocacy›
  - o Actions Taken
  - o AMWA Coalition Memberships
  - o Health Policy Links
  - o Position Statements
- Awards, Grants & Recognition›
  - o Awards›
    - Bertha VanHoosen Award
    - Camille Mermod Award
    - Elizabeth Blackwell Medal
    - Lila Wallis Women's Health Award
    - Woman in Science Award
  - o Grants & Scholarships›
    - Bemmann Grant
    - Overseas Assistance Grant
    - Wilhelm-Frankowski Scholarship
  - o Honors›
    - Changing the

## AMWA's Position Statement on Emergency Contraception

Founded in 1915, the American Medical Women's Association (AMWA) - a national medical organization of 10,000 women physicians - is dedicated to promoting women's health and furthering the professional development and well-being of women in medicine. AMWA's mission includes strong support of sound policies and programs to improve women's health.

---

**Related Positions**

Abortion and Access
Abortion
Reproductive Health

---

AMWA believes that the number of unintended pregnancies in the United States (3.2 million annually[1]) is unacceptably high and have a detrimental impact on women's health. AMWA should support programs that reduce the rate of unintended pregnancies, as these will improve women's health.

About half (1.7 million annually) of unintended pregnancies are the result of contraceptive failure.[1] Barrier methods of contraception have failure rates during the first year of typical use from 12% to 21%.[2] Condoms and diaphragms can slip during use and an estimated 1.5% of condoms break.[2] In addition to contraceptive failure, unintended pregnancies may result when women do not have control over the timing of sexual intercourse or the use of contraception.[3]

The consequences of unintended pregnancy are significant and can affect women and families in profound and irrevocable ways. Approximately half of all unintended pregnancies end in abortion, resulting in approximately 1.6 million abortions annually in the United States.[1] For pregnancies carried to term, the mother of an unintended pregnancy is at greater risk of depression, physical abuse, and not achieving her educational, financial and career goals. Relationships that she may be in are at three times a greater risk of dissolution. The child of an unintended pregnancy is at a greater risk of being born at low birth weight, dying in the first year of life, not receiving resources necessary for healthy development and being abused or neglected.[4] AMWA believes that emergency contraception can play a much stronger role in reducing unintended pregnancy and unnecessary abortion in our nation.

Emergency contraceptive pills (ECPs) provide a short, high dose of combined estrogen and progestin, or progestin alone and are 75% effective in preventing pregnancy within 72 hours after unprotected intercourse.[5] Several studies have shown that ECPs (combined estrogen/progestin pills) may inhibit or delay ovulation when given before or at the time of ovulation.[6,7,8] Minor changes in the endometrium

- Face of Medicine
  - Local Legends
  - Women in Medicine Hall of Fame
- Career Development›
  - Employment Connection
  - Grant & Funding Resources›
    - Grant Announcements
    - Grant & Funding Links
  - Medicine: A Woman's Career
  - Professional Organization Links
  - Woman to Woman Mentoring Program
- Medical Education›
  - Continuing Medical Education›
    - Alcohol 101
    - Domestic Violence
    - Menopause & Sexual Function
    - How to Negotiate
    - Women as Medical Leaders
  - Educational Programs›
    - Alcohol Awareness
    - Arthritis
    - Breast Cancer
    - Heart Disease
    - Osteoporosis
    - Overactive Bladder

may occur if ECPs are given after ovulation to inhibit implantation.ix AMWA agrees with respected organizations such as the National Institutes of Health and the American College of Obstetricians and Gynecologists (ACOG) in defining pregnancy as beginning with implantation.[10,11] Emergency contraceptive pills work prior to implantation and therefore are considered by these respected organizations and AMWA as a contraceptive, not as an abortifacient. Emergency contraceptive pills do not affect an established pregnancy and numerous studies of the teratologic risk of conception during regular use of oral contraceptives (including the use of older, higher-dose preparations) found no increase in risk.[11]

Emergency contraception is safe. The ACOG stated in 1996 that no published studies have reported evidenced based criteria contraindicating use of ECPs.[11] The World Health Organization noted that because ECPs are given over such a short time period, experts believe they have no clinical effect on conditions such as cardiovascular disease, angina, acute focal migraine and severe liver disease.[12] As such the medical restrictions that apply to the conventional use of combined oral contraceptives or progestin only oral contraceptives are not relevant to ECP use. Both the World Health Organization, and the International Planned Parenthood Federation have stated that there are no absolute contraindications to use of emergency contraceptive pills except pregnancy.[12,13] The pregnancy exception relates to the fact that the regimen is not effective during pregnancy, not to any teratogenic effects. The FDA has endorsed two ways of making emergency contraceptive pills available to women. On February 25, 1997, the FDA announced the use of certain combined oral contraceptives containing ethinyl estradiol and levonorgestrel as safe and effective for the prevention of pregnancy.[14] On September 3, 1998, the Food and Drug Administration (FDA) accepted a commercially available product containing ethinyl estradiol and levonorgestrel designated for use as an emergency contraceptive. On July 28, 1999 the FDA approved the first progestin-only contraceptive. The new product's efficacy in reducing pregnancies is 83% with less incidence of nausea and vomiting compared to the combined oral contraceptive containing ethinyl estradiol and levonorgesterel.

AMWA acknowledges that increasing women's access to emergency contraception is critical to more effectively using this unique contraceptive method. In one study where pharmacists prescribed ECPs, 50% of women seeking emergency contraception reported that they sought ECPs on a weekend or after 6 p.m. on a weeknight, times when it may have been difficult to contact their regular reproductive health care provider. In addition 18% of these women did not have a current health care provider. Provision of prescriptions for these products to patients at routine office visits, prior to need, will vastly improve their accessibility and timely use. Direct provision of emergency contraception by pharmacists is another means of increasing access. One pilot program in Washington State involves physicians and pharmacists working together though collaborative drug therapy agreements to make emergency contraception more accessible to women directly from a pharmacist without having to visit their regular health care provider first. Through the pilot program, pharmacists who

- ▪ Reproductive Health
- ▪ Tobacco Control
- o Looking for RHI?
- Meetings & Events›
  - o AMWA 2006 Annual Meeting›
    - ▪ Exhibitors
    - ▪ Meeting Schedule
    - ▪ Partnership Opportunities
    - ▪ Register Online
    - ▪ Registration Information
    - ▪ Session & Poster Proposals
    - ▪ Travel & Accommodations
- Membership›
  - o Join AMWA
  - o Logo Wear
  - o Membership Benefits
- Patient Information›
  - o Keeping Yourself Healthy›
    - ▪ Aging
    - ▪ Exercise
    - ▪ Smoking
    - ▪ Stress
  - o Systems, Disorders & Treatments›
    - ▪ Brain & Nervous System
    - ▪ Cardiovascular System
    - ▪ Digestive System
- Programs›
  - o AWHS Clinics
  - o Awards, Grants &

completed a training program focusing on emergency contraceptive pill prescribing, carry out a patient assessment, review issues necessary for informed consent, counsel women on use of emergency contraceptive pills and ongoing contraception, and make appropriate referrals for contraceptive or other regular health care such STD diagnosis and treatment of sexual abuse.

Easy access to emergency contraceptive pills was critical for 42% of the women included in this pilot program survey who reported that if they had not received emergency contraceptive pills directly from a pharmacist they would have taken no action and waited to see if they were pregnant.[15] Because of the stated importance of accessibility, AMWA is particularly concerned over pharmacy refusal to stock emergency contraceptive pills. As an example, Wal-Mart stores have refused to stock emergency contraceptive pills and will, instead, provide referrals to another pharmacy.

Wal-Mart is the world's largest retailer and the nation's fifth largest distributor of pharmaceuticals. Wal-Mart has pharmacies in more than 2428 of its 2450 stores. In rural and underserved areas, given Wal-Mart's strong price competitiveness, a Wal-Mart pharmacy may be the only pharmacy for the area. Therefore, Wal-Mart's current policy of referral to another pharmacy is, within an already medically underserved area, denial of emergent care. Wal-Mart's press release statement citing its refusal to stock emergency contraceptive pills for business reasons is questionable. As reported to the Securities and Exchange Commission form 10-k, 1999 Wal-Mart pharmaceutical sales totaled 9% of its $95,395,000,000 operating sales giving a $8,585,550,000 profit. It is clear that selling emergency contraceptive pills will not cause Wal-Mart undue financial hardship. Wal-Mart's decision has hit the most vulnerable of our population: women who by virtue of their rural location and perhaps their own poverty have little economic voice and therefore little political power.

AMWA affirms its commitment to supporting reproductive choice for women and believes that emergency contraception is an important option. AMWA is committed to promoting awareness of and improving access to emergency contraception for women of diverse ethnic and socioeconomic backgrounds. To achieve this goal, AMWA is committed to:

- Informing its membership about emergency contraception pill availability, its optimal use, potential concerns and success rate;
- Encouraging the widespread release of this information to the medical community, women's groups, health groups, the public and the media;
- Encouraging the display of informational brochures, posters, and wallet cards in health care facilities;
- Recommending the provision of preprinted prescriptions and instructions for use of emergency contraceptive pills at routine exams, in advance of the need for their use; and
- Advocating programs that provide improved access to emergency contraception pills for women through collaborative

- Scholarships
  - o Education
- Publications›
  - o Connections›
    - ▪ Current Issue
    - ▪ Past Issues
  - o JAMWA Archives›
    - ▪ Past Issues
    - ▪ Collections
    - ▪ Columns
    - ▪ Links for Past Issues
    - ▪ Related Book Titles
- Students›
  - o Why Join?
  - o Announcements
  - o Awards
  - o Looking for RHI?
  - o Overseas Assistance Grants
  - o Regions & Leadership
  - o Resources
  - o Student Loans›
    - ▪ Applying for a Loan
    - ▪ Student Loan Debt Management
  - o Woman to Woman Mentoring Program
- Support AMWA›
  - o

**Help support AMWA while you shop!** Your purchase at Amazon.com earns AMWA a referral fee.



agreements, especially for high use after-hours need (including further study of programs such as those that enable protocols for pharmacists to directly prescribe emergency contraception pills).

## REFERENCES

1. Institute of Medicine, The Best Intentions: Unintended Pregnancy and the Well Being of Children and Families, 1995.
2. Hatcher RA et al. Contraceptive Technology, 16th revised ed. New York, NY: Irvington Publishers Inc. 1994
3. Faundes A, Hardy E. Illegal abortion: consequences for women's health and the health care system. International Journal of Gynecology and Obstetrics. 1997; 59:77-83
4. Institute of Medicine. The Best Intentions: Unintended Pregnancy and the Well-being of Children and Families. Washington, D.C.: National Academy Press: 1995.
5. Trussel J, Rodrigues R, Ellerson C. New estimates of the effectiveness of the Yuzpe regimen of emergency contraception. Contraception. 1998; 57:363-369.
6. Swahn ML, Westlund P, Johannisson E, Bygdeman M. Effect of post-coital contraceptive methods on the endometrium and the menstrual cycle. Acta Obstetrica et Gynecologica Scandinavica (Copenhagen) 1996; 75: 738-744.
7. Ling WY, Robichaud A, Zayid I, Wrixon W, MacLeod SC. Mode of action of dl-norgestrel and ethinylestradiol combination in postcoital contraception. Fertility and Sterility 1979; 32: 297-302.
8. Rowlands S, Kubba AA, Gullebaud J, Bounds W. A possible mechanism of action of danazol and a ethinylestradiol/norgestrel combination used as postcoital contraceptive agents. Contraception 1986; 33: 539-545.
9. Glasier a. Emergency postcoital contraception. The New England Journal of Medicine 1997; 337:1058-1064.
10. OPRR Reports: Protection of Human Subjects. Code of Federal Regulations 45 CFR 46, March 8, 1983.
11. American College of Obstetricians and Gynecologists. ACOG practice pattern number 3: Emergency oral contraception. Washington, D.C. December 1996.
12. World Health Organization. Improving access to quality care in family planning: medical eligibility criteria for contraceptive use. Geneva 1996; 31-33 (WHO/FRH/ FPP/96.9.)
13. International Planned Parenthood Federation. IMAP statement on emergency contraception. IPPF Medical Bulletin. 1994; 28(6): 1-2.
14. Food and Drug Administration (FDA). Prescription drug products; Certain combined oral contraceptives for use a postcoital emergency contraception; Notice. Federal Register 62:8610-8612, February 25, 1997.
15. Program for Appropriate Technology in Health (PATH). Collaborative drug therapy agreements to promote public health. PATH. Seattle, WA. July 31, 1998. Unpublished Report

**Adopted by the House of Delegates November 1996**



| Find an Ob-Gyn | Contact Us | About Us |

Search put

Login to se

| Advocacy | Education | Information | Meetings | Membership | Practice Management | Publications | Women'

[Done with printing]

| ACOG |

QUI
- ACOG /
- ACOG I
- ACOG :
- CPT Cc
- Find an
- Membe
- My CMI
- Online [
- Postgra
- Resider

ACOG
Order
educati
materia
online. :
fast, ea:
- Patient
- Profess
- Multim
- Monthl

## ACOG NEWS RELEASE

For Release: May 7, 2004
Contact:    ACOG Office of Communications
              (202) 484-3321
              communications@acog.org



### Statement of
### The American College of Obstetricians and Gynecologists
### On the Failure of the FDA
### To Approve OTC Status for Plan B®

### By Vivian M. Dickerson, MD, ACOG President

***Washington, DC*** – The American College of Obstetricians and Gynecologists (ACOG) finds the US Food and Drug Administration's failure to approve over-the-counter status for Plan B®, despite the nearly unanimous recommendation of its own advisory panels, morally repugnant.

The Food and Drug Administration's (FDA's) action is a tragedy for American women, and a dark stain on the reputation of an evidence-based agency like the FDA.

This decision to ignore an advisory panel's assessment of the scientific evidence is not only rare, but it gives credence to recent criticisms that political interference is hampering scientific review within federal agencies today.

In December 2003, two FDA expert advisory panels overwhelmingly recommended approval of the drug by a 23-to-4 vote, after reviewing more than 15,000 pages of clinical data from approximately 40 studies submitted with the over-the-counter (OTC) application. The FDA typically follows the recommendations of the scientific committees. These experts made clear that EC is safe and that it does not increase promiscuity or unprotected sex among teenaged women, nor does it cause women to abandon their regular birth control methods.

There is a public health imperative in this country to increase access to EC. Accidents and coercion happen, and post-coital contraception must be made readily available to reduce unintended pregnancy and abortion rates.

ACOG and other organizations have estimated that greater access to emergency contraceptives could significantly reduce the US abortion rate. Everyone should support measures that help decrease the number of abortions in the US. The FDA, by failing to take action based on sound scientific evidence, apparently does not.

Women's need for effective contraception will not go away, and neither will Plan B®. Until such

time as the FDA acts upon the sound scientific evidence at its disposal, ACOG will step up its public education campaign, "Every Woman, Every Visit." We will continue to urge that ob-gyns across the nation provide advance prescriptions for EC to all reproductive age women at every office visit. Through the media, which has been so effective in promoting awareness of EC, we will also remind women to ask their doctor for advance prescriptions for EC.

ACOG's campaign, while it increases access to EC for many women, represents only a fraction of what might have been accomplished had the FDA approved widespread OTC status for Plan B®. We fervently hope that this shameful episode in FDA history will pass and that respect for scientific evidence will prevail once again at the FDA.

# # #

*The American College of Obstetricians and Gynecologists is the national medical organization representing over 46,000 members who provide health care for women.*



Privacy Statement | Important Disclaimer | Copyright Infringement | Terms of Use | Contact Us

Copyright © 2005 American College of Obstetricians and Gynecologists. All rights reserved.



| Find an Ob-Gyn | Contact Us | About Us |

Search put

Login to se

| Advocacy | Education | Information | Meetings | Membership | Practice Management | Publications | Women'

| ACOG

QUI

■ ACOG /
■ ACOG I
■ ACOG :
■ CPT Co
■ Find an
■ Membe
■ My CMI
■ Online I
■ Postgra
■ Resider

ACOG
Order
educati
materia
online.
fast, ea
• Patient
• Profess
• Multim
• Monthl

## ACOG NEWS RELEASE

For Release: January 5, 2005
Contact:      ACOG Office of Communications
              (202) 484-3321
              communications@acog.org

[Done with printing]



### Statement of Vivian M. Dickerson, MD, President
### The American College of Obstetricians and Gynecologists
### on *JAMA* Emergency Contraception Study

***Washington, DC*** — Research released today supports the contention that the leadership of the federal Food and Drug Administration (FDA) shortchanged and underestimated women last year by failing to approve over-the-counter (OTC) status for the emergency contraceptive Plan B.

Although the FDA typically follows the recommendations of its scientific committees, the May 2004 "not approved" decision by Steven Galston, acting director of the FDA's drugs division, ignored the nearly unanimous recommendations of FDA advisory panels and the advice of FDA staff that Plan B was safe for OTC use. His decision was wrong then, and it's still wrong today.

A study of 2,117 young women ages 15 to 24, reported in today's *Journal of the American Medical Association (JAMA)*, concludes that providing young women with access to emergency contraception (EC) did not lead them to engage in more risky sexual behavior. (See TR Raine et al, *Direct Access to Emergency Contraception Through Pharmacies and Effect on Unintended Pregnancy and STIs*, JAMA, 2005; 293:54-62, at www.jama.com.) The study demonstrates that ready availability of EC does not negate the ability of women to act responsibly, despite erroneous claims to the contrary by some EC opponents.

These new data clearly add to the existing body of evidence previously reviewed by two FDA expert advisory panels. They overwhelmingly had recommended OTC approval of Plan B by a 23-to-4 vote, after reviewing more than 15,000 pages of clinical data from approximately 40 studies submitted with the OTC application. The *JAMA* study confirms they were correct: EC does not increase promiscuity or unprotected sex among women, nor does it cause women to abandon their regular birth control methods.

ACOG and other organizations have estimated that greater access to emergency contraceptives could cut the US unintended pregnancy and abortion rates in half. FDA leaders bear significant responsibility for a public health failure to reduce these rates if they fail to consider sound scientific evidence.

### # #

*The American College of Obstetricians and Gynecologists is the national medical organization representing over 47,000 members who provide health care for women.*



Privacy Statement | Important Disclaimer | Copyright Infringement | Terms of Use | Contact Us

Copyright © 2005 American College of Obstetricians and Gynecologists. All rights reserved.

**American Academy of Pediatrics**
DEDICATED TO THE HEALTH OF ALL CHILDREN

| Home | Parenting Corner | Health Topics | Bookstore & Publications | Professional Education & Resources | Advocacy | Member Center | About AAP |

Browse | Advanced

**For Release:** May 27, 2004          **Contact:** Marjorie Tharp          Andrea Marks, MD
                                                  AAP                      SAM
                                                  202-374-8600             212-987-1414

## PLAN B SHOULD BE OVER-THE-COUNTER FOR ADOLESCENTS
### Safety data adequate

**Washington, DC**---The American Academy of Pediatrics (AAP) and the Society for Adolescent Medicine (SAM) sent a letter yesterday to the Food and Drug Administration (FDA) and Barr Research, Inc., calling on the federal agency to reconsider its decision on Plan B, an emergency contraceptive, and allow it to be distributed over-the-counter (OTC) to women and sexually active adolescents. There is adequate safety information for the drug to be used by adolescents, and it is needed to prevent teenage pregnancy, according to the two organizations.

The AAP and SAM strongly disagree with the FDA decision on May 7 rejecting Barr Research's request to make Plan B OTC. The agency cited a lack of safety data in adolescents, particularly the 14 - 16 age range.

"We believe FDA reached an erroneous conclusion when it determined that there is not adequate data to support the safe use of Plan B by young adolescent women..." the May 26 letter states. "There is adequate safety information about the use of emergency contraceptives both from Barr Research Inc.'s supplemental new drug application and data associated with long-term prescription use of these agents in the adolescent population. Approximately one-fifth of the participants in the Barr trials were between the ages of 14-16, which represents ages below or consistent with the average age of first intercourse."

If the medicine is ultimately approved as OTC, the organizations also urged that the product label have a statement instructing the individual to contact a physician or other health care professional after using the product.

"Excluding adolescents from having OTC access to Plan B sets a dangerous precedent for adolescent health," states the letter. "Sexually active adolescents should not have barriers to access reproductive health care."

While health professionals encourage abstinence in adolescence as the surest way to prevent sexually transmitted diseases and pregnancy, some teenagers do have sex. Using contraception correctly and having emergency contraception available is key to preventing pregnancy. Contrary to some claims, having emergency contraception available does not increase sexual activity among adolescents, according to recent research.

AAP and SAM called for Plan B OTC status in February comments to the federal government as well.

# # #

*The American Academy of Pediatrics is an organization of 57,000 primary care pediatricians, pediatric medical subspecialists and pediatric surgical specialists dedicated to the health, safety and well being of infants, children, adolescents and young adults.*

*The Society for Adolescent Medicine is a multidisciplinary organization of 1,400 health professionals who care for adolescents.*

---

*American Academy of Pediatrics*
*Department of Federal Affairs*
*601 13th Street, NW*
*Suite 400 North*
*Washington, DC 20005*
*202/347-8600*

© COPYRIGHT AMERICAN ACADEMY OF PEDIATRICS. ALL RIGHTS RESERVED
American Academy of Pediatrics, 141 Northwest Point Blvd., Elk Grove Village, IL 60007. 847-434-4000

Site map | Contact us | Privacy statement | About us | Home



# AMERICAN PUBLIC HEALTH ASSOCIATION



## Support of Public Education about Emergency Contraception and Reduction or Elimination of Barriers to Access

**11/18/2003**
200315



The American Public Health Association (APHA) has been at the forefront of numerous efforts to prevent disease and promote health, and specifically improve access to health care. Understanding that contraception is an integral part of reproductive health care and that barriers to access can lead to unintended pregnancies and preventable abortions, APHA supports measures to improve women□s awareness of and access to a full range of contraceptive options.

In the United States, almost 50 percent of all pregnancies are unintended, and almost half of unintended pregnancies end in abortion.[1] Notably, more than half of unintended pregnancies occur among women who are using contraception.[2] However, researchers estimate that half of the unintended pregnancies could be avoided if women had information and timely access to emergency contraception (EC).[3] The copper-T intrauterine device can also be used as EC. However, for the purposes of this policy statement, hereto forward, EC will refer to hormonal emergency contraceptive pills. In fact, EC use is estimated to have prevented more than 50,000 abortions in the U.S. in 2000 alone.[4]

In 1997, the United States Food and Drug Administration (FDA) ruled that certain combined oral contraceptives are safe and effective for use as postcoital contraception.[5] When taken correctly within days of unprotected intercourse, contraceptive failure, or sexual assault, EC can reduce a woman□s chance of becoming pregnant by up to 89 percent.[6] While FDA-approved dedicated products indicate that EC should be administered within 72 hours, recent data shows EC is still effective within up to 120 hours of intercourse.[7-9] The most common form of EC is emergency contraceptive pills, which contain high dosages of progestin or combined estrogen and progestin□the same hormones found in daily birth control pills.* Like other hormonal methods of contraception, EC works by delaying ovulation, by preventing fertilization, or by preventing implantation.[10-17]

Low awareness and barriers to access have led to lack of use. The vast majority of women have not heard of EC even though they have been available for many years, and only one in 10 OB/GYNs discuss EC with their patients as part of routine contraceptive counseling.[18] However, according to a 2002 public opinion poll, 72 percent of the American public□□a majority of Democrats, Republicans and Independents□□support legislation to expand public health information about EC and its availability.[19]

Many women who seek to obtain EC have difficulty accessing care in a timely fashion. For example, a 2000 study showed that approximately one in four calls to the EC Hotline (1-888-NOT-2-LATE) do not result in an appointment with a health care professional or telephone prescription for EC within 72 hours.[20] Almost half of U.S. college health centers do not provide EC.[21] Only 20 percent of female sexual assault survivors treated at hospital emergency departments, or less than half of those

who are at risk of unintended pregnancy, are provided EC.22
Women are more likely to use EC as a back-up method if they have it
readily available either through advance prescription or provision, or
pharmacies□practices that are well supported by professional medical
and public health associations. Studies examining advance provision of
EC report no serious side effects or concerns regarding repeat
use.23,24 The American College of Obstetricians and Gynecologists
(ACOG) encourages its physician members to prescribe EC in advance
of need and more than 60 medical, public health, and women□s health
advocacy organizations, including APHA, submitted a Citizen□s Petition
to the Food and Drug Administration to change the status of EC from
prescription to over-the-counter.25 In addition, over 40 medical and
women□s organizations, including ACOG, the American Society for
Reproductive Medicine, and the Association of Reproductive Health
Professionals are co-sponsors of the national □Back Up Your Birth
Control□ campaign to promote awareness of EC and reduce barriers to
access.

To ensure that women have the information and access to EC, the
American Public Health Association asserts the following:
1. In order to promote awareness of EC among the public and providers:
□    Federal and state legislative bodies are urged to authorize and
fund initiatives to develop and disseminate medically accurate
information about the use, safety, efficacy, and availability of EC as a
back-up method of contraception, such as the EC Education Act;
□    Relevant professional organizations are urged to update their
standards of care for EC and to support the development and
dissemination of education curricula about EC; and
□    State and local departments of health are urged to support
development of medically accurate, age-appropriate educational
initiatives about EC.
2.    In order to reduce or eliminate barriers to access of EC:
□    APHA supports efforts to switch the status of EC from prescription-
only to over-the-counter.
As interim measures:
□    Health systems are urged to establish protocols that ensure timely
access to treatment with EC, including permitting prescription of EC
without unnecessary physical examination; allowing telephone
prescription of EC; and ensuring the provision of information about EC
and the dispensing of EC on site in hospital emergency departments to
patients who are at risk of unintended pregnancy and desire the
medication;
□    Health systems are urged to establish protocols to ensure that a
patient is not denied timely access to EC based on moral or religious
objections of a health care provider;
□    State legislatures and relevant regulatory bodies are urged to
authorize measures to permit collaborative practice to permit trained
pharmacists to dispense EC; and
□    Health systems are urged to authorize standing orders for EC
prescribing authority for mid-level providers.

References

1.    Henshaw SK. Unintended pregnancy in the United States. Fam
Plann Perspect. 1998;30:24-29.
2.    ibid.
3.    Trussell J. Emergency Contraceptive Pills: A Simple Proposal to
Reduce Unintended Pregnancies. Fam Plann Perspec 1992;24(6):269-
270.
4.    Jones RK, Darroch JE, Henshaw, SK. Contraceptive Use Among
U.S. Women Having Abortions in 2000□2001. Perspec Sex Repro Hlth
2002;34:294-303.
5.    United States Food and Drug Administration. Prescription Drug

Products: Certain combined oral contraceptives for use as postcoital emergency contraception. Federal Register.1997;62(37):8610-8612.
6.  Task Force on Postovulatory Methods of Fertility Regulation. Randomised controlled trial of levonorgestrel versus the Yuzpe regimen of combined oral contraceptives for emergency contraception. Lancet. 1998;352:428-33.
7.  Ellertson C et al. Extending the time limit for starting the Yuzpe regimen of emergency contraception to 120 hours. Obstet Gynecol 2003;101: 1168-1171.
8.  Von Hertzen H, et al. Low dose mifepristone and two regimens of levonorgestrel for emergency contraception: a WHO multicentre randomized trial. Lancet 2002;360:1803-1810.
9.  Rodrigues I, Grou F, Joly J. Effectiveness of emergency contraceptive pills between 72 and 120 hours after unprotected intercourse. Am J Obstet Gynecol 2001;184(4):531-537.
10.  Swahn ML, et al. Effect of post-coital contraceptive methods on the endometrium and the menstrual cycle. Acta Obstet Gynecol Scand 1996;75:738-744.
11.  Ling WY, et al. Mode of action of dl-norgestrel and ethinylestradiol combination in postcoital contraception. Fertil Steril 1979;32:297-302.
12.  Rowlands S, et al. A possible mechanism of action of danazol and an ethinylestradiol/norgestrel combination used as postcoital contraceptive agents. Contraception 1986;33:539-545.
13.  Croxatto HB, et al. Effects of the Yuzpe regimen, given during the follicular phase, on ovarian function. Contraception 2002;65:121-128.
14.  Hapangama D, Glasier AF, Baird DT. The effects of peri-ovulatory administration of levonorgestrel on the menstrual cycle. Contraception 2001;63:123-129.
15.  Marions L, et al. Emergency contraception with mifepristone and levonorgestrel: mechanism of action. Obstet Gynecol 2002;100:65-71.
16.  Kubba AA, White JO, Guillebaud J, Elder MG. The biochemistry of human endometrium after two regimens of postcoital contraception: a dl-norgestrel/ethinylestradiol combination or danazol. Fertil Steril 1986;45:512-516.
17.  Yuzpe AA, Thurlow HJ, Ramzy I, Leyshon JI. Post coital contraception□a pilot study. J Reprod Med 1974;13:53-58.
18.  Henry J. Kaiser Family Foundation. National Survey of Health Care Providers on Emergency Contraception, 2000, Menlo Park, CA: Kaiser Family Foundation, 2000.
19.  Public Support for Government Involvement in Emergency Contraception Education Initiatives. Washington, DC: Reproductive Health Technologies Project, 2002.
20.  Trussell JT, et al. Access to Emergency Contraception. Obstet Gynecol. 2000;95:267-270.
21.  McCarthy S. Availability of Emergency Contraceptive Pills at University and College Student Health Centers. J Am Coll Hlth 2002;51:15-22.
22.  Amey, AL, Bishai, D. Measuring the quality of medical care for women who experience sexual assault with data from the National Hospital Ambulatory Medical Care Survey. Ann Emerg Med. 2002;39:631-638.
23.  Raine T, et al. Emergency Contraception: Advance Provision in a Young, High Risk Clinic Population. Obstet Gynecol 2000;96:1-7.
24.  Glasier A, Baird D. The effects of self-administering emergency contraception. New Eng J Med 1998;339(1):1-4.
25.  American College of Obstetricians and Gynecologists. Emergency Oral Contraception. ACOG Practice Bulletin, Washington, DC: American College of Obstetricians and Gynecologists, March 2001.

New Search  |  Back to APHA Home Page

Case 1:07-cv-00689-JDB    Document 4-4    Filed 06/29/2007    Page 1 of 4

800 I St., NW Washington, D.C. 20001-3710 (Ph: 202 777 APHA (Fax: 202 777 2534 E-mail: comments@APHA.org



Advanced Search

| ABOUT US | NEWS & PUBLICATIONS | MEMBERS | CME CENTER | CLINICAL & RESEARCH | PRACTICE MGMT | POLICY & ADVOCACY |



NEWS FOR TODAY'S FAMILY PHYSICIAN

# FPReport online

February 2004 • Vol. 10 • No. 2

# FDA ponders OTC status for emergency contraceptive

BY J. MICHAEL BRODIE

Plan B® -- the emergency contraception pill, or "morning after" pill -- should be available over the counter, two FDA panels advised the FDA recently. The Academy also weighed in on the issue.

The FDA Nonprescription Drugs Advisory Committee and Reproductive Health Drugs Advisory Committee voted 23 to 4 for the OTC status Dec. 16.



On the same day, AAFP Board Chair James Martin, M.D., of San Antonio wrote one of the panels to concur with the advisers' vote.

"The AAFP supports the change to OTC status because of emergency contraception's reported long-term safety record, its ease of use for our patients, the time-sensitive element of therapy and increased access to the medication for the uninsured in this country," Martin wrote.

Plan B consists of two progesterone pills to be taken 12 hours apart. For maximum effectiveness, Plan B should be taken within 24 hours after intercourse.

An FDA public affairs officer said Dec. 19 that the advisers had conducted several votes. For example, they voted 28 to 0 that there was evidence Plan B would be safe.

The 2003 AAFP Congress of Delegates voted for the OTC status for progesterone-only emergency contraceptives and recommended that information on safe sexual practices, birth control options and the advantage of having a personal physician should be included with such OTC products.

Wanda Filer, M.D., of York, Pa., was among the delegates who spoke in favor of the measure. "Emergency contraception has been underutilized, especially for sexual assault victims, even in emergency department settings," Filer, president of the Pennsylvania AFP, said last month. "The awareness of emergency contraceptives as an option to physicians and our patients has been very low."

The possible move to OTC status, accompanied by a strong educational component, could be a strong benefit to patients when time is of the essence, said Filer. "It will be vital for family physicians to be familiar with emergency contraceptives and to know how to counsel their patients about the many issues likely to surround its usage."

To reach writer J. Michael Brodie, e-mail mbrodie@aafp.org.

*FP Report* is published by the AAFP News Department.
Copyright © 2004 by American Academy of Family Physicians.

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

_____
                                          )
ASSOCIATION OF AMERICAN                   )
PHYSICIANS & SURGEONS, INC., *et al.*,    )
                                          )
   *Plaintiffs*,           )  Civil Action No. 07:0668
                                          )
   *v.*                     )
                                          )
FOOD & DRUG ADMINISTRATION, *et al.*,     )
                                          )
   *Defendants.*            )
----------------------------------------------------------)
                                          )
DURAMED PHARMACEUTICALS, INC.,            )
                                          )
   *Defendant Intervenor.*  )
_____)

## PROPOSED ORDER

   Upon consideration of the motion to intervene as of right pursuant to Federal Rule of

Civil Procedure 24(a)(2) filed by defendant intervenor Duramed Pharmaceuticals, Inc.

("Duramed"), the Declaration of Amy Niemann and exhibits in support thereof, the

memorandum of points and authorities and exhibits in support thereof, the consent by defendants

to Duramed's intervention, plaintiffs' memorandum of points and authorities in opposition

thereto, Duramed's reply to plaintiffs' memorandum, and all other pleadings in this litigation,

and after oral argument, it is this ___ day of _____, 2007,

   ORDERED that the motion to intervene as of right filed by defendant intervenor

Duramed is hereby GRANTED.


          _____
          United States District Judge

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

_____

|  |  |  |
|---|---|---|
| ASSOCIATION OF AMERICAN PHYSICIANS & SURGEONS, INC., *et al.*, | ) ) ) | |
| *Plaintiffs*, | ) ) | Civil Action No. 07:0668 |
| *v.* | ) ) | |
| FOOD & DRUG ADMINISTRATION, *et al.*, | ) ) | |
| *Defendants.* | ) | |
| ------------------------------------------------------- | ) | |
| DURAMED PHARMACEUTICALS, INC., | ) ) ) | |
| *Defendant Intervenor.* | ) | |

_____

### DISCLOSURE OF CORPORATE AFFILIATIONS AND FINANCIAL INTERESTS

Pursuant to Local Civil Rule 7.1 of the Local Rules of the United States District Court for the District of Columbia, I, the undersigned counsel of record for defendant intervenor Duramed Pharmaceuticals, Inc. ("Duramed"), certify that to the best of my knowledge and belief, the following are parent companies, subsidiaries or affiliates of Duramed which have any outstanding securities in the hands of the public:

(1)    Duramed is a wholly-owned subsidiary of Barr Pharmaceuticals, Inc. ("Barr Pharma");

(2)    Barr Pharma is a publicly held corporation; and

(3)    Pliva, dd ("Pliva"), a Croatian company, is majority owned and controlled by Barr Pharma.  Pliva's stock is publicly traded on the Zagreb stock exchange and on the London stock exchange via GDRs.

These representations are made in order that judges of this Court may determine the need for recusal.

Respectfully submitted,


By: _/s/ Richard M. Cooper_____
    Richard M. Cooper (# 92817)
    Ana C. Reyes (# 477354)

WILLIAMS & CONNOLLY LLP
725 Twelfth Street, N.W.
Washington, DC 20005
(tel.) (202) 434-5466
(fax)  (202) 434-5470
rcooper@wc.com
areyes@wc.com

*Counsel for Defendant Intervenor*
*Duramed Pharmaceuticals, Inc.*

Dated: June 29, 2007.

## CERTIFICATE OF SERVICE

I hereby certify that on this 29th day of June 2007, I served counsel with a copy of

Duramed Pharmaceuticals, Inc.'s ("Duramed") Motion to Intervene, Memorandum of Points and

Authorities, Declaration of Amy Niemann, accompanying Exhibits, and Proposed Order;

Duramed's Motion to Dismiss, Memorandum of Points and Authorities, accompanying Exhibits,

and Proposed Order; and Disclosure of Corporate Affiliations and Financial Interests, via

electronic mail to:

> Lawrence J. Joseph, Esq.
> Law Office of Lawrence J. Joseph
> 2121 K Street, NW
> Suite 800
> Washington, DC 20037
> Email: ljoseph@larryjoseph.com
>
> *Attorney for Plaintiffs*
>
> Jane M. Lyons, Esq.
> United States Attorney's Office
> 555 4th Street, NW
> Room E4822
> Washington, DC 20530
> Email: jane.lyons@usdoj.gov
>
> Karen Schifter, Esq.
> Office of the Chief Counsel
> United States Food and Drug Administration
> (GCF-1)
> Room 6-57
> 5600 Fishers Lane
> Rockville, MD 20857
> Email: karen.schifter@fda.hhs.gov
>
> *Attorneys for Defendants*

> \_\_\_\_\_/s/ Ana C. Reyes_____
> Ana C. Reyes

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| ASSOCIATION OF AMERICAN PHYSICIANS & SURGEONS, INC., *et al.*, <br><br> *Plaintiffs*, <br><br> *v.* <br><br> FOOD & DRUG ADMINISTRATION, *et al.*, <br><br> *Defendants*. <br> ------------------------------------------------ <br> DURAMED PHARMACEUTICALS, INC., <br><br> *Defendant Intervenor*. | ) ) ) ) ) Civil Action No. 07:0668 ) ) ) ) ) ) ) ) ) ) ) ) ) |

## DECLARATION OF AMY NIEMANN

I, Amy Niemann, do hereby declare as follows:

1.    I submit this Declaration in support of the motion of Duramed Pharmaceuticals, Inc. ("Duramed") to intervene in the action styled *Association of American Physicians & Surgeons, Inc., et al. v. Food & Drug Administration, et al.*, Civil Action No. 07:0668 (D.D.C. filed Apr. 12, 2007).

2.    I am an officer of Duramed, which is one of the operating subsidiaries of Barr Pharmaceuticals, Inc. ("Barr Pharma"). I have been associated with various subsidiaries of Barr Pharma since 2001. Previously, I worked for Ortho-McNeil Pharmaceutical, Inc., a subsidiary of Johnson & Johnson, from 1986 to October 2001, in roles of increasing responsibility in the sales and marketing of oral contraceptives.

3.     Duramed has dealt, and continues to deal, with the United States Food and Drug Administration ("FDA") on a number of drug approval issues.

4.     My duties include supervisory responsibility for marketing Duramed's proprietary products, including working to obtain FDA approval of drugs that Duramed seeks to market.

5.     I have been actively involved in Duramed's efforts to obtain FDA approval for marketing of Plan B (levonorgestrel) over-the-counter ("OTC"), *i.e.*, without a prescription, since Duramed obtained the rights to Plan B in early 2004.

6.     Plan B is the only FDA-approved emergency contraceptive composed of progestin-only tablets. Plan B contains levonorgestrel, the same synthetic hormone used safely in birth control pills for over 35 years.

7.     As indicated on its approved labeling, Plan B reduces the risk of pregnancy by up to 89% when taken within 72 hours after contraceptive failure or otherwise unprotected sexual intercourse. Plan B is not effective in terminating an existing pregnancy.

8.     As also indicated on its approved labeling, Plan B is more effective the sooner it is taken, and most effective if taken within the first 24 hours after unprotected intercourse.

9.     Prescription ("Rx")-only availability of Plan B is a barrier to access. The process of locating, contacting and visiting a prescribing physician is time-consuming. After a need for Plan B is recognized, time spent in obtaining a prescription for it reduces its effectiveness.

10.     Emergency contraceptive pills are available without a prescription in more than thirty countries world-wide.  I am unaware of any study showing that its use in these countries has not been safe and effective.

11.     Duramed has invested millions of dollars, and substantial resources, to obtain approval of OTC availability of Plan B.  Duramed made this investment for three primary reasons.

12.     First, Duramed was and is committed to enhancing the timely availability of emergency contraception for those who choose to use it.

13.     Second, Duramed was and is committed to advancing women's health through its drug products.  In fact, Duramed's work in making Plan B available OTC for consumers age 18 and older has garnered it a well-earned reputation among pharmacists, physicians and health-care professionals as a company that is committed to women's health.

14.     Third, because drugs are more readily available to consumers OTC than by Rx, Duramed expected to derive, and does derive, an economic benefit from the approval of its supplemental new drug application ("sNDA") for the availability of Plan B OTC for consumers age 18 and older and by prescription ("Rx") for women age 17 and younger.

15.     The regulatory history of Plan B began on February 25, 1997, when FDA requested submission of new drug applications ("sNDA") for combined oral contraceptives for use as emergency contraception.

16.      In response, the Women's Capital Corporation ("WCC") submitted to FDA NDA 21-045 for approval to manufacture and distribute Plan B as a prescription drug. FDA approved WCC's NDA on July 28, 1999.

17.      On April 22, 2003, WCC submitted to FDA an sNDA to switch Plan B from Rx to OTC availability for use by all women who would use the drug.

18.      On December 16, 2003, FDA held a joint meeting of its Nonprescription Drugs Advisory Committee and its Reproductive Health Drugs Advisory Committee (together, the "Joint Committee") to review the scientific and medical evidence concerning Plan B and to make recommendations on how FDA should act on the sNDA to switch Plan B from Rx to OTC availability.

19.      At the time of the Joint Committee hearing, Barr Pharma had executed a letter of intent to purchase WCC. Barr Pharma made a presentation to the Joint Committee in support of the proposed Rx-to-OTC switch of Plan B.

20.      The record before the Joint Committee, and FDA, included information on the safe and effective OTC use of Plan B. That information included data collected in a number of adequate and well-controlled clinical trials, which showed that Plan B is safe and effective for OTC use.

21.      Information presented to the Joint Committee also showed that Plan B has no potential for addiction or for harm from overdose, that medical screening is not needed before it is used, and that it is easy to use.

22.      The critical issue before the Joint Committee was whether to recommend to FDA removal of the prescription barrier to timely access to Plan B, which delayed women's access to the product.

23.    A transcript of the December 16, 2003 meeting of the Joint Committee is available at http://www.fda.gov/ohrms/dockets/ac/03/transcripts/4015T1.DOC.

24.    The Joint Committee members voted unanimously that Plan B is safe for use in a nonprescription setting, voted 23 to 4 in favor of the proposed Rx-to-OTC switch, and voted 27 to 1 that the data from the Actual Use Study submitted in the sNDA are generalizable to the overall population of potential users of Plan B as an OTC drug.

25.    In February 2004, Barr Pharma acquired 100% of the outstanding shares of WCC. As a result, Duramed acquired the Plan B sNDA and manufacturing and marketing rights to Plan B. At the time the transaction closed, Duramed became the sole owner of the sNDA. Thereafter, Duramed Research, Inc., an affiliate of Duramed, acted as the regulatory agent on behalf of Duramed in connection with the sNDA.

26.    On May 6, 2004, FDA issued a Not Approvable Letter as to Duramed's sNDA, on the asserted ground that there was a lack of adequate data regarding safe use of Plan B OTC by younger adolescents. A true and correct copy of FDA's May 6, 2004 letter is attached hereto as Exhibit 1.

27.    Although Duramed disputed FDA's analysis – Duramed maintained (and maintains) that the record showed that Plan B is safe and effective OTC for all women who would use it – on July 21, 2004 Duramed submitted to FDA an amended sNDA seeking OTC availability for Plan B for use by women age 16 and over and Rx availability for use by women under age 16. The sNDA was filed on July 22,

2004, and FDA's action date was January 20, 2005. Duramed submitted proposed dual-labeling as part of this amended sNDA.

28.    By letter dated August 26, 2005, FDA informed Duramed that the FDA's Center for Drug Evaluation and Research had completed its review of Duramed's amended sNDA and had found that "the available scientific data are sufficient to support the safe use of Plan B as an OTC product" for women age 17 and older. A true and correct copy of FDA's August 26, 2005 letter is attached hereto as Exhibit 2.

29.    In the August 26, 2005 letter, FDA refused to take final action on Duramed's sNDA, and delayed final action indefinitely. FDA stated that the sNDA presented the agency with the question whether and, if so, how to permit the distribution of the same pharmaceutical product to different populations for OTC and Rx use. FDA indicated that it would seek comments on whether to initiate rulemaking to resolve those issues.

30.    On September 1, 2005, FDA published in the *Federal Register* an Advance Notice of Proposed Rulemaking ("ANPRM") (Docket No. 2005N-0345), which sought public comment on whether to initiate rulemaking regarding dual OTC/Rx labeling. *See* 70 Fed. Reg. 52,050 (Sept. 1, 2005).

31.    Although it strongly disagreed with FDA's refusal to approve the sNDA at that time, Duramed submitted timely comments in response to the ANPRM. Duramed's comments contended that the issues FDA raised were readily resolvable, that rulemaking was unnecessary, and that it was time to approve the sNDA. Attached hereto as Exhibit 3 is a true and correct copy of Duramed's comments submitted in response to the ANPRM.

32.     On July 31, 2006, FDA sent Duramed a letter stating that the agency had reviewed the comments received in response to the ANPRM, and had determined that it was not necessary to engage in rulemaking to resolve the regulatory issues raised by the sNDA.

33.     On August 8, 2006, FDA and Duramed representatives met to address dual Rx and OTC marketing of Plan B.  I participated in this meeting.

34.     Duramed amended its sNDA again on August 17, 18, and 23, 2006, to propose revisions to the drug's labeling and to include an educational program for use in conjunction with OTC distribution of Plan B.

35.     On August 24, 2006, FDA approved OTC access to Plan B for consumers age 18 and older, and retained the prescription requirement for women age 17 and younger.  Attached hereto as Exhibit 4 is a true and correct copy of FDA's August 24, 2006 letter to Duramed.

36.     Duramed began marketing Plan B with a dual OTC/Rx label on November 1, 2006.

37.     On the basis of clinical studies conducted by Duramed to support OTC approval, FDA granted Duramed a three-year marketing exclusivity period for its Plan B OTC/Rx product, which is effective through August 24, 2009.

38.     Currently, Duramed distributes Plan B pursuant to FDA's August 24, 2006 approval of the Plan B sNDA.  Plan B is sold, both Rx and OTC, in a single package, which contains labeling that describes the proper use of the product.  Because it is a drug subject to a prescription limitation, Plan B is stocked behind a pharmacy counter and is dispensed only by the pharmacy staff under the supervision of a licensed

pharmacist. Government-issued identification is required for consumers who are age 18 and older and who wish to purchase the product OTC. True and correct copies of the Plan B packaging and labeling are attached hereto as Exhibit 5.

39.    Because all packages of Plan B include labeling for both Rx and OTC use, it is probable that vacation of the approval of the sNDA would make it necessary for Duramed to recall all Plan B inventory currently available in the U.S. market. Duramed would then have to re-package, re-label, and re-distribute units of Plan B. The cost to Duramed of recalling all available Plan B in the United States, and then changing the packaging and labeling to include Rx-only or OTC-only labeling would exceed ten million dollars.

40.    At the request of FDA, Duramed has implemented and promoted the Convenient Access Responsible Education ("CARE") program to provide healthcare professionals and consumers with information regarding appropriate distribution and use of Plan B and monitoring for compliance with the prescription-age requirement.

41.    Duramed's 226-person Women's Health Care Sales Force has promoted use of Plan B's OTC/Rx availability to professional audiences that include pharmacists, physicians, and other healthcare providers.

42.    The CARE program includes a comprehensive educational program for healthcare professionals and consumers. As part of the CARE program, Duramed has initiated a variety of continuing education programs for pharmacists and other healthcare practitioners, and has a publication plan that includes journal advertising.

43.    For example, Duramed has been working, and continues to work, closely with retail pharmacies and drug wholesalers to ensure that they understand and

follow FDA's prescription-age requirement for the dispensing of the product. Duramed has funded a continuing education course on emergency contraception that, to date, more than 44,000 pharmacists throughout the U.S. have completed. The course educates them on the revised prescription requirement for Plan B.

44.    The CARE program also involves Duramed's aggressive direct-to-consumer program to build awareness of Plan B's use and the new OTC access. This program has included: consumer educational advertisements in leading print media for women, such as Cosmopolitan, Glamour, Lucky, Jane, and Marie Claire; an internet media program directed to women age 18-29; an extensive public relations initiative with outreach to colleges and universities with the highest female enrollment; a 24-hour 800 line with access to live health-care professionals; and, among other things, a detailed, interactive Plan B website at www.go2planb.com.

45.    Duramed has invested more than $15 million in marketing Plan B for dual OTC and Rx dispensing, educating healthcare professionals and consumers about emergency contraception, and promoting the CARE program.

46.    In 2006, Duramed's sales of Plan B were approximately $35 million.

47.    The OTC/Rx sales of Plan B are on track to double from January to November 2007 from the Rx-only sales of Plan B from January to November 2006.

48.    Based on projected sales calculated by Nielson,[1] monthly sales of Plan B more than doubled from November 2006 to the present. This increase occurred

---

[1]    Nielsen Market Research ("Nielsen") is a company that collects and sells information on the projected sale of pharmaceutical products. Pharmaceutical manufacturers generally consider Nielsen's information reliable.

even though, as reflected in IMS data, the sales of Plan B by prescription decreased from November 2006 through April 2007.[2]

49.    The data indicate, therefore, that sales of Plan B have increased since November 2006, when it became available OTC for consumers age 18 and older, and that consumers are purchasing Plan B as an OTC product in greater numbers than they were purchasing it as a solely Rx product.

50.    Vacation of FDA's August 24, 2006 decision approving the sNDA would deprive Duramed of substantially all of the projected revenues and profits from increased sales due to Plan B's OTC availability, despite the millions of dollars in development costs Duramed has incurred seeking approval of the sNDA, preparing for distribution of Plan B OTC, marketing the dual OTC/Rx product, and educating healthcare professionals and consumers about the product.

51.    Moreover, vacation of FDA's decision would deprive Duramed of the exclusivity it has obtained from FDA for sale of Plan B OTC to consumers age 18 and older through August 24, 2009. The loss of this exclusivity would irreparably harm Duramed's ability to capture a large part of the market share for an OTC emergency contraceptive for consumers age 18 and older.

52.    Increased access to Plan B because of the OTC/Rx availability has a positive effect on women's health because use of Plan B may reduce unintended pregnancies.

---

[2]    IMS American ("IMS") is a company that collects and sells information on the sale of pharmaceutical products (often referred to as "IMS data"). Pharmaceutical manufacturers generally consider IMS data reliable.

53.     Vacation of FDA's August 24, 2006 decision would cause great confusion among consumers.

* * * * *

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed this 27th day of June 2007 in Woodcliff Lake, New Jersey

_Amy C. Niemann_
Amy Niemann

- 11 -



**DEPARTMENT OF HEALTH & HUMAN SERVICES**

Public Health Service

Food and Drug Administration
Rockville, MD  20857

NDA 21-045/S-011


Barr Research, Inc.
     Attention: Joseph A. Carrado, M.Sc., Ph.D.
     Senior Director, Regulatory Affairs
One Bala Plaza, Suite 324
Bala Cynwyd, PA 19004-1401

Dear Dr. Carrado:

Please refer to your supplemental new drug application dated April 16, 2003, received April 22, 2003, submitted under section 505(b) of the Federal Food, Drug, and Cosmetic Act for Plan B® (0.75mg levonorgestrel) tablets.

We acknowledge receipt of your submissions dated July 25 (3) and 31, August 8 (2), September 4, 8, 9, and 15, October 6, 10, 15 (2), 17, 21, 24, 29, 30 and 31, December 3 and 9, 2003; and January 9 and 30, February 6, 10, 13, 20 and 24, and March 11 and 26, 2004.

This supplemental new drug application proposes nonprescription (over-the-counter (OTC)) availability of Plan B (0.75mg levonorgestrel) tablets for emergency contraception to reduce the chance of pregnancy after unprotected sex (if a contraceptive failed or if birth control was not used).

We have completed our review of this supplement and, for the reasons described below, find that the supplemental application is not approvable at this time under section 505(d) of the Act and 21 CFR 314.125(b).

You propose OTC status for Plan B for both adults and children based primarily on an actual use study in 585 subjects.  Only 29 of the 585 subjects enrolled in the study were 14-16 years of age, and none was under 14 years of age.

In a December 16, 2003 joint meeting, the Nonprescription Drugs Advisory Committee and the Reproductive Health Drugs Advisory Committee considered your proposal to switch Plan B to nonprescription status.  Although the Joint Committee recommended that your proposal to switch Plan B be approved, some members of the Joint Committee, including the Chair, raised questions concerning whether the actual use data were generalizable to the overall population of nonprescription users, chiefly because of inadequate sampling of younger age groups.

Based on a review of the data, we have concluded that you have not provided adequate data to support a conclusion that Plan B can be used safely by young adolescent women for emergency contraception without the professional supervision of a practitioner licensed by law to administer the drug.  In your March 11, 2004, amendment, you proposed to change the indication to allow for marketing of Plan B as a prescription-only product for women

NDA 21-045/S-011
Page 2

under 16 years of age and a nonprescription product for women 16 years and older.  This preliminary proposal did not include draft product labeling to demonstrate how you propose to comply with both the prescription and nonprescription labeling requirements in a single packaging configuration.  Because of the preliminary and incomplete nature of the proposal, we did not conduct a complete review of this amendment during this review cycle.

Before this application can be approved, you would have to provide data demonstrating that Plan B can be used safely by women under 16 years of age without the professional supervision of a practitioner licensed by law to administer the drug.  Alternatively, you could supply additional information in support of the revised indication to allow for marketing of Plan B as a prescription-only product for women under the age of 16 years and a nonprescription product for women 16 years and older, including draft product labeling.  If you take the latter approach, your response to this letter would have to include details of how you propose to implement simultaneous prescription and nonprescription marketing of Plan B for women of different ages in a single packaging configuration while complying with all relevant statutory and regulatory requirements for labeling and marketing of this product.  We will have to assure ourselves that your proposed approach is consistent with our statutory authority.  If you pursue the alternative approach, we also would request details of your proposed program to educate consumers, pharmacists, and physicians about the dual marketing of Plan B as both a prescription and nonprescription product, as well as your proposed program to monitor implementation of this novel approach.

Wide availability of safe and effective contraceptives is important to public health.  We look forward to continuing to work with you if you decide to pursue either of these options.

When you respond to the above deficiencies, include a safety update as described at 21 CFR 314.50(d)(5)(vi)(b). The safety update should include data from all non-clinical and clinical studies of the drug under consideration regardless of indication, dosage form, or dose level.

1.  Describe in detail any significant changes or findings in the safety profile.

2.  When assembling the sections describing discontinuations due to adverse events, serious adverse events, and common adverse events, incorporate new safety data as follows:

    - Present new safety data from the studies for the proposed indication using the same format as the original NDA submission.
    - Present tabulations of the new safety data combined with the original NDA data.
    - Include tables that compare frequencies of adverse events in the original NDA with the retabulated frequencies described in the bullet above.
    - For indications other than the proposed indication, provide separate tables for the frequencies of adverse events occurring in clinical trials.

3.  Present a retabulation of the reasons for premature study discontinuation by incorporating the drop-outs from the newly completed studies.  Describe any new trends or patterns identified.

NDA 21-045/S-011
Page 3

4. Provide case report forms and narrative summaries for each patient who died during a clinical study or who did not complete a study because of an adverse event. In addition, provide narrative summaries for serious adverse events.

5. Describe any information that suggests a substantial change in the incidence of common, but less serious, adverse events between the new data and the original NDA data.

6. Provide a summary of worldwide experience on the safety of this drug. Include an updated estimate of use for drug marketed in other countries.

7. Provide English translations of current approved foreign labeling not previously submitted.

Within 10 days after the date of this letter, you are required to amend the supplemental application, notify us of your intent to file an amendment, or follow one of your other options under 21 CFR 314.120. If you do not follow one of these options, we will consider your lack of response a request to withdraw the application under 21 CFR 314.65. Any amendment should respond to all the deficiencies listed. We will not process a partial reply as a major amendment nor will the review clock be reactivated until all deficiencies have been addressed.

Under 21 CFR 314.102(d), you may request an informal meeting or telephone conference with the Divisions of Over-the-Counter Drugs and Reproductive and Urologic Drug Products to discuss what steps need to be taken before the application may be approved.

This product may be considered to be misbranded under the Federal Food, Drug, and Cosmetic Act if it is marketed with this change before approval of this supplemental application.

If you have any questions, call the Regulatory Project Manager at (301) 827-4260.

Sincerely,

*{See appended electronic signature page}*

Steven Galson, M.D., M.P.H.
Acting Director
Center for Drug Evaluation and Research

-------------------------------------------------------------------------------------------------------
**This is a representation of an electronic record that was signed electronically and this page is the manifestation of the electronic signature.**
-------------------------------------------------------------------------------------------------------

```
 /s/
--------------------
Steven Galson
5/6/04 04:56:02 PM
```

DEPARTMENT OF HEALTH & HUMAN SERVICES

Public Health Service

Food and Drug Administration
Rockville, MD  20857

NDA 21-045/S-011

Duramed Research, Inc.
Attention:  Joseph A. Carrado, M.Sc., R.Ph.
Senior Director, Regulatory Affairs
One Belmont Ave, 11th floor
Bala Cynwyd, PA  19004


Dear Mr. Carrado:

Please refer to your supplemental new drug application dated April 16, 2003, received April 22, 2003, submitted under section 505(b) of the Federal Food, Drug, and Cosmetic Act (the Act) for Plan B® (levonorgestrel) Tablets, 0.75 mg.

We acknowledge receipt of your submissions dated April 16, July 25 (3), and 31, August 8 (2), September 4, 8, 9, and 15, October 6, 10, 15 (2), 17, 21, 24, 29, 30, and 31, December 3, and 9, 2003, January 9, and 30, February 6, 10, 13, 20, and 24, March 11 and 26, May 6 and 11, June 30, July 21, 2004, and January 6, 12, 13, 14, 18, 19 and 21, 2005.

Your submission of July 21, 2004 constituted a complete response to our May 6, 2004 Not Approvable action letter.

The resubmitted supplemental new drug application provides for a switch from Rx only status to Over the Counter (OTC) status for women ages sixteen years and older.  Plan B would remain Rx only for women under sixteen years of age.  In addition, you have proposed that both the Rx and OTC version of Plan B be marketed in a single package.

The Center for Drug Evaluation and Research (CDER) has completed its review of this application, as amended, and has concluded that the available scientific data are sufficient to support the safe use of Plan B as an OTC product, but only for women who are 17 years of age and older.  However, the Agency is unable at this time to reach a decision on the approvability of the application because of unresolved issues that relate to your NDA discussed below.

Your application has presented us with three difficult and novel issues.  Specifically, you have proposed that Plan B be marketed in a single package, and sold either as Rx or OTC, depending on the age of the patient.  While the Agency has allowed the same active ingredient to be marketed both Rx and OTC based on indication, strength, dosage form and route of administration, the Agency has never determined whether a drug may be both Rx and OTC based on the age of the individual using the drug. A related concern is how, as a practical matter, an age-based distinction could be enforced.  In addition, we have never been confronted with whether the Rx and OTC versions of the same active ingredient may be marketed in a single package.

As you may be aware, questions have arisen over the years about whether there are any conditions under which an active ingredient may be simultaneously marketed in both a prescription drug product

NDA 21-045/S-011
Page 2

and an OTC drug product.  Notwithstanding our having allowed the practice in those rare instances where there is a meaningful difference in the indication, strength, dosage form or route of administration of the two products, we recognize that FDA's interpretation of section 503(b) of the Act has not been explicitly set forth in any of the regulations that discuss the process by which FDA classifies (or re-classifies) drugs as OTC or prescription.  See 21 CFR 310.200 and 310.201.

In this case, we have decided that the appropriate course is to ask for public comments on whether we should initiate a rulemaking to codify our interpretation of section 503(b) regarding when an active ingredient can be simultaneously marketed in both a prescription drug product and an OTC drug product.  To this end, we have decided to publish an advance notice of proposed rulemaking in the Federal Register.  In addition, the notice will seek public comments on questions related to the marketing of Rx and OTC versions of the same active ingredient in a single package.

At this time, the drug product may not be legally marketed OTC.  In the future, you will be notified in writing regarding changes in the status of your application.

Under 21 CFR 314.102(d), you may request an informal meeting or telephone conference to discuss what steps need to be taken before the application may be approved.

Sincerely,

Lester M. Crawford, DVM, PhD
Commissioner of Food and Drugs

## DEPARTMENT OF HEALTH AND HUMAN SERVICES
## FOOD AND DRUG ADMINISTRATION

| | |
|---|---|
| **RESPONSE OF DURAMED PHARMACEUTICALS, INC. AND DURAMED RESEARCH, INC. TO ADVANCE NOTICE OF PROPOSED RULEMAKING**<br><br>**DRUG APPROVALS: CIRCUMSTANCES UNDER WHICH AN ACTIVE INGREDIENT MAY BE SIMULTANEOUSLY MARKETED IN BOTH A PRESCRIPTION DRUG PRODUCT AND AN OVER-THE-COUNTER DRUG PRODUCT** | **Docket No. 2005N-0345**<br><br>**RIN No. 0910-AF72** |

On September 1, 2005, the Food and Drug Administration ("FDA") published in the Federal Register an Advance Notice of Proposed Rulemaking (Docket No. 2005N-0345) (the "Notice"). 70 Fed. Reg. 52,050 (Sept. 1, 2005). The Notice requests comment on whether FDA should initiate rulemaking to codify its interpretation of section 503(b) of the Federal Food, Drug, and Cosmetic Act, 21 U.S.C. §§ 301-399 ("FDCA"), regarding when an active ingredient may be marketed simultaneously in both a prescription ("Rx") and an over-the-counter ("OTC") drug product and other issues related to its consideration of Supplement 011 to approved New Drug Application 21-045 ("NDA 21-045/S011").

Duramed Research, Inc. and Duramed Pharmaceuticals, Inc. (together "Duramed") respectfully submit these comments in response to the above-referenced Notice. Duramed is the sponsor of the drug product, Plan B, which is the subject of NDA 21-045/S011.

Duramed believes that Plan B is safe and effective for OTC use for all women – a view that is shared by an overwhelming majority of the members of two separate FDA Advisory Committees, professional healthcare organizations and practitioners. However, at FDA's suggestion, and consistent with FDA's expression of concerns regarding the nonprescription use of the product by women under the age of sixteen, Duramed has proposed, in a supplement to its NDA, a dual-label product that would be an OTC product for women sixteen and older and a prescription product for women under sixteen.

## EXECUTIVE SUMMARY

1.    FDA's existing interpretation of section 503(b), 21 U.S.C. § 353(b)(1), regarding simultaneous marketing of an active ingredient as an Rx and OTC product has not caused any confusion, and therefore FDA does not need to initiate any rulemaking on its interpretation. As FDA states in the Notice, it has repeatedly approved simultaneous Rx and OTC marketing in the past; and Duramed has not been able to locate any evidence to support the contention that FDA's interpretation of section 503(b) as permitting such use is erroneous or needs clarification.

The public has been aware since at least May 2004 that FDA is considering permitting simultaneous Rx and OTC marketing of Plan B to different subpopulations, yet Duramed has been unable to find any basis to conclude that the FDCA does not authorize FDA to approve such marketing. It is beyond dispute that, since Duramed filed its supplement, there has been extensive public discussion – in articles and editorials in newspapers, professional journals, and other publications, on television and radio, and elsewhere – of the issues relating to Plan B, including limitation of OTC to a particular subpopulation. Interested members of the public have already had ample opportunity to express their views to the Agency, and have done so. It is time for FDA to take final action on NDA 21-045/S011.

2.      FDA has authority to enforce the limitation of Rx products to a subpopulation, just as it has authority to enforce the limitation of Rx products by indication, strength, route of administration, and dosage form. Moreover, FDA can enforce this limitation in actual practice through a variety of mechanisms, including, but not limited to, random inspections of pharmacies by FDA investigators and coordination with state and local law enforcement officials. To aid in FDA's efforts, Duramed has proposed a marketing program for Plan B that will include limiting distribution of Plan B to retail operations with pharmacy services and clinics. It will also include an educational component to help ensure the compliant, safe and effective use of Plan B. This program would be designed to educate pharmacists and health care practitioners on the Rx requirement for women age 15 and younger. It will also educate women age 15 and younger to discuss Plan B with their health care practitioners.

3.      Rx and OTC products can lawfully be sold in the same initial packaging, as long as the products do not call for different doses, different strengths, or different directions for use. Because marketing of Plan B to different subpopulations does not implicate any of these differences, the same initial packaging can be used for Plan B when dispensed pursuant to a prescription and when dispensed OTC. Specifically, FDCA § 503 can be satisfied by ensuring that all packages contain (i) adequate information and directions to ensure safe, effective, and appropriate OTC use, (ii) the legend "Rx only for women age 15 and younger," and (iii) appropriate space for the traditional Rx label, to be affixed by a pharmacist when dispensing the product pursuant to a prescription.

These answers to the questions in FDA's Notice are straightforward and, we think, not seriously in dispute. FDA has already determined that Plan B is safe and effective when dispensed OTC to women age 17 and older, yet FDA's continued delay in approving OTC status for the drug so dispensed is effectively preventing or delaying women of all ages from obtaining the drug as soon as possible and within its critical 72-hour period of effectiveness. This delay is contrary to the Agency's mission as set forth in FDCA § 903(b)(1), 21 U.S.C. § 393(b)(1), to "promote the public health by promptly and efficiently reviewing clinical research and taking appropriate action on the marketing of regulated products in a timely manner."

## BACKGROUND

Plan B is currently approved as a prescription drug indicated as "an emergency contraceptive that can be used to prevent pregnancy following unprotected intercourse or a known or suspected contraceptive failure." Plan B Package Insert. In a supplement to NDA 21-

045 (S-011) submitted to FDA on April 16, 2003, Women's Capital Corporation proposed that Plan B be switched from Rx to OTC status. The American College of Obstetricians and Gynecologists has estimated that making Plan B available OTC could prevent about 2 million pregnancies (about half of all unintended pregnancies in the United States), and about 500,000 abortions, per year.[1]  This objective can only be achieved if women who need Plan B have timely access to the product.

Based on the scientific evidence regarding its safety and its benefit to the health of women, every relevant leading medical organization in the United States supports the efficacy and safety of Plan B as an OTC product.  These organizations include the American Medical Association, the American Medical Women's Association, the American College of Obstetricians and Gynecologists, the American Academy of Pediatrics, the American Public Health Association, and the American Association of Family Physicians.[2]

In September 2005, Massachusetts became the eighth State to permit enhanced access to Plan B, by allowing pharmacists to dispense Plan B.  The others are Alaska, California, Hawaii, Maine, New Hampshire, New Mexico, and Washington.[3]  Over thirty countries world-wide—including Britain, France, Australia, and Sweden—already permit such use.[4]  Most recently, in 2005, Canada and India approved emergency contraception for nonprescription sales.[5]

After Duramed requested OTC status for Plan B, FDA jointly convened its Nonprescription Drugs Advisory Committee and FDA's Reproductive Health Drugs Advisory

---

[1]      Transcript of the December 16, 2003 meeting of the FDA Ctr. for Drug Eval. & Research, *Nonprescription Drugs Advisory Committee in Joint Session with the Advisory Committee for Reproductive Health Drugs*, Dec. 16, 2003, 33, 37, *available at* http://www.fda.gov/ohrms/dockets/ac/03/transcripts/4015T1.DOC (hereinafter, "Hearing Tr."). Duramed incorporates herein by reference the Hearing Transcript, which it presumes has been made part of docket number 2005N-0345.

[2]      A copy of each organization's statement is attached hereto at Exhibit ("Ex.") 1.

[3]      Alaska, *see* Alaska Stat. § 08.80 (2002) (Bd. ed. Feb. 2003), Alaska Admin. Code Title 12 § 52.240 (Bd. ed. Feb. 2003); California, *see* Cal. Bus & Prof. Code §§ 4016, 4025, & 4050 – 4052; Hawaii, *see* Haw. Rev. Stat. § 461-1; Maine, 32 Me. Rev. Stat. § 13821; Massachusetts, *see* SB 2073/HB 1643; New Hampshire, *see* N.H. Rev. Stat. § 318:47-e; New Mexico, *see* N.M. Stat. Ann. §§ 61-11-2, N.M. Reg. 16-19-26.9; and Washington, *see* Wash. Rev. Code 18.64, Wash. Admin. Code § 246-863-100.

[4]      Center for Reproductive Rights, "Governments Worldwide Put Emergency Contraception into Women's Hands:  A Global Review of Laws and Policies," 7 (Sept. 2004).  Attached hereto at Ex. 2.

[5]      *Morning After*, The Toronto Sun, April 24, 2005; *A Nod for Counter Sales of Emergency Contraceptives*, The Hindu, Sept. 1, 2005.  Attached hereto at Ex. 3.

Committee to review the application. In December 2003, after reviewing extensive scientific evidence, the committees voted, by a margin of 28 to 0, that Plan B is safe. The committees voted, by a margin of 23 to 4, that Plan B should be made available OTC.[6]

Reflecting strong public support for the switch to OTC status, editorials from across the country have urged FDA to accept the committees' recommendation. *The New York Times* called the committee vote "A Public Health Victory." *The Pittsburgh Post-Gazette* called it "welcome news," and urged that "FDA would be wise to accept the [committees'] recommendation and authorize sale as soon as possible." *The Denver Post* "strongly support[ed] the recommendation." *The Miami-Herald* stated that, "[t]he two panels' lopsided vote for Plan B is encouraging. In the past, the FDA has followed its experts' advice. It should do so now." *The Buffalo News* urged that NDA 21-045 "deserve[d] quick approval."[7]

Notwithstanding the findings and recommendations of the two expert committees, by letter dated May 6, 2004, Dr. Steven Galson, then acting director of the FDA Center for Drug Evaluation and Research ("CDER"), informed Duramed that Supplement 011 was not approvable. In an interview, Dr. Galson acknowledged that his action was not the norm, and that in refusing to allow Plan B to be sold OTC, he rejected not only the judgment of a joint advisory panel, but also the recommendations of his own staff.[8] A draft report by the Government Accountability Office agrees that the decision was highly unusual, that it was made with atypical involvement from senior agency officials, and that it was made months before it was formally announced.[9]

In its May 2004 letter, FDA stated that there was inadequate data to support that Plan B can be used safely by women under the age of 16 for emergency contraception without the supervision of a licensed practitioner. FDA did not cite any studies or data to support a concern that use of Plan B by younger adolescents is unsafe. Indeed, the advisory committees discussed and analyzed issues relating to OTC use of Plan B by adolescents, and did not vote to recommend against OTC use for that population.[10] In recent studies, access to emergency

---

[6]    Hearing Tr. at 349, 395.

[7]    Editorial, *A Public Health Victory*, N. Y. Times, Dec. 18, 2003; Editorial, *The FDA's Chance to Improve Contraception*, Pittsburgh Post-Gazette, Dec. 21, 2003; Editorial, *OK 'Morning After Pill,'* The Denver Post Dec. 18, 2003; Editorial, *Morning-After Pill Gets a Boost*, The Miami-Herald, Dec. 18, 2003; Editorial, *The Morning After Pill / Plan B Contraceptive Deserves Approval by FDA – And Quickly*, The Buffalo News, Dec. 29, 2003. These articles are attached hereto at Ex. 4.

[8]    Harris, Gardiner, *Morning-After-Pill Ruling Defies Norm*, N.Y. Times, May 8, 2004, at A13. Attached hereto at Ex. 5.

[9]    Kaufman, Marc, *Decision on Plan B Called Highly Unusual*, The Washington Post, Oct. 13, 2005, at A09 (reporting on draft GAO report). Attached hereto at Ex. 6.

[10]    *See, e.g.*, Hearing Tr. at 349-75.

contraception did not lead teenagers to increase sexually risky behavior.[11]  There was also no increase in sexually transmitted diseases or decrease in the use of other forms of contraception.[12]

FDA's May 2004 letter also suggested that Duramed could address the Agency's concerns by proposing a dual label for Plan B, with a prescription label for women under 16 and an OTC label for women 16 and older.  On July 6, 2004, Duramed submitted to FDA a complete response to the Agency's May 6 not-approvable letter.  Following FDA's suggestion, Duramed proposed OTC status only for the subpopulation of women age 16 or older while maintaining Rx status for women age 15 and younger.  Duramed also proposed that both the Rx version and the OTC version of Plan B be marketed in the same packaging (with a place for prescription-related information to be added when the product is dispensed pursuant to a prescription).  On August 11, 2004, FDA accepted the submission as a complete response to the May 2004 Not Approvable letter.  The PDUFA action date for the resubmission was January 20, 2005.  FDA informed Duramed on that date that the Agency would not then be taking an action on the supplement.

FDA's failure to take a final action on NDA 21-045 led Senators Hillary Rodham Clinton (D-NY) and Patty Murray (D-Wash.) to block a full Senate vote on Lester Crawford's nomination to be commissioner of FDA.  In July 2005, the Senators agreed to lift their holds after Health and Human Services ("HHS") Secretary Mike Leavitt wrote, in a letter to Senator Mike Enzi (R-Wyo.), who chairs the Senate Committee on Health, Education, Labor and Pensions, that FDA would act on Duramed's application by September 1, 2005.

By letter dated August 26, 2005, FDA informed Duramed that CDER had completed its review of Duramed's application and found that "the available scientific data are sufficient to support the safe use of Plan B as an OTC product" for women who are 17 years and older.  Letter from L. Crawford to Duramed Research, Inc. of 8/26/05.

Notwithstanding this undisputed scientific finding and the fact that Plan B is also effective in OTC use under the same directions for use that apply when the drug is dispensed pursuant to a prescription, FDA refused to take final action on Duramed's supplement, and indefinitely delayed final action.  FDA stated that the supplement presented the agency with the question of whether and how to market the same active ingredient to different populations for Rx and OTC use, and indicated that it would seek comments on whether to initiate rulemaking to resolve those issues.

---

[11]     *See* Tina R. Raine, *et al.*, *Direct Access to Emergency Contraception Through Pharmacies and Effect on Unintended Pregnancy and STIs*, JAMA 293:54-62 (2005) (study of 2,117 young women ages 15 to 24 concluded that providing young women with access to emergency contraception did not lead them to engage in more risky sexual behavior); Cynthia C. Harper, *et al.*, *The Effect of Increased Access to Emergency Contraception Among Young Adolescents*, 106 Obstetrics & Gynecology 483-491 (2005) ("*The Effect of Increased Access*") (finding that young adolescents with improved access to emergency contraception used the method more frequently when needed, but did not compromise their use of routine contraception or increase risky sexual behavior).  These studies are attached hereto at Ex. 7.

[12]     *The Effect of Increased Access*, at 489.

One FDA official and a consulting member of an FDA advisory committee have publicly resigned in protest over the August 26 Plan B decision. Susan F. Wood, the Assistant Commissioner for Women's Health and Director of the Agency's Office of Women's Health, resigned shortly after the August 26 decision was announced. She stated that FDA's decision was contrary to the scientific evidence and resulted from unwarranted interference in agency decision-making. "I can no longer serve as staff when scientific and clinical evidence, fully evaluated and recommended for approval by the professional staff here, has been overruled," she wrote in an e-mail to her staff and FDA colleagues.[13] In early October, Frank Davidoff, a member of FDA's Nonprescription Drugs Advisory Committee when it voted to recommend approval of Plan B for nonprescription sales in 2003, also resigned his current consulting position with that committee in protest. He stated: "There wasn't any observable scientific or procedural reason for [FDA] to first decline and then further delay the decision. I had to make the inference this was a decision that was made on the basis of political pressure, and it seemed to me that was unacceptable."[14]

The relevant scientific and medical communities have almost uniformly concurred with Dr. Wood's and Dr. Davidoff's assessment. They have heavily criticized FDA's continued refusal to approve OTC status for Plan B. An editorial in *The New England Journal of Medicine* was typical of this response: "[T]he agency has previously resisted political pressure to reflect a particular social policy or ideology. The recent actions of FDA leadership have . . . squandered the public trust and tarnished the agency's image." Allastair J.J. Wood, *et al.*, *A Sad Day for Science at the FDA*, 353:12 N. Engl. J. Med. 1196, 1198. Attached hereto as Ex. 10.

On October 7, 2005, a bipartisan group of 62 U.S. legislators wrote to FDA to urge acting Commissioner Andrew von Eschenbach to approve Plan B for OTC use. The legislators argued that, "[b]y further delaying the FDA's decision to expand access to emergency contraception, [FDA is] seriously hindering efforts to reduce abortions across the U.S." and it called on Dr. von Eschenbach to approve Plan B "without further delay." The legislators continued, "[w]e find it contradictory and disconcerting that the FDA's concerns are a direct result of the agency's own recommendations last May . . . . We believe this new delay does not truly reflect valid scientific or regulatory concerns"[15]

---

[13]     Marc Kaufman, *FDA Official Quits Over Delay on Plan B*, The Washington Post, Sept. 1, 2005, A08. Attached hereto at Ex. 8.

[14]     *FDA Advisor Resigns Over Plan B Handling*, The Associated Press, Oct. 6, 2005. Attached hereto at Ex. 9.

[15]     *U.S. Lawmakers Call for Morning-after Pill Approval*, Reuters, Oct. 11, 2005. Attached hereto at Ex. 11.

## DISCUSSION

FDA's Notice seeks comment on the following questions:

1.A.    Should FDA initiate a rulemaking to codify its interpretation of section 503(b) of the act regarding when an active ingredient can be simultaneously marketed in both a prescription drug product and an OTC drug product?

1.B.    Is there significant confusion regarding FDA's interpretation of section 503(b) of the FDCA?

1.C.    If so, would a rulemaking on this issue help dispel that confusion?

2.A.    If FDA limited sale of an OTC product to a particular subpopulation, e.g., by making the product available to the subpopulation by prescription only, would FDA be able to enforce such a limitation as a matter of law?

2.B.    If it could, would it be able to do so as a practical matter and, if so, how?

3.A.    Assuming it is legal to market the same active ingredient in both a prescription and OTC product, may the different products be legally sold in the same package?

3.B.    If the two products may be lawfully sold in a single package, under what circumstances would it be inappropriate to do so?

70 Fed. Reg. 52,050, 50,251 (Sept. 1, 2005). Duramed takes up each of these questions in turn below.

**I.    FDA'S INTERPRETATION OF SECTION 503(b) HAS NOT CREATED CONFUSION, AND THERE IS NO NEED FOR ANY RULEMAKING IN ORDER TO APPROVE NDA 21-045/S011.**

FDA need not, and should not, initiate a rulemaking to codify its interpretation of section 503(b) regarding when an active ingredient can be marketed simultaneously in both an Rx drug product and an OTC drug product.

As FDA acknowledges in the Notice, it has on a number of occasions permitted simultaneous Rx and OTC marketing of a product. Were FDA's interpretation of section 503(b) really in need of clarification, that need would have arisen well before now. The fact that the issue has not previously been raised is strong evidence that there is no need for rulemaking regarding FDA's interpretation of section 503(b).

7

Moreover, the issue presently before FDA is whether this drug product, Plan B, can simultaneously be marketed as both an Rx and an OTC drug product. Resolution of that issue need not, and ultimately does not, implicate FDA's long-standing interpretation of section 503(b).

A.    **UNDER THE FDCA AND FDA'S EXISTING REGULATIONS, PLAN B CAN PROPERLY BE AN OTC DRUG FOR ONE PATIENT SUBPOPULATION**

Generally, new drug products that are indicated for different patient populations are different "new drugs." Where new drug products are different, one may be an Rx drug product, and the other an OTC drug product, without creating any problem under the FDCA or FDA's regulations.

The Manual of Policies and Procedures of the Center for Drug Evaluation and Research ("MAPP") expressly contemplates that an Rx version and an OTC version of a drug product may differ only in the population for which they are indicated:

> **Initial Marketing of a Drug Product OTC.** This category of product could be one of two types: (1) OTC marketing of a product that was never previously marketed as a prescription drug product or (2) OTC marketing of a product in a strength, dose, route of administration, duration of use, population, indication, or dosage form different from ones previously approved for prescription use.

MAPP 6020.5 at 2 (Jan. 15, 1997) (boldface in original) (emphases added), *available at* http://www.fda.gov/cder/mapp/6020-5.pdf.[16] The use of the disjunctive "or" in the quoted passage makes clear that the passage expressly contemplates "OTC marketing in a . . . population . . . different from ones previously approved for prescription use," *id.*

There is no legally relevant distinction between the proposed subpopulation switch of Plan B and the scenario described in MAPP 6020.5. As applied to Plan B, the exact analogy would be a scenario in which Plan B had previously been approved only as an Rx drug for women age 15 and younger, and were now also to be approved as an OTC drug for women age 16 or over. In that scenario, the proposed OTC population would be "different from [the one] previously approved for prescription use." MAPP 6020.5 at 2.

---

[16]    The universe of OTC drug products consists of (i) those initially marketed OTC, and (ii) those switched from Rx to OTC status. As a matter of terminology, the term "Rx to OTC switch" "refers only to OTC marketing of a product that was once a prescription drug product for the same indication, strength, dose, duration of use, dosage form, population, and route of administration." MAPP 6020.5 at 2. The proposed Plan B subpopulation switch is an "Rx to OTC switch" with respect to the population of women age 16 and over: for that subpopulation, the drug product previously was available only as an Rx product, but would now be available OTC.

It should make absolutely no difference, however, that Plan B previously has been approved as an Rx drug for women age 16 or over (as well as for women age 15 and younger). In both the scenario described in MAPP 6020.5 and in the proposed scenario for Plan B, after approval of the drug for the specified OTC subpopulation, the drug would simultaneously be approved as an Rx drug for one subpopulation and as an OTC drug for another. Nothing in the discussion in MAPP 6020.5 suggests that, upon the approval of the OTC status for the new patient subpopulation, the Rx status for the remaining patient subpopulation would be withdrawn. Thus, MAPP 6020.5 demonstrates that there is no FDA policy that precludes the approval of a drug for simultaneous marketing as an Rx drug for one patient subpopulation and as an OTC drug for another.

The newness of a drug may arise from the newness of the "use" of the drug. 21 C.F.R. § 310.3(h)(4) (2005). Intended uses of a drug in different patient subpopulations constitute different uses of the drug, and thus create different new drugs, within the meaning of FDCA §§ 201(p) and 505(a), 21 U.S.C. §§ 321(p), 355(a). The reason why a supplement is required for an additional indication for an approved new drug is that the additional indication constitutes a new use of the drug and therefore creates a different new drug. A manufacturer of an approved drug that promotes its product for a use different from or additional to the approved use(s) is subject to a charge of violating FDCA § 301(d), 21 U.S.C. § 331(d), as well as to a misbranding charge under FDCA § 502(f)(1), 21 U.S.C. § 352(f)(1). *See Decision in Washington Legal Foundation v. Henney*, 65 Fed. Reg. 14,286-01, 14,286-01 (Mar. 16, 2000) ("an approved new drug that is marketed for a 'new use' becomes an unapproved new drug with respect to that use").

FDA recognizes that persons age 15 and younger constitute a patient population ("the pediatric age group") distinct from patient populations consisting of persons age 16 or over. *See* 21 C.F.R. § 201.57(f)(9)(i) (2005). Generally, separate investigations are necessary to support an indication for that population, as distinct from an indication for an adult population. *See generally*, FDCA § 505A, 21 U.S.C. § 355a; 21 C.F.R. § 201.57(f)(9)(ii) (2005).

Thus, for example, if a drug is indicated only for an adult population, but is promoted by its manufacturer for a pediatric population, the manufacturer would be subject to a charge under section 301(d) as well as to a charge under section 502(f)(1). The availability of a new-drug charge in this type of situation demonstrates conclusively that a drug intended for one patient population is a different new drug from the otherwise identical drug intended for a different patient population. In the language of section 310.3(h)(4), the difference between the intended patient population creates a different "use" of the drug – even though, in all other respects, the drug's physical qualities and its conditions of use (*e.g.*, the medical condition it is intended to treat) remain the same.[17]

Therefore, where intended patient populations are sufficiently distinct that FDA has concluded, on medical grounds, that one and the same product (*i.e.*, same ingredients, dosage

---

[17]    In the terms of FDCA § 201(p), 21 U.S.C. § 321(p), the difference in intended patient population constitutes a difference in "the conditions prescribed, recommended, or suggested" for the drug.

form, route of administration, strength, *etc.*) should be available OTC for one subpopulation of patients but only Rx for a second subpopulation, the uses of that product for the different subpopulations are different; and therefore the product, as intended for the different subpopulations, is, technically, two different new drugs.[18]

"Sometimes the dose of a product to be marketed OTC may be lower than the previous prescription dose, <u>or</u> the proposed use may differ from the prescription use." FDA, Questions and Answers[:] Over-the-Counter Drug Products Public Hearing June 28 and 29, 2000, at 3, *available at* http://www.fda.gov/cder/meeting/otcqa-600.htm (emphasis added). The FDA Questions and Answers expressly contemplate approval of a drug product for simultaneous marketing as an Rx drug for one use and as an OTC drug for another. As just explained, uses by different patient populations are different uses.

The permissibility under the FDCA of approving the same drug product as Rx for one patient population and as OTC for another is valuable and important for protection of the public health. Such a pair of approvals enables the Agency to titrate the degree of intervention by healthcare professionals in patients' access to the drug product. Where FDA appropriately determines that a particular drug product can be safely, effectively, and appropriately used by one patient population with access OTC, but that another patient population needs the supervision of a physician, it would be inappropriate to make the drug product either entirely OTC (in which case the group for whom a prescription requirement is warranted would be put at risk) or entirely Rx (in which case the group for whom a prescription requirement is unwarranted would be subjected to unnecessary burdens and expense and, in this case, may experience unnecessary delay in obtaining the product, whose effectiveness diminishes with delay before use).

Further support for the permissibility under the FDCA and FDA's regulations of simultaneous dispensing to different patient populations of Rx and OTC versions of a drug is provided by FDA policy with respect to veterinary drugs. With respect to the Rx legend, veterinary drugs are subject to provisions very similar to § 503(b)(4). *Compare* FDCA § 503(b)(4), 21 U.S.C. § 353(b)(4) *with* FDCA § 503(f)(4), 21 U.S.C. § 353(f)(4). CVM Program Policy & Procedures Manual Guide 1240.2220 § 3.d (Mar. 9, 2000), *available at* http://www.fda.gov/cvm/Policy_proced/2220.pdf, states:

> In the past, the same products used in varying routes of administration, dosage forms, and in varying species of animals may have been labeled prescription in one instance and non-prescription for other uses. The primary question is whether adequate directions for use can be written to assure safe and effective use. If an average food animal producer can safely and effectively administer a product, but a companion animal owner, regardless of label directions, cannot administer it safely and

---

[18]    Patient populations can be differentiated on a variety of bases – including disease state, experience with other drugs, and gender, as well as age.

> effectively, then the prescription status of the product must be
> different relative to these intended uses. If directions can be
> written for use for a particular route of administration (IV, IP, etc.)
> for one animal species but not for another, it is not inconsistent to
> grant OTC status for the one use and require the Rx legend for the
> other.

*Id.* This passage plainly contemplates that identical versions of a veterinary drug may be labeled in one instance (for one population) Rx and in another instance (for another population) OTC.

In sum, the proposed subpopulation switch of Plan B is consistent with existing written FDA policy. No further policy development is needed to support approval of the proposed subpopulation switch.

## B.    FDA'S INTERPRETATION SECTION 503(b) HAS NOT CAUSED ANY CONFUSION.

There has been no history of confusion regarding FDA's interpretation of section 503(b)(1) of the FDCA as permitting simultaneous Rx and OTC marketing when some meaningful difference exists that makes the drug safe and effective for one patient population only under the supervision of a licensed practitioner but safe and effective for another patient population without such supervision.

There can be no genuine dispute that FDA has the authority to allow simultaneous marketing of the same active ingredient in Rx products and OTC products. In fact, approval of otherwise Rx drug products for OTC use in an appropriate subpopulation is not a novel concept. Whether a subpopulation is defined by a disease state (*e.g.*, mild, moderate, severe), by prior experience with a drug (*e.g.*, failed on first-line therapy), by gender, or by age (*e.g.*, pediatric, geriatric) varies with particular products, but the principle is the same: different subpopulations for whom a drug is indicated create different "new drugs," for which separate approval is needed and which separately may be either Rx or OTC.

Although FDA has repeatedly found conditions under which an active ingredient may be marketed simultaneously in both a prescription drug product and an OTC drug product, and has presumably on occasion refused to find that such conditions exist, Duramed has been unable to locate any challenges to the interpretation of section 503(b)(1) that FDA utilizes to make such determinations. A review of the case law reveals that there is no published opinion addressing purported confusion regarding FDA's interpretation. Similarly, a review of the academic literature, including a review of the journals specific to issues relating to FDA and food and drug law, reveals that there has been no scholarly work identifying, or seeking to resolve, any confusion as to FDA's interpretation. In sum, neither the private nor public sector has been confused by FDA's interpretation.

11

C.    **BECAUSE THERE IS NO CONFUSION REGARDING FDA'S
      INTERPRETATION, RULEMAKING IS UNWARRANTED.**

Because there is no confusion regarding FDA's interpretation of section 503(b), there is no need for rulemaking to clarify FDA's interpretation.

Even if there were some circumstances in which confusion might somehow result from FDA's interpretation of section 503(b), there is no confusion regarding the application of FDA's interpretation to NDA 21-045/S011. Thus, no notice-and-comment rulemaking or guidance document is legally required or factually warranted in the circumstances here. The approval Duramed seeks from FDA is specific to NDA 21-045/S011 as amended, and does not raise broad issues potentially affecting other products.

If FDA is concerned that it has little prior experience with such use of an age restriction or its reflection in labels and labeling, the appropriate response is not to initiate rulemaking now. Instead, it is reasonable and appropriate for the agency to proceed case by case to accumulate experience before embodying a particular approach in a rule adopted in a notice-and-comment proceeding. *See, e.g., SEC v. Chenery Corp.*, 332 U.S. 194, 202-03 (1947) (agency has discretion to proceed case by case or by notice and comment).

Since there is currently no court-created deadline, a rulemaking seeking to clarify FDA's interpretation of section 503(b), if initiated before approval of NDA 21-145/S011, could potentially delay such approval by years. FDA should not delay a decision on the pending supplement in order to conduct rulemaking to address concern over the clarity of its interpretation in some hypothetical future scenario. The delay that would necessarily accompany rulemaking in this instance would be particularly unjustified because it would deny women age 17 and over prompt and convenient access to a drug that FDA has already found is safe and effective for them when available OTC. Such delay would be flatly contrary to FDCA § 903(b)(1), 21 U.S.C. § 393(b)(1).

II.    **FDA CAN ENFORCE LIMITED SALE OF AN OTC PRODUCT TO A
       PARTICULAR SUBPOPULATION.**

As the Notice highlights, there is nothing novel about an active ingredient that is marketed simultaneously in both an Rx drug product and an OTC drug product. FDA has repeatedly approved such simultaneous use where there is, as FDA states in its Notice, "some meaningful difference . . . between the two that makes the prescription product safe only under the supervision of a licensed practitioner." 70 Fed. Reg. at 52051. That the meaningful difference is in the population taking the drug, and not in the active ingredient, itself, has no impact on FDA's legal and practical ability to enforce the prescription requirement while permitting OTC sales of a drug with the same active ingredient.

**A.    AS A MATTER OF LAW, FDA CAN ENFORCE LIMITATION OF AN OTC PRODUCT TO A PARTICULAR SUBPOPULATION THROUGH ENFORCEMENT OF SECTION 503(B)(1)(B).**

Just as it has the legal authority to enforce a prescription limitation where the limitation applies to the entire population, FDA has the legal authority to enforce the prescription limitation of Plan B as to a subpopulation (*i.e.*, women 15 and younger).

Section 503(b)(1)(B) of the FDCA provides:

A drug intended for use by man which . . . is limited by an approved application under section 505 to use under the professional supervision of a practitioner licensed by law to administer such drug; shall be dispensed only (i) upon a written prescription of a practitioner licensed by law to administer such drug, or (ii) upon an oral prescription of such practitioner which is reduced promptly to writing and filed by the pharmacist, or (iii) by refilling any such written or oral prescription if such refilling is authorized by the prescriber either in the original prescription or by oral order which is reduced promptly to writing and filed by the pharmacist. <u>The act of dispensing a drug contrary to the provisions of this paragraph shall be deemed to be an act which results in the drug being misbranded while held for sale.</u>

21 U.S.C. § 353(b)(1)(B) (emphasis added).

In turn, section 301(k) provides that the following is a prohibited act: "The . . . doing of any other act with respect to, a food, drug, device, or cosmetic, if such act is done while such article is held for sale (whether or not the first sale) after shipment in interstate commerce and results in such article being adulterated or misbranded." 21 U.S.C. § 331(k).

Injunctive relief for violation of section 301(k) is available under FDCA § 302, 21 U.S.C. § 332. Criminal penalties for committing a prohibited act under section 301(k) are available under FDCA § 303(a), 21 U.S.C. § 333(a).

Reading these three sections together, "the conclusion is inescapable . . . that one dispensing drugs . . . contrary to the provisions of Sec. 353(b)(1) shall be guilty of, and subject to the punishment provided by law for, an act of misbranding." *United States v. Carlisle*, 234 F.2d 196, 199 (5th Cir. 1956). Thus, if FDA approves Duramed's supplement to NDA 21-045/S011, permitting OTC sale for those age 16 and over and requiring a prescription for sale to those under age 16, then selling to someone age 15 or younger without a prescription would constitute a prohibited act under section 301(k), for which civil and criminal remedies are available under the FDCA.

**B.    FDA HAS EXTENSIVE EXPERIENCE IN ENFORCING PRESCRIPTION REQUIREMENTS.**

The application of age restrictions to certain products is prevalent throughout our society. With respect to Plan B, the restriction could be enforced by requiring pharmacies to keep the drug behind the counter and dispense it only upon presentation of (i) a prescription or (ii) identification showing that the consumer is age 16 or over. These requirements and the age restriction can be enforced through a variety of mechanisms, all of which FDA has readily at its disposal and/or can employ in cooperation with state and local governments.

First, in testimony before the Committee on Government Reform on September 13, 2005, Robert J. Meyer, M.D., Director, Office of Drug Evaluation II ("Meyer Testimony"), outlined many of the enforcement mechanisms FDA currently employs to curb prescription drug abuse.[19] FDA could use these mechanisms to enforce a prescription requirement for women under age 16. For example, as it does in other matters, FDA can undertake joint investigative efforts with the Drug Enforcement Administration.

Second, FDA is authorized by FDCA § 704, 21 U.S.C. § 374, to conduct inspections of establishments that are subject to the requirements of the FDCA, which include pharmacies selling drug products. Anyone who refuses to permit such an inspection is subject to criminal penalties under FDCA § 301(f), 21 U.S.C. § 331(f), and § 303(a), 21 U.S.C. § 333(a). Under FDCA § 702, 21 U.S.C. § 372, FDA may conduct examinations and investigations, through officers and employees of the Department of Health and Human Services or through any health, food, or drug officer or employee of a state and local government, duly commissioned by the Secretary of Health and Human Services as an officer of the Department. Through use of its own, or state, investigators, FDA can conduct random, unannounced inspections of pharmacies or stores, to ensure that they are enforcing the prescription limitation of Plan B for women younger than age 15.

Third, FDA can deter persons from violating the subpopulation Rx requirement by aggressively pursuing criminal actions against known violators. FDA can use a number of means to pursue such enforcement. Cases can be developed through FDA's network of field offices, reviewed by FDA headquarters, and then submitted to the Office of Consumer Litigation ("OCL") in the Department of Justice. OCL determines whether to pursue criminal or civil remedies, if any. FDA can also refer cases through the Office of Criminal Investigations ("OCI"). OCI can refer cases directly to United States Attorneys' Offices.

Fourth, FDCA § 909, 21 U.S.C. § 399, authorizes FDA to make grants to States for the purpose of conducting examinations and investigations. FDA can allocate grants to state and local governments to aid them in their own enforcement of such a restriction. State drug inspectors, in connection with local law enforcement, are involved in enforcing prescription

---

[19]    Dr. Meyer's testimony is attached hereto at Ex. 12.

requirements.  President Bush's 2005 National Drug Control Strategy recognizes that state prescription drug monitoring programs are highly effective in curbing prescription drug abuse.[20]

Fifth, FDA has the inherent authority to publicize the importance of strict adherence to prescription requirements, and could undertake a public education campaign to ensure that women under the age of 16 are aware of their need to obtain a prescription to buy Plan B.  *See also* FDCA § 705, 21 U.S.C. § 375.  For example, as Dr. Meyers testified, FDA has recently partnered in launching a "prescription drug abuse prevention education effort, with the primary goal of preventing and reducing the abuse of prescription drugs . . . by teens and young adults."  Meyer Testimony at 4.  FDA could launch a similar educational campaign regarding Plan B.

Sixth, FDA can also monitor the advertising and promotion of Plan B through its Division of Drug Marketing, Advertising, and Communications, which is responsible for regulating prescription drug advertising and promotion.

Seventh, FDA can monitor its enforcement success by making annual reports to the Department of Health and Human Services concerning the methods and effectiveness of enforcement efforts.  For one example, the Substance Abuse and Mental Health Services Administration ("SAMHSA"), part of HHS, conducts an annual National Survey of Drug Use and Health on a random sample of U.S. households.  This survey seeks to determine the prevalence of non-medical use of prescription drugs.  FDA can work with SAMHSA to randomly sample, as part of its annual survey, the number of women under 16 who use Plan B without a prescription, report its findings, and thereby monitor the effectiveness of its enforcement efforts over time.

Duramed will aid FDA's efforts through its proposed Convenient Access, Responsible Education ("CARE") program.  Under the program, distribution of Plan B will be limited to retail operations with pharmacy services and clinics.  The product packaging for Plan B will also include a 24-hour toll-free number and a supplementary patient leaflet that will describe available contraceptive methods, including abstinence, and information on sexually transmitted diseases.  The program will also include educational and monitoring programs for physicians and pharmacists that clearly set forth, and evaluate the effectiveness of, the prescription age restriction.

---

[20]    The President's National Drug Control Strategy, The White House, 36-37 (2005). Attached hereto at Ex. 13.

**III.    RX AND OTC DRUG PRODUCTS CAN LAWFULLY BE SOLD IN THE SAME PACKAGING.**

**A.    FDCA § 503 CAN BE SATISFIED BY MARKETING THE Rx AND OTC VERSIONS OF PLAN B IN THE SAME INITIAL PACKAGING.**

Under the FDCA and current FDA regulations, Rx and OTC products can lawfully be sold in the same packaging. Specifically, with respect to packaging of Plan B, FDCA § 503 can be satisfied by ensuring that all packages contain (i) adequate information and directions to ensure safe, effective, and appropriate OTC use, (ii) the legend "Rx only for women under age 17," and (iii) appropriate space for the traditional Rx label, to be affixed by a pharmacist when dispensing the product pursuant to a prescription.

Issues relating to the label and labeling of Plan B have already been reviewed and addressed by the Reproductive Health and OTC Divisions of CDER during their review of Duramed's July 2004 submission. Appropriate labeling, including that on the tamper-evident seal, has been created and submitted to FDA.

**1.    The Label.**

**a.    Compliance with General Requirements Applicable to the Label.**

Plan B, when dispensed as an Rx drug, would need to comply, and would comply, with all requirements applicable to the label of an Rx drug and, when dispensed as an OTC drug, need to comply, and would comply, with all requirements applicable to an OTC drug. It would also need to comply, and would comply, with all requirements applicable to it during the period prior to dispensing.

It is proposed that Plan B have a printed label that includes all mandatory information for an OTC product. The proposed label and outer packaging comply with all the affirmative requirements applicable to OTC labels under FDCA §§ 502(b), 502(e)(1)(A), 502(f), 502(g), 21 U.S.C. § 352(b), 352(e)(1)(A), 352(f), 352(g); 21 C.F.R. §§ 201.1, 201.5, 201.10, 201.15, 201.17, 201.60-.62 (2005).

In addition, when Plan B is dispensed pursuant to a prescription, its label would be subject to all the requirements applicable to labels of Rx drugs under FDCA §§ 502(b), 502(e)(1)(B), 502(g), 21 U.S.C. §§ 352(b), 352(e)(1)(B), 352(g); 21 C.F.R. §§ 201.50, 201.51, 201.100(b) (2005).

Even though Plan B, as an OTC product, would bear adequate directions for use by consumers who, in accordance with the approved labeling, may buy the product without a prescription, it would not (in legal contemplation) bear adequate directions for use by patients who, in accordance with the approved labeling, may buy the product only with a prescription.[21]

---

[21]    The legal theory justifying prescription status as to those patients is that adequate directions for use by them cannot be written.

16

Therefore, when dispensed to a patient who may obtain the product only pursuant to a prescription, Plan B must comply, and would comply, with all the conditions, set forth in 21 C.F.R. § 201.100 (2005), for exemption from the requirement of adequate directions for use by the prescription population, FDCA § 502(f)(1), 21 U.S.C. § 352(f)(1).

There is no obstacle to simultaneous compliance with all these requirements. Indeed, because the product information, including all directions for use, are exactly the same for the Rx and the OTC users of Plan B, the presence of the OTC information and directions on the packages dispensed to Rx users would tend to enhance their safe, effective, and appropriate use of the product. Neither subpopulation of patients would be in any way adversely affected by the presence on the package of any information placed there in order to comply with a regulatory requirement for the protection of the other subpopulation.

FDCA § 503(b)(2), 21 U.S.C. § 353(b)(2), exempts an Rx drug from many of the requirements of § 502, 21 U.S.C. § 352, if its label contains (i) the name and address of the dispenser; (ii) the serial number and date of the prescription or its filing; (iii) the name of the prescriber, (iv) if stated in the prescription, the name of the patient; and (v) the directions for use and cautionary statements, if any, contained in such prescription. The information required by section 503(b)(2) would appear on the Rx label attached to the package by the pharmacist when dispensing the product pursuant to a prescription.

### b.    Compliance with Section 503(b)(4).

FDCA § 503(b)(4) provides:

(A)    A drug that is subject to paragraph (1) shall be deemed to be misbranded if at any time prior to dispensing the label of the drug fails to bear, at a minimum, the symbol "Rx only".

(B)    A drug to which paragraph (1) does not apply shall be deemed to be misbranded if at any time prior to dispensing the label of the drug bears the symbol described in subparagraph (A).

21 U.S.C. § 353(b)(4).

Whether a drug product is subject to section 503(b)(4)(A) or 503(b)(4)(B) depends entirely on whether it falls under paragraph (1) of section 503(b). Under the proposed subpopulation switch, Plan B would remain an Rx product for women under age 16. Therefore, it would remain "[a] drug that is subject to paragraph (1)" of section 503(b). Consequently, at all times, it would remain subject to section 503(b)(4)(A), and would not be subject to section 503(b)(4)(B), which applies only to drug products that are not subject to any prescription requirement under section 503(b)(1) at all. Even the units of Plan B ultimately dispensed OTC to women age 16 or over would be subject to a prescription restriction under section 503(b)(1) against their being dispensed OTC to women under age 15, and so would be subject to section 503(b)(4)(A) rather than to section 503(b)(4)(B).

Duramed proposes that Plan B comply with section 503(b)(4)(A) by bearing on its label the legend: "Rx only for women under age 15 and younger." Section 503(b)(4)(A) requires that "the symbol 'Rx only'" appear on Plan B's label. The symbol "Rx only" would appear on the label as part of the statement "Rx only for women age 15 and younger." Nothing in section 503(b)(4)(A) precludes the appearance of the symbol on a label as part of a truthful and non-misleading statement of the prescription limitation applicable to the labeled product under its NDA. Indeed, the expression "at a minimum" in section 503(b)(4)(A) expressly contemplates that the words "Rx only" may appear with other words on the label. The proposed Rx legend would comply literally with the text of section 503(b)(4)(A). It also would fully serve the purpose of section 503(b)(4), which is to make clear to pharmacists and the public when a drug product is to be dispensed OTC or only by prescription.

**2.    Labeling.**

**a.    OTC Labeling.**

The Plan B package would also need to contain, and would contain, labeling that complies with the labeling requirements applicable to OTC products, 21 C.F.R. § 201.66 (2003).

**b.    Rx Labeling.**

There would also need to be Rx labeling with respect to the class of patients to whom the product may be dispensed only pursuant to a prescription. *See* 21 C.F.R. §§ 201.50, 201.56; 201.100(c), 201.100(e) (2005). Thus, it would be necessary to revise the current Rx labeling. Plan B would comply with these requirements.

**c.    NDC Number.**

There would not be separate NDC numbers for the (Rx and OTC) versions of Plan B. There is no need for separate numbers because all purposes of the NDC system would be fully served here by a single number.

**B.    IN LIMITED CIRCUMSTANCES NOT APPLICABLE TO PLAN B, TWO PRODUCTS COULD NOT BE SOLD IN THE SAME PACKAGING.**

It would be inappropriate to sell two products in the same packaging if different doses, different strengths, or different directions for use were needed for the safe and effective use of the OTC produce as compared to the safe and effective use of the prescription product. None of these circumstances, however, applies to the marketing and sale of Plan B.

**CONCLUSION**

For the foregoing reasons, (i) FDA should not initiate rulemaking with regard to its interpretation of section 503 of the FDCA; (ii) FDA has the legal authority and practical ability to enforce an age-related prescription limitation applicable to Plan B; and (iii) FDA can permit the marketing of the Rx and OTC versions of Plan B in the same packaging.

FDA has determined that Plan B is safe and effective for OTC use in women age 17 and older. Therefore, FDA should give final approval to NDA 21-045/S011 without further delay.

Respectfully submitted,

Richard M. Cooper
Ana C. Reyes

WILLIAMS & CONNOLLY LLP
725 12th Street, NW
Washington, D.C. 20005
(202) 434-5000

*Attorneys for Duramed*
*Pharmaceuticals, Inc. and Duramed*
*Research, Inc.*

November 1, 2005



**DEPARTMENT OF HEALTH & HUMAN SERVICES**

Public Health Service

Food and Drug Administration
Rockville, MD 20857

21-045/S-011

Duramed Research, Inc.
Attention: Joseph A. Carrado, M.Sc., R.Ph.
       Vice President, Clinical Regulatory Affairs
One Belmont Ave, 11th floor
Bala Cynwyd, PA 19004

Dear Mr. Carrado:

Please refer to your supplemental new drug application dated April 16, 2003, received April 22, 2003, submitted under section 505(b) of the Federal Food, Drug, and Cosmetic Act for Plan B® (levonorgestrel) Tablets, 0.75 mg.

We also acknowledge receipt of your submissions dated July 25 (3), and 31, August 8 (2), September 4, 8, 9, and 15, October 6, 10, 15 (2), 17, 21, 24, 29, 30, and 31, December 3, and 9, 2003; January 9, and 30, February 6, 10, 13, 20, and 24, March 11 and 26, May 6 and 11, June 30, July 21, 2004; January 6, 12, 13, 14, 18, 19 and 21, and August 26, 2005; and August 2, 17, 18, and 23, 2006.

Your submission of July 21, 2004, constituted a complete response to our May 6, 2004, Not Approvable letter. The resubmitted supplemental new drug application provides for a switch to Over-the-Counter (OTC) status for women ages 16 years or greater and maintenance of prescription status for women under age 16. On August 26, 2005, then Commissioner Lester M. Crawford, DVM, PhD, sent you a letter indicating that the Agency was unable, at that time, to reach a decision on the approvability of the application because of unresolved issues that related to your NDA. The letter mentioned three issues: whether the same active ingredient could be marketed both Rx and OTC based solely on the age of the individual using the drug; how, as a practical matter, an age-based distinction could be enforced; and whether the Rx and OTC versions of the same active ingredient may be marketed in a single package. The letter also stated that the agency had decided to ask for public comments on whether we should initiate a rulemaking to codify our interpretation of section 503(b) of the Federal Food, Drug, and Cosmetic Act regarding when an active ingredient can be simultaneously marketed in both a prescription drug product and an OTC drug product through an advance notice of proposed rulemaking (ANPRM) that published on September 1, 2005 (70 FR 52050). The comment period closed on November 1, 2005, and the agency received about 47,000 comments. The agency hired a contractor to summarize and categorize the comments and the contractor submitted a final report on May 19, 2006.

On July 31, 2006, Dr. Andrew von Eschenbach, Acting Commissioner of Food and Drugs, sent you a letter indicating that the agency had reviewed the comments received in response to the ANPRM and determined it was not necessary to engage in rulemaking to resolve the novel regulatory issues raised by your application and that we were now proceeding with further evaluation of your application.

NDA 21-045/S-011
Page 2

We met with you on August 8, 2006, and discussed how to address the issues raised in Dr. von Eschenbach's letter regarding the restriction on OTC sales of Plan B® to ages 18 and over, the packaging, and the Convenient Access Responsible Education (CARE^SM) Program.

On August 17, 18, and 23, 2006, you amended your application to propose revisions to the labeling and to the CARE^SM Program.

We have completed our review of this application, as amended, and have concluded that adequate information has been presented to demonstrate that Plan B® is safe and effective for use under the conditions set forth in the draft labeling submitted on August 23, 2006.  This application is approved, effective on the date of this letter, to allow OTC availability of Plan B® for consumers 18 years and older.  Plan B® remains available by prescription only for women 17 years and younger.

The final printed labeling (FPL) must be identical to the enclosed labeling (prescription package insert, outer carton label, inner card label, and consumer information leaflet).   The inner card and outer carton labels must be formatted in accordance with the requirements of 21 CFR 201.66.

Please submit an electronic version of the FPL according to the guidance for industry titled *Providing Regulatory Submissions in Electronic Format – NDA*.  Alternatively, you may submit 20 paper copies of the FPL as soon as it is available, in no case more than 30 days after it is printed.  Individually mount 15 of the copies on heavy-weight paper or similar material.  For administrative purposes, designate this submission "**FPL for approved NDA 21-045 /S-011**."  Approval of this submission by FDA is not required before the labeling is used.

We also remind you of the activities you agreed to as specified in the CARE^SM Program described in your submission dated August 23, 2006.  You agreed to:

- Monitor trends in the use of emergency contraception to evaluate the effectiveness of the CARE^SM program.  Specifically, you have agreed to conduct a market research survey or surveys of a subset of healthcare professionals annually, and when practicable, in collaboration with established professional groups.  Your surveys will be designed to determine whether the Rx requirement for those ages 17 and younger is being adhered to at the point of purchase and to provide signals of program effectiveness and potential problems associated with consumers' understanding of the purpose and proper use of Plan B®.

- Using relevant survey data regularly collected by others (e.g., Centers for Disease Control's Behavioral Risk Factor Safety Surveillance (CDC BRFSS), Youth Risk Behavior Safety Surveillance (YRBSS)), to monitor for potential indicators that Plan B® is being used in an inappropriate manner.  Potential areas of monitoring and reporting include evaluating possible correlations between increases in sexually transmitted infections (STIs) based on geographic areas and data and trends in pregnancy and/or abortion rates based on geographic areas.

- Conduct a "Point-of-Purchase Monitoring Program" to track how Plan B® is being sold at the time of purchase, including using anonymous shoppers who will be directed to visit locations where Plan B® is available and purchase the product.  Using the data collected, you will document and analyze the level of comprehension of the Plan B® prescription age requirement and how it is handled at the point of purchase.  The program will be conducted twice in the first

NDA 21-045/S-011
Page 3

year and annually thereafter.  The sponsor will report repeat violators to the relevant State
Boards of Pharmacy.

- Report to FDA on the results of these activities on a six-month interval beginning 30 calendar
  days after the six-month interval commencing on the date of this approval.

Finally, we note and agree with the other elements of the CARE[SM] Program, described in your
submission of August 23, 2006, which are designed to ensure compliance with the approved labeling,
and particularly the restriction of OTC use to ages 18 and older.  The program includes the following
elements:

- The sponsor and third party distributors, wholesalers, and chain drug companies will only
  distribute Plan B[®] to licensed pharmacies or other licensed healthcare clinics.  As a result, Plan
  B[®] will not be sold at gas stations or convenience stores.  Given that Plan B[®] will have both Rx
  and OTC labeling, the pharmacies will keep Plan B[®] behind-the-counter.

- The sponsor will conduct an education campaign that will focus initially on healthcare
  professionals (including prescribers and pharmacists) to raise awareness and knowledge levels
  about emergency contraception.  The education campaign will clearly communicate the
  prescription age requirement and the appropriate use of emergency contraception. The
  campaign will include continuing education by certified professionals and educational materials
  (including websites and toll free numbers) that can be accessed easily and at any time.

- The sponsor will make available to State Boards of Pharmacy continuing education programs
  for use at annual meetings and other regional programs.

- The sponsor will provide to prescribers and healthcare professional associations materials for
  distribution to patients that will encourage patients to discuss any questions about emergency
  contraception with a healthcare professional.

- The sponsor plans to educate consumers in part by targeting consumers ages 18 to 44 to convey
  critical awareness and educational messages as well as information about product availability,
  time sensitivity of use, and the age requirements to obtain Plan B[®] as a prescription or OTC
  product.

Any change to the CARE[SM] Program must be discussed with FDA prior to its implementation and is
subject to FDA's review.

All applications for new active ingredients, new dosage forms, new indications, new routes of
administration, and new dosing regimens are required to contain an assessment of the safety and
effectiveness of the product in pediatric patients unless this requirement is waived or deferred.  The
safety and effectiveness of Plan B[®] provided pursuant to a prescription in pediatric patients (those
under age 18) need not be addressed under the Pediatric Research Equity Act of 2003 (PREA) because
this supplemental application does not propose a new indication for women in this age group (i.e., Plan
B[®] is to remain prescription for women under 18).

In addition, we request that you submit to FDA four copies of the introductory promotional materials
that you propose to use for Plan B[®].  Submit all proposed materials in draft or mock-up form, not final

NDA 21-045/S-011
Page 4

print.  Send one copy to the Division of Reproductive and Urologic Products, one to the Division of Nonprescription Clinical Evaluation, and two copies of both the promotional materials and the package insert directly to:

>Food and Drug Administration
>Center for Drug Evaluation and Research
>Division of Drug Marketing, Advertising, and Communications
>Food and Drug Administration
>5901-B Ammendale Road
>Beltsville, MD 20705-1266

If you issue a letter communicating important information about this drug product (i.e., a "Dear Health Care Professional" letter), we request that you submit a copy of the letter to this NDA and a copy to the following address:

>MEDWATCH
>Food and Drug Administration
>WO 22, Room 4447
>10903 New Hampshire Avenue
>Silver Spring, MD 20993-0002

Please submit one market package of Plan B® when it is available.

We remind you that you must comply with reporting requirements for an approved NDA (21 CFR 314.80 and 314.81).

If you have any questions, call the Office of Nonprescription Products, Division of Nonprescription Clinical Evaluation at (301) 796-2080.

>Sincerely,
>
>*{See appended electronic signature page}*
>
>Steven Galson, M.D., M.P.H.
>Director
>Center for Drug Evaluation and Research

Enclosure



### Drug Facts

**Active ingredient (in each tablet)**     **Purpose**
Levonorgestrel 0.75mg.................Emergency contraceptive

**Use** reduces chance of pregnancy after unprotected sex
(if a contraceptive failed or if you did not use birth control)

### Warnings

**Allergy alert:** Do not use if you have ever had an allergic
reaction to levonorgestrel

**Sexually transmitted diseases (STDs) alert:** This product
does **not** protect against HIV/AIDS or other STDs

**Do not use**
■ if you are already pregnant (because it will not work)
■ for regular birth control

**When using this product** you may have
■ nausea          ■ vomiting          ■ stomach pain
■ tiredness       ■ diarrhea          ■ dizziness
■ menstrual changes   ■ breast pain   ■ headache

**Keep out of reach of children.** In case of overdose, get medical
help or contact a Poison Control center right away.

### Directions

■ women 18 years of age and over:
■ take the first tablet as soon as possible but no later than
  72 hours (3 days) after unprotected sex. The sooner you
  take the first tablet, the more effective it will be.  ▶



DURA med ®|   Mfg. by Gedeon Richter, Ltd., Budapest, Hungary
             for Duramed Pharmaceuticals, Inc.
             Subsidiary of Barr Pharmaceuticals, Inc.
             Pomona, New York 10970

©2006 Duramed Pharmaceuticals, Inc.

### Drug Facts (continued)

■ take the second tablet **12 hours** after you take the first tablet
■ prescription only for age 17 and under. If age 17 or under, see
  a healthcare professional.

### Other information

■ **before using this product read the enclosed consumer
  information leaflet for complete directions and information**
■ this product is not recommended for regular birth control. It
  does not work as well as most other birth control methods
  used correctly.
■ **this product works mainly by preventing ovulation (egg
  release). It may also prevent fertilization of a released egg
  (joining of sperm and egg) or attachment of a fertilized egg
  to the uterus (implantation). See consumer information leaflet.**
■ when used correctly every time you have sex, latex condoms
  greatly reduce, but do not eliminate, the risk of pregnancy and
  the risk of catching or spreading HIV, the virus that causes AIDS.
  See condom labeling for additional STD information.
■ this package is sealed with 2 seals imprinted with Plan B®. Do
  not use if these printed seals have either been removed or broken.
■ store at 20-25°C (68-77°F)

### Inactive ingredients
colloidal silicon dioxide, corn starch, gelatin, lactose
monohydrate, magnesium stearate, potato starch, talc

### ☎ Questions or comments?
For more information or to speak to a healthcare professional,
call **1-800-330-1271,** 24 hours a day/7 days a week.
Visit our Web site at www.go2planb.com

N  5 1285 76993  0
3

R8-06 (v.1)

*Place Label Here*

15001114

2 Levonorgestrel Tablets
0.75 mg each



LEVONORGESTREL
tablets 0.75 mg
Emergency Contraceptive

**Plan B**® (Levonorgestrel) Tablets, 0.75 mg

**Rx only for women age 17 and younger**

For women age 17 and younger, Plan B ® is a prescription–only emergency contraceptive.  Plan B® is intended to prevent pregnancy after known or suspected contraceptive failure or unprotected intercourse.  Emergency contraceptive pills (like all oral contraceptives) do not protect against infection with HIV (the virus that causes AIDS) and other sexually transmitted diseases.

**DESCRIPTION**
Emergency contraceptive tablet.  Each Plan B® tablet contains 0.75 mg of a single active steroid ingredient,  levonorgestrel  [18,19-Dinorpregn-4-en-20-yn-3-one-13-ethyl-17-hydroxy-,  (17α)-(-)-], a totally synthetic progestogen. The inactive ingredients present are colloidal silicon dioxide, potato starch, gelatin, magnesium stearate, talc, corn starch, and lactose monohydrate. Levonorgestrel has a molecular weight of 312.45, and the following structural and molecular formulas:



**CLINICAL PHARMACOLOGY**
Emergency contraceptives are not effective if the woman is already pregnant.  Plan B® is believed to act as an emergency contraceptive principally by preventing ovulation or fertilization (by altering tubal transport of sperm and/or ova).  In addition, it may inhibit implantation (by altering the endometrium).  It is not effective once the process of implantation has begun.

**Pharmacokinetics**
*Absorption:*
No specific investigation of the absolute bioavailability of Plan B® in humans has been conducted.  However, literature indicates that levonorgestrel is rapidly and completely absorbed after oral administration (bioavailability about 100%) and is not subject to first pass metabolism. After a single dose of Plan B® (0.75 mg) administered to 16 women under fasting conditions, maximum serum concentrations of levonorgestrel are 14.1 $\pm$ 7.7 ng/mL (mean $\pm$ SD) at an average of 1.6 $\pm$ 0.7 hours.  No formal study of the effect of food on the absorption of levonorgestrel has been undertaken.

**Table 1**      **Pharmacokinetic Parameter Values Following Single Dose Administration of Plan B® (Levonorgestrel) Tablets 0.75 mg to Healthy Female Volunteers**

| N | Mean (± S.D.) | | | | | |
|---|---|---|---|---|---|---|
| | $C_{max}$ (ng/mL) | $T_{max}$ (h) | CL (L/h) | $V_d$ (L) | $T_{\frac{1}{2}}$ (h) | $AUC_{0-\infty}$ (ng/mL/h) |
| 16 | 14.1 ± 7.7 | 1.6 ± 0.7 | 7.7 ± 2.7 | 260.0 | 24.4 ± 5.3 | 123.1 ± 50.1 |

*Distribution:*
Levonorgestrel in serum is primarily protein bound. Approximately 50% is bound to albumin and 47.5% is bound to sex hormone binding globulin (SHBG).

*Metabolism:*
Following a single oral dosage, levonorgestrel does not appear to be extensively metabolized by the liver. The primary metabolites are 3α,5β- and 3α,5α-tetrahydrolevonorgestrel with 16β-hydroxynorgestrel also identified. Together, these account for less than 10% of parent plasma levels. Urinary metabolites hydroxylated at the 2α and 16β positions have also been identified. Small amounts of the metabolites are present in plasma as sulfate and glucuronide conjugates.

*Excretion:*
The elimination half-life of levonorgestrel following single dose administration as Plan B® (0.75 mg) is 24.4 ± 5.3 hours. Excretion following single dose administration as emergency contraception is unknown, but based on chronic, low-dose contraceptive use, levonorgestrel and its metabolites are primarily excreted in the urine, with smaller amounts recovered in the feces.

**SPECIAL POPULATIONS**

**Geriatric**
This product is not intended for use in geriatric (age 65 years or older) populations and pharmacokinetic data are not available for this population.

**Pediatric**
This product is not intended for use in pediatric (premenarcheal) populations, and pharmacokinetic data are not available for this population.

**Race**
No formal studies have evaluated the effect of race. However, clinical trials demonstrated a higher pregnancy rate in the Chinese population with both Plan B® and the Yuzpe regimen (another form of emergency contraception consisting of two doses of ethinyl estradiol 0.1 mg + levonorgestrel 0.5 mg). The reason for this apparent increase in the pregnancy rate of emergency contraceptives in Chinese women is unknown.

**Hepatic Insufficiency and Renal Insufficiency**
No formal studies have evaluated the effect of hepatic insufficiency or renal insufficiency on the disposition of emergency contraceptive tablets.

**Drug-Drug Interactions**
No formal studies of drug-drug interactions were conducted.

**INDICATIONS & USAGE**
For women age 17 and younger, Plan B® is a prescription-only emergency contraceptive that can be used to prevent pregnancy following unprotected intercourse or a known or suspected contraceptive failure.  To obtain optimal efficacy, the first tablet should be taken as soon as possible within 72 hours of intercourse.  The second tablet must be taken 12 hours later.

**Clinical Studies**
A double-blind, controlled clinical trial in 1,955 evaluable women compared the efficacy and safety of Plan B® (one 0.75 mg tablet of levonorgestrel taken within 72 hours of intercourse, and one tablet taken 12 hours later) to the Yuzpe regimen (two tablets of 0.25 mg levonorgestrel and 0.05 mg ethinyl estradiol, taken within 72 hours of intercourse, and two tablets taken 12 hours later). Plan B® was at least as effective as the Yuzpe regimen in preventing pregnancy.  After a single act of intercourse, the expected pregnancy rate of 8% (with no contraception) was reduced to approximately 1% with Plan B®.

Emergency contraceptives are not as effective as routine contraception since their failure rate, while low based on a single use, would accumulate over time with repeated use (see Warnings). See Table 2 below.

**Table 2:** **Percentage of women experiencing an unintended pregnancy during the first year of typical use and the first year of perfect use of contraception and the percentage continuing use at the end of the first year, United States.**

| Method (1) | % of Women Experiencing an Unintended Pregnancy within the First Year of Use | | % of Women Continuing Use at One Year [3] |
|---|---|---|---|
| | Typical Use [1] (2) | Perfect Use [2] (3) | (4) |
| Chance [4] | 85 | 85 | |
| Spermicides [5] | 26 | 6 | 40 |
| Periodic abstinence | 25 | | 63 |
|     Calendar | | 9 | |
|     Ovulation method | | 3 | |
|     Sympto-thermal [6] | | 2 | |
|     Post-ovulation | | 1 | |
| Withdrawal | 19 | 4 | |
| Cap [7] | | | |
|     Parous women | 40 | 26 | 42 |
|     Nulliparous women | 20 | 9 | 56 |
| Sponge | | | |
|     Parous women | 40 | 20 | 42 |
|     Nulliparous women | 20 | 9 | 56 |
| Diaphragm [7] | 20 | 6 | 56 |
| Condom [8] | | | |
|     Female (Reality) | 21 | 5 | 56 |
|     Male | 14 | 3 | 61 |
| Pill | 5 | | 71 |
|     Progestin only | | 0.5 | |
|     Combined | | 0.1 | |
| IUD: | | | |
|     Progesterone T | 2.0 | 1.5 | 81 |
|     Copper T 380A | 0.8 | 0.6 | 78 |
|     LNg 20 | 0.1 | 0.1 | 81 |
| Depo Provera | 0.3 | 0.3 | 70 |
| Norplant and Norplant-2 | 0.05 | 0.05 | 88 |
| Female sterilization | 0.5 | 0.5 | 100 |
| Male sterilization | 0.15 | 0.10 | 100 |
| **Emergency Contraceptive Pills:** Treatment initiated within 72 hours after unprotected intercourse reduces the risk of pregnancy by at least 75%. [9] | | | |
| **Lactational Amenorrhea Method:** LAM is a highly effective, *temporary* method of contraception. [10] | | | |

Source: Trussell J, Contraceptive efficacy. In Hatcher RA, Trussell J, Stewart F, Cates W, Stewart GK, Kowal D, Guest F, Contraceptive Technology: Seventeenth Revised Edition. New York NY: Irvington Publishers, 1998.

1   Among *typical* couples who initiate use of a method (not necessarily for the first time), the percentage who experience an unintended pregnancy during the first year if they do not stop use for any other reason.

2   Among couples who initiate use of a method (not necessarily for the first time) and who use it *perfectly* (both consistently and correctly), the percentage who experience an unintended pregnancy during the first year if they do not stop use for any other reason.

3   Among couples attempting to avoid pregnancy, the percentage who continue to use a method for one year.

4   The percentages of women becoming pregnant in columns (2) and (3) are based on data from populations where contraception is not used and from women who cease using contraception in order to become pregnant. Among such populations, about 89% become pregnant within one year. This estimate was lowered slightly (to 85%) to represent the percentage who would become pregnant within one year among women now relying on reversible methods of contraception if they abandoned contraception altogether.

5   Foams, creams, gels, vaginal suppositories and vaginal film.

6   Cervical mucus (ovulation) method supplemented by calendar in the pre-ovulatory and basal body temperature in the post-ovulatory phases.

7   With spermicidal cream or jelly.

8   Without spermicides.

9   The treatment schedule is one dose within 72 hours after unprotected intercourse and a second dose 12 hours after the first dose. The Food and Drug Administration has declared the following brands of oral contraceptives to be safe and effective for emergency contraception: Ovral (1 dose is 2 white pills), Alesse (1 dose is 5 pink pills), Nordette or Levlen (1 dose is 2 light-orange pills), Lo/Ovral (1 dose is 4 white pills), Triphasil or Tri-Levlen (1 dose is 4 yellow pills).

10  However, to maintain effective protection against pregnancy, another method of contraception must be used as soon as menstruation resumes, the frequency or duration of breastfeeds is reduced, bottle feeds are introduced or the baby reaches six months of age.

## CONTRAINDICATIONS

Progestin-only contraceptive pills (POPs) are used as a routine method of birth control over longer periods of time, and are contraindicated in some conditions.  It is not known whether these same conditions apply to the Plan B® regimen consisting of the emergency use of two progestin pills.  POPs however, are not recommended for use in the following conditions:

•   Known or suspected pregnancy
•   Hypersensitivity to any component of the product

## WARNINGS

**Plan B® is not recommended for routine use as a contraceptive.**
**Plan B® is not effective in terminating an existing pregnancy.**

## Effects on Menses

Menstrual bleeding patterns are often irregular among women using progestin-only oral contraceptives and in clinical studies of levonorgestrel for postcoital and emergency contraceptive use.  Some women may experience spotting a few days after taking Plan B®.  At the time of expected menses, approximately 75% of women using Plan B® had vaginal bleeding similar to their normal menses, 12-13% bled more than usual, and 12% bled less than usual.  The majority of women (87%) had their next menstrual period at the expected time or within ± 7

days, while 13% had a delay of more than 7 days beyond the anticipated onset of menses. If there is a delay in the onset of menses beyond 1 week, the possibility of pregnancy should be considered.

**Ectopic Pregnancy**
Ectopic pregnancies account for approximately 2% of reported pregnancies (19.7 per 1,000 reported pregnancies). Up to 10% of pregnancies reported in clinical studies of routine use of progestin-only contraceptives are ectopic. A history of ectopic pregnancy need not be considered a contraindication to use of this emergency contraceptive method. Health providers, however, should be alert to the possibility of an ectopic pregnancy in women who become pregnant or complain of lower abdominal pain after taking Plan B®.

**PRECAUTIONS**

**Pregnancy**
Many studies have found no effects on fetal development associated with long-term use of contraceptive doses of oral progestins (POPs). The few studies of infant growth and development that have been conducted with POPs have not demonstrated significant adverse effects.

**STD/HIV**
Plan B®, like progestin-only contraceptives, does not protect against HIV infection (AIDS) and other sexually transmitted diseases.

**Physical Examination and Follow-up**
A physical examination is not required prior to prescribing Plan B®. A follow-up physical or pelvic examination, however, is recommended if there is any doubt concerning the general health or pregnancy status of any woman after taking Plan B®.

**Carbohydrate Metabolism**
The effects of Plan B® on carbohydrate metabolism are unknown. Some users of progestin-only oral contraceptives (POPs) may experience slight deterioration in glucose tolerance, with increases in plasma insulin; however, women with diabetes mellitus who use POPs do not generally experience changes in their insulin requirements. Nonetheless, diabetic women should be monitored while taking Plan B®.

**Drug Interactions**
Theoretically, the effectiveness of low-dose progestin-only pills is reduced by hepatic enzyme-inducing drugs such as the anticonvulsants phenytoin, carbamazepine, and barbiturates, and the antituberculosis drug rifampin. No significant interaction has been found with broad-spectrum antibiotics. It is not known whether the efficacy of Plan B® would be affected by these or any other medications.

**Nursing Mothers**

Small amounts of progestin pass into the breast milk in women taking progestin-only pills for long-term contraception resulting in steroid levels in infant plasma of 1-6% of the levels of maternal plasma.  However, no adverse effects due to progestin-only pills have been found on breastfeeding performance, either in the quality or quantity of the milk, or on the health, growth or development of the infant.

**Pediatric Use**
Safety and efficacy of progestin-only pills have been established in women of reproductive age for long-term contraception.  Safety and efficacy are expected to be the same for postpubertal adolescents under the age of 16 and for users 16 years and older.  Use of Plan B[®] emergency contraception before menarche is not indicated.

**Fertility Following Discontinuation**
The limited available data indicate a rapid return of normal ovulation and fertility following discontinuation of progestin-only pills for emergency contraception and long-term contraception.

**ADVERSE REACTIONS**
The most common adverse events in the clinical trial for women receiving Plan B[®] included nausea (23%), abdominal pain (18%), fatigue (17%), headache (17%), and menstrual changes.  The table below shows those adverse events that occurred in ≥5% of Plan B[®] users.

**Table 3  Adverse Events in ≥5% of Women, by % Frequency**

| Most Common Adverse Events | Plan B[®] Levonorgestrel N=977 (%) |
|---|---|
| Nausea | 23.1 |
| Abdominal Pain | 17.6 |
| Fatigue | 16.9 |
| Headache | 16.8 |
| Heavier Menstrual Bleeding | 13.8 |
| Lighter Menstrual Bleeding | 12.5 |
| Dizziness | 11.2 |
| Breast Tenderness | 10.7 |
| Other complaints | 9.7 |
| Vomiting | 5.6 |
| Diarrhea | 5.0 |

Plan B[®] demonstrated a superior safety profile over the Yuzpe regimen for the following adverse events:
- Nausea:  Occurred in 23% of women taking Plan B[®] (compared to 50% with Yuzpe)
- Vomiting:  Occurred in 6% of women taking Plan B[®] (compared to 19% with Yuzpe)

**DRUG ABUSE AND DEPENDENCE**

There is no information about dependence associated with the use of Plan B[®].

**OVERDOSAGE**

There are no data on overdosage of Plan B[®], although the common adverse event of nausea and its associated vomiting may be anticipated.

**DOSAGE AND ADMINISTRATION**

One tablet of Plan B[®] should be taken orally <u>as soon as possible</u> within 72 hours after unprotected intercourse.  The second tablet should be taken 12 hours after the first dose. Efficacy is better if Plan B[®] is taken as directed as soon as possible after unprotected intercourse. Plan B[®] can be used at any time during the menstrual cycle.

The user should be instructed that if she vomits within one hour of taking either dose of medication she should contact her health care professional to discuss whether to repeat that dose.

**HOW SUPPLIED**

**Plan B[®]** (Levonorgestrel) Tablets, 0.75 mg are available for a single course of treatment in PVC/aluminum foil blister packages of two tablets each.  The tablet is white, round and marked: INOR.

Available as:
Unit-of-use            NDC 51285-038-93
Store Plan B[®] tablets at controlled room temperature, 20° to 25°C (68° to 77°F); excursions permitted between 15° to 30°C (59° to 86°F) [See USP].

Mfg. by Gedeon Richter, Ltd., Budapest, Hungary
for Duramed Pharmaceuticals, Inc.
Subsidiary of Barr Pharmaceuticals, Inc.
Pomona, New York 10970
Phone: 1-800-330-1271        Website: www.go2planb.com
Revised August 2006
BR- 038 / 21000382503

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

_____
                        )
ASSOCIATION OF AMERICAN        )
PHYSICIANS & SURGEONS, INC., *et al.*,  )
                        )
        *Plaintiffs*,        )     Civil Action No. 07:0668
                        )
        *v.*             )     ORAL ARGUMENT REQUESTED
                        )
FOOD & DRUG ADMINISTRATION, *et al.*,  )
                        )
        *Defendants*.        )
------------------------------------------------------------)
                        )
DURAMED PHARMACEUTICALS, INC.,   )
                        )
        *Defendant Intervenor*.   )
_____)

## MOTION BY DURAMED PHARMACEUTICALS, INC. TO DISMISS

Defendant intervenor Duramed Pharmaceuticals, Inc. ("Duramed") hereby moves that this Court dismiss with prejudice plaintiffs' Complaint under Fed. R. Civ. P. 12(b)(1) for lack of subject-matter jurisdiction and for failure to exhaust an administrative remedy, and that it dismiss Counts II and IV-VI under Fed. R. Civ. P. 12(b)(6) for failure to state a claim upon which relief can be granted.

A Memorandum of Points and Authorities and Proposed Order are filed herewith.  Oral

argument is respectfully requested.

Respectfully submitted,

By:   /s/ Richard M. Cooper
      Richard M. Cooper (# 92817)
      Ana C. Reyes (# 477354)

      WILLIAMS & CONNOLLY LLP
      725 Twelfth Street, N.W.
      Washington, DC 20005
      (tel.) (202) 434-5466
      (fax)  (202) 434-5470
      rcooper@wc.com
      areyes@wc.com

      *Counsel for Defendant Intervenor*
      *Duramed Pharmaceuticals, Inc.*

Dated:  June 29, 2007.

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| ASSOCIATION OF AMERICAN PHYSICIANS & SURGEONS, INC., *et al.*, | ) ) ) ) | |
| *Plaintiffs*, | ) ) | Civil Action No. 07:0668 |
| *v.* | ) ) | |
| FOOD & DRUG ADMINISTRATION, *et al.*, | ) ) | |
| *Defendants*. | ) ) | |
| ------------------------------------------------------------ | ) ) | |
| DURAMED PHARMACEUTICALS, INC., | ) ) | |
| *Defendant Intervenor*. | ) ) | |

## MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF DURAMED PHARMACEUTICALS, INC.'S MOTION TO DISMISS

Richard M. Cooper (# 92817)
Ana C. Reyes (# 477354)
WILLIAMS & CONNOLLY LLP
725 Twelfth Street, N.W.
Washington, DC 20005
(tel.) (202) 434-5466
(fax) (202) 434-5470
rcooper@wc.com
areyes@wc.com

*Counsel for Defendant Intervenor*
*Duramed Pharmaceuticals, Inc.*

Dated:  June 29, 2007.

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ............................................................................................. iii

TABLE OF ABBREVIATIONS ...................................................................................... vii

INTRODUCTION ............................................................................................................. 1

BACKGROUND ............................................................................................................... 2

ARGUMENT .................................................................................................................... 4

I.     PLAINTIFFS LACK STANDING. ....................................................................... 4

    A.     The Requirements for Standing. ................................................................. 4

    B.     Plaintiffs Do Not Have Standing. .............................................................. 5

        1.     Plaintiffs Do Not Allege Concrete Injury in Fact or a Causal
              Connection Between the Alleged Harm and Plan B's OTC
              Availability ...................................................................................... 6

        2.     Plaintiffs Do Not Allege Concrete Injury in Fact from Plan B's
              Dual OTC/Rx Availability. ............................................................. 9

        3.     Plaintiffs Do Not Have Standing To Sue On Behalf of The
              General Populace ........................................................................... 10

        4.     Plaintiffs Do Not Have Standing To Sue On Behalf of Their
              Physician Members. ...................................................................... 12

        5.     Plaintiff SDW Does Not Have Standing To Sue on Behalf of
              Its Pharmacist Members. ............................................................... 15

II.    PLAINTIFFS HAVE FAILED TO EXHAUST AN AVAILABLE
    ADMINISTRATIVE REMEDY. ....................................................................... 16

III.   COUNTS II AND IV-VI FAIL TO STATE A CLAIM UPON WHICH
    RELIEF CAN BE GRANTED. ........................................................................... 18

    A.     Count II Fails To State a Claim Upon Which Relief Can Be Granted. ................. 19

        1.     Count II Fails Because the Text and Objectives of Section
              353(b) Require FDA's Interpretation Permitting a Drug To Be
              Dispensed Rx to One Patient Population and OTC to Another. ............... 20

        2.     Alternatively, Count II Fails Because FDA's Interpretation is
              Reasonable and Entitled to Deference at *Chevron* Step Two. ................ 22

    B.     Count IV Fails To State a Claim Because Plaintiffs Have Not Alleged
        That FDA Has Mandated That Plan B Be Treated as a Third Class of
        Drug. .......................................................................................................... 30

    C.     Count V Fails To State a Claim Because the APA Does Not Require
        Notice-and-Comment Rulemaking in the Circumstances Here ........................... 31

        1.     FDA Has Broad Discretion To Proceed by Adjudication
              Without Notice-and-Comment Rulemaking. ............................................. 32

2.     The sNDA Approval Involved Interpretation of Section 353(b), Not Interpretation of a Substantive Rule. .................................................... 34

3.     An Agency May Change an Interpretation of a Statute, an Interpretive Rule, or a Policy Statement Without Notice and Comment ....................................................................................................... 37

4.     Approval of the Partial Switch and Associated Labeling Did Not Involve Departure from Any Established FDA Interpretation of a Regulation .................................................................... 39

5.     Application of a New Statutory Interpretation Here Did Not Raise Any Issue as to Retroactivity .......................................................... 40

D.     Count VI Fails To State a Claim Because It Is Based on a Flawed Statutory Interpretation ........................................................................................ 41

CONCLUSION ................................................................................................................... 42

# TABLE OF AUTHORITIES

## Federal Cases

*Air Transportation Association of America, Inc. v. FAA*, 291 F.3d 49 (D.C. Cir. 2002) ............ 39

*Alaska Professional Hunters Association v. FAA*, 177 F.3d 1030 (D.C. Cir. 1999) ................... 39

*Alliance for Bio-Integrity v. Shalala*, 116 F. Supp. 2d 166 (D.D.C. 2000) ........................... 34, 35

*American Immigration Lawyers Association v. Reno*, 199 F.3d 1352 (D.C. Cir. 2000) ............. 14

* *American Mining Congress v. Mine Safety & Health Administration*,
  995 F.2d 1106 (D.C. Cir. 1993) ............................................................... 35, 36, 37, 38

*American Postal Workers Union v. United States Postal Service*,
  707 F.2d 548 (D.C. Cir. 1983) .................................................................................. 35

*Arkansas Power & Light Co. v. Interstate Commerce Commission*,
  725 F.2d 716 (D.C. Cir. 1984) .................................................................................. 33

*Association of American Railroads v. Department of Transp.*,
  198 F.3d 944 (D.C. Cir. 1999) .................................................................................. 39

*Babbitt v. United Farm Workers National Union*, 442 U.S. 289 (1979) ................................... 15

*Bailey v. Johnson*, 48 F.3d 965 (6th Cir. 1995) ............................................................... 6

*Barnhart v. Walton*, 535 U.S. 212 (2002) ....................................................................... 23

* *Bell Atlantic Corp. v. Twombly*, 127 S. Ct. 1955 (2007) .......................................... 18

*Bristol-Myers Squibb Co. v. Shalala*, 923 F. Supp. 212 (D.D.C. 1996) ................................... 19

*Brotherhood of Locomotive Engineers & Trainmen v. Surface Transportation Board*,
  457 F.3d 24 (D.C. Cir. 2006) .................................................................................... 8

*Buckman Co. v. Plaintiffs' Legal Comm.*, 531 U.S. 341 (2001) ...................................... 6

*Burroughs Wellcome Co. v. Schweiker*, 649 F.2d 221 (4th Cir. 1981) ..................................... 34

* *Calumet Industries, Inc. v. Brock*, 807 F.2d 225 (D.C. Cir. 1986) .......................... 12, 13

*Center for Law & Education v. Department of Education*,
  396 F.3d 1152 (D.C. Cir. 2005) ................................................................................. 9

* *Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.*,
  467 U.S. 837 (1984) ...................................................................... 20, 22, 23, 37

*Chrysler Corp. v. Brown*, 441 U.S. 281 (1979) ................................................................ 35

*Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402 (1971) ................................... 19

*Citizens to Save Spencer County v. EPA*, 600 F.2d 844 (D.C. Cir. 1979) ................................... 35

*Clark-Cowlitz Joint Operating Agency v. FERC*, 826 F.2d 1074 (D.C. Cir. 1987) ......... 38, 40, 41

*Clarke v. Securities Industry Association*, 479 U.S. 388 (1987) ............................................. 12

*Conley v. Gibson*, 355 U.S. 41 (1957) ........................................................................... 18

*Cutler v. Kennedy*, 475 F. Supp. 838 (D.D.C. 1979), *overruled on other grounds*,
  *Chaney v. Heckler*, 718 F.2d 1174 (D.C. Cir. 1983) ............................................... 11

*Davis v. Michigan Department of Treasury*, 489 U.S. 803 (1989)............................................... 19

*Estee Lauder, Inc. v. FDA*, 727 F. Supp. 1 (D.D.C. 1989) ......................................................... 17

*Elk Grove Unified School District v. Newdow*, 542 U.S. 1 (2004)................................................. 4

*Fiedler v. Clark*, 714 F.2d 77 (9th Cir. 1983) ........................................................................... 6

*Florida Audubon Society v. Bensten*, 94 F.3d 658 (D.C. Cir. 1996) ............................................ 4

*FTC v. Ken Roberts Co.*, 276 F.3d 583 (D.C. Cir. 2001) ........................................................... 42

*FW/PBS, Inc. v. City of Dallas*, 493 U.S. 215 (1990), *modified in part on other grounds*, *City of Littleton v. Z.J. Gifts D-4, LLC*, 541 U.S. 774 (2004)............................................... 5, 14

*Garlic v. FDA*, 783 F. Supp. 4 (D.D.C. 1992) ........................................................................... 17

*General Motors Corp. v. Ruckelshaus*, 742 F.2d 1561 (D.C. Cir. 1984) (en banc) ..................... 35

*Goodman v. FCC*, 182 F.3d 987 (D.C. Cir. 1999)................................................................ 13, 14

*Griffin v. Oceanic Contractors, Inc.*, 458 U.S. 564 (1982) .................................................. 22, 42

*Hein v. Freedom From Religion Foundation, Inc.*, __ S. Ct. __, 2007 WL 1803960 (June 25, 2007) ................................................................................... 11

*Hudson v. FAA*, 192 F.3d 1031 (D.C. Cir. 1999) ...................................................................... 37

*In re Orthopedic Bone Screw Products Liability Litigation*, 193 F.3d 781 (3d Cir. 1999)........................................................................................... 6

*Kowalski v. Tesmer*, 543 U.S. 125 (2004) ........................................................................... 7, 13

*Lineas Aereas del Caribe, S.A. v. Department of Transportation*, 791 F.2d 972 (D.C. Cir. 1986) ......................................................................................... 33

\* *Lujan v. Defenders of Wildlife*, 504 U.S. 555 (1992) ........................................... 4, 5, 6, 11, 13

*Lujan v. National Wildlife Federation*, 497 U.S. 871 (1990) .................................................... 12

*Mylan Laboratories, Inc. v. Thompson*, 389 F.3d 1272 (D.C. Cir. 2004) .................................... 23

*National Family Planning & Reproductive Health Association v. Sullivan*, 979 F.2d 227 (D.C. Cir. 1992) ......................................................................................... 35

*National Wrestling Coaches Association v. Department of Education*, 366 F.3d 930 (D.C. Cir. 2004) ...................................................................................... 5, 12

*NLRB v. Bell Aerospace Co.*, 416 U.S. 267 (1974) ................................................................... 33

*NLRB v. Wyman-Gordon Co.*, 394 U.S. 759 (1969)................................................................... 33

*Northwest Airlines, Inc. v. FAA*, 795 F.2d 195 (D.C. Cir. 1986)................................................... 6

*Orengo Caraballo v. Reich*, 11 F.3d 186 (D.C. Cir. 1993) ........................................................ 38

*Pacific Gas & Electric Co. v. Federal Power Commision*, 506 F.2d 33 (D.C. Cir. 1974)........... 34

*Paralyzed Veterans of America, Inc. v. D.C. Arena L.P.*, 117 F.3d 579 (D.C. Cir. 1997).................................................................................... 37, 38

*PDK Lab, Inc. v. Friedlander*, 103 F.3d 1105 (2d Cir. 1997) ....................................................... 6

iv

*Powell v. Castaneda*, 390 F. Supp.2d 1 (D.D.C. 2005) ............................................................ 18

*Public Citizen v. Foreman*, 631 F.2d 969 (D.C. Cir. 1980) .................................................... 11

*Rodriguez v. SK&F Co.*, 833 F.2d 8 (1st Cir. 1987) ................................................................ 6

\* *SEC v. Chenery Corp.*, 332 U.S. 194 (1947) .............................................................. 32, 33

*Serono Laboratories, Inc. v. Shalala*, 158 F.3d 1313 (D.C. Cir. 1998) ................................ 22

*Sewell Coal Co. v. Federal Mine Safety & Health Review Commission*,
  686 F.2d 1066 (4th Cir. 1982) .......................................................................................... 33

*Shell Offshore Inc. v. Babbitt*, 238 F.3d 622 (5th Cir. 2001) ........................................... 38

*Skidmore v. Swift & Co.*, 323 U.S. 134 (1944) ................................................................. 22

\* *Syncor International Corp. v. Shalala*, 127 F.3d 90 (D.C. Cir. 1997) ..................... 34, 35, 39

*Takhar v. Kessler*, 76 F.3d 995 (9th Cir. 1996) ................................................................. 15

*Teva Pharmaceutical, Industry, Ltd. v. FDA*, 355 F. Supp. 2d 111 (D.D.C. 2004),
  *aff'd sub nom. Teva Pharmaceutical, Industry, Ltd. v. Crawford*,
  410 F.3d 51 (D.C. Cir. 2005) .......................................................................................... 19

*United States v. Sage Pharmaceuticals, Inc.*, 210 F.3d 475 (5th Cir. 2000) ........................ 13

\* *United States v. Mead Corp.*, 533 U.S. 218 (2001) ....................................................... 23

*Valley Forge Christian College v. Americans United for Separation of Church & State*,
  454 U.S. 464 (1982) ................................................................................................. 4, 5, 11

*Warth v. Seldin*, 422 U.S. 490 (1975) ................................................................ 4, 5, 6, 8, 10, 11

*Whitaker v. Thompson*, 239 F. Supp.2d 43 (D.D.C. 2003),
  *aff'd*, 353 F.3d 947 (D.C. Cir. 2004) ............................................................................... 13

*Whitmore v. Arkansas*, 495 U.S. 149 (1990) ..................................................................... 7, 8

## Federal Statutes

5 U.S.C. § 551 (2000) ............................................................................................................. 21

5 U.S.C. § 553 (2000) .......................................................................................... 31, 33, 37, 39

5 U.S.C. § 706 (2000) ............................................................................................................. 17

21 U.S.C. § 331 (2000) ........................................................................................................... 37

21 U.S.C. § 332 (2000) ........................................................................................................... 37

21 U.S.C. § 333 (2000) ........................................................................................................... 37

21 U.S.C. § 334 (2000) ........................................................................................................... 37

21 U.S.C. § 352 (2000 & Supp. IV 2006) ............................................................................. 24

21 U.S.C. § 353 (2000) (as amended 2003) ..................................................................... *passim*

21 U.S.C. § 355 (2000 & Supp. IV 2006) ............................................................................. 19

21 U.S.C. § 371 (2000) ........................................................................................................... 39

21 U.S.C. § 393 (2000) ........................................................................................................ 11

**Federal Regulations**

21 C.F.R. § 10.25 (2007) .............................................................................................. 9, 16, 17

21 C.F.R. § 10.30 (2007) ................................................................................................... 9, 17

21 C.F.R. § 201.100 (2007) .................................................................................................. 25

21 C.F.R. § 310.200 (2007) .................................................................................................. 23

21 C.F.R. § 310.3 (2007) ...................................................................................................... 21

21 C.F.R. § 330.10 (2007) .............................................................................................. 21, 23

21 C.F.R. § 314.105 (2007) .................................................................................................. 22

21 C.F.R. § 314.125 (2007) .................................................................................................. 22

**Miscellaneous**

70 Fed. Reg. 52,050 (Sept. 1, 2005) ................................................................. 3, 19, 24, 29, 31

S. Rep. No. 82-946 (1951) .............................................................................................. 27, 28

H.R. Rep. No. 82-700 (1951) .......................................................................................... 27, 28

Federal Rule of Civil Procedure 12(b) ............................................................................... 1, 18

## TABLE OF ABBREVIATIONS

| | |
|---|---|
| AAPS | Association of American Physicians and Surgeons, Inc. |
| ANPRM | Advance Notice of Proposed Rulemaking |
| APA | Administrative Procedure Act |
| Barr Pharma | Barr Pharmaceuticals, Inc. |
| CDER | FDA's Center for Drug Evaluation and Research |
| Duramed | Duramed Pharmaceuticals, Inc. |
| FDA | The Food and Drug Administration |
| FDCA | Federal Food, Drug, and Cosmetic Act |
| NDA | New drug application |
| OTC | Over-the-counter |
| Rx | Prescription |
| SDW | Safe Drugs for Women |
| sNDA | Supplemental new drug application |
| WCC | Women's Capital Corporation |

# INTRODUCTION

Plan B (levonorgestrel) is an emergency contraceptive, which reduces the chance of pregnancy after unprotected intercourse (*i.e.*, if another birth control method fails or if none was used). More than thirty countries – including Britain, France, Australia, and Sweden – permit emergency contraception to be sold without a doctor's prescription ("Rx").[1] The Food and Drug Administration ("FDA") has found that Plan B is safe and effective for over-the-counter ("OTC"), *i.e.*, non-prescription, use by women age 18 and older.

Not so, assert Plaintiffs Association of American Physicians & Surgeons, Inc., *et al.* (together, "plaintiffs"). They ask this Court to reject the expert opinions of FDA, and to find, instead, that Plan B is not safe and effective for OTC use by any woman at any age. Yet, plaintiffs do not allege that using Plan B directly causes harm, and they do not identify a single user of Plan B harmed by its OTC availability.

This Court should dismiss the Complaint pursuant to Federal Rule of Civil Procedure 12(b)(1) because it fails to allege subject-matter jurisdiction, and it should dismiss the Complaint because plaintiffs have failed to exhaust an available administrative remedy. In addition, it should dismiss Counts II and IV-VI of the Complaint pursuant to Rule 12(b)(6) because these counts fail to state a claim upon which relief can be granted.

---

[1] Center for Reproductive Rights, "Governments Worldwide Put Emergency Contraception into Women's Hands," 7 (Sept. 2004), *available at* http://www.reproductiverights.org/pdf/pub_bp_govtswwec.pdf (last visited June 29, 2007).

# BACKGROUND[2]

Plan B is the only FDA-approved emergency contraceptive composed of progestin-only tablets. *See* Complaint for Declaratory and Injunctive Relief ("Compl."), ¶¶ 40, 41. Plan B is manufactured and marketed by Duramed Pharmaceuticals, Inc. ("Duramed"), a wholly-owned subsidiary of Barr Pharmaceuticals, Inc. ("Barr Pharma"). *Id.* ¶ 50.

On January 29, 1999, Women's Capital Corporation ("WCC") – now a wholly owned subsidiary of Duramed – submitted to FDA a new drug application ("NDA") for approval of Plan B as a prescription drug. Compl. ¶ 48. FDA approved the NDA on July 28, 1999. *Id.*

On April 22, 2003, WCC submitted to FDA a supplemental NDA ("sNDA") to switch Plan B from Rx to OTC availability for all consumers. *Id.* ¶ 50. WCC sought what, in food and drug practice, is commonly called an "Rx-to-OTC switch."[3] On or about February 26, 2004, Barr Pharma acquired WCC. *Id.*

By correspondence dated May 6, 2004, FDA issued a Not Approvable Letter in response to the Plan B sNDA. FDA cited an alleged failure to demonstrate that adolescents under age 16 could use Plan B without professional supervision by a practitioner licensed to administer the drug. Comp. ¶ 51. In response, Duramed submitted an amended sNDA to retain Rx status for women age 16 and under, and to permit OTC availability for those 16 and over. *Id.* ¶ 52. (Duramed maintains that Plan B is safe and effective OTC for all women who would use it.)

By letter dated August 26, 2005, FDA informed Duramed that FDA's Center for Drug Evaluation and Research ("CDER") had completed its review of Duramed's amended sNDA and

---

[2]      Duramed Pharmaceuticals, Inc. contests many allegations in the Complaint, but, pursuant to Rules 12(b)(1) & (6), those allegations are taken as true (solely) for purposes of the present motion to dismiss.

[3]      *See, e.g.*, FDA, CDER, Manual of Policies and Procedures (MaPP 6020.5) 2 (Jan. 15, 1997), *available at* http://www.fda.gov/cder/mapp/6020-5.pdf.

had found that "the scientific data [are] sufficient to support safe use" of Plan B as an OTC product for women age 17 years and older.  Compl. ¶ 52.  Notwithstanding this scientific finding, FDA, in the letter, refused to take final action on Duramed's sNDA, *id.*, and, indeed, delayed final action indefinitely.  FDA stated that the sNDA presented the agency with the question whether and, if so, how to permit the distribution of one and the same pharmaceutical product to different populations for OTC and Rx use, and indicated that it would seek public comment on whether to initiate rulemaking to resolve those issues.  *Id.*

On September 1, 2005, FDA published in the *Federal Register* an Advance Notice of Proposed Rulemaking ("ANPRM") (Docket No. 2005N-0345), which sought public comment on whether to initiate rulemaking regarding dual OTC/Rx labeling.  70 Fed. Reg. 52,050 (Sept. 1, 2005).  FDA received approximately 47,000 comments in response.  Compl. ¶ 54.

On July 31, 2006, FDA sent to Duramed a letter stating that the agency had determined that it was not necessary to engage in rulemaking to approve the sNDA.  Compl. ¶ 56.  Finally, on August 24, 2006, more than three years after the filing of the initial sNDA, FDA approved OTC access to Plan B for use by women age 18 and older, and retained the prescription requirement for women age 17 and younger.  *Id.* ¶¶ 58, 60; Exhibit (Ex.) 1 (the "FDA decision").

Currently, Plan B is sold in a single package containing labeling that describes the OTC use by women age 18 and older, and the Rx use by women age 17 and younger. Compl. ¶ 61; Ex. 2.

On April 12, 2007 – more than eight months after FDA approved the sNDA – plaintiffs filed the present lawsuit.  Plaintiffs do not allege that Plan B causes any direct harm to women or girls.  Compl. *passim*.  Instead, plaintiffs allege that the availability of Plan B OTC will lead women age 18 and older to make ill-considered decisions regarding their health care, and that those decisions might, in turn, lead to harm, Compl. ¶¶ 12, 13; and that younger women will obtain Plan B without a prescription illicitly, *id.* ¶ 76.

3

For the reasons set forth below, plaintiffs' Complaint should be dismissed.

## ARGUMENT

### I.    PLAINTIFFS LACK STANDING.

#### A.    The Requirements for Standing.

To bring suit, plaintiffs must establish that they have Article III standing. *See Valley Forge Christian Col. v. Americans United for Separation of Church & State,* 454 U.S. 464, 472, 475 (1982). To do so, plaintiffs must show that they have suffered "injury in fact" that is "concrete and particularized" and "actual or imminent, not 'conjectural' or 'hypothetical.'" *Lujan v. Defenders of Wildlife,* 504 U.S. 555, 560-61 (1992) (internal quotations omitted). Plaintiffs must also establish "a causal connection between the injury and the conduct complained of," and that it is "'likely,' as opposed to merely 'speculative,' that the injury would be 'redressed by a favorable decision.'" *Id.* (internal quotation omitted).[4]

Beyond these Article III requirements, plaintiffs must establish that no "prudential" limitation prevents the Court from hearing their claims. *See Elk Grove Unified Sch. Dist. v. Newdow*, 542 U.S. 1, 11-12 (2004). In the ordinary course, plaintiffs must sue on their own behalf, and not on behalf of the interests of third parties. *Lujan*, 504 U.S. at 562. Plaintiffs cannot rely on the generalized grievances of the population. *Warth v. Seldin*, 422 U.S. 490, 499 (1975). Moreover, plaintiffs who seek to challenge a governmental action under a statute, such as the Federal Food, Drug, and Cosmetic Act ("FDCA"), 21 U.S.C. § 353(b) (2000) (as amended

---

[4]    To the extent that plaintiffs allege procedural injury, "the normal standards for redressability and immediacy" are relaxed. *Lujan,* 504 U.S. at 572 n. 7. However, "[t]he mere violation of a procedural requirement . . . does not permit any and all persons to sue to enforce the requirement." *Florida Audubon Soc'y v. Bensten*, 94 F.3d 658, 664 (D.C. Cir. 1996) (*citing Lujan*, 504 U.S. at 572-73). Plaintiffs alleging a procedural violation must have a concrete injury apart from interest in having the procedure observed. *See Lujan*, 504 U.S. at 573 n.8.

2003), must be within the "zone of interests" the statute is intended to protect or regulate.  *See Valley Forge*, 454 U.S. at 475.

An association suing on behalf of its members must demonstrate that:  "(1) at least one of its members would have standing to sue in his own right, (2) the interests the association seeks to protect are germane to its purpose, and (3) neither the claim asserted nor the relief requested requires that an individual member of the association participate in the lawsuit."  *Nat'l Wrestling Coaches Ass'n v. Dep't of Educ.*, 366 F.3d 930, 937 (D.C. Cir. 2004).

The party invoking a court's subject-matter jurisdiction has the burden of establishing the elements required for standing, and "courts must accept as true all material allegations of the complaint."  *Warth,* 422 U.S. at 501; *Lujan*, 504 U.S. at 560-61.  Plaintiffs, however, must "clearly . . . allege facts demonstrating that [they are] proper part[ies] to invoke judicial resolution of the dispute."  *FW/PBS, Inc. v. City of Dallas*, 493 U.S. 215, 231 (1990) (internal quotations omitted), *modified in part on other grounds*, *City of Littleton v. Z.J. Gifts D-4, LLC*, 541 U.S. 774 (2004).  Plaintiffs must "'allege … <u>facts</u> essential to show jurisdiction.  If [they] fai[l] to make the necessary allegations, [they have] no standing.'"  *Id.* at 231 (alteration in original) (emphasis added); *Lujan*, 504 U.S. at 560-61.

### B.    Plaintiffs Do Not Have Standing.

The members of the four plaintiff organizations include "women and girls," physicians, and pharmacists.  Compl. ¶¶ 13-15.  Plaintiffs allege in conclusory terms that women and girls "will receive inadequate health care, drug-labeling information, and counseling related to Plan B and contraceptives as the direct result of [FDA's] unlawful approval of Plan B for OTC distribution."  *Id.* ¶ 13.  Somehow, the result will be decreased healthcare for women and an increase in the incidence of sexually transmitted diseases.  *Id.* ¶¶ 64-65.

Plaintiffs' speculative pleading is insufficient to satisfy the stringent standing requirements that govern this Court's exercise of its subject-matter jurisdiction. "[P]leadings must be something more than an ingenious academic exercise in the conceivable." *Warth*, 422 U.S. at 508 (internal quotation omitted); *Northwest Airlines, Inc. v. FAA*, 795 F.2d 195, 201 (D.C. Cir. 1986) (fact that party can imagine injury is insufficient to confer standing).

> **1.    Plaintiffs Do Not Allege Concrete Injury in Fact or a Causal Connection Between the Alleged Harm and Plan B's OTC Availability.**

Plaintiffs' allegations present a case study of the type of "conjectural" and "hypothetical" allegations of "injury" that the Supreme Court has repeatedly held are insufficient to confer Article III standing. *See Lujan,* 504 U.S. at 560-61.[5]

First, plaintiffs' allegations as to girls age 17 and younger are irrelevant. The legal and medical situation as to them is precisely the same as it was prior to FDA's decision: they can purchase Plan B only by prescription. FDA's decision has no effect on them.[6]

---

[5]    Plaintiffs allege that the approval "denies female patients their rights under the FFDCA." Compl. ¶ 9. The FDCA, however, does not regulate the practice of medicine, *Buckman Co. v. Plaintiffs' Legal Comm.*, 531 U.S. 341, 350-51 (2001), and so does not create any legally enforceable rights for "female patients." More broadly, it creates no private right of action. *E.g.*, *In re Orthopedic Bone Screw Prods. Liab. Litig.*, 193 F.3d 781, 788 (3d Cir. 1999); *PDK Labs., Inc. v. Friedlander*, 103 F.3d 1105, 1113 (2d Cir. 1997); *Bailey v. Johnson*, 48 F.3d 965, 966-68 (6th Cir. 1995); *Rodriguez v. SK&F Co.*, 833 F.2d 8, 9 (1st Cir. 1987) (per curiam); *Fiedler v. Clark*, 714 F.2d 77, 79 (9th Cir. 1983) (per curiam). Rights of patients (female and male) arise under state law, not the FDCA. Moreover, plaintiffs could not plausibly allege that FDA's approval of the sNDA denies "female patients" any rights. The decision does not change the availability of Plan B to any women age 17 and younger. As to women age 18 and older, it does not impose any compulsion, burden, or restraint, or deny any opportunity. After FDA's decision, women age 18 and older retain their full freedom to visit a physician as often as they wish and to control their own sexual behavior. No "rights" that plaintiffs could plausibly specify are granted by the FDCA (or any other law) and denied by the FDA decision that plaintiffs challenge.

[6]    Plaintiffs' allegation that young girls may obtain Plan B from older persons who bought Plan B OTC is too speculative and attenuated a harm to confer standing. *See* pp. 9-10, *infra*.

Second, plaintiffs do not – and cannot – allege that anything in Plan B's dual OTC/Rx labeling and marketing prohibits physicians from addressing with their female patients safe intercourse practices, contraception generally, the safety and effectiveness of Plan B, and the need for regular medical screening. Plaintiffs' Complaint is based on the purely conjectural claim that women age 18 and older who obtain Plan B OTC will not seek a physician's advice when needed.[7] If, however, the physicians have, as plaintiffs allege, "close and confidential relationships" with their female patients, then they can easily avoid the alleged injury to those patients by addressing with them those health care issues in the proper place – a doctor's office, not the courtroom.[8]

Third, the Complaint fails to make any specific and concrete allegation that any girl or woman has been harmed. Instead, plaintiffs aver merely that Plan B's availability OTC will lead some women to make decisions that may, in turn, lead to harm. Plaintiffs' speculative inferences fail to allege an injury in fact. *See Whitmore v. Arkansas*, 495 U.S. 149, 158 (1990) (standing cannot be premised on possible threat of future injury). The Supreme Court has "said many times" that "[a]llegations of possible future injury do not satisfy the requirements of Article III.

---

[7]     Alleged studies showing that female patients may visit their doctors less frequently when Plan B is available OTC do not advance plaintiffs' case. Information on how many times women visit their doctors does not address (i) the number of such visits that are needed for protection of women's health, (ii) the quality of the visits that do occur, or (iii) whether during those visits patients seek, or doctors on their own provide, information about contraception. To the extent that plaintiffs' claim is that a reduction in physician visits results in patients obtaining less healthcare information and less healthcare generally, their grievance applies to all drugs available OTC, and should be rejected on that ground.

[8]     Plaintiffs do not have standing to sue on behalf of potential future patients. *See Kowalski v. Tesmer*, 543 U.S. 125, 130 (2004) (holding that attorneys lacked third-party standing to bring suit on behalf of hypothetical future clients). Plaintiffs can sue on behalf of third parties only if plaintiffs have a special relationship with them. *See infra* pp. 13-14. Obviously, they do not have such a relationship with people who, at the time of suit, are not patients of their members.

A threatened injury must be certainly impending to constitute injury in fact." *Id.* (internal quotations omitted). The Complaint here alleges no "certainly impending" injury.

Fourth, plaintiffs do not – and cannot – allege that the alleged harm described in the Complaint is directly caused by Plan B's availability OTC. If and to the extent that women suffer injuries when Plan B is available OTC, those injuries would stem from the women's own decisions regarding health care, contraception, and intercourse, not from the use of Plan B or from the FDA decision. Such intervening causal events preclude Article III standing here. *See, e.g.*, *Bhd. of Locomotive Eng'rs & Trainmen v. Surface Trans. Bd.*, 457 F.3d 24, 28 (D.C. Cir. 2006) (self-inflicted injury does not support standing).

Fifth, plaintiffs' allegations of harm are premised on the theory that OTC availability will "cause" women to obtain Plan B. That theory is not supportable. The partial switch of Plan B to OTC availability makes access to it by women age 18 and older easier, but it does not <u>cause</u> women to do anything. If mere availability of a product caused purchase, no manufacturer would ever lack for sales. If a woman age 18 or over wishes to purchase Plan B OTC, she can. If she does not wish to purchase it, she will not. Women are free to consult with their physicians before making such a purchase. Thus, there is <u>no causal connection</u> between FDA's decision approving the sNDA and the harms that plaintiffs allege, all of which could stem only from women's independent third-party decisions about purchasing Plan B and about obtaining a physician's advice about purchasing it. Alleged harm to women 18 and older results from their own free and independent decisions. Alleged harm to physicians who treat those women results from the free and independent decisions by those women, not from the FDA decision. *Cf. Warth*, 422 U.S. at 509 (the injury complained of – increases in taxation – results only from decisions made by the appropriate authorities, who are not parties).

Sixth, plaintiffs' unsupported speculation that Plan B's availability OTC and Rx will lead to an increase in exposure to sexually transmitted diseases is insufficient to confer standing. "Outside of increased exposure to environmental harms, hypothesized increased risk has never been deemed sufficient injury [to confer standing]." *Center for Law & Educ. v. Dep't of Educ.*, 396 F.3d 1152, 1160-61 (D.C. Cir. 2005) (internal quotations omitted).

Seventh, plaintiffs allege that Plan B's labeling is misleading. Compl. ¶¶ 69-70. Plaintiffs do not allege any concrete harm from the labeling, however.[9] Rather, their allegations relate to the <u>effectiveness</u> of Plan B. Moreover, the relief plaintiffs seek – vacation of FDA's approval – would not redress the alleged deficiency (which would remain in the Rx labeling). If Plan B's labeling is in any way deficient, the remedy is not to vacate FDA's approval of the sNDA, but to improve the labeling. To obtain such relief, plaintiffs have an administrative remedy they have not invoked: a citizen petition under 21 C.F.R. §§ 10.25, 10.30 (2007).

**2.      Plaintiffs Do Not Allege Concrete Injury in Fact from Plan B's Dual OTC/Rx Availability.**

Counts II-VI of the Complaint are based on Plan B's dual OTC and Rx availability. Plaintiffs' have alleged two "harms" from this dual availability: (i) that underage females who lack a prescription may obtain Plan B from women age 18 and older who bought it OTC, and (ii) that pharmacists will incur added burden and expense. Neither harm creates standing.

If the first "harm" occurred, it would not be <u>caused</u> by the FDA decision or by Plan B's OTC availability. Instead, it would be caused by the independent decisions and actions of third parties: the decisions and actions of the underage user who sought Plan B without a prescription,

---

[9]      Paragraph 67 refers to data published only in 2007, well after FDA's August 26, 2006 decision. FDA's decision cannot properly be vacated on the basis of such data. The appropriate course for plaintiffs is to dismiss their lawsuit and submit such data to FDA as part of a citizen petition under 21 C.F.R. §§ 10.25, 10.30. Moreover, the data fail to support Count I for the further reason that – even if reliable, which they are not – the data relate to <u>effectiveness</u>, and not to any <u>harm</u> resulting from Plan B.

and of the person age 18 or older who provided it to the underage user. Exactly the same "harm" could occur with no OTC availability if a woman who obtained Plan B with a prescription provided it to a woman or girl who had no prescription.

Such independent third-party decisions do not create standing for these plaintiff organizations. Standing cannot be based on speculations about the actions of third parties. This break in the causal connection destroys standing. *See supra*, pp. 7-8. Moreover, plaintiffs cannot derive standing from harms due to violations of labeling restrictions by people they claim to represent.

Further, plaintiffs do not allege a single instance in which a woman under age 18 has unlawfully obtained Plan B. Plaintiffs allege only that some underage persons have obtained alcohol and tobacco. Compl. ¶ 76. Those allegations have no bearing on Plan B, which – unlike alcohol and tobacco – is available only in medical facilities, and only after a pharmacist (a licensed professional) has confirmed the purchaser's age. Nothing in the Complaint suggests that pharmacists are less well-equipped to verify a purchaser's age than to verify the authenticity of a prescription and that the prescription is for the person presenting it. Plaintiffs' speculative allegations of what might happen after Plan B is dispensed are insufficient to create standing.

As to the second "harm," plaintiffs' allegations of added burden and expense are also insufficient to create standing. *See* pp. 15-16, *infra*.

### 3.    Plaintiffs Do Not Have Standing To Sue On Behalf Of The General Populace.

Plaintiffs cannot meet the prudential standing requirement by arguing that they sue on behalf of individual parties. The "girls and women" whose interests plaintiffs claim to represent are a large part of the general populace. Yet, "when the asserted harm is a 'generalized grievance' shared in substantially equal measure by all or a large class of citizens, that harm alone normally does not warrant exercise of jurisdiction." *Warth*, 422 U.S. at 499. Otherwise

10

stated, "a plaintiff raising only a generally available grievance about government . . . does not state an Article III case or controversy." *Lujan*, 504 U.S. at 573-74.[10] "Without such limitations . . . the courts would be called upon to decide abstract questions of wide public significance even though other governmental institutions may be more competent to address the questions and even though judicial intervention may be unnecessary to protect individual rights." *Warth*, 422 U.S. at 499. *See also Hein v. Freedom From Religion Foundation, Inc.*, __ S. Ct. __, 2007 WL 1803960, at *9 (June 25, 2007) (plurality op.).

That is the case here. Plaintiffs, who have not alleged any individualized harm, ask this Court to second-guess a considered scientific and medical decision by the federal agency that has the expertise and the statutory mandate to assess Plan B's safety and effectiveness. Plaintiffs do so even though Plan B's partial OTC availability in no way interferes with patients' rights to visit their physicians or physicians' rights to counsel their patients. Here, judicial intervention plainly is unnecessary to protect any <u>individual</u> rights.

---

[10]    This case is unlike *Cutler v. Kennedy*, where this Court found standing on the part of plaintiffs who claimed that they would be harmed by the OTC status of certain drugs. There, a marketing scheme implemented by FDA permitted OTC status to a group of drugs that the agency had not yet determined were safe and effective for OTC use. Indisputably, that action exposed plaintiffs to drugs that FDA had not determined were safe and effective. 475 F. Supp. 838, 848 (D.D.C. 1979), *overruled on other grounds*, *Chaney v. Heckler*, 718 F.2d 1174, 1188 n.5 (D.C. Cir. 1983). Here, by contrast, FDA has expressly found that Plan B is safe and effective for OTC use by women age 18 and older. Ex. 1. Moreover, here there is no allegation that using Plan B will directly harm women, only speculation that OTC availability will lead women to make certain decisions that may, in turn, lead to harm.

This case is also unlike *Public Citizen v. Foreman*, 631 F.2d 969, 974 n.12 (D.C. Cir. 1980), which held that plaintiffs had standing to seek a declaratory judgment that nitrites in bacon are an unsafe food additive. There, unlike here, plaintiffs alleged an injury – that nitrite-free bacon was not readily available at a reasonable price.

Neither *Cutler* in 1979 nor *Public Citizen* in 1980 had the benefit of the Supreme Court's later decisions strengthening the requirements for establishing standing, including *Valley Forge*, decided in 1985, and *Lujan*, decided in 1992. Those later decisions undermine the limited view in 1979-80 of the requirements for Article III and prudential standing.

11

4.   **Plaintiffs Do Not Have Standing To Sue On Behalf of Their Physician Members.**

Plaintiffs allege their members include physicians, and AAPS submits with the Complaint a declaration by one of its members, Thomas L. Ritter, M.D.  *See* Compl. Ex. 1 ("Ritter Decl.").  As organizations seeking to sue on behalf of their members, plaintiffs are required to establish that at least one member of each organization has standing to sue.  *See Nat'l. Wrestling Coaches*, 366 F.3d at 937.[11]  The Ritter Declaration fails to perform that office. The Supreme Court has cautioned that "replac[ing] conclusory allegations of the complaint or answer with conclusory allegations of an affidavit" is insufficient to create standing.  *See Lujan v. National Wildlife Fed'n.*, 497 U.S. 871, 888 (1990).

Dr. Ritter's Declaration seeks to establish standing on two grounds.  First, he claims that he will lose revenue if Plan B is made available OTC.  Ritter Decl. ¶ 6.  That grievance is irrelevant to the standing inquiry.

A "loss-of-revenue injury" does not create standing here because it fails the "zone of interest" test for prudential standing.  *See Calumet Indus., Inc. v. Brock*, 807 F.2d 225, 228 (D.C. Cir. 1986).  As the Supreme Court has explained:  "[i]n cases where the plaintiff is not itself the subject of the contested regulatory action, the [zone of interest] test denies a right of review if the plaintiff's interests are so marginally related to or inconsistent with the purposes implicit in the statute that it cannot reasonably be assumed that Congress intended to permit the suit."  *Clarke v. Sec. Indus. Ass'n*, 479 U.S. 388, 399 (1987).  The pecuniary interests of physicians are not among those within the scope of the FDCA's description of FDA's mission, 21 U.S.C. § 393(b). Dr. Ritter's asserted interest in profit is not even marginally related to the FDCA, whose "comprehensive scheme of drug regulation is designed to ensure the nation's drug supply is safe

---

[11]   None of the other plaintiffs has filed a declaration to support its standing.

and effective." *United States v. Sage Pharm., Inc.*, 210 F.3d 475, 479 (5th Cir. 2000); *Whitaker v. Thompson*, 239 F. Supp. 2d 43, 50 (D.D.C. 2003) ("[T]he legislative intent behind enactment of the original FDCA was to protect the public from unsafe drugs."), *aff'd*, 353 F.3d 947 (D.C. Cir. 2004).[12]  Had Congress intended to maximize physicians' profits, it would not have provided for OTC availability of drugs at all.

Dr. Ritter's claimed pecuniary injury also results from women's own independent decisions to seek or not seek his services.  Therefore, his first theory – of harm to himself – also fails to establish the "causal connection between the injury and the conduct complained of," required by *Lujan*, 504 U.S. at 560, for Article III standing.

Second, Dr. Ritter claims that his patients will be harmed by FDA's approval of the sNDA.  Ritter Decl. ¶ 9.  Dr. Ritter, however, cannot bring a claim on behalf of unnamed, hypothetical third-party claimants, particularly women who incur such harm because they do not establish, or do not maintain, a patient-doctor relationship with him.  Although, in some very limited circumstances, a litigant can establish standing to sue on behalf of someone else – namely, where the litigant has a special relationship with the person whose right the litigant seeks to assert <u>and</u> that person is unlikely to be able to assert the right on her own, *see Kowalski*, 543 U.S. at 125 – those circumstances are not present here.  Neither the Complaint nor Dr. Ritter's Declaration alleges (or could plausibly allege) that women harmed by Plan B's OTC availability have valid claims but cannot sue on their own, or even that there are any obstacles to their doing so.  This failure is sufficient to deny third-party standing.  *See Goodman v. FCC*, 182

---

[12]     In *Calumet*, this Court rejected a challenge by manufacturers of certain lubricating oils to OSHA's exclusion of competitors' oils from "health hazards" labeling requirements.  807 F.2d at 226.  The court held that, because the plaintiffs were not regulated by the agency action they challenged and because "the interest to be protected by the [OSHA] is worker safety and <u>not</u> business profits," petitioners' interests, "as entrepreneurs seeking to protect their competitive interests," did not meet the test for prudential standing.  *Id.* at 228.  Similarly here, the FDCA is intended to protect consumers, not physicians' profits.

F.3d 987, 992 (D.C. Cir. 1999) (plaintiff can assert the rights of a third party only when there is "some hindrance to the third party's ability to protect his or her own interests" (quotation omitted)).[13]

American Immigration Lawyers Ass'n v. Reno, 199 F.3d 1352 (D.C. Cir. 2000), held that immigration-rights organizations lacked standing to raise claims on behalf of aliens subjected to expedited removal. The court pointed out that the organizations were well aware of the restrictions imposed by the new regulation providing for expedited removal. The organizations, however, did "not allege that, despite their best efforts, they were unable to identify and provide legal assistance to any other potential plaintiffs – that is, aliens facing removal during the relevant time frame." Id. at 1363. The court held that, even though the statute prohibited some aliens from communicating with anyone while in the country, there was no legal obstacle to communications between the organizations and the aliens because the aliens could contact the organizations, and bring suit in the United States, after returning to their native countries. Id. Because the statute did not place legal obstacles to the organizations' communications with the aliens, or obstacles to those aliens suing on their own behalf, the organizations lacked standing.

Here, as in Reno, plaintiffs do not, and could not plausibly, allege that, despite their best efforts, they cannot provide assistance to their patients because of Plan B's partial OTC

---

[13]    The Complaint asserts that Plan B's OTC status will deny these women the ability to vindicate their own rights. Compl. ¶ 9. That assertion makes no sense. Plan B's OTC status does not deny any right of any woman. All women potentially affected by the FDA decision are free to seek a physician's advice (and, indeed, a physician's unnecessary prescription) whenever they consider buying Plan B. The claim that granting women age 18 and older a right (to obtain Plan B OTC) denies them a right (to consult Dr. Ritter) is Orwellian. Further, because the Complaint's and Dr. Ritter's conclusory assertion is not supported by any allegation of particular facts, it fails to create standing. See FW/PBS, 493 U.S. at 231. The implausibility of a legal challenge to FDA's decision by a woman age 18 or older merely reflects the fact that the decision does not deny such a woman any legal right.

availability. Nor do they allege that anyone with a valid claim against the FDA decision cannot sue on her own.

### 5. Plaintiff SDW Does Not Have Standing To Sue on Behalf of Its Pharmacist Members.

The Complaint asserts that SDW's pharmacist members would be subject to "expanded legal liability." Compl. ¶ 14. It does not identify the expanded liability – because there is none. The only change made by the FDA decision is that pharmacists may now sell Plan B OTC to women age 18 and older. If pharmacists take suitable steps to ensure that the women to whom they sell Plan B OTC are 18 or over, they face no added liability. The Complaint fails to allege any actual or threatened liability of a pharmacist relating to Plan B. The mere possibility that some pharmacist may negligently sell Plan B OTC to a woman under age 18, and may, as a result, incur liability, does not create standing. "When plaintiffs do not claim that they have ever been threatened with prosecution, that a prosecution is likely, or even that a prosecution is remotely possible, they do not allege a dispute susceptible to resolution by a federal court." *Babbitt v. United Farm Workers Nat'l Union,* 442 U.S. 289, 298-99 (1979) (internal quotations omitted); *see also Takhar v. Kessler*, 76 F.3d 995, 1000 (9th Cir. 1996) (rejecting possibility of future prosecution as basis for standing because plaintiff did not "set forth any [allegations of] concrete or actual threat of prosecution," and rejecting each of his "fear of prosecution" allegations as too speculative to create standing).

Next, SDW's allegation of "added expense and administrative burdens" is purely conjectural. Compl. ¶ 15. The Complaint does not allege any facts that would enable the Court to assess the alleged "added expense and administrative burdens" on pharmacists. No alleged facts show that the cost or burden of dispensing Plan B OTC exceeds the cost or burden of dispensing it Rx. Indeed, for a pharmacist, OTC dispensing probably involves <u>less</u> cost and burden. Pharmacists no longer have to ensure that a woman age 18 or older has a valid

prescription for Plan B, and no longer have to maintain such customers' prescriptions on file.  A pharmacist has to confirm customers' ages, but that is a simple process easily accomplished by asking for a valid driver's license or alternative documentation.  In fact, the Complaint does not even allege that the <u>pharmacists</u> that SDW purports to represent would incur any added expense, which, rather, would fall on <u>pharmacy owners</u>.

Third, SDW's allegation of "compelled speech . . . in violation of these pharmacists' conscience-based objections to Plan B," fails.  Compl. ¶ 16.  Any pharmacists' conscience-based objections to Plan B would apply whether Plan B is available Rx only, OTC only, or both Rx (for one patient population) and OTC (for another).  Moreover, there is no "compelled <u>speech</u>" here because selling a drug does not constitute "speech."  Even if it did, there would be no "<u>compelled</u> speech" unless pharmacists were "compelled" to sell Plan B.  SDW does not allege that any of its members is "compelled" to sell Plan B or would suffer any concrete repercussion for refusing to sell it.  If there were any compulsion, it would be exerted by pharmacists' employers (who are not parties here), not by the FDA decision.[14]

## II.    PLAINTIFFS HAVE FAILED TO EXHAUST AN AVAILABLE ADMINISTRATIVE REMEDY.

There is an independent basis for this Court to find that it should dismiss the Complaint: before coming to court, plaintiffs failed to exhaust an available administrative remedy, *i.e.*, the remedy provided by 21 C.F.R. § 10.25(a) (2007), which provides that "[a]n interested person may petition the Commissioner to issue, amend, or revoke a regulation or order, or to take or refrain from taking any other form of administrative action."  Plaintiffs should have first

---

[14]    Ascertaining a customer's age is not compelled speech in any legally cognizable sense.  If it were, age restrictions on the sale of tobacco products, alcoholic beverages, and OTC nicotine-replacement therapies would be in jeopardy under the First Amendment.

requested from FDA the revocation of the FDA decision, which they ask this Court to vacate. *See also* 21 C.F.R. § 10.30 (2007).

Plaintiffs' Complaint alleges that FDA did not consider certain "peer-reviewed literature for the proposition that emergency-contraceptive users are significantly less likely than control never to have had a pelvic exam . . . or a pap smear . . ." Compl. ¶ 66.  Plaintiffs also cite to a study published in 2007 – after FDA's August 2006 decision. *Id.* ¶ 107.  Plaintiffs claim that these studies "would be before the agency in any remand or reconsideration of the Plan B approval ordered by this Court . . . ." *Id.*

Plaintiffs do not need any order by this Court to submit to FDA these or other materials they believe aid their cause.  To the contrary, plaintiffs can, and, indeed, <u>are legally required to</u>, file a citizen petition pursuant to 21 C.F.R. §§ 10.25 and 10.30 prior to any judicial intervention to obtain the relief they seek.  *See Garlic v. FDA*, 783 F. Supp. 4 (D.D.C.  1992) (dismissing complaint against FDA for failure to exhaust administrative remedies by filing a citizen's petition); *Estee Lauder, Inc. v. FDA*, 727 F. Supp. 1, 6-7 (D.D.C. 1989) (same).

In *Garlic*, plaintiffs, suffering from Alzheimer's Disease, challenged FDA's failure to approve a certain drug to treat the disease.  This Court summarily rejected plaintiffs' argument that filing a citizen petition was not mandatory:  "The provision for review of the Commissioner's final decision confirms that the procedure is intended to allow the FDA to develop its policy without judicial interference.  The procedure also allows the FDA to produce an administrative record for the reviewing court to consider." *Garlic*, 783 F. Supp. at 4-5.  The Court further cautioned that permitting "'interested parties' to bypass administrative remedies would undermine the entire regulatory process.  Drug manufacturers could circumvent FDA's procedures by soliciting private citizens to sue for judicial approval of new medications." *Id.* at

5. That reasoning applies here. Those opposed to certain drugs could sue for judicial injunction of approvals outside the carefully structured regulatory process.

Plaintiffs have an avenue to present their grievances to FDA. Plaintiffs should pursue it before asking this Court to rule on medical and scientific issues.

## III.    COUNTS II AND IV-VI FAIL TO STATE A CLAIM UPON WHICH RELIEF CAN BE GRANTED.

Counts II and IV-VI of the Complaint should be dismissed pursuant to Federal Rule of Civil Procedure 12(b)(6) for "failure to state a claim upon which relief can be granted."

Under this rule, the Court takes as true all factual allegations in the Complaint, but not legal conclusions. *See Powell v. Castaneda*, 390 F. Supp. 2d 1, 10 (D.D.C. 2005). In *Bell Atlantic Corp. v. Twombly*, 127 S. Ct. 1955 (2007), the Supreme Court recently clarified the pleading standard under Rule 8(a), and its application to motions to dismiss under Rule 12(b)(6). The Court "retire[d]" the "famous observation" that "the accepted rule [is] that a complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief" *Id.* at 1969 (*citing Conley v. Gibson*, 355 U.S. 41, 45-46 (1957)). "The phrase is best forgotten as an incomplete, negative gloss on an accepted pleading standard: once a claim has been stated adequately, it may be supported by showing any set of facts consistent with the allegations in the complaint." *Id.*

*Twombly* held, instead, that, "[w]hile a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Id.* at 1964-65. "Factual allegations must be enough to raise a right to relief above the speculative level . . . on the assumption that all the allegations in the complaint are true (even if doubtful in fact) . . . ." *Id.* at

1969 (citations omitted).  Thus, the adequacy of a complaint now depends on the sufficiency of "[f]actual allegations," not speculations.

### A.    Count II Fails To State a Claim Upon Which Relief Can Be Granted.

Under the Administrative Procedure Act ("APA"), the Court may vacate an FDA decision only if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law."  5 U.S.C. § 706(2)(A) (2000).  This standard is highly deferential to the agency.  *See Citizens to Pres. Overton Park, Inc. v. Volpe,* 401 U.S. 402, 416 (1971).  Accordingly, "there is a presumption in favor of the validity of [the] administrative action [in an action challenging FDA's interpretation of the FDCA]."  *Teva Pharm., Indus., Ltd. v. FDA*, 355 F. Supp. 2d 111, 116 (D.D.C. 2004), *aff'd sub nom*. *Teva Pharm. Indus., Ltd. v. Crawford*, 410 F.3d 51 (D.C. Cir. 2005) (*quoting Bristol-Myers Squibb Co. v. Shalala,* 923 F. Supp. 212, 216 (D.D.C. 1996)) (first alteration in original).

FDA has interpreted 21 U.S.C. § 353(b) as permitting, in certain circumstances, an active ingredient to be distributed simultaneously in both an Rx drug product and an OTC drug product.  *See* 70 Fed. Reg. at 52,051.  In Count II, plaintiffs challenge FDA's interpretation.  They contend that the FDCA "authorizes approval of a drug product for only one of two mutually exclusive modes of distribution and labeling."  Compl. ¶ 83.  Plaintiffs are dead wrong.

Plaintiffs' approach requiring that all uses of a drug be either OTC or Rx is wrong as a matter of statutory construction and public policy, because it is contrary to the text (discussed *infra*) and one of the objectives of section 353:  "to relieve retail pharmacists and the public from burdensome and unnecessary restrictions on the dispensing of drugs that are safe for use without the supervision of a physician."  Ex. 3 (S. Rep. No. 82-946, at 1-2 (1951)).  By contrast, FDA's long-standing interpretation, which permits OTC availability for use of a drug by one patient population, and Rx availability for use by another, is consistent with the statutory text and the

statutory objectives – to ensure that drugs for which supervision by a doctor is needed for safety and effectiveness are available only by prescription, while also ensuring that drugs that are safe and effective for OTC use are available to the appropriate patient population without a prescription.

FDA's interpretation should be upheld at step one of the analysis under *Chevron U.S.A., Inc. v. National Resources Defense Council, Inc.*, 467 U.S. 837 (1984), because it follows the plain and unambiguous statutory text, or, alternatively, at step two, because FDA's interpretation is reasonable and, therefore, must be given deference. The FDA decision approving the Plan B sNDA was not "arbitrary and capricious, an abuse of discretion, or otherwise contrary to law" under the APA. Accordingly, this Court should dismiss Counts II (and IV).

### 1. Count II Fails Because the Text and Objectives of Section 353(b) Require FDA's Interpretation Permitting a Drug To Be Dispensed Rx to One Patient Population and OTC to Another.

The very objectives of sections 353(b)(1) and (3), plainly evident in the text – to require a prescription where necessary (§ 353(b)(1)) and to permit OTC availability where a prescription is unnecessary (§ 353(b)(3)) – require FDA's interpretation permitting a drug to be dispensed Rx to one patient population (for which a prescription is necessary) and OTC to another (for which a prescription is unnecessary). Plaintiffs' contrary interpretation would fail to implement either section 353(b)(1) or section 353(b)(3).

Section 353(b)(3), which plaintiffs allege does not support FDA's approval of Plan B for Rx availability to one patient population and OTC availability to another, should be construed in light of the entire statute. "It is a fundamental canon of statutory construction that the words of a statute must be read in their context and with a view to their place in the overall statutory scheme." *Davis v. Mich. Dep't of Treasury,* 489 U.S. 803, 809 (1989).

Section 353(b)(1) protects consumers from the dangers arising from OTC dispensing of drugs for which a physician's supervision is necessary for safe and effective use. This provision permitted FDA to restrict Plan B to Rx use by women age 17 and under.

Section 353(b)(3) addresses Congress's countervailing concern that consumer access to medications that are safe and effective for OTC use not be unduly impaired. It permits FDA, "by regulation," to determine as to a particular drug or a group of drugs that the requirements of section 353(b)(1) "are not necessary for the protection of the public health." 21 U.S.C. § 353(b)(3). FDA has promulgated the regulation contemplated by section 353(b)(3): 21 C.F.R. § 310.200(b) (2006). *See also* 21 C.F.R. § 330.10(a)(4)(vi) (2006).[15] Section 353(b)(3), together with section 310.200(b), authorized FDA to permit Plan B to be dispensed OTC to women age 18 and older.

Section 353(b)(2), supplemented by section 353(b)(4), ensures that pharmacists receive adequate guidance regarding the lawful marketing and dispensing of drugs. *See* 21 U.S.C. § 353(b)(2), (4). Those provisions require that drugs be dispensed with an "Rx only" label if they are subject to a prescription limitation under section 353(b)(1).

---

[15]    FDA's regulations also provide that, where a drug is used by two different patient populations, the drug in the uses by the different patient populations constitutes two different drugs. Only a "new drug" needs approval by FDA. 21 U.S.C. § 355(a). The fact that in one patient population a drug is not a "new drug," however, does not mean that in a different patient population that drug also is not a "new drug." *See* 21 C.F.R. § 310.3(h)(5) (2007). The population for which a drug is recommended in its labeling is a "condition" within the scope of section 310.3(h)(5). Thus, where the labeling of a drug distinguishes between two different patient populations with respect to the use of the drug, the drug in one patient population is a different new drug from the drug as recommended for use in the other patient population. The reason why a manufacturer that has an approved NDA and seeks to expand the use of the approved drug to an additional patient population (*e.g.*, a pediatric or geriatric population) must obtain FDA approval of an sNDA is that such expansion involves a "new drug" that is different from the "new drug" previously approved by FDA.

This regulatory scheme, as interpreted and implemented by FDA, strikes the congressionally intended balance between ensuring that drugs for which a prescription is needed are Rx only, and that drugs for which a prescription is not needed are available OTC. Plaintiffs' proposed interpretation would upset this balance by denying FDA the authority and flexibility it needs (and that FDA's interpretation provides) to classify particular uses of drugs as Rx or OTC on a use-by-use basis.

Indeed, plaintiffs' interpretation would lead to the absurd result of requiring FDA to regulate drugs as Rx-only for all uses by all patient populations even where the drugs are safe and effective for some OTC use by certain patient populations. That interpretation fails because "interpretations of a statute which would produce absurd results are to be avoided if alternative interpretations consistent with the legislative purpose are available." *Griffin v. Oceanic Contractors, Inc.*, 458 U.S. 564, 575 (1982).

> ### 2. Alternatively, Count II Fails Because FDA's Interpretation is Reasonable and Entitled to Deference at *Chevron* Step Two.

FDA's statutory interpretation is entitled to deference under *Chevron* because it is reasonable. 467 U.S. at 844; *see also Serono Labs., Inc. v. Shalala*, 158 F.3d 1313, 1320 (D.C. Cir. 1998) (granting FDA's interpretation of FDCA *Chevron* deference at step two). At a minimum, FDA's interpretation, like that of any agency interpreting its organic act, is entitled to respectful consideration under *Skidmore v. Swift & Co.*, 323 U.S. 134, 139-40 (1944).

> #### a. FDA's August 24, 2006 Approval Letter Merits *Chevron* Deference.

The issues relating to Plan B arose in the context of a supplement to an NDA. Final FDA action on an NDA or supplement takes the form of a letter. *See* 21 C.F.R. §§ 314.105, 314.125 (2007). An approval letter is a form of license; a letter refusing approval is a denial of a license. In APA terms, each such letter is an "order" within the meaning of 5 U.S.C. § 551(6) (2000); and

an administrative proceeding on an NDA or supplement is an informal "adjudication" within the meaning of 5 U.S.C. § 551(7). FDA approved the Plan B sNDA by letter on August 24, 2006. Compl. ¶ 58; Ex. 1.

Both the Supreme Court and the D.C. Circuit have granted *Chevron* deference to statutory interpretations embodied in agency documents indistinguishable from FDA's August 24, 2006 letter and related FDA memoranda. In *Barnhart v. Walton*, 535 U.S. 212 (2002), the Court held that there is no bar to granting deference to an agency interpretation that did not emerge from notice-and-comment rulemaking. *Id.* at 222. Instead, it held that "whether a court should give such deference depends in significant part upon the interpretive method used and the nature of the question at issue." *Id.* (*citing United States v. Mead Corp.*, 533 U.S. 218, 229-31 (2001)). The Court held that the agency's interpretation was due deference because of "the interstitial nature of the legal question, the related expertise of the Agency, the importance of the question to administration of the statute, the complexity of that administration, and the careful consideration the Agency has given the question over a long period of time." *Id.*

In *Mylan Laboratories, Inc. v. Thompson,* 389 F.3d 1272, 1279-80 (D.C. Cir. 2004), the D.C. Circuit granted *Chevron* deference to an FDA letter because "[t]here is no denying the complexity of the statutory regime under which the FDA operates, the FDA's expertise or the careful craft of the scheme it devised to reconcile the various statutory provisions. Further, the FDA's decision made no great legal leap but relied in large part on its previous determination of the same or similar issues and on its own regulations." *Id.* at 1280.

Similar circumstances here require *Chevron* deference to FDA's interpretation of section 353(b), as reflected in 21 C.F.R. §§ 310.200(b) and 330.10(a)(4)(vi) and in its letter approving the Plan B sNDA. FDA's interpretation (i) involves the exercise of scientific and medical judgment regarding the safety and effectiveness of Plan B when distributed OTC for use by

23

women age 18 and older and when distributed Rx for use by women age 17 and younger; (ii) is

the product of a number of formal adjudications (the Plan B adjudication and the adjudications as

to other NDAs or sNDAs for simultaneous Rx and OTC distribution of a drug);[16] (iii) was

developed in response to particular factual circumstances in the regulated industry, as to which

FDA has expertise; (iv) was made by the Commissioner, the agency head, personally;[17] (v)

addresses a question that has historically been of particular importance in the administration of

the FDCA, *see* 70 Fed. Reg. 52,050 (Sept. 1, 2005); (vi) is in an area of the law in which the

federal courts do not have extensive experience; and (vii) was made under the undeniably

"complex" FDCA regulatory scheme.

Finally, there can be no denying the complexity and specialized nature of the question

whether, and, if so, to what extent, to approve a proposed Rx-to-OTC switch.  FDA's scientific

and medical judgment bear on that determination.  It is FDA's responsibility to ensure that its

classification of a drug as Rx or OTC is neither over-regulatory (making drugs that in certain

circumstances are safe and effective for OTC use available by prescription only), or under-

regulatory (making fully available OTC drugs for which in certain circumstances a physician's

---

[16]     FDA has approved simultaneous Rx and OTC distribution of, *inter alia*, the following drugs:  Meclizine (Rx for vertigo; OTC for nausea with motion sickness); Clotrimazol (Rx for candidiasis; OTC for athlete's foot, ring worm, jock itch); Loperamide (Rx for chronic diarrhea; OTC for acute diarrhea); nicotine products (Rx for administration through inhalers and nasal sprays; OTC in gums, lozenges and patches); ibuprofen (Rx at 400mg+ for arthritis; OTC at 400mg and below for aches and pains); and H2 blockers (Rx at 300mg+ for ulcers; OTC at 200mg for heartburn).  *See* 70 Fed. Reg. 52,050 (Sept. 1, 2005).

[17]     FDA Commissioner Von Eschenbach personally made the decision to approve Plan B for simultaneous OTC and Rx distribution to different patient populations.  *See* Compl. ¶ 58; Ex. 6 (Memorandum from Andrew C. Von Eschenbach, M.D. to NDA 21- 45, S-011 (Aug. 23, 2006)).  The decision was based, in part, on his acknowledgement of existing "well-established state and private-sector infrastructures to restrict certain products to consumers 18 and older."  *Id.* at 1-2 (giving as examples tobacco, non-prescription nicotine replacement therapy products, and non-prescription cold and cough products).

supervision is needed for safe and effective use).  Plaintiffs' interpretation would compel FDA to regulate in the over-regulatory manner that FDA's interpretation properly avoids.

> **b.**    **FDA's Interpretation Is Consistent with the Statutory Scheme.**

Plaintiffs allege that FDA lacks authority to permit distribution of the "same drug product, with the same labeling, for simultaneous distribution as both an OTC and an Rx product."  Compl. ¶ 83.  FDA does have such authority.

Although Plan B, when dispensed OTC, bears adequate directions for use by women age 18 and older, who, in accordance with the approved labeling, may buy it OTC, it does not (in legal contemplation) bear adequate directions for use by women age 17 and younger, who, in accordance with the approved labeling, may buy it only with a prescription.[18]  Therefore, when dispensed to a woman under age 18, Plan B must comply, and does comply, with all the conditions, set forth in 21 C.F.R. § 201.100 (2007), for exemption from the requirement of adequate directions for use by the prescription population, 21 U.S.C. § 352(f)(1) (2000 & Supp. IV 2006).

Apart from allegations relating to FDCA § 353(b)(4), discussed in the next paragraph, the Complaint does not allege that there is any obstacle to simultaneous compliance by Plan B with all the FDCA's labeling requirements for OTC drugs and all its labeling requirements for Rx drugs.  Indeed, because, as determined by FDA, the product information, including all directions for use, is exactly the same for the Rx and the OTC users of Plan B, the presence of the OTC information and directions on the packages dispensed to Rx users <u>enhances</u> their safe and effective use of the product.  The Complaint does not allege that either the patient population of women age 17 and younger or the patient population of women age 18 and older is in any way

---

[18]    The legal theory justifying prescription status as to those patients is that adequate directions for use by them, without a physician's supervision, cannot be written.

adversely affected by the presence on the Plan B package of any information placed there in order to comply with a regulatory requirement for the protection of the other population. Nor does the Complaint allege that Plan B fails to comply with any labeling requirement applicable to it when dispensed OTC or applicable to it when dispensed Rx.[19]

FDCA § 353(b)(4) provides:

(A)    A drug that is subject to paragraph (1) shall be deemed to be misbranded if at any time prior to dispensing the label of the drug fails to bear, at a minimum, the symbol "Rx only".

(B)    A drug to which paragraph (1) does not apply shall be deemed to be misbranded if at any time prior to dispensing the label of the drug bears the symbol described in subparagraph (A).

21 U.S.C. § 353(b)(4) (2000). Whether a drug product is subject to section 353(b)(4)(A) or to section 353(b)(4)(B) depends entirely on whether it "is subject to paragraph (1)" of section 353(b). Under the FDA decision, Plan B remains an Rx product for women age 17 and younger. Therefore, at all times, it remains "[a] drug that is subject to paragraph (1)" of section 353(b). Consequently, it is subject to section 353(b)(4)(A), and not to section 353(b)(4)(B), which applies only to drug products that are not subject to any prescription requirement under section 353(b)(1). Even units of Plan B dispensed OTC to women age 18 and older are subject to a prescription restriction under section 353(b)(1) against their being dispensed OTC to women age 17 and younger, and so are subject to section 353(b)(4)(A), not to section 353(b)(4)(B).

Plan B complies with section 353(b)(4)(A) by bearing on its label the legend: "Rx only for women age 17 and younger." Ex. 2. Section 353(b)(4)(A) requires that "the symbol 'Rx

---

[19]    The FDCA, in 21 U.S.C. § 353(b)(2), exempts an Rx drug from many of the requirements of 21 U.S.C. § 352, if its label contains (i) the name and address of the dispenser; (ii) the serial number and date of the prescription or its filing; (iii) the name of the prescriber; (iv) if stated in the prescription, the name of the patient; and (v) the directions for use and cautionary statements, if any, contained in such prescription. The information required by section 353(b)(2) appears on an Rx label the pharmacist attaches to the package when dispensing the product pursuant to a prescription.

only'" appear on Plan B's label.   The symbol "Rx only" appears on that label as part of the statement "<u>Rx only</u> for women age 17 and younger."  *Id.* (emphasis added).

Nothing in section 353(b)(4)(A) precludes the appearance of the symbol on a label as part of a truthful and non-misleading statement of the prescription limitation applicable to the labeled drug under its approved NDA (including all approved sNDAs).  Indeed, the expression "at a minimum" in section 353(b)(4)(A) expressly contemplates that the words "Rx only" may appear with other words on the label.  Thus, Plan B's Rx legend complies literally with the text of section 353(b)(4)(A).  It also fully serves the objective of section 353(b)(4):  to make clear to pharmacists and the public when a drug product is to be dispensed OTC or only by prescription.

### c.    FDA's Interpretation Is Consistent with Congressional Intent.

Plaintiffs allege that, in enacting the Durham-Humphrey Amendments, Pub. L. No. 82-215, 65 Stat. 648 (1951), which added section 353(b) to the FDCA, "Congress expressly deemed the presence or absence of the Rx legend as mutually exclusive for Rx and OTC products, respectively."  Compl. ¶ 33.  As shown at pages 20-27, *supra*, neither the statutory text nor the plainly evident statutory purposes require such mutual exclusivity (which, indeed, would be contrary to the statutory purposes).  Nor does the statute's legislative history require it.

The Senate Report on the Amendments stated their purpose as "to deal more directly and realistically with the labeling and dispensing of drugs . . ." S. Rep. No. 82-946, at 1-2.  The Amendments had two objectives:  "(1) to protect the public from abuses in the sale of potent prescription drugs; and (2) to relieve retail pharmacists and the public from burdensome and unnecessary restrictions on the dispensing of drugs that are safe for use without the supervision of a physician."  *Id*.  The House Report is in accord:  it uses the same language to describe the amendments' "two broad objectives."  Ex. 4 (H.R. Rep. No. 82-700, at 2-3 (1951)).

As to the first objective, prior to the Amendments the initial responsibility was on the manufacturer to decide whether its drug was unsuitable for self-medication and therefore must be labeled with a cautionary legend that dispensing required a prescription.  *See* H.R. Rep. No. 82-700, at 3-5.  To no great surprise, manufacturers did not discharge that responsibility consistently; and the result was "great confusion in the use of the prescription legend."  *Id.* at 5.  If FDA disagreed with a manufacturer's determination, it would bring an enforcement action to require the appropriate label to be placed on the product.  *Id.* at 4-5.

Under that system, "the retail druggist [was] often unable to know, until the question [wa]s settled by litigation, whether a particular drug can be sold on prescription only."  *Id.* at 4.  Moreover, the practical effect was that "[m]any products of identical composition, placed on the market by different manufacturers . . . would bear the prescription legend while another of the same composition would provide direction for use [OTC legend]."  *Id.* at 5.  In some instances, the "druggist would not even know . . . the class in which the manufacturer intended to place such drugs."  *Id*.  The Amendments solved this problem by requiring FDA involvement *ex ante*, as opposed to *ex post*, in the Rx-or-OTC determination.

FDA's interpretation, permitting certain drugs to be marketed simultaneously Rx for one population and OTC for a different population, is entirely consistent with this goal of the Amendments.  Pursuant to FDA's approval, Plan B's labeling includes a legend that unambiguously informs pharmacists (and others) as to its classification for purposes of dispensing:  "Rx only for age 17 and younger."  Plaintiffs have not made a single factual allegation that this labeling has caused confusion among pharmacists.

As to the second objective, Congress sought to alleviate the real public-health concern that drugs that were safe and effective for OTC use were being dispensed only by prescription, thereby placing undue burdens on pharmacists and restricting the public's ready access to such

drugs.  Section 353(b)(3), permitting the agency to remove drugs from the prescription

requirement, was a "relaxation . . . necessary to permit the sale without prescription of drugs . . .

when that safeguard is unnecessary."  *Id.* at 16.  *See also* 70 Fed. Reg. at 52,051.

FDA's interpretation achieves this second objective.  By contrast, achievement of that

objective would be prevented if FDA were prohibited from using its regulatory authority and

expertise to make necessary distinctions between uses of a drug that are appropriate for OTC

access and uses that are appropriate only with a prescription.  *See supra*, pp. 27-30.

Plaintiffs rest their construction of the statute on one line from the Senate Report – not

found in the statute – which states that, under the labeling requirements of section 353(b)(4),

"over-the-counter drugs are forbidden to bear a label containing this caution statement ['Caution:

Federal law prohibits dispensing without prescription']."  S. Rep. 82-946 at 11.  Contrary to

plaintiffs' allegations, that statement does not prohibit a drug from containing a label that states:

"Rx only for women age 17 and younger."

The statement on which plaintiffs rely refers to drugs that are appropriate for OTC

dispensing for all populations and uses.  "[O]ver-the-counter drugs" are drugs that are not subject

to any prescription limitation at all.  The statement plaintiffs rely on has no bearing on what is

permissible for a drug that FDA determines should have Rx and OTC distribution for use by

different patient populations, and therefore should be subject to a prescription limitation.  As

explained *supra*, Plan B is not an "over-the-counter" drug:  at all times, as to all units, and even

when dispensed OTC, it is subject to a prescription limitation.

Moreover, the statement plainly was intended to address a situation in which the

appearance of the caution statement on a drug label would be false:  *i.e.*, an OTC drug bearing a

statement that it may be dispensed only Rx.  Here, plainly, the appearance of the Rx legend on

Plan B's labeling is not false.  Indeed, Plan B's label stating when a prescription is required (and,

by necessary implication, when OTC dispensing is permitted) is true, and well serves the legislative goals of providing certainty to pharmacists, making drugs available OTC where that is appropriate, and restricting drugs to prescription use where that is appropriate.

**B.    Count IV Fails To State a Claim Because Plaintiffs Have Not Alleged That FDA Has Mandated That Plan B Be Treated as a Third Class of Drug.**

Plaintiffs allege FDA lacks authority to create a "third class" of drug, which they define as "a class of drugs that require pharmacists to supplement the labeling or that certain subpopulations might misuse with direct access." Compl. ¶ 94. They allege that such a class of drugs creates "anti-competitive and anti-consumer effects on the distribution of nonprescription drugs." *Id.* ¶ 95.

Plaintiffs do not, and cannot plausibly, allege that FDA regulates Plan B as a third class of drugs. Every unit of Plan B is subject to a prescription limitation: that it not be sold to a woman age 17 or under without a prescription. Of course, therefore, packages of Plan B must be kept behind a pharmacy counter, and cannot be sold by a grocery store. This treatment of Plan B as drug subject to a prescription limitation – dispensing only by physicians and pharmacists in neighborhood pharmacies, clinics, hospitals, and other medical facilities; storage behind the counter rather than on open shelves accessible to consumers – follows necessarily from Plan B's availability as a drug subject to a prescription limitation. Plaintiffs fail to allege that FDA has imposed on Plan B any limitation that does not flow from its being subject to a prescription limitation.

Plaintiffs do not allege any harm to distribution. They do not allege any facts amounting to an anticompetitive effect (*e.g.*, facts constituting an anticompetitive reduction of supply or increase in price). Moreover, plaintiffs fail to allege that they or any of their members have been harmed by any anticompetitive effect. They do not allege that they are or represent market participants (*e.g.*, owners of gas stations or convenience stores) that complain that they are not

30

able to sell Plan B because its sale is restricted to pharmacies and other medical facilities.  They

do not allege that they are or represent purchasers of Plan B who, somehow, have suffered from

some anticompetitive effect.  Indeed, the remedy plaintiffs seek – elimination of any OTC

availability of Plan B – would not change the number of outlets that sell Plan B, and so would

not change whatever competitive effects Plan B currently has.[20]  For these reasons, in addition to

those at pages 5-16, *supra*, plaintiffs lack standing to proceed with this Count (and they would

lack it even if, contrary to pages 5-16, *supra*, they had alleged harm sufficient to confer standing

for the other Counts in the Complaint).

Finally, although plaintiffs allege that FDA exceeded its authority, they do not allege that

FDA compelled Duramed to do anything beyond treating Plan B as a drug subject to a

prescription limitation.

### C. Count V Fails To State a Claim Because the APA Does Not Require Notice-and-Comment Rulemaking in the Circumstances Here.

"FDA has interpreted . . . [section 353](b)(1) of the act to allow marketing of the same

active ingredient in products that are both prescription and OTC, assuming some meaningful

difference exists between the two that makes the prescription product safe only under the

supervision of a licensed practitioner."  70 Fed. Reg. at 52,051.  Plan B is the first instance of

FDA approval of the "marketing of the same active ingredient in a prescription product for one

population and in an OTC product for a subpopulation" with no difference between the product

dispensed Rx and the product dispensed OTC.  *Id.*  FDA's approval of Plan B does not, however,

involve any new general legal interpretation as to which rulemaking is required by law.

---

[20]    To the extent that eliminating OTC availability would impose more administrative burden on pharmacists (record-keeping for Rx dispensing of units that otherwise could have been dispensed OTC) and on women age 18 and older and/or their physicians (due to the need for the women to obtain a prescription), plaintiffs' proposed remedy would <u>increase</u> the costs to consumers – certainly not a pro-competitive effect.

Count V complains, nevertheless, that FDA did not conduct a rulemaking to add a "patient-based 'age' parameter" to its "meaningful difference" test. Compl. ¶ 100. Count V fails. No rulemaking was legally required or factually warranted in the circumstances here. The approval Duramed sought from FDA was specific to NDA 21-045, Supplement 011 as amended, and did not raise any issue of broad applicability.

FDA's approval of the partial switch of Plan B from Rx to OTC dispensing and its approval of the labeling of Plan B involved interpretations of the FDCA and application of FDA policy. It did <u>not</u> involve an interpretation of any substantive rule embodied in a regulation, and was <u>not</u> a departure from any previous FDA policy that was authoritatively adopted, communicated to the public through adjudications amounting to an administrative common law, and relied on by regulated parties. Therefore, in the circumstances of this case, FDA's approval was not subject to the requirement of notice and comment under the APA, 5 U.S.C. § 553 (2000).

### 1. FDA Has Broad Discretion To Proceed by Adjudication Without Notice-and-Comment Rulemaking.

The Supreme Court has made clear that federal agencies have broad discretion to resolve interpretive and policy issues in adjudications without rulemaking.

*SEC v. Chenery Corp.* ("*Chenery II*"), 332 U.S. 194 (1947), involved an SEC adjudication that raised interpretive and policy issues. The Commission had to decide whether to approve an amendment to a reorganization plan. The Court rejected the argument that the Commission should have used notice-and-comment rulemaking, rather than adjudication, to decide the issues presented.

The Court first made clear that, in adjudicating a matter before it, an agency must apply its interpretation of the statute to the facts found, even if that interpretation has not previously been subjected to notice and comment. *See Chenery II*, 332 U.S. at 201.

The Court then described the discretion agencies have to proceed either by adjudication or by notice and comment.  "Not every principle essential to the effective administration of a statute can or should be cast immediately into the mold of a general rule."  *Id.* at 202.  "Some principles must await their own development, while others must be adjusted to meet particular, unforeseeable situations.  In performing its important functions in these respects, therefore, an administrative agency must be equipped to act either by general rule or by individual order."  *Id.*  "[T]he choice made between proceeding by general rule or by individual, *ad hoc* litigation is one that lies primarily in the informed discretion of the administrative agency."  *Id.* at 203.[21]

That rationale applies here.  Adoption of an age restriction as the dividing line between OTC and Rx availability was a reasonable and appropriate means to resolve the concerns raised in the letter from Steven Galson, M.D., M.P.H. (May 6, 2004), denying approval of NDA 21-045/S-011.  Compl. ¶ 51.  Yet, FDA has little prior experience with such use of an age restriction or its reflection in labeling.  Therefore, it is reasonable and appropriate for the agency to proceed case by case to accumulate experience before embodying a particular approach in a rule of general applicability.

In fact, FDA did provide ample opportunities for public comment.  It invited "interested persons" to submit "data, information or views" to the December 2003 meeting of advisory committees.  *See* http://www.fda.gov/oc/advisory/accalendar/cder12541d121603.html.  It also published the ANPRM, 70 Fed. Reg. 52,050, and received approximately 47,000 comments, Compl. ¶¶ 53-54.  Three of the four plaintiffs here commented.  Compl. ¶ 54.  The fourth (SDW)

---

[21]    The Fourth Circuit has characterized *Chenery II*: "In that case, the SEC had applied an innovative, adjudicatory order retroactively.  The Supreme Court upheld the SEC."  *Sewell Coal Co. v. Federal Mine Safety & Health Review Comm'n*, 686 F.2d 1066, 1069 (4th Cir. 1982).  *See also NLRB v. Bell Aerospace Co.*, 416 U.S. 267 (1974); *NLRB v. Wyman-Gordon Co.*, 394 U.S. 759, 765, 770, 772 (1969); *Lineas Aereas del Caribe, S.A. v. DOT*, 791 F.2d 972, 978 (D.C. Cir. 1986); *Arkansas Power & Light Co. v. ICC*, 725 F.2d 716, 723 (D.C. Cir. 1984).

did not bother to; the Complaint does not explain why.  Plaintiffs cannot plausibly claim they were denied an opportunity to be heard as to the proposed Rx-to-OTC switch of Plan B.[22]

### 2. The sNDA Approval Involved Interpretation of Section 353(b), Not Interpretation of a Substantive Rule.

The legal issues relating to the partial Rx-to-OTC switch and the means to comply with section 353(b)(4) all involve an interpretation of section 353(b), and do not involve any exercise of delegated law-making authority.  Therefore, under the APA, the legal interpretations FDA relied on to approve the partial switch and the means of compliance have the status of interpretive rules or, possibly, statements of policy, both of which are exempted from notice-and-comment rulemaking by 5 U.S.C. § 553(b)(A).

The APA categories relevant here are:  general statement of policy, interpretive rule, and substantive (or legislative) rule.  In *Syncor International Corp. v. Shalala*, 127 F.3d 90 (D.C. Cir. 1997), the D.C. Circuit distinguished among them.

A policy statement "does not seek to impose or elaborate or interpret a legal norm.  It merely represents an agency position with respect to how it will treat – typically enforce – the governing legal norm."  *Syncor*, 127 F.3d at 94.  A policy statement binds neither the public nor the agency.  *Id.*[23]

---

[22] Plaintiffs claim a due process violation on the grounds that they would have provided comments in a notice-and-rulemaking procedure.  Compl. ¶ 12.  Of course, plaintiffs do not have a due process right to provide comments in a rulemaking procedure that the agency is not required to undertake.

Plaintiffs' due process claim also fails for the straightforward reason that plaintiffs were required to, but did not, file a Citizen's Petition with FDA to obtain the relief they seek from this Court.  (Plaintiffs' allegation that "neither FFDCA nor any other provision of law provides an alternate legal remedy for Plaintiffs' injuries," Compl. ¶ 21, is, as a matter of law, simply incorrect.  *See* 21 C.F.R. §§ 10.25, 10.30.)

[23] *See, e.g.*, *Burroughs Wellcome Co. v. Schweiker*, 649 F.2d 221 (4th Cir. 1981) (FDA's paper NDA policy); *Pac. Gas & Elec. Co. v. Federal Power Commission*, 506 F.2d 33, 37-39 (D.C. Cir. 1974); *Alliance for Bio-Integrity v. Shalala*, 116 F. Supp. 2d 166, 173 (D.D.C. 2000)

Here, to the extent the partial switch involved the application of section 353(b) to a set of facts that, thus far, is unique, FDA was entitled to treat any elaboration of policy it applied in resolving the matter as non-binding (*i.e.*, as not thereafter limiting its discretion under the FDCA), and as establishing, at most, a presumption as to how the agency will resolve proposals for partial switches by exercising its discretion in the future. *See Chrysler Corp. v. Brown*, 441 U.S. 281, 302 n.31 (1979); *Alliance for Bio-Integrity*, 116 F. Supp. 2d at 173.

In contrast to a policy statement, a rule (whether interpretive or substantive) binds the agency to a particular legal position until the agency changes it. *Syncor*, 127 F.3d at 94.

An interpretive rule "reflects an agency's construction of a statute that has been entrusted to the agency to administer. The legal norm is one that Congress has devised; the agency does not purport to modify that norm, in other words, to engage in law-making." *Id.* The interpretive rule "simply states what the administrative agency thinks the statute means, and only 'reminds affected parties of existing duties.'" *General Motors Corp. v. Ruckelshaus*, 742 F.2d 1561, 1565 (D.C. Cir. 1984) (en banc) (*quoting Citizens to Save Spencer County v. EPA*, 600 F.2d 844, 876 & n.153 (D.C. Cir. 1979)). The statutory construction remains interpretive (rather than substantive or legislative), even though courts will defer to it under *Chevron*. The agency is not asserting authority to make positive law on its own. "Instead, it is construing the product of congressional lawmaking . . . ." *Syncor*, 127 F.3d at 94. "A rule that clarifies a statutory term is the classic example of an interpretative rule." *Nat'l Family Planning & Reprod. Health Ass'n v. Sullivan*, 979 F.2d 227, 236 (D.C. Cir. 1992); *American Postal Workers Union v. United States Postal Serv.*, 707 F.2d 548 (D.C. Cir. 1983) (change in method by which agency calculated retirement benefits was interpretative rule, though it affected pay of over 11,000 workers); *American Mining Cong. v. Mine Safety & Health Admin.*, 995 F.2d 1106, 1111-12 (D.C. Cir.

(FDA issuance is a policy statement because it "merely creates a presumption and does not ultimately bind the agency's discretion").

1993) ("Where a statute or legislative rule has created a legal basis for enforcement, an agency can simply let its interpretation evolve ad hoc in the process of enforcement or other applications (e.g., grants)").

Here, FDA's approval of the partial switch and the associated labeling of Plan B can properly be viewed as reflecting the evolution of the agency's interpretation of section 353(b) in the course of reviewing NDAs and sNDAs ("other applications" of the statute, in the words of *American Mining Cong.*, 995 F.2d at 1112). The evolution remains interpretive, not substantive; and it will continue on a case-by-case basis in the future. This characterization of FDA's rationale for approving the partial switch and the means of complying with the labeling requirements of section 353(b) is faithful to the facts and circumstances, places the rationale in the most appropriate legal category, and fully preserves the agency's discretion and flexibility to adapt its statutory interpretation to whatever circumstances may be presented in the future.

A <u>substantive rule</u> is an exercise of policy (and therein similar to a policy statement), and is a rule. A substantive rule differs from a policy statement and from an interpretive rule because it modifies or adds to a legal norm through action based on the agency's own delegated authority to make law. Because the agency is engaged in law-making, the APA requires notice and comment for promulgation of a substantive rule. *Syncor*, 127 F.3d at 95.

The D.C. Circuit has articulated four questions useful in determining whether a rule is interpretive or substantive:

> (1) whether in the absence of the rule there would not be an adequate legislative basis for enforcement action or other agency action to confer benefits or ensure the performance of duties, (2) whether the agency has published the rule in the Code of Federal Regulations, (3) whether the agency has explicitly invoked its general legislative authority, or (4) whether the rule effectively amends a prior legislative rule. If the answer to any of these questions is affirmative, [the pronouncement is] a legislative, not an interpretive rule.

*Am. Mining Cong.*, 995 F.2d at 1112.

The legal interpretations underlying FDA's approval of the partial switch (including the proposed labeling) are permissible under section 353 and constitute an interpretive rule or policy statement, not a substantive rule. These interpretations warrant a negative answer to each of the four questions in *American Mining Congress*. First, an adequate legislative basis for an enforcement action is provided by 21 U.S.C. §§ 353(b)(4), 331(a), 332-34. Second, the FDA legal interpretations that plaintiffs challenge have not been published in the C.F.R. Third, FDA has not explicitly invoked its general legislative authority. Fourth, FDA has not effectively amended any prior legislative rule.

FDA's legal position is interpretive because it elaborates or interprets the legal norms set forth in section 353(b) in general, and explains how Duramed may comply with the requirements of section 353(b)(4). Arguably, it would be a policy statement analogous to that in *Hudson v. FAA*, 192 F.3d 1031, 1036 (D.C. Cir. 1999): *i.e.*, a statement as to how the agency will regard a means of compliance with the statute. Such a position certainly would not be substantive because the legal norms at issue are solely those created by Congress in section 353(b), not ones created by FDA. FDA applied to a factual situation the established legal norms and policies governing Rx and OTC dispensing and the communication to pharmacists and others of clear guidance as to how the drug is to be dispensed.

> **3.** **An Agency May Change an Interpretation of a Statute, an Interpretive Rule, or a Policy Statement Without Notice and Comment.**

*Paralyzed Veterans of America, Inc. v. D.C. Arena L.P.*, 117 F.3d 579 (D.C. Cir. 1997), expressly rejected the argument that "an agency has the same latitude to modify its interpretation of a regulation as it does its interpretation of a statute under *Chevron*." *Id.* at 586 (emphases added). The court's statement that "there is no barrier to an agency altering its initial interpretation to adopt another reasonable interpretation – even one that represents a new policy

37

response," *id.*, plainly means that notice-and-comment rulemaking is not required for a change in an agency's interpretation of a <u>statute</u>.

If the change is made by an interpretive rule (*i.e.*, an interpretation of a legal norm created by Congress, as distinguished from an interpretation of a legal norm created by the agency), then notice-and-comment rulemaking is not required, even if the new interpretation differs from a prior interpretation.  In *Clark-Cowlitz Joint Operating Agency v. FERC*, 826 F.2d 1074 (D.C. Cir. 1987), for example, the court held that it was proper for FERC, in an adjudication, (i) to adopt a statutory interpretation directly contrary to FERC's prior interpretation of the same statute, (ii) to do so without notice and comment, and (iii) to apply the new interpretation in that very adjudication.

The situation is otherwise, however, with respect to a change in an agency's interpretation of a <u>substantive rule embodied in a regulation</u>.  *Paralyzed Veterans*, 117 F.3d at 586.  As to a <u>substantive regulation</u>, an agency may change its interpretation only by notice and comment where the change would constitute an <u>amendment</u> of the regulation.

Even as to substantive regulations, however, not every change in interpretation constitutes an amendment.  "A rule does not, in this inquiry, become an amendment merely because it supplies crisper and more detailed lines than the authority being interpreted."  *Am. Mining Cong.*, 995 F.2d at 1112.  "Agencies need not provide notice and comment for every meaningful policy decision.  Interpretations of ambiguous or unclear regulations by agencies may be exempt from the APA's notice and comment requirements."  *Shell Offshore Inc. v. Babbitt*, 238 F.3d 622, 629 n.6 (5th Cir. 2001).  In *Orengo Caraballo v. Reich*, 11 F.3d 186, 195 (D.C. Cir. 1993), the court made clear that the APA category of interpretive rules includes interpretations of regulations as well as interpretations of statutes.  *Id.* at 195-96.

Thus, an agency may <u>change</u> its interpretation of a statute and may <u>adopt</u> an interpretation of a regulation (where the adopted interpretation does not amount to an amendment of the regulation) by means of an interpretive rule, which, under 5 U.S.C. § 553(b), need not be promulgated through notice-and-comment rulemaking.  The notice-and-comment process is not required even if the agency views the new interpretation as binding, *i.e.*, as an interpretive <u>rule</u>.  All rules, as such, bind the agency that adopts them until the agency changes them, *Syncor*, 127 F.3d at 94; but, under section 553(b), an interpretive rule may be changed without notice and comment.

*Association of American Railroads v. Department of Transportation*, 198 F.3d 944 (D.C. Cir. 1999), interpreted *Alaska Professional Hunters Ass'n v. FAA*, 177 F.3d 1030 (D.C. Cir. 1999), as holding that notice-and-comment rulemaking is required for a change in agency interpretation where (i) there has been a prior, different  interpretation that was "express, direct, and uniform"; (ii) that interpretation has been publicly "reflected in official agency adjudications," amounting to "administrative common law"; and (iii) there has been substantial reliance on that interpretation by regulated parties.  *Id.* at 949-50 (quotations omitted); *see also Air Transp. Ass'n of Am., Inc. v. FAA*, 291 F.3d 49, 58 (D.C. Cir. 2002).

Here, no prior, different administrative interpretation of section 353(b) would preclude the approved partial switch and associated labeling, and would satisfy <u>any</u> of the three triggering conditions relied on in *Association of American Railroads*.

      **4.**      **Approval of the Partial Switch and Associated Labeling Did Not Involve Departure from Any Established FDA Interpretation of a Regulation.**

Approval of the partial switch and associated labeling did not involve FDA committing itself to a new interpretation of any substantive (or interpretive) regulation.  There is no FDA regulation that, as previously interpreted, stood as an obstacle to approval of the partial switch

and associated labeling, and therefore had to be reinterpreted if FDA were to approve the sNDA. Therefore, cases requiring notice and comment in connection with an amendment of a substantive regulation do not apply here. Indeed, as just noted, of the three elements necessary to the analysis in *Association of American Railroads*, none is present here.

Any new interpretation that would have been needed would have been of section 353(b) of the FDCA. FDA's approval did not supplement the statute, but merely construed it. It did not involve the exercise of any law-making authority under 21 U.S.C. § 371(a) (authorizing FDA to issue regulations), but was merely a direct interpretation of section 353(b), one FDA could make even if section 371(a) did not exist.

In its articulation of rationales for the approved partial switch and for Plan B's labeling, FDA was elaborating the concepts and provisions in section 353(b). It explained how those provisions were satisfied and how their purposes were served in the context of Plan B. *See* Ex. 5 (Steven Galson, Director, CDER, Memorandum, Subject: Plan B, at 2-3 (August 24, 2006)). No new legal norms or purposes were created.

In sum, even if the FDA decision is viewed as committing FDA to a new interpretation of section 353(b) (or of any other provision of the FDCA), FDA could, under APA § 553(b)(A), commit itself to that new interpretation and approve the sNDA without notice and comment.

### 5.    Application of a New Statutory Interpretation Here Did Not Raise Any Issue as to Retroactivity.

"[W]hen as an incident of its adjudicatory function an agency interprets a statute, it may apply that new interpretation in the proceeding before it." *Clark-Cowlitz*, 826 F.2d at 1081 (citing cases). Thus, there is no retroactivity problem here, even from a new statutory interpretation.

Retroactive application of a new interpretation in an adjudicatory proceeding raises an issue only where such application "would work a manifest injustice." *Id.* (internal quotation

omitted).  Here, under the five-factor test applied in *Clark-Cowlitz*, it is plain that application of a new interpretation in the adjudication of the sNDA was entirely appropriate.  In particular, there is no allegation that plaintiffs (or others opposed to the FDA decision) have detrimentally relied on any interpretation of the FDCA or of any FDA regulation that is contrary to an interpretation necessary to support the decision.

Finally, in acting on Duramed's sNDA, FDA did not attach consequences to past conduct, but merely made a licensing decision that applied to future conduct (*i.e.*, the future marketing of Plan B).  There is no retroactivity here.

### D.    Count VI Fails To State a Claim Because It Is Based on a Flawed Statutory Interpretation.

FDA "may by regulation remove drugs subject to section 355 of this title from the requirements of paragraph (1) of this subsection when such requirements are not necessary for the protection of the public health."  21 U.S.C. § 353(b)(3).  An FDA regulation, 21 C.F.R. § 310.200(b), implements this statutory authorization.

The express words of section 353(b)(3) are that FDA "may by regulation remove drugs."  In that statutory expression, the term "regulation" is singular, not plural; and the term "drugs" is plural, not singular.  Thus, section 353(b)(3) plainly contemplates removal by one regulation of multiple drugs.  FDA has promulgated such a regulation, 21 C.F.R. § 310.200(b), which removes drugs with certain characteristics from section 353(b)(1).  Having once promulgated that regulation, FDA thereafter need only decide by informal adjudication, case by case, whether this or that particular drug satisfies the criteria in the regulation.

Count VI of the Complaint misconstrues the statutory expression "may by regulation."  Plaintiffs' position is that the statute requires FDA to engage in a separate rulemaking <u>each and every time</u> it removes a drug from section 353(b)(1), *i.e.*, from prescription-only status.  Nothing in the text of section 353, in the APA, in general principles of administrative law, or in sound

41

public policy warrants burdening FDA and regulated entities with such a cumbersome and inefficient procedure.

FDA has stated that, from 1976 to 1996 alone, it approved over 600 Rx-to-OTC switches. *See* Tamar Nordenberg, *Now Available Without A Prescription*, FDA Consumer Magazine (Nov. 1996), *available at* http://www.fda.gov/fdac/features/996_otc.html.  Under plaintiffs' interpretation of section 353(b)(3), to approve those switches FDA would have had to conduct more than 600 separate and useless notice-and-comment rulemakings.  A statute should not be read to lead to such an absurd result.  *See Griffin v. Oceanic Contractors, Inc.*, 458 U.S. at 575; *FTC v. Ken Roberts Co.*, 276 F.3d 583, 590 (D.C. Cir. 2001).

FDA's interpretation of section 353(b)(3), is reasonable, and is entitled to *Chevron* deference.  *See* pp. 22-25, *supra*.

## CONCLUSION

For the foregoing reasons, the Court should dismiss the Complaint with prejudice.

Respectfully submitted,


By:     /s/ Richard M. Cooper
       Richard M. Cooper (# 92817)
       Ana C. Reyes (# 477354)

       WILLIAMS & CONNOLLY LLP
       725 Twelfth Street, N.W.
       Washington, DC 20005
       (tel.) (202) 434-5466
       (fax)  (202) 434-5470
       rcooper@wc.com
       areyes@wc.com

       *Counsel for Defendant Intervenor*
       *Duramed Pharmaceuticals, Inc.*

Dated:  June 29, 2007.

42



**DEPARTMENT OF HEALTH & HUMAN SERVICES**

Public Health Service

Food and Drug Administration
Rockville, MD  20857

21-045/S-011

Duramed Research, Inc.
Attention: Joseph A. Carrado, M.Sc., R.Ph.
          Vice President, Clinical Regulatory Affairs
One Belmont Ave, 11th floor
Bala Cynwyd, PA  19004

Dear Mr. Carrado:

Please refer to your supplemental new drug application dated April 16, 2003, received April 22, 2003, submitted under section 505(b) of the Federal Food, Drug, and Cosmetic Act for Plan B® (levonorgestrel) Tablets, 0.75 mg.

We also acknowledge receipt of your submissions dated July 25 (3), and 31, August 8 (2), September 4, 8, 9, and 15, October 6, 10, 15 (2), 17, 21, 24, 29, 30, and 31, December 3, and 9, 2003; January 9, and 30, February 6, 10, 13, 20, and 24, March 11 and 26, May 6 and 11, June 30, July 21, 2004; January 6, 12, 13, 14, 18, 19 and 21, and August 26, 2005; and August 2, 17, 18, and 23, 2006.

Your submission of July 21, 2004, constituted a complete response to our May 6, 2004, Not Approvable letter.  The resubmitted supplemental new drug application provides for a switch to Over-the-Counter (OTC) status for women ages 16 years or greater and maintenance of prescription status for women under age 16.  On August 26, 2005, then Commissioner Lester M. Crawford, DVM, PhD, sent you a letter indicating that the Agency was unable, at that time, to reach a decision on the approvability of the application because of unresolved issues that related to your NDA.  The letter mentioned three issues: whether the same active ingredient could be marketed both Rx and OTC based solely on the age of the individual using the drug; how, as a practical matter, an age-based distinction could be enforced; and whether the Rx and OTC versions of the same active ingredient may be marketed in a single package.  The letter also stated that the agency had decided to ask for public comments on whether we should initiate a rulemaking to codify our interpretation of section 503(b) of the Federal Food, Drug, and Cosmetic Act regarding when an active ingredient can be simultaneously marketed in both a prescription drug product and an OTC drug product through an advance notice of proposed rulemaking (ANPRM) that published on September 1, 2005 (70 FR 52050).  The comment period closed on November 1, 2005, and the agency received about 47,000 comments.  The agency hired a contractor to summarize and categorize the comments and the contractor submitted a final report on May 19, 2006.

On July 31, 2006, Dr. Andrew von Eschenbach, Acting Commissioner of Food and Drugs, sent you a letter indicating that the agency had reviewed the comments received in response to the ANPRM and determined it was not necessary to engage in rulemaking to resolve the novel regulatory issues raised by your application and that we were now proceeding with further evaluation of your application.

NDA 21-045/S-011
Page 2

We met with you on August 8, 2006, and discussed how to address the issues raised in Dr. von Eschenbach's letter regarding the restriction on OTC sales of Plan B® to ages 18 and over, the packaging, and the Convenient Access Responsible Education (CARE^SM) Program.

On August 17, 18, and 23, 2006, you amended your application to propose revisions to the labeling and to the CARE^SM Program.

We have completed our review of this application, as amended, and have concluded that adequate information has been presented to demonstrate that Plan B® is safe and effective for use under the conditions set forth in the draft labeling submitted on August 23, 2006. This application is approved, effective on the date of this letter, to allow OTC availability of Plan B® for consumers 18 years and older. Plan B® remains available by prescription only for women 17 years and younger.

The final printed labeling (FPL) must be identical to the enclosed labeling (prescription package insert, outer carton label, inner card label, and consumer information leaflet). The inner card and outer carton labels must be formatted in accordance with the requirements of 21 CFR 201.66.

Please submit an electronic version of the FPL according to the guidance for industry titled *Providing Regulatory Submissions in Electronic Format – NDA*. Alternatively, you may submit 20 paper copies of the FPL as soon as it is available, in no case more than 30 days after it is printed. Individually mount 15 of the copies on heavy-weight paper or similar material. For administrative purposes, designate this submission "**FPL for approved NDA 21-045 /S-011**." Approval of this submission by FDA is not required before the labeling is used.

We also remind you of the activities you agreed to as specified in the CARE^SM Program described in your submission dated August 23, 2006. You agreed to:

- Monitor trends in the use of emergency contraception to evaluate the effectiveness of the CARE^SM program. Specifically, you have agreed to conduct a market research survey or surveys of a subset of healthcare professionals annually, and when practicable, in collaboration with established professional groups. Your surveys will be designed to determine whether the Rx requirement for those ages 17 and younger is being adhered to at the point of purchase and to provide signals of program effectiveness and potential problems associated with consumers' understanding of the purpose and proper use of Plan B®.

- Using relevant survey data regularly collected by others (e.g., Centers for Disease Control's Behavioral Risk Factor Safety Surveillance (CDC BRFSS), Youth Risk Behavior Safety Surveillance (YRBSS)), to monitor for potential indicators that Plan B® is being used in an inappropriate manner. Potential areas of monitoring and reporting include evaluating possible correlations between increases in sexually transmitted infections (STIs) based on geographic areas and data and trends in pregnancy and/or abortion rates based on geographic areas.

- Conduct a "Point-of-Purchase Monitoring Program" to track how Plan B® is being sold at the time of purchase, including using anonymous shoppers who will be directed to visit locations where Plan B® is available and purchase the product. Using the data collected, you will document and analyze the level of comprehension of the Plan B® prescription age requirement and how it is handled at the point of purchase. The program will be conducted twice in the first

NDA 21-045/S-011
Page 3

year and annually thereafter.  The sponsor will report repeat violators to the relevant State
Boards of Pharmacy.

- Report to FDA on the results of these activities on a six-month interval beginning 30 calendar
  days after the six-month interval commencing on the date of this approval.

Finally, we note and agree with the other elements of the CARE[SM] Program, described in your
submission of August 23, 2006, which are designed to ensure compliance with the approved labeling,
and particularly the restriction of OTC use to ages 18 and older.  The program includes the following
elements:

- The sponsor and third party distributors, wholesalers, and chain drug companies will only
  distribute Plan B[®] to licensed pharmacies or other licensed healthcare clinics.  As a result, Plan
  B[®] will not be sold at gas stations or convenience stores.  Given that Plan B[®] will have both Rx
  and OTC labeling, the pharmacies will keep Plan B[®] behind-the-counter.

- The sponsor will conduct an education campaign that will focus initially on healthcare
  professionals (including prescribers and pharmacists) to raise awareness and knowledge levels
  about emergency contraception.  The education campaign will clearly communicate the
  prescription age requirement and the appropriate use of emergency contraception. The
  campaign will include continuing education by certified professionals and educational materials
  (including websites and toll free numbers) that can be accessed easily and at any time.

- The sponsor will make available to State Boards of Pharmacy continuing education programs
  for use at annual meetings and other regional programs.

- The sponsor will provide to prescribers and healthcare professional associations materials for
  distribution to patients that will encourage patients to discuss any questions about emergency
  contraception with a healthcare professional.

- The sponsor plans to educate consumers in part by targeting consumers ages 18 to 44 to convey
  critical awareness and educational messages as well as information about product availability,
  time sensitivity of use, and the age requirements to obtain Plan B[®] as a prescription or OTC
  product.

Any change to the CARE[SM] Program must be discussed with FDA prior to its implementation and is
subject to FDA's review.

All applications for new active ingredients, new dosage forms, new indications, new routes of
administration, and new dosing regimens are required to contain an assessment of the safety and
effectiveness of the product in pediatric patients unless this requirement is waived or deferred.  The
safety and effectiveness of Plan B[®] provided pursuant to a prescription in pediatric patients (those
under age 18) need not be addressed under the Pediatric Research Equity Act of 2003 (PREA) because
this supplemental application does not propose a new indication for women in this age group (i.e., Plan
B[®] is to remain prescription for women under 18).

In addition, we request that you submit to FDA four copies of the introductory promotional materials
that you propose to use for Plan B[®].  Submit all proposed materials in draft or mock-up form, not final

NDA 21-045/S-011
Page 4

print.  Send one copy to the Division of Reproductive and Urologic Products, one to the Division of Nonprescription Clinical Evaluation, and two copies of both the promotional materials and the package insert directly to:

> Food and Drug Administration
> Center for Drug Evaluation and Research
> Division of Drug Marketing, Advertising, and Communications
> Food and Drug Administration
> 5901-B Ammendale Road
> Beltsville, MD 20705-1266

If you issue a letter communicating important information about this drug product (i.e., a "Dear Health Care Professional" letter), we request that you submit a copy of the letter to this NDA and a copy to the following address:

> MEDWATCH
> Food and Drug Administration
> WO 22, Room 4447
> 10903 New Hampshire Avenue
> Silver Spring, MD 20993-0002

Please submit one market package of Plan B® when it is available.

We remind you that you must comply with reporting requirements for an approved NDA (21 CFR 314.80 and 314.81).

If you have any questions, call the Office of Nonprescription Products, Division of Nonprescription Clinical Evaluation at (301) 796-2080.

> Sincerely,
>
> *{See appended electronic signature page}*
>
> Steven Galson, M.D., M.P.H.
> Director
> Center for Drug Evaluation and Research

Enclosure



### Drug Facts

**Active ingredient (in each tablet)**     **Purpose**
Levonorgestrel 0.75mg.....................Emergency contraceptive

**Use** reduces chance of pregnancy after unprotected sex
(if a contraceptive failed or if you did not use birth control)

**Warnings**

**Allergy alert:** Do not use if you have ever had an allergic
reaction to levonorgestrel

**Sexually transmitted diseases (STDs) alert:** This product
does **not** protect against HIV/AIDS or other STDs

**Do not use**
- if you are already pregnant (because it will not work)
- for regular birth control

**When using this product** you may have
- nausea
- vomiting
- stomach pain
- tiredness
- diarrhea
- dizziness
- menstrual changes
- breast pain
- headache

**Keep out of reach of children.** In case of overdose, get medical
help or contact a Poison Control center right away.

**Directions**
- women 18 years of age and over:
- take the first tablet as soon as possible but no later than
72 hours (3 days) after unprotected sex. The sooner you
take the first tablet, the more effective it will be. ▶



Mfg. by Gedeon Richter, Ltd., Budapest, Hungary
for Duramed Pharmaceuticals, Inc.
Subsidiary of Barr Pharmaceuticals, Inc.
Pomona, New York 10970

©2006 Duramed Pharmaceuticals, Inc.

N
3  5 1285 76993  0

### Drug Facts (continued)
- take the second tablet **12 hours** after you take the first tablet
- prescription only for age 17 and under. If age 17 or under, see
a healthcare professional.

**Other information**
- **before using this product read the enclosed consumer
information leaflet for complete directions and information**
- this product is not recommended for regular birth control. It
does not work as well as most other birth control methods
used correctly.
- **this product works mainly by preventing ovulation (egg
release). It may also prevent fertilization of a released egg
(joining of sperm and egg) or attachment of a fertilized egg
to the uterus (implantation). See consumer information leaflet.**
- when used correctly every time you have sex, latex condoms
greatly reduce, but do not eliminate, the risk of pregnancy and
the risk of catching or spreading HIV, the virus that causes AIDS.
See condom labeling for additional STD information.
- this package is sealed with 2 seals imprinted with Plan B®. Do
not use if these printed seals have either been removed or broken.
- store at 20-25°C (68-77°F)

**Inactive ingredients**
colloidal silicon dioxide, corn starch, gelatin, lactose
monohydrate, magnesium stearate, potato starch, talc

**☎ Questions or comments?**
For more information or to speak to a healthcare professional,
call **1-800-330-1271,** 24 hours a day/7 days a week.
Visit our Web site at www.go2planb.com

Place Label Here

R8-06 (v.1)

15001114

2 Levonorgestrel Tablets
0.75 mg each


Plan B®
LEVONORGESTREL
tablets 0.75 mg
Emergency Contraceptive

**Plan B**® (Levonorgestrel) Tablets, 0.75 mg

**Rx only for women age 17 and younger**

For women age 17 and younger, Plan B ® is a prescription–only emergency contraceptive.  Plan B® is intended to prevent pregnancy after known or suspected contraceptive failure or unprotected intercourse.  Emergency contraceptive pills (like all oral contraceptives) do not protect against infection with HIV (the virus that causes AIDS) and other sexually transmitted diseases.

**DESCRIPTION**

Emergency contraceptive tablet.  Each Plan B® tablet contains 0.75 mg of a single active steroid ingredient, levonorgestrel  [18,19-Dinorpregn-4-en-20-yn-3-one-13-ethyl-17-hydroxy-,  (17α)-(-)-], a totally synthetic progestogen. The inactive ingredients present are colloidal silicon dioxide, potato starch, gelatin, magnesium stearate, talc, corn starch, and lactose monohydrate. Levonorgestrel has a molecular weight of 312.45, and the following structural and molecular formulas:



**CLINICAL PHARMACOLOGY**

Emergency contraceptives are not effective if the woman is already pregnant.  Plan B® is believed to act as an emergency contraceptive principally by preventing ovulation or fertilization (by altering tubal transport of sperm and/or ova).  In addition, it may inhibit implantation (by altering the endometrium).  It is not effective once the process of implantation has begun.

**Pharmacokinetics**

*Absorption:*

No specific investigation of the absolute bioavailability of Plan B® in humans has been conducted.  However, literature indicates that levonorgestrel is rapidly and completely absorbed after oral administration (bioavailability about 100%) and is not subject to first pass metabolism. After a single dose of Plan B® (0.75 mg) administered to 16 women under fasting conditions, maximum serum concentrations of levonorgestrel are 14.1 ± 7.7 ng/mL (mean ± SD) at an average of 1.6 ± 0.7 hours.  No formal study of the effect of food on the absorption of levonorgestrel has been undertaken.

**Table 1**         **Pharmacokinetic Parameter Values Following Single Dose Administration of Plan B® (Levonorgestrel) Tablets 0.75 mg to Healthy Female Volunteers**

| N | Mean ($\pm$ S.D.) | | | | | |
|---|---|---|---|---|---|---|
| | $C_{max}$ (ng/mL) | $T_{max}$ (h) | CL (L/h) | $V_d$ (L) | $T_{\frac{1}{2}}$ (h) | $AUC_{0-\infty}$ (ng/mL/h) |
| 16 | 14.1 $\pm$ 7.7 | 1.6 $\pm$ 0.7 | 7.7 $\pm$ 2.7 | 260.0 | 24.4 $\pm$ 5.3 | 123.1 $\pm$ 50.1 |

*Distribution:*
Levonorgestrel in serum is primarily protein bound. Approximately 50% is bound to albumin and 47.5% is bound to sex hormone binding globulin (SHBG).

*Metabolism:*
Following a single oral dosage, levonorgestrel does not appear to be extensively metabolized by the liver. The primary metabolites are 3α,5β- and 3α,5α-tetrahydrolevonorgestrel with 16β-hydroxynorgestrel also identified. Together, these account for less than 10% of parent plasma levels. Urinary metabolites hydroxylated at the 2α and 16β positions have also been identified. Small amounts of the metabolites are present in plasma as sulfate and glucuronide conjugates.

*Excretion:*
The elimination half-life of levonorgestrel following single dose administration as Plan B® (0.75 mg) is 24.4 $\pm$ 5.3 hours. Excretion following single dose administration as emergency contraception is unknown, but based on chronic, low-dose contraceptive use, levonorgestrel and its metabolites are primarily excreted in the urine, with smaller amounts recovered in the feces.

**SPECIAL POPULATIONS**

**Geriatric**
This product is not intended for use in geriatric (age 65 years or older) populations and pharmacokinetic data are not available for this population.

**Pediatric**
This product is not intended for use in pediatric (premenarcheal) populations, and pharmacokinetic data are not available for this population.

**Race**
No formal studies have evaluated the effect of race. However, clinical trials demonstrated a higher pregnancy rate in the Chinese population with both Plan B® and the Yuzpe regimen (another form of emergency contraception consisting of two doses of ethinyl estradiol 0.1 mg + levonorgestrel 0.5 mg). The reason for this apparent increase in the pregnancy rate of emergency contraceptives in Chinese women is unknown.

**Hepatic Insufficiency and Renal Insufficiency**
No formal studies have evaluated the effect of hepatic insufficiency or renal insufficiency on the disposition of emergency contraceptive tablets.

**Drug-Drug Interactions**
No formal studies of drug-drug interactions were conducted.

**INDICATIONS & USAGE**
For women age 17 and younger, Plan B® is a prescription-only emergency contraceptive that can be used to prevent pregnancy following unprotected intercourse or a known or suspected contraceptive failure.  To obtain optimal efficacy, the first tablet should be taken as soon as possible within 72 hours of intercourse.  The second tablet must be taken 12 hours later.

**Clinical Studies**
A double-blind, controlled clinical trial in 1,955 evaluable women compared the efficacy and safety of Plan B® (one 0.75 mg tablet of levonorgestrel taken within 72 hours of intercourse, and one tablet taken 12 hours later) to the Yuzpe regimen (two tablets of 0.25 mg levonorgestrel and 0.05 mg ethinyl estradiol, taken within 72 hours of intercourse, and two tablets taken 12 hours later).  Plan B® was at least as effective as the Yuzpe regimen in preventing pregnancy.  After a single act of intercourse, the expected pregnancy rate of 8% (with no contraception) was reduced to approximately 1% with Plan B®.

Emergency contraceptives are not as effective as routine contraception since their failure rate, while low based on a single use, would accumulate over time with repeated use (see Warnings). See Table 2 below.

**Table 2:** **Percentage of women experiencing an unintended pregnancy during the first year of typical use and the first year of perfect use of contraception and the percentage continuing use at the end of the first year, United States.**

| Method (1) | % of Women Experiencing an Unintended Pregnancy within the First Year of Use | | % of Women Continuing Use at One Year [3] |
|---|---|---|---|
| | Typical Use [1] (2) | Perfect Use [2] (3) | (4) |
| Chance [4] | 85 | 85 | |
| Spermicides [5] | 26 | 6 | 40 |
| Periodic abstinence | 25 | | 63 |
|     Calendar | | 9 | |
|     Ovulation method | | 3 | |
|     Sympto-thermal [6] | | 2 | |
|     Post-ovulation | | 1 | |
| Withdrawal | 19 | 4 | |
| Cap [7] | | | |
|     Parous women | 40 | 26 | 42 |
|     Nulliparous women | 20 | 9 | 56 |
| Sponge | | | |
|     Parous women | 40 | 20 | 42 |
|     Nulliparous women | 20 | 9 | 56 |
| Diaphragm [7] | 20 | 6 | 56 |
| Condom [8] | | | |
|     Female (Reality) | 21 | 5 | 56 |
|     Male | 14 | 3 | 61 |
| Pill | 5 | | 71 |
|     Progestin only | | 0.5 | |
|     Combined | | 0.1 | |
| IUD: | | | |
|     Progesterone T | 2.0 | 1.5 | 81 |
|     Copper T 380A | 0.8 | 0.6 | 78 |
|     LNg 20 | 0.1 | 0.1 | 81 |
| Depo Provera | 0.3 | 0.3 | 70 |
| Norplant and Norplant-2 | 0.05 | 0.05 | 88 |
| Female sterilization | 0.5 | 0.5 | 100 |
| Male sterilization | 0.15 | 0.10 | 100 |

**Emergency Contraceptive Pills:** Treatment initiated within 72 hours after unprotected intercourse reduces the risk of pregnancy by at least 75%. [9]

**Lactational Amenorrhea Method:** LAM is a highly effective, *temporary* method of contraception. [10]

Source: Trussell J, Contraceptive efficacy. In Hatcher RA, Trussell J, Stewart F, Cates W, Stewart GK, Kowal D, Guest F, Contraceptive Technology: Seventeenth Revised Edition. New York NY: Irvington Publishers, 1998.

[1]  Among *typical* couples who initiate use of a method (not necessarily for the first time), the percentage who experience an unintended pregnancy during the first year if they do not stop use for any other reason.

[2]  Among couples who initiate use of a method (not necessarily for the first time) and who use it *perfectly* (both consistently and correctly), the percentage who experience an unintended pregnancy during the first year if they do not stop use for any other reason.

[3]  Among couples attempting to avoid pregnancy, the percentage who continue to use a method for one year.

[4]  The percentages of women becoming pregnant in columns (2) and (3) are based on data from populations where contraception is not used and from women who cease using contraception in order to become pregnant. Among such populations, about 89% become pregnant within one year. This estimate was lowered slightly (to 85%) to represent the percentage who would become pregnant within one year among women now relying on reversible methods of contraception if they abandoned contraception altogether.

[5]  Foams, creams, gels, vaginal suppositories and vaginal film.

[6]  Cervical mucus (ovulation) method supplemented by calendar in the pre-ovulatory and basal body temperature in the post-ovulatory phases.

[7]  With spermicidal cream or jelly.

[8]  Without spermicides.

[9]  The treatment schedule is one dose within 72 hours after unprotected intercourse and a second dose 12 hours after the first dose. The Food and Drug Administration has declared the following brands of oral contraceptives to be safe and effective for emergency contraception: Ovral (1 dose is 2 white pills), Alesse (1 dose is 5 pink pills), Nordette or Levlen (1 dose is 2 light-orange pills), Lo/Ovral (1 dose is 4 white pills), Triphasil or Tri-Levlen (1 dose is 4 yellow pills).

[10]  However, to maintain effective protection against pregnancy, another method of contraception must be used as soon as menstruation resumes, the frequency or duration of breastfeeds is reduced, bottle feeds are introduced or the baby reaches six months of age.

## CONTRAINDICATIONS

Progestin-only contraceptive pills (POPs) are used as a routine method of birth control over longer periods of time, and are contraindicated in some conditions.  It is not known whether these same conditions apply to the Plan B® regimen consisting of the emergency use of two progestin pills.  POPs however, are not recommended for use in the following conditions:

•  Known or suspected pregnancy
•  Hypersensitivity to any component of the product

## WARNINGS

**Plan B® is not recommended for routine use as a contraceptive.**
**Plan B® is not effective in terminating an existing pregnancy.**

## Effects on Menses

Menstrual bleeding patterns are often irregular among women using progestin-only oral contraceptives and in clinical studies of levonorgestrel for postcoital and emergency contraceptive use.  Some women may experience spotting a few days after taking Plan B®.  At the time of expected menses, approximately 75% of women using Plan B® had vaginal bleeding similar to their normal menses, 12-13% bled more than usual, and 12% bled less than usual.  The majority of women (87%) had their next menstrual period at the expected time or within $\pm$ 7

days, while 13% had a delay of more than 7 days beyond the anticipated onset of menses.  If there is a delay in the onset of menses beyond 1 week, the possibility of pregnancy should be considered.

**Ectopic Pregnancy**

Ectopic pregnancies account for approximately 2% of reported pregnancies (19.7 per 1,000 reported pregnancies). Up to 10% of pregnancies reported in clinical studies of routine use of progestin-only contraceptives are ectopic.  A history of ectopic pregnancy need not be considered a contraindication to use of this emergency contraceptive method.  Health providers, however, should be alert to the possibility of an ectopic pregnancy in women who become pregnant or complain of lower abdominal pain after taking Plan B®.

**PRECAUTIONS**

**Pregnancy**

Many studies have found no effects on fetal development associated with long-term use of contraceptive doses of oral progestins (POPs).  The few studies of infant growth and development that have been conducted with POPs have not demonstrated significant adverse effects.

**STD/HIV**

Plan B®, like progestin-only contraceptives, does not protect against HIV infection (AIDS) and other sexually transmitted diseases.

**Physical Examination and Follow-up**

A physical examination is not required prior to prescribing Plan B®.  A follow-up physical or pelvic examination, however, is recommended if there is any doubt concerning the general health or pregnancy status of any woman after taking Plan B®.

**Carbohydrate Metabolism**

The effects of Plan B® on carbohydrate metabolism are unknown. Some users of progestin-only oral contraceptives (POPs) may experience slight deterioration in glucose tolerance, with increases in plasma insulin; however, women with diabetes mellitus who use POPs do not generally experience changes in their insulin requirements.  Nonetheless, diabetic women should be monitored while taking Plan B®.

**Drug Interactions**

Theoretically, the effectiveness of low-dose progestin-only pills is reduced by hepatic enzyme-inducing drugs such as the anticonvulsants phenytoin, carbamazepine, and barbiturates, and the antituberculosis drug rifampin.  No significant interaction has been found with broad-spectrum antibiotics.  It is not known whether the efficacy of Plan B® would be affected by these or any other medications.

**Nursing Mothers**

Small amounts of progestin pass into the breast milk in women taking progestin-only pills for long-term contraception resulting in steroid levels in infant plasma of 1-6% of the levels of maternal plasma.  However, no adverse effects due to progestin-only pills have been found on breastfeeding performance, either in the quality or quantity of the milk, or on the health, growth or development of the infant.

**Pediatric Use**
Safety and efficacy of progestin-only pills have been established in women of reproductive age for long-term contraception.  Safety and efficacy are expected to be the same for postpubertal adolescents under the age of 16 and for users 16 years and older.  Use of Plan B[®] emergency contraception before menarche is not indicated.

**Fertility Following Discontinuation**
The limited available data indicate a rapid return of normal ovulation and fertility following discontinuation of progestin-only pills for emergency contraception and long-term contraception.

**ADVERSE REACTIONS**
The most common adverse events in the clinical trial for women receiving Plan B[®] included nausea (23%), abdominal pain (18%), fatigue (17%), headache (17%), and menstrual changes. The table below shows those adverse events that occurred in ≥5% of Plan B[®] users.

**Table 3  Adverse Events in ≥5% of Women, by % Frequency**

| Most Common Adverse Events | Plan B[®] Levonorgestrel N=977 (%) |
|---|---|
| Nausea | 23.1 |
| Abdominal Pain | 17.6 |
| Fatigue | 16.9 |
| Headache | 16.8 |
| Heavier Menstrual Bleeding | 13.8 |
| Lighter Menstrual Bleeding | 12.5 |
| Dizziness | 11.2 |
| Breast Tenderness | 10.7 |
| Other complaints | 9.7 |
| Vomiting | 5.6 |
| Diarrhea | 5.0 |

Plan B[®] demonstrated a superior safety profile over the Yuzpe regimen for the following adverse events:
- Nausea:  Occurred in 23% of women taking Plan B[®] (compared to 50% with Yuzpe)
- Vomiting:  Occurred in 6% of women taking Plan B[®] (compared to 19% with Yuzpe)

**DRUG ABUSE AND DEPENDENCE**

There is no information about dependence associated with the use of Plan B®.

**OVERDOSAGE**

There are no data on overdosage of Plan B®, although the common adverse event of nausea and its associated vomiting may be anticipated.

**DOSAGE AND ADMINISTRATION**

One tablet of Plan B® should be taken orally <u>as soon as possible</u> within 72 hours after unprotected intercourse.  The second tablet should be taken 12 hours after the first dose. Efficacy is better if Plan B® is taken as directed as soon as possible after unprotected intercourse. Plan B® can be used at any time during the menstrual cycle.

The user should be instructed that if she vomits within one hour of taking either dose of medication she should contact her health care professional to discuss whether to repeat that dose.

**HOW SUPPLIED**

**Plan B**® (Levonorgestrel) Tablets, 0.75 mg are available for a single course of treatment in PVC/aluminum foil blister packages of two tablets each.  The tablet is white, round and marked: INOR.

Available as:
Unit-of-use            NDC 51285-038-93
Store Plan B® tablets at controlled room temperature, 20° to 25°C (68° to 77°F); excursions permitted between 15° to 30°C (59° to 86°F) [See USP].

Mfg. by Gedeon Richter, Ltd., Budapest, Hungary
for Duramed Pharmaceuticals, Inc.
Subsidiary of Barr Pharmaceuticals, Inc.
Pomona, New York 10970
Phone: 1-800-330-1271          Website: www.go2planb.com
Revised August 2006
BR- 038 / 21000382503

# Calendar No. 898

| 82d Congress<br>*1st Session* | SENATE | Report<br>No. 946 |
|---|---|---|

## AMENDING SECTIONS 303 (C) AND 503 (B) OF THE FEDERAL FOOD, DRUG, AND COSMETIC ACT

---

October 12 (legislative day, October 1), 1951.—Ordered to be printed

---

Mr. Humphrey, from the Committee on Labor and Public Welfare, submitted the following

## REPORT

[To accompany H. R. 3298]

The Committee on Labor and Public Welfare, to whom was referred the bill (H. R. 3298) to amend section 503 (b) of the Federal Food, Drug, and Cosmetic Act, as amended, having considered the same, report favorably thereon with amendments and recommend that the bill, as amended, do pass.

The amendments are as follows:

(1) On page 3, line 5, strike out the words "or otherwise without examination of the patient" and insert in lieu thereof a comma.

(2) On page 3, lines 19–22, strike out the words "or any other statement which represents or implies that the dispensing of the drug without the prescription of a licensed practitioner is prohibited."

(3) On page 4, between lines 5 and 6, insert a new section 2, to read as follows:

Sec. 2. Subsection (c) of section 303 of the Federal Food, Drug, and Cosmetic Act, as amended, is amended by inserting before the period a semicolon and the following: "or (4) for having violated section 301 (b), (c), or (k) by failure to comply with section 502 (f) in respect to an article received in interstate commerce to which neither section 503 (a) nor section 503 (b) (1) is applicable, if the delivery or proffered delivery was made in good faith and the labeling at the time thereof contained the same directions for use and warning statements as were contained in the labeling at the time of such receipt of such article."

(4) On page 4, line 6, strike out the figure "2" and insert in lieu thereof the figure "3."

### INTRODUCTION

This bill amends the Federal Food, Drug, and Cosmetic Act to deal more directly and realistically with the labeling and dispensing of drugs that may be sold only upon the prescription of licensed practitioners. It has a twofold objective: (1) to protect the public from abuses in the sale of potent prescription drugs; and (2) to relieve retail

**2**    AMENDING THE FEDERAL FOOD, DRUG, AND COSMETIC ACT

pharmacists and the public from burdensome and unnecessary restrictions on the dispensing of drugs that are safe for use without the supervision of a physician.   The committee believes that the bill, as amended, will serve to eliminate much confusion and dissatisfaction caused by ambiguities in the present provisions of the act, and will benefit drug manufacturers, retail druggists, medical practitioners, and the public.

In its consideration of this bill, the Committee has had the benefit of careful study of its provisions by its standing Subcommittee on Health.   The subcommittee carefully and thoroughly explored the need for such legislation at this time, and examined the manner in which the provisions of the bill are adapted to deal with the serious problems which have been shown to exist in connection with the labeling and dispensing of both "prescription" and "over-the-counter" drugs.   Hearings on the bill were held before the subcommittee from September 11 through September 13, 1951.   Favorable action on the bill was urged at the hearing by the Federal Security Administrator and by the Food and Drug Administration, the agency of the Government that administers and enforces the Federal Food, Drug, and Cosmetic Act.   In addition, virtually all segments of the drug industry, including the principal associations of drug manufacturers, the retail druggists, and the licensed pharmacists were represented at the hearing and submitted testimony which clearly shows that this bill is necessary legislation and will do much to make the Act a fairer and more effective instrument for protecting the public against abuses in the labeling and dispensing of drugs.   A representative of the American Medical Association testified at the hearing in support of the bill.

The hearing held before the subcommittee developed the fact that while there was virtually unanimity of opinion of those who testified as to the need for basic changes in the law governing the labeling and dispensing of "prescription" drugs, there were two principal issues in controversy.

1. The first area of controversy was over a proposal to authorize the Federal Security Administrator to list by name or class the "dangerous" drugs that may be sold only on prescription.   The subcommittee had before it for consideration at the time of the hearing, not only this bill, which has been passed by the House of Representatives, but also the companion Senate bill (S. 1186), and amendments in the nature of a substitute therefor, introduced by Senator Humphrey.   The principal difference between the bill as passed by the House of Representatives and Senator Humphrey's amendments in the nature of a substitute, had to do with the requirement under which, as part of the definition of so-called dangerous drugs, an administrative determination would have been necessary thus to classify a drug.   The amendments in the nature of a substitute for S. 1186 also set forth detailed procedures, including administrative hearings to be followed in connection with the making of administrative determinations referred to, together with provisions for judicial review of such determinations.

Prior to the hearing, the provisions for administrative listing of so-called dangerous drugs were vigorously supported by the National Association of Retail Druggists, and equally vigorously opposed by the several associations of drug manufacturers, including the American Pharmaceutical Manufacturers' Association, the American Drug Man-

AMENDING THE FEDERAL FOOD, DRUG, AND COSMETIC ACT    **3**

ufacturers Association, and the Proprietary Association. At the hearing, however, a statement was submitted on behalf of all four of these associations, indicating an agreement on their part that the controversial provisions for administrative listing of so-called dangerous drugs might be eliminated. The four associations, at the same time, proposed two new amendments to the bill. This agreement had the effect of eliminating one of the principal areas of controversy, particularly in view of the fact that the subcommittee was assured by the Food and Drug Administration and the Federal Security Administrator that the bill, while not in their view the best solution, would be workable in the form proposed under the agreement. The subcommittee recommended to the Committee on Labor and Public Welfare, therefore, that the provisions of the House bill which omit the administrative listing provisions, rather than the provisions of the amendments in the nature of a substitute for S. 1186 which include such provisions, be favorably reported to the Senate. The subcommittee further recommended, in reporting favorably on the House bill, that the bill be amended to include the two amendments proposed by the associations of retail druggists and drug manufacturers under the agreement referred to above. The intent and effect of these amendments are discussed hereafter in this report.

2. The other principal area of controversy which developed at the hearing arose with respect to certain language of the bill which was objected to by the representative of a firm engaged in selling through the mail to epileptic patients living throughout the United States a medication comprised principally of phenobarbital. Although the language in question was included in the legislation as originally introduced in both the House of Representatives and the Senate, in the bill as reported to the House of Representatives by the House Interstate and Foreign Commerce Committee and in the bill as passed in the House of Representatives, no issue had been raised concerning this language prior to the hearing before the subcommittee. The subcommittee, however, felt that the language might safely be omitted from the bill. Accordingly, it proposed, and the committee recommends, that this language be stricken. The effect of this amendment is discussed elsewhere in this report.

#### WHAT THE BILL DOES

As has been pointed out, the bill amends the Federal Food, Drug, and Cosmetic Act so that its provisions will be better adapted to deal realistically with the labeling and dispensing of drugs that may be sold only upon the prescription of licensed practitioners. Its provisions are remedial in the sense that they are intended to protect the public from abuses in the sale of potent prescription medicines. They will also relieve retail pharmacists of unnecessary restrictions on the dispensing of drugs that are safe for use without medical supervision.

*Prescription drugs*

The bill provides a statutory definition of prescription drugs; it expressly forbids their sale without a prescription; it specifies how they are to be labeled both at the time of interstate shipment and at the time of ultimate dispensing; and it prohibits unauthorized refilling of prescriptions for them.

**4**    AMENDING THE FEDERAL FOOD, DRUG, AND COSMETIC ACT

There are three classes of drugs covered by the statutory definition. The first includes the habit-forming drugs subject to section 502 (d) of the present statute. These are such drugs as the barbiturates. The third class includes all new drugs restricted to prescription sale by effective new-drug applications under section 505 of the present statute. There is no controversy whatever about these two classes. The second class includes any drug which "because of its toxicity or other potentiality for harmful effect, or the method of its use, or the collateral measures necessary to its use, is not safe for use except under the supervision of a practitioner licensed by law to administer such drugs."

This definition of so-called dangerous drugs is contained in paragraph (b) (1) (B) of the bill. It is substantially the same as the administrative definition now contained in the regulations issued by the Federal Security Administrator under the provisions of the Federal Food, Drug, and Cosmetic Act. The proposed definition, however, omits the reference to "efficacious" for use, as well as "safe" for use, without the supervision of a medical practitioner in order to be eligible for over-the-counter sale. This omission is not intended to mean that the only matter to be considered in applying the definition is whether or not a particular drug is poisonous.

The word "safe," as used in the definition, is intended to have its ordinary meaning. For example, nontoxic drugs like quinidine sulfate, intended for heart disease, or penicillin, for infections, are not safe for self-medication because their unsupervised use may indirectly cause injury or death. The language of the definition clearly shows that toxicity is only one factor to be considered by the courts in determining whether a particular drug is safe for use without medical supervision. The definition requires the court to consider also other potentialities for harmful effect, the method by which the drug is used, and the collateral measures that may be necessary in order to use the drug safely. When this language is given judicial interpretation consistent with the over-all purpose of the Federal Food, Drug, and Cosmetic Act to protect the public health it will effectively restrict to prescription sale all drugs that require professional supervision for their use.

In order to give this general definition a more precise meaning so that it may be applied with greater uniformity by the drug trade the Administrator can exercise the authority he has under section 701 (a) of the Federal Food, Drug, and Cosmetic Act to issue interpretative regulations. It is to be understood that the inclusion of the statutory definition does not, of course, in any way derogate from the Administrator's authority to interpret and enforce the definition through the issuance of any regulations necessary or appropriate to protect the public from indiscriminate dispensing of drugs over the counter when they may be unsafe for use without the supervision of a practitioner licensed by law to administer such drugs.

As previously stated, the committee considered S. 1186 together with H. R. 3298. S. 1186 would have authorized the Federal Security Administrator to list by name or class the drugs which he considered within the statutory definition. The grant of such administrative authority was objected to as an unnecessary regulation of the drug industry, and the committee concluded that administrative listing is not necessary at this time. It was felt that the statutory definition,

together with the authority to make interpretative regulations, could bring an end to the existing confusion in drug labeling and that uniformity can be achieved through cooperative efforts of the drug industry and the Food and Drug Administration working under the statutory plan. If the present confusion is not ended by this legislation it will then be time enough to consider the need for the administrative listing approach.

All drugs covered by the three classifications of prescription drugs must bear a label containing the statement "Federal law prohibits dispensing without prescription." This gives the retail druggist clear notice that he will be in violation of the Federal Food, Drug, and Cosmetic Act if he dispenses any drug so labeled without a prescription. This bill also specifies what information must be contained upon the label of the package dispensed to the patient. That label must contain the name and address of the dispenser, the serial number and date of the prescription or of its filling, the name of the prescriber, and, if stated in the prescription, the name of the patient, and the directions for use and cautionary statements, if any, contained in the prescription.

This bill strengthens the controls over the habit-forming barbiturates. The problems of misuse of these drugs to the detriment of the public—especially of young people—are growing and must be controlled in the public interest. The bill requires that they be sold only on prescription and forbids unauthorized refills of prescriptions for them. In this, it is a definite and clear step forward. It is felt, however, that these drugs pose a special problem not common to all drugs because they are desired by addicts for nonmedical use. This will call for their special treatment, and the committee wishes it understood that in recommending the passage of this bill, as amended, it does so with the knowledge that further legislative consideration must be given to adequate barbiturate controls.

The bill does not relieve any person from any requirements of law, now existing or hereafter adopted, with respect to drugs covered by the narcotic control laws. Paragraph (5) of section 1 makes this clear.

*Oral prescriptions*

The present law does not recognize the practice of dispensing drugs on oral prescriptions. The committee feels that in this respect the law needs modification and clarification for the convenience of the public, the retail druggist, and the physician. The filling and refilling of prescriptions upon oral or telephone orders with proper safeguards should be permitted, and this bill gives statutory recognition to the practice of telephone dispensing. It permits oral prescriptions for all drugs. However, in the case of habit-forming drugs, dangerous drugs, and new drugs limited to prescription sale, an oral prescription would have to be reduced promptly to writing and kept on file by the pharmacist. The oral order may be communicated to the dispenser by the prescriber himself or under his express authority.

*Oral prescriptions for habit-forming drugs*

The committee believes that the term "oral prescription," as used in the bill in connection with habit-forming drugs to which section 502 (d) of the act applies, should be given a construction which will assure that these drugs are used only upon the express order of a practitioner licensed by law to administer them. In fact, certain of

**6**    AMENDING THE FEDERAL FOOD, DRUG, AND COSMETIC ACT

these drugs, such as narcotics subject to the Harrison Narcotics Act may be dispensed only on a written prescription of a licensed practitioner, and this requirement is expressly preserved by the bill. (See par. (5) of the new sec. 503 (b).)    The public interest clearly requires that other habit-forming drugs be dispensed and used only under the close and immediate supervision of a licensed practitioner.    Accordingly, it is the intention of the committee that the term "oral prescription" as applied to these drugs, means an order communicated orally to the pharmacist by a practitioner licensed by law to administer such drugs, expressly prescribing such a drug, which is reduced promptly to writing and filed by the pharmacist.    The Food and Drug Administration, within the limitations of its staffing, can check pharmacists' records to make sure that all habit-forming drugs sold are accounted for by prescriptions on file.    The pharmacist, before he dispenses any such drug on oral order, must obtain satisfactory evidence, on the basis of consultation with the licensed practitioner or otherwise, that the order has been expressly authorized in each case by such practitioner.

·    The Federal Security Agency may adopt regulations needed for the efficient enforcement of this provision, and may find it desirable to require special records for any habit-forming drugs dispensed so that pharmacists and enforcement officials alike can readily detect any possible abuses of the oral prescription privilege extended for such drugs.

*Refilling prescriptions*

The bill, as amended, deals expressly with the troublesome problem of refilling prescriptions.    Under the present law a drug dispensed by refilling a prescription without the knowledge or consent of the prescriber is misbranded and the dispenser is liable to criminal prosecution.    The committee concluded that these provisions are too stringent and should be modified.    There is no reason why the law should prohibit the refilling of prescriptions for drugs that are not dangerous and are suitable for use by a layman without medical supervision. The bill provides that prescriptions for such drugs may be freely refilled.    But, here again, as to drugs which are habit-forming, or which are dangerous, or which are restricted by new drug applications to use under medical supervision, the bill requires that prescriptions may be refilled only with the prescriber's express authorization. This authorization may be either written or oral, but if it is given orally the dispenser must promptly reduce it to writing and keep it on file.

The provisions relating to the refilling of prescriptions are needed to meet a serious public health problem which has arisen from the indiscriminate refilling of prescriptions for dangerous and habit-forming drugs.    A witness for the Food and Drug Administration cited cases in which death had occurred as a consequence of unauthorized prescription refills.    The use of dangerous and habit-forming drugs must be under the supervision of the prescribing physician.    This bill is intended to require that the licensed practitioner, if he has not authorized the refill in writing, be consulted by the pharmacist and the refill be authorized by such practitioner before any prescription for a drug that is limited to prescription sale may be refilled.

### EFFECT OF COMMITTEE AMENDMENS

Amendment (1) was proposed by a firm engaged in selling through the mails to epileptic patients living throughout the United States a medication comprised principally of phenobarbital. Other provisions of the bill, to which the firm did not object, clarify and simplify the provisions of existing law regarding the labeling, sale, and dispensing of habit-forming and other dangerous drugs that should be sold only on prescription. These provisions are adequate to enable the Food and Drug Administration to compel such firms through appropriate court action, if necessary, to operate in a manner consistent with the public interest. The committee is aware of the obvious dangers to the public interest in the sale of barbiturates, including phenobarbital, without immediate and close medical supervision. The Food and Drug Administration has a responsibility in connection with the elimination of such dangers. This bill greatly strengthens the Administration's hand in discharging that responsibility.

The other two amendments were proposed by the combined drug trade in a statement signed by the National Association of Retail Druggists, the American Pharmaceutical Manufacturers' Association, the American Drug Manufacturers Association, and the Proprietary Association.

Amendment (2) was recommended because the associations felt the language it strikes out was of uncertain meaning and added nothing of importance to the bill. In any event, should a person place a statement on the label of a drug entirely safe for self-medication representing or implying that dispensing it without a prescription is prohibited by Federal law, that drug would be misbranded under the provision of law, section 502 (a), which forbids false or misleading labeling statements. Striking the language objected to does not relieve any manufacturer, regardless of the way in which he does business, from compliance with the requirement of section 502 (f) that all drugs not limited to prescription sale must bear adequate warnings and adequate directions for use telling the purchasing public what the drug is to be used for and how it is to be taken to accomplish the beneficial effects it is intended to have.

Amendment (3) was proposed to emphasize the fact that the responsibility for preparing adequate directions for use and appropriate warnings against misuse in the labeling of drugs that may be sold without a prescription is upon the manufacturer and not the retail druggist. It does nothing more than free the retail druggist of responsibility for supplementing the labeling of some manufacturers' drugs to give the public adequate directions for use and warnings against misuse. The druggist could rely in good faith upon the manufacturers' labeling for compliance with these requirements of the existing law. The amendment offers the druggist no protection against violations which arise if he sells a dangerous drug covered by paragraph (1) of the bill without meeting the prescription requirements.

Amendment (4) is a technical renumbering amendment.

### EFFECTIVE DATE

Section 3 of the amended bill provides that its provisions shall take effect 6 months after the date of its enactment. This postponement

**8**    AMENDING THE FEDERAL FOOD, DRUG, AND COSMETIC ACT

of the effective date is considered necessary to permit manufacturers to meet the new labeling requirements.

Section 1 of the bill amends the Federal Food, Drug, and Cosmetic Act by substituting for subsection (b) of section 503, relating to the labeling and dispensing of prescription drugs, a new subsection defining drugs that may be dispensed only on prescription and specifying the conditions under which such drugs may be dispensed.

*Prescription drugs*

Under paragraph (1) of the new subsection (b) prescription drugs are defined as drugs intended for use by man which fall within any one of three different categories. In limiting prescription drugs to those intended for use by man this new subsection differs from the present law, which refers to prescription drugs to include not only those dispensed on prescription of physicians and dentists, but also those dispensed on prescription of a veterinarian. Under the committee bill, drugs intended for use under the supervision of a veterinarian will not require a prescription, although it will be possible under section 502 (f) to exempt such drugs from adequate directions for use if they are to be used by or under the supervision of a veterinarian. In the absence of any exempting regulations, these drugs will be subject to the labeling and dispensing requirements of the act applicable to over-the-counter drugs.

The three categories of prescription drugs defined as such in the bill are: (*a*) habit-forming drugs to which section 502 (d) of the act relating to drugs containing any narcotic or hypnotic substance, including barbituric acid, or habit-forming chemical derivatives thereof, is applicable; (*b*) drugs which, because of their toxicity or other potentiality for harmful effect, or the methods of their use, or the collateral measures necessary to their use, are not safe except under the supervision of a practitioner licensed by law to administer such drugs; or (*c*) drugs which are limited by an effective application under section 505 of the act, relating to new drugs, to use under professional supervision.

Included in the first of these three categories are not only the habit-forming narcotics and chemical derivatives thereof, but also barbituric acid and its habit-forming derivatives, such as amytal, phenobarbital, pentobarbital, and the like. This category includes all of the drugs and derivatives thereof specified in section 502 (d) of the act and the regulations thereunder. Dispensing of these drugs must not only comply with the provisions of the bill, but also must conform to the requirements of that section, and the interstate label must bear the name and quantity or proportion of the habit-forming drug or derivatives and in juxtaposition therewith the statement: "Warning—May be habit forming."

The second category of prescription drugs, defined in subparagraph (B) of paragraph (1) of the new subsection (b) includes the so-called dangerous drugs. As noted elsewhere in this report, the phrase "not safe," as used in this subparagraph, is intended to have its ordinary meaning. Furthermore, in determining whether a drug is safe for use without medical supervision, there must be taken into consideration

not only the drug's toxicity, but also other potentialities for harmful effect, the method by which it is used, and the collateral measures necessary to its safe use. The broad language of the definition contained in this subparagraph is intended to comprehend all drugs that in fact should be administered under medical supervision in order to insure their safe use. Such difficult borderline cases as may arise under this definition can be dealt with under the interpretative and rule-making power provided for in section 701 (a) of the act.

The third category of drugs defined as "prescription" drugs includes all new drugs restricted to prescription sale by effective new drug applications under section 505 of the act.

*Written and oral prescriptions and refills*

Paragraph (1) of the new subsection (b) also provides that a "prescription" drug (any drug falling in any one of the three categories referred to above) shall be dispensed only (1) upon a written prescription of a practitioner licensed by law to administer such drug, or (2) upon an oral prescription of such a practitioner, communicated by him or under his express authority to the pharmacist, if such prescription is promptly reduced to writing and filed by the pharmacist, or (3) by refilling any such written or oral prescription if such refilling is authorized by or under the express authority of the practitioner either in the original prescription or by oral order, which is reduced promptly to writing and filed by the pharmacist. The provisions with respect to oral prescriptions and refills do not apply, however, in the case of narcotics subject to the Internal Revenue Code (Harrison Narcotic Act), since subparagraph (5) of the new subsection (b) expressly safeguards the provisions of that act, and under those provisions and the regulations of the Bureau of Narcotics such drugs may be dispensed only on written prescription. Also, as pointed out elsewhere, with respect to other habit-forming drugs, oral prescriptions and refills are limited to situations in which the pharmacist obtains satisfactory evidence, on the basis of consultation with a licensed practitioner or otherwise, that the prescription or refill has been expressly authorized by such practitioner. A violation of the prescription requirements of paragraph (1) of the new subsection (b) is, under the provisions of this paragraph, deemed to be an act which results in the drug being misbranded while held for sale.

*Labeling of prescription drugs*

Paragraph (2) of the new subsection (b) provides that a drug dispensed on prescription shall be exempt from the provisions of the act relating to the misbranding of drugs except those which specify that a drug shall be deemed to be misbranded if its labeling is false or misleading in any particular (sec. 502 (a)), if it is an imitation of another drug or is offered for sale under the name of another drug (sec. 502 (i) (2) and (3)), if it is, or purports to be, or is represented as a drug composed wholly or partly of insulin or of penicillin or certain other antibiotics except under certain conditions (sec. 502 (k) and (l)). These provisions continue to apply to any drug subject to the act, whether sold over-the-counter or on prescription. Similarly, the packaging requirements set forth in section 502 (g) and (h) apply to all such drugs. Prescription drugs must, however, bear at the time of dispensing a label containing the name and address of the dispenser,

**10**   AMENDING THE FEDERAL FOOD, DRUG, AND COSMETIC ACT

the serial number and the date of the prescription or of its filling, the name of the practitioner, if stated in the prescription the name of the patient, and the directions for use and cautionary statements, if any, stated in the prescription. The exemption provided for by this paragraph does not apply to any drug dispensed in the course of the conduct of a business of dispensing drugs pursuant to diagnosis by mail, or to a drug dispensed in violation of paragraph (1) of the subsection.

*Exempt narcotics and similar drugs*

Under paragraph (3) of the new subsection (b) the Administrator may by regulation remove habit-forming drugs, as defined in section 502 (d), and new drugs, from the prescription requirements contained in paragraph (1) of the subsection when these requirements are not necessary for the protection of the public health.

*Prescription legend*

Paragraph (4) of the new subsection requires that, in addition to the labeling requirements in the case of prescription drugs specified in paragraph (2) of the subsection, the interstate label on such drugs must bear the statement "Caution: Federal law prohibits dispensing without prescription." On the other hand, over-the-counter drugs are forbidden to bear a label containing this caution statement. A prescription drug, the label on which does not bear the specified caution statement, is deemed to be misbranded. So, too, is an over-the-counter drug, the label on which bears this or a substantially similar statement.

*Narcotics and marihuana*

Paragraph (5) of the new subsection provides that compliance with the requirements of the bill does not relieve any person from any other requirement prescribed by or under authority of law with respect to drugs now or hereafter within the classifications defined in the Harrison Narcotic Act (sec. 3220 of the Internal Revenue Code, 26 U. S. C. 3220), or marihuana, as defined in section 3238 (b) of the Internal Revenue Code (26 U. S. C. 3238 (b)).

*Good faith defense for retail druggists*

Section 2 of the bill amends section 303 of the act, which specifies the penalties applicable to violations of the act. It adds to the several defenses available under subsection (c) of section 303 a new defense which has the effect of relieving from liability because of misbranding under section 502 (f) of the act any dispenser who makes delivery or proffers delivery of a drug in good faith if the labeling on such drug at the time of such delivery or proffered delivery contained the same directions for use and warning statements as were contained in the labeling at the time of receipt of the drug by such dispenser. This defense, however, is not applicable in the case of a drug which, in accordance with the practice of the trade, is to be processed, labeled, or repacked in substantial quantities at establishments other than those where originally processed or packed, and is not applicable to a prescription drug.

*Effective date*

Section 3 contains an effective date provision. In order to enable the drug industry to adapt its operations to the requirements specified in the bill, and to give the Food and Drug Administration time in

AMENDING THE FEDERAL FOOD, DRUG, AND COSMETIC ACT   11

which to develop procedures necessary to implement administration of the bill, it is provided that the provisions of the bill will not go into effect until 6 months have elapsed after the date of its enactment.

## CHANGES IN EXISTING LAW

In compliance with subsection 4 of rule XXIX of the Standing Rules of the Senate, changes in the existing law made by the bill are shown as follows: (Existing law proposed to be omitted is enclosed in black brackets; new matter is printed in italics, existing law in which no change is proposed is shown in roman).

### FEDERAL FOOD, DRUG AND COSMETIC ACT

#### PENALTIES

SEC. 303. (a) Any person who violates any of the provisions of section 301 shall be guilty of a misdemeanor and shall on conviction thereof be subject to imprisonment for not more than one year, or a fine of not more than $1,000, or both such imprisonment and fine; but if the violation is committed after a conviction of such person under this section has become final such person shall be subject to imprisonment for not more than three years, or a fine of not more than $10,000, or both such imprisonment and fine.

(b) Notwithstanding the provisions of subsection (a) of this section, in case of a violation of any of the provisions of section 301, with intent to defraud or mislead, the penalty shall be imprisonment for not more than three years, or a fine of not more than $10,000, or both such imprisonment and fine.

(c) No person shall be subject to the penalties of subsection (a) of this section, (1) for having received in interstate commerce any article and delivered it or proffered delivery of it, if such delivery or proffer was made in good faith, unless he refuses to furnish on request of an officer or employee duly designated by the Administrator the name and address of the person from whom he purchased or received such article and copies of all documents, if any there be, pertaining to the delivery of the article to him; or (2) for having violated section 301 (a) or (d), if he establishes a guaranty or undertaking signed by, and containing the name and address of, the person residing in the United States from whom he received in good faith the article, to the effect, in case of an alleged violation of section 301 (a), that such article is not adulterated or misbranded, within the meaning of this Act, designating this Act, or to the effect, in case of an alleged violation of section 301 (d), that such article is not an article which may not, under the provisions of section 404 or 505, be introduced into interstate commerce; or (3) for having violated section 301 (a), where the violation exists because the article is adulterated by reason of containing a coal-tar color not from a batch certified in accordance with regulations promulgated by the Administrator under this Act, if such person establishes a guaranty or undertaking signed by, and containing the name and address of, the manufacturer of the coal-tar color, to the effect that such color was from a batch certified in accordance with the applicable regulations promulgated by the Administrator under this Act; *or (4) for having violated section 301 (b), (c) or (k) by failure to comply with section 502 (f) in respect to an article received in interstate commerce to which neither section 503 (a) nor section 503 (b) (1) is applicable, if the delivery or proffered delivery was made in good faith and the labeling at the time thereof contained the same directions for use and warning statements as were contained in the labeling at the time of such receipt of such article.*

#### EXEMPTIONS IN CASE OF DRUGS AND DEVICES

SEC. 503. (a) The Administrator is hereby directed to promulgate regulations exempting from any labeling or packing requirement of this Act drugs and devices which are, in accordance with the practice of the trade, to be processed, labeled, or repacked in substantial quantities at establishments other than those where originally processed or packed, on condition that such drugs and devices are not adulterated or misbranded under the provisions of this Act upon removal from such processing, labeling, or repacking establishment.

**12**   AMENDING THE FEDERAL FOOD, DRUG, AND COSMETIC ACT

〔(b) A drug dispensed on a written prescription signed by a physician, dentist, or veterinarian (except a drug dispensed in the course of the conduct of a business of dispensing drugs pursuant to diagnosis by mail), shall if—

(1) such physician, dentist, or veterinarian is licensed by law to administer such drug, and

(2) such drug bears a label containing the name and place of business of the dispenser, the serial number and date of such prescription, and the name of such physician, dentist, or veterinarian,

be exempt from the requirements of section 502 (b) and (e), and (in case such prescription is marked by the writer thereof as not refillable or its refilling is prohibited by law) of section 502 (d).〕

(b) (1) A drug intended for use by man which—

(A) is a habit-forming drug to which section 502 (d) applies; or

(B) because of its toxicity or other potentiality for harmful effect, or the method of its use, or the collateral measures necessary to its use, is not safe for use except under the supervision of a practitioner licensed by law to administer such drug; or

(C) is limited by an effective application under section 505 to use under the professional supervision of a practitioner licensed by law to administer such drug,

shall be dispensed only (i) upon a written prescription of a practitioner licensed by law to administer such drug, or (ii) upon an oral prescription of such practitioner which is reduced promptly to writing and filed by the pharmacist, or (iii) by refilling any such written or oral prescription if such refilling is authorized by the prescriber either in the original prescription or by oral order which is reduced promptly to writing and filed by the pharmacist. The act of dispensing a drug contrary to the provisions of this paragraph shall be deemed to be an act which results in the drug being misbranded while held for sale.

(2) Any drug dispensed by filling or refilling a written or oral prescription of a practitioner licensed by law to administer such drug shall be exempt from the requirements of section 502, except paragraphs (a), (i) (2) and (3), (k), and (l), and the packaging requirements of paragraphs (g) and (h), if the drug bears a label containing the name and address of the dispenser, the serial number and date of the prescription or of its filling, the name of the prescriber, and, if stated in the prescription, the name of the patient, and the directions for use and cautionary statements, if any, contained in such prescription. This exemption shall not apply to any drug dispensed in the course of the conduct of a business of dispensing drugs pursuant to diagnosis by mail, or to a drug dispensed in violation of paragraph (1) of this subsection.

(3) The Administrator may by regulation remove drugs subject to section 502 (d) and section 505 from the requirements of paragraph (1) of this subsection when such requirements are not necessary for the protection of the public health.

(4) A drug which is subject to paragraph (1) of this subsection shall be deemed to be misbranded if at any time prior to dispensing its label fails to bear the statement "Caution: Federal law prohibits dispensing without prescription". A drug to which paragraph (1) of this subsection does not apply shall be deemed to be misbranded if at any time prior to dispensing its label bears the caution statement quoted in the preceding sentence.

(5) Nothing in this subsection shall be construed to relieve any person from any requirement prescribed by or under authority of law with respect to drugs now included or which may hereafter be included within the classifications stated in section 3220 of the Internal Revenue Code (26 U. S. C. 3220), or to marihuana as defined in section 3238 (b) of the Internal Revenue Code (26 U. S. C. 3238 (b)).

○

Case 1:07-cv-00668-JDB     Document 13-18     Filed 06/29/2007     Page 1 of 37

| 82D CONGRESS<br>1st Session | HOUSE OF REPRESENTATIVES | REPORT<br>No. 700 |
| --- | --- | --- |

# AMENDING SECTION 503 (b) OF THE FEDERAL FOOD, DRUG, AND COSMETIC ACT

JULY 16, 1951.—Committed to the Committee of the Whole House on the State of the Union and ordered to be printed

Mr. WILLIAMS of Mississippi, from the Committee on Interstate and Foreign Commerce, submitted the following

# REPORT

[To accompany H. R. 3298]

The Committee on Interstate and Foreign Commerce, to whom was referred the bill (H. R. 3298) to amend section 503 (b) of the Federal Food, Drug, and Cosmetic Act, having considered the same, report favorably thereon with an amendment and recommend that the bill as amended do pass.

The amendment is as follows:

Strike out all after the enacting clause and insert the following:

That subsection (b) of section 503 of the Federal Food, Drug, and Cosmetic Act, as amended, is amended to read as follows:

"(b) (1) A drug intended for use by man which—

"(A) is a habit-forming drug to which section 502 (d) applies; or

"(B) because of its toxicity or other potentiality for harmful effect, or the method of its use, or the collateral measures necessary to its use, has been determined by the Administrator, on the basis of opinions generally held among experts qualified by scientific training and experience to evaluate the safety and efficacy of such drug (and, where a public hearing is required by paragraph (5), on the basis of evidence adduced at such hearing by such experts), to be safe and efficacious for use only after professional diagnosis by, or under the supervision of, a practitioner licensed by law to administer such drug; or

"(C) is limited by an effective application under section 505 to use under the professional supervision of a practitioner licensed by law to administer such drug,

shall be dispensed only (i) upon a written prescription of a practitioner licensed by law to administer such drug, or (ii) upon an oral prescription of such practitioner which is reduced promptly to writing and filed by the pharmacist, or (iii) by refilling any such written or oral prescription if such refilling is authorized by the prescriber either in the original prescription or by oral order which is reduced promptly to writing and filed by the pharmacist. The act of dispensing a drug contrary to the provisions of this paragraph shall be deemed to be an act which results in the drug being misbranded while held for sale.

"(2) Any drug dispensed by filling or refilling a written or oral prescription of a practitioner licensed by law to administer such drug shall be exempt from the

**2    AMENDING THE FEDERAL FOOD, DRUG, AND COSMETIC ACT**

requirements of section 502, except paragraphs (a), (i) (2) and (3), (k), and (l), and the packaging requirements of paragraphs (g) and (h), if the drug bears a label containing the name and address of the dispenser, the serial number and date of the prescription or of its filling, the name of the prescriber, and, if stated in the prescription, the name of the patient, and the directions for use and cautionary statements, if any, contained in such prescription. This exemption shall not apply to any drug dispensed in the course of the conduct of a business of dispensing drugs pursuant to diagnosis by mail or otherwise without examination of the patient or to a drug dispensed in violation of paragraph (1) of this subsection.

"(3) The Administrator may by regulation remove drugs subject to section 502 (d) and section 505 from the requirements of paragraph (1) of this subsection when such requirements are not necessary for the protection of the public health.

"(4) A drug which is subject to paragraph (1) of this subsection shall be deemed to be misbranded if at any time prior to dispensing its label fails to bear the statement 'Caution: Federal law prohibits dispensing without prescription'. A drug to which paragraph (1) of this subsection does not apply shall be deemed to be misbranded if at any time prior to dispensing its label bears the caution statement quoted in the preceding sentence or any other statement which represents or implies that the dispensing of the drug without the prescription of a licensed practitioner is prohibited.

"(5) Any interested person may file with the Administrator a petition proposing the making of a determination, or the modification of a determination made or proposed to be made, by the Administrator pursuant to subparagraph (B) of paragraph (1). The filing of a petition for the purpose of opposing a proposed determination that a drug is one to which such subparagraph (B) applies shall stay the operation of paragraph (1) with respect to such drug until a petition for judicial review can be filed and interim relief sought under section 10 (d) of the Administrative Procedure Act. The petition shall set forth in general terms the proposal contained therein, and shall state reasonable grounds therefor. The Administrator shall give public notice of the proposal made in the petition and shall give to all interested persons a reasonable opportunity to present their views thereon, orally or in writing, and as soon as practicable thereafter shall make public his action on the proposal. At any time prior to the thirtieth day after such action is made public, any interested person may file with the Administrator objections to such action, specifying with particularity the changes proposed, stating reasonable grounds therefor, and requesting a public hearing for the taking of evidence of experts who are qualified by scientific training and experience to testify on the question of whether the drug in question is safe and efficacious for use only after professional diagnosis by, or under the supervision of, a practitioner licensed by law to administer such drug. The Administrator shall thereupon, after appropriate notice, hold such public hearing. As soon as practicable after the hearing, the Administrator shall make his determination and issue an appropriate order. The Administrator shall make his order only after a review of the whole record and in accordance with the reliable, probative, and substantial evidence, and shall make detailed findings of the facts on which he based his order. Such order shall be subject to judicial review in accordance with the provisions of section 701 (f) and (g).

"(6) Nothing in this subsection shall be construed to relieve any person from any requirement prescribed by or under authority of law with respect to drugs now included or which may hereafter be included within the classifications stated in section 3220 of the Internal Revenue Code (26 U. S. C. 3220), or to marihuana as defined in section 3238 (b) of the Internal Revenue Code (26 U. S. C. 3238 (b))."

SEC. 2. The provisions of this Act shall take effect six months after the date of its enactment.

## WHAT THE BILL DOES

This bill amends the Federal Food, Drug, and Cosmetic Act to accomplish two broad objectives:

(1) To strengthen the protection of the public health against dangerous abuses in the sale of potent prescription drugs;

(2) To relieve retail druggists and the public from burdensome and unnecessary restrictions on the dispensing of drugs which may be safely used without supervision by a physician.

The bill does this by placing in the Federal Food, Drug, and Cosmetic Act express provisions which will eliminate confusion and dissatisfaction which exist under the present rather general provisions dealing with the labeling and dispensing of drugs which may be sold only on prescription and drugs which may be sold over the counter.

The bill, as amended, is designed to solve these labeling and dispensing problems in the following ways:

1. By providing for a clear-cut method of distinguishing between "prescription" drugs (that is, drugs which are not suitable for self-medication because they should be used only under the supervision of a physician, and which therefore should be dispensed only on prescription) and "over-the-counter" drugs (that is, drugs which are suitable for self-medication, and which therefore should be permitted to be dispensed freely "over-the-counter"), and by requiring that drugs be so labeled as to indicate to the retail druggist and to the general public into which of these two classes they fall.

Under the present law, and the regulations issued thereunder, the initial responsibility is upon the manufacturer to decide whether his drug is unsuitable for self-medication and therefore must be labeled with a caution legend (that is, a warning that the drug in question may be dispensed only by or on prescription of a physician) and may be sold only on prescription, or whether his drug is suitable for self-medication and therefore must be labeled with adequate directions for use and may be sold freely over the counter. Lack of uniformity among manufacturers in interpreting the present law and regulations has led to great confusion in the labeling of drugs for prescription sale and for over-the-counter sale.

2. By expressly setting forth in the statute the restrictions applicable to the dispensing of "prescription" drugs.

At present the restrictions on dispensing "prescription" drugs are not specifically stated in the statute. As hereafter explained, they result from conditions which have been imposed by the Federal Security Administrator in connection with certain exemptions which he is authorized to grant under the present law.

3. By authorizing the filling and refilling of telephone prescriptions under appropriate safeguards.

The present law recognizes written and signed prescriptions only, in complete disregard of the need for the use of the telephone in prescribing medicines.

4. By specifying in detail the conditions under which pharmacists may refill prescriptions.

Under the present law no prescription may be lawfully refilled unless refilling is specifically authorized in writing by the prescribing physician. This makes it unlawful for the pharmacist to refill prescriptions without written authorization even for drugs which are suitable for self-medication. The bill would permit the refilling of prescriptions for such drugs without authorization from the physician. However, in the case of dangerous drugs, habit-forming drugs, and new drugs which are limited to use under medical supervision, it would prohibit refilling unless the prescribing physician specifically authorizes the refill.

**4**    AMENDING THE FEDERAL FOOD, DRUG, AND COSMETIC ACT

### COMMITTEE HEARINGS

The committee held extensive hearings on this bill.   The testimony amply supports the conclusion that legislation is urgently needed and it is believed that the provisions of the bill, as amended, will further the protection of the public health by meeting the complex problems which were brought to the committee's attention in the hearings.

The committee has received communications with respect to this proposed legislation from the Federal Security Administrator, the Deputy Attorney General, and the Administrative Office of the United States Courts.   These communications are printed in an appendix to this report.

### GENERAL STATEMENT

*Prescription drugs.*—There is urgent need for affirmative and clear provisions in the law to deal with the labeling of prescription drugs and the restrictions upon their sale.

The present law prohibits the over-the-counter sale of drugs labeled as being for prescription sale only, but it does this in the following indirect manner.

A drug is required by present law to bear "adequate directions for use."   This requirement may be relaxed by regulations of the Federal Security Administrator when such directions are not necessary for the protection of the public health.   Drugs suitable for use only by or under the direction of a licensed practitioner have been exempted from the adequate directions requirement on condition that they be labeled "Caution—To be dispensed only by or on prescription of a physician."   If a druggist sells without a prescription a drug bearing this caution label, the drug is misbranded and the druggist violates the act.

The present law and regulations do not provide a satisfactory method for determining the drugs which properly fall within the prescription class.   Furthermore, these matters should be regulated by specific statutory provisions rather than, as at present, largely through administrative regulations.

Under the present regulation the retail druggist is often unable to know, until the question is settled by litigation, whether a particular drug can be sold on prescription only.   The regulation requires the prescription legend on drugs which are generally regarded as safe and efficacious for use only under medical supervision.   All other drugs are required to bear adequate directions for use, and this means directions adequate for a layman to follow.   The initial responsibility is upon the manufacturer to decide whether his drug belongs in one class or the other.

If a manufacturer decides that his drug is suitable for use only under medical supervision, and labels it with the prescription legend, it is necessary, if the Administrator disagrees on the basis of expert advice to that effect, to bring a criminal prosecution, a seizure action, or an injunction to require that the legend be taken off and adequate directions for use written.   On the other hand, if the manufacturer decides that his drug is suitable for use by a layman without consulting a physician, and labels it with directions for use, but the Administrator disagrees on the basis of expert advice to that effect, an action must be

brought charging that the drug violates either section 502 (a) by being represented falsely to be safe and effective for lay use or section 502 (j) because the drug may be dangerous to health when used as directed. Litigation, at best, is a slow process and can be directed at only one party and one product at a time.   It is not a satisfactory method for establishing correct future labeling of a particular drug regardless of who manufactures it.

The practical effect of the present regulatory system has been great confusion in the use of the prescription legend.  Many products of identical composition, placed on the market by different manufacturers, were shown to the committee in a practical demonstration of the druggists' dilemma.  One would bear the prescription legend while another of the same composition would provide directions for use.

For example, a sample of precipitated chalk manufactured by one manufacturer was labeled with the legend:

Caution: To be dispensed only by or on the prescription of a physician, dentist, or veterinarian, or otherwise used only for manufacturing purposes.  This restriction applies only to medicinal uses.

Another sample of the same drug manufactured by a different manufacturer carried the following directions for use:

Antacid—Average dose: one-quarter teaspoonful in water.  May also be used as a tooth powder.

Another example involved strychnine sulfate in small doses (onesixtieth grain).  This drug manufactured by one manufacturer carried the legend:

Caution: To be dispensed only by or on the prescription of a physician.

The same drug manufactured by another manufacturer carried the following directions for use:

To improve appetite and digestion.  For adults only: 1 tablet before meals. Other doses as prescribed by physician.  Warning: Do not take more than 6 tablets in 24 hours.

A third example involved dehydrocholic acid.  This drug manufactured by one manufacturer carried the caution legend:

To be used only by or on the prescription of the physician.

The identical drug produced by another manufacturer carried the following directions for use:

Dosage: *Adults*—1 tablet 3 times daily with or after meals.  *Children*—Only under the direct supervision of a physician.
In the presence of jaundice, this product should be used only under the direction of a physician.

It should be noted that these directions for use do not state the condition for the treatment of which this particular drug is to be used.

Also presented were samples of acetophenetidin and acetophenetidin with salol which, as manufactured by one manufacturer, carried the caution legend, and as manufactured by another manufacturer carried directions for use.

Some products were shown to the committee which had something like the prescription legend and also recommended dosages.  The druggist would not even know, in such a case, the class in which the manufacturer intended to place such drugs.

**6**    AMENDING THE FEDERAL FOOD, DRUG, AND COSMETIC ACT

For example, in the case of ammonium chloride (7½ grains), one manufacturer labeled this drug with a caution legend:

Caution: To be dispensed only by or on the prescription of a physician.

The same drug manufactured by another manufacturer carried the following legend:

Adult dose—one or two tablets repeated as directed by the physician.

A second sample involved thyroid tablets. One manufacturer labeled this drug:

Caution: To be dispensed by or on the prescription of a physician. Indiscriminate use may be harmful.

Another manufacturer labeled the identical drug as follows:

Directions: To be used on advice or prescription of a physician.

It should be noted that while the "directions" refer to prescription of a physician, confusion is caused to the druggist by failing to use the standard caution legend prescribed by the regulations.

A third example involves quinidine sulfate. One manufacturer labeled this drug with the standard caution legend:

Caution: To be dispensed only by or on the prescription of a physician.

Another manufacturer labeled the same product with the following legend:

Adult dose—1 tablet as directed by the physician.

An example of three different labels for the same drug was also presented. Methenamine was labeled by the first manufacturer:

Adult dose—1 to 3 tablets as directed by the physician.

The second manufacturer labeled this product:

Caution: To be used only by or on the prescription of a physician.

The third manufacturer labeled this drug with the following directions for use:

Dose: As a urinary antiseptic, 1 tablet with a large glass of water twice a day for not longer than 7 days. Urine should be kept acid. Other dosage or uses as directed by physician.

The confusion existing under present law has resulted in inadequate protection of the public health. In a situation where the druggist is uncertain as to the drugs which may be dispensed only on prescription, it is inevitable that there have been many cases of indiscriminate and unauthorized over-the-counter sales of dangerous drugs and other drugs which should be used only under medical supervision.

The committee believes that the present public health problem in connection with the unlawful labeling and dispensing of prescription drugs exists largely because the present law is not clearly and affirmatively expressed in the statute. The overwhelming majority of drug manufacturers and pharmacists are anxious to comply with provisions of law which they can understand. In contrast with the present law, this proposed legislation will be clear and readily understood. It is believed that after this legislation is enacted the need for enforcement, through criminal action, seizure, and injunction, will arise only in the cases of a few violators who are oblivious to their obligations to society.

Under the bill, as amended, three types of drugs will be limited to prescription sale, namely, habit-forming drugs, "dangerous" drugs,

and new drugs which, under the present law, already may be limited to use under professional supervision. The confusion under present law exists primarily with respect to "dangerous" drugs, that is, those not suitable for self-medication. The bill provides a workable method by which clear determinations can be made, at the earliest practicable time, as to whether particular drugs are "dangerous" drugs. Such determinations will be made by the Federal Security Administrator on the basis of a statutory standard, and a list of such drugs will be formulated. The Administrator's determinations will be subject to judicial review.

All drugs which, by the amended bill, are restricted to prescription sale *must* carry the prescription legend: "Caution—Federal law prohibits dispensing without prescription." No other drugs will be permitted to carry this prescription label. The latter drugs, as required by the present law, must carry adequate directions for use telling the user what the drug is for and how it is to be used.

The bill, as amended, expressly provides that the drugs limited to prescription sale (when intended for human consumption) shall be dispensed only upon a written or oral prescription of a licensed practitioner. Oral prescriptions will be permissible only when promptly reduced to writing by the pharmacist and filed by him. Refilling of prescriptions will be permissible only if authorized in the original prescription or by an oral order of the licensed practitioner which is promptly reduced to writing by the pharmacist and filed by him.

This legislation will provide for certainty which is lacking under the present law and which is very important to the enforcement agency, to the retail druggist, and to the public. The committee believes that these changes in the law will impose no hardship on the reputable manufacturer and will, indeed, afford him a means of knowing, before he subjects his products to seizure and himself to prosecution, whether his drug must be labeled for prescription dispensing or for over-the-counter sale.

Certainty is important to the enforcement agency because it permits more effective enforcement through appropriate control over drugs that are too dangerous, or otherwise unsuitable, to be used by a layman without medical diagnosis or supervision. Under this proposed legislation it will be possible to *prevent* injury to the public, as contrasted with the present system which is largely concerned with punishing past violations.

*Oral prescriptions.*—Another phase of the present law which needs modification and clarification is with respect to the filling and refilling of oral, or telephone, prescriptions. The present law does not recognize the practice of dispensing drugs on oral prescription. For the convenience of the public, the retail druggist, and the physician, the committee feels that the filling and refilling of prescriptions on oral order, under proper safeguards, should be permitted. The bill, as amended, contains appropriate provisions, explained below in this report, which deal with this question.

*Refilling prescriptions.*—The Food and Drug Administration has found that a serious public-health problem exists in the indiscriminate refilling of prescriptions for dangerous and habit-forming drugs. Examples were cited in which death resulted from unauthorized refillings of prescriptions for barbiturates and benzedrine. A 45-year-old man, father of two children, was found dead in 1950 from an overdose of barbiturates obtained on a prescription written in 1945

**8**    AMENDING THE FEDERAL FOOD, DRUG, AND COSMETIC ACT

or 1946. Investigation revealed that the original prescription had been refilled many times without consulting the prescribing physician. The man became addicted to this habit-forming drug and shortly before his death was taking many times the therapeutic dose to satisfy his cravings. His death would not have occurred had the physician's instructions been followed.

The benzedrine death occurred in 1950, 13 years after the original prescription was written. The widow stated that the prescription had been repeatedly refilled during that time. The physician had last seen the deceased in 1937 and at that time had written a prescription for 14 10-milligram tablets. The amount dispensed in the refills had substantially increased until just before his death this man was taking as much as 25 tablets a day. The prescribing physician stated that he had not intended that the patient take more than the original 14 tablets which he prescribed.

The Food and Drug Administration has interpreted the existing law to prohibit the unauthorized refilling of prescriptions for all drugs. This interpretation, which is doubtless justified by the terms of the present law, is needlessly restrictive in making illegal the refilling of prescriptions for those drugs that can be bought over the counter without prescriptions. Furthermore, it is difficult for the enforcement official to meet the refill problem as it relates to dangerous and habit-forming drugs when that matter is not expressly dealt with in the statute.

The committee has included in the bill, as amended, express provisions, explained below in this report, to clarify the present law with respect to the refilling of prescriptions.

## DETERMINATION OF WHAT DRUGS ARE PRESCRIPTION DRUGS

### CONFLICTING LEGISLATIVE RECOMMENDATIONS

The committee was confronted with a dilemma in that the trade and professional organizations representing the different interested groups have made conflicting recommendations. The National Association of Retail Druggists, on the one hand, has urged that in the interest of achieving the greatest possible certainty for the retail druggists and the general public, the Federal Security Administrator should be vested with the power to determine on the basis of a statutory standard, but subject to judicial review, which drugs are to be sold on prescription only. The drug manufacturers, on the other hand, represented by the American Pharmaceutical Manufacturers' Association, the American Drug Manufacturers' Association, and the Proprietary Association, and those pharmacists who are represented by the American Pharmaceutical Association, have opposed the vesting of any such authority in a Federal official. They have contended that the determination of which drugs may be sold only on prescription should be left to judicial determination, on the basis of a statutory standard, in court proceedings (seizure, criminal prosecution, or injunction) instituted by the Federal enforcement officials.

### THE COMMITTEE'S DECISION

The committee has thoroughly studied the arguments adduced by both sides in favor of their respective proposals. It has come to the conclusion that administrative determination, subject to judicial

review, gives the greatest promise of effectively relieving the retail druggists and the general public from the presently existing confusion. This decision has been made somewhat reluctantly because the committee is deeply conscious of the fact that the power to determine which drugs are prescription drugs and which are over-the-counter drugs is one which affects drug manufacturers, drug wholesalers, retail druggists, pharmacists, physicians, and, last but not least, the general public. The reasons for the committee's decision are set forth below.

### PROPOSED STATUTORY LIST

The committee studied the question of whether such a grant of power to an administrative officer could be avoided by inserting in the bill a list of drugs that may be sold on prescription only. The committee, however, has come to the conclusion that such a list could be formulated only after extensive hearings involving expert testimony with respect to each drug that might be placed on this list. Furthermore, over the years, a statutory list of prescription drugs would prove too inflexible to keep pace with the rapid changes and developments occurring in the drug field.

### CASE-BY-CASE JUDICIAL DETERMINATION

The committee gave careful consideration to the proposal of the drug manufacturers that the determination of which drugs may be sold only on prescription should be left solely to judicial determination in seizure, injunction, and criminal cases.

Testimony was presented that this case-by-case method of judicial determination would unnecessarily and unfairly involve retail druggists in court proceedings. This would come about, so the retail druggists argue, because the Federal Security Administrator would continue to have the power, which he now has and which he now exercises, to seize drugs on the shelves of retail druggists (or to institute injunction or criminal proceedings against druggists) primarily for the purpose of bringing test cases to determine whether the drugs in question are prescription drugs or over-the-counter drugs. Not infrequently, unfavorable publicity results from such seizures or court proceedings to the great damage of the druggist, injuring him not only financially but also lowering his standing in the community.

The committee feels that the institution of test cases to determine for the future whether a given drug may be sold only on prescription or may be sold over the counter does not constitute a desirable and effective use of the judicial process. Actually, in such cases, the Government would not be seeking primarily the decision of the court that a particular person had violated the law. It would be seeking a determination of the court that drug "A," for example, is too dangerous for self-medication, and that, therefore, in the future, it should be sold only on prescription, or conversely, that drug "B" which was labeled with the prescription legend, and which failed to set forth on its label proper directions for use, was actually a safe drug which could be sold over the counter.

## CONSIDERATIONS WHICH INFLUENCED THE COMMITTEE'S DECISION

The considerations which have influenced the committee in its decision to provide for administrative determination subject to judicial review may be summarized as follows:

First. The administrative process will involve as parties only those primarily interested, namely, the drug manufacturers. It would not involve the retail druggists, whose interest is limited to securing certainty as to how they may sell a given drug.

Second. The task of determining which drugs shall be sold only on prescription is, in its nature, essentially a legislative or rule-making function, unsuited for solution solely through the judicial process.

Third. The committee's decision is entirely consistent with the one made in 1938 when Congress gave the Administrator the authority to list habit-forming derivatives of the drugs named in section 502 (d), and it has not been suggested that that authority has been abused.

Fourth. In the opinion of the committee the judicial-review provisions afford adequate protection against arbitrary or legally unjustified action on the part of the Administrator. This particular phase is discussed below in greater detail under the heading "Judicial review."

Fifth. If the proposal of the drug manufacturers were adopted, great confusion might result from conflicting court decisions with respect to the same drug in different jurisdictions. One United States district court might hold that a given drug was dangerous, judged by the statutory standard, while another district court might hold the opposite. There are more than 80 United States district courts. Even if all of the cases were tried without juries, it would be almost beyond the realm of possibility that uniformity could be obtained. With the vagaries of the jury system, it is believed that uniformity of decisions would be wholly impossible. One firm might obtain a judgment favorable to it that a particular drug was safe for over-the-counter sale, while others in the industry were required to limit it to prescription sale.

From a public-health standpoint, the users of drugs should not be subjected to the hazards of delay incident to litigation. A recent hormone case, decided in favor of the Government by the United States Court of Appeals for the Ninth Circuit, took more than 2 years in litigation in order to limit the drug to prescription use under existing law. The drug was capable of causing accelerated growth of cancer of the prostate, a condition not uncommon in the fifties and sixties. While the litigation was in progress irreparable injury was done. Under the suggestion to use the case-by-case method of judicial determination, the druggist, on whom the burden of prosecution would fall most directly, would be in a very difficult position. He would have to determine at his risk whether a drug which the manufacturer had labeled with directions for use for over-the-counter sale had been correctly classified. He would follow the label only at his peril.

Finally, it is difficult to understand why the drug manufacturers themselves should prefer to have their products seized or to be proceeded against in criminal cases merely toward the end of securing a determination as to whether a particular drug is or is not a prescription drug.

AMENDING THE FEDERAL FOOD, DRUG, AND COSMETIC ACT    11

### LIMITATIONS ON ADMINISTRATOR'S POWERS

The committee recognizes that the Federal Security Administrator is not, and should not be expected to be, an expert qualified to decide which drugs should be sold on prescription only and which should be sold freely over the counter. Therefore, in the bill, as amended, the committee has provided that the Administrator is to make this determination on the basis of a statutory standard. The standard which he is to apply is essentially the same standard presently contained in the regulations of the Federal Security Administrator promulgated under section 502 (f) of the Federal Food, Drug, and Cosmetic Act. That standard has been accepted by the drug trade as proper and adequate, and representatives of drug manufacturers, appearing before the committee, urged that it be written into the law as the basis for case-by-case judicial determinations.

Under this standard a drug will be adjudged a prescription drug if because of its toxicity or any other potentiality for harmful effect, or the method of its use, or the collateral measures necessary to its use, it is unsafe or inefficacious for use without professional supervision. In applying this standard to a given drug, the Administrator is directed to follow the opinions generally held among experts qualified by scientific training and experience to evaluate the safety and efficacy of the drug in question. If any interested party desires a public hearing on whether a particular determination by the Administrator on that basis is justified, he may demand such a hearing. At the hearing the evidence taken will be evidence presented by qualified experts. The Administrator must base his action, after the hearing, on the testimony given by such experts, not on his own personal views. In short, the committee amendment, in effect, places the Federal Security Administrator in the role of collecting informed medical opinions and, in either placing the drug on the prescription list or deciding that the drug is suitable, for over-the-counter sale, he merely reflects the opinions generally held among medical experts.

By incorporating this standard in the law and by specifying the process to be used by the Administrator in applying it, the committee believes it has achieved a practical and equitable solution of the dilemma in which it found itself as a result of the conflicting legislative recommendations submitted by the trade and professional organizations in the drug field.

### EFFICACY OF DRUGS

The standard which the bill, as amended, would write into the law (subparagraph (B) of paragraph (b) (1) of the amendment) contains the words "efficacy" and "efficacious." The use of these words has given rise to some apprehension, particularly on the part of manufacturers of proprietary drugs (patent medicines), that the Federal Security Administrator might have the power to determine which drugs are "efficacious" or "effective" and which are not. It may be stated unequivocally that this provision is not intended to grant any such power to the Administrator, nor does it lend itself in any way to such an interpretation.

**12**  AMENDING THE FEDERAL FOOD, DRUG, AND COSMETIC ACT

The provision provides for a determination by the Administrator whether a given drug—

on the basis of opinions generally held among experts qualified by scientific experience to evaluate the safety and *efficacy* of such drugs  *  *  * [is]  *  *  * safe and *efficacious for use only after professional diagnosis by, or under the supervision of, a practitioner licensed by law to administer such drug;*  *  *  *.

The question to be determined by the Administrator on the basis of expert opinion, therefore, is not whether a drug is efficacious but whether it can be used efficaciously without professional diagnosis or supervision.

The provision assumes that the drug is effective in the hands of a physician, and the reason for putting it on the prescription list is that it is only effective when used under professional supervision.

For example, no qualified person questions the efficacy of quinidine sulfate in the treatment of certain heart diseases. However, in view of the serious nature of the disease and the necessity of adjusting the dose to the individual patient's need, the drug obviously cannot be used with efficacy except when used under professional supervision. While the drug is not dangerously toxic, the user may nevertheless die if in the course of self-medication he should fail to take a dose which is suited to his individual needs.

### JUDICIAL REVIEW

A determination by the Administrator, though based on expert testimony, will be reviewable by the courts. By making applicable the provisions of section 701 (f) and (g) of present law, the amended bill will insure that any interested person may obtain judicial review by a United States court of appeals and, upon certiorari, by the Supreme Court of the United States.

The reviewing court will have power to set aside the Administrator's order if it is not in accordance with law, and the Administrator's findings as to the facts will be conclusive only if supported by reliable, probative, and substantial evidence on the record considered as a whole.

The bill, as introduced, proposed to permit any interested person dissatisfied with a determination of the Administrator to secure judicial review in the nature of a trial de novo in a court of appeals of the United States. This provision was intended to give to an aggrieved party the greatest possible insurance of fairness and justice. However, the committee is convinced that no matter how well intended, this proposal was impractical.

The committee came to this conclusion largely on the basis of the very earnest presentation made by the Honorable Harold M. Stephens, Chief Judge of the United States Court of Appeals for the District of Columbia Circuit, speaking on behalf of, and by direction of, the Judicial Conference of the United States. The gist of Judge Stephens' testimony was that the needs of the United States courts demand that the judicial review of administrative determinations be limited to a review of whether the administrative determination is based on reliable, probative, and substantial evidence considering the whole record made before the administrative agency. This is the extent and character of review provided for under the provisions of the Administrative Procedure Act, enacted in 1946.

It was pointed out by Judge Stephens that the United States courts of appeals are appellate courts and not trial courts, and that such courts for several reasons are not equipped to handle trials. First, the United States courts of appeals are three-judge courts. It has been the experience of the United States courts that trials are conducted more efficiently by single judges than by three or more judges. Questions involving the admissibility of evidence, for example, have to be determined frequently and promptly in the course of a trial. While a single judge can rule on these questions as they occur without delay, three judges would have to confer on each issue as it was raised and such conferences involve necessarily delay, thus making the trial a cumbersome affair. Furthermore, United States courts of appeals, being appellate courts rather than trial courts, do not have jury boxes in their courtrooms, do not have jury lists, and do not have jury rooms. All of these considerations militate against providing for de novo trials in United States courts of appeals.

If, on the other hand, the district courts of the United States were to be required to determine the validity of administrative determinations in all instances on the basis of de novo trials, such a great additional burden would be placed upon these courts that the number of Federal district court judges would have to be greatly increased.

Furthermore, Judge Stephens pointed out with great emphasis that recent decisions of the Supreme Court of the United States (*Universal Camera Corp.* v. *N. L. R. B.* and *Labor Board* v. *Pittsburgh S. S. Co.*, decided February 26, 1951) insure that the ordinary and usual type of judicial review of administrative action (which is the type provided for by this bill, as amended, and by the Administrative Procedure Act) affords full protection against arbitrary or legally unjustified action by administrative officials.

In addition to the foregoing objections to the proposal to provide for judicial review in a trial de novo, it is believed that the proposal might be unconstitutional on the ground that it would seek to have Federal "constitutional" courts exercise a function which is essentially legislative or administrative, rather than judicial. This point is discussed in the letters from the Deputy Attorney General and the Federal Security Administrator printed in the appendix to this report.

## ORAL PRESCRIPTIONS

The bill, as amended, contains provisions which give statutory recognition to the frequent practice engaged in by physicians of using the telephone to transmit prescriptions to a pharmacist. The use of the telephone in prescribing medicines is of great convenience to the users of such medicines and is, in some areas of this country, essential to the public health. The statutory recognition of oral prescriptions proposed by the bill does away with the unrealistic provisions of the present Federal Food, Drug, and Cosmetic Act which recognizes a written and signed prescription only. The committee amendment would permit the use of oral prescriptions in the case of all drugs. However, in case of habit-forming drugs, dangerous drugs, or new drugs which are limited to prescriptions, an oral prescription would have to be reduced promptly to writing and filed by the pharmacist.

**14**  AMENDING THE FEDERAL FOOD, DRUG, AND COSMETIC ACT

The committee gave serious consideration to whether it was desirable to place additional safeguards on oral prescriptions. However, it was determined that the admittedly limited safeguards provided for in the committee amendment would be adequate until the need for more rigid requirements has been proven by experience.

If the committee amendment is enacted into law, it is hoped that the Commissioner of Food and Drugs will observe closely the effect of the provisions with respect to oral prescriptions and will report to the responsible committees of both Houses any abuses that might develop as a consequence of the relaxation of the written prescription requirement now contained in the Federal Food, Drug, and Cosmetic Act.

## REFILLING PRESCRIPTIONS

The bill, as amended, deals expressly with the troublesome problem of refilling prescriptions. Under the present law a drug dispensed on a "written prescription, signed by a physician," is entitled to certain limited exemptions from the labeling requirements that ordinarily apply to drugs. Through the force of these exemptions, drugs sold on written prescriptions are not misbranded even though they fail to meet the labeling requirements of the act. The Food and Drug Administration, relying upon its understanding of what is meant by a "written prescription," has taken the position that a drug dispensed by refilling a prescription without the knowledge or consent of the prescriber is not dispensed on prescription and thus is not exempt from the labeling provisions of the act. Without such exemption, the drug is misbranded by dispensing it without the prescriber's authorization.

This administrative position meets the public health problems found to exist by reason of the indiscriminate and unauthorized refilling of prescriptions for dangerous drugs and for other drugs that require medical supervision for their effective use. Some drugs, such as amphetamine (benzedrine) and the barbiturates, are desired by addicts and others for nonmedical use. The records of the Food and Drug Administration contain the stories of broken homes and human derelicts that the improper use of these drugs has caused. Other drugs in the prescription-only class may cause irreparable injury before the user knows that the drug is having any physiological effect upon him. But the present law, interpreted to reach these abuses existing in connection with the refilling of prescriptions, also prohibits the refilling of prescriptions for drugs that are not dangerous and are entirely suitable for use by a layman without medical supervision. Furthermore, if the refilling of prescriptions for dangerous drugs and drugs which require medical supervision in their use is to be controlled, the statute itself should contain express provisions providing for such controls.

The bill, as amended, meets this situation by providing that when drugs are prescribed which are safe and effective for lay use without medical supervision, and which could be bought freely over the counter without a prescription, the prescriptions may be freely refilled. But as to drugs which are habit-forming, or which are safe and efficacious only after medical diagnosis has been made or when medical supervision is exercised, and as to drugs which are restricted by new drug applications to use under medical supervision, the bill provides that

prescriptions cannot be refilled unless the prescriber has expressly authorized the refill. This authorization may be either written or oral, but if it is given orally the dispenser must promptly reduce the authorization to writing and file it.

## SECTION BY SECTION EXPLANATION OF THE BILL, AS AMENDED

### SECTION 1. AMENDMENT TO EXISTING LAW

The first section of the bill, as amended, proposes to rewrite section 503 (b) of the present law. At the present time, section 503 (b) merely provides for an exemption from certain labeling requirements in the case of drugs dispensed on written prescription. As proposed to be rewritten, section 503 (b) would contain paragraphs (1) to (6), inclusive, which are explained below:

*Paragraph (1)—Prohibited acts*

This paragraph provides that three types of drugs which are intended for human consumption shall be dispensed only under the following conditions:

    (i) Upon a written prescription of a practitioner licensed by law to administer the drug, or

    (ii) Upon an oral prescription of such practitioner which is reduced promptly to writing by the pharmacist and filed by him, or

    (iii) By refilling any such written or oral prescription if such refilling is authorized by the prescriber either in the original prescription or by an oral order which is reduced promptly to writing by the pharmacist and filed by him.

The types of drugs to which these requirements are made applicable are specified in three subparagraphs, designated (A), (B), and (C).

Subparagraph (A) covers habit-forming drugs. Subparagraph (C) covers any new drug which, under other provisions of the act, is limited to use under professional supervision. No controversy has arisen as to these provisions.

Subparagraph (B) covers "dangerous" drugs, and describes them as any drug which—

because of its toxicity or other potentiality for harmful effect, or the method of its use, or the collateral measures necessary to its use, has been determined by the Administrator * * * to be safe and efficacious for use only after professional diagnosis by, or under the supervision of, a practitioner licensed by law to administer such drug.

The standard here used is essentially the same as that used in regulations heretofore prescribed under the act. As used in such regulations the standard has been generally acceptable to the drug industry as shown in the testimony before the committee.

Subparagraph (B) provides that the Federal Security Administrator will have the duty of determining (on the basis of opinions generally held among qualified experts) the specific drugs covered by the standard, his determination being subject to judicial review as provided in paragraph (5).

Paragraph (1) provides that the act of dispensing a drug contrary to its provisions shall be deemed to be an act which results in the drug being misbranded while held for sale. The effect of this provision is to

**16**  AMENDING THE FEDERAL FOOD, DRUG, AND COSMETIC ACT

make criminal, injunction, and seizure provisions of the act applicable to the dispensing of a drug in violation of the provisions of paragraph (1).

*Paragraph (2)—Exemption from labeling requirements*

This paragraph exempts drugs dispensed by filling or refilling a written or oral prescription of a licensed practitioner from most of the labeling and packaging requirements which ordinarily apply to drugs. To get the exemption, the container in which the prescription medicine is dispensed must bear a label containing the name and address of the dispenser, the serial number and date of the prescription or of its filling, the name of the prescriber, and, if stated in the prescription, the name of the patient, and the directions for use and cautionary statements, if any, contained in the prescription.

The exemption does not relax the prohibition against false or misleading labeling, the prohibition against selling an imitation drug, or offering a drug for sale under the name of another drug; nor does the exemption change the requirement that any drug containing insulin, penicillin, streptomycin, aureomycin, chloramphenicol, or bacitracin must be pretested and certified, or the requirement that any official drug must be packaged as required by the official compendium, or that any drug liable to deterioration must be packaged in accordance with regulations established under existing law. The exemption will not be applicable to any drug dispensed in the course of the conduct of the business of dispensing drugs pursuant to diagnosis by mail or otherwise without examination of the patient. The latter provision follows the existing law.

It is provided in paragraph (2) that the exemption provided thereby shall not apply to habit-forming, dangerous, and new drugs dispensed in violation of the prescription requirements of paragraph (1).

*Paragraph (3)—Exemption from prescription requirements*

This paragraph permits the Administrator by regulations to remove habit-forming and new drugs from the prescription requirement of paragraph (1) when that requirement is not necessary for the protection of the public health. These drugs are the ones covered by subparagraphs (A) and (C) of paragraph (1). This relaxation is necessary to permit the sale without prescription of drugs containing small amounts of habit-forming drugs as components. and to permit the sale of new drugs without prescription when that safeguard is unnecessary.

*Paragraph (4)—Labeling of prescription drugs and over-the-counter drugs*

This paragraph requires that any drug to which paragraph (1) applies must bear on its label the statement "Caution: Federal law prohibits dispensing without prescription." It also provides that a drug to which paragraph (1) does not apply shall be deemed to be misbranded if at any time prior to dispensing its label bears any statement which represents or implies that the dispensing of the drug without the prescription of a licensed practitioner is prohibited.

*Paragraph (5)—Hearings and judicial review*

This paragraph deals with the procedure to be followed in a case where an interested party desires to secure a formal hearing or judicial review with respect to a determination by the Administrator as to whether a drug is a "dangerous" drug according to the standard contained in subparagraph (B) of paragraph (1). This procedure is made available to contest either a proposed determination by the Administrator, to seek a determination that a drug which has already been listed should be removed from the list, or to seek to have placed on the list a drug which is not on the list.

For any of these purposes an interested person may file a petition with the Administrator. Where the petition is for the purpose of opposing a proposed determination that a drug is "dangerous", the filing of a petition will stay the operation of paragraph (1) with respect to the drug until a petition for judicial review can be filed, and interim relief sought, under section 10 (d) of the Administrative Procedure Act. This provision, together with the procedural safeguards of the Administrative Procedure Act, will insure that the Administrator cannot place a drug on the list until interested persons have had full opportunity to test the validity of the Administrator's action.

When a petition is filed stating reasonable grounds, the Administrator will be under a duty to give public notice of the proposal made in the petition and to give all interested persons a reasonable opportunity to present their views, orally or in writing, and it will be his duty to act on the petition as soon as is practicable. Any interested person who is dissatisfied with the Administrator's action may (if he files an objection to such action, stating reasonable grounds therefor, within 30 days after it is made public) demand and secure a public hearing before the Administrator for the taking of evidence of experts who are qualified by scientific training and experience to testify on the question of whether the drug in question is safe and efficacious for use only after professional diagnosis by, or under the supervision of, a practitioner licensed by law to administer the drug. As soon as practicable after the hearing, the Administrator must issue an appropriate order. The Administrator may make his order only after consideration of the whole record and in accordance with reliable, probative, and substantial evidence, and he will be required to make detailed findings of the facts on which he based his order.

The order of the Administrator will be subject to judicial review in accordance with the provisions of section 701 (f) and (g) of the Federal Food, Drug, and Cosmetic Act. These are the judicial review provisions which are now applicable to the review of orders issued under certain other provisions of the act. Such review will be by the appropriate circuit court of appeals of the United States, and may be had upon the filing of a petition with the court at any time prior to the ninetieth day after the issuance of the order by the Administrator. Review will be upon the basis of the "substantial evidence" rule which is the generally applicable provision for judicial review contained in the Administrative Procedure Act.

**18**   AMENDING THE FEDERAL FOOD, DRUG, AND COSMETIC ACT

*Paragraph (6)—Narcotics laws unaffected*

This paragraph provides that nothing in subsection (b) shall be construed to relieve any person from any requirement prescribed by or under law with respect to narcotics or marihuana.

## SECTION 2. EFFECTIVE DATE

This section of the bill provides that its provisions shall take effect 6 months after the date of its enactment into law. This postponement of the effective date of the legislation is deemed to be necessary in order that the Administrator will have time to take steps, before the legislation takes effect, with a view to determining which drugs are "dangerous" under the standard prescribed in subparagraph (B) of section 503 (b) (1).

## CHANGES IN EXISTING LAW

In compliance with paragraph 2a of rule XIII of the Rules of the House of Representatives, changes in existing law made by the bill, as introduced, are shown as follows (existing law proposed to be omitted is enclosed in black brackets, new matter is printed in italics, existing law in which no change is proposed is shown in roman):

### SECTION 503 OF THE FEDERAL FOOD, DRUG, AND COSMETIC ACT

#### EXEMPTIONS IN CASE OF DRUGS AND DEVICES

SEC. 503. (a) The Administrator is hereby directed to promulgate regulations exempting from any labeling or packing requirement of this Act drugs and devices which are, in accordance with the practice of the trade, to be processed, labeled, or repacked in substantial quantities at establishments other than those where originally processed or packed, on condition that such drugs and devices are not adulterated or misbranded under the provisions of this Act upon removal from such processing, labeling, or repacking establishment.

[(b) A drug dispensed on a written prescription signed by a physician, dentist, or veterinarian (except a drug dispensed in the course of the conduct of a business of dispensing drugs pursuant to diagnosis by mail), shall if—

[(1) such physician, dentist, or veterinarian is licensed by law to administer such drug, and

[(2) such drug bears a label containing the name and place of business of the dispenser, the serial number and date of such prescription, and the name of such physician, dentist, or veterinarian,

be exempt from the requirements of section 502 (b) and (e), and (in case such prescription is marked by the writer thereof as not refillable or its refilling is prohibited by law) of section 502 (d).]

*(b) A drug dispensed by filling or refilling a written or oral prescription of a practitioner licensed by law to administer such drug shall be exempt from the requirements of section 502, except paragraphs (a), (i) (2) and (3), (k), and (l), and the packaging requirements of paragraphs (g) and (h), if the drug bears a label containing the name and address of the dispenser, the serial number and date of the prescription, or of its filling, the name of the prescriber, and, if stated in the prescription, the name of the patient, and the directions for use and cautionary statements, if any, contained in such prescription. This exemption shall not apply to any drug dispensed in the course of the conduct of a business of dispensing drugs pursuant to diagnosis by mail or otherwise without examination of the patient. If the drug is intended for use by man and—*

*(1) is a habit-forming drug subject to the regulations prescribed under section 502 (d);*

*(2) has been found by the Administrator, after investigation and opportunity for public hearing, to be unsafe or ineffective for use without the professional diagnosis or supervision of a practitioner licensed by law;*

AMENDING THE FEDERAL FOOD, DRUG, AND COSMETIC ACT    **19**

*(5) if an effective application under section 505 limits it to use under the professional supervision of a practitioner licensed by law, such exemption shall apply only if such drug is dispensed upon a written prescription of a practitioner licensed by law to administer such drug or upon an oral prescription of such practitioner which is reduced to writing and filed by the pharmacist, or is dispensed by refilling a prescription if such refilling is authorized by the prescriber in the original prescription or by oral order and such order is reduced to writing and filed by the pharmacist.*

*The Administrator may by regulation remove drugs subject to section 502 (d) and section 505 from the provision of this subsection when such requirements are not necessary for the protection of the public health.*

*A drug which is subject to clause (1), (2), or (5) of this subsection shall be deemed to be misbranded if at any time prior to dispensing its label fails to bear the statement "Caution: Federal law prohibits sale or dispensing without prescription".*

*The act of dispensing a drug contrary to the provisions of this subsection shall be deemed to be an act which results in the drug's being misbranded while held for sale.*

*Any interested person may file with the Administrator a petition proposing the addition to, or deletion from, the list of drugs promulgated by the Administrator in accordance with clause (2) hereof. Such petition shall set forth the proposal in general terms and shall state reasonable grounds therefor. The Administrator shall give public notice of the proposal and an opportunity for all interested persons to present their views thereon, orally or in writing, and as soon as practicable thereafter shall make public his action upon such proposal. At any time prior to the thirtieth day after such action is made public any interested person may file objections to such action, specifying with particularity the changes desired, stating reasonable grounds therefor and requesting a public hearing upon such objections. The Administrator shall thereupon, after due notice, hold such public hearing. As soon as practicable after completion of the hearing, the Administrator shall by order make public his action on such objections.*

*An order so issued by the Administrator may, within ninety days after its issuance, be appealed by any interested person in accordance with the provisions prescribed in section 701 (f) and (g) of this Act, except that an appeal from the Administrator's order issued hereunder shall be in the nature of a trial de novo, without presumptions in favor of either party to such appeal.*

*The provisions of this section of the Act shall not be applicable to drugs now included or which may hereafter be included within the classifications stated in section 3220 of the Internal Revenue Code (26 U. S. C. 3220), or to marijuana as defined in section 3238 (b) of the Internal Revenue Code (26 U. S. C. 328 (b)).*

## APPENDIX

FEDERAL SECURITY AGENCY,
*Washington, April 30, 1951.*

Hon. ROBERT CROSSER,
*Chairman, Committee on Interstate and Foreign Commerce,*
*House of Representatives, Washington 25, D. C.*

DEAR MR. CHAIRMAN: This letter is in response to your request of March 21, 1951, for a report on H. R. 3298, a bill to amend section 503 (b) of the Federal Food, Drug, and Cosmetic Act.

This bill is in substantially the same form as that introduced as H. R. 8904 in the Eighty-first Congress, second session, which this Agency endorsed. Section 503 (b) of the present law recognizes only written prescriptions, whereas the section as amended by the bill would recognize oral prescriptions as well, with the safeguard under certain circumstances that the pharmacist reduce the oral order to writing and file it. The present law does not provide a clear differentiation between those drugs which should be dispensed solely on prescription and those which may be sold over the counter. It is the intent of the bill to supply this deficiency by requiring the dispensing on prescription only of specified habit-forming drugs and those specifically designated in regulations or new drug applications which cannot be safely and effectively used without professional diagnosis and supervision. The bill provides that the labels of such drugs bear a caution against dispensing without prescription.

This Agency is sympathetic to the purposes of the bill. It would clarify the obligations of pharmacists, would promote the operations of all on the high standards now followed by the majority, and would afford better protection to the public health than the present law against abuses by a minority in dispensing highly potent drugs by over-the-counter sales or by refilling prescriptions without the knowledge and approval of the prescriber.

The bill contains, however, three new paragraphs beginning at line 15 of page 3 and continuing to line 14 of page 4. The most significant feature of the new paragraphs is a "trial de novo" (lines 12–14 on p. 4) in a United States court of appeals on appeals from the Administrator's orders. An outline of the procedure leading up to the proposed "trial de novo" is relevant. Clause (2) of new section 503 (b) requires that an opportunity for public hearing be afforded before the Administrator promulgates a list of drugs that are unsafe or ineffective for use without professional diagnosis and supervision and thus must therefore be dispensed only on prescription. This public hearing, it would seem, may be held under the informal rule-making procedure of section 4 of the Administrative Procedure Act. No appeal would lie at this stage from the resulting action of the Administrator (see Administrative Procedure Act, sec. 10).

The last paragraph on page 3 of the bill provides for a formal hearing and judicial review when any interested party disagrees with the order of the Administrator issued under clause 2. The procedural steps provided are as follows: (1) Any interested person may file a petition setting forth the proposal for addition to or deletion from the list of drugs, with a statement of reasonable grounds. (2) Public notice of the proposal and an opportunity to present views by interested parties are given. (3) A decision of the Administrator with respect to that proposal is made. (4) Objections to the decision may be filed within 30 days, with a request for a public hearing on such objections. (5) A hearing on the objections is held. The formal hearing provisions of sections 7 and 8 of the Administrative Procedure Act would apparently apply to that hearing. (6) An order is issued. This order is subject to judicial review in accordance with section 701 (f) and (g) of the Food and Drug Act, except that such review shall be "in the nature of a trial de novo, without presumptions in favor of either party to such appeal."

These provisions are in general patterned after section 507 (f) (21 U. S. C. 357 (f)) relating to the certification of antibiotic drugs. The Administrator's order with respect to objections filed by interested parties concerning his regulations under section 507 (f) is subject to the provisions of section 701 (f) and (g) (21 U. S. C. 371 (f) and (g)). Section 701 (f) provides that the findings of the Administrator as to the facts, if supported by substantial evidence, shall be conclusive. But the bill expands the scope of review. The bill directs that the "appeal" is to be in the nature of a "trial de novo" without presumptions in favor of either party to such appeal. The concept of a "trial de novo" at the appellate level departs radically from legislation governing the review of rules and regulations issued by administrative agencies, and goes beyond the require-

ments of the Administrative Procedure Act which was intended to bring uniformity to administrative proceedings and their judicial review. The scope of judicial review now embodied in section 10 (e) of the Administrative Procedure Act is that agency action shall be upheld where it is supported by "substantial evidence," but the court is directed to review the whole record in determining whether the evidence is substantial. This provision has recently been examined by the Supreme Court in *Universal Camera Corp. v. National Labor Relations Board*, decided February 26, 1951. The specific provision to this effect in section 701 (f) of the Federal Food, Drug, and Cosmetic Act, and its conformity to the Administrative Procedure Act, was judicially approved in *Willapoint Oysters v. Ewing* (174 F. 2d 676, cert. den. 338 U. S. 860).

The proposed bill, in contrast, would extend the function of the reviewing court beyond that contemplated by the Administrative Procedure Act. The appellate court in a "trial de novo" would become a trier of facts with respect to difficult questions of drug action, questions which are not at all suited for judicial determination but which require expert scientific knowledge for informed judgment. The determination of such a question is peculiarly within the expert competence of an administrative agency yet the court would be expressly enjoined to attach no "presumptions" to its action, i. e., to give no weight to it. The Administrative Procedure Act has recognized the principle of deference to administrative expertise by providing for review as to the legal sufficiency of the evidence presented in support of a regulation, not a complete and needless retrial of the facts in an appellate court.[1]

There is serious question, moreover, as to the propriety of conferring the power to make a determination that is essentially legislative upon a "constitutional court." This was declared objectionable by the Supreme Court in *Federal Radio Commission v. General Electric Co.* (281 U. S. 464 (1930)) and in the cases there cited. In the General Electric case, the Radio Act of 1927 had authorized the court of appeals, after decision by the Commission, to take additional evidence, hear, review, and determine the appeal upon the record and the evidence, and alter or revise the decision appealed from—in short, a review de novo. While the opinion acknowledged that Congress may make the Court of Appeals for the District of Columbia a "superior and revising" agency, it concluded that the Supreme Court could not be invested with similar powers. In this connection, it should be noted that section 701 (f) (4) of the Food and Drug Act, which is incorporated in the bill by reference, would confer jurisdiction on the Supreme Court to review decisions of the courts of appeals. Moreover, under the bill proceedings for judicial review could be filed in the court of appeals for the circuit in which the petitioner resides or has his principal place of business, which, in most cases, would be outside the District of Columbia. Such other courts of appeals, being "constitutional courts," would be subject to the same disability in this respect as the Supreme Court.

The legislative history of the present act reveals that Congress was confronted with a similar problem as to the scope of review of administrative regulations and rejected the solution now proposed. As reported out with an amendment by the House Committee on Interstate and Foreign Commerce after passage by the Senate, S. 5, Seventy-fifth Congress, contained a special review provision in section 701 (f) permitting anyone appealing from a regulation to adduce additional evidence before a district court, and further providing that the court might take such further action as "justice may require" (H. Rept. No. 2139, 75th Cong., 3d sess., pp. 11–12). The Supreme Court, in *Federal Security Administrator v. Quaker Oats Co.* (318 U. S. 218 (1943)) explained the elimination of this provision: "* * * before enactment, the conference committee substituted for these provisions those which became section 701 (f) of the act. While under that section the Administrator's regulations must be supported by findings based upon 'substantial evidence' adduced at the hearing, the Administrator's findings as to the facts if based on substantial evidence are conclusive. In explaining these changes the chairman of the House conferees stated on the floor of the House that 'there is no purpose that the court shall exercise the functions that belong to the executive or the legislative branches' (83 Congressional Record, p. 9096)."

The conference committee further noted, with respect to the review provided in section 701 (f) (S. Rept. No. 2716, 75th Cong., 3d sess.):

"The type of judicial review provided in the agreement is as broad as the Constitution permits in the case of review by a constitutional court. It is to be noted that the function of the Secretary in making regulations and orders to

---

[1] In any event, the use of the word "trial" in the bill is in itself a misnomer. In all probability the drafters intended to have a review on the record and not a trial de novo.

**22**    AMENDING THE FEDERAL FOOD, DRUG, AND COSMETIC ACT

carry them out is legislative in character * * *. Judicial review of the Secretary's action to determine if there was substantial evidence to support the finding, and of course, upon constitutional questions, may be had."

To permit a review by trial de novo at the level of the court of appeals would not only impede and hamper the enforcement program with respect to the most dangerous drugs, but would burden these courts with a legislative function which, it appears likely, they may not constitutionally be called upon to perform.

This bill also authorizes oral prescriptions which are reduced to writing and filed by the pharmacist. It does not require that the physician confirm or agree to confirm the prescription in writing. In this, it departs from the bill which we previously endorsed. We believe that at the very least the physician should agree to confirm his oral prescriptions in writing within 72 hours, and that he should not be entirely freed from his responsibility to confirm because the pharmacist reduced the telephone order to writing.

We therefore recommend that the bill, with the above-suggested amendment, with the deletion of the excepting provision in lines 12–14 on page 4, and with certain clarifications and technical amendments which we should like to suggest at the appropriate time, be enacted by the Congress.

The Bureau of the Budget advises that there is no objection to the submission of this report to your committee.

Sincerely yours,

OSCAR R. EWING, *Administrator.*

———

APRIL 30, 1951.

Hon. ROBERT CROSSER,
    *Chairman, Committee on Interstate and Foreign Commerce,*
    *House of Representatives, Washington, D. C.*

MY DEAR MR. CHAIRMAN: This is in response to your request for the views of the Department of Justice concerning the bill (H. R. 3298) to amend section 503 (b) of the Federal Food, Drug, and Cosmetic Act.

Section 502 of the Federal Food, Drug, and Cosmetic Act (21 U. S. C. 352) sets forth the various circumstances under which drugs and devices will be deemed to be misbranded. Section 503 (b) (21 U. S. C. 353 (b) ) specifies certain exemptions with respect to drugs dispensed on written prescriptions.

The bill would amend section 503 (b) so as to provide that a drug dispensed by filling or refilling a written or oral prescription shall be exempt from the requirements of section 502, except with respect to certain packaging requirements and those provisions of the section which provide that a drug shall be deemed to be misbranded if its labeling is false or misleading in any particular or if it is an imitation of another drug or if it is offered for sale under the name of another drug, and except with respect to the provisions of the act dealing with insulin and the various antibiotics covered by the statute. The measure provides, however, that such exemption shall prevail only if the drug bears a label containing the name and address of the dispenser, the serial number and date of the prescription or of its filling, the name of the prescriber and, if stated in the prescription, the name of the patient, and the directions for use and cautionary statements, if any, contained in the prescription.

Separate provision is made if the drug is intended for use by man, and is (1) a habit-forming drug subject to the regulations prescribed under section 502 (d) (21 U. S. C. 352 (d)), or (2) has been found by the Federal Security Administrator to be unsafe or ineffective for use without the professional diagnosis or supervision of a practitioner licensed by law, or (3) if an effective new drug application under section 505 (21 U. S. C. 355) limits it to use under the professional supervision of a licensed practitioner. In such event the exemption is to apply only if the drug is dispensed upon a written prescription or upon an oral prescription which is reduced to writing and filed by the pharmacist, or is dispensed by refilling a prescription if such refilling is authorized by the prescriber in the original prescription or the oral order and such order is reduced to writing and filed by the pharmacist. A drug which falls within the three categories mentioned immediately above will be misbranded if at any time prior to its being dispensed its label fails to bear the statement "Caution: Federal law prohibits sale or dispensing without prescription."

The bill also provides that the act of dispensing the drug contrary to the provisions of the bill shall be deemed to be an act which results in the drug's being misbranded while held for sale. This would insert into the Federal Food, Drug, and Cosmetic Act the theory, based on regulations, pursuant to which the Food and Drug Administration has recommended prosecution of druggists who sell,

without prescriptions, drugs bearing the so-called prescription legend and which have not been removed from the immediate containers in which they were shipped in interstate commerce. Such a sale by a druggist would be in violation of section 301 (k) (21 U. S. C. 331 (k)).

The bill also provides a procedure whereby any interested person may file a petition with the Federal Security Administrator proposing the addition to or deletion from the list of drugs found to be unsafe or ineffective for use in accordance with clause (2) of section 503 (b). Upon the filing of such a petition, the Administrator is required to give public notice of the proposal and a hearing thereon, and as soon as practicable thereafter shall make public his action upon such proposal. Any interested person may file objections to such action and request a public hearing upon such objections. The Administrator shall thereupon after due notice hold such public hearing and as soon as practicable thereafter by order make public his action on such objections. The order of the Administrator may within 90 days after its issuance be appealed to the court of appeals in accordance with the provisions prescribed in section 701 (f) and (g) of the Act (21 U. S. C. 371 (f) and (g)), except that such appeal shall be in the nature of a trial de novo without presumptions in favor of either party to such appeal.

The bill also provides that its provisions shall not apply to drugs now included or which may hereafter be included within the classification stated in section 3220 of the Internal Revenue Code or to marijuana as defined in section 3238 (b) thereof.

Whether the bill should be enacted involves a question of policy concerning which this Department prefers not to make any recommendation. There are certain features of the measure, however, concerning which the committee may wish to give further consideration.

The bill provides for two public hearings in connection with a proposal for the addition to or deletion from the list of drugs found to be unsafe in accordance with the provisions of clause 2. A public hearing is provided for on the original proposal, and again provided for in connection with objections to the action of the Administrator upon the proposal. It would seem that the one public hearing on the original proposal would be sufficient.

The bill also provides for an appeal from the order of the Administrator. It is assumed that the order referred to is that made after the public hearing on the objections to the previous action of the Administrator. The review proceeding is to be in accordance with the provisions of section 701 (f) and (g) of the act, except that the appeal shall be in the nature of a trial de novo. It will be noted, however, that the review proceedings in section 701 are confined to questions of law. The court is given jurisdiction to affirm the order complained of or to set it aside in whole or in part. If the order refuses to issue, amend, or repeal a regulation and such order is not in accordance with law, the court shall by its judgment order the Administrator to take action with respect to the matter, in accordance with law. In a de novo proceeding the court ordinarily has the power and function to make its own findings and judgment. Such a trial contemplates not only the record before the Administrator but the testimony of additional witnesses if desired. No such procedure is contemplated under section 701. The provision for a trial de novo would be incompatible with the review procedure provided for and leaves an ambiguity and doubt as to what the function of the appellate court would be. In addition, such a proceeding would appear to make the appellate court a revising agency and its action in the nature of an administrative decision. A question arises as to whether such a function is within the judicial power conferred upon Federal courts by the Constitution. Compare *Radio Commission v. General Electric Co.* (281 U. S. 464).

It might be desirable to consider the question of review in connection with the action of the Administrator in designating unsafe drugs under clause (2). It is believed that a review from such a determination in accordance with the procedure in section 701, would fully protect the rights of any person adversely affected since the Supreme Court has recently held that in considering the question of whether an order of this nature is supported by substantial evidence, the appellate court shall review the whole record.

The Director of the Bureau of the Budget has advised that there is no objection to the submission of this report.

Yours sincerely,

PEYTON FORD,
*Deputy Attorney General.*

**24**   AMENDING THE FEDERAL FOOD, DRUG, AND COSMETIC ACT

ADMINISTRATIVE OFFICE OF THE UNITED STATES COURTS,
*Washington 13, D. C., March 29, 1951.*

Hon. ROBERT CROSSER,
*House Office Building, Washington, D. C.*

DEAR CONGRESSMAN CROSSER: I have compared the bill about which you have written me on March 22, 1951, to amend section 503 (b) of the Federal Food, Drug, and Cosmetic Act (H. R. 3298) with the present provision of the statute. The statute deals with the exemption from the requirements of the Federal Food, Drug, and Cosmetic Act in relation to the labeling of drugs handled in interstate commerce of drugs that are dispensed on a written prescription of a licensed physician, dentist, or veterinarian. The bill would make more detailed and specific the safeguards against abuse of the exemption from the provisions of the general statute.

The only feature of the bill that my office may qualify me to discuss is the provision in the next to the last paragraph of subsection (b) of section 503 of the statute as proposed to be amended (p. 4, lines 8 to 14) and especially the last clause on lines 11 to 14 of the printed bill. This section provides for appeals from orders of the Federal Security Administrator adding to or deleting from the list of drugs promulgated by him as "unsafe or ineffective for use without the professional diagnosis or supervision of a practitioner licensed by law" (clause 2, p. 2, lines 12 to 16 of the printed bill). It defines the procedure on appeal in general by reference to section 701 (f) (g) of the statute (21 U. S. C. 371 (f) (g)). These subsections provide that appeals from the orders of the Administrator may be filed in the United States court of appeals for the circuit in which the person taking the appeal resides or has his principal place of business. The pending bill would not change the court which would have jurisdiction to review orders of the Administrator in reference to the subject matter affected. That court would continue to be the court of appeals for the circuit.

The exception at the end of the paragraph would, however, make an important change from the present statute in respect of the procedure on review. Sections 701 (f) (g) of the present statute (21 U. S. C. 371 (f) (g)) prescribe that when a review is taken the review shall be had upon a transcript of the record and proceedings before the Administrator. "The findings of the Administrator as to the facts, if supported by substantial evidence, shall be conclusive." The paragraph referred to of the pending bill would change the practice and make the appeal "in the nature of a trial de novo, without presumptions in favor of either party to such appeal."

The Judicial Conference of the United States under which I act has not considered the particular bill and, therefore, I am not in a position to express an official opinion in regard to it, although the conference is on record in opposition to the procedure of a trial de novo by a three-judge court for review of the orders of administrative agencies. I would point out that the provision that appeals from the order of the Administrator shall be in the nature of a trial de novo, reverses what has been for 20 years or more a uniform trend in the Federal Government to provide for the hearing and decision of appeals from orders of administrative agencies by the courts of appeals upon the record made before the agencies. This procedure has been repeatedly provided for by the Congress, most recently by a law passed at the end of the Eighty-first Congress and approved December 29, 1950, in relation to the review of certain orders of the Federal Communications Commission, the Secretary of Agriculture, and the United States Maritime Commission (Public Law 901 of the 81st Cong.). That law originated in a recommendation of such legislation by the Judicial Conference.

The considerations underlying the act are stated in House Report No. 2122 of the Eighty-first Congress. The report states that review by the court of appeals of orders of administrative agencies upon the record made before the agencies "has important advantages in simplicity and expedition" over a trial de novo by a three-judge court. From the report I quote pertinent portions as follows:

"First, the submission of the cases upon the records made before the administrative agencies will avoid the making of two records, one before the agency and one before the court, and thus going over the same ground twice * * *."

"Second, in many cases in which hearing in the district courts by panels of three judges is now required there will be a large saving of judicial time and energy. It is generally recognized that three-judge courts are not well adapted for conducting hearings. The necessity of holding conferences whenever questions arise in the course of the proceedings, as they repeatedly do in relation to such matters as the admissibility of evidence. very much slows the trial. In addition the proceeding takes the time of three judges, whereas one would be sufficient at this

preliminary stage of the case. The method of review prescribed by the proposed bill would secure the collaboration of three judges at the stage where it is useful, namely, in the decision without consuming their time unnecessarily in the preceding phases of the case."

While the practice which was changed by Public Law 901 of the Eighty-first Congress in reference to the agencies there concerned was trial de novo by a three-judge district court and the trial de novo on appeal from orders of the Administrator in the field of the pending bill would be such a trial by three judges of a court of appeals, all the disadvantages of trial de novo by a three-judge court referred to in the report of the last Congress would apply. There would be the same going over the ground twice in two records, the same difficulty inevitable in a court of three judges in conferring upon questions of the admission of evidence and other interlocutory matters arising during the proceedings, thus slowing the trial, and the same absorption of the time of three judges where one would be sufficient. It may be added that in no case at present, with perhaps an occasional extraordinary exception does a court of appeals sit as a trial court or hear evidence. The present statute which the pending bill would change, provides that even in those instances in which the court allows the petitioner to adduce additional evidence, such evidence shall be taken before the Administrator and adduced to the court rather than taken by the court of appeals directly.

The precedent which would be set by the pending bill of having the hearing on review conducted by the court of appeals as a trial de novo would be a radical departure. It would be contrary to the general judgment in reference to the effective procedure for the review of orders of administrative agencies as expressed in the report and law of the last Congress which have been cited. Such a change of method at this time when there is serious congestion in a number of Federal courts would tend to increase the present difficulties and delays in the handling of the judicial business.

Sincerely yours,

HENRY P. CHANDLER.

---

ADMINISTRATIVE OFFICE OF THE UNITED STATES COURTS,
*Washington 13, D. C., April 12, 1951.*

Hon. ROBERT CROSSER,
*House Office Building, Washington, D. C.*

DEAR CONGRESSMAN CROSSER: In further reference to the bill to amend section 503 (b) of the Federal Food, Drug, and Cosmetic Act (H. R. 3298) about which you inquired of me on March 22, 1951, I would point out that the provision for judicial review of actions of the Administrator contained in the next to the last paragraph of subsection (b) of section 503 of the statute as proposed to be amended (p. 4, lines 11 to 14 of the bill) is in conflict with the criterion prescribed in such long-considered and deliberate enactments of the Congress as the Administrative Procedure Act approved June 11 1946 (60 Stat. 237), and the Labor Management Relations Act, 1947, commonly known as the Taft-Hartley Act approved June 23, 1947 (61 Stat. 136). The legislative policy in reference to the weight to be given to the decisions of administrative agencies by the courts and the evidence necessary to sustain them were recently considered at length by the Supreme Court of the United States and reviewed in detail in the case of *Universal Camera Corporation* v. *National Labor Relations Board* (No. 40 at the present term of the court). At the same time the court rendered a brief corollary opinion applying the same standard of review in the case of *National Labor Relations Board* v. *Pittsburgh Steamship Co.* (No. 42 at the present term of court). Briefly, the development of the standard to be applied by the courts on the review of orders of administrative agencies as set forth in the opinion in the case of the Universal Camera Corp., supra, is this:

The original National-Labor Relations Act, commonly known as the Wagner Act, provided in section 10 (e) in reference to the judicial review of decisions of the National Labor Relations Board that "The findings of the Board as to the facts, if supported by evidence, shall be conclusive" (49 Stat. 449, 454, 29 U. S. C. 160 (e)).

The Supreme Court in *Washington, V. & M Coach Co.* v. *Labor Board* (301 U. S. 142) construed "evidence" to mean substantial evidence. In the early years of application of the Wagner Act the opinion became current that on judicial review of an order of the National Labor Relations Board, if there was in the record made before the Board evidence which taken by itself would justify the Board's decision, that would be enough to satisfy the test of substantial evidence irrespec-

tive of other parts of the record.  The Supreme Court in its opinion supra stated that there were expressions in some of the opinions of that Court which were cited (*Labor Board* v. *Waterman Steamship Corp.*, 309 U. S. 206; *Labor Board* v. *Bradford Dyeing Assn.*, 310 U. S. 318; and *Labor Board* v. *Nevada Consolidated Copper Corp.*, 316 U. S. 105) that whether or not so contemplated gave color to that view.

The doctrine stated brought criticism which was reflected in the passage in 1940 of the Walter-Logan bill.  Even so, the bill adopted the test for judicial review of orders of administrative agencies which was expressed in the Wagner Act as construed by the Supreme Court, that the findings of fact by an agency could be set aside by a court if "not supported by substantial evidence."  President Roosevelt vetoed the bill partly because it limited too strictly the administrative process and partly because an experienced committee appointed by the Attorney General of the United States was then engaged in a study of the actual operation of the administrative process.  That committee submitted its final report in 1941. The majority report observed that there was dissatisfaction with the fact-finding procedures then being used by administrative bodies but concluded that it would be inadvisable to depart from the test on judicial review of substantial evidence which then applied to the review of orders of administrative agencies.  Three members of the committee, however, registered dissent on the ground that the recommendations of the committee did not go far enough to correct defects in the procedures of administrative agencies.  Among other things, the dissenting members of the committee recommended as one principle of judicial review applicable generally to administrative agencies, that review should extend to "findings, inferences, or conclusions of fact unsupported, upon the whole record, by substantial evidence."  The Supreme Court in the Camera Corp. case supra states that reference to the whole record appears for the first time in the recommendation of the minority of the Attorney General's committee.  The opinion of the Court goes on to state that this idea found its way into the Administrative Procedure Act enacted in 1946 (pp. 6 to 8 of the opinion in the Camera Corp. case supra).  So the Administrative Procedure Act in section 10 (e) provided that on judicial review the court should hold unlawful and set aside agency action if—

"(5) unsupported by substantial evidence in any case subject to the requirements of sections 7 and 8 or otherwise reviewed on the record of an agency hearing provided by statute; or (6) unwarranted by the facts to the extent that the facts are subject to trial de novo by the reviewing court.  In making the foregoing determinations the court shall review the whole record or such portions thereof as may be cited by any party, and due account shall be taken of the rule of prejudicial error" (60 Stat. 244, 5 U. S. C. 1009 (e)).

It is important to note that the statute requires that a court in determining whether or not an order of an administrative agency under review is "unsupported by substantial evidence" shall "review the whole record or such portions thereof as may be cited by any party."  In short, in adopting the Administrative Procedure Act the Congress did not do away with the presumption on review in favor of the decision of an administrative agency if supported by substantial evidence, but made it unmistakably clear that the reviewing court in determining whether there was substantial evidence to justify the conclusion must take into account the whole record, or any portions cited by any parties, which doubtless would be all the pertinent parts.

The Supreme Court in its recent opinion in the Camera Corp. case points out that the amendment of the Wagner Act by the Taft-Hartley Act adopted in effect the same standard for judicial review of decisions of the National Labor Relations Board, that was prescribed for administrative agencies generally by the Administrative Procedure Act.  The provision of the Taft-Hartley law appears in section 10 (e) that the findings of the National Labor Relations Board "with respect to questions of fact if supported by substantial evidence on the record considered as a whole shall be conclusive" (29 U. S. C., 1946 ed., Supp. III, 160 (e)).

The Supreme Court points out in the Camera Corp. case that the effect of the Administrative Procedure Act and the Labor-Management Relations Act, 1947, has been to require reviewing courts to carry the scrutiny of decisions of administrative agencies further than was thought in some legal circles to be necessary prior to the passage of the Administrative Procedure Act.  Upon this the Court said:

"Whether or not it was ever permissible for courts to determine the substantiality of evidence supporting a Labor Board decision merely on the basis of evidence which in and of itself justified it, without taking into account contra-

dictory evidence or evidence from which conflicting inferences could be drawn, the new legislation definitively precludes such a theory of review and bars its practice. The substantiality of evidence must take into account whatever in the record fairly detracts from its weight. This is the clear meaning of the reference in both statutes to 'the whole record.' Committee reports and the adoption in the Administrative Procedure Act of the minority views of the Attorney General's Committee demonstrate that to enjoin such a duty on the reviewing court was one of the important purposes of the movement which eventuated in that enactment."

The Supreme Court is careful to point out in its recent decision that it does not mean that in reviewing the decision of an administrative agency a court shall consider the record before the agency de novo and substitute its judgment for that of the agency. The court expressed its meaning upon the necessity of considering "the whole record" as follows:

"To be sure, the requirement for canvassing 'the whole record' in order to ascertain substantiality does not furnish a calculus of value by which a reviewing court can assess the evidence. Nor was it intended to negative the function of the Labor Board as one of those agencies presumably equipped or informed by experience to deal with a specialized field of knowledge, whose findings within that field carry the authority of an expertness which courts do not possess and therefore must respect. Nor does it mean that even as to matters not requiring expertise a court may displace the Board's choice between two fairly conflicting views, even though the court would justifiably have made a different choice had the matter been before it de novo. Congress has merely made it clear that a reviewing court is not barred from setting aside a Board decision when it cannot conscientiously find that the evidence supporting that decision is substantial, when viewed in the light that the record in its entirety furnishes, including the body of evidence opposed to the Board's view."

The provision of the pending bill that the review before a court of appeals of a decision of the Administrator under the Federal Food, Drug, and Cosmetic Act "shall be in the nature of a trial de novo, without presumptions in favor of either party" is plainly contrary to the policy of the Congress deliberately adopted in the Administrative Procedure Act after years of discussion and consideration and followed in the Taft-Hartley law. That policy is that the judical review of orders of administrative agencies shall be upon the record made before the agencies and not in the nature of a second trial, and that if the action of the agency is supported by substantial evidence when considered in the light of the entire record, it shall stand. It would seem that the Congress might hesitate to change a policy based upon experience and finally crystallized in outstanding legislative acts, as the pending bill would do.

    Sincerely yours,

HENRY P. CHANDLER.

# MINORITY REPORT

We do not have any objections to the provisions of the bill which give authority for the filling and refilling of oral or telephone prescriptions. The present law does not recognize oral prescriptions, and we agree with the majority that, for the benefit of the public, the physician, and the retail druggist, the filling and refilling of oral prescriptions, under proper safeguard should be permitted. We also approve restricting the refilling of prescriptions dispensing dangerous drugs, except when authorized orally or in writing by the physician. We believe that the enactment of the foregoing provisions of the bill is as far as Congress should go at this time in making changes in the present law with respect to the labeling and dispensing of drugs. The remaining provisions would make basic changes in the method of determining which drugs are dangerous and may be sold only on prescription, and which drugs are safe and may be sold over the counter. We think the present method, which leaves this determination to the courts, should be left unchanged except that a proper standard to be applied in determining whether a drug is dangerous should be incorporated in the statute.

### BASIS FOR OBJECTIONS

The most objectionable feature of the bill lies in the provision which would give the Federal Security Administrator the power to determine the category in which a drug should be placed. In other words, the Administrator would decide by the issuance of regulations the drugs which could be sold only upon prescription and, by the process of exclusion, those which could be sold over the counter without prescription. This we believe to be a dangerous delegation of authority to the Federal Security Administrator and one that is wholly unnecessary. Moreover, instead of solving the problems of the public, the retail druggist and the physician, it will add to present difficulties by increased bureaucratic regulation.

Admittedly, there is some degree of confusion today arising from labeling policies by drug manufacturers. In some instances one company will label a drug for prescription sale only, while another will label the same drug for over-the-counter use. But there is a remedy for this situation under existing law. If a drug manufacturer places a dangerous drug on the market without a proper caution label against nonprescription use, he may be prosecuted criminally, and the Government may seize his product. Similarly, if a drug manufacturer labels a harmless drug for prescription use only he may likewise be proceeded against for erroneous labeling. If a druggist dispenses a drug which the manufacturer has not properly labeled he is not subject to prosecution while acting in good faith.

Retail druggists have been told that if this bill passes they could then rely upon the label of the manufacturer and safely dispense all

drugs in accordance therewith. But such is far from being the case. Under the amended bill the druggist could not safely dispense any drug without referring to the regulations of the Federal Security Administrator. If he sold a drug contrary to the regulations of the Administrator he would be subject to prosecution and the defense of good faith would not be available to him.

### THE DRUGGISTS' DILEMMA

It is reliably estimated that if this bill became a law on its effective date approximately 30,000 drugs would be subject to regulation. This would mean that every druggist in the country would have to obtain copies of the Security Administrator's regulations from the Federal Register, and go over his entire inventory and relabel his drugs in conformity with such regulations. This initial task would be a tremendous burden to the average druggist, but his troubles wouldn't end there. Thenceforth, he would have to review the regulations in the Federal Register from day to day and week to week in order to be sure that he was complying with the Administrator's list.

We are all familiar with the problems that beset the small-business man today because of OPS and other bureaucratic regulation. For Congress to impose the additional regimentation upon the already harried and frustrated small-business man is not only unreasonable but ridiculous.

We maintain, therefore, that the present system of determining prescription drugs by judicial process on a case-by-case basis is much to be preferred over the suggested remedy, which would create more headaches than it would solve. We have been constrained to disagree with the majority and to file this report because we are convinced that the bill as reported constitutes an excessive and entirely unwarranted grant of discretionary power to the Federal Security Administrator.

### REGULATION OF THE DRUG INDUSTRY

The exemption of prescription refills and of oral prescriptions from certain labeling requirements of the Federal Food, Drug, and Cosmetic Act has been availed of for the advancement of a plan to regulate the drug industry. The bill as reported empowers the Administrator to restrict to prescription sale all articles included within the broad definition of the word "drug" which he has determined to be "safe and efficacious for use only after professional diagnosis by, or under the supervision of, a practitioner licensed by law to administer such drug."

The word "drug" as defined in the Federal Food, Drug, and Cosmetic Act, means: (1) articles recognized in the United States Pharmacopoeia, the Homeopathic Pharmacopoeia of the United States, and the National Formulary; (2) articles intended for use in the diagnosis, cure, mitigation, treatment, or prevention of disease in man or other animals; (3) articles (other than food) intended to affect the structure or any function of the body of man or other animals; and (4) articles intended for use as a component of any of the foregoing articles.

This definition includes substances, compounds, mixtures, and fabrications of all kinds and forms used, or intended to be used, for the purposes above stated. There was testimony at the hearings that there are approximately 30,000 such "drugs." Any such drug intended for use by man which "on the basis of opinions generally held among experts qualified by scientific training and experience to evaluated the safety and efficacy of such drug" the Administrator determines "to be safe and efficacious for use only after professional diagnosis by, or under the supervision of, a practitioner licensed by law to administer such drug," shall be thereby restricted to sale only on prescription.

The bill grants the Administrator authority to separate all drugs into two classes—prescription and over the counter. Notwithstanding the majority report's references to "dangerous" and "potent" drugs, this power is not confined to them. There is little, if any, uncertainty about them. This power will find its greatest exercise in the wide field of conflicting opinion. There, as the testimony shows, "there are literally thousands of different drug items." This large field was described by the Administrator, in his testimony before the committee, as the "twilight zone." The power to govern it administratively would in time, amount to an over-all control of the manufacture, distribution, and administration of drugs. And, in the exercise of it, the Administrator would have greatly to do not only with the manufacture and distribution of drugs, but with the practice of pharmacy and medicine.

### EFFICACY OF DRUGS

This control is widened by the use of the words "efficacy" and "efficacious". The majority report labors a distinction between the Administrator having the power "to determine which drugs are 'efficacious' or 'effective'" and his having the power to determine whether they "can be used efficaciously without professional diagnosis or supervision." The undersigned do not find the distinction to be as clear and as easily discernible as the majority professes. Stated either way, the power granted to the Administrator is vast in scope, and, in administrative application and interpretation, would in time become larger and embrace both statements of the authority.

The majority illustrates with the drug quinidine sulfate. More illustrative, however, is a statement in the Administrator's testimony. Asked whether there is any possibility under the bill that a prescription would be required for a refill of aspirin, the Administrator stated:

Well, as of today, I would say "No," but I think you have to recognize that under this bill you might have an Administrator who would call a hearing to put aspirin on the list of dangerous drugs. If he held that aspirin was a dangerous drug and that was appealed to the circuit court of appeals and they upheld it, then you would be in that situation.

For further illustration, attention may be drawn to the word "diagnosis." Drugs which the Administrator determines are not safe or efficacious until "after professional diagnosis" are to be restricted to prescription sale. It is well known that there are some "experts" who entertain the view that hardly any drug is either "safe" or "efficacious" without professional diagnosis; that the layman is not competent to diagnose his ailments; and that, without being able to diagnose, he is all the more unable to prescribe for himself.

AMENDING THE FEDERAL FOOD, DRUG, AND COSMETIC ACT    **31**

## SOCIALIZED MEDICINE

In the opinion of the undersigned, there is no doubt that the bill as reported jeopardizes the traditional right of self-medication and choice of remedies. Self-medication is not confined to so-called "patent medicines." It embraces use by the public of medicaments or "drugs" which are sold over the counter and which may be purchased without prescription, whether or not they are advertised direct to the public by newspaper, magazine, and radio. The Federal Food, Drug, and Cosmetic Act, as enacted in 1938, recognized the right of self-medication, and one of the committee reports stated that it was not the purpose of the act to restrict self-medication, but to make it safe.

Thousands of articles of a medicinal or remedial nature are now lawfully available to the people and may be purchased without the expense of prescriptions—fees to doctors and prescription prices at the drug store. The undersigned believe that the bill as reported will increasingly over the years restrict the number and nature of drugs available to the public on over-the-counter sale, and thus will gradually and substantially increase the cost of medication. This bill, therefore, could very well become a handmaiden of socialized medicine in that as the costs of medical care are increased there will be a corresponding demand by the people for governmental relief.

## CONTROL BY LICENSE

No grant of administrative power as wide in scope and as far-reaching in effect and implication as that in this bill has heretofore been proposed for the regulation of the drug industry. The grant of power in this bill is such as to transform, as to drugs, the Federal Food, Drug, and Cosmetic Act from a control by statutorily defined requirements to a control by license.

This proposed control is subject only to limited, uncertain, and impracticable restraint. It is no restraint to say, as the bill does, that the Administrator is to make his determination "on the basis of opinions generally held among experts qualified by scientific training and experience to evaluate the safety and efficacy" of drugs. Rather, it is lax to permit administrative authority to be constituted and rights of citizens determined on "opinions generally held" by persons unnamed in and unknown to the statute, to be selected and qualified at later times by the Administrator himself.

Practically, this bill shifts the burden of proof from the Administrator, who would assert the authority, to the citizen, who challenges it. The bill provides that the Administrator makes his determination merely on the basis of opinions of experts. If the producer or distributor of one of the drugs whose sale is restricted challenges the Administrator's determination, the bill provides that he "may file with the Administrator a petition proposing * * * a modification of a determination made or proposed to be made by the Administrator * * *." Then a sequence of time-consuming and expensive steps are begun:

(1) The Administrator gives public notice of the proposal contained in the petition and gives to "interested" persons an opportunity to present views orally or in writing;

**32**  AMENDING THE FEDERAL FOOD, DRUG, AND COSMETIC ACT

(2) Thereafter, the Administrator makes public his action on the proposal;

(3) Within 30 days after he makes such action public, any "interested" person may file with the Administrator objections to such action, stating changes proposed, grounds therefor, and requesting a public hearing "for the taking of evidence of experts who are qualified by scientific training and experience to testify on the question of whether the drug in question is safe and efficacious for use only after professional diagnosis by, or under the supervision of, a practitioner licensed by law to administer such drug";

(4) The Administrator shall then give notice and hold a public hearing;

(5) Thereafter, the Administrator shall make his determination and issue an order;

(6) The order shall then be subject to "judicial review in accordance with the provisions of section 701 (f) and (g)" of the Federal Food, Drug, and Cosmetic Act, which are (in part):

(f) A summons and petition served upon the Administrator, whereupon the Administrator must certify and file in the court the transcript of the proceedings and the record on which the Administrator based his order;

(g) A certified copy of the transcript of the record and proceedings shall be furnished by the Administrator to any interested party at his request, and payment of the cost thereof.

(7) Review of the record by a United States Court of Appeals. "The findings of the Administrator as to the facts, if supported by substantial evidence, shall be conclusive."

### CONCLUSION

We desire to affirm our support of that part of the proposed legislation referred to in the first paragraph of this report. Our objections to the remaining provisions of the bill are grounded on the tremendous grant of unnecessary power in the hands of the Federal Security Administrator.

LEONARD W. HALL,
JOSEPH P. O'HARA,
JOHN B. BENNETT.

# INDIVIDUAL MINORITY VIEW

The undersigned, while concurring in the minority report in opposition to the vast delegation of authority to the Administrator, strongly feels that if this bill is to become law there should be a provision for an appeal and a trial de novo in the United States district court.

Not having had the time to submit my individual views to the other signers of the minority report, I therefore take the responsibility of submitting these additional views.

An appellant who desires a review of the record by a United States court of appeals, is confronted with the law, with reference to the decisions of the Federal Security Administrator, as follows:

The findings of the Administrator as to the facts, if supported by substantial evidence, shall be conclusive.

The majority of the committee takes the position that the Administrator's action under the bill in listing a drug as "dangerous," thereby limiting it to prescription sale, is subject to judicial review which will assure those affected against abuse of the power granted the Administrator.

With this conclusion I vigorously disagree.

The bill provides for judicial review under the familiar "substantial evidence" rule, which permits the courts to overturn administrative action only if the abuse of administrative authority is of a most flagrant character.

In recent years there has been increasing dissatisfaction with the "substantial evidence" rule, under which the findings of fact made by the administrative agency are conclusive if supported by substantial evidence.

The following typical statements by the Supreme Court give an idea as to the limitations under which the courts have operated in reviewing administrative action under the "substantial evidence" rule:

\* \* \* (The) court \* \* \* will not consider the expediency or wisdom of the order, or whether, on like testimony, it would have made a similar ruling. *Int. Com. Comm.* v. *Union Pacific R. R.*, 222 U. S. 541.

The order of the Commission \* \* \* was not arbitrary but sustained by substantial, though conflicting, evidence. The courts cannot settle the conflict nor put their judgment against that of the rate-making body \* \* \*. *Int. Com. Comm.* v. *Louis. & Nash. R. R.* 227, U. S. 88, 100.

If the record contained any substantial evidence to support the administrative fact findings, the courts often have felt obligated to sustain the administrative action without reference to how heavily such evidence may have been outweighed by the countervailing evidence in the record. Under this limitation the courts cannot set aside administrative action even when it is clearly contrary to the manifest weight of the evidence.

The type of judicial review leaves much too large an area in which the administrative agency has a free hand to exercise, in an unfair

**34**  AMENDING THE FEDERAL FOOD, DRUG, AND COSMETIC ACT

and unjust manner, the power of life and death over important elements of the economic structure of the country.

The majority report strongly suggests that recent Supreme **Court**
decisions (*Universal Camera Corp.* v. *N. L. R. B.* and *Labor Board* **v.**
*Pittsburgh S. S. Co.*) have made a change in the law which insures
operation of the "substantial evidence" rule in such manner that full
protection will be given by the courts against unjustified administrative action. These cases held that the courts, in determining
whether the administrative action is supported by substantial evidence, are under a duty to make that determination after consideration of the whole record before the administrative agency. No one
can say at this time whether, or to what extent, these cases will actually
change anything so far as scope and character of judicial review is
concerned. There is good ground for believing that they merely
state what the law always has been. There is nothing in these cases
to indicate that the Supreme Court would regard it as proper for a
reviewing court to weigh the evidence in the record and, on the basis
of its appraisal of the evidence, reach its own independent judgment
as to what the administrative action should have been and take appropriate action to insure that the administrative action conforms to
the judgment of the court.

Mr. Justice Frankfurter, speaking for the Court in the Universal
Camera case, made the following statement which indicates the
narrow limits of judicial review under the law as it is interpreted in
that case:

> To be sure, the requirement for canvassing "the whole record" in order to
> ascertain substantiality does not furnish a calculus of value by which a reviewing
> court can assess evidence. * * * Nor does it mean that even as to matters
> not requiring expertise a court may displace the Board's choice between two
> fairly conflicting views, even though the court would justifiably have made a
> different choice had the matter been before it de novo.

In the opinion of the undersigned, these cases have no important
bearing on the fundamental issue here involved.

The bill as introduced would have authorized judicial review of
the Administrator's action in a proceeding in the nature of a trial
de novo. In the opinion of the undersigned, that type of judicial
review would afford a proper judicial check on administrative abuses.

Largely on the basis of testimony presented to the committee by
Judge Stephens of the United States Court of Appeals for the District
of Columbia, the committee has rejected this proposal of the introduced bill.

To the extent that the testimony criticized provision for a de novo
trial in a United States court of appeals, the objections made by Judge
Stephens are probably sound, but no convincing argument has been
made against providing for de novo review in an appropriate United
States district court. It may be true that review by district courts,
if provided for in the case of administrative action of every type,
would make some increase, to a limited extent, of cases in United
States district courts. However, the proposal in the introduced bill
did not extend to all cases of administrative action, but only to review
of the action of the Federal Security Administrator, under this proposed legislation, in listing a drug as a "dangerous" drug. This
would not require any increase in the number of United States district
judges, in my opinion. Furthermore, even if it did, that would be **a**

small price to pay for judicial review which would effectively control abuses in the exercise of the vast administrative power which this bill proposes to grant to the Federal Security Administrator.

The majority report, apparently on the basis of views stated in letters from the Federal Security Administrator and the Deputy Attorney General of the United States, expresses doubts as to the constitutionality of any provision providing for judicial review of the Administrator's action in a de novo proceeding, on the ground that this would seek to have Federal "constitutional" courts exercise an improper function—that is, one which is legislative or administrative in character, and therefore "nonjudicial."

The views expressed in the letters referred to are based upon a decision rendered by the Supreme Court in the General Electric case (281 U. S. 464) which was decided in 1930. That case held that the Supreme Court (being a "constitutional" court, i. e., one which, because created under the judiciary article of the Constitution, can exercise only "judicial" powers) could not be vested with the power to act as a "superior and revising" administrative agency in reviewing a decision of the Court of Appeals of the District of Columbia (which is not a "constitutional" court) in a case, arising under the Radio Act of 1927, in which the latter court had exercised de novo review of action taken by the Federal Radio Commission. This, the court said, was because it could exercise "judicial powers only," and could not "exercise or participate in the exercise of functions which are essentially legislative or administrative."

The argument is that since United States courts of appeals and United States district courts are "constitutional" courts the principle of the General Electric case applies to them, although this specific question has never been judicially decided. However, even if this is so, de novo review of the Administrator's action would not be barred by the principle of the General Electric case. This is because of the difference in the nature of the function which the court would exercise.

In the General Electric case the basic question in issue was whether the public convenience and necessity would be served by granting an application for renewal of a broadcasting license. Under this bill, the question in issue would be whether a particular drug is—

because of its toxicity or other potentiality for harmful effect, or the method of its use, or the collateral measures necessary to its use * * * (determined) * * * on the basis of opinions generally held among experts qualified * * * to evaluate the safety and efficacy of such drug * * * to be safe and efficacious for use only after professional diagnosis by, or under the supervision of, a practitioner licensed by law to administer such drug.

It will be seen at a glance that the bill calls for the application of a standard, or test, which is not of the same character as that involved in the General Electric case. The latter case called for the exercise of broad judgment and discretion in deciding whether renewal of a broadcasting license would serve "the public convenience and necessity." It is not surprising that the Supreme Court took the view that substitution of its judgment for that of the agency on that question would have involved exercise of a nonjudicial function.

However, under the bill, no similar judgment or discretion would have to be exercised by the court. In applying the standard, or test, provided for by the bill a court would be determining whether a particular drug was or was not included within its terms. The function

of the court would not be essentially different from that exercised by courts every day. It would merely call for application of a statutory standard to the facts of a particular case.

In this connection, it is important to bear in mind that the standard written into the bill is essentialy the same as that now contained in the regulation (prescribed under section 502 (f) of the act) which differentiates "dangerous" drugs (which may be sold only on prescription) from those drugs which (if they bear adequate directions for use) may be safely sold over the counter. In criminal prosecutions, and in seizure and injunction proceedings, involving alleged misbranding, the outcome of the case may depend upon the application by the court to the facts of the case of this standard prescribed in the regulation. If the courts exercise a "judicial" function in applying this standard in criminal, seizure, and injunction actions, how can it be reasonably contended that a court would be called upon to exercise a "nonjudicial" function in applying essentially the same standard in de novo review of the Administrator's action?

Furthermore, it was urged before the committee that this same standard be written into the bill as the basis for case-by-case judicial decision as to which drugs are "dangerous" and which drugs are not. No one suggested that that proposal would have required the courts to exercise a "nonjudicial" function.

The need for trial de novo is emphasized by the narrowness of review of administrative proceedings by the appellate courts. In an increasing number of cases the courts are declaring their impotence to review the findings of fact.

Particularly is this true where the administrative decision is of a quasi-judicial nature, as in the instances of appeals from the Federal Trade Commission, which is a fact-finding body. The courts have repeatedly held that they are bound by the Federal Trade Commission's judgment as to the quality and sufficiency of evidence. Such evidence may consist of biased testimony—*Segal* v. *Federal Trade Commission* (142 Fed. (2d) 255); incompetent evidence—*Bene* v. *Federal Trade Commission* (299 Fed. 468); and the testimony of selected experts—*E. Griffith Hughes, Inc.* v. *Federal Trade Commission* (77 Fed. (2d) 886). In the Segal case the court observed that a part of the testimony was "obviously biased" and said:

> Even so, if the Commission wished to rely upon such testimony, we may not intervene, whatever might be our own indisposition to accept what he said.

The courts refuse on appeal to weigh the evidence. They hold that they are bound by the Commission's findings, if supported by evidence, despite the fact that the weight may be to the contrary. Thus, they need read only the Commission's side of the case and if there is evidence to support the findings, the record to the contrary may be ignored.

The principles of a trial de novo are outlined in my opinion, by Chief Justice D. Lawrence Groner of the Circuit Court of Appeals for the District of Columbia in a letter to the Attorney General—report of the Committee on Administrative Procedure, Seventy-ninth Congress, page 248:

> The correct decision of this question is one of immense importance. It should, in my opinion, be considered by Congress in the light of the real and true purposes which the founders of our Government sought to achieve for themselves and their

posterity. These were free action, free enterprise, free competition. They believed that equal justice between man and man and between citizen and state was one of the impartial rewards which encouraged to efforts that produced great and lasting results. Therefore, they made no provision for exemptions from legal duty. What they did provide for was that there should be no oppression, no exaction by tyranny, no spoliation of private right by public authority, and that there should be a fair, honest, effective government to maintain the things which were thought to be the prerogatives of every individual man.

As in the case of the Federal Trade Commission, the Federal Security Administrator is not only a regulator but he will adjudicate issues of fact between the Government and the citizen as a judicial tribunal. The Administrator, under this bill, will be asked to determine the question of fact of some 30,000 drug items—

because of its toxicity or other potentiality for harmful effect, or the method of its use, or the collateral measures necessary to its use * * * (determined) * * * on the basis of opinions generally held among experts qualified * * * to evaluate the safety and efficacy of such drug * * * to be safe and efficacious for use only after professional diagnosis by, or under the supervision of, a practitioner licensed by law to administer such drug.

In the light of the above-quoted section of this bill, the Administrator will be called upon to make decisions of fact "on the basis of opinions generally held among experts qualified." It may be upon the decision of one expert who is opposed by many experts, upon testimony which may be biased or unbiased; and yet, under existing decisions, even if the Administrator made his decision on testimony which was obviously biased, that decision of the Administrator, for all practical purposes, would be final without a trial de novo.

In the light of the Supreme Court decisions and the sweeping scope of the powers granted the governmental administrative agency, unless there is to be complete administrative absolutism, it is obvious that both the Government and the individual should have a "day in court."

JOSEPH P. O'HARA.

O

MEMORANDUM

DATE:        August 24, 2006

FROM:        Steven Galson, MD, MPH
             Director, Center for Drug Evaluation and Research

TO:          NDA 21-045, S-011

SUBJECT:     Plan B[®]

## I.    Introduction

On April 16, 2003, Barr Pharmaceuticals (Barr or the sponsor[1]) submitted a supplement to NDA 21-045 to switch Plan B[®], (levonorgestrel) Tablets, 0.75 mg, to over-the-counter (OTC) status.  The supplement, S-011, submitted under section 505(b) of the Federal Food, Drug, and Cosmetic Act (the Act), was received April 23, 2003.  On May 6, 2004, I issued a Not Approvable letter because the supplement did not contain data demonstrating that the product was safe and effective for OTC use by women under age 16.

On July 21, 2004, Barr resubmitted its supplement to NDA 21-045, S-011, seeking to switch Plan B[®]'s prescription (Rx) status to OTC for women 16 years of age and older, and to have Plan B[®] remain Rx for women under 16 years of age.  This resubmission of July 21, 2004, constituted a complete response to our May 6, 2004, Not Approvable letter.  The resubmitted supplemental new drug application proposed to switch Plan B[®] to OTC status for women ages 16 years or greater and maintenance of prescription status for women under age 16.

On August 26, 2005, then Commissioner Lester M. Crawford, DVM, PhD, sent the sponsor a letter indicating that the Center for Drug Evaluation and Research (CDER) had completed its review of the application, as amended, and had concluded that the available scientific data are sufficient to support the safe use of Plan B[®] as an OTC product, but only for women who are 17 years of age and older.

The letter went on to state, however, that the Agency was unable, at that time, to reach a decision on the approvability of the application because of unresolved issues that related to the NDA.  The letter mentioned three issues:  whether the same active ingredient could be marketed both Rx and OTC based solely on the age of the individual using the drug; how, as a practical matter, an age-based distinction could be enforced; and whether the Rx and OTC versions of the same active ingredient may be marketed in a single package.  The letter also stated that the agency had decided to ask for public comments on whether we should initiate a rulemaking to codify our interpretation of section 503(b) of the Federal Food, Drug, and Cosmetic Act regarding when an active ingredient can be

---

[1] The current applicant for the Plan B sNDA is Duramed Research Pharmaceuticals, a wholly-owned subsidiary of Barr.  For ease of reference, this memo will refer to both entities as Barr.

simultaneously marketed in both a prescription drug product and an OTC drug product through an advance notice of proposed rulemaking (ANPRM) that published on September 1, 2005 (70 FR 52050). The comment period closed on November 1, 2005, and the agency received about 47,000 comments. The agency hired a contractor to summarize and categorize the comments and the contractor submitted a final report on May 19, 2006.

On July 31, 2006, Dr. Andrew von Eschenbach, Acting Commissioner of Food and Drugs, sent the sponsor a letter indicating that the agency had reviewed the comments received in response to the ANPRM and determined it was not necessary to engage in rulemaking to resolve the novel regulatory issues raised by the application and that we were now proceeding with further evaluation of the application.

CDER staff met with the sponsor on August 8, 2006, and discussed how to address the issues raised in Dr. von Eschenbach's letter regarding the restriction on OTC sales of Plan B® to ages 18 and over, the packaging of prescription and OTC Plan B® in one package, and the Convenient Access Responsible Education (CARE^SM) Program.

On August 17, 18, and 23, 2006, the sponsor amended its application to propose revisions to the labeling and to the CARE^SM Program.

## II.    Approval Standards

FDA must require Rx dispensing of any drug that is not safe for use "except under the supervision of a practitioner licensed by law to administer such drug."[2] A drug sponsor may submit a supplemental application to "switch" a drug that FDA has already approved for Rx use to OTC status. FDA will grant a supplemental application to "switch" when it finds that Rx dispensing is:

> not necessary for the protection of the public health by reason of the drug's toxicity or other potentiality for harmful effect, or the method of its use, or the collateral measures necessary to its use, and . . . the drug is safe and effective for use in self-medication as directed in proposed labeling.[3]

Such switch applications generally include data from actual use and labeling comprehension studies to demonstrate that the product can be safely and effectively used without the supervision of a practitioner licensed by law to administer the drug. FDA may approve an NDA application only when, among other things, the investigations submitted in the application include adequate tests showing whether or not the drug is safe for use under the conditions prescribed, recommended, or suggested in the proposed labeling and when there is sufficient information to determine from the application whether the drug is safe for use.[4]

---

[2] 21 U.S.C. § 353(b)(1).
[3] 21 C.F.R. § 310.200(b).
[4] See 21 U.S.C. § 355(d).

### III.    Findings

I have completed my review of this application, as amended, and have concluded that adequate information has been presented to demonstrate that the drug products are safe and effective for use under the conditions set forth in the draft labeling submitted August 23, 2006.  My previous memoranda on this application (May 6, 2004, and August 25, 2005) describe my reasoning for concluding that Plan B® is safe and effective for OTC use for ages 17 and older, but, in the absence of additional data demonstrating that it is safe and effective for OTC use in women under 17, it must remain Rx for this age group.[5] This memorandum addresses the three issues raised in Dr. von Eschenbach's July 31, 2006 letter:  the age 18 restriction, the packaging of the product, and the CARE[SM] program.

#### A.  Restriction to Rx Use for Women Under 18

Regarding the restriction on OTC use to age 18 and older, Dr. von Eschenbach decided that this was the appropriate age for OTC use for the reasons described in his memorandum of August 23, 2006.  I have read that memorandum and, although I previously concluded that OTC use should be restricted to women 17 or older, I have now determined that for the reasons Dr. von Eschenbach outlines, the approval of this application should reflect a restriction to OTC use for those age 18 and older.

#### B.  Packaging

Regarding the packaging of the Rx and OTC products in a single package, Barr has proposed to package Plan B® in a package that is designed to satisfy both the Rx and OTC labeling requirements.  On the front of the package, the statement will appear:  "Rx only for age 17 and younger."  In addition, the package will have the Drug Facts box required for all OTC products, and will have space for a pharmacist to apply the standard prescription drug labeling before dispensing the product pursuant to a prescription. These proposals make it clear that the product is Rx for age 17 and younger, and OTC for ages 18 and older, satisfying the requirements of section 503(b)(4)(A) of the Act that a drug that is subject to the prescription requirement in section 503(b)(1) bear the "Rx

---

[5] As I noted in my August 26, 2005, memo, various CDER reviewers recommended that Plan B® should be switched OTC for the entire population of women who might use the product, including women under age 18.  Similar views were expressed by various CDER reviewers in this review cycle (see for example, August 22, 2006, review of the Director, Office of New Drugs, the Director, Office of Nonprescription Products (ONP), and the Acting Director, Office of Drug Evaluation III).  For the same reasons described in my August 26, 2005, memo, I do not agree with those recommendations.

I would, however, like to clarify for the record a statement in my August 25, 2005 memo.  On page 5, I stated that if Plan B® was used routinely for contraception (a use inconsistent with the labeling), the well-known risks associated with hormonal contraceptives, such as blood clots and stroke, are likely to be higher than with the use of other contraceptives. While it would be inappropriate to use Plan B® for routine contraception because this dose of levonorgestrel has not been shown to be safe and effective for such a use, the relationship between progestin-only oral contraceptives, such as levonorgestrel, and strokes and blood clots has not been fully defined. This clarification does not change my view that the sponsor did not establish that Plan B® can be used safely and effectively by women under 17 without the supervision of a licensed practitioner.

only" symbol.  Because section 503(b)(1) applies here, section 503(b)(4)(B), does not.
Section 503(b)(4)(B) states:  "A drug to which paragraph (1) does not apply shall be
deemed to be misbranded if at any time prior to dispensing the label of the drug bears the
symbol described in subparagraph (A) [the "Rx only" symbol]."

Furthermore, there are important policy reasons for approving this packaging
configuration related to implementing the restriction of the OTC product to ages 18 and
over.  Because the package will be labeled with the "Rx only" symbol, State and Federal
law will require that the packages be dispensed only by pharmacies and other healthcare
providers such as physicians and clinics authorized to dispense prescription drugs.  The
product will not be available through convenience stores and gas stations because they
will not be authorized to sell the prescription product.  As described in  the CARE$^{SM}$
program, wholesale distributors and retail chain drug stores confirmed to the sponsor that
they will distribute Plan B$^{®}$ only to licensed pharmacies or heath care clinics.
Furthermore, since Plan B$^{®}$ has both Rx and OTC labeling, pharmacies will keep Plan B$^{®}$
behind-the-counter, and either a prescription or government-issued proof of age will be
presented before sale of the product.

## C. The CARE$^{SM}$ Program

In its July 2004 submission, Barr submitted proposed labeling that included a consumer
information leaflet that elaborates on the information contained on the Plan B$^{®}$ outer
carton and inner packaging.  Among the important information that is included in the
consumer information leaflet is information about how Plan B$^{®}$ works, when it is
appropriate to use Plan B$^{®}$, how often it should be used, side effects and warnings, and
directions for use.  In addition, Barr Laboratories proposed an educational program
(Convenient Access Responsible Education Program, CARE$^{SM}$) with the following
elements:  (1) labeling, packaging, web site, and informational 24-hour toll-free number,
(2) education initiatives for healthcare providers and pharmacists, (3) distribution plans,
and (4) monitoring efforts to assess whether the Rx/OTC age distinction is understood
and adhered to.

In response to Dr. von Eschenbach's letter of July 31, 2006, describing several issues that
he asked be addressed concerning the enforceability of the age restriction, representatives
from CDER met with Barr to discuss proposed changes to the CARE$^{SM}$ program to
address these concerns.  On August 17 and 18, and 23, 2006, Barr submitted amendments
to Supplement O11 proposing changes to the CARE$^{SM}$ program.

Specifically, Barr:

- Made changes throughout the program to reflect that Plan B$^{®}$ would be made
  available only by prescription to women age 17 and younger and would be made
  available OTC to those age 18 and older who show a government-issued
  identification of their age.
- Clarified that wholesale distributors and chain drug companies will only distribute
  Plan B$^{®}$ to licensed pharmacies or other licensed healthcare clinics.
- Clarified that since Plan B$^{®}$ will be labeled as both Rx and OTC, pharmacies will
  keep the product behind the counter to effectuate the restriction of the OTC

product to ages 18 and older.
- Clarified that if violations of the age restriction are observed, the sponsor will increase its educational efforts regarding the age restriction and focus on improving the level of understanding among pharmacists and pharmacy staff, and will also report repeat violators to the relevant State Boards of Pharmacy.[6]
- Committed to report to FDA the results of its surveys to provide signals of program effectiveness and potential problems, and the point-of-purchase monitoring program to determine whether the Rx requirement for those ages 17 and younger is being adhered to at the point of purchase. These results will be reported to FDA at six-month intervals beginning 30 calendar days after the six-month interval commencing on the date of the approval of the amended sNDA.
- Made additional editorial and clarifying changes to the CARE[SM] program to reflect changes in packaging.

I have determined that with the changes the sponsor has proposed, the CARE[SM] program is adequate to support my finding that Plan B[®] can be safely distributed in the package configuration proposed by Barr.

To ensure that Plan B[®] will be used safely and effectively by Rx consumers age 17 and below and OTC consumers age 18 and above, the sponsor has agreed to the following activities:

- Monitor trends in the use of emergency contraception to evaluate the effectiveness of the CARE[SM] program. Specifically, the sponsor agreed to conduct a market research survey or surveys of a subset of healthcare professionals annually, and when practicable, in collaboration with established professional groups. These surveys will be designed to determine whether the Rx requirement for those ages 17 and younger is being adhered to at the point of purchase and to provide signals of program effectiveness and potential problems

---

[6] I disagree with the recommendation by the Office of Surveillance and Epidemiology (OSE) that the CARE[SM] program should require the sponsor to notify FDA instead of the State Boards of Pharmacy when pharmacists repeatedly fail to comply with the age restriction (OSE Plan B[®] CARE[SM] Program Review Team Review, August 22, 2006). The Director, ONP, accepted OSE's recommendation (Director, ONP Review, August 22, 2006). OSE explained that it believed such a measure of monitoring the compliance with the age restriction was "overly punitive" and may have a negative impact on the availability of this product OTC. OSE states that a lack of pharmacy compliance may be reflective of an inadequate education plan and this information could be used as an opportunity to improve and/or revise the CARE[SM] program. I disagree that the sponsor's proposal is overly punitive, or that it is proposed as a substitute for adequate education. The CARE[SM] program states that "findings from the [point-of-purchase] study will be communicated to the pharmacy and the corporate office, if appropriate, since education and retraining will be the first course of remedial action." (CARE[SM] Program, August 22, 2006, p. 11) The plan states that only in the case of repeat violators will the violator's State Board of Pharmacy be notified. (Id.) Furthermore, these reports to a State Board of Pharmacy do not mean that FDA will not be informed of violations. The CARE[SM] program provides that the sponsor will report to FDA periodically the findings of the point-of-purchase monitoring program. I believe the sponsor's proposed approach to monitoring will increase the likelihood that pharmacists will dispense Plan B[®] appropriately, and it is within the sponsor's discretion to propose such action.

associated with consumers' understanding of the purpose and proper use of Plan B®.

- Using relevant survey data regularly collected by others (e.g., Centers for Disease Control's Behavioral Risk Factor Safety Surveillance (CDC BRFSS), Youth Risk Behavior Safety Surveillance (YRBSS)), to monitor for potential indicators that Plan B® is being used in an inappropriate manner. Potential areas of monitoring and reporting include evaluating possible correlations between increases in sexually transmitted infections (STIs) based on geographic areas and data and trends in pregnancy and/or abortion rates based on geographic areas.

- Conduct a "Point-of-Purchase Monitoring Program" to track how Plan B® is being sold at the time of purchase, including using anonymous shoppers who will be directed to visit locations where Plan B® is available and purchase the product. Using the data collected, the sponsor will document and analyze the level of comprehension of the Plan B® prescription age requirement and how it is handled at the point of purchase. The program will be conducted twice in the first year and annually thereafter. The sponsor will report repeat violators to the relevant State Boards of Pharmacy.

- Report to FDA on the results of these activities on a six-month interval beginning 30 calendar days after the six-month interval commencing on the date of the approval of the amended sNDA.

Finally, I note and agree with the other elements of the CARE[SM] program described in the submission of August 23, 2006, which are designed to help ensure compliance with the approved labeling, and particularly the restriction of OTC use to ages 18 and older. The program includes the following elements:

- The sponsor and third party distributors, wholesalers, and chain drug companies will only distribute Plan B® to licensed pharmacies or other licensed healthcare clinics. As a result, Plan B® will not be sold at gas stations or convenience stores. Given that Plan B® will have both Rx and OTC labeling, the pharmacies will keep Plan B® behind-the-counter.

- The sponsor will conduct an education campaign that will focus initially on healthcare professionals (including prescribers and pharmacists) to raise awareness and knowledge levels about emergency contraception. The education campaign will clearly communicate the prescription age requirement and the appropriate use of emergency contraception. The campaign will include continuing education by certified professionals and educational materials (including websites and toll free numbers) that can be accessed easily and at any time.

- The sponsor will make available to State Boards of Pharmacy continuing education programs for use at annual meetings and other regional programs.

- The sponsor will provide to prescribers and healthcare professional associations materials for distribution to patients that will encourage patients to discuss any questions about emergency contraception with a healthcare professional.

- The sponsor plans to educate consumers, in part by targeting consumers ages 18 to 44 to convey critical awareness and educational messages as well as

6

information about product availability, time sensitivity of use, and the age requirements to obtain Plan B® as a prescription or OTC product.

I conclude that the CARE[SM] program is sufficiently rigorous to prevent young women from obtaining Plan B® over-the-counter without the supervision of a practitioner licensed by law to prescribe the drug.  Monitoring of the program's effectiveness will allow FDA to assess whether further modifications will be necessary to prevent inappropriate use of Plan B®.

## IV.    Conclusion

In conclusion, I find that Barr's sNDA, as amended most recently on August 23, 2006, meets the statutory standards for approval as set forth in 21 U.S.C. 355(d).

**-------------------------------------------------------------------------------------------------------**
**This is a representation of an electronic record that was signed electronically and this page is the manifestation of the electronic signature.**
**-------------------------------------------------------------------------------------------------------**

```
 /s/
---------------------
Leah Christl
8/23/2006 07:38:08 PM
CSO
I am entering this memo into DFS for signature
by Dr. Steven Galson. My signture is for
process purposes only.


Steven Galson
8/24/2006 07:17:59 AM
MEDICAL OFFICER
```

MEMORANDUM

DATE:        8/23/06

FROM:        Dr. Andrew C. Von Eschenbach
             Acting Commissioner
             United States Food and Drug Administration

TO:          NDA 21-045, S-011

SUBJECT:     Appropriate age restriction for Plan B$^®$

This memorandum regards Barr Laboratories' (Barr or the sponsor[1]) supplemental new drug application (sNDA) dated April 22, 2003, and Barr's subsequent amendments, including its amended sNDA dated August 17, 2006. Barr's most recent sNDA requests that FDA switch Plan B's prescription (Rx) status to non-prescription for women 18 years of age and older, and to have Plan B$^®$ remain Rx for girls under 18 years of age.

In an August 26, 2005 memo written by Dr. Steven Galson, the Director of the Center for Drug Evaluation and Research (CDER), CDER found that for women 17 and older the existing Rx dispensing requirements for Plan B$^®$ are not necessary to protect the public health and that an Rx-only to non-prescription switch for those consumers is authorized under 21 U.S.C. 353(b)(3) and 21 CFR 310.200. CDER also determined, however, that Barr had not established that Plan B$^®$ could be used safely and effectively by young adolescents – girls 16 and younger – for emergency contraception without the professional supervision of a practitioner licensed by law to administer the drug. As a result of this scientific conclusion (with which I concur), Plan B$^®$ may not lawfully be made available without a prescription to this group under section 503(b) of the Federal Food, Drug, and Cosmetic Act.

In considering the difficulty of enforcing an age-based restriction on the availability of this oral hormonal contraceptive, I have concluded that 18 (rather than 17) is the more appropriate cutoff point to best promote and protect the public health. The state-regulated pharmacies that will be dispensing Plan B$^®$ under Barr's voluntary CARE$^{SM}$ program (as well as society as a whole) are more familiar with 18 as a cutoff age. I understand that in all 50 states, 18 is the age of majority (i.e., the legal delineation between minor and adult), and retail outlets, including pharmacies, are familiar with using 18 as the age restriction for the sale of certain products. With regard to drug products, for example, the legal age to purchase FDA approved non-prescription nicotine replacement therapy products is 18. Moreover, I also understand that as a matter of state law many products routinely sold by pharmacies, e.g., tobacco products and non-prescription cough-cold products like pseudoephedrine, are restricted to consumers 18 and older.

---

[1] The current applicant for the Plan B sNDA is Duramed Research Pharmaceuticals (Duramed), a wholly-owned subsidiary of Barr. For ease of reference, this memo will refer to both entities as Barr.

This approach builds on well-established state and private-sector infrastructures to restrict certain products to consumers 18 and older. Indeed, the agency selected 18 as the appropriate age for non-prescription nicotine replacement therapy products, in part, because the States had already uniformly restricted the sale of tobacco products to those 18 and older. By so doing, FDA was able to utilize the existing state-created infrastructure limiting the sale of tobacco products to minors to ensure the enforcement of its age-based restriction on non-prescription nicotine replacement therapy products. Here, Barr's CARE$^{SM}$ program specifically utilizes state-licensed pharmacies to implement its restricted distribution plan. Given this fact, and the existing experience pharmacies have enforcing the age-based restriction of 18, I have determined that to best protect and promote the public health non-prescription Plan B$^®$ should be available for ages 18 and above.

Leveraging well-established state and private-sector infrastructures will allow for comprehensive and effective enforcement of the age-based restrictions. As a result, this approach should minimize the likelihood that younger girls for whom Plan B$^®$ has not been found safe and effective for non-prescription use will have access to the product without professional supervision. Therefore, this approach should help ensure safe and effective use of the product.

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

_____

ASSOCIATION OF AMERICAN                 )
PHYSICIANS & SURGEONS, INC., *et al.*,  )
                                        )
                    *Plaintiffs*,       )          Civil Action No. 07:0668
                                        )
        *v.*                            )
                                        )
FOOD & DRUG ADMINISTRATION, *et al.*,   )
                                        )
                    *Defendants.*       )
------------------------------------------------------------)
                                        )
DURAMED PHARMACEUTICALS, INC.,          )
                                        )
                *Defendant Intervenor*. )
_____)

**PROPOSED ORDER**

Upon consideration of the motion to dismiss filed by defendant intervenor Duramed

Pharmaceuticals, Inc. ("Duramed"), the memorandum of points and authorities and exhibits in

support thereof, plaintiffs' memorandum of points and authorities in opposition thereto,

Duramed's reply to plaintiffs' memorandum, and all other pleadings in this litigation, and after

oral argument, it is this __ day of _____, 2007,

ORDERED that the motion to dismiss filed by defendant intervenor Duramed is hereby

GRANTED and that the Complaint is DISMISSED WITH PREJUDICE.


                                        _____
                                        United States District Judge