# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

―――――――――――――――――――――――――― )
ASSOCIATION OF AMERICAN )
PHYSICIANS & SURGEONS, INC., *et al.*, )
)
    *Plaintiffs*, )        Civil Action No. 07:0668 (JDB)
)
        *v.* )        ORAL ARGUMENT REQUESTED
)
FOOD & DRUG ADMINISTRATION, *et al.*, )
)
    *Defendants*. )
-------------------------------------------------------------)
)
DURAMED PHARMACEUTICALS, INC., )
)
    *Defendant Intervenor*. )
―――――――――――――――――――――――――― )

## MOTION BY DURAMED PHARMACEUTICALS, INC.
## TO DISMISS FIRST AMENDED COMPLAINT

Defendant intervenor Duramed Pharmaceuticals, Inc. ("Duramed") hereby moves that this Court dismiss with prejudice plaintiffs' First Amended Complaint under Fed. R. Civ. P. 12(b)(1) for lack of subject-matter jurisdiction and for failure to exhaust an administrative remedy, and that it dismiss Counts II and IV-VI under Fed. R. Civ. P. 12(b)(6) for failure to state a claim upon which relief can be granted.

A Memorandum of Points and Authorities and Proposed Order are filed herewith.  Oral argument is respectfully requested.

Respectfully submitted,


By:  /s/ Richard M. Cooper
    Richard M. Cooper (# 92817)
    Ana C. Reyes (# 477354)

    WILLIAMS & CONNOLLY LLP
    725 Twelfth Street, N.W.
    Washington, DC 20005
    (tel.) (202) 434-5466
    (fax)  (202) 434-5470
    rcooper@wc.com
    areyes@wc.com

    *Counsel for Defendant Intervenor*
    *Duramed Pharmaceuticals, Inc.*

Dated:  September 21, 2007

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| ⸺⸺⸺⸺⸺⸺⸺⸺⸺⸺⸺⸺⸺⸺<br><br>ASSOCIATION OF AMERICAN<br>PHYSICIANS & SURGEONS, INC., *et al.*,<br><br>      *Plaintiffs*,<br><br>      *v.*<br><br>FOOD & DRUG ADMINISTRATION, *et al.*,<br><br>      *Defendants.*<br>-------------------------------------------------------------<br><br>DURAMED PHARMACEUTICALS, INC.,<br><br>      *Defendant Intervenor.*<br>⸺⸺⸺⸺⸺⸺⸺⸺⸺⸺⸺⸺⸺⸺ | Civil Action No. 07:0668 (JDB) |

# MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF
# DURAMED PHARMACEUTICALS, INC.'S
# MOTION TO DISMISS FIRST AMENDED COMPLAINT

Richard M. Cooper (# 92817)
Ana C. Reyes (# 477354)
WILLIAMS & CONNOLLY LLP
725 Twelfth Street, N.W.
Washington, DC 20005
(tel.) (202) 434-5466
(fax) (202) 434-5470
rcooper@wc.com
areyes@wc.com

*Counsel for Defendant Intervenor,*
*Duramed Pharmaceuticals, Inc.*

Dated: Sept. 21, 2007

# TABLE OF CONTENTS

TABLE OF AUTHORITIES .................................................................................................... iii

TABLE OF ABBREVIATIONS ............................................................................................. vii

TABLE OF EXHIBITS ......................................................................................................... viii

INTRODUCTION ..................................................................................................................... 1

BACKGROUND ....................................................................................................................... 2

ARGUMENT ............................................................................................................................. 4

I.  PLAINTIFFS LACK STANDING ................................................................................. 4

    A.  The Requirements for Standing ........................................................................... 4

    B.  CWA and FRC Do Not Have Standing To Sue on Behalf of Women,
        and Parents of Girls ............................................................................................. 6

        1.  CWA And FRC Do Not Allege Any Imminent Harm ........................... 6

        2.  Plan B's Labeling Does Not Support Standing for Women or the
            Parents of Girls .................................................................................... 8

        3.  There Is No Causation ........................................................................ 12

        4.  CWA Does Not Meet the Germaneness Requirement for
            Organizational Standing, and FRC Does Not Allege that It Has
            Members ............................................................................................. 13

    C.  AAPS and SDW Do Not Have Standing To Sue on Behalf of
        Physicians and Pharmacists .............................................................................. 14

        1.  AAPS's Members Are Not Within the Zone of Interests Protected
            by the FDCA ...................................................................................... 14

        2.  AAPS and Its Members Cannot Sue on Behalf of Third Parties ....... 15

        3.  No Harm Is Alleged to SDW's Members .......................................... 16

II.  PLAINTIFFS HAVE FAILED TO EXHAUST AN AVAILABLE
    ADMINISTRATIVE REMEDY ................................................................................. 19

III.  COUNTS II AND IV-VI FAIL TO STATE A CLAIM UPON WHICH
     RELIEF CAN BE GRANTED ..................................................................................... 21

    A.  Count II Fails To State a Claim Upon Which Relief Can Be Granted
        Because It Is Based on an Incorrect Statutory Interpretation .............................. 22

        1.  Count II Fails Because the Unambiguous Text and Objectives of
            Section 353(b) Require FDA's Interpretation Permitting a Drug, in
            Appropriate Circumstances, To Be Dispensed Rx to One Patient
            Population and OTC to Another .......................................................... 23

        2.  Alternatively, Count II Fails Because FDA's Interpretation Is
            Reasonable and Entitled to Deference at *Chevron* Step Two ........... 26

B.  Count IV Fails To State a Claim Because Plaintiffs Have Not Alleged that FDA Has Mandated that Plan B Be Treated as a Third Class of Drug ................................................................................................... 34

C.  Count V Fails To State a Claim Because the APA Does Not Require Notice-and-Comment Rulemaking in the Circumstances Here ........................... 35

1.  FDA Has Broad Discretion To Proceed by Adjudication Without Notice-and-Comment Rulemaking ...................................................... 36

2.  The sNDA Approval Involved Interpretation of Section 353(b), Not Interpretation of a Substantive Rule ............................................ 38

3.  An Agency May Change an Interpretation of a Statute, an Interpretive Rule, or a Policy Statement Without Notice and Comment ............................................................................................. 41

4.  Approval of the Plan B sNDA Did Not Involve Departure from Any Established FDA Interpretation of a Regulation ......................... 43

D.  Count VI Fails To State a Claim Because It Is Based on an Incorrect Statutory Interpretation ............................................................................ 44

CONCLUSION ........................................................................................................... 45

# TABLE OF AUTHORITIES

## FEDERAL CASES

*Air Transportation Association of America, Inc. v. FAA*,
   291 F.3d 49 (D.C. Cir. 2002) ...................................................................43

*Alaska Professional Hunters Association v. FAA*,
   177 F.3d 1030 (D.C. Cir. 1999) ...............................................................43

*Alliance for Bio-Integrity v. Shalala*, 116 F. Supp. 2d 166 (D.D.C. 2000) ...............................39

*American Legal Foundation v. FCC*, 808 F.2d 84 (D.C. Cir. 1987) ...............................5

*American Mining Congress v. Mine Safety & Health Administration*, 995 F.2d 1106
   (D.C. Cir. 1993) ................................................................................40, 41, 42

*American Postal Workers Union v. United States Postal Service*, 707 F.2d 548
   (D.C. Cir. 1983) ...................................................................................39

*Association of American Railroads v. Department of Transportation*, 198 F.3d 944
   (D.C. Cir. 1999) ...............................................................................43, 44

*Association of Flight Attendants-CWA v. Chao*, 493 F.3d 155 (D.C. Cir. 2007) .........................20

*Babbitt v. United Farm Workers National Union*, 442 U.S. 289 (1979)......................................17

*Barnhart v. Walton*, 535 U.S. 212 (2002)...................................................................27

*Bell Atlantic Corp. v. Twombly*, 127 S. Ct. 1955 (2007) .........................................21, 22

*Brotherhood  of Locomotive Engineers & Trainmen v. Surface Transportation Board*,
   457 F.3d 24 (D.C. Cir. 2006) ...............................................................12, 13

*Burroughs Wellcome Co. v. Schweiker*, 649 F.2d 221 (4th Cir. 1981).........................................39

*Calumet Industries, Inc. v. Brock*, 807 F.2d 225 (D.C. Cir. 1986)................................14

*Center for Law & Eduation. v. Department of Education*,
   396 F.3d 1152 (D.C. Cir. 2005) ................................................................6

*Chevron U.S.A., Inc. v. Natural Resources Defense Council*, 467 U.S. 837 (1984) ............. *passim*

*Chrysler Corp. v. Brown*, 441 U.S. 281 (1979) ..........................................................39

*Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402 (1971) ......................................22

*Clark-Cowlitz Joint Operating Agency v. FERC*, 826 F.2d 1074 (D.C. Cir. 1987) ....................42

*Clarke v. Securities Industry Association*, 479 U.S. 388 (1987) ....................................................14

*Davis v. Michigan Department of Treasury*, 489 U.S. 803 (1989)...................................................24

*EEOC v. St. Francis Xavier Parochial School*, 117 F.3d 621 (D.C. Cir. 1997)............................3

*Elk Grove Unified School District v. Newdow*, 542 U.S. 1 (2004)..................................................4

*Estee Lauder, Inc. v. FDA*, 727 F. Supp. 1 (D.D.C. 1989) ............................................................19

*FEC v. Akins*, 524 U.S. 11 (1998)..............................................................................................9, 10

*Florida Audubon Society v. Bentsen*, 94 F.3d 658 (D.C. Cir. 1996) ..............................................4

*Forsham v. Harris*, 445 U.S. 169 (1980) .....................................................................................21

*FTC v. Ken Roberts Co.*, 276 F.3d 583 (D.C. Cir. 2001) .........................................................26, 45

*FW/PBS, Inc. v. City of Dallas*, 493 U.S. 215 (1990), *modified in part on other grounds*,
    *City of Littleton v. Z.J. Gifts D-4, LLC*, 541 U.S. 774 (2004).....................................................5

*Garlic v. FDA*, 783 F. Supp. 4 (D.D.C. 1992) .........................................................................19, 20

*General Motors Corp. v. Ruckelshaus*, 742 F.2d 1561 (D.C. Cir. 1984) ......................................39

*Griffin v. Oceanic Contractors, Inc.*, 458 U.S. 564 (1982) .....................................................26, 45

*Hudson v. FAA*, 192 F.3d 1031 (D.C. Cir. 1999) .........................................................................41

*Lujan v. Defenders of Wildlife*, 504 U.S. 555 (1992) ............................................................. *passim*

*Mylan Laboratories, Inc. v. Thompson*, 389 F.3d 1272 (D.C. Cir. 2004) .....................................27

*National Family Planning & Reproductive Health Association v. Sullivan*, 979 F.2d 227
    (D.C. Cir. 1992) ..........................................................................................................................39

*National Wrestling Coaches Association v. Department of Education*, 366 F.3d 930
    (D.C. Cir. 2004) .............................................................................................................................5

*Orengo Caraballo v. Reich*, 11 F.3d 186 (D.C. Cir. 1993) ....................................................42, 43

*Pacific Gas & Electric Co. v. Federal Power Commission*, 506 F.2d 33 (D.C. Cir. 1974) .........39

*Paralyzed Veterans of America, Inc. v. D.C. Arena L.P.*, 117 F.3d 579
    (D.C. Cir. 1997) .......................................................................................................................41, 42

*Primax Recoveries, Inc. v. Lee*, 260 F. Supp. 2d 43 (D.D.C. 2003)...............................................7

*Public Citizen Health Research Group v. Commissioner, FDA*, 740 F.2d 21
    (D.C. Cir. 1984) ..........................................................................................................................21

iv

*Public Citizen, Inc. v. National Highway Traffic Safety Admin.*, 489 F.3d 1279
    (D.C. Cir. 2007) ...............................................................................5, 6, 7

*Public Citizen v. FTC*, 869 F.2d 1541 (D.C. Cir. 1989) ...............................9, 10, 11, 16

*SEC v. Chenery Corp.*, 332 U.S. 194 (1947) .....................................................37

*Serono Labs., Inc. v. Shalala*, 158 F.3d 1313 (D.C. Cir. 1998)............................26

*Shell Offshore Inc. v. Babbitt*, 238 F.3d 622 (5th Cir. 2001)..............................42

*Skidmore v. Swift & Co.*, 323 U.S. 134 (1944) ..............................................26

*Syncor International Corp. v. Shalala*, 127 F.3d 90 (D.C. Cir. 1997)........................38, 39, 40, 43

*Takhar v. Kessler*, 76 F.3d 995 (9th Cir. 1996) ............................................17

*Teva Pharmaceuticals, Industries, Ltd. v. FDA*, 355 F. Supp. 2d 111 (D.D.C. 2004), *aff'd*
    *sub nom. Teva Pharmaceuticals, Industries, Ltd. v. Crawford*,
    410 F.3d 51 (D.C. Cir. 2005) ................................................................22

*United States v. Sage Pharmaceuticals, Inc.*, 210 F.3d 475 (5th Cir. 2000) ................14

*Valley Forge Christian Coll. v. Americans United for Separation of
    Church & State, Inc.*, 454 U.S. 464 (1982).................................................4, 5

*Warth v. Seldin*, 422 U.S. 490 (1975) ......................................................5

*Whitaker v. Thompson*, 239 F. Supp. 2d 43 (D.D.C. 2003), *aff'd*, 353 F.3d 947
    (D.C. Cir. 2004) .............................................................................14

## OTHER AUTHORITIES

5 U.S.C. § 551 (2000) .......................................................................26

5 U.S.C. § 553 (2000) ..............................................................36, 38, 43, 44

5 U.S.C. § 706 (2000) .......................................................................22

21 U.S.C. § 321(p) (2000) ...................................................................25

21 U.S.C. § 352 (2000 & Supp. IV 2006)...............................................29, 30

21 U.S.C. § 353(b) (2000) ............................................................. *passim*

21 U.S.C. § 355(a) (2000)...........................................................24, 25, 44

21 U.S.C. § 371 (2000) ......................................................................44

21 U.S.C. § 393 (2000) ......................................................................14

21 C.F.R. § 10.25 (2007) .................................................................................................9, 19, 21

21 C.F.R. § 10.30 (2007) ............................................................................................................19

21 C.F.R. § 10.45 (2007) ............................................................................................................20

21 C.F.R. § 201.100 (2007) ........................................................................................................29

21 C.F.R. § 310.3 (2007) ............................................................................................................25

21 C.F.R. § 310.200 (2007) ...........................................................................................24, 27, 44

21 C.F.R. § 330.10 (2007) ................................................................................................24, 27

21 C.F.R. § 314.70 (2007) ..........................................................................................................25

21 C.F.R. § 314.105 (2007) ........................................................................................................26

21 C.F.R. § 314.125 (2007) ........................................................................................................26

70 Fed. Reg. 52,050 (Sept. 1, 2005) ................................................3, 22, 28, 33, 36, 38

2B Phillip E. Areeda et al., *Antitrust Law:  An Analysis of Antitrust Principles and Their Application* (3d ed. 2007) .....................................................................................................16

Holly Stewart *et al*., The Impact of Using Emergency Contraception on Reproductive Health Outcomes:  A Retrospective Review in an Urban Adolescent Clinic, J. Pediatric Adolescent Gynecology, 2003 Oct. 16(5)......................................................... 7-8

**TABLE OF ABBREVIATIONS**

| | |
|---|---|
| AAPS | Association of American Physicians and Surgeons, Inc. |
| AIPAC | American Israel Public Affairs Committee |
| ANPRM | Advance Notice of Proposed Rulemaking |
| APA | Administrative Procedure Act |
| Barr Pharma | Barr Pharmaceuticals, Inc. |
| CDER | FDA's Center for Drug Evaluation and Research |
| CWA | Concerned Women for America |
| Duramed | Duramed Pharmaceuticals, Inc. |
| EC | Emergency contraceptive |
| FAC | First Amended Complaint |
| FDA | The Food and Drug Administration |
| FDCA | Federal Food, Drug, and Cosmetic Act |
| FEC | Federal Election Commission |
| FRC | Family Research Council |
| NDA | New drug application |
| OTC | Over-the-counter |
| Rx | Prescription or by prescription |
| SDW | Safe Drugs for Women |
| sNDA | Supplemental new drug application |
| Stewart | Holly Stewart *et al.*, The Impact of Using Emergency Contraception on Reproductive Health Outcomes:  A Retrospective Review in an Urban Adolescent Clinic, J. Pediatric Adolescent Gynecology, 2003 Oct. 16(5). |
| WCC | Women's Capital Corporation |

**TABLE OF EXHIBITS**

Ex. 1       FDA Decision (Aug. 24, 2006)

Ex. 2       Plan B Package

Ex. 3       Holly Stewart *et al*., <u>The Impact of Using Emergency Contraception on</u>
            <u>Reproductive Health Outcomes:  A Retrospective Review in an Urban Adolescent</u>
            <u>Clinic</u>, J. Pediatric Adolescent Gynecology, 2003 Oct. 16(5).

Ex. 4       Plan B OTC Label Comprehension Study

Ex. 5       Memorandum from Andrew C. Von Eschenbach, M.D., to NDA 21- 45, S-011
            (Aug. 23, 2006)

Ex. 6       S. Rep. No. 82-946 (1951)

Ex. 7       H.R. Rep. No. 82-700 (1951)

Ex. 8       Memorandum from Steven Galson, M.D., Director, CDER, Subject:  Plan B
            (Aug. 24, 2006)

# INTRODUCTION

Plan B (levonorgestrel) is an emergency contraceptive ("EC"), which reduces the chance of pregnancy after unprotected intercourse (*i.e.*, if another birth control method fails or if none was used). More than thirty countries – including Britain, France, Australia, and Sweden – permit emergency contraceptives to be sold without a doctor's prescription ("Rx").[1] The Food and Drug Administration ("FDA") has found that Plan B is safe and effective for over-the-counter ("OTC"), *i.e.*, non-prescription, use by women age 18 and older.

Plaintiffs, Association of American Physicians & Surgeons, Inc. ("AAPS"), *et al.* (together, "plaintiffs"), disagree. Eight months after FDA permitted OTC sale of Plan B, they brought suit and asked this Court to reject the medical and scientific expertise of FDA, and to find, instead, that Plan B is not safe and effective for OTC use by any woman at any age. In their original Complaint, plaintiffs did not allege that using Plan B directly causes harm, and they did not identify a single user of Plan B harmed by its OTC availability. In August, plaintiffs filed their First Amended Complaint ("FAC") – an attempt to cure the fatal standing problems present in the original Complaint. The attempt fails. Plaintiffs still do not allege that Plan B directly causes harm, and still have not identified a single user of Plan B harmed by its OTC availability.

This Court should dismiss the FAC pursuant to Fed. R. Civ. P. 12(b)(1) because it fails to allege subject-matter jurisdiction, and because plaintiffs have failed to exhaust an available administrative remedy. The Court should also dismiss Counts II and IV-VI of the FAC pursuant to Rule 12(b)(6) because they fail to state a claim upon which relief can be granted.

---

[1]     Ctr. for Reproductive Rights, <u>Governments Worldwide Put Emergency Contraception into Women's Hands</u>, 7 (Sept. 2004), *available at* http://www.reproductiverights.org/pdf/ pub_bp_govtswwec.pdf.

# BACKGROUND[2]

Plan B is an FDA-approved EC.  *See* FAC ¶ 58.  It is manufactured and marketed by Duramed Pharmaceuticals, Inc. ("Duramed"), a wholly-owned subsidiary of Barr Pharmaceuticals, Inc. ("Barr Pharma").  *Id.* ¶ 8.

On January 29, 1999, Women's Capital Corporation ("WCC") – now a wholly owned subsidiary of Duramed – submitted to FDA a new drug application ("NDA") for approval of Plan B as a prescription drug.  *Id.* ¶ 66.  FDA approved the NDA on July 28, 1999.  *Id.*

In April 2003, WCC submitted to FDA a supplemental NDA ("sNDA") to switch Plan B from Rx to OTC availability for all consumers.  *Id.* ¶ 68.  WCC sought what, in food and drug practice, is commonly called an "Rx-to-OTC switch."[3]  On or about February 26, 2004, Barr Pharma acquired WCC.  *Id.*

By correspondence dated May 6, 2004, FDA issued a Not Approvable Letter in response to the Plan B sNDA.  *Id.* ¶ 69.  FDA cited an alleged failure to demonstrate that adolescents under age 16 could use Plan B without professional supervision by a licensed medical practitioner.  *Id.*  In response, Duramed submitted an amended sNDA to retain Rx status for women under age 16, and to permit OTC availability for those age 16 and over.  *Id.* ¶ 70.  (Duramed maintains that Plan B is safe and effective OTC for all women who would use it.)

By letter dated August 26, 2005, FDA informed Duramed that FDA's Center for Drug Evaluation and Research ("CDER") had completed its review of Duramed's amended sNDA and had found that "the scientific data [are] sufficient to support safe use" of Plan B as an OTC product for women age 17 years and older.  *Id.*  Notwithstanding this scientific finding, FDA, in

---

[2]    Duramed Pharmaceuticals, Inc. contests many allegations in the FAC, but, pursuant to Rules 12(b)(1) and (6), takes those allegations as true (solely) for purposes of the present motion.

[3]    *See, e.g.*, FDA, CDER, Manual of Policies and Procedures (MaPP 6020.5) 2 (Jan. 15, 1997), *available at* http://www.fda.gov/cder/mapp/6020-5.pdf.

the letter, refused to take final action on Duramed's sNDA, *id.*, and, indeed, delayed final action indefinitely.  FDA stated that the sNDA presented the agency with the question whether and, if so, how to permit the distribution of one and the same pharmaceutical product to different populations for OTC and Rx use, and indicated that it would seek public comment on whether to initiate rulemaking to resolve those issues.  *Id.*

On September 1, 2005, FDA published in the *Federal Register* an Advance Notice of Proposed Rulemaking ("ANPRM") (Docket No. 2005N-0345), which sought public comment on whether to initiate rulemaking regarding dual OTC/Rx labeling.  70 Fed. Reg. 52,050 (Sept. 1, 2005).  FDA received approximately 47,000 comments in response.  FAC ¶ 72.

On July 31, 2006, FDA sent to Duramed a letter stating that the agency had determined that it was unnecessary to engage in rulemaking to approve the sNDA.  *Id.* ¶ 74.  Finally, on August 24, 2006, more than three years after the filing of the initial sNDA, FDA approved OTC access to Plan B for use by women age 18 and older, and retained the prescription requirement for women age 17 and younger.  *Id.* ¶ 76; Exhibit ("Ex.") 1 (the "FDA Decision").[4]

Currently, Plan B is sold in a single package containing labeling that describes the OTC use by women age 18 and older, and the Rx use by women age 17 and younger.  Ex. 2.

On April 12, 2007 – more than eight months after FDA approved the sNDA – plaintiffs filed the present lawsuit.  In response, FDA and Duramed filed motions to dismiss, which argued, *inter alia*, that plaintiffs did not allege sufficient facts to establish their standing to sue.  On August 17, 2007, plaintiffs amended their Complaint in an attempt to cure those deficiencies.  They did not succeed.  Plaintiffs still do not allege that Plan B causes any direct harm to women or girls.  FAC *passim*.  Instead, plaintiffs allege that the availability of Plan B OTC will lead

---

[4]    All exhibits are copies of materials incorporated in the FAC.  In ruling on a motion to dismiss, the court may consider documents "attached to or incorporated in the complaint." *EEOC v. St. Francis Xavier Parochial Sch.*, 117 F.3d 621, 624 (D.C. Cir. 1997).

women age 18 and older to make ill-considered decisions regarding their health care, and that

those decisions may, in turn, lead to harm; that younger women may obtain Plan B without a

prescription illicitly; that the Plan B labeling is misleading; that physicians may lose money; and

that pharmacists may be inconvenienced.  FAC ¶¶ 18-26.

For the reasons set forth below, the FAC should be dismissed.

**ARGUMENT**

## I.    PLAINTIFFS LACK STANDING.

### A.    The Requirements for Standing.

Plaintiffs must establish that they have Article III standing.  *See Valley Forge Christian*

*Coll. v. Americans United for Separation of Church & State, Inc.,* 454 U.S. 464, 472, 475 (1982).

Plaintiffs must show that they have suffered "injury in fact" that is "concrete and particularized"

and "actual or imminent, not 'conjectural' or 'hypothetical.'"  *Lujan v. Defenders of Wildlife,*

504 U.S. 555, 560-61 (1992) (internal quotations omitted).  Plaintiffs must also establish "a

causal connection between the injury and the conduct complained of," and that it is "'likely,' as

opposed to merely 'speculative,' that the injury will be 'redressed by a favorable decision.'"  *Id.*

(internal quotations omitted).[5]  Where, as here, the parties invoking federal jurisdiction are not

the object of the governmental action they challenge, standing is "substantially more difficult to

establish."  *Id.* at 562 (internal quotations omitted).

Plaintiffs must also establish that no "prudential" limitation prevents the Court from

hearing their claims.  *See Elk Grove Unified Sch. Dist. v. Newdow,* 542 U.S. 1, 11-12 (2004).  In

---

[5]     To the extent that plaintiffs allege procedural injury, "the normal standards for
redressability and immediacy" are relaxed. *Lujan,* 504 U.S. at 572 n.7.  However, "[t]he mere
violation of a procedural requirement . . . does not permit any and all persons to sue to enforce
the requirement." *Florida Audubon Soc'y v. Bentsen*, 94 F.3d 658, 664 (D.C. Cir. 1996) (*citing
Lujan*, 504 U.S. at 572-73).  Plaintiffs alleging a procedural violation must have a concrete injury
apart from an interest in having the procedure observed. *See Lujan*, 504 U.S. at 573 n.8.

the ordinary course, plaintiffs must sue on their own behalf, not on behalf of the interests of third

parties. *Lujan*, 504 U.S. at 562. Plaintiffs cannot rely on general grievances of the population.

*Warth v. Seldin*, 422 U.S. 490, 499 (1975). Plaintiffs who seek to challenge an agency action

under a statute, such as the Federal Food, Drug, and Cosmetic Act ("FDCA"), 21 U.S.C.

§ 353(b) (2000) (as amended 2003), must be within "the zone of interests to be protected or

regulated by the statute or constitutional guarantee in question." *Valley Forge*, 454 U.S. at 475.

　　To establish organizational standing, a plaintiff organization must satisfy the standing

requirements that apply to individuals. *See American Legal Found. v. FCC*, 808 F.2d 84, 89

(D.C. Cir. 1987). An organization suing not in its own right but on behalf of its members must

demonstrate that: "(1) at least one of its members would have standing to sue in his own right,

(2) the interests the association seeks to protect are germane to its purpose, and (3) neither the

claim asserted nor the relief requested requires that an individual member of the association

participate in the lawsuit." *National Wrestling Coaches Ass'n v. Department of Educ.*, 366 F.3d

930, 937 (D.C. Cir. 2004). An organization challenging an agency action on that basis "must

show . . . that at least one member has suffered injury in fact." *Public Citizen, Inc. v. National

Highway Traffic Safety Admin.*, 489 F.3d 1279, 1289 (D.C. Cir. 2007).

　　The party invoking a court's subject-matter jurisdiction has the burden of establishing the

elements required for standing, and "courts must accept as true all material allegations of the

complaint." *Warth,* 422 U.S. at 501; *Lujan*, 504 U.S. at 560-61. Plaintiffs must "'allege . . .

<u>facts</u> essential to show jurisdiction. If [they] fai[l] to make the necessary allegations, [they have]

no standing.'" *FW/PBS, Inc. v. City of Dallas*, 493 U.S. 215, 231 (1990) (internal quotations

omitted) (alteration in original) (emphasis added), *modified in part on other grounds*, *City of

Littleton v. Z.J. Gifts D-4, LLC,* 541 U.S. 774 (2004); *Lujan*, 504 U.S. at 560-61.

**B.     CWA and FRC Do Not Have Standing To Sue on Behalf of Women, and Parents of Girls.**

**1.     CWA And FRC Do Not Allege Any Imminent Harm.**

Plaintiffs Concerned Women for America ("CWA") and Family Research Council ("FRC") each sue on behalf of women and parents of girls.  FAC ¶¶ 4, 5, 15.[6]  They must allege facts showing that such individuals would have standing to sue.  The FAC however, fails to make any specific allegation that any woman or parent of a girl <u>has been or will be</u> harmed.  Instead, the FAC avers merely that Plan B's OTC availability may increase the risk that: (1) women will not obtain certain medical services, and will thereby increase the risk that their health will be negatively affected; (2) minor girls will obtain Plan B without a prescription; and (3) women will believe that Plan B should be used as regular birth control.  FAC ¶¶ 18, 87.  In sum, they allege that OTC availability of Plan B may <u>indirectly</u> increase women's risk of harm.

The D.C. Circuit recently rejected the very proposition CWC and FRA rely on here:  that "'increased risk' is *itself* concrete, particularized, and *actual* injury for standing purposes." *National Highway*, 489 F.3d at 1297 (emphasis in original).  It held that deeming "all purely speculative increased risks [to be] injurious" would render moot the entire requirement of actual or imminent injury.  *Id.* at 1294.  The court stated:  "Allegations of possible future injury do not satisfy the requirements of Article III.  A threatened injury must be certainly impending to constitute injury in fact."  *Id.* (internal quotations omitted) (quoting *Whitmore v. Arkansas*, 495 U.S. 149, 158 (1990)) (standing cannot be premised on possible threat of future injury); *see also Center for Law & Educ. v. Department of Educ.*, 396 F.3d 1152, 1160-61 (D.C. Cir. 2005) ("Outside of increased exposure to environmental harms, hypothesized increased risk has never

---

[6]     The FAC does not allege that CWA or FRC is suing on behalf of girls.  If, and to the extent that either does seek to represent girls, it lacks standing for the same reasons that it lacks standing to represent women and parents of girls.

been deemed sufficient injury [to confer standing].").

The D.C. Circuit held that an organization challenging agency action establishes standing only if "the agency action causes an individual or individual members of an organization to face an increase in the risk of harm that is 'substantial,' and the ultimate risk of harm also is 'substantial.'" *National Highway*, 489 F.3d at 1296. "[T]he constitutional requirement of imminence as articulated by the Supreme Court . . . necessarily compels a very strict understanding of what increases in risk and overall risk levels can count as 'substantial.'" *Id.*

CWC and FRA allege neither that women, girls, or parents of girls face an increase in the risk of harm that is substantial, nor that the overall risk levels are also substantial, nor do they allege any facts that would substantiate such allegations, even had they been made.[7]  On the basis of one study, plaintiffs allege that OTC access to Plan B causes a decrease in the medical visits, counseling, and screening of women.  FAC ¶ 84.  The study is Holly Stewart *et al*., The Impact of Using Emergency Contraception on Reproductive Health Outcomes:  A Retrospective Review in an Urban Adolescent Clinic, J. Pediatric Adolescent Gynecology, 2003 Oct. 16(5) ("Stewart") (Ex. 3).[8]  That study, however, completely fails to support their allegations.

First, although the study found that women receiving an EC at a clinic received additional medical services, the study did not include any women who received an EC OTC.  Therefore, it

---

[7]    In deciding whether to dismiss a complaint for lack of subject matter jurisdiction, this Court need not accept conclusory factual allegations that are not supported by facts alleged in the complaint.  *See Primax Recoveries, Inc. v. Lee*, 260 F. Supp. 2d 43, 47 (D.D.C. 2003).  Therefore, this Court need not accept Plaintiffs' conclusion, unsupported by the alleged facts, that harm will result – indirectly – from OTC availability of Plan B.

[8]    Plaintiffs do not cite the study by name.  Instead, they refer to a study that two of them (and two other groups) cited in comments to FDA.  FAC ¶ 84.  The Stewart study is cited by name in those comments at page 23.  *See* http://www.cwfa.org/images/content/ planbfiling_CWA_%20FRC_e_%20al_11-01-2005.pdf (The comments incorrectly cite to the study as being published in October 2001.  It was published in November 2003).  The numbers cited in FAC ¶ 84 are the same as those attributed to the Stewart study in the comments at 23.

did not show that women who receive an EC OTC fail to receive medical care they need or fail
to receive, by means other than a clinic visit to obtain an EC, medical care equal to that received
by women who obtain an EC at a clinic. Second, the study did not address whether women who
receive an EC by prescription (*e.g.*, a telephonic prescription) receive the same medical care as
women who receive it at a clinic.[9] Third, there is no reason to believe that women who receive
an EC at a clinic are representative of women who use Plan B purchased OTC. Fourth, the study
addressed use of ECs by girls and young women ages 13 to 20, with a mean age of 16.8, *id.* at
315-16; and, of course, under the FDA Decision, participants 17 years of age and younger would
still have needed a prescription to purchase Plan B. In sum, on its face, the Stewart study is
irrelevant to OTC access to Plan B, and provides no support for plaintiffs' claims.

### 2.    Plan B's Labeling Does Not Support Standing for Women or the Parents of Girls.

The FAC alleges that Plan B's labeling is misleading. FAC ¶¶ 85-87. The FAC fails to
allege any concrete harm from the labeling, however. Rather, its allegations relate to the
<u>effectiveness</u>, not the safety, of Plan B. *Id.* Moreover, the relief the FAC seeks – vacation of
FDA's approval – would not redress the alleged deficiency (which would remain in the Rx

---

[9]     The Stewart study <u>also</u> found that using an EC is <u>not</u> associated with increased risk of
future sexually transmitted infections among adolescent girls. Indeed, it found that the control
subjects had a <u>higher</u> incidence of Chlamydia. Stewart at 317. Thus, as to the patients at
clinics, the Stewart study contradicts the speculations in FAC ¶ 83.

Even if the study had shown that female patients representative of the general population
of users of Plan B visit doctors less frequently when Plan B is available OTC, it would not
support the FAC's speculative allegations of possible harm. Information on how many times
women visit their doctors does not address (i) the number of such visits that are <u>needed</u> for
protection of health, (ii) the quality of the visits that do occur, or (iii) whether during those visits
doctors provide information about contraception. To the extent that plaintiffs claim that a
reduction in physician visits results in patients obtaining less healthcare information and less
healthcare generally, *see* FAC ¶ 82, their claim appears to be that it is unlawful for FDA to fail to
use its authority to restrict every drug to Rx-only status to compel consumers to contact doctors
so as to be counseled about medical services that might improve their health. Thus, plaintiffs'
grievance applies to <u>every</u> drug available OTC, and should be rejected on that ground.

labeling).  Indeed, there is no precedent for, and no logic supports, restriction to Rx status of a

drug, or a use of a drug, that is otherwise safe and effective when the drug is dispensed OTC  but

whose labeling is deficient in some way.  If Plan B's labeling is deficient, the appropriate remedy

is not to vacate the FDA Decision and restrict Plan B to Rx status, but to correct the labeling.[10]

To obtain that (or any other) relief, CWA and FRC have an administrative remedy they have not

invoked:  a citizen petition under 21 C.F.R. §§ 10.25, 10.30 (2007).  *See* pp. 19-21, *infra*.

CWA's and FRC's allegations of standing to sue as to the contents of Plan B's labeling

apparently are based on *FEC v. Akins*, 524 U.S. 11 (1998), and *Public Citizen v. FTC*, 869 F.2d

1541 (D.C. Cir. 1989), which plaintiffs cited in opposing Duramed's motion to intervene.  *See*

Opposition to Motion to Intervene 9 (filed July 13, 2007).  Both cases are easily distinguishable.

In *Akins*, standing was premised on the fact that the challenged agency decision denied

statutorily-mandated information that the plaintiffs could obtain only if the Federal Election

Commission ("FEC") ordered a third party, the American Israel Public Affairs Committee

("AIPAC"), to publicly disclose information held only by the AIPAC.  *Akins*, 524 U.S. at 20.

AIPAC would not provide that information unless ordered by the FEC to do so.  Moreover,

standing was based on the court's finding – on the basis of an interpretation of the particular

statute at issue – that "Congress, intending to protect voters such as respondents from suffering

the kind of injury here at issue, intended to authorize this kind of suit."  *Id.* (emphasis added).

The plaintiffs' theory in *Akins* was that the statute required the FEC to compel the AIPEC

to provide information to the plaintiffs.  Here, to the contrary, the plaintiffs' theory is not that

section 353(b) requires FDA to compel physicians to provide information to prospective users of

---

[10]    Adopting plaintiffs' position that a need for a labeling change would require revocation
of the approval of an sNDA (and, presumably, an NDA), instead of merely an amendment of the
labeling, would place enormous burdens on FDA.  For example, over 90 sNDAs for labeling
revisions were approved in August 2007 alone.  *See http://www.accessdata.fda.gov/scripts/cder/
drugsatfda/index.cfm?fuseaction=Reports.Supplements*.

Plan B but, rather, that it requires FDA to compel prospective users of Plan B to seek information from physicians.  This entirely different kind of theory – not compulsion exerted on sellers of a product, but compulsion exerted on prospective buyers of a product – finds no support in *Akins*.  Moreover, whereas in *Akins* the statute supported compulsion of sellers to provide information, here one of Congress's principal objectives in enacting section 353(b) was to avoid unnecessary compulsion of prospective buyers (through an Rx requirement) where FDA finds that a new drug is safe and effective for OTC use.  *See infra* pp. 22-33.

Moreover, the *Akins* plaintiffs could not, on their own, have obtained the information they wanted from the APIAC because the AIPAC would not have given it to them.  By contrast, here, even with the FDA Decision, patients contemplating use of Plan B or their parents may, on their own, consult physicians before buying or using Plan B, and may obtain information from them (or from any other source).  If a woman who obtains Plan B OTC foregoes consultation with a physician or foregoes an office visit at which she could receive information or medical services, she does so not because the FDA Decision prevents her from doing so but because she chooses not to do so.  In sum, the kind of harm that supported standing in *Akins* does not exist here.

CWA and FRC fare no better by relying on *Public Citizen*.  There, the Comprehensive Smokeless Tobacco Health Education Act, 15 U.S.C. §§ 4401-4408, required producers and distributors of smokeless tobacco products to include specified health warnings on all advertisements for their products.  *Public Citizen*, 869 F.2d at 1542.  Public Citizen challenged a regulation by the Federal Trade Commission ("FTC") that expressly exempted from the warning requirement "utilitarian objects for personal use . . ."  *Id.*  The court found standing because the statute expressly provided that a warning was to be placed on smokeless tobacco products, and plaintiffs' action, if successful, would require warnings on utilitarian products.  *Id.* at 1547.

Without the warnings, there was "[a]n infringement of an individual's statutory right to receive information . . . " *Id.* at 1548. The FAC here, however, does not identify any statute that entitles CWA or FRC to obtain the type of labeling information – comparison of efficacy for emergency contraceptives for an entire year only – they claim to have been denied.

Moreover, here there is no injury sufficient to confer standing. The information CWA and FRC allege they are entitled to receive is already in Plan B's labeling. The FAC alleges that the labeling misleadingly compares the efficacy rate for perfect use in a single instance with the failure rates of traditional contraceptives for both typical and perfect use over an entire year. FAC ¶ 86. It also alleges that the labeling uses the words "not recommended" and "not intended" instead of "not effective" for routine contraceptive use. It urges that the labeling warn consumers that Plan B is "'not effective for routine use' or words to that effect." *Id.* ¶ 87.

Plan B's labeling already addresses both concerns: In the "Drug Facts" box, the section on "Other Information" states: "It does not work as well as most other birth control methods used correctly." Ex. 2, at 2. The section on "Warnings" states: "**Do not use** . . . for regular birth control." *Id.* (emphasis in original). The package insert for patients states: "Emergency contraceptives are not as effective as routine contraception since their failure rate, while low based on a single use, would accumulate over time with repeated use (see Warnings)." *Id.* at 5 (emphases added).[11] The accompanying chart manifestly does not compare Plan B's rate of effectiveness with those of birth control methods for routine use: each of the latter is a line item in the chart, but there is no line item for Plan B. *Id.* at 6. The 75% figure rate cited in FAC ¶ 86 is in a separate box below the chart. Even if the implied failure rate of 25% were compared to the failure rates in the chart, it would be higher than every other one except chance and the cap

---

[11]    The Warnings in the package insert state: "**Plan B is not recommended for routine use as a contraceptive.**" Ex. 2 at 7 (boldface and underlining in original).

for parous women. *Id.* In sum, the labeling uses the words "not as effective," and warns that the efficacy rate for single use should not be compared to that for use of routine contraception over time. Therefore, CWA and FRC cannot premise standing on a denial of information, or a presentation of misleading information, in Plan B's labeling.[12]

### 3. There Is No Causation.

CWA and FRC also cannot establish the causation element of standing. The FAC is based on the purely conjectural claim that women age 18 and older who obtain Plan B OTC will not seek a physician's advice when needed. Nothing in Plan B's dual OTC/Rx availability and marketing, however, prohibits physicians from addressing with their female patients any topics relevant to their health. Moreover, under the FAC's allegations, if, and to the extent that, women suffer injuries when Plan B is available OTC, those injuries would stem from the women's own decisions regarding health care and contraception, not from the use of Plan B or from the FDA Decision. Such intervening causal events squarely preclude Article III standing. *See, e.g.*, *Brotherhood of Locomotive Eng'rs & Trainmen v. Surface Transp. Bd.*, 457 F.3d 24, 28 (D.C. Cir. 2006) (self-inflicted injury does not support standing).

CWA's and FRC's allegations as to the increased risk to girls age 17 and younger do not support any claim. The legal and medical situation as to them is precisely the same as it was prior to FDA's decision: they can purchase Plan B only by prescription.

The FAC alleges that underage a female who lacks a prescription may obtain Plan B from someone age 18 or older who bought it OTC. FAC ¶ 95. The FAC alleges no facts, however, as

---

[12]    The Label Comprehension Study, cited at FAC ¶ 88, does not support plaintiffs' claims because: (1) the Plan B labeling was amended after the Label Comprehension Study; and thus the inferences that plaintiffs seek to draw as to the now superseded labeling are irrelevant; and (2) the Study found that the majority of subjects could understand the proposed OTC label with regard to the indication for Plan B, and could recognize common and severe adverse events. *See* Ex. 4 (Plan B OTC Label Comprehension Study) at 348.

to such transfers of Plan B since it became available OTC, or as to studies or foreign experience relating to ECs suggesting that such transfers are likely to occur to any appreciable extent.

Even if such transfers were alleged, they would not be <u>caused</u> by the FDA Decision or by Plan B's OTC availability. Instead, they would be <u>caused</u> by the independent decisions and actions of third parties: the underage users who sought Plan B without a prescription, and the persons age 18 or older who provided it to the underage users. Exactly the same "harm" could occur with no OTC availability if women who obtained Plan B with a prescription provided it to women or girls who had no prescription. Standing cannot be based on these allegations because they are speculations about the actions of third parties, and because those parties' actions breach the causal connection. *Brotherhood of Locomotive Eng'rs & Trainmen*, 457 F.3d at 28.

### 4. CWA Does Not Meet the Germaneness Requirement for Organizational Standing, and FRC Does Not Allege that It Has Members.

CWA does not allege that the interests it seeks to protect in this case are germane to its organizational purposes. CWA claims merely to represent women and men before governmental bodies on issues of specific interest to women, and that it has been active in reproductive issues. FAC ¶ 4. CWA does not allege its organizational mission or purpose. The allegation that it is involved in reproductive issues fails to indicate whether such involvement is germane to its official mission or purpose. The Court, therefore, has no basis upon which to determine whether standing <u>in this case</u> is consistent with CWA's organizational mission or purpose.

FRC does not even allege that it is a membership organization, that it has any members, or who its members are. *See* FAC ¶ 5. Therefore, the FAC provides no basis for finding that FRC has standing on the basis of the interests of its members (if it has any).

**C.    AAPS and SDW Do Not Have Standing To Sue on Behalf of Physicians and Pharmacists.**

**1.    AAPS's Members Are Not Within the Zone of Interests Protected by the FDCA.**

AAPS represents physicians only.  *Id.* ¶ 3.  AAPS alleges that doctors will lose revenue if Plan B is made available OTC.  *Id.* ¶¶ 19-20.  However, a "loss-of-revenue injury" does not create standing here because it fails the "zone of interests" test for prudential standing.  *See Calumet Indus., Inc. v. Brock*, 807 F.2d 225, 228 (D.C. Cir. 1986).  As the Supreme Court has explained:  "In cases where the plaintiff is not itself the subject of the contested regulatory action, the [zone of interests] test denies a right of review if the plaintiff's interests are so marginally related to or inconsistent with the purposes implicit in the statute that it cannot reasonably be assumed that Congress intended to permit the suit."  *Clarke v. Securities Indus. Ass'n*, 479 U.S. 388, 399 (1987).  The pecuniary interests of physicians are not among those within the scope of the FDCA's description of FDA's mission under the FDCA, 21 U.S.C. § 393(b).  AAPS's asserted interest in profit is not even marginally related to the FDCA, whose "comprehensive scheme of drug regulation is designed to ensure the nation's drug supply is safe and effective."  *United States v. Sage Pharms., Inc.*, 210 F.3d 475, 479 (5th Cir. 2000); *Whitaker v. Thompson*, 239 F. Supp. 2d 43, 50 (D.D.C. 2003) ("[T]he legislative intent behind enactment of the original FDCA was to protect the public from unsafe drugs."), *aff'd*, 353 F.3d 947 (D.C. Cir. 2004).[13]  Had Congress intended to maximize physicians' profits by maximizing patients' visits to doctors, it would not have provided for OTC availability of drugs at all.

---

[13]    *Calumet* rejected a claim of standing by manufacturers of certain lubricating oils to challenge OSHA's exclusion of competitors' oils from "health hazards" labeling requirements. 807 F.2d at 226.  The court held that, because the plaintiffs were not regulated by the agency action they challenged and because "the interest to be protected by the [OSHA] is worker safety and *not* business profits," petitioners' interests, "as entrepreneurs seeking to protect their competitive interests," did not meet the test for prudential standing.  *Id.* at 228 (emphasis in original).  Similarly here, the FDCA is intended to protect consumers, not physicians' profits.

The claimed pecuniary injury also results from women's own independent decisions to seek or not seek physicians' services.  Therefore, AAPS's theory also fails to establish the "causal connection between the injury and the conduct complained of," required by *Lujan*, 504 U.S. at 560, for Article III standing.

**2.      AAPS and Its Members Cannot Sue on Behalf of Third Parties.**

AAPS claims that its members' patients and customers will be harmed by the FDA Decision.  FAC ¶¶ 21-22.  This claim is not one of harm to AAPS or to its members, but to the members' patients and customers.  The claim is thus beyond the ordinary claim of organizational standing to seek redress for harm to an organization's members.  AAPS is at two removes from the alleged harm, not just one.

AAPS's claims of harm, in any event, are nonsensical.  The FAC asserts that Plan B's OTC status will deny AAPS's members' patients the ability to vindicate their own rights.  *Id.*  But Plan B's OTC status does not deny any right of any woman.  All women potentially affected by the FDA Decision are free to seek a physician's advice (and, indeed, as to women age 18 or older, a physician's unnecessary prescription) whenever they consider buying Plan B.  The claim that <u>granting</u> women age 18 and older a right (to obtain Plan B OTC) <u>denies</u> them a right (to be compelled to consult a medical practitioner if they want Plan B) is Orwellian.

Indeed, plaintiffs allege that they have "close and confidential relationships with their patients."  FAC ¶ 21.  This allegation highlights the illogic of AAPS's theory of standing.  AAPS claims, without any supporting particular facts, that its members' patients "lack a formal understanding of the risks posed by foregoing medical screening and by using Plan B without fully understanding the potential complications."  *Id.*  Yet it is the very "close and confidential relationship" between AAPS's members and their patients that can and should prevent this very "harm."  There is, simply put, no harm because, at <u>any</u> visit, an AAPS member can communicate

15

the need for the broad range of medical services alleged in FAC ¶ 82 to the female patients, with whom the member has the alleged "close and confidential relationship."  If AAPS contends that its members cannot communicate that information because the women choose <u>never</u> to consult them, then the members (and AAPS) lack the type of close relationship required under the standing doctrine to sue on behalf of women and the parents of girls, *see Lujan*, 504 U.S. at 562.

AAPS's right to sue on behalf of patients fails for another reason.  The FAC alleges, in effect, that physicians have an economic interest in objecting to competition from pharmacists. FAC ¶¶ 19-20.  The established understanding is that increased competition benefits consumers. *See, e.g.*, 2B Phillip E. Areeda et al., *Antitrust Law:  An Analysis of Antitrust Principles and Their Application* 4–5 (3d ed. 2007).  Here, the FAC alleges that, as suppliers of services to consumers, AAPS's members have standing to argue, on behalf of consumers of those services, that competition should be reduced.  The patent illogic of that position and the bias that arises from the alleged economic interest of physicians in reducing competition, FAC ¶ 19, to the disadvantage of their patients preclude standing for AAPS on the basis of a finding that its physician members have standing as representatives of the members' patients age 18 and older who want Plan B.[14]

### 3.    No Harm Is Alleged to SDW's Members.

The FAC asserts that the FDA Decision subjects pharmacist members of Safe Drugs for Women ("SDW") to "expanded legal liability."  FAC ¶ 24.  Although the FAC refers darkly to "selling a misbranded drug," *id.* ¶ 23, and to exposure to "tort liability," *id.* ¶ 24, it alleges no facts that could constitute such liability.  In sum, it fails to identify any "expanded liability" –

---

[14]    A number of States permit pharmacy access to emergency contraceptives without the involvement of a medical doctor, without regard to the FDA Decision.  *See* http://www.ec-help.org.  The alleged "competition" between pharmacist and doctors would not support standing for plaintiffs' members from these States.

because there is none. The only change made by the FDA Decision is that pharmacists may now sell Plan B OTC to customers age 18 and older. If pharmacists take suitable steps to ensure that the customers to whom they sell Plan B OTC are age 18 or over, they face no added liability.

The mere possibility that some pharmacist may improperly sell Plan B OTC to a customer under age 18, and may, as a result, incur liability, does not create standing. "When plaintiffs do not claim that they have ever been threatened with prosecution, that a prosecution is likely, or even that a prosecution is remotely possible, they do not allege a dispute susceptible to resolution by a federal court." *Babbitt v. United Farm Workers Nat'l Union,* 442 U.S. 289, 298-99 (1979) (internal quotations omitted); *see also Takhar v. Kessler*, 76 F.3d 995, 1000 (9th Cir. 1996) (rejecting possibility of future prosecution as basis for standing because plaintiff did not "set forth any [allegations of] concrete or actual threat of prosecution," and rejecting each of his "fear of prosecution" allegations as too speculative to create standing).

Next, SDW's allegation of "added expense and administrative burdens," FAC ¶ 25, is purely conjectural. The FAC does not allege any particular facts that would enable the Court to assess the alleged "added expense and administrative burdens" on pharmacists. No alleged facts show that the cost or burden of dispensing Plan B OTC exceeds the cost or burden of dispensing it Rx. Indeed, for pharmacists, OTC dispensing probably involves <u>less</u> cost and burden. They no longer have to ensure that a customer age 18 or older has a valid prescription for Plan B, and no longer have to maintain such customers' prescriptions on file. They no longer have to take the time to accept and record telephonic prescriptions of Plan B for such customers.[15]

---

[15]    The FAC asserts that the FDA Decision imposes on pharmacists "requirements not applicable to either OTC or Rx drugs. Under Plan B's distribution scheme under the 'CARE' program, such pharmacists must involve themselves directly in sales that cashiers previously could handle." FAC ¶ 25. These conclusory allegations are not supported by any alleged facts. Nothing in the FDA Decision requires any pharmacist to substitute for a cashier, or otherwise imposes on pharmacists any burden that does not already exist as to other OTC and Rx drugs. Pharmacists already are responsible for dispensing age-restricted OTC nicotine-replacement drug

A pharmacist does have to confirm the age of a customer seeking Plan B OTC, but doing so is a simple and quick process, easily accomplished by having a pharmacy clerk ask for valid government-issued identification. Even if doing so were an "added expense and administrative burden" compared to Rx dispensing, the increase plainly would be *de minimis*.

The FAC also alleges that, under the "CARE" program, unlike when Plan B was available only Rx, pharmacists must "often" involve themselves directly in the sales of Plan B, *e.g.*, when there is only one pharmacist on duty. This possibility, the FAC alleges, could subject pharmacists to "compelled speech." FAC ¶ 26. These allegations are incoherent. Any pharmacist's conscience-based objections to Plan B would apply whether Plan B is available Rx or OTC . Even if Plan B were Rx only, every unit of it would be dispensed under the supervision of a pharmacist; and, if only one pharmacist were on duty, he or she would dispense it. The FDA Decision does not determine whether more than one pharmacist is on duty at any given time or when a pharmacist, rather than a clerk supervised by a pharmacist, must personally provide the product. Finally, confirming a customer's age is not compelled speech in any legally cognizable

---

Continued ...

products. In his memorandum explaining the FDA Decision, Commissioner Von Eschenbach notes: "[R]etail outlets, including pharmacies, are familiar with using 18 as the age restriction for the sale of certain products. With regard to drug products, for example, the legal age to purchase FDA approved non-prescription nicotine replacement therapy products is 18. Moreover, I also understand that as a matter of state law many products routinely sold by pharmacies, *e.g.*, tobacco products and nonprescription cough-cold products like pseudoephedrine, are restricted to consumers 18 and older." Ex. 5 at 1 (Memorandum from Andrew C. Von Eschenbach, M.D., to NDA 21- 45, S-011 (Aug. 23, 2006)) A pharmacist's responsibility for supervising the correct dispensing of Plan B is no more burdensome than the analogous responsibility for supervising the correct dispensing of Rx drugs after they have been prepared and are awaiting customer pick-up. The pharmacist need not personally interact with customers.

sense.  If it were, age restrictions on the sale of tobacco products, alcoholic beverages, and OTC nicotine-replacement therapies would be in jeopardy under the First Amendment.[16]

Finally, FAC ¶ 30 alleges, on the basis of FAC ¶ 46, that pharmacists are within the zone of interests protected by 21 U.S.C. § 353(b).  The only interest of pharmacists referred to in ¶ 46 is an interest in clarity as to whether a drug is to be dispensed Rx or OTC.  The FAC fails to allege any harm to that interest.  It fails to allege that the legend "Rx only for women age 17 and younger" is unclear, or has confused any pharmacist.  Thus, the FAC fails to allege any harm to the one interest of pharmacists it alleges is protected by section 353(b).

## II.    PLAINTIFFS HAVE FAILED TO EXHAUST AN AVAILABLE ADMINISTRATIVE REMEDY.

There is an independent basis for dismissal of the FAC:  plaintiffs have failed to exhaust an available administrative remedy, *i.e.*, that provided by 21 C.F.R. § 10.25(a) (2007), which provides:  "An interested person may petition the Commissioner to issue, amend, or revoke a regulation or order, or to take or refrain from taking any other form of administrative action." *See also* 21 C.F.R. § 10.30 (2007).[17]  Plaintiffs are required to file a citizen petition under those provisions before seeking judicial relief.  *See*, *e.g.*, *Garlic v. FDA*, 783 F. Supp. 4 (D.D.C. 1992) (dismissing complaint against FDA for failure to exhaust administrative remedies by filing a citizen's petition); *Estee Lauder, Inc. v. FDA*, 727 F. Supp. 1, 6-7 (D.D.C. 1989) (same).[18]

---

[16]    The FDA Decision does not compel any pharmacy to stock Plan B or any pharmacist, as a matter of professional responsibility, to dispense it.  Those are matters for private decision and state law.

[17]    Plaintiffs' allegation that "neither FFDCA nor any other provision of law provides an alternate legal remedy for Plaintiffs' injuries," FAC ¶ 36, is, as a matter of law, simply incorrect. *See* 21 C.F.R. §§ 10.25, 10.30.  FAC ¶ 37 reflects a lack of understanding of the concept of an adequate administrative remedy:  *i.e.*, one that may result in the agency action plaintiffs seek.

[18]    These decisions demonstrate that that the *Federal Register* preambles cited in FAC ¶ 31 do not bind the Department of Justice or this Court, and, indeed, have no operative effect.

In *Association of Flight Attendants-CWA v. Chao*, 493 F.3d 155 (D.C. Cir. 2007), the

D.C. Circuit recently re-affirmed the requirement of exhaustion of administrative remedies:

> "[N]o one is entitled to judicial relief for a supposed or threatened injury until the
> prescribed administrative remedy has been exhausted." *Myers v. Bethlehem
> Shipbuilding Corp.,* 303 U.S. 41, 50-51, 58 S. Ct. 459, 82 L. Ed. 638 (1938).
> Broadly speaking, the doctrine of exhaustion of administrative remedies "serves
> the twin purposes of protecting administrative agency authority and promoting
> judicial efficiency." *McCarthy v. Madigan,* 503 U.S. 140, 145, 112 S. Ct. 1081,
> 117 L. Ed. 2d 291 (1992).  The exhaustion requirement ensures that agencies-and
> not the federal courts-take primary responsibility for implementing the regulatory
> programs assigned by Congress.  *Id.*; *see also McKart v. United States,* 395 U.S.
> 185, 193-95, 89 S. Ct. 1657, 23 L. Ed. 2d 194 (1969).

*Id.* at 158 (alteration in original).  The court dismissed a suit by unions seeking to compel the

FAA and OSHA to regulate the airline industry's working conditions because the unions had not

exhausted available administrative remedies.  *Id.*

In *Garlic*, plaintiffs suffering from Alzheimer's Disease challenged FDA's failure to

approve a certain drug to treat the disease.  This Court summarily rejected plaintiffs' argument

that filing a citizen petition was not mandatory:  "The provision for review of the

Commissioner's final decision confirms that the procedure is intended to allow the FDA to

develop its policy without judicial interference.  The procedure also allows the FDA to produce

an administrative record for the reviewing court to consider."  *Garlic*, 783 F. Supp. at 4-5.  The

Court further cautioned that permitting "'interested parties' to bypass administrative remedies

would undermine the entire regulatory process."  *Id.* at 5.  That reasoning applies here.

Plaintiffs do not allege that they were not required to exhaust the available administrative

remedy, or that any of the limited exceptions to the exhaustion requirement, *see Chao*, 493 F.3d

---

Continued ...

FAC ¶ 56 asserts that 21 C.F.R. § 10.45(e) "acknowledge[s] that an interested person
may seek judicial review without first petitioning the Commissioner."  What section 10.45(e)
actually states is:  "An interested person may request judicial review of a final decision of the
Commissioner . . . without first petitioning the Commissioner <u>for reconsideration or for a stay of
action</u> . . . ."  21 C.F.R. § 10.45(e) (2007) (emphasis added).

at 158, applies here.  Instead, plaintiffs seek a blanket ruling from this Court that FDA lacks

authority to impose a "mandatory" administrative process.  FAC ¶¶ 28, 136.  What makes

exhaustion of the remedy provided by sections 10.25 and 10.30 mandatory, however, is not

anything FDA has done (beyond providing the remedy) but the judicially-created exhaustion

doctrine.  In effect, plaintiffs ask this Court to overturn that entire doctrine.

That request is flatly contrary to, *e.g.*, the authorities cited in the passage from *Chao*

quoted on page 20, *supra*.  *See also Forsham v. Harris*, 445 U.S. 169, 174 n.3 (1980) (noting

without disapproval that court of appeals had remanded to FDA for exhaustion of administrative

remedies litigation to enjoin proposed labeling); *Public Citizen Health Research Group v.

Commissioner, FDA*, 740 F.2d 21, 28 (D.C. Cir. 1984) (applying exhaustion requirement).

This Court should decline to hear plaintiffs' claims until plaintiffs have exhausted the

administrative remedy available to them.

## III.    COUNTS II AND IV-VI FAIL TO STATE A CLAIM UPON WHICH RELIEF CAN BE GRANTED.

Counts II and IV-VI of the FAC should be dismissed pursuant to Fed. R. Civ. P. 12(b)(6)

for "failure to state a claim upon which relief can be granted."

In *Bell Atlantic Corp. v. Twombly*, 127 S. Ct. 1955 (2007), the Supreme Court recently

clarified the pleading standard under Fed. R. Civ. P. 8(a), and its application to motions to

dismiss under Rule 12(b)(6).  The Court expressly "retire[d]" the "famous observation" that "the

accepted rule [is] that a complaint should not be dismissed for failure to state a claim unless it

appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which

would entitle him to relief" *Id.* at 1968-69 (*quoting Conley v. Gibson*, 355 U.S. 41, 45-46

(1957)).  "The phrase is best forgotten as an incomplete, negative gloss on an accepted pleading

standard: once a claim has been stated adequately, it may be supported by showing any set of

facts consistent with the allegations in the complaint."  *Id*. at 1969.

*Twombly* held, instead, that, "[w]hile a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Id.* at 1964-65 (alterations in original) (citations omitted). "Factual allegations must be enough to raise a right to relief above the speculative level . . . on the assumption that all the allegations in the complaint are true (even if doubtful in fact) . . . ." *Id.* at 1969 (citation and footnote omitted). Thus, the adequacy of a complaint now depends on the sufficiency of "[f]actual allegations," not speculations.

### A.    Count II Fails To State a Claim Upon Which Relief Can Be Granted Because It Is Based on an Incorrect Statutory Interpretation.

Under the Administrative Procedure Act ("APA"), the Court may vacate the FDA Decision only if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A) (2000). This standard is very deferential to the agency. *See Citizens to Pres. Overton Park, Inc. v. Volpe,* 401 U.S. 402, 416 (1971). Accordingly, "there is a presumption in favor of the validity of [the] administrative action [in an action challenging FDA's interpretation of the FDCA]." *Teva Pharm., Indus., Ltd. v. FDA*, 355 F. Supp. 2d 111, 116 (D.D.C. 2004) (*quoting Bristol-Myers Squibb Co. v. Shalala,* 923 F. Supp. 212, 216 (D.D.C. 1996)) (first alteration in original), *aff'd sub nom. Teva Pharm. Indus., Ltd. v. Crawford*, 410 F.3d 51 (D.C. Cir. 2005).

FDA has interpreted 21 U.S.C. § 353(b) as permitting, in certain circumstances, an active ingredient to be distributed simultaneously in both an Rx drug product and an OTC drug product. *See* 70 Fed. Reg. at 52,051. In Count II, plaintiffs challenge FDA's interpretation of section 353(b). They contend that it "authorizes approval of a drug product for only one of two mutually exclusive modes of distribution and labeling." FAC ¶ 102. Plaintiffs are dead wrong.

Plaintiffs' approach, requiring that all uses of a drug be either OTC or Rx, is wrong as a matter of statutory construction and public policy, because it is contrary to the text (discussed *infra*) and a key objective of section 353: "to relieve retail pharmacists and the public from burdensome and unnecessary restrictions on the dispensing of drugs that are safe for use without the supervision of a physician." Ex. 6 (S. Rep. No. 82-946, at 1-2 (1951)). By contrast, FDA's interpretation, which permits OTC availability for use of a drug by one patient population, and Rx availability for use by another, is consistent with the statutory text and serves the statutory objectives – to ensure that drugs for which supervision by a doctor is needed for safety and effectiveness are available only by prescription, while also ensuring that drugs that are safe and effective for OTC use are available to the appropriate patient population without a prescription.

FDA's interpretation should be upheld at step one of the analysis under *Chevron U.S.A., Inc. v. National Res. Def. Council*, 467 U.S. 837 (1984), because it is required by the unambiguous statutory text, or, alternatively, at step two, because FDA's interpretation is reasonable and, therefore, must be given deference. The FDA Decision approving the Plan B sNDA was not "arbitrary and capricious, an abuse of discretion, or otherwise contrary to law" under the APA. Accordingly, this Court should dismiss Counts II.

      **1.**      **Count II Fails Because the Unambiguous Text and Objectives of Section 353(b) Require FDA's Interpretation Permitting a Drug, in Appropriate Circumstances, To Be Dispensed Rx to One Patient Population and OTC to Another.**

The text of section 353(b)(1) and (3) and the objectives plainly evident in the text – to require a prescription where necessary (§ 353(b)(1)) and to permit OTC availability where a prescription is unnecessary (§ 353(b)(3)) – require FDA's interpretation permitting a drug to be dispensed Rx to one patient population (for which a prescription is necessary) and OTC to another (for which a prescription is unnecessary). Plaintiffs' contrary interpretation would fail to implement section 353(b)(1) or 353(b)(3), and so is contrary to the statutory text and objectives.

Section 353(b)(3), which plaintiffs allege does not support FDA's approval of Plan B for Rx availability to one patient population and OTC availability to another, should be construed in light of section 353(b) as a whole. "It is a fundamental canon of statutory construction that the words of a statute must be read in their context and with a view to their place in the overall statutory scheme." *Davis v. Michigan Dep't of Treasury,* 489 U.S. 803, 809 (1989).

The text of section 353(b)(1) protects consumers from the dangers arising from OTC dispensing of drugs for which a physician's supervision is necessary for safe and effective use. This provision authorized FDA to restrict Plan B to Rx use by women age 17 and under.

The text of section 353(b)(3) addresses Congress's countervailing concern that consumer access to medications that are safe and effective for OTC use not be unduly impaired by a prescription requirement. It authorizes FDA, "by regulation," to determine as to a particular drug or a group of drugs that the requirements of section 353(b)(1) "are not necessary for the protection of the public health." 21 U.S.C. § 353(b)(3). FDA has promulgated the regulation contemplated by section 353(b)(3): 21 C.F.R. § 310.200(b) (2007). *See also* 21 C.F.R. § 330.10(a)(4)(vi) (2007). Section 353(b)(3), together with section 310.200(b), authorized FDA to permit Plan B to be dispensed OTC to women age 18 and older.

The express words of section 353(b)(3) are that FDA "may by regulation remove drugs subject to [21 U.S.C. § 355, *i.e.*, "new drugs"] from the requirements of paragraph (1) of this subsection when such requirements are not necessary for the protection of the public health." In that statutory expression, the term "regulation" is singular, not plural; and the term "drugs" is plural, not singular. Thus, section 353(b)(3) unambiguously contemplates and authorizes removal by one regulation of multiple new drugs from the prescription requirement of section 353(b)(1). FDA has promulgated such a regulation, 21 C.F.R. § 310.200(b), which removes new drugs with certain characteristics from section 353(b)(1). Having once promulgated that

24

regulation, FDA thereafter need only decide by informal adjudication, case by case, whether this or that particular new drug satisfies the criteria stated in the regulation. Each set of conditions prescribed, recommended, or suggested in the labeling of an approved new drug constitutes a different new drug.[19] Therefore, section 353(b)(3) plainly and unambiguously authorizes FDA's interpretation of it here, which plaintiffs challenge.

That interpretation also serves the objectives manifest in the text of section 353. Section 353(b)(2), supplemented by section 353(b)(4), ensures that pharmacists receive from drug manufacturers adequate guidance regarding the lawful marketing and dispensing of drugs. *See* 21 U.S.C. § 353(b)(2), (4). Those provisions require that drugs be dispensed with an "Rx only" label if they are subject to a prescription limitation under section 353(b)(1).

This regulatory scheme, as interpreted and implemented by FDA, strikes the congressionally intended balance between ensuring that drugs for uses for which a prescription is needed are Rx only under section 353(b)(1), and that drugs for uses for which a prescription is not needed are available OTC under section 353(b)(3). Plaintiffs' proposed interpretation would upset this balance by denying FDA the authority and flexibility it needs (and that FDA's interpretation provides) to classify particular uses of drugs as Rx or OTC on a use-by-use basis

---

[19]      Under 21 C.F.R. § 310.3(h)(5) (2007), where a new drug is used by two different patient populations, the drug in each of those uses is a different "new drug." Any "new drug" needs approval by FDA. 21 U.S.C. § 355(a) (2000). (The term "new drug" is defined in 21 U.S.C. § 321(p).) The population for which a drug is recommended in its labeling is a "condition" within the scope of section 310.3(h)(5). Thus, where the labeling of a new drug provides for its use in two different patient populations, as to each such population the new drug is a different new drug. The reason why a manufacturer that has an approved NDA and seeks to expand the use of the approved new drug to an additional patient population (*e.g.*, a population with a less or more severe stage of the disease for which the new drug is already indicated or for a population with a different disease) must obtain FDA approval of an sNDA, *see* 21 C.F.R. § 314.70(b)(2)(v)(A), (C) (2007), is that such expansion creates a "new drug" that is different from the "new drug" previously approved. Thus, as a technical legal matter, a new drug with an FDA-approved NDA may constitute multiple different new drugs – one for each set of conditions prescribed, recommended, or suggested in its labeling.

as the circumstances of each drug separately warrant.  Therefore, plaintiffs' theory of section 353(b) is contrary to the statutory text and the statutory objective of avoiding a prescription requirement where it is unnecessary for safe and effective use of a drug.

Indeed, plaintiffs' interpretation would lead to the absurd result of requiring FDA to regulate drugs as Rx-only for all uses by all patient populations even where the drugs are safe and effective for OTC use by certain patient populations.  That interpretation fails because "interpretations of a statute which would produce absurd results are to be avoided if alternative interpretations consistent with the legislative purpose are available."  *Griffin v. Oceanic Contractors, Inc.*, 458 U.S. 564, 575 (1982); *FTC v. Ken Roberts Co.*, 276 F.3d 583, 590 (D.C. Cir. 2001).

### 2.    Alternatively, Count II Fails Because FDA's Interpretation Is Reasonable and Entitled to Deference at *Chevron* Step Two.

FDA's statutory interpretation is entitled to deference under *Chevron* because it is reasonable.  467 U.S. at 844; *see also Serono Labs., Inc. v. Shalala*, 158 F.3d 1313, 1320 (D.C. Cir. 1998) (granting FDA's interpretation of FDCA *Chevron* deference at step two).  At a minimum, FDA's interpretation, like that of any agency interpreting its organic act, is entitled to respectful consideration under *Skidmore v. Swift & Co.*, 323 U.S. 134, 139-40 (1944).

### a.    FDA's August 24, 2006 Approval Letter Merits *Chevron* Deference.

The issues relating to Plan B arose in the context of a supplement to an NDA.  Final FDA action on an NDA or supplement takes the form of a letter.  *See* 21 C.F.R. §§ 314.105, 314.125 (2007).  An approval letter is a form of license; a letter refusing approval is a denial of a license. In APA terms, each such letter is an "order" within the meaning of 5 U.S.C. § 551(6) (2000); and an administrative proceeding on an NDA or supplement is an informal "adjudication" within the meaning of 5 U.S.C. § 551(7).  FDA approved the sNDA on August 24, 2006.  FAC ¶ 76; Ex. 1.

Both the Supreme Court and the D.C. Circuit have granted *Chevron* deference to statutory interpretations embodied in agency documents indistinguishable from FDA's August 24, 2006 letter and related FDA memoranda.  In *Barnhart v. Walton*, 535 U.S. 212 (2002), the Court held that there is no bar to granting deference to an agency interpretation that did not emerge from notice-and-comment rulemaking.  *Id.* at 222.  Instead, it held that "whether a court should give such deference depends in significant part upon the interpretive method used and the nature of the question at issue."  *Id.* (*citing United States v. Mead Corp.*, 533 U.S. 218, 229-31 (2001)).  The Court held that deference to the agency's interpretation was due because of "the interstitial nature of the legal question, the related expertise of the Agency, the importance of the question to administration of the statute, the complexity of that administration, and the careful consideration the Agency has given the question over a long period of time."  *Id.*

In *Mylan Laboratories, Inc. v. Thompson,* 389 F.3d 1272, 1279-80 (D.C. Cir. 2004), the D.C. Circuit granted *Chevron* deference to an FDA letter because "[t]here is no denying the complexity of the statutory regime under which the FDA operates, the FDA's expertise or the careful craft of the scheme it devised to reconcile the various statutory provisions.  Further, the FDA's decision made no great legal leap but relied in large part on its previous determination of the same or similar issues and on its own regulations."  *Id.* at 1280.

Similar circumstances here require *Chevron* deference to FDA's interpretation of section 353(b), as reflected in 21 C.F.R. §§ 310.200(b) and 330.10(a)(4)(vi) and in its letter approving the Plan B sNDA.  FDA's interpretation (i) involves the exercise of scientific and medical judgment regarding the safety and effectiveness of Plan B when dispensed OTC for use by women age 18 and older and when dispensed Rx for use by women age 17 and younger; (ii) is the product of a number of formal adjudications (the Plan B adjudication and the adjudications as

27

to other NDAs or sNDAs for simultaneous Rx and OTC distribution of a drug);[20] (iii) was developed in response to particular factual circumstances in the regulated industry, as to which FDA has expertise; (iv) was made by the Commissioner, the agency head, personally;[21] (v) addresses a question that has historically been of particular importance in the administration of the FDCA, *see* 70 Fed. Reg. 52,050; (vi) is in an area of the law in which the federal courts do not have extensive experience; and (vii) was made under the undeniably "complex" FDCA regulatory scheme.

Finally, there can be no denying the complexity and specialized nature of the question whether, and, if so, to what extent, to approve a proposed Rx-to-OTC switch. FDA's scientific and medical judgments bear on that determination. It is FDA's responsibility to ensure that its classification of a drug as Rx or OTC is neither over-regulatory (making drugs that in certain circumstances are safe and effective for OTC use available only by prescription), or under-regulatory (making fully available OTC drugs for which in certain circumstances a physician's supervision is needed for safe and effective use).

---

[20]     FDA has approved simultaneous Rx and OTC distribution of, *inter alia*, the following drugs: Meclizine (Rx for vertigo; OTC for nausea with motion sickness); Clotrimazol (Rx for candidiasis; OTC for athlete's foot, ring worm, jock itch); Loperamide (Rx for chronic diarrhea; OTC for acute diarrhea); nicotine products (Rx for administration through inhalers and nasal sprays; OTC in gums, lozenges and patches); ibuprofren (Rx at 400mg+ for arthritis; OTC at 400mg and below for aches and pains); and H2 blockers (Rx at 300mg+ for ulcers; OTC at 200mg for heartburn). *See* 70 Fed. Reg. 52,050 (Sept. 1, 2005).

[21]     FDA Commissioner Von Eschenbach personally made the decision to approve Plan B for simultaneous OTC and Rx distribution to different patient populations. *See* FAC ¶ 76; Ex. 5. The decision was based, in part, on his acknowledgement of existing "well-established state and private-sector infrastructures to restrict certain products to consumers 18 and older." *Id.* at 1-2 (giving as examples tobacco, non-prescription nicotine replacement therapy products, and non-prescription cold and cough products).

> **b.** **FDA's Interpretation Is Consistent with the Statutory Scheme.**

Plaintiffs allege that FDA lacks authority to permit distribution of the "same drug product, with the same labeling, for simultaneous distribution as both an OTC and an Rx product." FAC ¶ 102. FDA does have such authority.

Although Plan B, when dispensed OTC, bears adequate directions for OTC use by women age 18 and older, who, in accordance with the approved labeling, may buy it OTC, it does not (in legal contemplation) bear adequate directions for OTC use by women age 17 and younger, who, in accordance with the approved labeling, may buy it only with a prescription.[22] Therefore, when dispensed to a woman under age 18, Plan B must comply, and does comply, with all the conditions, set forth in 21 C.F.R. § 201.100 (2007), for exemption from the requirement of adequate directions for use by the Rx population, 21 U.S.C. § 352(f)(1) (2000 & Supp. IV 2006).

Apart from allegations relating to FDCA § 353(b)(4), discussed in the next paragraph, the FAC does not allege that there is any obstacle to simultaneous compliance by Plan B with all the FDCA's labeling requirements for OTC drugs and all its labeling requirements for Rx drugs. Indeed, because, as determined by FDA, the product information, including all directions for use, is exactly the same for the Rx and the OTC users of Plan B, the presence of the OTC information and directions on the packages dispensed to Rx users <u>enhances</u> their safe and effective use of the product. The FAC does not allege that either the patient population of women age 17 and younger or the patient population of women age 18 and older is in any way adversely affected by

---

[22] The legal theory justifying prescription status as to those patients is that adequate directions for use by them, without a physician's supervision, cannot be written. *See* 21 U.S.C. § 353(b)(1)(A) (requiring Rx status for any drug that "is not safe for use except under the supervision of a practitioner licensed by law to administer such drug"). Necessarily, in the case of a drug that is within the scope of section 353(b)(1)(A), directions for use without medical supervision cannot substitute for medical supervision. Therefore, such directions cannot be adequate for safe use.

the presence on or in the Plan B package of any information placed there in order to comply with a regulatory requirement for the protection of the other population. Nor does the FAC allege that Plan B fails to comply with any labeling requirement applicable to it when dispensed OTC or applicable to it when dispensed Rx.[23]

FDCA § 353(b)(4) provides:

> (A)    A drug that is subject to paragraph (1) shall be deemed to be misbranded if at any time prior to dispensing the label of the drug fails to bear, at a minimum, the symbol "Rx only".

> (B)    A drug to which paragraph (1) does not apply shall be deemed to be misbranded if at any time prior to dispensing the label of the drug bears the symbol described in subparagraph (A).

21 U.S.C. § 353(b)(4) (2000). Whether a drug product is subject to section 353(b)(4)(A) or to section 353(b)(4)(B) depends solely on whether it "is subject to paragraph (1)" of section 353(b). Under the FDA Decision, Plan B remains an Rx product for women age 17 and younger. Therefore, at all times, it remains "[a] drug that is subject to paragraph (1)" of section 353(b). Even units of Plan B dispensed OTC for women age 18 and older are subject to a prescription restriction under section 353(b)(1) against their being dispensed OTC for women age 17 and younger. Consequently, Plan B, whether dispensed Rx or OTC, is subject to section 353(b)(4)(A), and not to section 353(b)(4)(B), which applies only to drug products that are not subject to any prescription requirement under section 353(b)(1). Accordingly, units of Plan B dispensed OTC are subject to section 353(b)(4)(A), not to section 353(b)(4)(B).

Plan B complies with section 353(b)(4)(A) by bearing on its label the legend: "Rx only

---

[23]    The FDCA, in 21 U.S.C. § 353(b)(2), exempts an Rx drug from many of the requirements of 21 U.S.C. § 352, if its label contains (i) the name and address of the dispenser; (ii) the serial number and date of the prescription or its filing; (iii) the name of the prescriber; (iv) if stated in the prescription, the name of the patient; and (v) the directions for use and cautionary statements, if any, contained in such prescription. The information required by section 353(b)(2) appears on an Rx label the pharmacist attaches to the package when dispensing the product pursuant to a prescription.

for women age 17 and younger." Ex. 2.  Section 353(b)(4)(A) requires that "the symbol 'Rx

only'" appear on Plan B's label.  The symbol "Rx only" appears on that label as part of the

statement "<u>Rx only</u> for women age 17 and younger."  *Id.* (emphasis added).

Nothing in section 353(b)(4)(A) precludes the appearance of the symbol on a label as part

of a truthful and non-misleading statement of the prescription limitation applicable to the labeled

drug under its approved NDA (including all approved sNDAs).  Indeed, the expression "at a

minimum" in section 353(b)(4)(A) expressly contemplates that the words "Rx only" may appear

with other words on the label.  Thus, Plan B's Rx legend complies literally with the text of

section 353(b)(4)(A).  It also fully serves the objective of section 353(b)(4):  to make clear to

pharmacists and the public when a drug product is to be dispensed OTC or only by prescription.

     **c.**     **FDA's Interpretation Is Consistent with Congressional Intent.**

Plaintiffs allege that, in enacting the Durham-Humphrey Amendments, Pub. L. No. 82-

215, 65 Stat. 648 (1951), which added section 353(b) to the FDCA, "Congress expressly deemed

the presence or absence of the Rx legend as mutually exclusive for Rx and OTC products,

respectively."  FAC ¶ 50.  As shown at pages 23-31, *supra*, however, neither the statutory text

nor the plainly evident statutory purposes require such mutual exclusivity (which, indeed, would

be contrary to the statutory purposes).  Nor does the statute's legislative history require it.

The Senate Report on the Amendments stated their intent "to deal more directly and

realistically with the labeling and dispensing of drugs . . ." S. Rep. No. 82-946, at 1-2.  The

Amendments had two objectives:  "(1) to protect the public from abuses in the sale of potent

prescription drugs; and (2) to relieve retail pharmacists and the public from burdensome and

unnecessary restrictions on the dispensing of drugs that are safe for use without the supervision

of a physician."  *Id*.  The House Report is in accord:  it uses the same language to describe the

amendments' "two broad objectives."  Ex. 7 (H.R. Rep. No. 82-700, at 2-3 (1951)).

As to the first objective, prior to the Amendments the initial responsibility was on a manufacturer to decide whether its drug was unsuitable for self-medication and therefore must be labeled with a cautionary legend that a prescription was required for dispensing.  *See* H.R. Rep. No. 82-700, at 3-5.  To no great surprise, manufacturers did not discharge that responsibility consistently; and the result was "great confusion in the use of the prescription legend."  *Id.* at 5. If FDA disagreed with a manufacturer's determination, it would bring an enforcement action to require the appropriate label to be placed on the product.  *Id.* at 4-5.

Under that system, "the retail druggist [was] often unable to know, until the question [wa]s settled by litigation, whether a particular drug can be sold on prescription only."  *Id.* at 4. Moreover, the practical effect was that "[m]any products of identical composition, placed on the market by different manufacturers . . . would bear the prescription legend while another of the same composition would provide direction for use [OTC legend]."  *Id.* at 5.  In some instances, the "druggist would not even know . . . the class in which the manufacturer intended to place such drugs."  *Id*.  The Amendments solved this problem by requiring FDA involvement *ex ante*, as opposed to *ex post*, in the Rx-or-OTC determination.

FDA's interpretation, permitting certain drugs to be marketed simultaneously Rx for one population and OTC for a different population, is entirely consistent with this goal of the Amendments.  Pursuant to FDA's approval, Plan B's labeling includes a legend that unambiguously informs pharmacists (and others) as to its classification for purposes of dispensing:  "Rx only for age 17 and younger."  Plaintiffs have not made a single factual allegation that this labeling has caused confusion among pharmacists.

As to the second objective, Congress sought to alleviate the real public-health concern that drugs that were safe and effective for OTC use were being dispensed only by prescription, thereby placing undue burdens on pharmacists and restricting the public's ready access to such

drugs.  Section 353(b)(3), permitting the agency to remove drugs from the prescription requirement, was a "relaxation . . . necessary to permit the sale without prescription of drugs . . . when that safeguard is unnecessary."  *Id.* at 16.  *See also* 70 Fed. Reg. at 52,051.

FDA's interpretation achieves this second objective.  By contrast, achievement of that objective would be prevented if FDA were prohibited from using its regulatory authority and expertise to make necessary distinctions between uses of a drug that are appropriate for OTC access and uses that are appropriate only with a prescription.  *See supra*, pp. 23-26.

Plaintiffs rest their construction of the statute on one line from the Senate Report – not found in the statute – which states that, under the labeling requirements of section 353(b)(4), "over-the-counter drugs are forbidden to bear a label containing this caution statement ['Caution: Federal law prohibits dispensing without prescription']."  S. Rep. 82-946 at 10.  Contrary to plaintiffs' allegations, that statement does not prohibit a drug from containing a label that states: "Rx only for age 17 and younger."

The statement on which plaintiffs rely refers to drugs that are appropriate for OTC dispensing for all populations and uses.  "[O]ver-the-counter drugs" are drugs that are not subject to any prescription limitation at all.  The statement plaintiffs rely on has no bearing on what is permissible for a drug that FDA determines should have Rx and OTC distribution for use by different patient populations, and therefore should be subject to a prescription limitation.  As explained at page 34, *infra*, Plan B is not an "over-the-counter" drug:  at all times, as to all units, and even when dispensed OTC, it is subject to a prescription limitation.

Moreover, the statement plainly was intended to address a situation in which the appearance of the caution statement on a drug label would be false:  *i.e.*, an OTC drug bearing a statement that it may be dispensed only Rx.  Here, plainly, the appearance of the Rx legend on Plan B's label is not false.  Indeed, Plan B's label stating when a prescription is required (and, by

necessary implication, when OTC dispensing is permitted) is true, and well serves the congressional objectives of providing certainty to pharmacists, making drugs available OTC where that is appropriate, and restricting drugs to prescription use where that is appropriate.

> **B.    Count IV Fails To State a Claim Because Plaintiffs Have Not Alleged that FDA Has Mandated that Plan B Be Treated as a Third Class of Drug.**

Plaintiffs allege that FDA lacks authority to create a "third class" of drug, which they define as "a class of drugs that require pharmacists to supplement the labeling or that certain subpopulations might misuse with direct access." FAC ¶ 115. They allege that such a class of drugs creates "anti-competitive and anti-consumer effects on the distribution of nonprescription drugs." *Id.* ¶ 116. This count fails for the reasons asserted with respect to Count II at pages 22-34, *supra*, and for the following additional reasons.

Plaintiffs do not, and cannot plausibly, allege that FDA regulates Plan B as a third class of drugs. Every unit of Plan B is subject to a prescription limitation: that it not be sold to a consumer age 17 or under without a prescription. Of course, therefore, like packages of all other drugs subject to a prescription limitation, packages of Plan B must be kept behind a pharmacy counter, and cannot be sold by, *e.g.*, a grocery store. This treatment of Plan B as a drug subject to a prescription limitation – dispensing only by physicians and pharmacists in neighborhood pharmacies, clinics, hospitals, and other medical facilities; storage behind the counter rather than on open shelves accessible to consumers – follows necessarily from Plan B's availability as a drug subject to a prescription limitation. Similarly, the age restriction applicable to OTC dispensing of Plan B also follows from the definition of the Rx population in terms of age. As Commissioner Von Eschenbach noted, identical age restrictions already apply to other drugs dispensed OTC. *See* note 15, *supra*. Plaintiffs do not allege any other way in which Plan B constitutes a "third class of drugs" uniquely different from existing Rx and OTC drugs.

Plaintiffs do not allege any harm to distribution. They do not allege any facts amounting to an anticompetitive effect (*e.g.*, facts constituting an anticompetitive reduction of supply or increase in price). Moreover, plaintiffs fail to allege that they or their members have been harmed by any anticompetitive effect.[24] They do not allege that they are or represent market participants (*e.g.*, owners of gas stations or convenience stores) that complain that they are not able to sell Plan B because its sale is restricted to pharmacies and other medical facilities. They do not allege that they are or represent purchasers of Plan B who, somehow, have suffered from some anticompetitive effect. Indeed, the remedy plaintiffs seek – elimination of any OTC availability of Plan B – would not change the number of outlets that sell Plan B, and so would not change whatever competitive effects Plan B currently has. For these reasons, in addition to those at pages 4-19, *supra*, plaintiffs lack standing to proceed with this Count (and they would lack it even if, contrary to pages 4-19, *supra*, they had alleged harm sufficient to confer standing for the other Counts in the FAC).

Finally, although plaintiffs allege in conclusory terms that FDA exceeded its authority, they do not allege any facts showing that FDA compelled Duramed to do anything beyond treating Plan B as a drug subject to a prescription limitation and an age restriction. Even if, somehow, FDA exceeded its authority in imposing some burden on Duramed, because plaintiffs have not alleged how any burden imposed on Duramed injures them or their members, plaintiffs lack standing to complain of any such burden.

### C.    Count V Fails To State a Claim Because the APA Does Not Require Notice-and-Comment Rulemaking in the Circumstances Here.

"FDA has interpreted . . . [section 353](b)(1) of the act to allow marketing of the same

---

[24]    Indeed, plaintiffs complain of <u>increased</u> competition between physicians and pharmacists. FAC ¶ 20. Plaintiffs' mutually inconsistent allegations with respect to competition are mirrored by plaintiffs' claims to represent physicians, pharmacists, and consumers, *see* FAC ¶¶ 3-6, whose interests with respect to competition in the sale of drugs are mutually conflicting.

active ingredient in products that are both prescription and OTC, assuming some meaningful difference exists between the two that makes the prescription product safe only under the supervision of a licensed practitioner." 70 Fed. Reg. at 52,051. Plan B is the first instance of FDA approval of the "marketing of the same active ingredient in a prescription product for one population and in an OTC product for a subpopulation" with no physical difference between the product dispensed Rx and the product dispensed OTC. *Id.* FDA's approval of Plan B does not, however, involve any new general legal interpretation as to which rulemaking is required by law.

Count V complains, nevertheless, that FDA did not conduct a rulemaking to add a "patient-based 'age' parameter" to its "meaningful difference" test. FAC ¶ 121. Count V fails. No rulemaking was legally required or factually warranted in the circumstances here. The "meaningful difference" standard (which is discussed in FAC ¶ 53) does not appear in any FDA regulation. The approval Duramed sought from FDA was specific to NDA 21-045, Supplement 011 as amended, and did not raise any issue of broad applicability.

FDA's approval of the partial switch of Plan B from Rx to OTC dispensing and its approval of the labeling of Plan B involved interpretations of the FDCA and application of FDA policy. It did <u>not</u> involve any new interpretation of any substantive rule embodied in a regulation, and was <u>not</u> a departure from any previous FDA policy that was authoritatively adopted, communicated to the public through adjudications amounting to an administrative common law, and relied on by regulated parties. Therefore, here, FDA's approval was not subject to the requirement of notice and comment under the APA, 5 U.S.C. § 553 (2000).

### 1.    FDA Has Broad Discretion To Proceed by Adjudication Without Notice-and-Comment Rulemaking.

The Supreme Court has made clear that federal agencies have broad discretion to resolve interpretive and policy issues in adjudications without rulemaking. *SEC v. Chenery Corp.* ("*Chenery II*"), 332 U.S. 194 (1947), involved an SEC adjudication that raised interpretive and

policy issues. The Commission had to decide whether to approve an amendment to a reorganization plan. The Court rejected the argument that the Commission was required to use notice-and-comment rulemaking, rather than adjudication, to decide the issues presented.

The Court first made clear that, in adjudicating a matter before it, an agency must apply its interpretation of the statute to the facts found, even if that interpretation has not previously been subjected to notice and comment. *See Chenery II*, 332 U.S. at 201.

The Court then described the discretion agencies have to proceed either by adjudication or by notice and comment. "Not every principle essential to the effective administration of a statute can or should be cast immediately into the mold of a general rule." *Id.* at 202. "Some principles must await their own development, while others must be adjusted to meet particular, unforeseeable situations. In performing its important functions in these respects, therefore, an administrative agency must be equipped to act either by general rule or by individual order." *Id.* "[T]he choice made between proceeding by general rule or by individual, ad hoc litigation is one that lies primarily in the informed discretion of the administrative agency." *Id.* at 203.

That rationale applies here. Adoption of an age restriction as the dividing line between OTC and Rx availability was a reasonable and appropriate means to resolve the concerns raised in the letter from Steven Galson, M.D., M.P.H. (May 6, 2004), denying approval of NDA 21-045/S-011. FAC ¶ 69. Yet, FDA has little prior experience with such use of an age restriction or its reflection in labeling. Therefore, it is reasonable for the agency to proceed case by case to accumulate experience before embodying a particular approach in a rule of general applicability.

In fact, FDA did provide ample opportunities for public comment. It invited "interested persons" to submit "data, information or views" to the public meeting of advisory committees at which the Plan B sNDA was considered. *See* http://www.fda.gov/oc/advisory/accalendar/cder12541d121603.html. It also published the ANPRM, 70 Fed. Reg. 52,050, and received

approximately 47,000 comments, FAC ¶¶ 71-72.  Three of the four plaintiffs here commented.

FAC ¶ 27.  Plaintiffs cannot plausibly claim they were denied an opportunity to be heard as to

the proposed Rx-to-OTC switch of Plan B.[25]

### 2.    The sNDA Approval Involved Interpretation of Section 353(b), Not Interpretation of a Substantive Rule.

The legal issues relating to the FDA Decision and the means to comply with section

353(b)(4) all involve an interpretation of section 353(b), and do not involve any exercise of

delegated law-making authority.  Therefore, under the APA, the legal interpretations FDA relied

on to approve the partial switch and the means of compliance with section 353(b)(4) have the

status of interpretive rules or, possibly, statements of policy, both of which are exempted by 5

U.S.C. § 553(b)(A) from section 553's requirement of notice-and-comment rulemaking .

The APA categories relevant here are:  general statement of policy, interpretive rule, and

substantive (or legislative) rule.  In *Syncor International Corp. v. Shalala*, 127 F.3d 90 (D.C. Cir.

1997), the D.C. Circuit distinguished among them.

A policy statement "does not seek to impose or elaborate or interpret a legal norm.  It

merely represents an agency position with respect to how it will treat – typically enforce – the

governing legal norm."  *Syncor*, 127 F.3d at 94.  A policy statement is not binding.  *Id.*[26]

---

[25]    Plaintiffs claim a due process violation on the ground that they would have provided comments in a notice-and-comment  procedure.  FAC ¶ 27.  Of course, plaintiffs do not have a due process right to provide comments in a rulemaking procedure that the agency is not required to undertake and did not undertake.

Plaintiffs' due process claim also fails for the straightforward reason that plaintiffs were required to, but did not, file a Citizen's Petition with FDA to obtain the relief they now seek from this Court.  *See* pp. 19-21, *supra*.

[26]    *See, e.g.*, *Burroughs Wellcome Co. v. Schweiker*, 649 F.2d 221 (4th Cir. 1981) (FDA's paper NDA policy); *Pacific Gas & Elec. Co. v. Federal Power Commission*, 506 F.2d 33, 37-39 (D.C. Cir. 1974); *Alliance for Bio-Integrity v. Shalala*, 116 F. Supp. 2d 166, 173 (D.D.C. 2000) (FDA issuance is a policy statement because it "merely creates a presumption and does not ultimately bind the agency's discretion.").

Here, to the extent the FDA Decision involved the application of section 353(b) to a set of facts that, thus far, is unique, FDA was entitled to treat any elaboration of policy it applied in resolving the matter as non-binding (*i.e.*, as not thereafter limiting its discretion under the FDCA), and as establishing, at most, a presumption as to how the agency will resolve proposals for partial switches by exercising its discretion in the future. *See Chrysler Corp. v. Brown*, 441 U.S. 281, 302 n.31 (1979); *Alliance for Bio-Integrity*, 116 F. Supp. 2d at 173.

In contrast to a policy statement, a <u>rule</u> (whether interpretive or substantive) binds the agency to a particular legal position until the agency changes it. *Syncor*, 127 F.3d at 94.

An <u>interpretive rule</u> "reflects an agency's construction of a statute that has been entrusted to the agency to administer. The legal norm is one that Congress has devised; the agency does not purport to modify that norm, in other words, to engage in law-making." *Id*. The interpretive rule "simply states what the administrative agency thinks the statute means, and only reminds affected parties of existing duties." *General Motors Corp. v. Ruckelshaus*, 742 F.2d 1561, 1565 (D.C. Cir. 1984) (en banc) (internal quotation omitted). The statutory construction is interpretive (rather than substantive or legislative), even though courts defer to it under *Chevron*. The agency is not asserting authority to make positive law on its own. "Instead, it is construing the product of congressional lawmaking . . . ." *Syncor*, 127 F.3d at 94. "A rule that clarifies a statutory term is the classic example of an interpretative rule." *National Family Planning & Reprod. Health Ass'n v. Sullivan*, 979 F.2d 227, 236 (D.C. Cir. 1992); *American Postal Workers Union v. United States Postal Serv.*, 707 F.2d 548 (D.C. Cir. 1983) (change in method by which agency calculated benefits was interpretative rule, though it affected pay of over 11,000 workers); *American Mining Cong. v. Mine Safety & Health Admin.*, 995 F.2d 1106, 1111-12 (D.C. Cir. 1993) ("Where a statute or legislative rule has created a legal basis for enforcement, an agency can simply let its interpretation evolve ad hoc in the process of enforcement . . . .").

Here, the FDA Decision, including FDA's approval of Plan B's labeling can properly be viewed as reflecting the evolution of the agency's interpretation of section 353(b) in the course of reviewing NDAs and sNDAs ("other applications" of the statute, in the words of *American Mining Congress*, 995 F.2d at 1112). The evolution remains interpretive, not substantive; and it will continue on a case-by-case basis in the future. This characterization of FDA's rationale for approving the partial switch and the means of complying with the labeling requirements of section 353(b)(4) is faithful to the facts and circumstances, places the rationale in the most appropriate legal category, and fully preserves the agency's discretion and flexibility to adapt its statutory interpretation to whatever circumstances may be presented in the future.

A <u>substantive rule</u> is an exercise of policy (and therein is similar to a policy statement), and is a rule (and therein differs from a policy statement). A substantive rule differs from a policy statement and from an interpretive rule because it modifies or adds to a legal norm through action based on the agency's own delegated authority to make law. Because the agency is engaged in law-making, the APA requires notice and comment for promulgation of a substantive rule. *Syncor*, 127 F.3d at 95.

The D.C. Circuit has articulated four questions useful in determining whether a rule is interpretive or substantive:

> (1) whether in the absence of the rule there would not be an adequate legislative basis for enforcement action or other agency action to confer benefits or ensure the performance of duties, (2) whether the agency has published the rule in the Code of Federal Regulations, (3) whether the agency has explicitly invoked its general legislative authority, or (4) whether the rule effectively amends a prior legislative rule. If the answer to any of these questions is affirmative, [the pronouncement is] a legislative, not an interpretive rule.

*Am. Mining Cong.*, 995 F.2d at 1112.

The legal interpretations underlying the FDA Decision, including FDA's approval of Plan B's labeling, are permissible under section 353(b), and constitute an interpretive rule or policy

statement, not a substantive rule.  These interpretations warrant a negative answer to each of the four questions in *American Mining Congress*.  First, an adequate legislative basis for an enforcement action is provided by 21 U.S.C. §§ 353(b)(1), (4), 331(a), 332-34.  Second, the legal interpretations FDA developed in connection with its review of the sNDA for Plan B have not been published in the C.F.R.  Third, in approving the sNDA, FDA has not explicitly invoked its general legislative authority.  Fourth, FDA has not effectively amended any prior legislative rule.

FDA's legal position is interpretive because it elaborates or interprets the legal norms set forth in section 353(b) in general, and explains how Duramed may comply with the requirements of section 353(b)(4).  Arguably, it would be a policy statement analogous to that in *Hudson v. FAA*, 192 F.3d 1031, 1036 (D.C. Cir. 1999):  *i.e.*, a statement as to how the agency will regard a means of compliance with the statute.  Such a position certainly would not be substantive because the legal norms at issue are solely those created by Congress in section 353(b), not ones created by FDA.  FDA applied to a factual situation the established legal norms and policies governing Rx and OTC dispensing and the communication to pharmacists and others of clear guidance as to how a drug is to be dispensed.

### 3.    An Agency May Change an Interpretation of a Statute, an Interpretive Rule, or a Policy Statement Without Notice and Comment.

*Paralyzed Veterans of America, Inc. v. D.C. Arena L.P.*, 117 F.3d 579 (D.C. Cir. 1997), expressly rejected the argument that "an agency has the same latitude to modify its interpretation of a <u>regulation</u> as it does its interpretation of a <u>statute</u> under *Chevron*."  *Id.* at 586 (emphases added).  The court's statement that "there is no barrier to an agency altering its initial interpretation to adopt another reasonable interpretation – even one that represents a new policy response," *id.*, plainly means that notice-and-comment rulemaking is not required for a change in an agency's interpretation of a <u>statute</u>.

If the change is made by an interpretive rule (*i.e.*, an interpretation of a legal norm

41

created by Congress, as distinguished from an interpretation of a legal norm created by the agency), then notice-and-comment rulemaking is not required, even if the new interpretation differs from a prior interpretation. In *Clark-Cowlitz Joint Operating Agency v. FERC*, 826 F.2d 1074 (D.C. Cir. 1987), for example, the court held that it was proper for FERC, in an adjudication, (i) to adopt a statutory interpretation directly contrary to FERC's prior interpretation of the same statute, (ii) to do so without notice and comment, and (iii) to apply the new interpretation in that very adjudication.

The situation is otherwise, however, with respect to a change in an agency's interpretation of a substantive rule embodied in a regulation. *Paralyzed Veterans*, 117 F.3d at 586. As to a substantive regulation, an agency may change its interpretation only by notice and comment where the change would constitute an amendment of the regulation.

Even as to substantive regulations, however, not every change in interpretation constitutes an amendment. "A rule does not, in this inquiry, become an amendment merely because it supplies crisper and more detailed lines than the authority being interpreted." *Am. Mining Cong.*, 995 F.2d at 1112. "Agencies need not provide notice and comment for every meaningful policy decision. Interpretations of ambiguous or unclear regulations by agencies may be exempt from the APA's notice and comment requirements." *Shell Offshore Inc. v. Babbitt*, 238 F.3d 622, 629 n.6 (5th Cir. 2001). In *Orengo Caraballo v. Reich*, 11 F.3d 186, 195 (D.C. Cir. 1993), the court made clear that the APA category of interpretive rules includes interpretations of regulations as well as interpretations of statutes. *Id.* at 195-96.

Thus, an agency may adopt or change an interpretation of a statute or a regulation (where the adopted or changed interpretation does not amount to an amendment of the regulation) by means of an interpretive rule, which, under 5 U.S.C. § 553(b), need not be promulgated through notice-and-comment rulemaking. Notice-and-comment is not required even if the agency views

42

the new interpretation as binding, *i.e.*, as an interpretive <u>rule</u>. All rules, as such, bind the agency

that adopts them until it changes them, *Syncor*, 127 F.3d at 94; but, under section 553(b), an

interpretive rule may be changed without notice and comment.

> *Association of American Railroads v. Department of Transp.*, 198 F.3d 944, 947 (D.C.

Cir. 1999), interpreted *Alaska Professional Hunters Ass'n v. FAA*, 177 F.3d 1030 (D.C. Cir.

1999), as holding that notice-and-comment rulemaking is required for a change in agency

interpretation where (i) there has been a prior, different  interpretation that was "express, direct,

and uniform"; (ii) that interpretation has been publicly "reflected in official agency

adjudications," amounting to "administrative common law"; and (iii) there has been substantial

reliance on that interpretation by regulated parties. *Association Am. R.R.*, at 949-50 (quotations

omitted); *see also Air Transp. Ass'n of Am., Inc. v. FAA*, 291 F.3d 49, 58 (D.C. Cir. 2002).

Here, no prior, different administrative interpretation of section 353(b) would preclude

the FDA Decision, including approval of Plan B's labeling, and would satisfy <u>any</u> of the three

triggering conditions relied on in *Association of American Railroads*.  The FAC does not allege

any facts that would constitute a basis for applying *Alaska Professional Hunters Ass'n* here.

> **4.    Approval of the Plan B sNDA Did Not Involve Departure from Any
> Established FDA Interpretation of a Regulation.**

Approval of the Plan B sNDA and associated labeling did not involve FDA committing

itself to a new interpretation of any substantive (or interpretive) regulation.  There is no FDA

regulation that, as previously interpreted, stood as an obstacle to approval of the Plan B sNDA,

including the labeling of Plan B, and therefore had to be reinterpreted if FDA were to approve

the sNDA.  The "meaningful difference" policy is merely a <u>policy</u>, as recognized in FAC ¶ 71.

Under the APA, an agency may change a policy without notice-and-comment rulemaking.

Therefore, cases requiring notice and comment to amend a <u>substantive regulation</u> do not apply

here.  Indeed, as just noted, of the three elements necessary to the analysis in *Association of*

*American Railroads*, none is alleged in the FAC to be present here.

Any new interpretation that would have been needed would have been of section 353(b) of the FDCA. FDA's approval did not supplement the statute, but merely interpreted it. It did not involve the exercise of any law-making authority under 21 U.S.C. § 371(a) (authorizing FDA to issue regulations), but was merely a direct interpretation of section 353(b), one FDA could make even if section 371(a) did not exist.

In its articulation of rationales for the approval of the Plan B sNDA, FDA was elaborating the concepts and provisions in section 353(b). It explained how those provisions were satisfied and how their purposes were served in the context of Plan B. *See* Ex. 8 (Memorandum from Steven Galson, M.D., Director, CDER, Subject: Plan B, at 2-3 (Aug. 24, 2006)). No new legal norms or purposes were created.

In sum, even if the FDA Decision were viewed as committing FDA to a new interpretation of section 353(b), FDA could, under APA § 553(b)(A), commit itself to that new interpretation and approve the sNDA without notice and comment.

### D.   Count VI Fails To State a Claim Because It Is Based on an Incorrect Statutory Interpretation.

FDA "may by regulation remove drugs subject to [21 U.S.C. § 355] from the requirements of paragraph (1) of this subsection when such requirements are not necessary for the protection of the public health." 21 U.S.C. § 353(b)(3). An FDA regulation, 21 C.F.R. § 310.200(b), implements this statutory authorization. This text is analyzed at page 24, *supra*.

Count VI of the Complaint misconstrues the statutory expression "may by regulation." Plaintiffs' position is that the statute requires FDA to engage in a separate rulemaking each and every time it removes a drug from section 353(b)(1), *i.e.*, from prescription-only status. Nothing in the text of section 353, section 310.200(b), the APA, general principles of administrative law, or sound public policy warrants burdening FDA and those affected by Rx-

to-OTC switch decisions with such a cumbersome and inefficient procedure.

FDA has stated that, from 1976 to 1996 alone, it approved over 600 Rx-to-OTC switches. *See* Tamar Nordenberg, *Now Available Without A Prescription*, FDA Consumer Magazine (Nov. 1996), *available at* http://www.fda.gov/fdac/features/996_otc.html.  Under plaintiffs' interpretation of section 353(b)(3), to approve those switches FDA would have had to conduct more than 600 separate and useless notice-and-comment rulemakings.  A statute should not be read to lead to such an absurd result.  *See Griffin v. Oceanic Contractors, Inc.*, 458 U.S. at 575; *FTC v. Ken Roberts Co.*, 276 F.3d at 590.

FDA's interpretation of section 353(b)(3) is reasonable, and is entitled to *Chevron* deference.  *See* pages 26-34, *supra*.

## CONCLUSION

For the foregoing reasons, the Court should dismiss the FAC with prejudice.

Respectfully submitted,


By:    _/s/ Richard M. Cooper_____
            Richard M. Cooper (# 92817)
            Ana C. Reyes (# 477354)

            WILLIAMS & CONNOLLY LLP
            725 Twelfth Street, N.W.
            Washington, DC  20005
            (tel.) (202) 434-5466
            (fax)  (202) 434-5470
            rcooper@wc.com
            areyes@wc.com

            *Counsel for Defendant Intervenor*
            *Duramed Pharmaceuticals, Inc.*

Dated:  Sept. 21, 2007



**DEPARTMENT OF HEALTH & HUMAN SERVICES**

Public Health Service
_____

Food and Drug Administration
Rockville, MD  20857

21-045/S-011

Duramed Research, Inc.
Attention: Joseph A. Carrado, M.Sc., R.Ph.
         Vice President, Clinical Regulatory Affairs
One Belmont Ave, 11th floor
Bala Cynwyd, PA  19004

Dear Mr. Carrado:

Please refer to your supplemental new drug application dated April 16, 2003, received April 22, 2003, submitted under section 505(b) of the Federal Food, Drug, and Cosmetic Act for Plan B® (levonorgestrel) Tablets, 0.75 mg.

We also acknowledge receipt of your submissions dated July 25 (3), and 31, August 8 (2), September 4, 8, 9, and 15, October 6, 10, 15 (2), 17, 21, 24, 29, 30, and 31, December 3, and 9, 2003; January 9, and 30, February 6, 10, 13, 20, and 24, March 11 and 26, May 6 and 11, June 30, July 21, 2004; January 6, 12, 13, 14, 18, 19 and 21, and August 26, 2005; and August 2, 17, 18, and 23, 2006.

Your submission of July 21, 2004, constituted a complete response to our May 6, 2004, Not Approvable letter.  The resubmitted supplemental new drug application provides for a switch to Over-the-Counter (OTC) status for women ages 16 years or greater and maintenance of prescription status for women under age 16.  On August 26, 2005, then Commissioner Lester M. Crawford, DVM, PhD, sent you a letter indicating that the Agency was unable, at that time, to reach a decision on the approvability of the application because of unresolved issues that related to your NDA.  The letter mentioned three issues: whether the same active ingredient could be marketed both Rx and OTC based solely on the age of the individual using the drug; how, as a practical matter, an age-based distinction could be enforced; and whether the Rx and OTC versions of the same active ingredient may be marketed in a single package.  The letter also stated that the agency had decided to ask for public comments on whether we should initiate a rulemaking to codify our interpretation of section 503(b) of the Federal Food, Drug, and Cosmetic Act regarding when an active ingredient can be simultaneously marketed in both a prescription drug product and an OTC drug product through an advance notice of proposed rulemaking (ANPRM) that published on September 1, 2005 (70 FR 52050).  The comment period closed on November 1, 2005, and the agency received about 47,000 comments.  The agency hired a contractor to summarize and categorize the comments and the contractor submitted a final report on May 19, 2006.

On July 31, 2006, Dr. Andrew von Eschenbach, Acting Commissioner of Food and Drugs, sent you a letter indicating that the agency had reviewed the comments received in response to the ANPRM and determined it was not necessary to engage in rulemaking to resolve the novel regulatory issues raised by your application and that we were now proceeding with further evaluation of your application.

NDA 21-045/S-011
Page 2

We met with you on August 8, 2006, and discussed how to address the issues raised in Dr. von Eschenbach's letter regarding the restriction on OTC sales of Plan B[®] to ages 18 and over, the packaging, and the Convenient Access Responsible Education (CARE[SM]) Program.

On August 17, 18, and 23, 2006, you amended your application to propose revisions to the labeling and to the CARE[SM] Program.

We have completed our review of this application, as amended, and have concluded that adequate information has been presented to demonstrate that Plan B[®] is safe and effective for use under the conditions set forth in the draft labeling submitted on August 23, 2006. This application is approved, effective on the date of this letter, to allow OTC availability of Plan B[®] for consumers 18 years and older. Plan B[®] remains available by prescription only for women 17 years and younger.

The final printed labeling (FPL) must be identical to the enclosed labeling (prescription package insert, outer carton label, inner card label, and consumer information leaflet). The inner card and outer carton labels must be formatted in accordance with the requirements of 21 CFR 201.66.

Please submit an electronic version of the FPL according to the guidance for industry titled *Providing Regulatory Submissions in Electronic Format – NDA*. Alternatively, you may submit 20 paper copies of the FPL as soon as it is available, in no case more than 30 days after it is printed. Individually mount 15 of the copies on heavy-weight paper or similar material. For administrative purposes, designate this submission "**FPL for approved NDA 21-045 /S-011**." Approval of this submission by FDA is not required before the labeling is used.

We also remind you of the activities you agreed to as specified in the CARE[SM] Program described in your submission dated August 23, 2006. You agreed to:

- Monitor trends in the use of emergency contraception to evaluate the effectiveness of the CARE[SM] program. Specifically, you have agreed to conduct a market research survey or surveys of a subset of healthcare professionals annually, and when practicable, in collaboration with established professional groups. Your surveys will be designed to determine whether the Rx requirement for those ages 17 and younger is being adhered to at the point of purchase and to provide signals of program effectiveness and potential problems associated with consumers' understanding of the purpose and proper use of Plan B[®].

- Using relevant survey data regularly collected by others (e.g., Centers for Disease Control's Behavioral Risk Factor Safety Surveillance (CDC BRFSS), Youth Risk Behavior Safety Surveillance (YRBSS)), to monitor for potential indicators that Plan B[®] is being used in an inappropriate manner. Potential areas of monitoring and reporting include evaluating possible correlations between increases in sexually transmitted infections (STIs) based on geographic areas and data and trends in pregnancy and/or abortion rates based on geographic areas.

- Conduct a "Point-of-Purchase Monitoring Program" to track how Plan B[®] is being sold at the time of purchase, including using anonymous shoppers who will be directed to visit locations where Plan B[®] is available and purchase the product. Using the data collected, you will document and analyze the level of comprehension of the Plan B[®] prescription age requirement and how it is handled at the point of purchase. The program will be conducted twice in the first

NDA 21-045/S-011
Page 3

year and annually thereafter.  The sponsor will report repeat violators to the relevant State Boards of Pharmacy.

- Report to FDA on the results of these activities on a six-month interval beginning 30 calendar days after the six-month interval commencing on the date of this approval.

Finally, we note and agree with the other elements of the CARE[SM] Program, described in your submission of August 23, 2006, which are designed to ensure compliance with the approved labeling, and particularly the restriction of OTC use to ages 18 and older.  The program includes the following elements:

- The sponsor and third party distributors, wholesalers, and chain drug companies will only distribute Plan B[®] to licensed pharmacies or other licensed healthcare clinics.  As a result, Plan B[®] will not be sold at gas stations or convenience stores.  Given that Plan B[®] will have both Rx and OTC labeling, the pharmacies will keep Plan B[®] behind-the-counter.

- The sponsor will conduct an education campaign that will focus initially on healthcare professionals (including prescribers and pharmacists) to raise awareness and knowledge levels about emergency contraception.  The education campaign will clearly communicate the prescription age requirement and the appropriate use of emergency contraception. The campaign will include continuing education by certified professionals and educational materials (including websites and toll free numbers) that can be accessed easily and at any time.

- The sponsor will make available to State Boards of Pharmacy continuing education programs for use at annual meetings and other regional programs.

- The sponsor will provide to prescribers and healthcare professional associations materials for distribution to patients that will encourage patients to discuss any questions about emergency contraception with a healthcare professional.

- The sponsor plans to educate consumers in part by targeting consumers ages 18 to 44 to convey critical awareness and educational messages as well as information about product availability, time sensitivity of use, and the age requirements to obtain Plan B[®] as a prescription or OTC product.

Any change to the CARE[SM] Program must be discussed with FDA prior to its implementation and is subject to FDA's review.

All applications for new active ingredients, new dosage forms, new indications, new routes of administration, and new dosing regimens are required to contain an assessment of the safety and effectiveness of the product in pediatric patients unless this requirement is waived or deferred.  The safety and effectiveness of Plan B[®] provided pursuant to a prescription in pediatric patients (those under age 18) need not be addressed under the Pediatric Research Equity Act of 2003 (PREA) because this supplemental application does not propose a new indication for women in this age group (i.e., Plan B[®] is to remain prescription for women under 18).

In addition, we request that you submit to FDA four copies of the introductory promotional materials that you propose to use for Plan B[®].  Submit all proposed materials in draft or mock-up form, not final

NDA 21-045/S-011
Page 4

print.  Send one copy to the Division of Reproductive and Urologic Products, one to the Division of Nonprescription Clinical Evaluation, and two copies of both the promotional materials and the package insert directly to:

> Food and Drug Administration
> Center for Drug Evaluation and Research
> Division of Drug Marketing, Advertising, and Communications
> Food and Drug Administration
> 5901-B Ammendale Road
> Beltsville, MD 20705-1266

If you issue a letter communicating important information about this drug product (i.e., a "Dear Health Care Professional" letter), we request that you submit a copy of the letter to this NDA and a copy to the following address:

> MEDWATCH
> Food and Drug Administration
> WO 22, Room 4447
> 10903 New Hampshire Avenue
> Silver Spring, MD 20993-0002

Please submit one market package of Plan B® when it is available.

We remind you that you must comply with reporting requirements for an approved NDA (21 CFR 314.80 and 314.81).

If you have any questions, call the Office of Nonprescription Products, Division of Nonprescription Clinical Evaluation at (301) 796-2080.

> Sincerely,
>
> *{See appended electronic signature page}*
>
> Steven Galson, M.D., M.P.H.
> Director
> Center for Drug Evaluation and Research

Enclosure



## Drug Facts

**Active ingredient (in each tablet)**      **Purpose**
Levonorgestrel 0.75mg.................Emergency contraceptive

**Use** reduces chance of pregnancy after unprotected sex
(if a contraceptive failed or if you did not use birth control)

### Warnings
**Allergy alert:** Do not use if you have ever had an allergic
reaction to levonorgestrel

**Sexually transmitted diseases (STDs) alert:** This product
does **not** protect against HIV/AIDS or other STDs

**Do not use**
- if you are already pregnant (because it will not work)
- for regular birth control

**When using this product** you may have
- nausea
- vomiting
- stomach pain
- tiredness
- diarrhea
- dizziness
- menstrual changes
- breast pain
- headache

**Keep out of reach of children.** In case of overdose, get medical
help or contact a Poison Control center right away.

### Directions
- women 18 years of age and over:
- take the first tablet as soon as possible but no later than
72 hours (3 days) after unprotected sex. The sooner you
take the first tablet, the more effective it will be. ▶

**DURA** *med* ® | Mfg. by Gedeon Richter, Ltd., Budapest, Hungary
for Duramed Pharmaceuticals, Inc.
Subsidiary of Barr Pharmaceuticals, Inc.
Pomona, New York 10970

©2006 Duramed Pharmaceuticals, Inc.

## Drug Facts (continued)
- take the second tablet **12 hours** after you take the first tablet
- prescription only for age 17 and under. If age 17 or under, see
a healthcare professional.

### Other information
- **before using this product read the enclosed consumer
information leaflet for complete directions and information**
- this product is not recommended for regular birth control. It
does not work as well as most other birth control methods
used correctly.
- **this product works mainly by preventing ovulation (egg
release). It may also prevent fertilization of a released egg
(joining of sperm and egg) or attachment of a fertilized egg
to the uterus (implantation). See consumer information leaflet.**
- when used correctly every time you have sex, latex condoms
greatly reduce, but do not eliminate, the risk of pregnancy and
the risk of catching or spreading HIV, the virus that causes AIDS.
See condom labeling for additional STD information.
- this package is sealed with 2 seals imprinted with Plan B®. Do
not use if these printed seals have either been removed or broken.
- store at 20-25°C (68-77°F)

### Inactive ingredients
colloidal silicon dioxide, corn starch, gelatin, lactose
monohydrate, magnesium stearate, potato starch, talc

☎ **Questions or comments?**
For more information or to speak to a healthcare professional,
call **1-800-330-1271**, 24 hours a day/7 days a week.
Visit our Web site at www.go2planb.com

N
3   5 1285 7 6993   0

RB-06 (v.1)

Place Label Here

15001114

2 Levonorgestrel Tablets
0.75 mg each

Plan B
LEVONORGESTREL
tablets 0.75 mg
Emergency Contraceptive

# Plan B® (Levonorgestrel) Tablets, 0.75 mg

**Rx only for women age 17 and younger**

For women age 17 and younger, Plan B ® is a prescription–only emergency contraceptive. Plan B® is intended to prevent pregnancy after known or suspected contraceptive failure or unprotected intercourse. Emergency contraceptive pills (like all oral contraceptives) do not protect against infection with HIV (the virus that causes AIDS) and other sexually transmitted diseases.

## DESCRIPTION

Emergency contraceptive tablet. Each Plan B® tablet contains 0.75 mg of a single active steroid ingredient, levonorgestrel [18,19-Dinorpregn-4-en-20-yn-3-one-13-ethyl-17-hydroxy-, (17α)-(-)-], a totally synthetic progestogen. The inactive ingredients present are colloidal silicon dioxide, potato starch, gelatin, magnesium stearate, talc, corn starch, and lactose monohydrate. Levonorgestrel has a molecular weight of 312.45, and the following structural and molecular formulas:



## CLINICAL PHARMACOLOGY

Emergency contraceptives are not effective if the woman is already pregnant. Plan B® is believed to act as an emergency contraceptive principally by preventing ovulation or fertilization (by altering tubal transport of sperm and/or ova). In addition, it may inhibit implantation (by altering the endometrium). It is not effective once the process of implantation has begun.

## Pharmacokinetics

*Absorption:*

No specific investigation of the absolute bioavailability of Plan B® in humans has been conducted. However, literature indicates that levonorgestrel is rapidly and completely absorbed after oral administration (bioavailability about 100%) and is not subject to first pass metabolism. After a single dose of Plan B® (0.75 mg) administered to 16 women under fasting conditions, maximum serum concentrations of levonorgestrel are $14.1 \pm 7.7$ ng/mL (mean $\pm$ SD) at an average of $1.6 \pm 0.7$ hours. No formal study of the effect of food on the absorption of levonorgestrel has been undertaken.

**Table 1        Pharmacokinetic Parameter Values Following Single Dose Administration of Plan B® (Levonorgestrel) Tablets 0.75 mg to Healthy Female Volunteers**

| N | Mean ($\pm$ S.D.) | | | | | |
|---|---|---|---|---|---|---|
| | $C_{max}$ (ng/mL) | $T_{max}$ (h) | CL (L/h) | $V_d$ (L) | $T_{\frac{1}{2}}$ (h) | $AUC_{0-\infty}$ (ng/mL/h) |
| 16 | 14.1 $\pm$ 7.7 | 1.6 $\pm$ 0.7 | 7.7 $\pm$ 2.7 | 260.0 | 24.4 $\pm$ 5.3 | 123.1 $\pm$ 50.1 |

*Distribution:*
Levonorgestrel in serum is primarily protein bound.  Approximately 50% is bound to albumin and 47.5% is bound to sex hormone binding globulin (SHBG).

*Metabolism:*
Following a single oral dosage, levonorgestrel does not appear to be extensively metabolized by the liver.   The primary metabolites are 3α,5β- and 3α,5α-tetrahydrolevonorgestrel with 16β-hydroxynorgestrel also identified.   Together, these account for less than 10% of parent plasma levels.  Urinary metabolites hydroxylated at the 2α and 16β positions have also been identified.  Small amounts of the metabolites are present in plasma as sulfate and glucuronide conjugates.

*Excretion:*
The elimination half-life of levonorgestrel following single dose administration as Plan B® (0.75 mg) is 24.4 $\pm$ 5.3 hours.  Excretion following single dose administration as emergency contraception is unknown, but based on chronic, low-dose contraceptive use, levonorgestrel and its metabolites are primarily excreted in the urine, with smaller amounts recovered in the feces.

**SPECIAL POPULATIONS**

**Geriatric**
This product is not intended for use in geriatric (age 65 years or older) populations and pharmacokinetic data are not available for this population.

**Pediatric**
This product is not intended for use in pediatric (premenarcheal) populations, and pharmacokinetic data are not available for this population.

**Race**
No formal studies have evaluated the effect of race.  However, clinical trials demonstrated a higher pregnancy rate in the Chinese population with both Plan B® and the Yuzpe regimen (another form of emergency contraception consisting of two doses of ethinyl estradiol 0.1 mg + levonorgestrel 0.5 mg).  The reason for this apparent increase in the pregnancy rate of emergency contraceptives in Chinese women is unknown.

**Hepatic Insufficiency and Renal Insufficiency**
No formal studies have evaluated the effect of hepatic insufficiency or renal insufficiency on the disposition of emergency contraceptive tablets.

**Drug-Drug Interactions**
No formal studies of drug-drug interactions were conducted.

## INDICATIONS & USAGE

For women age 17 and younger, Plan B® is a prescription-only emergency contraceptive that can be used to prevent pregnancy following unprotected intercourse or a known or suspected contraceptive failure.  To obtain optimal efficacy, the first tablet should be taken as soon as possible within 72 hours of intercourse.  The second tablet must be taken 12 hours later.

**Clinical Studies**
A double-blind, controlled clinical trial in 1,955 evaluable women compared the efficacy and safety of Plan B® (one 0.75 mg tablet of levonorgestrel taken within 72 hours of intercourse, and one tablet taken 12 hours later) to the Yuzpe regimen (two tablets of 0.25 mg levonorgestrel and 0.05 mg ethinyl estradiol, taken within 72 hours of intercourse, and two tablets taken 12 hours later). Plan B® was at least as effective as the Yuzpe regimen in preventing pregnancy.  After a single act of intercourse, the expected pregnancy rate of 8% (with no contraception) was reduced to approximately 1% with Plan B®.

Emergency contraceptives are not as effective as routine contraception since their failure rate, while low based on a single use, would accumulate over time with repeated use (see Warnings). See Table 2 below.

**Table 2:** **Percentage of women experiencing an unintended pregnancy during the first year of typical use and the first year of perfect use of contraception and the percentage continuing use at the end of the first year, United States.**

| Method (1) | % of Women Experiencing an Unintended Pregnancy within the First Year of Use | | % of Women Continuing Use at One Year [3] |
|---|---|---|---|
| | Typical Use [1] (2) | Perfect Use [2] (3) | (4) |
| Chance [4] | 85 | 85 | |
| Spermicides [5] | 26 | 6 | 40 |
| Periodic abstinence | 25 | | 63 |
|     Calendar | | 9 | |
|     Ovulation method | | 3 | |
|     Sympto-thermal [6] | | 2 | |
|     Post-ovulation | | 1 | |
| Withdrawal | 19 | 4 | |
| Cap [7] | | | |
|     Parous women | 40 | 26 | 42 |
|     Nulliparous women | 20 | 9 | 56 |
| Sponge | | | |
|     Parous women | 40 | 20 | 42 |
|     Nulliparous women | 20 | 9 | 56 |
| Diaphragm [7] | 20 | 6 | 56 |
| Condom [8] | | | |
|     Female (Reality) | 21 | 5 | 56 |
|     Male | 14 | 3 | 61 |
| Pill | 5 | | 71 |
|     Progestin only | | 0.5 | |
|     Combined | | 0.1 | |
| IUD: | | | |
|     Progesterone T | 2.0 | 1.5 | 81 |
|     Copper T 380A | 0.8 | 0.6 | 78 |
|     LNg 20 | 0.1 | 0.1 | 81 |
| Depo Provera | 0.3 | 0.3 | 70 |
| Norplant and Norplant-2 | 0.05 | 0.05 | 88 |
| Female sterilization | 0.5 | 0.5 | 100 |
| Male sterilization | 0.15 | 0.10 | 100 |

**Emergency Contraceptive Pills:** Treatment initiated within 72 hours after unprotected intercourse reduces the risk of pregnancy by at least 75%. [9]

**Lactational Amenorrhea Method:** LAM is a highly effective, *temporary* method of contraception. [10]

Source: Trussell J, Contraceptive efficacy. In Hatcher RA, Trussell J, Stewart F, Cates W, Stewart GK, Kowal D, Guest F, Contraceptive Technology: Seventeenth Revised Edition. New York NY: Irvington Publishers, 1998.

[1] Among *typical* couples who initiate use of a method (not necessarily for the first time), the percentage who experience an unintended pregnancy during the first year if they do not stop use for any other reason.

[2] Among couples who initiate use of a method (not necessarily for the first time) and who use it *perfectly* (both consistently and correctly), the percentage who experience an unintended pregnancy during the first year if they do not stop use for any other reason.

[3] Among couples attempting to avoid pregnancy, the percentage who continue to use a method for one year.

[4] The percentages of women becoming pregnant in columns (2) and (3) are based on data from populations where contraception is not used and from women who cease using contraception in order to become pregnant. Among such populations, about 89% become pregnant within one year. This estimate was lowered slightly (to 85%) to represent the percentage who would become pregnant within one year among women now relying on reversible methods of contraception if they abandoned contraception altogether.

[5] Foams, creams, gels, vaginal suppositories and vaginal film.

[6] Cervical mucus (ovulation) method supplemented by calendar in the pre-ovulatory and basal body temperature in the post-ovulatory phases.

[7] With spermicidal cream or jelly.

[8] Without spermicides.

[9] The treatment schedule is one dose within 72 hours after unprotected intercourse and a second dose 12 hours after the first dose. The Food and Drug Administration has declared the following brands of oral contraceptives to be safe and effective for emergency contraception: Ovral (1 dose is 2 white pills), Alesse (1 dose is 5 pink pills), Nordette or Levlen (1 dose is 2 light-orange pills), Lo/Ovral (1 dose is 4 white pills), Triphasil or Tri-Levlen (1 dose is 4 yellow pills).

[10] However, to maintain effective protection against pregnancy, another method of contraception must be used as soon as menstruation resumes, the frequency or duration of breastfeeds is reduced, bottle feeds are introduced or the baby reaches six months of age.

## CONTRAINDICATIONS

Progestin-only contraceptive pills (POPs) are used as a routine method of birth control over longer periods of time, and are contraindicated in some conditions.  It is not known whether these same conditions apply to the Plan B® regimen consisting of the emergency use of two progestin pills.  POPs however, are not recommended for use in the following conditions:

• Known or suspected pregnancy
• Hypersensitivity to any component of the product

## WARNINGS

**Plan B® is not recommended for routine use as a contraceptive.**

**Plan B® is not effective in terminating an existing pregnancy.**

## Effects on Menses

Menstrual bleeding patterns are often irregular among women using progestin-only oral contraceptives and in clinical studies of levonorgestrel for postcoital and emergency contraceptive use.  Some women may experience spotting a few days after taking Plan B®.  At the time of expected menses, approximately 75% of women using Plan B® had vaginal bleeding similar to their normal menses, 12-13% bled more than usual, and 12% bled less than usual.  The majority of women (87%) had their next menstrual period at the expected time or within $\pm$ 7

days, while 13% had a delay of more than 7 days beyond the anticipated onset of menses. If there is a delay in the onset of menses beyond 1 week, the possibility of pregnancy should be considered.

**Ectopic Pregnancy**
Ectopic pregnancies account for approximately 2% of reported pregnancies (19.7 per 1,000 reported pregnancies). Up to 10% of pregnancies reported in clinical studies of routine use of progestin-only contraceptives are ectopic. A history of ectopic pregnancy need not be considered a contraindication to use of this emergency contraceptive method. Health providers, however, should be alert to the possibility of an ectopic pregnancy in women who become pregnant or complain of lower abdominal pain after taking Plan B®.

**PRECAUTIONS**

**Pregnancy**
Many studies have found no effects on fetal development associated with long-term use of contraceptive doses of oral progestins (POPs). The few studies of infant growth and development that have been conducted with POPs have not demonstrated significant adverse effects.

**STD/HIV**
Plan B®, like progestin-only contraceptives, does not protect against HIV infection (AIDS) and other sexually transmitted diseases.

**Physical Examination and Follow-up**
A physical examination is not required prior to prescribing Plan B®. A follow-up physical or pelvic examination, however, is recommended if there is any doubt concerning the general health or pregnancy status of any woman after taking Plan B®.

**Carbohydrate Metabolism**
The effects of Plan B® on carbohydrate metabolism are unknown. Some users of progestin-only oral contraceptives (POPs) may experience slight deterioration in glucose tolerance, with increases in plasma insulin; however, women with diabetes mellitus who use POPs do not generally experience changes in their insulin requirements. Nonetheless, diabetic women should be monitored while taking Plan B®.

**Drug Interactions**
Theoretically, the effectiveness of low-dose progestin-only pills is reduced by hepatic enzyme-inducing drugs such as the anticonvulsants phenytoin, carbamazepine, and barbiturates, and the antituberculosis drug rifampin. No significant interaction has been found with broad-spectrum antibiotics. It is not known whether the efficacy of Plan B® would be affected by these or any other medications.

**Nursing Mothers**

Small amounts of progestin pass into the breast milk in women taking progestin-only pills for long-term contraception resulting in steroid levels in infant plasma of 1-6% of the levels of maternal plasma. However, no adverse effects due to progestin-only pills have been found on breastfeeding performance, either in the quality or quantity of the milk, or on the health, growth or development of the infant.

**Pediatric Use**
Safety and efficacy of progestin-only pills have been established in women of reproductive age for long-term contraception. Safety and efficacy are expected to be the same for postpubertal adolescents under the age of 16 and for users 16 years and older. Use of Plan B® emergency contraception before menarche is not indicated.

**Fertility Following Discontinuation**
The limited available data indicate a rapid return of normal ovulation and fertility following discontinuation of progestin-only pills for emergency contraception and long-term contraception.

**ADVERSE REACTIONS**
The most common adverse events in the clinical trial for women receiving Plan B® included nausea (23%), abdominal pain (18%), fatigue (17%), headache (17%), and menstrual changes. The table below shows those adverse events that occurred in ≥5% of Plan B® users.

**Table 3  Adverse Events in ≥5% of Women, by % Frequency**

| Most Common Adverse Events | Plan B® Levonorgestrel N=977 (%) |
|---|---|
| Nausea | 23.1 |
| Abdominal Pain | 17.6 |
| Fatigue | 16.9 |
| Headache | 16.8 |
| Heavier Menstrual Bleeding | 13.8 |
| Lighter Menstrual Bleeding | 12.5 |
| Dizziness | 11.2 |
| Breast Tenderness | 10.7 |
| Other complaints | 9.7 |
| Vomiting | 5.6 |
| Diarrhea | 5.0 |

Plan B® demonstrated a superior safety profile over the Yuzpe regimen for the following adverse events:
  • Nausea:  Occurred in 23% of women taking Plan B® (compared to 50% with Yuzpe)
  • Vomiting:  Occurred in 6% of women taking Plan B® (compared to 19% with Yuzpe)

**DRUG ABUSE AND DEPENDENCE**

There is no information about dependence associated with the use of Plan B®.


**OVERDOSAGE**

There are no data on overdosage of Plan B®, although the common adverse event of nausea and its associated vomiting may be anticipated.


**DOSAGE AND ADMINISTRATION**

One tablet of Plan B® should be taken orally <u>as soon as possible</u> within 72 hours after unprotected intercourse.  The second tablet should be taken 12 hours after the first dose. Efficacy is better if Plan B® is taken as directed as soon as possible after unprotected intercourse. Plan B® can be used at any time during the menstrual cycle.

The user should be instructed that if she vomits within one hour of taking either dose of medication she should contact her health care professional to discuss whether to repeat that dose.


**HOW SUPPLIED**

**Plan B®** (Levonorgestrel) Tablets, 0.75 mg are available for a single course of treatment in PVC/aluminum foil blister packages of two tablets each.  The tablet is white, round and marked: INOR.

Available as:
Unit-of-use            NDC 51285-038-93
Store Plan B® tablets at controlled room temperature, 20° to 25°C (68° to 77°F); excursions permitted between 15° to 30°C (59° to 86°F) [See USP].

Mfg. by Gedeon Richter, Ltd., Budapest, Hungary
for Duramed Pharmaceuticals, Inc.
Subsidiary of Barr Pharmaceuticals, Inc.
Pomona, New York 10970
Phone: 1-800-330-1271        Website: www.go2planb.com
Revised August 2006
BR- 038 / 21000382503

J Pediatr Adolesc Gynecol (2003) 16:313–318

# Original Studies

## The Impact of Using Emergency Contraception on Reproductive Health Outcomes: A Retrospective Review in an Urban Adolescent Clinic

Holly E. Stewart, MD[1], Melanie A. Gold, DO[2,3], and Andrew M. Parker, PhD[4]

[1]Western Psychiatric Institute and Clinic University Health Center of Pittsburgh, Pittsburgh, Pennsylvania, USA; [2]Department of Pediatrics, University of Pittsburgh School of Medicine, Pittsburgh, Pennsylvania, USA; [3]Division of Adolescent Medicine, Children's Hospital of Pittsburgh, Pittsburgh, Pennsylvania, USA; [4]Department of Marketing, Virginia Polytechnic Institute and State University, Blacksburg, Virginia, USA

**Abstract.** The effort to make emergency contraception (EC) more easily available has been challenged by concerns that prescribing EC may tempt adolescents to have unprotected intercourse, resulting in higher rates of pregnancy and sexually transmitted infections (STIs). This study examined differences in reproductive health history and outcomes among girls who were prescribed EC compared with those seeking other reproductive health care. In a retrospective chart review, the subjects (182 total: 92 EC, 90 control) were girls aged 13 to 21 years, 63% black and 31% white, in an urban, hospital-based adolescent outpatient clinic. Pregnancies, STIs, and visits for first pelvic examination and Pap smear were compared for the 12 months before the identifying visit (IDV) and for up to 2 years after the IDV (mean: 10.9 months ± 8.2 months). Twenty-six subjects became pregnant with no significant difference between groups. Control subjects were found to have a higher incidence of chlamydia. Before the IDV, EC users were more likely than controls to have never had a pelvic examination (23% vs. 6%, $P < 0.002$) or a Pap smear (24% vs. 6%, $P < 0.002$). However, 80% of EC subjects who had never had a pelvic examination received one as a result of the initial visit and follow-up related to receiving EC. Using EC is not associated with increased risk for future STIs and pregnancy among adolescent girls. Requesting EC may initiate routine gynecologic care.

---

**Key Words.** Emergency contraception—Pap smear—Sexually transmitted infections—Postcoital contraception—Adolescent—Reproductive health care—Pregnancy—Routine gynecologic care—Pelvic examination

---

*Address reprint requests to:* Holly E. Stewart, MD, Western Psychiatric Institute and Clinic University Health Center of Pittsburgh, 3811 O'Hara Street, Pittsburgh, PA 15213. E-mail: stewarthe@msx.upmc.edu

© 2003 North American Society for Pediatric and Adolescent Gynecology
Published by Elsevier Inc.

## Introduction

Over 800,000 adolescent girls between the ages of 15 and 19 become pregnant each year.[1,2] It is estimated that approximately 85% of these pregnancies are unintended.[3] In spite of increased education and availability of various methods of contraception, 35% of adolescents do not use contraception at first intercourse.[4] Of those who use contraception, many use it inconsistently or incorrectly, leading to contraceptive failures. Emergency contraception (EC) can play a critical role in preventing unwanted pregnancy among adolescent girls who are in the process of establishing their contraceptive practices.[4] EC may have a particularly important role for adolescent girls who have recently initiated sexual activity because they are more likely to be sporadic users of contraception.[5]

Adolescents trying to gain access to EC in a timely manner may meet multiple obstacles. Counseling and provision of EC have been challenged by concerns that easy access to EC may encourage unprotected intercourse and decrease ongoing use of more effective contraception.[6,7] Others have suggested that an urgent visit for EC may not only provide an emergency intervention to prevent unintended pregnancy, but also provide an opportunity for an adolescent to obtain her first pelvic examination, be screened for sexually transmitted infections (STIs) and cervical cancer, receive general contraceptive education, and initiate use of an ongoing method of contraception. Even though there may be a substantially higher risk of pregnancy and STIs at the time of initial presentation for EC, health interventions that are part of the EC visit and follow-up can help a young woman to reduce her long-term risk of unintended pregnancy and pelvic

1083-3188/03/$22.00
doi:10.1016/j.jpag.2003.09.001

infections. Finer and Zabin showed that adolescent women wait for long periods (mean: 22 months) from the first intercourse to presenting for the first family planning visit.[8] The interval separating first intercourse and the first family planning visit may be shortened by a visit for EC.

This study explores the relationship between EC use and reproductive health history and outcomes. We investigated how two groups of young women (a group who were prescribed EC at an urban, hospital-based adolescent clinic and another who received routine gynecologic care at the same site) differ with respect to pregnancies, STIs, number of lifetime sexual partners, age at first intercourse (coitarche), and the acquisition of an annual pelvic examination and Pap smear. We hypothesized that young women who use EC would not significantly differ from control subjects with regard to their history of pregnancy or STIs. It would be important to know if there were pre-existing differences in pregnancy and STI histories between the groups, because these might account for differences in pregnancies and STIs reported subsequent to an identifying visit (IDV) for EC or routine gynecologic care. Likewise, we hypothesized that young women who use EC would not differ from control subjects in their incidence of pregnancy and STIs following a visit for EC or routine gynecologic care. We also hypothesized that a significant proportion of young women who presented for EC would have had no previous gynecologic care before receiving EC and that the visit for EC would become the impetus for getting more comprehensive reproductive health care, including a pelvic examination and Pap smear.

## Methods

Our study took place in an urban, hospital-based outpatient adolescent clinic providing both primary care and reproductive health services under a Title X contract. After receiving approval from the hospital's Institutional Review Board, all clinic log sheets at the adolescent clinic from June 1, 1995, to July 31, 1998, were reviewed for EC use. We reviewed the log sheets for the term "ECP" under the heading of "reason for visit" and for the terms "Ovral" or "Lo/Ovral" under the heading of "treatment". These entries were identified as possible EC visits (Ovral and Lo/Ovral were the most common oral contraceptives used for EC during the timeframe[a]), and each subject's name was recorded on a list of potential EC group subjects. Each subject's age was determined from the birth date in the log.

As each EC subject was identified, a control subject, who had a clinic visit within 7 days of the EC subject's IDV, was matched by age with the EC subject. Records for all subjects were obtained and reviewed from two sources: the central medical records department at the hospital and confidential family planning charts that were stored in the adolescent clinic, separate from the medical records of the hospital. All records identified for each subject were requisitioned.

Fig. 1 summarizes the process of selecting the subject charts for the EC and comparison groups. When charts were located, the visit record corresponding to the clinic log data was confirmed and designated as the identifying visit or IDV. For the control group, the IDV was limited to this single visit. However, for the EC group, the IDV included both the visit for obtaining EC as well as an EC follow-up visit (called the identifying visit follow-up or IDVFU, when referred to specifically) at the clinic. We included both the request and follow-up visit as the EC IDV because it more accurately reflected routine care for EC subjects. A 2-week follow-up visit was recommended to patients after EC was prescribed. Because of the difficulty of returning within a strict 14-day period, any visit within 30 days of the EC IDV was considered as an EC follow-up visit. At follow-up, the effectiveness of the EC to prevent pregnancy was confirmed with a urine pregnancy test, adherence to the EC medication regimen was documented, and a pelvic examination and Pap smear were performed; an STI screening was performed if indicated. A pelvic examination, Pap



**Fig. 1.** (a) Exclusion of EC subjects' charts. (b) Exclusion of control subjects' charts.

---

[a]The timeframe of our study predates the US Food and Drug Administration's approval of Preven in 1998 and Plan B in 1999.[9]

smear, and STI screening were not required for prescribing EC. They were usually deferred to the EC follow-up visit unless a patient exhibited signs or symptoms of an STI at the EC request visit. Acquisition of pelvic examination, Pap smear, and STI screening was attributed to subjects in the control group only if these events occurred at the IDV; for the EC subjects, these events were counted if they occurred at the IDV or the EC follow-up visit.

We recorded pregnancies and STIs that were documented for the 12-month period prior to the IDV and the 24-month period following the IDV for EC and control subjects, and tracked records of each subject's reproductive health care on a visit-by-visit basis. Some subjects had no visits after the IDV (n = 41, 23%); others had five or more recorded over the 24 months (n = 44, 25%). A maximum of five visits was tracked for each subject. To assess the incidence of pregnancy, each chart was examined for every visit prior to the IDV to determine pregnancy data. Both the recorded history and laboratory data, when available, contributed to the assessment of pregnancy for each subject. All records of the tests and their results were verified by reviewing the clinic log for each visit when the testing occurred. Pap smear, gonorrhea, chlamydia, and Trichomonas test results[b] were recorded (when available) for each study subject. The records were examined for the 12 months prior to the IDV, the IDV or IDV follow-up, and the 24 months following the IDV.

## Comparison of the EC and Control Groups

The EC and control groups were compared with regard to incidence of pregnancy, STI, and acquisition of first pelvic examination and Pap smear. The two groups were compared 12 months prior to the IDV; at the IDV; and during the 24 months following the IDV. Data were also gathered regarding age at first intercourse, numbers of past pregnancies, number of current and lifetime partners, and pregnancy test results.

Each EC subject's medical record was examined for documentation of EC use. All visit records were examined for documentation of EC prescription, both before and after the IDV. In addition, EC users often had an EC intake form from a visit where EC was prescribed. This form asked the subject whether she had ever used EC before. If the subject reported yes, then this was recorded as past use. Both patient history

and documentation of EC prescription by clinicians were used to contribute to overall EC usage history.

## Analysis of Data

Data were analyzed descriptively for frequencies, and group differences were analyzed by chi-square tests using the Statistical Package for Social Sciences.[10] Independent samples $t$-tests were used to test group differences in age and coitarche.

Our study sample was large enough to detect all but the smallest effect sizes in pregnancy and STI rates. Using the chi-square test to assess for differences in proportions, with an alpha = 0.05 and power = 0.80, an n of 62 per group would be needed to detect a mean (0.4 vs. 0.65) effect, and an n of 26 per group would be needed to detect a large (0.4 vs. 0.78) effect. To detect the smallest (0.4 vs. 0.5) effect, a sample size of 388 per group would be required.[11]

## Results

### Characteristics

Nearly two thirds (63%) of the total sample was African American. Our sample reflects the usual ethnic distribution of the adolescent clinic patient population. The EC and control groups did not differ significantly with respect to race. EC and control subjects were effectively matched for age; the mean age of the total sample was 16.8 ± 1.5 years, with a range of 13 to 20 years.

The mean age at first intercourse or coitarche for the entire sample was 14.5 years ± 1.7 years, with a range of 9 to 18 years. The EC and control groups did not differ significantly with respect to coitarche. Only 4% delayed their first intercourse until age 18 or later. The number of lifetime partners ranged from 1 to 40, with a mean of 4.2 ± 5.3, a median of 2, and a mode of 1. There was no difference between the EC and control groups with respect to the number of lifetime partners. The overwhelming majority (81%) stated that they had one current partner at the time of the IDV; 7% reported two partners, and 12% reported no current partners. See Table 1 for a summary of characteristics.

### Pregnancy

Of the total sample, 27% of subjects had been pregnant before the IDV. No significant difference was found between EC and control subjects with regards to pregnancy history. At the IDV, positive pregnancy tests were rare: one subject from the EC group and two

---

[b]Trichomonas infection was diagnosed via wet prep from a vaginal swab. Chlamydia was diagnosed via polymerase chain reaction obtained from the cervix. Gonorrhea was diagnosed from cervical culture grown on Thayer Martin chocolate agar.

**Table 1.** Characteristics of Participants at Identifying Visit

| Characteristic | Total* n = 182 | EC Users n = 92 | Controls n = 90 | P value |
|---|---|---|---|---|
| Age in Years, Mean (SD) | 16.8 (1.5) | 16.8 (1.5) | 16.8 (1.5) | 0.90 |
| Coitarche in Years, Mean (SD) | 14.5 (1.7) | 14.7 (1.8) | 14.2 (1.5) | 0.09 |
| | N (%) | N (%) | N (%) | |
| Race | | | | |
| African American | 114 (65) | 53 (30) | 61 (35) | |
| Non–African American | 61 (35) | 35 (20) | 26 (15) | 0.26 |
| White | 57 (31) | 31 (18) | 26 (15) | |
| Hispanic | 2 (1) | 2 (1) | — | |
| Biracial | 2 (1) | 2 (1) | — | |
| Ever Pregnant | 31 (27) | 20 (17) | 11 (10) | 0.08 |

*Because of missing data, the total n value for each variable varied.

subjects from the control group had a positive pregnancy test.[c] At the IDV follow-up, two EC subjects were pregnant. In the 24 months after the IDV, 14% of the total sample (n = 26) had a positive pregnancy test documented in the chart. EC subjects (n = 16, 17%) were no more likely to have a positive pregnancy test than control subjects (n = 10, 11%, $P < 0.23$).

**Sexually Transmitted Infections**
No significant differences were found between EC and controls in the prevalence of STIs (Trichomonas, gonorrhea, or chlamydia) either at baseline (the IDV and the 12 months prior) or during any single follow up period during the subsequent 24 months (Table 2). For the 24-month follow-up period as a whole, there was a significant difference between EC and control subjects in the rate of Chlamydia infection. More control subjects (n = 33) were diagnosed with Chlamydia than EC subjects (n = 20, $P = 0.03$). No difference was found between groups for the number of Trichomonas and gonorrhea infections over the 24-month follow-up period as a whole.

**Pelvic Examination and Pap Smear Acquisition**
Of the total sample, 14% (n = 24) of subjects had never had a pelvic examination, 15% (n = 24) of the subjects had never had a Pap smear; the IDV was the first opportunity for these subjects to obtain these services (Table 3). EC subjects were more likely than control subjects to have never had a pelvic examination (n = 19, 23% for EC; n = 5, 6% for control;

[c]The EC subject with a positive pregnancy test at the IDV was 7 weeks postabortion. She had a negative pregnancy test 2 weeks later at her IDV follow-up.

$P = 0.002$) or a Pap smear (n = 19, 24% for EC; n = 5, 6% for control; $P = 0.002$). The majority of subjects who had never had a pelvic examination or Pap smear received a pelvic examination (67%) and Pap smear (63%), as well as appropriate STI screening tests at the IDV or IDV follow-up. Of those subjects who had never had a Pap smear or pelvic examination, EC and control subjects were equally likely to obtain them at the IDV and IDV follow-up (80% and 63%, respectively, for pelvic examination; 63% and 60%, respectively, for Pap smear).

**EC Descriptive Data**

More than half (52%, n = 48) of the EC group returned for a follow-up visit. Of those returning, 67% came within 2 weeks as recommended; the remainder returned within 4 weeks of receiving their EC. Pregnancy testing was documented at the follow-up visit for 45 subjects in the EC group. Of this group, 4% (n = 2) had a positive urine pregnancy test.

**Follow-up**

The average length of follow-up for all subjects was 10.8 months ± 8.3 months (mean: 11 months) with a range of 0 to 24 months. Twenty-one percent of the entire sample never returned to the clinic within the 24-month follow-up period; the EC and control group were equally likely to never have another gynecologic visit documented in the 24-month period after the IDV. The first post-IDV visit occurred a mean of 4.6 months after the IDV ± 3.6 months (mean mode: 3 months), with a range of 1 to 18 months.

**Discussion**

As hypothesized, our data show few differences between EC users and controls in terms of their experiences of pregnancies and STIs either before or after the EC user's identifying visit for EC. No differences were found in the occurrence of pregnancy at any point in the study, suggesting that EC use is neither as common among adolescents who have experienced pregnancies and STIs, nor is its use associated with subsequent higher incidence of pregnancy. One explanation may be that EC is often used as a crisis intervention when another contraceptive method fails. Another explanation may be that the majority of subjects used EC only one time, while using more reliable methods the rest of the time, which would not significantly increase their odds of pregnancy. For sexually active

**Table 2.** Sexually Transmitted Infections Over Time by Group

|  | 12 mos Before IDV | IDV | 1–6 mos After IDV | 7–12 mos After IDV | 13–24 mos After IDV | Total Cases Over 24 mos | P value |
|---|---|---|---|---|---|---|---|
| Gonorrhea | 3 cases (3 EC/0 C) | 3 cases (1 EC/2 C) | 5 cases (2 EC/3 C) | 4 cases (2 EC/2 C) | 4 cases (1 EC/3 C) | 19 cases (9 EC/10 C) | 0.77 |
| Chlamydia | 19 cases (7 EC/12 C) | 12 cases (5 EC/7 C) | 6 cases (2 EC/4 C) | 8 cases (2 EC/6 C) | 8 cases (4 EC/4 C) | 53 cases (20 EC/33 C) | 0.03 |
| Trichomonas | 11 cases (1 EC/10 C) | 5 cases (4 EC/1 C) | 11 cases (6 EC/5 C) | 6 cases (1 EC/5 C) | 10 cases (8 EC/2 C) | 43 cases (20 EC/23 C) | 0.54 |

EC, emergency contraception group; C, control group; IDV, indentifying visit; mos, months.

girls who use condoms but experience method failure, EC improves their chance of preventing pregnancy, and may initiate their obtaining gynecologic care. For girls who have initiated sexual intercourse without contraception, EC provides an opportunity to prevent pregnancy after a single act of unprotected intercourse and provides an opportunity to access other care, including counseling about contraception and STI screening.

Reproductive health care providers often struggle with balancing the potential barrier of requiring a pelvic examination at an EC dispensing visit with the possibility of missing a population of EC users who might not follow up in 2 to 4 weeks for STI and cancer screening. First-time family planning patients are potentially the most concerning because they do not have an established rapport with the clinic staff and may have never received screening for STI and cervical cancer or contraceptive counseling. Of all subjects for whom the IDV and IDV follow-up were the first opportunities

**Table 3.** Differences in Pelvic Examinations and Pap Smears by Group

|  | Total n (%) | Control n (%) | EC n (%) | P value |
|---|---|---|---|---|
| **Pelvic Examination** | | | | |
| Never had pelvic exam prior to IDV* | 24 (14) | 5 (6) | 19 (23) | 0.002 |
| Of these, obtained first pelvic at IDV or IDV follow-up | 16 (9) | 4 (4) | 12 (13) | 0.48 |
| **Pap Smear** | | | | |
| Never had Pap smear prior to IDV | 24 (15) | 5 (6) | 19 (24) | 0.002 |
| Of these, obtained first Pap smear at IDV or IDV follow-up | 15 (8) | 3 (3) | 12 (13) | 0.90 |

EC, emergency contraception; IDV, identifying visit.
*For EC subjects, the IDV is defined as the visit found in the clinic log at which the subject received EC, plus the IDV follow-up visit, which may have occurred 2 to 4 weeks after the initial EC visit. For control subjects, the IDV was the visit found in the clinic log within 7 days of the corresponding EC visit. No follow-up visits are included as part of the IDV for the control subjects.

for a pelvic and Pap smear, EC users and controls were equally likely to obtain the pelvic and Pap smear at this time. Out of 92 EC users, only 7 (7.6%) missed getting their first pelvic and Pap smear because they did not return for follow-up. The Adolescent Clinic protocol at our institution strongly encouraged follow-up 2 weeks after a visit for EC, but we acknowledge that protocols at other health services may vary.

Taking into account all subjects—not just those for whom a pelvic examination was indicated because of having symptoms of an STI or needing a first or annual pelvic examination—control subjects were more likely than EC users to get a pelvic and Pap smear at the IDV or IDV follow-up. This may reflect the fact that for many EC users a pelvic examination was not indicated at the IDV. Control subjects may have been presenting with symptoms of STI or for renewal or change of a contraceptive method. EC subjects, in contrast, presented in a 3-day window after unprotected intercourse, which may have no relation to the presentation of STI symptoms or the timing of an annual Pap smear. Therefore, the group selection process itself may have created a significant difference between the two groups in acquisition of pelvic examination and Pap smear at the IDV. Requiring a pelvic examination at the time of prescribing EC may be a barrier to accessibility by increasing the cost of a visit.[12] If indicated, screening examinations should be encouraged for STI and PAP smear testing; however, in general patients should be allowed to return after a 14-day interval, when a urine pregnancy test can reliably detect EC failure.

We predicted that there would be no differences in STI occurrence by group. We were surprised to find that the control subjects were more likely to be diagnosed with chlamydia than the EC subjects when evaluating the 24-month follow-up period as a whole. These data support our hypothesis that EC use is not associated with a greater incidence of STI. The larger incidence of chlamydia in control subjects could possibly be explained by differences in condom use over time in the two groups. We could not effectively collect data regarding ongoing contraceptive use in our retrospective chart review. The number of STIs occurring in our population is too small to answer this question definitively, and more research is needed.

## Limitations

As with any retrospective review, the single greatest limitation in our review was the variability of available data from chart to chart. This flaw is common to all retrospective chart reviews, because the data was collected for purposes other than research.[13] Not every data point was collected at the time of the clinic visit for every subject because there may have been no clinical need for it. This fact made comparing EC users and controls problematic. For example, many EC users had a special EC intake form in their charts, which provided consistent information that was often not available from control charts. For example, documentation of the number of current partners was available in 76 EC charts, but in only eight control charts. Each subject's data profile was a unique compilation of all points available for that subject. For some subjects, this represented nearly all desired data; for others this represented only a small fraction. Incomplete data presents difficulty in generalization.

Another limitation is that the subjects in our study may have received follow-up care at another site for pregnancy and STI and we did not have access to those records to review. In addition, the subjects who were lost to follow-up in our study may have slanted the data in favor of or against our conclusions. Larger study groups would better reveal the differences and similarities between EC users and controls, especially around the issue of loss to follow-up. Our mean period of follow-up was 10.8 months—less than half of the defined study period of 24 months. With a larger initial study group, a larger number of subjects would generate more follow-up visits from which to collect data. However, the number of subjects in our sample provided sufficient power to detect medium and large effect sizes in STIs and pregnancies between those patients who used EC and those who presented for other reproductive health care. A larger sample size would have been needed to detect smaller effects.

Lastly, our study was conducted in an urban, hospital-based clinic, and the results may not be comparable to other sites and other subject populations. Again, more research with different populations of EC users would aid in determining conclusions about the risks and benefits of using EC. More prospective research assessing the relationship between EC use and pregnancy and STI is needed.

## Conclusions

Our data showed that EC use was not associated with an increased incidence of pregnancy or STIs and support our hypothesis that using EC is not associated with poorer reproductive health outcomes. Many barriers to EC use still remain, but our data suggest that the risk associated with EC use is much smaller than the benefits. Prescribing EC in advance should be considered, given the favorable risk-benefit ratio in this adolescent clinic population. For some young women, benefits may include expanded access to gynecologic care. Our data showed that EC use may be associated with obtaining the first pelvic examination and Pap smear among subjects who had never received these services. Obtaining EC may provide the opportunity for STI testing, cancer screening, and contraceptive counseling that could ultimately improve reproductive health outcomes for young women who request EC.

*Acknowledgments:* The authors wish to thank Gina S. Sucato, MD, for her review of the initial and revised manuscript and the Research Advisory Committee of the Children's Hospital of Pittsburgh for funding Dr. Stewart's Summer Research Internship when the data for this study were collected.

## References

1. AGI: Teenage Pregnancy: Overall trends and state-by-state information, New York, AGI, 1999, Table 1
2. Henshaw SK: US Teenage Pregnancy Statistics with Comparative Statistics for Women Ages 20–24, New York, AGI, 1999, p 5
3. Forrest JD: Epidemiology of unintended pregnancy and contraceptive use. Am J Obstet Gynecol 1994; 170:1485
4. Chiou VM, Shrier LY, Emans SJ: Emergency postcoital contraception. J Pediatr Adolesc Gynecol 1998; 11:61
5. Glei DA: Measuring contraceptive use patterns among teenage and adult women. Fam Plann Perspect 1999; 31:73
6. Golden NH, Seigel WM, Fisher M, et al: Emergency contraception: pediatricians' knowledge, attitudes and opinions. Pediatrics 2001; 107:287
7. Gold MA, Schein A: Emergency contraception: a national survey of adolescent health experts. Fam Plann Perspect 1997; 29:15
8. Finer LB, Zabin LS: Does the timing of the first family planning visit still matter? Fam Plann Perspect 1998; 30:30
9. Moore AS: Emergency contraceptive options. RN 1999; 62:43
10. Release 11.5, Statistical Program for Social Sciences, Chicago, IL, SPSS Inc., 2002
11. Cohen J: Statistical Power Analysis for the Behavioral Sciences (2nd ed.). Hillsdale (NJ), Lawrence Erlbaum Associates, Inc., 1998, 227–249
12. Trussell J, Duran V, Shochet T, et al: Access to emergency contraception. Obstet Gynecol 2000; 95:267
13. Judd C: Research Methods in Social Relations, Fortworthy TX, Harcourt Brace Jovanovich College Publishers, 1991, pp 295–296

# Comprehension of a Prototype Over-the-Counter Label for an Emergency Contraceptive Pill Product

Elizabeth G. Raymond, MD, MPH, Sandra M. Dalebout, MPH, and Sharon I. Camp, PhD

**OBJECTIVE:** This study was designed to evaluate comprehension of a prototype over-the-counter package label for an emergency contraceptive pill product.

**METHODS:** Interviews were conducted with 663 women in malls and family planning clinics in eight United States cities. The sample included many young and minority women and women of low literacy. After looking at the package, subjects were asked 30 questions that addressed 11 communication objectives about indications, contraindications, instructions, side effects, and management of serious complications. Most questions asked whether or not use of the product would be appropriate in a described situation.

**RESULTS:** Seven of the 11 communication objectives were each understood by more than 85% of subjects. Most women in the study understood the most important objectives: that the product is indicated for prevention of pregnancy after unprotected sex (93%), that the first pill should be taken within 72 hours or as soon as possible after intercourse (97%), that the product should not be used by women who are already pregnant (98%), and that the product does not prevent sexually transmitted diseases or human immunodeficiency virus/acquired immune deficiency syndrome (94%). More-literate women were more likely to understand the objectives than less-literate women.

**CONCLUSION:** These results indicate that by reading the prototype label, most women could understand key information necessary for safe and effective use of this product. (Obstet Gynecol 2002;100:342–9.  © 2002 by The American College of Obstetricians and Gynecologists.)

Emergency contraceptive pills are indicated for use after unprotected sexual intercourse to prevent pregnancy. The levonorgestrel-only regimen consists of one dose of levonorgestrel 0.75 mg taken as soon as possible after unprotected sex, followed by a second identical dose 12 hours later. A prescription version of this regimen (Plan B, distributed by Women's Capital Corporation, Washington, DC) was approved by the United States Food

and Drug Administration in 1999. The distributor of that product now plans to apply to market the regimen over the counter. In considering whether to allow a drug to be marketed over the counter, the Food and Drug Administration often requires data from a label comprehension study to establish that the product label conveys to users the information that is needed for the safe and effective use of the product without the supervision of a health care provider.[1] This study was designed to test comprehension of a prototype label for the over-the-counter product. The prototype was similar to the approved prescription label but was slightly modified to be consistent with Food and Drug Administration content and formatting requirements for over-the-counter drugs (see box on page 347).

## MATERIALS AND METHODS

The study design and questionnaire were heavily influenced by the Food and Drug Administration's comments on early drafts of the protocol. The stated goal of the study was to estimate whether subjects understood 11 communication objectives relevant to safe and effective use of the product. These objectives address indications for use of the product, contraindications, instructions, possible side effects, and management of serious complications, as described on the label approved by the Food and Drug Administration for the prescription version of the product.

A convenience sample of study subjects was recruited between June 18, 2001 and July 12, 2001 at malls and family planning clinics in or near eight large United States cities (Denver, CO; Los Angeles, CA; Chicago,

From Family Health International, Research Triangle Park, North Carolina; and Women's Capital Corporation, Washington, District of Columbia.

**Financial Disclosure**

Support for this study was provided by Family Health International (FHI) with funds from the John Merck Fund, another private foundation, and Women's Capital Corporation. Sharon I. Camp is President and Chief Executive Officer of Women's Capital Corporation. The views expressed in this article do not necessarily reflect those of FHI or either of the two foundations funding this study.

© 2002 by The American College of Obstetricians and Gynecologists. Published by Elsevier Science Inc.    0029-7844/02/$22.00
PII S0029-7844(02)02086-0

IL; San Antonio, TX; Philadelphia, PA; Miami, FL; Phoenix, AZ; and Washington, DC). To be eligible to participate, women had to be 12 to 50 years old; able to read English well enough to read an over-the-counter product label; without a health care or marketing background; and without a history of participation in this study. Within these criteria, recruiters at each site were asked to meet or exceed quotas for subgroups of minority women and women felt to be at high risk for poor comprehension. These quotas were based on the proportion of each subgroup in the United States population according to the year 2000 United States census and on advice from expert consultants. The quotas were calculated as percentages of the target sample size of 575 women and were as follows: 20% aged 17 or younger; 11% black; 11% Hispanic; 4% Asian or Pacific Islander; and 20% eighth-grade reading level or lower.

Interviews were conducted by trained interviewers in a private room within the mall or clinic. Before the survey, a validated test of reading comprehension in adults (the Rapid Estimate of Adult Literacy in Medicine[2]) was administered to all subjects aged 18 years or older who had not completed college. For this test, the subject was asked to read 66 words aloud, and the number she pronounced correctly was recorded. The developers of the test have published approximate grade levels corresponding to various test scores.

For the survey, each subject was given a prototype over-the-counter package. This package, like the prescription version of this product, had text on both the outside and the inside of the sealed four-panel folder (see box on page 347). The pills were enclosed in blister bubbles embedded in the inside of the folder. The subject was instructed first to look at the outside of the package as if she were thinking about whether to purchase the product. The package was retrieved, and the interviewer asked one question about the product. The package was then returned to the subject, and she was permitted to look at the outside while the interviewer asked five additional questions. The subject was then told to open the package and review it as if she were about to use the product. She was permitted to refer to the entire label as the interviewer asked 24 additional questions. Questions included multiple-choice and open-ended formats. Most presented a scenario, and the subject was asked whether or not use of the product would be correct in the situation described. Several questions were included that were not directly addressed by the label; for example, two questions asked whether fever and breathing difficulty (not mentioned on the label) could be adverse effects of the product, and one question required subjects to infer that asthma (also not mentioned) is not a contraindication to use. After completing the product questionnaire, the interviewer recorded demographic information about the subject. Finally, the subject was asked to complete a self-administered questionnaire about her sexual and contraceptive history. Before initiation of the study, all questions had been pretested on 10 women at a mall not subsequently involved in the study. Other than this pretest, no prior studies of the label or of similar labels had been conducted.

The sample size was calculated to allow estimation of the proportion of women understanding each communication objective with a 95% confidence interval of ten percentage points, conservatively assuming that the proportion would be 50%. No adjustments were made for multiple confidence interval estimations. Calculations indicated that the minimum required sample size was 385 women. Based on advice from the Food and Drug Administration and consultants, the minimum desired sample size was increased to 575.

The focus of the analysis was to determine the proportion of subjects who demonstrated "understanding" of each of the communication objectives. Understanding for each objective was operationally defined by a previously specified combination of acceptable responses to designated questions about the product. For example, a woman was considered to have understood objective 1 (the product is indicated for prevention of pregnancy after unprotected sex) if she gave acceptable answers to two of the following four questions:

- Without looking at the label, tell me what Plan B is used for.
- A woman's partner used a condom during sex with her, but the condom broke. The next morning, she used Plan B to prevent pregnancy. Was this a correct use of Plan B?
- A woman with asthma had unprotected sex. The next day, she took Plan B to prevent pregnancy. Was this a correct use of Plan B?
- A woman had unprotected sex 2 days ago and then used Plan B to prevent pregnancy. Was this a correct use of Plan B?

Percentages were truncated rather than rounded. Confidence limits were calculated using binomial standard errors and $P$ values were calculated using $\chi^2$ or Fishers exact tests.

The study protocol was approved by the Protection of Human Subjects Committee of Family Health International. Signed parental consent was required for subjects aged 17 or younger who were recruited in mall settings. Parents and subjects were separated before the consent was obtained to ensure that the subjects did not have any advance information about the product when they completed the interview.

**Table 1.** Characteristics of Eligible Subjects

| | $n^*$ (N = 656) | % |
|---|---|---|
| Age (y) | | |
|   12–16 | 76 | 11.6 |
|   17–25 | 355 | 54.1 |
|   26–50 | 225 | 34.3 |
| Race | | |
|   White | 324 | 51.4 |
|   Black | 155 | 24.6 |
|   Other | 151 | 24.0 |
| Ethnicity | | |
|   Hispanic | 154 | 23.5 |
|   Non-Hispanic | 500 | 76.5 |
| Income | | |
|   0–$15,000 | 57 | 11.6 |
|   $15,001–$25,000 | 63 | 12.8 |
|   $25,001–$35,000 | 101 | 20.6 |
|   $35,001–$45,000 | 111 | 22.6 |
|   $45,001 or more | 159 | 32.4 |
| Marital status | | |
|   Single | 487 | 74.4 |
|   Married | 143 | 21.8 |
|   Divorced or widowed | 25 | 3.8 |
| Highest level of school completed | | |
|   8th grade or less | 30 | 4.6 |
|   9th–11th grade | 148 | 22.6 |
|   High school or GED | 199 | 30.4 |
|   Vocational/technical school | 18 | 2.8 |
|   Less than 4 years college | 117 | 17.9 |
|   College or higher | 142 | 21.7 |
| Literacy level[†] among subjects age 18 or older who had not completed college (n=395) | | |
|   6th grade or less | 18 | 4.6 |
|   7th–8th grade | 121 | 30.8 |
|   High school | 254 | 64.6 |

\* Missing responses not included in the table.
† Assessed using Rapid Estimate of Adult Literacy in Medicine.[2]

## RESULTS

A total of 663 interviews were conducted (72–111 in each city). Seven women interviewed did not meet the inclusion criteria. The other 656 women were included in the analysis. They had a median age of 21 years (range 12–50 years) and represented a broad spectrum of demographic characteristics (Table 1). Of 393 women aged 18 years or older who had not completed college, 35.4% scored at the eighth grade level or below on the literacy test. At least 474 of the 599 women who responded to the sexual history questionnaire had previously had sex (79%), and of those, at least 314 (66%) had had intercourse without contraception despite a desire not to become pregnant. At least 390 (82%) of the sexually experienced subjects had had some sort of pregnancy scare: missed oral contraceptive pills, broken condom, unprotected intercourse despite a desire not to be pregnant, or worry that they might be pregnant. Forty-one

(6%) of the eligible women reported ever having used emergency contraceptive pills.

Nineteen of the 30 questions about the package were answered acceptably by at least 85% of subjects, and only four were answered acceptably by fewer than 75% of subjects (Table 2). Incorrect answers were not concentrated among a few women; the median number of questions answered acceptably was 27, and only 42 women (6.4%) gave acceptable answers to all questions. More than 85% of subjects demonstrated understanding of seven of the 11 communication objectives, according to the previously specified criteria (Table 3). The proportion who understood each of the 11 communication objectives was compared in subgroups defined by the following 11 characteristics: age, race, ethnicity, city of interview, interview site (mall or clinic), income category, highest level of schooling completed, literacy level (among subjects aged 18 years or older who had not completed college), previous sexual experience, experience with pregnancy scare (condom break, missed oral contraceptive pills, unprotected intercourse, or worry about unwanted pregnancy), and experience using emergency contraceptive pills. Among these 121 comparisons, 39 statistically significant differences were found ($P < .05$; data not shown). However, the only apparent pattern was that women of lower literacy were significantly less likely to understand almost all objectives than more literate women. However, eight of the 11 objectives were each understood by more than 80% of women with low literacy.

## DISCUSSION

After reading the prototype over-the-counter label, a high proportion of women were able to understand 11 key messages necessary for safe and effective over-the-counter use of this product. These included messages about indications for use, contraindications, instructions, possible adverse effects, and management of serious complications of use. Three particularly important objectives were understood by more than 93% of subjects: that the product is indicated for prevention of pregnancy after unprotected sex, that it does not prevent human immunodeficiency virus or acquired immune deficiency syndrome, and that it should not be used by women who are already pregnant. In addition, 97% of subjects understood the most important instruction for use: that the first pill should be taken within 72 hours or as soon as possible after intercourse.

Two communication objectives were understood by fewer than 80% of the study population. Although more than 85% of subjects indicated correctly that the product should not be used as regular birth control when they

**Table 2.** Proportion of Subjects Who Gave Acceptable Answer to Survey Questions

| | Number (%) with acceptable answer ($N = 656$) |
|---|---|
| Question asked after subject looked at exterior of package and then returned package to interviewer: | |
| 1. Without looking at the label, tell me what Plan B is used for. (Acceptable answers: emergency contraception; contraception) | 551 (83.9) |
| Questions asked while subject was allowed to look at package exterior only: | |
| 2. Is Plan B the same as ordinary birth control pills or is it different from ordinary birth control pills? (Acceptable answer: different) | 536 (81.7) |
| 3. According to the label, should Plan B be used as regular birth control? (Acceptable answer: no) | 560 (85.3) |
| 4. After unprotected sex, when is the best time to take the first tablet? (Acceptable answer: within 72 hours, or 3 days, or as soon as possible) | 529 (80.6) |
| 5. Suppose I told you a woman who is 2 months pregnant used Plan B. Would you say she used Plan B correctly or incorrectly? (Acceptable answer: incorrectly) | 601 (91.6) |
| 6. Why? (Acceptable answer: she was already pregnant, it won't work, it's too late) | 614 (93.5) |
| Questions asked while subject was allowed to look at entire package: | |
| 7. A woman used Plan B to be sure she doesn't get any sexually transmitted diseases. Was this a correct use of Plan B? (Acceptable answer: no) | 629 (95.8) |
| 8. A woman's partner used a condom during sex with her, but the condom broke. The next morning, she used Plan B to prevent pregnancy. Was this a correct use of Plan B? (Acceptable answer: yes) | 595 (90.7) |
| 9. A woman had unusual vaginal bleeding during the past week. She had unprotected sex and then she took Plan B to prevent pregnancy. Was this a correct use of Plan B? (Acceptable answer: no) | 497 (75.7) |
| 10. A woman with asthma had unprotected sex. The next day, she took Plan B to prevent pregnancy. Was this a correct use of Plan B? (Acceptable answer: yes) | 412 (62.8) |
| 11. A woman has missed her period. She did a home pregnancy test and it was positive. She then used Plan B because she didn't want to be pregnant. Was this a correct use of Plan B? (Acceptable answer: no) | 587 (89.4) |
| 12. A woman knows she is allergic to an ingredient in Plan B. She used Plan B because she noticed that her partner's condom broke during sex with her. Was this a correct use of Plan B? (Acceptable answer: no) | 599 (91.3) |
| 13. A woman had unprotected sex 2 days ago and then used Plan B to prevent pregnancy. Was this a correct use of Plan B? (Acceptable answer: yes) | 569 (86.7) |
| 14. A woman had unprotected sex a week ago and then used Plan B to prevent pregnancy. Was this a correct use of Plan B? (Acceptable answer: no) | 620 (94.5) |
| 15. A woman is planning to have sex tonight. She usually uses condoms to prevent pregnancy. This time she plans to use Plan B instead because her husband complains about using condoms. Is this a correct use of Plan B? (Acceptable answer: no) | 306 (46.6) |
| 16. A woman used Plan B every day instead of her usual birth control pills. Was this a correct use of Plan B? (Acceptable answer: no) | 594 (90.5) |
| 17. A woman took both Plan B tablets at the same time. Was this a correct use of Plan B? (Acceptable answer: no) | 630 (96.0) |
| 18. A woman and her husband don't like using condoms and the woman doesn't want to take birth control pills. They decide to use Plan B as their main contraceptive method. Is this a correct use of Plan B? (Acceptable answer: no) | 448 (68.2) |
| 19. Will Plan B be more effective if a woman takes it 1 day after unprotected sex or if she takes it 2 days after unprotected sex? (Acceptable answer: 1 day) | 467 (71.1) |
| 20. According to the label, does Plan B protect against HIV (the virus that causes AIDS) and other sexually transmitted diseases? (Acceptable answer: no) | 642 (97.8) |
| 21. After a woman takes Plan B, when should she expect her next period? Should she expect it immediately, at about the normal time, 1 week late, or never? (Acceptable answer: at about the normal time or 1 week late*) | 582 (88.7) |
| 22. How many days does the label say is the longest after sex a woman should wait before taking the first Plan B tablet? (Acceptable answer: 3 days or 72 hours) | 599 (91.3) |
| 23. When should a woman take the 2nd Plan B tablet? (Acceptable answer: any answer that mentioned 12 hours; the next morning) | 563 (85.8) |
| 24. According to the label, if a woman gets severe stomach pain after using Plan B, what should she do? (Acceptable answer: see/call a doctor) | 535 (81.5) |
| 25. Can nausea be a side effect of Plan B? (Acceptable answer: yes) | 650 (99.0) |
| 26. Can trouble breathing be a side effect of Plan B? (Acceptable answer: no) | 547 (83.3) |
| 27. Can vomiting be a side effect of Plan B? (Acceptable answer: yes) | 626 (95.4) |
| 28. Can fever be a side effect of Plan B? (Acceptable answer: no) | 524 (79.8) |
| 29. Are there any other possible side effects that I haven't mentioned? (Acceptable answer: yes) | 616 (93.9) |
| 30. Please name one of these other possible side effects. (Acceptable answer: named a condition listed on package) | 573 (87.3) |

* One week late was considered acceptable because the package text stated that "If your period is more than one week late, you may be pregnant."

**Table 3.** Percent of Eligible Subjects Who Understood Each Communication Objective

| Objective | % Who understood objective | 95% Confidence interval |
|---|---|---|
| 1) The product is indicated for prevention of pregnancy after unprotected sex. | 93 | 0.91, 0.95 |
| 2) The product is intended as a back-up method and should not be used for regular contraception. | 67 | 0.64, 0.71 |
| 3) The product does not prevent sexually transmitted diseases or HIV/AIDS. | 94 | 0.92, 0.96 |
| 4) The first pill should be taken within 72 hours after intercourse. | 85 | 0.82, 0.88 |
| 5) The first pill should be taken as soon as possible after intercourse. | 82 | 0.79, 0.85 |
| 4 or 5) The first pill should be taken within 72 hours or as soon as possible after intercourse. | 97 | 0.96, 0.98 |
| 6) The second pill should be taken 12 hours after the first. | 85 | 0.83, 0.88 |
| 7) The product should not be used by women who are already pregnant. | 98 | 0.97, 0.99 |
| 8) The product should not be used by women with unexplained vaginal bleeding. | 75 | 0.72, 0.79 |
| 9) The product should not be used by women with allergy to any ingredient in the product. | 91 | 0.88, 0.93 |
| 10) Side effects include nausea and vomiting. | 89 | 0.87, 0.91 |
| 11) If severe abdominal pain develops, the user should seek medical care immediately. | 81 | 0.78, 0.84 |

were asked directly, only 67% met the definition of understanding the corresponding objective. One possible explanation for this relatively poor result is that several of the four questions used in the definition may in retrospect have required an excessively strict or unrealistic interpretation. For example, one question stated: "A woman is planning to have sex tonight. She usually uses condoms to prevent pregnancy. This time she plans to use Plan B instead because her husband complains about using condoms. Is this a correct use of Plan B?" Only 46% of subjects gave the acceptable answer to this question, which was "no." The intent of the question was that if a woman knows in advance that her husband will refuse to use condoms, she should either find another contraceptive method or refuse to have sex with him, rather than plan to use the product. However, this choice may be improbable in the minds of many women. Subjects may have assumed that unprotected sex was inevitable in the specific situation described, after which use of the product would in fact be appropriate. Alternatively, women may not consider that a decision to use the product instead of another method on a single, isolated occasion actually violates the intent of the label warnings; instead, they may interpret the label as advising only against consistent or repeated use of this product as a primary contraceptive method. Such an interpretation is unlikely to be highly detrimental to a woman's health; because pregnancy after a single coital act is statistically unlikely during most of the menstrual cycle,[3] occasional

use of this product as a primary method will not substantially increase the risk of unwanted pregnancy.

Only three-quarters of subjects understood that the product should not be used by women with unexplained vaginal bleeding. The questionnaire included just one question to test this objective, which in retrospect would have been too few to test an important concept. However, the rationale for the Food and Drug Administration's requirement that this contraindication be included on the prescription label is unknown. To our knowledge no published medical guidelines for use of emergency contraceptive pills include unexplained bleeding as a contraindication.[4,5]

Two objectives were understood by between 80% and 85% of subjects: that the first pill should be taken as soon as possible after intercourse, and that the user should seek medical care immediately if severe abdominal pain develops. However, the first of these objectives should not be considered in isolation; the more important message is that almost all women (97%) understood the overall time frame for product use (*either* within 72 hours *or* as soon as possible after sex). Furthermore, research has shown that this regimen is highly effective even if delayed up to 72 hours after intercourse, and a similar regimen is effective even if use is delayed longer than that.[6] Failure to appreciate the written warning about abdominal pain in the label itself is not of great clinical concern, because women do not need written instructions to know that they should see a doctor if severe pain

A. Facsimile of outside of package

*Plan B*®
**Emergency Contraception**

**2 levonorgestrel tablets**
**0.75 mg each**

| Drug Facts | |
| --- | --- |
| *Active ingredient (in each tablet)* | *Purpose* |
| Levonorgestrel 0.75 mg | Emergency Contraception |
| *Use*   Reduces chance of pregnancy after unprotected sex (if a contraceptive failed or if you did not use contraception) | |
| *Warnings* | |
| **Do not use:** | |
| • if you are already pregnant (because it will not work) | |
| • if you are allergic to any ingredient in Plan B | |
| • if you have unusual vaginal bleeding | |
| **Plan B is not recommended for regular contraception.** | |
| **Plan B does not protect against HIV (the virus that causes AIDS) or any other sexually transmitted diseases.** | |

| **When using this product, you may have** | | | |
| --- | --- | --- | --- |
| • nausea | • vomiting | • stomach pain | • tiredness |
| • diarrhea | • dizziness | • breast pain | • headache |
| • menstrual changes | | | |

| If breastfeeding, ask a doctor before use. |
| --- |
| **Keep out of the reach of children.** |
| *Directions* |
| • Take the first tablet as soon as possible but no later than 72 hours (3 days) after unprotected sex. |
| • Take the second tablet 12 hours after you take the first tablet. |
| *Inactive ingredients:*  colloidal silicon dioxide, potato starch, gelatin, magnesium stearate, talc, corn starch, lactose monohydrate |
| *Questions?*  ☎1-800-330-1271  ⌨ www.go2planb.com |

B. Text on inside of package (formatted onto six panels)

**WHAT IS PLAN B?**
Plan B is a back-up contraceptive. It can prevent pregnancy after unprotected sex (if a contraceptive fails or if no birth control method was used).  Plan B should not be used in place of regular contraception.  It does not work as well as most other contraceptives used correctly.

- Plan B does not prevent HIV (the virus causing AIDS) or other sexually transmitted diseases.

**WHO SHOULD NOT USE PLAN B?**
- Pregnant women (Plan B cannot cause an abortion.)
- Women who are allergic to any ingredient in Plan B.
- Women who have unusual vaginal bleeding.

**WHAT IF I AM ALREADY PREGNANT AND USE PLAN B?**
If you are already pregnant Plan B is unlikely to harm the fetus.

**SIDE EFFECTS**
Possible side effects may include:

- Nausea (23% of users)
- Stomach pain (18%)
- Fatigue (17%)
- Headache (17%)
- Dizziness (10%)
- Breast pain (10%)
- Vomiting (6%)
- Diarrhea (6%)

Talk to a doctor if side effects are severe or last more than 48 hours.

**See a doctor right away if you have severe stomach pain,** since this can be a warning sign of a tubal (ectopic) pregnancy – a serious medical problem.

1    Take the first tablet **as soon as possible** within 72 hours (3 days) after unprotected sex.

2    Take the second tablet 12 hours after you take the first tablet.

After taking Plan B you may have spotting or your menstrual period might be heavier (14% of users) or lighter (13%). Your next period should come at the normal time, or a few days early or late.  **If your period is more than one week late, you may be pregnant.**

**HOW WELL DOES PLAN B WORK?**
Plan B lowers the risk of pregnancy by 89% after one act of unprotected sex (from about 8%, on average, down to about 1%).

Plan B works better the sooner you use it after unprotected sex.

Do not take more than 2 tablets in 24 hours.

Store at room temperature.

Plan B is manufactured by Gedeon Richter, Ltd, Budapest, Hungary.
Plan B is distributed in the United States and Canada by: Women's Capital Corporation, 1990 M Street, NW, Washington, DC 20036, 800-330-1271
www.go2planb.com

develops. Moreover, no evidence exists to indicate that emergency contraceptive pills increase the risk of ectopic pregnancy, which was implied in the warning.[7]

The study population was diverse and included large numbers of minority women, young women, and less-educated or less-literate women. Although less-educated and less-literate women were less likely to understand the objectives than more-educated and more-literate women, understanding was generally high in all subgroups examined. Most of the study subjects had experienced a contraceptive accident or pregnancy scare and thus might have been candidates for using emergency

contraception. However, only a small number had ever used emergency contraceptive pills, and therefore it is unlikely that our results were substantially influenced by previous experience with this or a similar product.

At the request of the Food and Drug Administration, the study included questions that were asked when the subject had differing degrees of access to the label. The first question was asked after the package had been taken away from the subject, and five additional questions were asked while the subject was looking only at the outside of the package. These restrictions probably resulted in a lower likelihood of answering correctly than would occur in the real over-the-counter setting, in which women would be able to look at the entire package before using the product. Nevertheless, the proportion of subjects who gave acceptable answers to each of these six questions was at least 80%. Because these questions covered the key information that a woman would need to decide whether to purchase the product (indication for treatment, the appropriate timing of use, and the main contraindication, pregnancy), the finding that a high proportion of women answered these questions correctly after reading only the outside of the package is noteworthy.

This study had several limitations. The study population was a convenience sample of women recruited in shopping malls and family planning clinics and thus may not be representative of all women who might ultimately use the product. Whether this selection process may have led to an overestimate or an underestimate of the degree of understanding of the label is unknown, however. A more serious concern is that requirement for parental consent for minor subjects recruited in malls may have resulted in an atypical sample of young women who were comfortable talking about sex and contraception and who therefore may have been more likely than most teens to answer questions correctly. Clearly, our results cannot be extended to the many women in the United States who do not read English.

Surprisingly little published data are available on how well the public understands other medication package labels. One study of three prototype labels for a proposed over-the-counter cholestyramine product found results similar to those presented here: the proportion of subjects who correctly answered questions about key messages on the label ranged from 78% to 99% for various questions, and more-educated subjects were significantly more likely than less-educated subjects to answer correctly.[8] Another study of two labels for an over-the-counter ranitidine product found that 86–90% of people surveyed understood directions for use. Unlike our study, neither of these prior studies included scenario questions that required subjects to apply the infor-

mation on the label to specific situations.[9] Our finding that most subjects could answer such questions correctly suggests that the understanding of the emergency contraception product label may be translated into appropriate action when women use the product.

The characteristics of this product clearly justify consideration for over-the-counter distribution. Levonorgestrel is safe—even if taken in pregnancy, evidence suggests that it will not harm the pregnancy or the fetus —and it has no potential for addiction. The regimen has few contraindications, all of which should be easy for the consumer to identify for herself without needing an examination. The instructions for use are simple, and the same dose is used for all patients.[10,11] Furthermore, recent data indicate that the efficacy of treatment is substantially greater the sooner the drug is taken; in the trial cited above, the chance of pregnancy was almost seven times lower if treatment was initiated within the first 24 hours after intercourse than if treatment was delayed more than 48 hours.[12] Therefore, women should be able to obtain the product promptly whenever they need it. Distribution over the counter may be the most effective means of accomplishing this goal and has been endorsed by many expert groups, including the American College of Obstetricians and Gynecologists (American College of Obstetricians and Gynecologists News Release, February 14, 2001), the American Academy of Pediatrics (Citizen's Petition submitted by Center for Reproductive Law and Policy to USFDA, February 14, 2001), and the American Medical Association (AMA Eyes Over-the-Counter Access of Emergency Contraception. American Medical News December 25, 2000; 43:9).

With the favorable findings of this study, the next research step in the process to obtain Food and Drug Administration approval for over-the-counter distribution of the product is to proceed with an "actual use study" to assess whether women who obtain this product in a simulated over-the-counter setting will use it safely and effectively. Recruitment for such a study began in November 2001.

## REFERENCES

1. Soller RW. OTCness. Drug Inf J 1998;32:555–60.
2. Davis TC, Long SW, Jackson RH, Mayeaux EJ, George RB, Murphy PW, et al. Rapid estimate of adult literacy in medicine: A shortened screening instrument. Fam Med 1993;25:391–5.
3. Wilcox AJ, Weinberg CR, Baird DD. Timing of sexual intercourse in relation to ovulation. Effects on the probability of conception, survival of the pregnancy, and sex of the baby. N Engl J Med 1995;333:1517–21.

4. American College of Obstetricians and Gynecologists. ACOG practice patterns. Emergency oral contraception. Number 25. Washington, DC: American College of Obstetricians and Gynecologists, 2001.

5. World Health Organization. Improving access to quality care in family planning. Medical eligibility criteria for contraceptive use. 2nd edition. May 11, 2001.

6. Rodrigues I, Grou F, Joly J. Effectiveness of emergency contraceptive pills between 72 and 120 hours after unprotected sexual intercourse. Am J Obstet Gynecol 2001;184: 531–7.

7. Nielsen CL, Miller L. Ectopic gestation following emergency contraceptive pill administration. Contraception 2000;62:275–6.

8. Friedman CP, Romeo D, Hinton SS. Healthcare decisions and product labeling: Results of a consumer comprehension study of prototype labeling for proposed over-the-counter cholestyramine. Am J Med 1997;102:50–6.

9. Ciociola AA, Sirgo MA, Pappa KA, McGuire JA, Fung K. A study of the nonprescription drug consumer's understanding of the ranitidine product label and actual product usage patterns in the treatment of episodic heartburn. Am J Ther 2001;8:387–98.

10. Grimes DA, Raymond EG, Scott Jones B. Emergency contraception over-the-counter: The medical and legal imperatives. Obstet Gynecol 2001;98:151–5.

11. Ellertson C, Trussell J, Stewart FH, Winikoff B. Should emergency contraceptive pills be available without prescription? J Am Med Womens Assoc 1998;53:226–9, 232.

12. Task Force on Postovulatory Methods of Fertility Regulation. Randomised controlled trial of levonorgestrel versus the Yuzpe regimen of combined oral contraceptives for emergency contraception. Lancet 1998;352:428–33.

Address reprint requests to: Elizabeth G. Raymond, MD, MPH, Family Health International, PO Box 13950, Research Triangle Park, NC 27709; E-mail: eraymond@fhi.org.

*Received November 27, 2001. Received in revised form February 11, 2002. Accepted March 7, 2002.*

MEMORANDUM

DATE:      8/23/06

FROM:      Dr. Andrew C. Von Eschenbach
           Acting Commissioner
           United States Food and Drug Administration

TO:        NDA 21-045, S-011

SUBJECT:   Appropriate age restriction for Plan B®

This memorandum regards Barr Laboratories' (Barr or the sponsor[1]) supplemental new
drug application (sNDA) dated April 22, 2003, and Barr's subsequent amendments,
including its amended sNDA dated August 17, 2006. Barr's most recent sNDA requests
that FDA switch Plan B's prescription (Rx) status to non-prescription for women 18
years of age and older, and to have Plan B® remain Rx for girls under 18 years of age.

In an August 26, 2005 memo written by Dr. Steven Galson, the Director of the Center for
Drug Evaluation and Research (CDER), CDER found that for women 17 and older the
existing Rx dispensing requirements for Plan B® are not necessary to protect the public
health and that an Rx-only to non-prescription switch for those consumers is authorized
under 21 U.S.C. 353(b)(3) and 21 CFR 310.200. CDER also determined, however, that
Barr had not established that Plan B® could be used safely and effectively by young
adolescents – girls 16 and younger – for emergency contraception without the
professional supervision of a practitioner licensed by law to administer the drug. As a
result of this scientific conclusion (with which I concur), Plan B® may not lawfully be
made available without a prescription to this group under section 503(b) of the Federal
Food, Drug, and Cosmetic Act.

In considering the difficulty of enforcing an age-based restriction on the availability of
this oral hormonal contraceptive, I have concluded that 18 (rather than 17) is the more
appropriate cutoff point to best promote and protect the public health. The state-
regulated pharmacies that will be dispensing Plan B® under Barr's voluntary CARE^SM
program (as well as society as a whole) are more familiar with 18 as a cutoff age. I
understand that in all 50 states, 18 is the age of majority (i.e., the legal delineation
between minor and adult), and retail outlets, including pharmacies, are familiar with
using 18 as the age restriction for the sale of certain products. With regard to drug
products, for example, the legal age to purchase FDA approved non-prescription nicotine
replacement therapy products is 18. Moreover, I also understand that as a matter of state
law many products routinely sold by pharmacies, e.g., tobacco products and non-
prescription cough-cold products like pseudoephedrine, are restricted to consumers 18
and older.

---

[1] The current applicant for the Plan B sNDA is Duramed Research Pharmaceuticals (Duramed), a wholly-
owned subsidiary of Barr. For ease of reference, this memo will refer to both entities as Barr.

This approach builds on well-established state and private-sector infrastructures to restrict certain products to consumers 18 and older. Indeed, the agency selected 18 as the appropriate age for non-prescription nicotine replacement therapy products, in part, because the States had already uniformly restricted the sale of tobacco products to those 18 and older. By so doing, FDA was able to utilize the existing state-created infrastructure limiting the sale of tobacco products to minors to ensure the enforcement of its age-based restriction on non-prescription nicotine replacement therapy products. Here, Barr's CARE$^{SM}$ program specifically utilizes state-licensed pharmacies to implement its restricted distribution plan. Given this fact, and the existing experience pharmacies have enforcing the age-based restriction of 18, I have determined that to best protect and promote the public health non-prescription Plan B$^®$ should be available for ages 18 and above.

Leveraging well-established state and private-sector infrastructures will allow for comprehensive and effective enforcement of the age-based restrictions. As a result, this approach should minimize the likelihood that younger girls for whom Plan B$^®$ has not been found safe and effective for non-prescription use will have access to the product without professional supervision. Therefore, this approach should help ensure safe and effective use of the product.

# Calendar No. 898

| 82D CONGRESS | SENATE | REPORT |
|---|---|---|
| *1st Session* | | No. 946 |

## AMENDING SECTIONS 303 (C) AND 503 (B) OF THE FEDERAL FOOD, DRUG, AND COSMETIC ACT

OCTOBER 12 (legislative day, OCTOBER 1), 1951.—Ordered to be printed

Mr. HUMPHREY, from the Committee on Labor and Public Welfare, submitted the following

## REPORT

[To accompany H. R. 3298]

The Committee on Labor and Public Welfare, to whom was referred the bill (H. R. 3298) to amend section 503 (b) of the Federal Food, Drug, and Cosmetic Act, as amended, having considered the same, report favorably thereon with amendments and recommend that the bill, as amended, do pass.

The amendments are as follows:

(1) On page 3, line 5, strike out the words "or otherwise without examination of the patient" and insert in lieu thereof a comma.

(2) On page 3, lines 19–22, strike out the words "or any other statement which represents or implies that the dispensing of the drug without the prescription of a licensed practitioner is prohibited."

(3) On page 4, between lines 5 and 6, insert a new section 2, to read as follows:

SEC. 2. Subsection (c) of section 303 of the Federal Food, Drug, and Cosmetic Act, as amended, is amended by inserting before the period a semicolon and the following: "or (4) for having violated section 301 (b), (c), or (k) by failure to comply with section 502 (f) in respect to an article received in interstate commerce to which neither section 503 (a) nor section 503 (b) (1) is applicable, if the delivery or proffered delivery was made in good faith and the labeling at the time thereof contained the same directions for use and warning statements as were contained in the labeling at the time of such receipt of such article."

(4) On page 4, line 6, strike out the figure "2" and insert in lieu thereof the figure "3."

### INTRODUCTION

This bill amends the Federal Food, Drug, and Cosmetic Act to deal more directly and realistically with the labeling and dispensing of drugs that may be sold only upon the prescription of licensed practitioners. It has a twofold objective: (1) to protect the public from abuses in the sale of potent prescription drugs; and (2) to relieve retail

**2**  AMENDING THE FEDERAL FOOD, DRUG, AND COSMETIC ACT

pharmacists and the public from burdensome and unnecessary restrictions on the dispensing of drugs that are safe for use without the supervision of a physician. The committee believes that the bill, as amended, will serve to eliminate much confusion and dissatisfaction caused by ambiguities in the present provisions of the act, and will benefit drug manufacturers, retail druggists, medical practitioners, and the public.

In its consideration of this bill, the Committee has had the benefit of careful study of its provisions by its standing Subcommittee on Health. The subcommittee carefully and thoroughly explored the need for such legislation at this time, and examined the manner in which the provisions of the bill are adapted to deal with the serious problems which have been shown to exist in connection with the labeling and dispensing of both "prescription" and "over-the-counter" drugs. Hearings on the bill were held before the subcommittee from September 11 through September 13, 1951. Favorable action on the bill was urged at the hearing by the Federal Security Administrator and by the Food and Drug Administration, the agency of the Government that administers and enforces the Federal Food, Drug, and Cosmetic Act. In addition, virtually all segments of the drug industry, including the principal associations of drug manufacturers, the retail druggists, and the licensed pharmacists were represented at the hearing and submitted testimony which clearly shows that this bill is necessary legislation and will do much to make the Act a fairer and more effective instrument for protecting the public against abuses in the labeling and dispensing of drugs. A representative of the American Medical Association testified at the hearing in support of the bill.

The hearing held before the subcommittee developed the fact that while there was virtually unanimity of opinion of those who testified as to the need for basic changes in the law governing the labeling and dispensing of "prescription" drugs, there were two principal issues in controversy.

1. The first area of controversy was over a proposal to authorize the Federal Security Administrator to list by name or class the "dangerous" drugs that may be sold only on prescription. The subcommittee had before it for consideration at the time of the hearing, not only this bill, which has been passed by the House of Representatives, but also the companion Senate bill (S. 1186), and amendments in the nature of a substitute therefor, introduced by Senator Humphrey. The principal difference between the bill as passed by the House of Representatives and Senator Humphrey's amendments in the nature of a substitute, had to do with the requirement under which, as part of the definition of so-called dangerous drugs, an administrative determination would have been necessary thus to classify a drug. The amendments in the nature of a substitute for S. 1186 also set forth detailed procedures, including administrative hearings to be followed in connection with the making of administrative determinations referred to, together with provisions for judicial review of such determinations.

Prior to the hearing, the provisions for administrative listing of so-called dangerous drugs were vigorously supported by the National Association of Retail Druggists, and equally vigorously opposed by the several associations of drug manufacturers, including the American Pharmaceutical Manufacturers' Association, the American Drug Man-

ufacturers Association, and the Proprietary Association. At the hearing, however, a statement was submitted on behalf of all four of these associations, indicating an agreement on their part that the controversial provisions for administrative listing of so-called dangerous drugs might be eliminated. The four associations, at the same time, proposed two new amendments to the bill. This agreement had the effect of eliminating one of the principal areas of controversy, particularly in view of the fact that the subcommittee was assured by the Food and Drug Administration and the Federal Security Administrator that the bill, while not in their view the best solution, would be workable in the form proposed under the agreement. The subcommittee recommended to the Committee on Labor and Public Welfare, therefore, that the provisions of the House bill which omit the administrative listing provisions, rather than the provisions of the amendments in the nature of a substitute for S. 1186 which include such provisions, be favorably reported to the Senate. The subcommittee further recommended, in reporting favorably on the House bill, that the bill be amended to include the two amendments proposed by the associations of retail druggists and drug manufacturers under the agreement referred to above. The intent and effect of these amendments are discussed hereafter in this report.

2. The other principal area of controversy which developed at the hearing arose with respect to certain language of the bill which was objected to by the representative of a firm engaged in selling through the mail to epileptic patients living throughout the United States a medication comprised principally of phenobarbital. Although the language in question was included in the legislation as originally introduced in both the House of Representatives and the Senate, in the bill as reported to the House of Representatives by the House Interstate and Foreign Commerce Committee and in the bill as passed in the House of Representatives, no issue had been raised concerning this language prior to the hearing before the subcommittee. The subcommittee, however, felt that the language might safely be omitted from the bill. Accordingly, it proposed, and the committee recommends, that this language be stricken. The effect of this amendment is discussed elsewhere in this report.

### WHAT THE BILL DOES

As has been pointed out, the bill amends the Federal Food, Drug, and Cosmetic Act so that its provisions will be better adapted to deal realistically with the labeling and dispensing of drugs that may be sold only upon the prescription of licensed practitioners. Its provisions are remedial in the sense that they are intended to protect the public from abuses in the sale of potent prescription medicines. They will also relieve retail pharmacists of unnecessary restrictions on the dispensing of drugs that are safe for use without medical supervision.

*Prescription drugs*

The bill provides a statutory definition of prescription drugs; it expressly forbids their sale without a prescription; it specifies how they are to be labeled both at the time of interstate shipment and at the time of ultimate dispensing; and it prohibits unauthorized refilling of prescriptions for them.

**4**   AMENDING THE FEDERAL FOOD, DRUG, AND COSMETIC ACT

There are three classes of drugs covered by the statutory definition. The first includes the habit-forming drugs subject to section 502 (d) of the present statute. These are such drugs as the barbiturates. The third class includes all new drugs restricted to prescription sale by effective new-drug applications under section 505 of the present statute. There is no controversy whatever about these two classes. The second class includes any drug which "because of its toxicity or other potentiality for harmful effect, or the method of its use, or the collateral measures necessary to its use, is not safe for use except under the supervision of a practitioner licensed by law to administer such drugs."

This definition of so-called dangerous drugs is contained in paragraph (b) (1) (B) of the bill. It is substantially the same as the administrative definition now contained in the regulations issued by the Federal Security Administrator under the provisions of the Federal Food, Drug, and Cosmetic Act. The proposed definition, however, omits the reference to "efficacious" for use, as well as "safe" for use, without the supervision of a medical practitioner in order to be eligible for over-the-counter sale. This omission is not intended to mean that the only matter to be considered in applying the definition is whether or not a particular drug is poisonous.

The word "safe," as used in the definition, is intended to have its ordinary meaning. For example, nontoxic drugs like quinidine sulfate, intended for heart disease, or penicillin, for infections, are not safe for self-medication because their unsupervised use may indirectly cause injury or death. The language of the definition clearly shows that toxicity is only one factor to be considered by the courts in determining whether a particular drug is safe for use without medical supervision. The definition requires the court to consider also other potentialities for harmful effect, the method by which the drug is used, and the collateral measures that may be necessary in order to use the drug safely. When this language is given judicial interpretation consistent with the over-all purpose of the Federal Food, Drug, and Cosmetic Act to protect the public health it will effectively restrict to prescription sale all drugs that require professional supervision for their use.

In order to give this general definition a more precise meaning so that it may be applied with greater uniformity by the drug trade the Administrator can exercise the authority he has under section 701 (a) of the Federal Food, Drug, and Cosmetic Act to issue interpretative regulations. It is to be understood that the inclusion of the statutory definition does not, of course, in any way derogate from the Administrator's authority to interpret and enforce the definition through the issuance of any regulations necessary or appropriate to protect the public from indiscriminate dispensing of drugs over the counter when they may be unsafe for use without the supervision of a practitioner licensed by law to administer such drugs.

As previously stated, the committee considered S. 1186 together with H. R. 3298. S. 1186 would have authorized the Federal Security Administrator to list by name or class the drugs which he considered within the statutory definition. The grant of such administrative authority was objected to as an unnecessary regulation of the drug industry, and the committee concluded that administrative listing is not necessary at this time. It was felt that the statutory definition,

together with the authority to make interpretative regulations, could bring an end to the existing confusion in drug labeling and that uniformity can be achieved through cooperative efforts of the drug industry and the Food and Drug Administration working under the statutory plan. If the present confusion is not ended by this legislation it will then be time enough to consider the need for the administrative listing approach.

All drugs covered by the three classifications of prescription drugs must bear a label containing the statement "Federal law prohibits dispensing without prescription." This gives the retail druggist clear notice that he will be in violation of the Federal Food, Drug, and Cosmetic Act if he dispenses any drug so labeled without a prescription. This bill also specifies what information must be contained upon the label of the package dispensed to the patient. That label must contain the name and address of the dispenser, the serial number and date of the prescription or of its filling, the name of the prescriber, and, if stated in the prescription, the name of the patient, and the directions for use and cautionary statements, if any, contained in the prescription.

This bill strengthens the controls over the habit-forming barbiturates. The problems of misuse of these drugs to the detriment of the public—especially of young people—are growing and must be controlled in the public interest. The bill requires that they be sold only on prescription and forbids unauthorized refills of prescriptions for them. In this, it is a definite and clear step forward. It is felt, however, that these drugs pose a special problem not common to all drugs because they are desired by addicts for nonmedical use. This will call for their special treatment, and the committee wishes it understood that in recommending the passage of this bill, as amended, it does so with the knowledge that further legislative consideration must be given to adequate barbiturate controls.

The bill does not relieve any person from any requirements of law, now existing or hereafter adopted, with respect to drugs covered by the narcotic control laws. Paragraph (5) of section 1 makes this clear.

*Oral prescriptions*

The present law does not recognize the practice of dispensing drugs on oral prescriptions. The committee feels that in this respect the law needs modification and clarification for the convenience of the public, the retail druggist, and the physician. The filling and refilling of prescriptions upon oral or telephone orders with proper safeguards should be permitted, and this bill gives statutory recognition to the practice of telephone dispensing. It permits oral prescriptions for all drugs. However, in the case of habit-forming drugs, dangerous drugs, and new drugs limited to prescription sale, an oral prescription would have to be reduced promptly to writing and kept on file by the pharmacist. The oral order may be communicated to the dispenser by the prescriber himself or under his express authority.

*Oral prescriptions for habit-forming drugs*

The committee believes that the term "oral prescription," as used in the bill in connection with habit-forming drugs to which section 502 (d) of the act applies, should be given a construction which will assure that these drugs are used only upon the express order of a practitioner licensed by law to administer them. In fact, certain of

6    AMENDING THE FEDERAL FOOD, DRUG, AND COSMETIC ACT

these drugs, such as narcotics subject to the Harrison Narcotics Act may be dispensed only on a written prescription of a licensed practitioner, and this requirement is expressly preserved by the bill. (See par. (5) of the new sec. 503 (b).) The public interest clearly requires that other habit-forming drugs be dispensed and used only under the close and immediate supervision of a licensed practitioner. Accordingly, it is the intention of the committee that the term "oral prescription" as applied to these drugs, means an order communicated orally to the pharmacist by a practitioner licensed by law to administer such drugs, expressly prescribing such a drug, which is reduced promptly to writing and filed by the pharmacist. The Food and Drug Administration, within the limitations of its staffing, can check pharmacists' records to make sure that all habit-forming drugs sold are accounted for by prescriptions on file. The pharmacist, before he dispenses any such drug on oral order, must obtain satisfactory evidence, on the basis of consultation with the licensed practitioner or otherwise, that the order has been expressly authorized in each case by such practitioner.

The Federal Security Agency may adopt regulations needed for the efficient enforcement of this provision, and may find it desirable to require special records for any habit-forming drugs dispensed so that pharmacists and enforcement officials alike can readily detect any possible abuses of the oral prescription privilege extended for such drugs.

*Refilling prescriptions*

The bill, as amended, deals expressly with the troublesome problem of refilling prescriptions. Under the present law a drug dispensed by refilling a prescription without the knowledge or consent of the prescriber is misbranded and the dispenser is liable to criminal prosecution. The committee concluded that these provisions are too stringent and should be modified. There is no reason why the law should prohibit the refilling of prescriptions for drugs that are not dangerous and are suitable for use by a layman without medical supervision. The bill provides that prescriptions for such drugs may be freely refilled. But, here again, as to drugs which are habit-forming, or which are dangerous, or which are restricted by new drug applications to use under medical supervision, the bill requires that prescriptions may be refilled only with the prescriber's express authorization. This authorization may be either written or oral, but if it is given orally the dispenser must promptly reduce it to writing and keep it on file.

The provisions relating to the refilling of prescriptions are needed to meet a serious public health problem which has arisen from the indiscriminate refilling of prescriptions for dangerous and habit-forming drugs. A witness for the Food and Drug Administration cited cases in which death had occurred as a consequence of unauthorized prescription refills. The use of dangerous and habit-forming drugs must be under the supervision of the prescribing physician. This bill is intended to require that the licensed practitioner, if he has not authorized the refill in writing, be consulted by the pharmacist and the refill be authorized by such practitioner before any prescription for a drug that is limited to prescription sale may be refilled.

## EFFECT OF COMMITTEE AMENDMENTS

Amendment (1) was proposed by a firm engaged in selling through the mails to epileptic patients living throughout the United States a medication comprised principally of phenobarbital. Other provisions of the bill, to which the firm did not object, clarify and simplify the provisions of existing law regarding the labeling, sale, and dispensing of habit-forming and other dangerous drugs that should be sold only on prescription. These provisions are adequate to enable the Food and Drug Administration to compel such firms through appropriate court action, if necessary, to operate in a manner consistent with the public interest. The committee is aware of the obvious dangers to the public interest in the sale of barbiturates, including phenobarbital, without immediate and close medical supervision. The Food and Drug Administration has a responsibility in connection with the elimination of such dangers. This bill greatly strengthens the Administration's hand in discharging that responsibility.

The other two amendments were proposed by the combined drug trade in a statement signed by the National Association of Retail Druggists, the American Pharmaceutical Manufacturers' Association, the American Drug Manufacturers Association, and the Proprietary Association.

Amendment (2) was recommended because the associations felt the language it strikes out was of uncertain meaning and added nothing of importance to the bill. In any event, should a person place a statement on the label of a drug entirely safe for self-medication representing or implying that dispensing it without a prescription is prohibited by Federal law, that drug would be misbranded under the provision of law, section 502 (a), which forbids false or misleading labeling statements. Striking the language objected to does not relieve any manufacturer, regardless of the way in which he does business, from compliance with the requirement of section 502 (f) that all drugs not limited to prescription sale must bear adequate warnings and adequate directions for use telling the purchasing public what the drug is to be used for and how it is to be taken to accomplish the beneficial effects it is intended to have.

Amendment (3) was proposed to emphasize the fact that the responsibility for preparing adequate directions for use and appropriate warnings against misuse in the labeling of drugs that may be sold without a prescription is upon the manufacturer and not the retail druggist. It does nothing more than free the retail druggist of responsibility for supplementing the labeling of some manufacturers' drugs to give the public adequate directions for use and warnings against misuse. The druggist could rely in good faith upon the manufacturers' labeling for compliance with these requirements of the existing law. The amendment offers the druggist no protection against violations which arise if he sells a dangerous drug covered by paragraph (1) of the bill without meeting the prescription requirements.

Amendment (4) is a technical renumbering amendment.

## EFFECTIVE DATE

Section 3 of the amended bill provides that its provisions shall take effect 6 months after the date of its enactment. This postponement

**8**    AMENDING THE FEDERAL FOOD, DRUG, AND COSMETIC ACT

of the effective date is considered necessary to permit manufacturers to meet the new labeling requirements.

SECTIONAL ANALYSIS

Section 1 of the bill amends the Federal Food, Drug, and Cosmetic Act by substituting for subsection (b) of section 503, relating to the labeling and dispensing of prescription drugs, a new subsection defining drugs that may be dispensed only on prescription and specifying the conditions under which such drugs may be dispensed.

*Prescription drugs*

Under paragraph (1) of the new subsection (b) prescription drugs are defined as drugs intended for use by man which fall within any one of three different categories. In limiting prescription drugs to those intended for use by man this new subsection differs from the present law, which refers to prescription drugs to include not only those dispensed on prescription of physicians and dentists, but also those dispensed on prescription of a veterinarian. Under the committee bill, drugs intended for use under the supervision of a veterinarian will not require a prescription, although it will be possible under section 502 (f) to exempt such drugs from adequate directions for use if they are to be used by or under the supervision of a veterinarian. In the absence of any exempting regulations, these drugs will be subject to the labeling and dispensing requirements of the act applicable to over-the-counter drugs.

The three categories of prescription drugs defined as such in the bill are: (*a*) habit-forming drugs to which section 502 (d) of the act relating to drugs containing any narcotic or hypnotic substance, including barbituric acid, or habit-forming chemical derivatives thereof, is applicable; (*b*) drugs which, because of their toxicity or other potentiality for harmful effect, or the methods of their use, or the collateral measures necessary to their use, are not safe for use except under the supervision of a practitioner licensed by law to administer such drugs; or (*c*) drugs which are limited by an effective application under section 505 of the act, relating to new drugs, to use under professional supervision.

Included in the first of these three categories are not only the habit-forming narcotics and chemical derivatives thereof, but also barbituric acid and its habit-forming derivatives, such as amytal, phenobarbital, pentobarbital, and the like. This category includes all of the drugs and derivatives thereof specified in section 502 (d) of the act and the regulations thereunder. Dispensing of these drugs must not only comply with the provisions of the bill, but also must conform to the requirements of that section, and the interstate label must bear the name and quantity or proportion of the habit-forming drug or derivatives and in juxtaposition therewith the statement: "Warning—May be habit forming."

The second category of prescription drugs, defined in subparagraph (B) of paragraph (1) of the new subsection (b) includes the so-called dangerous drugs. As noted elsewhere in this report, the phrase "not safe," as used in this subparagraph, is intended to have its ordinary meaning. Furthermore, in determining whether a drug is safe for use without medical supervision, there must be taken into consideration

not only the drug's toxicity, but also other potentialities for harmful effect, the method by which it is used, and the collateral measures necessary to its safe use. The broad language of the definition contained in this subparagraph is intended to comprehend all drugs that in fact should be administered under medical supervision in order to insure their safe use. Such difficult borderline cases as may arise under this definition can be dealt with under the interpretative and rule-making power provided for in section 701 (a) of the act.

The third category of drugs defined as "prescription" drugs includes all new drugs restricted to prescription sale by effective new drug applications under section 505 of the act.

*Written and oral prescriptions and refills*

Paragraph (1) of the new subsection (b) also provides that a "prescription" drug (any drug falling in any one of the three categories referred to above) shall be dispensed only (1) upon a written prescription of a practitioner licensed by law to administer such drug, or (2) upon an oral prescription of such a practitioner, communicated by him or under his express authority to the pharmacist, if such prescription is promptly reduced to writing and filed by the pharmacist, or (3) by refilling any such written or oral prescription if such refilling is authorized by or under the express authority of the practitioner either in the original prescription or by oral order, which is reduced promptly to writing and filed by the pharmacist. The provisions with respect to oral prescriptions and refills do not apply, however, in the case of narcotics subject to the Internal Revenue Code (Harrison Narcotic Act), since subparagraph (5) of the new subsection (b) expressly safeguards the provisions of that act, and under those provisions and the regulations of the Bureau of Narcotics such drugs may be dispensed only on written prescription. Also, as pointed out elsewhere, with respect to other habit-forming drugs, oral prescriptions and refills are limited to situations in which the pharmacist obtains satisfactory evidence, on the basis of consultation with a licensed practitioner or otherwise, that the prescription or refill has been expressly authorized by such practitioner. A violation of the prescription requirements of paragraph (1) of the new subsection (b) is, under the provisions of this paragraph, deemed to be an act which results in the drug being misbranded while held for sale.

*Labeling of prescription drugs*

Paragraph (2) of the new subsection (b) provides that a drug dispensed on prescription shall be exempt from the provisions of the act relating to the misbranding of drugs except those which specify that a drug shall be deemed to be misbranded if its labeling is false or misleading in any particular (sec. 502 (a)), if it is an imitation of another drug or is offered for sale under the name of another drug (sec. 502 (i) (2) and (3)), if it is, or purports to be, or is represented as a drug composed wholly or partly of insulin or of penicillin or certain other antibiotics except under certain conditions (sec. 502 (k) and (l)). These provisions continue to apply to any drug subject to the act, whether sold over-the-counter or on prescription. Similarly, the packaging requirements set forth in section 502 (g) and (h) apply to all such drugs. Prescription drugs must, however, bear at the time of dispensing a label containing the name and address of the dispenser,

**10**   AMENDING THE FEDERAL FOOD, DRUG, AND COSMETIC ACT

the serial number and the date of the prescription or of its filling, the name of the practitioner, if stated in the prescription the name of the patient, and the directions for use and cautionary statements, if any, stated in the prescription. The exemption provided for by this paragraph does not apply to any drug dispensed in the course of the conduct of a business of dispensing drugs pursuant to diagnosis by mail, or to a drug dispensed in violation of paragraph (1) of the subsection.

*Exempt narcotics and similar drugs*

Under paragraph (3) of the new subsection (b) the Administrator may by regulation remove habit-forming drugs, as defined in section 502 (d), and new drugs, from the prescription requirements contained in paragraph (1) of the subsection when these requirements are not necessary for the protection of the public health.

*Prescription legend*

Paragraph (4) of the new subsection requires that, in addition to the labeling requirements in the case of prescription drugs specified in paragraph (2) of the subsection, the interstate label on such drugs must bear the statement "Caution: Federal law prohibits dispensing without prescription." On the other hand, over-the-counter drugs are forbidden to bear a label containing this caution statement. A prescription drug, the label on which does not bear the specified caution statement, is deemed to be misbranded. So, too, is an over-the-counter drug, the label on which bears this or a substantially similar statement.

*Narcotics and marihuana*

Paragraph (5) of the new subsection provides that compliance with the requirements of the bill does not relieve any person from any other requirement prescribed by or under authority of law with respect to drugs now or hereafter within the classifications defined in the Harrison Narcotic Act (sec. 3220 of the Internal Revenue Code, 26 U. S. C. 3220), or marihuana, as defined in section 3238 (b) of the Internal Revenue Code (26 U. S. C. 3238 (b)).

*Good faith defense for retail druggists*

Section 2 of the bill amends section 303 of the act, which specifies the penalties applicable to violations of the act. It adds to the several defenses available under subsection (c) of section 303 a new defense which has the effect of relieving from liability because of misbranding under section 502 (f) of the act any dispenser who makes delivery or proffers delivery of a drug in good faith if the labeling on such drug at the time of such delivery or proffered delivery contained the same directions for use and warning statements as were contained in the labeling at the time of receipt of the drug by such dispenser. This defense, however, is not applicable in the case of a drug which, in accordance with the practice of the trade, is to be processed, labeled, or repacked in substantial quantities at establishments other than those where originally processed or packed, and is not applicable to a prescription drug.

*Effective date*

Section 3 contains an effective date provision. In order to enable the drug industry to adapt its operations to the requirements specified in the bill, and to give the Food and Drug Administration time in

which to develop procedures necessary to implement administration of the bill, it is provided that the provisions of the bill will not go into effect until 6 months have elapsed after the date of its enactment.

## CHANGES IN EXISTING LAW

In compliance with subsection 4 of rule XXIX of the Standing Rules of the Senate, changes in the existing law made by the bill are shown as follows: (Existing law proposed to be omitted is enclosed in black brackets; new matter is printed in italics, existing law in which no change is proposed is shown in roman).

### FEDERAL FOOD, DRUG AND COSMETIC ACT

#### PENALTIES

SEC. 303. (a) Any person who violates any of the provisions of section 301 shall be guilty of a misdemeanor and shall on conviction thereof be subject to imprisonment for not more than one year, or a fine of not more than $1,000, or both such imprisonment and fine; but if the violation is committed after a conviction of such person under this section has become final such person shall be subject to imprisonment for not more than three years, or a fine of not more than $10,000, or both such imprisonment and fine.

(b) Notwithstanding the provisions of subsection (a) of this section, in case of a violation of any of the provisions of section 301, with intent to defraud or mislead, the penalty shall be imprisonment for not more than three years, or a fine of not more than $10,000, or both such imprisonment and fine.

(c) No person shall be subject to the penalties of subsection (a) of this section, (1) for having received in interstate commerce any article and delivered it or proffered delivery of it, if such delivery or proffer was made in good faith, unless he refuses to furnish on request of an officer or employee duly designated by the Administrator the name and address of the person from whom he purchased or received such article and copies of all documents, if any there be, pertaining to the delivery of the article to him; or (2) for having violated section 301 (a) or (d), if he establishes a guaranty or undertaking signed by, and containing the name and address of, the person residing in the United States from whom he received in good faith the article, to the effect, in case of an alleged violation of section 301 (a), that such article is not adulterated or misbranded, within the meaning of this Act, designating this Act, or to the effect, in case of an alleged violation of section 301 (d), that such article is not an article which may not, under the provisions of section 404 or 505, be introduced into interstate commerce; or (3) for having violated section 301 (a), where the violation exists because the article is adulterated by reason of containing a coal-tar color not from a batch certified in accordance with regulations promulgated by the Administrator under this Act, if such person establishes a guaranty or undertaking signed by, and containing the name and address of, the manufacturer of the coal-tar color, to the effect that such color was from a batch certified in accordance with the applicable regulations promulgated by the Administrator under this Act; *or (4) for having violated section 301 (b), (c) or (k) by failure to comply with section 502 (f) in respect to an article received in interstate commerce to which neither section 503 (a) nor section 503 (b) (1) is applicable, if the delivery or proffered delivery was made in good faith and the labeling at the time thereof contained the same directions for use and warning statements as were contained in the labeling at the time of such receipt of such article.*

#### EXEMPTIONS IN CASE OF DRUGS AND DEVICES

SEC. 503. (a) The Administrator is hereby directed to promulgate regulations exempting from any labeling or packing requirement of this Act drugs and devices which are, in accordance with the practice of the trade, to be processed, labeled, or repacked in substantial quantities at establishments other than those where originally processed or packed, on condition that such drugs and devices are not adulterated or misbranded under the provisions of this Act upon removal from such processing, labeling, or repacking establishment.

**12**    AMENDING THE FEDERAL FOOD, DRUG, AND COSMETIC ACT

[(b) A drug dispensed on a written prescription signed by a physician, dentist, or veterinarian (except a drug dispensed in the course of the conduct of a business of dispensing drugs pursuant to diagnosis by mail), shall if—

(1) such physician, dentist, or veterinarian is licensed by law to administer such drug, and

(2) such drug bears a label containing the name and place of business of the dispenser, the serial number and date of such prescription, and the name of such physician, dentist, or veterinarian,

be exempt from the requirements of section 502 (b) and (e), and (in case such prescription is marked by the writer thereof as not refillable or its refilling is prohibited by law) of section 502 (d).]

(b) (1) *A drug intended for use by man which—*

*(A) is a habit-forming drug to which section 502 (d) applies; or*

*(B) because of its toxicity or other potentiality for harmful effect, or the method of its use, or the collateral measures necessary to its use, is not safe for use except under the supervision of a practitioner licensed by law to administer such drug; or*

*(C) is limited by an effective application under section 505 to use under the professional supervision of a practitioner licensed by law to administer such drug, shall be dispensed only (i) upon a written prescription of a practitioner licensed by law to administer such drug, or (ii) upon an oral prescription of such practitioner which is reduced promptly to writing and filed by the pharmacist, or (iii) by refilling any such written or oral prescription if such refilling is authorized by the prescriber either in the original prescription or by oral order which is reduced promptly to writing and filed by the pharmacist. The act of dispensing a drug contrary to the provisions of this paragraph shall be deemed to be an act which results in the drug being misbranded while held for sale.*

*(2) Any drug dispensed by filling or refilling a written or oral prescription of a practitioner licensed by law to administer such drug shall be exempt from the requirements of section 502, except paragraphs (a), (i) (2) and (3), (k), and (l), and the packaging requirements of paragraphs (g) and (h), if the drug bears a label containing the name and address of the dispenser, the serial number and date of the prescription or of its filling, the name of the prescriber, and, if stated in the prescription, the name of the patient, and the directions for use and cautionary statements, if any, contained in such prescription. This exemption shall not apply to any drug dispensed in the course of the conduct of a business of dispensing drugs pursuant to diagnosis by mail, or to a drug dispensed in violation of paragraph (1) of this subsection.*

*(3) The Administrator may by regulation remove drugs subject to section 502 (d) and section 505 from the requirements of paragraph (1) of this subsection when such requirements are not necessary for the protection of the public health.*

*(4) A drug which is subject to paragraph (1) of this subsection shall be deemed to be misbranded if at any time prior to dispensing its label fails to bear the statement "Caution: Federal law prohibits dispensing without prescription". A drug to which paragraph (1) of this subsection does not apply shall be deemed to be misbranded if at any time prior to dispensing its label bears the caution statement quoted in the preceding sentence.*

*(5) Nothing in this subsection shall be construed to relieve any person from any requirement prescribed by or under authority of law with respect to drugs now included or which may hereafter be included within the classifications stated in section 3220 of the Internal Revenue Code (26 U. S. C. 3220), or to marihuana as defined in section 3238 (b) of the Internal Revenue Code (26 U. S. C. 3238 (b)).*

O

| 82D CONGRESS | } | HOUSE OF REPRESENTATIVES | { | REPORT |
| 1st Session | | | | No. 700 |

# AMENDING SECTION 503 (b) OF THE FEDERAL FOOD, DRUG, AND COSMETIC ACT

JULY 16, 1951.—Committed to the Committee of the Whole House on the State of the Union and ordered to be printed

Mr. WILLIAMS of Mississippi, from the Committee on Interstate and Foreign Commerce, submitted the following

# REPORT

[To accompany H. R. 3298

The Committee on Interstate and Foreign Commerce, to whom was referred the bill (H. R. 3298) to amend section 503 (b) of the Federal Food, Drug, and Cosmetic Act, having considered the same, report favorably thereon with an amendment and recommend that the bill as amended do pass.

The amendment is as follows:

Strike out all after the enacting clause and insert the following:

That subsection (b) of section 503 of the Federal Food, Drug, and Cosmetic Act, as amended, is amended to read as follows:

"(b) (1) A drug intended for use by man which—

"(A) is a habit-forming drug to which section 502 (d) applies; or

"(B) because of its toxicity or other potentiality for harmful effect, or the method of its use, or the collateral measures necessary to its use, has been determined by the Administrator, on the basis of opinions generally held among experts qualified by scientific training and experience to evaluate the safety and efficacy of such drug (and, where a public hearing is required by paragraph (5), on the basis of evidence adduced at such hearing by such experts), to be safe and efficacious for use only after professional diagnosis by, or under the supervision of, a practitioner licensed by law to administer such drug; or

"(C) is limited by an effective application under section 505 to use under the professional supervision of a practitioner licensed by law to administer such drug,

shall be dispensed only (i) upon a written prescription of a practitioner licensed by law to administer such drug, or (ii) upon an oral prescription of such practitioner which is reduced promptly to writing and filed by the pharmacist, or (iii) by refilling any such written or oral prescription if such refilling is authorized by the prescriber either in the original prescription or by oral order which is reduced promptly to writing and filed by the pharmacist. The act of dispensing a drug contrary to the provisions of this paragraph shall be deemed to be an act which results in the drug being misbranded while held for sale.

"(2) Any drug dispensed by filling or refilling a written or oral prescription of a practitioner licensed by law to administer such drug shall be exempt from the

**2**    AMENDING THE FEDERAL FOOD, DRUG, AND COSMETIC ACT

requirements of section 502, except paragraphs (a), (i) (2) and (3), (k), and (l), and the packaging requirements of paragraphs (g) and (h), if the drug bears a label containing the name and address of the dispenser, the serial number and date of the prescription or of its filling, the name of the prescriber, and, if stated in the prescription, the name of the patient, and the directions for use and cautionary statements, if any, contained in such prescription. This exemption shall not apply to any drug dispensed in the course of the conduct of a business of dispensing drugs pursuant to diagnosis by mail or otherwise without examination of the patient or to a drug dispensed in violation of paragraph (1) of this subsection.

"(3) The Administrator may by regulation remove drugs subject to section 502 (d) and section 505 from the requirements of paragraph (1) of this subsection when such requirements are not necessary for the protection of the public health.

"(4) A drug which is subject to paragraph (1) of this subsection shall be deemed to be misbranded if at any time prior to dispensing its label fails to bear the statement 'Caution: Federal law prohibits dispensing without prescription'. A drug to which paragraph (1) of this subsection does not apply shall be deemed to be misbranded if at any time prior to dispensing its label bears the caution statement quoted in the preceding sentence or any other statement which represents or implies that the dispensing of the drug without the prescription of a licensed practitioner is prohibited.

"(5) Any interested person may file with the Administrator a petition proposing the making of a determination, or the modification of a determination made or proposed to be made, by the Administrator pursuant to subparagraph (B) of paragraph (1). The filing of a petition for the purpose of opposing a proposed determination that a drug is one to which such subparagraph (B) applies shall stay the operation of paragraph (1) with respect to such drug until a petition for judicial review can be filed and interim relief sought under section 10 (d) of the Administrative Procedure Act. The petition shall set forth in general terms the proposal contained therein, and shall state reasonable grounds therefor. The Administrator shall give public notice of the proposal made in the petition and shall give to all interested persons a reasonable opportunity to present their views thereon, orally or in writing, and as soon as practicable thereafter shall make public his action on the proposal. At any time prior to the thirtieth day after such action is made public, any interested person may file with the Administrator objections to such action, specifying with particularity the changes proposed, stating reasonable grounds therefor, and requesting a public hearing for the taking of evidence of experts who are qualified by scientific training and experience to testify on the question of whether the drug in question is safe and efficacious for use only after professional diagnosis by, or under the supervision of, a practitioner licensed by law to administer such drug. The Administrator shall thereupon, after appropriate notice, hold such public hearing. As soon as practicable after the hearing, the Administrator shall make his determination and issue an appropriate order. The Administrator shall make his order only after a review of the whole record and in accordance with the reliable, probative, and substantial evidence, and shall make detailed findings of the facts on which he based his order. Such order shall be subject to judicial review in accordance with the provisions of section 701 (f) and (g).

"(6) Nothing in this subsection shall be construed to relieve any person from any requirement prescribed by or under authority of law with respect to drugs now included or which may hereafter be included within the classifications stated in section 3220 of the Internal Revenue Code (26 U. S. C. 3220), or to marihuana as defined in section 3238 (b) of the Internal Revenue Code (26 U. S. C. 3238 (b))."

SEC. 2. The provisions of this Act shall take effect six months after the date of its enactment.

## WHAT THE BILL DOES

This bill amends the Federal Food, Drug, and Cosmetic Act to accomplish two broad objectives:

(1) To strengthen the protection of the public health against dangerous abuses in the sale of potent prescription drugs;

(2) To relieve retail druggists and the public from burdensome and unnecessary restrictions on the dispensing of drugs which may be safely used without supervision by a physician.

AMENDING THE FEDERAL FOOD, DRUG, AND COSMETIC ACT    3

The bill does this by placing in the Federal Food, Drug, and Cosmetic Act express provisions which will eliminate confusion and dissatisfaction which exist under the present rather general provisions dealing with the labeling and dispensing of drugs which may be sold only on prescription and drugs which may be sold over the counter.

The bill, as amended, is designed to solve these labeling and dispensing problems in the following ways:

1. By providing for a clear-cut method of distinguishing between "prescription" drugs (that is, drugs which are not suitable for self-medication because they should be used only under the supervision of a physician, and which therefore should be dispensed only on prescription) and "over-the-counter" drugs (that is, drugs which are suitable for self-medication, and which therefore should be permitted to be dispensed freely "over-the-counter"), and by requiring that drugs be so labeled as to indicate to the retail druggist and to the general public into which of these two classes they fall.

Under the present law, and the regulations issued thereunder, the initial responsibility is upon the manufacturer to decide whether his drug is unsuitable for self-medication and therefore must be labeled with a caution legend (that is, a warning that the drug in question may be dispensed only by or on prescription of a physician) and may be sold only on prescription, or whether his drug is suitable for self-medication and therefore must be labeled with adequate directions for use and may be sold freely over the counter. Lack of uniformity among manufacturers in interpreting the present law and regulations has led to great confusion in the labeling of drugs for prescription sale and for over-the-counter sale.

2. By expressly setting forth in the statute the restrictions applicable to the dispensing of "prescription" drugs.

At present the restrictions on dispensing "prescription" drugs are not specifically stated in the statute. As hereafter explained, they result from conditions which have been imposed by the Federal Security Administrator in connection with certain exemptions which he is authorized to grant under the present law.

3. By authorizing the filling and refilling of telephone prescriptions under appropriate safeguards.

The present law recognizes written and signed prescriptions only, in complete disregard of the need for the use of the telephone in prescribing medicines.

4. By specifying in detail the conditions under which pharmacists may refill prescriptions.

Under the present law no prescription may be lawfully refilled unless refilling is specifically authorized in writing by the prescribing physician. This makes it unlawful for the pharmacist to refill prescriptions without written authorization even for drugs which are suitable for self-medication. The bill would permit the refilling of prescriptions for such drugs without authorization from the physician. However, in the case of dangerous drugs, habit-forming drugs, and new drugs which are limited to use under medical supervision, it would prohibit refilling unless the prescribing physician specifically authorizes the refill.

**4**    AMENDING THE FEDERAL FOOD, DRUG, AND COSMETIC ACT

## COMMITTEE HEARINGS

The committee held extensive hearings on this bill. The testimony amply supports the conclusion that legislation is urgently needed and it is believed that the provisions of the bill, as amended, will further the protection of the public health by meeting the complex problems which were brought to the committee's attention in the hearings.

The committee has received communications with respect to this proposed legislation from the Federal Security Administrator, the Deputy Attorney General, and the Administrative Office of the United States Courts. These communications are printed in an appendix to this report.

## GENERAL STATEMENT

*Prescription drugs.*—There is urgent need for affirmative and clear provisions in the law to deal with the labeling of prescription drugs and the restrictions upon their sale.

The present law prohibits the over-the-counter sale of drugs labeled as being for prescription sale only, but it does this in the following indirect manner.

A drug is required by present law to bear "adequate directions for use." This requirement may be relaxed by regulations of the Federal Security Administrator when such directions are not necessary for the protection of the public health. Drugs suitable for use only by or under the direction of a licensed practitioner have been exempted from the adequate directions requirement on condition that they be labeled "Caution—To be dispensed only by or on prescription of a physician." If a druggist sells without a prescription a drug bearing this caution label, the drug is misbranded and the druggist violates the act.

The present law and regulations do not provide a satisfactory method for determining the drugs which properly fall within the prescription class. Furthermore, these matters should be regulated by specific statutory provisions rather than, as at present, largely through administrative regulations.

Under the present regulation the retail druggist is often unable to know, until the question is settled by litigation, whether a particular drug can be sold on prescription only. The regulation requires the prescription legend on drugs which are generally regarded as safe and efficacious for use only under medical supervision. All other drugs are required to bear adequate directions for use, and this means directions adequate for a layman to follow. The initial responsibility is upon the manufacturer to decide whether his drug belongs in one class or the other.

If a manufacturer decides that his drug is suitable for use only under medical supervision, and labels it with the prescription legend, it is necessary, if the Administrator disagrees on the basis of expert advice to that effect, to bring a criminal prosecution, a seizure action, or an injunction to require that the legend be taken off and adequate directions for use written. On the other hand, if the manufacturer decides that his drug is suitable for use by a layman without consulting a physician, and labels it with directions for use, but the Administrator disagrees on the basis of expert advice to that effect, an action must be

AMENDING THE FEDERAL FOOD, DRUG, AND COSMETIC ACT    5

brought charging that the drug violates either section 502 (a) by being represented falsely to be safe and effective for lay use or section 502 (j) because the drug may be dangerous to health when used as directed. Litigation, at best, is a slow process and can be directed at only one party and one product at a time. It is not a satisfactory method for establishing correct future labeling of a particular drug regardless of who manufactures it.

The practical effect of the present regulatory system has been great confusion in the use of the prescription legend. Many products of identical composition, placed on the market by different manufacturers, were shown to the committee in a practical demonstration of the druggists' dilemma. One would bear the prescription legend while another of the same composition would provide directions for use.

For example, a sample of precipitated chalk manufactured by one manufacturer was labeled with the legend:

Caution: To be dispensed only by or on the prescription of a physician, dentist, or veterinarian, or otherwise used only for manufacturing purposes. This restriction applies only to medicinal uses.

Another sample of the same drug manufactured by a different manufacturer carried the following directions for use:

Antacid—Average dose: one-quarter teaspoonful in water. May also be used as a tooth powder.

Another example involved strychnine sulfate in small doses (one-sixtieth grain). This drug manufactured by one manufacturer carried the legend:

Caution: To be dispensed only by or on the prescription of a physician.

The same drug manufactured by another manufacturer carried the following directions for use:

To improve appetite and digestion. For adults only: 1 tablet before meals. Other doses as prescribed by physician. Warning: Do not take more than 6 tablets in 24 hours.

A third example involved dehydrocholic acid. This drug manufactured by one manufacturer carried the caution legend:

To be used only by or on the prescription of the physician.

The identical drug produced by another manufacturer carried the following directions for use:

Dosage: *Adults*—1 tablet 3 times daily with or after meals. *Children*—Only under the direct supervision of a physician.
In the presence of jaundice, this product should be used only under the direction of a physician.

It should be noted that these directions for use do not state the condition for the treatment of which this particular drug is to be used.

Also presented were samples of acetophenetidin and acetophenetidin with salol which, as manufactured by one manufacturer, carried the caution legend, and as manufactured by another manufacturer carried directions for use.

Some products were shown to the committee which had something like the prescription legend and also recommended dosages. The druggist would not even know, in such a case, the class in which the manufacturer intended to place such drugs.

**6**    AMENDING THE FEDERAL FOOD, DRUG, AND COSMETIC ACT

For example, in the case of ammonium chloride (7½ grains), one manufacturer labeled this drug with a caution legend:

Caution: To be dispensed only by or on the prescription of a physician.

The same drug manufactured by another manufacturer carried the following legend:

Adult dose.—one or two tablets repeated as directed by the physician.

A second sample involved thyroid tablets. One manufacturer labeled this drug:

Caution: To be dispensed by or on the prescription of a physician. Indiscriminate use may be harmful.

Another manufacturer labeled the identical drug as follows:

Directions: To be used on advice or prescription of a physician.

It should be noted that while the "directions" refer to prescription of a physician, confusion is caused to the druggist by failing to use the standard caution legend prescribed by the regulations.

A third example involves quinidine sulfate. One manufacturer labeled this drug with the standard caution legend:

Caution: To be dispensed only by or on the prescription of a physician.

Another manufacturer labeled the same product with the following legend:

Adult dose—1 tablet as directed by the physician.

An example of three different labels for the same drug was also presented. Methenamine was labeled by the first manufacturer:

Adult dose—1 to 3 tablets as directed by the physician.

The second manufacturer labeled this product:

Caution: To be used only by or on the prescription of a physician.

The third manufacturer labeled this drug with the following directions for use:

Dose: As a urinary antiseptic, 1 tablet with a large glass of water twice a day for not longer than 7 days. Urine should be kept acid. Other dosage or uses as directed by physician.

The confusion existing under present law has resulted in inadequate protection of the public health. In a situation where the druggist is uncertain as to the drugs which may be dispensed only on prescription, it is inevitable that there have been many cases of indiscriminate and unauthorized over-the-counter sales of dangerous drugs and other drugs which should be used only under medical supervision.

The committee believes that the present public health problem in connection with the unlawful labeling and dispensing of prescription drugs exists largely because the present law is not clearly and affirmatively expressed in the statute. The overwhelming majority of drug manufacturers and pharmacists are anxious to comply with provisions of law which they can understand. In contrast with the present law, this proposed legislation will be clear and readily understood. It is believed that after this legislation is enacted the need for enforcement, through criminal action, seizure, and injunction, will arise only in the cases of a few violators who are oblivious to their obligations to society.

Under the bill, as amended, three types of drugs will be limited to prescription sale, namely, habit-forming drugs, "dangerous" drugs,

and new drugs which, under the present law, already may be limited to use under professional supervision. The confusion under present law exists primarily with respect to "dangerous" drugs, that is, those not suitable for self-medication. The bill provides a workable method by which clear determinations can be made, at the earliest practicable time, as to whether particular drugs are "dangerous" drugs. Such determinations will be made by the Federal Security Administrator on the basis of a statutory standard, and a list of such drugs will be formulated. The Administrator's determinations will be subject to judicial review.

All drugs which, by the amended bill, are restricted to prescription sale *must* carry the prescription legend: "Caution—Federal law prohibits dispensing without prescription." No other drugs will be permitted to carry this prescription label. The latter drugs, as required by the present law, must carry adequate directions for use telling the user what the drug is for and how it is to be used.

The bill, as amended, expressly provides that the drugs limited to prescription sale (when intended for human consumption) shall be dispensed only upon a written or oral prescription of a licensed practitioner. Oral prescriptions will be permissible only when promptly reduced to writing by the pharmacist and filed by him. Refilling of prescriptions will be permissible only if authorized in the original prescription or by an oral order of the licensed practitioner which is promptly reduced to writing by the pharmacist and filed by him.

This legislation will provide for certainty which is lacking under the present law and which is very important to the enforcement agency, to the retail druggist, and to the public. The committee believes that these changes in the law will impose no hardship on the reputable manufacturer and will, indeed, afford him a means of knowing, before he subjects his products to seizure and himself to prosecution, whether his drug must be labeled for prescription dispensing or for over-the-counter sale.

Certainty is important to the enforcement agency because it permits more effective enforcement through appropriate control over drugs that are too dangerous, or otherwise unsuitable, to be used by a layman without medical diagnosis or supervision. Under this proposed legislation it will be possible to *prevent* injury to the public, as contrasted with the present system which is largely concerned with punishing past violations.

*Oral prescriptions.*—Another phase of the present law which needs modification and clarification is with respect to the filling and refilling of oral, or telephone, prescriptions. The present law does not recognize the practice of dispensing drugs on oral prescription. For the convenience of the public, the retail druggist, and the physician, the committee feels that the filling and refilling of prescriptions on oral order, under proper safeguards, should be permitted. The bill, as amended, contains appropriate provisions, explained below in this report, which deal with this question.

*Refilling prescriptions.*—The Food and Drug Administration has found that a serious public-health problem exists in the indiscriminate refilling of prescriptions for dangerous and habit-forming drugs. Examples were cited in which death resulted from unauthorized refillings of prescriptions for barbiturates and benzedrine. A 45-year-old man, father of two children, was found dead in 1950 from an overdose of barbiturates obtained on a prescription written in 1945

8    AMENDING THE FEDERAL FOOD, DRUG, AND COSMETIC ACT

or 1946. Investigation revealed that the original prescription had been refilled many times without consulting the prescribing physician. The man became addicted to this habit-forming drug and shortly before his death was taking many times the therapeutic dose to satisfy his cravings. His death would not have occurred had the physician's instructions been followed.

The benzedrine death occurred in 1950, 13 years after the original prescription was written. The widow stated that the prescription had been repeatedly refilled during that time. The physician had last seen the deceased in 1937 and at that time had written a prescription for 14 10-milligram tablets. The amount dispensed in the refills had substantially increased until just before his death this man was taking as much as 25 tablets a day. The prescribing physician stated that he had not intended that the patient take more than the original 14 tablets which he prescribed.

The Food and Drug Administration has interpreted the existing law to prohibit the unauthorized refilling of prescriptions for all drugs. This interpretation, which is doubtless justified by the terms of the present law, is needlessly restrictive in making illegal the refilling of prescriptions for those drugs that can be bought over the counter without prescriptions. Furthermore, it is difficult for the enforcement official to meet the refill problem as it relates to dangerous and habit-forming drugs when that matter is not expressly dealt with in the statute.

The committee has included in the bill, as amended, express provisions, explained below in this report, to clarify the present law with respect to the refilling of prescriptions.

## DETERMINATION OF WHAT DRUGS ARE PRESCRIPTION DRUGS

### CONFLICTING LEGISLATIVE RECOMMENDATIONS

The committee was confronted with a dilemma in that the trade and professional organizations representing the different interested groups have made conflicting recommendations. The National Association of Retail Druggists, on the one hand, has urged that in the interest of achieving the greatest possible certainty for the retail druggists and the general public, the Federal Security Administrator should be vested with the power to determine on the basis of a statutory standard, but subject to judicial review, which drugs are to be sold on prescription only. The drug manufacturers, on the other hand, represented by the American Pharmaceutical Manufacturers' Association, the American Drug Manufacturers' Association, and the Proprietary Association, and those pharmacists who are represented by the American Pharmaceutical Association, have opposed the vesting of any such authority in a Federal official. They have contended that the determination of which drugs may be sold only on prescription should be left to judicial determination, on the basis of a statutory standard, in court proceedings (seizure, criminal prosecution, or injunction) instituted by the Federal enforcement officials.

### THE COMMITTEE'S DECISION

The committee has thoroughly studied the arguments adduced by both sides in favor of their respective proposals. It has come to the conclusion that administrative determination, subject to judicial

AMENDING THE FEDERAL FOOD, DRUG, AND COSMETIC ACT    9

review, gives the greatest promise of effectively relieving the retail druggists and the general public from the presently existing confusion. This decision has been made somewhat reluctantly because the committee is deeply conscious of the fact that the power to determine which drugs are prescription drugs and which are over-the-counter drugs is one which affects drug manufacturers, drug wholesalers, retail druggists, pharmacists, physicians, and, last but not least, the general public. The reasons for the committee's decision are set forth below.

### PROPOSED STATUTORY LIST

The committee studied the question of whether such a grant of power to an administrative officer could be avoided by inserting in the bill a list of drugs that may be sold on prescription only. The committee, however, has come to the conclusion that such a list could be formulated only after extensive hearings involving expert testimony with respect to each drug that might be placed on this list. Furthermore, over the years, a statutory list of prescription drugs would prove too inflexible to keep pace with the rapid changes and developments occurring in the drug field.

### CASE-BY-CASE JUDICIAL DETERMINATION

The committee gave careful consideration to the proposal of the drug manufacturers that the determination of which drugs may be sold only on prescription should be left solely to judicial determination in seizure, injunction, and criminal cases.

Testimony was presented that this case-by-case method of judicial determination would unnecessarily and unfairly involve retail druggists in court proceedings. This would come about, so the retail druggists argue, because the Federal Security Administrator would continue to have the power, which he now has and which he now exercises, to seize drugs on the shelves of retail druggists (or to institute injunction or criminal proceedings against druggists) primarily for the purpose of bringing test cases to determine whether the drugs in question are prescription drugs or over-the-counter drugs. Not infrequently, unfavorable publicity results from such seizures or court proceedings to the great damage of the druggist, injuring him not only financially but also lowering his standing in the community.

The committee feels that the institution of test cases to determine for the future whether a given drug may be sold only on prescription or may be sold over the counter does not constitute a desirable and effective use of the judicial process. Actually, in such cases, the Government would not be seeking primarily the decision of the court that a particular person had violated the law. It would be seeking a determination of the court that drug "A," for example, is too dangerous for self-medication, and that, therefore, in the future, it should be sold only on prescription, or conversely, that drug "B" which was labeled with the prescription legend, and which failed to set forth on its label proper directions for use, was actually a safe drug which could be sold over the counter.

**10**  AMENDING THE FEDERAL FOOD, DRUG, AND COSMETIC ACT

CONSIDERATIONS WHICH INFLUENCED THE COMMITTEE'S DECISION

The considerations which have influenced the committee in its decision to provide for administrative determination subject to judicial review may be summarized as follows:

First. The administrative process will involve as parties only those primarily interested, namely, the drug manufacturers. It would not involve the retail druggists, whose interest is limited to securing certainty as to how they may sell a given drug.

Second. The task of determining which drugs shall be sold only on prescription is, in its nature, essentially a legislative or rule-making function, unsuited for solution solely through the judicial process.

Third. The committee's decision is entirely consistent with the one made in 1938 when Congress gave the Administrator the authority to list habit-forming derivatives of the drugs named in section 502 (d), and it has not been suggested that that authority has been abused.

Fourth. In the opinion of the committee the judicial-review provisions afford adequate protection against arbitrary or legally unjustified action on the part of the Administrator. This particular phase is discussed below in greater detail under the heading "Judicial review."

Fifth. If the proposal of the drug manufacturers were adopted, great confusion might result from conflicting court decisions with respect to the same drug in different jurisdictions. One United States district court might hold that a given drug was dangerous, judged by the statutory standard, while another district court might hold the opposite. There are more than 80 United States district courts. Even if all of the cases were tried without juries, it would be almost beyond the realm of possibility that uniformity could be obtained. With the vagaries of the jury system, it is believed that uniformity of decisions would be wholly impossible. One firm might obtain a judgment favorable to it that a particular drug was safe for over-the-counter sale, while others in the industry were required to limit it to prescription sale.

From a public-health standpoint, the users of drugs should not be subjected to the hazards of delay incident to litigation. A recent hormone case, decided in favor of the Government by the United States Court of Appeals for the Ninth Circuit, took more than 2 years in litigation in order to limit the drug to prescription use under existing law. The drug was capable of causing accelerated growth of cancer of the prostate, a condition not uncommon in the fifties and sixties. While the litigation was in progress irreparable injury was done. Under the suggestion to use the case-by-case method of judicial determination, the druggist, on whom the burden of prosecution would fall most directly, would be in a very difficult position. He would have to determine at his risk whether a drug which the manufacturer had labeled with directions for use for over-the-counter sale had been correctly classified. He would follow the label only at his peril.

Finally, it is difficult to understand why the drug manufacturers themselves should prefer to have their products seized or to be proceeded against in criminal cases merely toward the end of securing a determination as to whether a particular drug is or is not a prescription drug.

AMENDING THE FEDERAL FOOD, DRUG, AND COSMETIC ACT    11

### LIMITATIONS ON ADMINISTRATOR'S POWERS

The committee recognizes that the Federal Security Administrator is not, and should not be expected to be, an expert qualified to decide which drugs should be sold on prescription only and which should be sold freely over the counter.   Therefore, in the bill, as amended, the committee has provided that the Administrator is to make this determination on the basis of a statutory standard.   The standard which he is to apply is essentially the same standard presently contained in the regulations of the Federal Security Administrator promulgated under section 502 (f) of the Federal Food, Drug, and Cosmetic Act.   That standard has been accepted by the drug trade as proper and adequate, and representatives of drug manufacturers, appearing before the committee, urged that it be written into the law as the basis for case-by-case judicial determinations.

Under this standard a drug will be adjudged a prescription drug if because of its toxicity or any other potentiality for harmful effect, or the method of its use, or the collateral measures necessary to its use, it is unsafe or inefficacious for use without professional supervision. In applying this standard to a given drug, the Administrator is directed to follow the opinions generally held among experts qualified by scientific training and experience to evaluate the safety and efficacy of the drug in question.   If any interested party desires a public hearing on whether a particular determination by the Administrator on that basis is justified, he may demand such a hearing.   At the hearing the evidence taken will be evidence presented by qualified experts. The Administrator must base his action, after the hearing, on the testimony given by such experts, not on his own personal views.   In short, the committee amendment, in effect, places the Federal Security Administrator in the role of collecting informed medical opinions and, in either placing the drug on the prescription list or deciding that the drug is suitable for over-the-counter sale, he merely reflects the opinions generally held among medical experts.

By incorporating this standard in the law and by specifying the process to be used by the Administrator in applying it, the committee believes it has achieved a practical and equitable solution of the dilemma in which it found itself as a result of the conflicting legislative recommendations submitted by the trade and professional organizations in the drug field.

### EFFICACY OF DRUGS

The standard which the bill, as amended, would write into the law (subparagraph (B) of paragraph (b) (1) of the amendment) contains the words "efficacy" and "efficacious."   The use of these words has given rise to some apprehension, particularly on the part of manufacturers of proprietary drugs (patent medicines), that the Federal Security Administrator might have the power to determine which drugs are "efficacious" or "effective" and which are not.   It may be stated unequivocally that this provision is not intended to grant any such power to the Administrator, nor does it lend itself in any way to such an interpretation.

**12**  AMENDING THE FEDERAL FOOD, DRUG, AND COSMETIC ACT

The provision provides for a determination by the Administrator whether a given drug—

on the basis of opinions generally held among experts qualified by scientific experience to evaluate the safety and efficacy of such drugs  *  *  *  [is]  *  *  *  safe and efficacious for use only after professional diagnosis by, or under the supervision of, a practitioner licensed by law to administer such drug;  *  *  *.

The question to be determined by the Administrator on the basis of expert opinion, therefore, is not whether a drug is efficacious but whether it can be used efficaciously without professional diagnosis or supervision.

The provision assumes that the drug is effective in the hands of a physician, and the reason for putting it on the prescription list is that it is only effective when used under professional supervision.

For example, no qualified person questions the efficacy of quinidine sulfate in the treatment of certain heart diseases. However, in view of the serious nature of the disease and the necessity of adjusting the dose to the individual patient's need, the drug obviously cannot be used with efficacy except when used under professional supervision. While the drug is not dangerously toxic, the user may nevertheless die if in the course of self-medication he should fail to take a dose which is suited to his individual needs.

### JUDICIAL REVIEW

A determination by the Administrator, though based on expert testimony, will be reviewable by the courts. By making applicable the provisions of section 701 (f) and (g) of present law, the amended bill will insure that any interested person may obtain judicial review by a United States court of appeals and, upon certiorari, by the Supreme Court of the United States.

The reviewing court will have power to set aside the Administrator's order if it is not in accordance with law, and the Administrator's findings as to the facts will be conclusive only if supported by reliable, probative, and substantial evidence on the record considered as a whole.

The bill, as introduced, proposed to permit any interested person dissatisfied with a determination of the Administrator to secure judicial review in the nature of a trial de novo in a court of appeals of the United States. This provision was intended to give to an aggrieved party the greatest possible insurance of fairness and justice. However, the committee is convinced that no matter how well intended, this proposal was impractical.

The committee came to this conclusion largely on the basis of the very earnest presentation made by the Honorable Harold M. Stephens, Chief Judge of the United States Court of Appeals for the District of Columbia Circuit, speaking on behalf of, and by direction of, the Judicial Conference of the United States. The gist of Judge Stephens' testimony was that the needs of the United States courts demand that the judicial review of administrative determinations be limited to a review of whether the administrative determination is based on reliable, probative, and substantial evidence considering the whole record made before the administrative agency. This is the extent and character of review provided for under the provisions of the Administrative Procedure Act, enacted in 1946.

AMENDING THE FEDERAL FOOD, DRUG, AND COSMETIC ACT     **13**

It was pointed out by Judge Stephens that the United States courts of appeals are appellate courts and not trial courts, and that such courts for several reasons are not equipped to handle trials. First, the United States courts of appeals are three-judge courts. It has been the experience of the United States courts that trials are conducted more efficiently by single judges than by three or more judges. Questions involving the admissibility of evidence, for example, have to be determined frequently and promptly in the course of a trial. While a single judge can rule on these questions as they occur without delay, three judges would have to confer on each issue as it was raised and such conferences involve necessarily delay, thus making the trial a cumbersome affair. Furthermore, United States courts of appeals, being appellate courts rather than trial courts, do not have jury boxes in their courtrooms, do not have jury lists, and do not have jury rooms. All of these considerations militate against providing for de novo trials in United States courts of appeals.

If, on the other hand, the district courts of the United States were to be required to determine the validity of administrative determinations in all instances on the basis of de novo trials, such a great additional burden would be placed upon these courts that the number of Federal district court judges would have to be greatly increased.

Furthermore, Judge Stephens pointed out with great emphasis that recent decisions of the Supreme Court of the United States (*Universal Camera Corp.* v. *N. L. R. B.* and *Labor Board* v. *Pittsburgh S. S. Co.*, decided February 26, 1951) insure that the ordinary and usual type of judicial review of administrative action (which is the type provided for by this bill, as amended, and by the Administrative Procedure Act) affords full protection against arbitrary or legally unjustified action by administrative officials.

In addition to the foregoing objections to the proposal to provide for judicial review in a trial de novo, it is believed that the proposal might be unconstitutional on the ground that it would seek to have Federal "constitutional" courts exercise a function which is essentially legislative or administrative, rather than judicial. This point is discussed in the letters from the Deputy Attorney General and the Federal Security Administrator printed in the appendix to this report.

ORAL PRESCRIPTIONS

The bill, as amended, contains provisions which give statutory recognition to the frequent practice engaged in by physicians of using the telephone to transmit prescriptions to a pharmacist. The use of the telephone in prescribing medicines is of great convenience to the users of such medicines and is, in some areas of this country, essential to the public health. The statutory recognition of oral prescriptions proposed by the bill does away with the unrealistic provisions of the present Federal Food, Drug, and Cosmetic Act which recognizes a written and signed prescription only. The committee amendment would permit the use of oral prescriptions in the case of all drugs. However, in case of habit-forming drugs, dangerous drugs, or new drugs which are limited to prescriptions, an oral prescription would have to be reduced promptly to writing and filed by the pharmacist.

**14**   AMENDING THE FEDERAL FOOD, DRUG, AND COSMETIC ACT

The committee gave serious consideration to whether it was desirable to place additional safeguards on oral prescriptions. However, it was determined that the admittedly limited safeguards provided for in the committee amendment would be adequate until the need for more rigid requirements has been proven by experience.

If the committee amendment is enacted into law, it is hoped that the Commissioner of Food and Drugs will observe closely the effect of the provisions with respect to oral prescriptions and will report to the responsible committees of both Houses any abuses that might develop as a consequence of the relaxation of the written prescription requirement now contained in the Federal Food, Drug, and Cosmetic Act.

### REFILLING PRESCRIPTIONS

The bill, as amended, deals expressly with the troublesome problem of refilling prescriptions. Under the present law a drug dispensed on a "written prescription, signed by a physician," is entitled to certain limited exemptions from the labeling requirements that ordinarily apply to drugs. Through the force of these exemptions, drugs sold on written prescriptions are not misbranded even though they fail to meet the labeling requirements of the act. The Food and Drug Administration, relying upon its understanding of what is meant by a "written prescription," has taken the position that a drug dispensed by refilling a prescription without the knowledge or consent of the prescriber is not dispensed on prescription and thus is not exempt from the labeling provisions of the act. Without such exemption, the drug is misbranded by dispensing it without the prescriber's authorization.

This administrative position meets the public health problems found to exist by reason of the indiscriminate and unauthorized refilling of prescriptions for dangerous drugs and for other drugs that require medical supervision for their effective use. Some drugs, such as amphetamine (benzedrine) and the barbiturates, are desired by addicts and others for nonmedical use. The records of the Food and Drug Administration contain the stories of broken homes and human derelicts that the improper use of these drugs has caused. Other drugs in the prescription-only class may cause irreparable injury before the user knows that the drug is having any physiological effect upon him. But the present law, interpreted to reach these abuses existing in connection with the refilling of prescriptions, also prohibits the refilling of prescriptions for drugs that are not dangerous and are entirely suitable for use by a layman without medical supervision. Furthermore, if the refilling of prescriptions for dangerous drugs and drugs which require medical supervision in their use is to be controlled, the statute itself should contain express provisions providing for such controls.

The bill, as amended, meets this situation by providing that when drugs are prescribed which are safe and effective for lay use without medical supervision, and which could be bought freely over the counter without a prescription, the prescriptions may be freely refilled. But as to drugs which are habit-forming, or which are safe and efficacious only after medical diagnosis has been made or when medical supervision is exercised, and as to drugs which are restricted by new drug applications to use under medical supervision, the bill provides that

AMENDING THE FEDERAL FOOD, DRUG, AND COSMETIC ACT    **15**

prescriptions cannot be refilled unless the prescriber has expressly authorized the refill. This authorization may be either written or oral, but if it is given orally the dispenser must promptly reduce the authorization to writing and file it.

## SECTION BY SECTION EXPLANATION OF THE BILL, AS AMENDED

### SECTION 1. AMENDMENT TO EXISTING LAW

The first section of the bill, as amended, proposes to rewrite section 503 (b) of the present law. At the present time, section 503 (b) merely provides for an exemption from certain labeling requirements in the case of drugs dispensed on written prescription. As proposed to be rewritten, section 503 (b) would contain paragraphs (1) to (6), inclusive, which are explained below:

*Paragraph (1)—Prohibited acts*

This paragraph provides that three types of drugs which are intended for human consumption shall be dispensed only under the following conditions:

    (i) Upon a written prescription of a practitioner licensed by law to administer the drug, or

    (ii) Upon an oral prescription of such practitioner which is reduced promptly to writing by the pharmacist and filed by him, or

    (iii) By refilling any such written or oral prescription if such refilling is authorized by the prescriber either in the original prescription or by an oral order which is reduced promptly to writing by the pharmacist and filed by him.

The types of drugs to which these requirements are made applicable are specified in three subparagraphs, designated (A), (B), and (C).

Subparagraph (A) covers habit-forming drugs. Subparagraph (C) covers any new drug which, under other provisions of the act, is limited to use under professional supervision. No controversy has arisen as to these provisions.

Subparagraph (B) covers "dangerous" drugs, and describes them as any drug which—

because of its toxicity or other potentiality for harmful effect, or the method of its use, or the collateral measures necessary to its use, has been determined by the Administrator * * * to be safe and efficacious for use only after professional diagnosis by, or under the supervision of, a practitioner licensed by law to administer such drug.

The standard here used is essentially the same as that used in regulations heretofore prescribed under the act. As used in such regulations the standard has been generally acceptable to the drug industry as shown in the testimony before the committee.

Subparagraph (B) provides that the Federal Security Administrator will have the duty of determining (on the basis of opinions generally held among qualified experts) the specific drugs covered by the standard, his determination being subject to judicial review as provided in paragraph (5).

Paragraph (1) provides that the act of dispensing a drug contrary to its provisions shall be deemed to be an act which results in the drug being misbranded while held for sale. The effect of this provision is to

**16    AMENDING THE FEDERAL FOOD, DRUG, AND COSMETIC ACT**

make criminal, injunction, and seizure provisions of the act applicable to the dispensing of a drug in violation of the provisions of paragraph (1).

*Paragraph (2)—Exemption from labeling requirements*

This paragraph exempts drugs dispensed by filling or refilling a written or oral prescription of a licensed practitioner from most of the labeling and packaging requirements which ordinarily apply to drugs. To get the exemption, the container in which the prescription medicine is dispensed must bear a label containing the name and address of the dispenser, the serial number and date of the prescription or of its filling, the name of the prescriber, and, if stated in the prescription, the name of the patient, and the directions for use and cautionary statements, if any, contained in the prescription.

The exemption does not relax the prohibition against false or misleading labeling, the prohibition against selling an imitation drug, or offering a drug for sale under the name of another drug; nor does the exemption change the requirement that any drug containing insulin, penicillin, streptomycin, aureomycin, chloramphenicol, or bacitracin must be pretested and certified, or the requirement that any official drug must be packaged as required by the official compendium, or that any drug liable to deterioration must be packaged in accordance with regulations established under existing law.   The exemption will not be applicable to any drug dispensed in the course of the conduct of the business of dispensing drugs pursuant to diagnosis by mail or otherwise without examination of the patient.   The latter provision follows the existing law.

It is provided in paragraph (2) that the exemption provided thereby shall not apply to habit-forming, dangerous, and new drugs dispensed in violation of the prescription requirements of paragraph (1).

*Paragraph (3)—Exemption from prescription requirements*

This paragraph permits the Administrator by regulations to remove habit-forming and new drugs from the prescription requirement of paragraph (1) when that requirement is not necessary for the protection of the public health.   These drugs are the ones covered by subparagraphs (A) and (C) of paragraph (1).   This relaxation is necessary to permit the sale without prescription of drugs containing small amounts of habit-forming drugs as components, and to permit the sale of new drugs without prescription when that safeguard is unnecessary.

*Paragraph (4)—Labeling of prescription drugs and over-the-counter drugs*

This paragraph requires that any drug to which paragraph (1) applies must bear on its label the statement "Caution: Federal law prohibits dispensing without prescription." It also provides that a drug to which paragraph (1) does not apply shall be deemed to be misbranded if at any time prior to dispensing its label bears any statement which represents or implies that the dispensing of the drug without the prescription of a licensed practitioner is prohibited.

*Paragraph (5)—Hearings and judicial review*

This paragraph deals with the procedure to be followed in a case where an interested party desires to secure a formal hearing or judicial review with respect to a determination by the Administrator as to whether a drug is a "dangerous" drug according to the standard contained in subparagraph (B) of paragraph (1). This procedure is made available to contest either a proposed determination by the Administrator, to seek a determination that a drug which has already been listed should be removed from the list, or to seek to have placed on the list a drug which is not on the list.

For any of these purposes an interested person may file a petition with the Administrator. Where the petition is for the purpose of opposing a proposed determination that a drug is "dangerous", the filing of a petition will stay the operation of paragraph (1) with respect to the drug until a petition for judicial review can be filed, and interim relief sought, under section 10 (d) of the Administrative Procedure Act. This provision, together with the procedural safeguards of the Administrative Procedure Act, will insure that the Administrator cannot place a drug on the list until interested persons have had full opportunity to test the validity of the Administrator's action.

When a petition is filed stating reasonable grounds, the Administrator will be under a duty to give public notice of the proposal made in the petition and to give all interested persons a reasonable opportunity to present their views, orally or in writing, and it will be his duty to act on the petition as soon as is practicable. Any interested person who is dissatisfied with the Administrator's action may (if he files an objection to such action, stating reasonable grounds therefor, within 30 days after it is made public) demand and secure a public hearing before the Administrator for the taking of evidence of experts who are qualified by scientific training and experience to testify on the question of whether the drug in question is safe and efficacious for use only after professional diagnosis by, or under the supervision of, a practitioner licensed by law to administer the drug. As soon as practicable after the hearing, the Administrator must issue an appropriate order. The Administrator may make his order only after consideration of the whole record and in accordance with reliable, probative, and substantial evidence, and he will be required to make detailed findings of the facts on which he based his order.

The order of the Administrator will be subject to judicial review in accordance with the provisions of section 701 (f) and (g) of the Federal Food, Drug, and Cosmetic Act. These are the judicial review provisions which are now applicable to the review of orders issued under certain other provisions of the act. Such review will be by the appropriate circuit court of appeals of the United States, and may be had upon the filing of a petition with the court at any time prior to the ninetieth day after the issuance of the order by the Administrator. Review will be upon the basis of the "substantial evidence" rule which is the generally applicable provision for judicial review contained in the Administrative Procedure Act.

18    AMENDING THE FEDERAL FOOD, DRUG, AND COSMETIC ACT

*Paragraph (6)—Narcotics laws unaffected*

This paragraph provides that nothing in subsection (b) shall be construed to relieve any person from any requirement prescribed by or under law with respect to narcotics or marihuana.

### SECTION 2. EFFECTIVE DATE

This section of the bill provides that its provisions shall take effect 6 months after the date of its enactment into law.    This postponement of the effective date of the legislation is deemed to be necessary in order that the Administrator will have time to take steps, before the legislation takes effect, with a view to determining which drugs are "dangerous" under the standard prescribed in subparagraph (B) of section 503 (b) (1).

## CHANGES IN EXISTING LAW

In compliance with paragraph 2a of rule XIII of the Rules of the House of Representatives, changes in existing law made by the bill, as introduced, are shown as follows (existing law proposed to be omitted is enclosed in black brackets, new matter is printed in italics, existing law in which no change is proposed is shown in roman):

### SECTION 503 OF THE FEDERAL FOOD, DRUG, AND COSMETIC ACT

#### EXEMPTIONS IN CASE OF DRUGS AND DEVICES

SEC. 503. (a) The Administrator is hereby directed to promulgate regulations exempting from any labeling or packing requirement of this Act drugs and devices which are, in accordance with the practice of the trade, to be processed, labeled, or repacked in substantial quantities at establishments other than those where originally processed or packed, on condition that such drugs and devices are not adulterated or misbranded under the provisions of this Act upon removal from such processing, labeling, or repacking establishment.

[(b) A drug dispensed on a written prescription signed by a physician, dentist, or veterinarian (except a drug dispensed in the course of the conduct of a business of dispensing drugs pursuant to diagnosis by mail), shall if—

[(1) such physician, dentist, or veterinarian is licensed by law to administer such drug, and

[(2) such drug bears a label containing the name and place of business of the dispenser, the serial number and date of such prescription, and the name of such physician, dentist, or veterinarian,

be exempt from the requirements of section 502 (b) and (e), and (in case such prescription is marked by the writer thereof as not refillable or its refilling is prohibited by law) of section 502 (d).]

*(b) A drug dispensed by filling or refilling a written or oral prescription of a practitioner licensed by law to administer such drug shall be exempt from the requirements of section 502, except paragraphs (a), (i) (2) and (3), (k), and (l), and the packaging requirements of paragraphs (g) and (h), if the drug bears a label containing the name and address of the dispenser, the serial number and date of the prescription, or of its filling, the name of the prescriber, and, if stated in the prescription, the name of the patient, and the directions for use and cautionary statements, if any, contained in such prescription.    This exemption shall not apply to any drug dispensed in the course of the conduct of a business of dispensing drugs pursuant to diagnosis by mail or otherwise without examination of the patient.    If the drug is intended for use by man and—*

*(1) is a habit-forming drug subject to the regulations prescribed under section 502 (d);*

*(2) has been found by the Administrator, after investigation and opportunity for public hearing, to be unsafe or ineffective for use without the professional diagnosis or supervision of a practitioner licensed by law;*

AMENDING THE FEDERAL FOOD, DRUG, AND COSMETIC ACT    **19**

*(5) if an effective application under section 505 limits it to use under the professional supervision of a practitioner licensed by law, such exemption shall apply only if such drug is dispensed upon a written prescription of a practitioner licensed by law to administer such drug or upon an oral prescription of such practitioner which is reduced to writing and filed by the pharmacist, or is dispensed by refilling a prescription if such refilling is authorized by the prescriber in the original prescription or by oral order and such order is reduced to writing and filed by the pharmacist.*

*The Administrator may by regulation remove drugs subject to section 502 (d) and section 505 from the provision of this subsection when such requirements are not necessary for the protection of the public health.*

*A drug which is subject to clause (1), (2), or (5) of this subsection shall be deemed to be misbranded if at any time prior to dispensing its label fails to bear the statement "Caution: Federal law prohibits sale or dispensing without prescription".*

*The act of dispensing a drug contrary to the provisions of this subsection shall be deemed to be an act which results in the drug's being misbranded while held for sale.*

*Any interested person may file with the Administrator a petition proposing the addition to, or deletion from, the list of drugs promulgated by the Administrator in accordance with clause (2) hereof. Such petition shall set forth the proposal in general terms and shall state reasonable grounds therefor. The Administrator shall give public notice of the proposal and an opportunity for all interested persons to present their views thereon, orally or in writing, and as soon as practicable thereafter shall make public his action upon such proposal. At any time prior to the thirtieth day after such action is made public any interested person may file objections to such action, specifying with particularity the changes desired, stating reasonable grounds therefor and requesting a public hearing upon such objections. The Administrator shall thereupon, after due notice, hold such public hearing. As soon as practicable after completion of the hearing, the Administrator shall by order make public his action on such objections.*

*An order so issued by the Administrator may, within ninety days after its issuance, be appealed by any interested person in accordance with the provisions prescribed in section 701 (f) and (g) of this Act, except that an appeal from the Administrator's order issued hereunder shall be in the nature of a trial de novo, without presumptions in favor of either party to such appeal.*

*The provisions of this section shall not be applicable to drugs now included or which may hereafter be included within the classifications stated in section 3220 of the Internal Revenue Code (26 U. S. C. 3220), or to marijuana as defined in section 3238 (b) of the Internal Revenue Code (26 U. S. C. 328 (b)).*

**20**   AMENDING THE FEDERAL FOOD, DRUG, AND COSMETIC ACT

APPENDIX

FEDERAL SECURITY AGENCY,
*Washington, April 30, 1951.*

Hon. ROBERT CROSSER,
*Chairman, Committee on Interstate and Foreign Commerce,*
*House of Representatives, Washington 25, D. C.*

DEAR MR. CHAIRMAN: This letter is in response to your request of March 21, 1951, for a report on H. R. 3298, a bill to amend section 503 (b) of the Federal Food, Drug, and Cosmetic Act.

This bill is in substantially the same form as that introduced as H. R. 8904 in the Eighty-first Congress, second session, which this Agency endorsed. Section 503 (b) of the present law recognizes only written prescriptions, whereas the section as amended by the bill would recognize oral prescriptions as well, with the safeguard under certain circumstances that the pharmacist reduce the oral order to writing and file it. The present law does not provide a clear differentiation between those drugs which should be dispensed solely on prescription and those which may be sold over the counter. It is the intent of the bill to supply this deficiency by requiring the dispensing on prescription only of specified habit-forming drugs and those specifically designated in regulations or new drug applications which cannot be safely and effectively used without professional diagnosis and supervision. The bill provides that the labels of such drugs bear a caution against dispensing without prescription.

This Agency is sympathetic to the purposes of the bill. It would clarify the obligations of pharmacists, would promote the operations of all on the high standards now followed by the majority, and would afford better protection to the public health than the present law against abuses by a minority in dispensing highly potent drugs by over-the-counter sales or by refilling prescriptions without the knowledge and approval of the prescriber.

The bill contains, however, three new paragraphs beginning at line 15 of page 3 and continuing to line 14 of page 4. The most significant feature of the new paragraphs is a "trial de novo" (lines 12–14 on p. 4) in a United States court of appeals on appeals from the Administrator's orders. An outline of the procedure leading up to the proposed "trial de novo" is relevant. Clause (2) of new section 503 (b) requires that an opportunity for public hearing be afforded before the Administrator promulgates a list of drugs that are unsafe or ineffective for use without professional diagnosis and supervision and thus must therefore be dispensed only on prescription. This public hearing, it would seem, may be held under the informal rule-making procedure of section 4 of the Administrative Procedure Act. No appeal would lie at this stage from the resulting action of the Administrator (see Administrative Procedure Act, sec. 10).

The last paragraph on page 3 of the bill provides for a formal hearing and judicial review when any interested party disagrees with the order of the Administrator issued under clause 2. The procedural steps provided are as follows: (1) Any interested person may file a petition setting forth the proposal for addition to or deletion from the list of drugs, with a statement of reasonable grounds. (2) Public notice of the proposal and an opportunity to present views by interested parties are given. (3) A decision of the Administrator with respect to that proposal is made. (4) Objections to the decision may be filed within 30 days, with a request for a public hearing on such objections. (5) A hearing on the objections is held. The formal hearing provisions of sections 7 and 8 of the Administrative Procedure Act would apparently apply to that hearing. (6) An order is issued. This order is subject to judicial review in accordance with section 701 (f) and (g) of the Food and Drug Act, except that such review shall be "in the nature of a trial de novo, without presumptions in favor of either party to such appeal."

These provisions are in general patterned after section 507 (f) (21 U. S. C. 357 (f)) relating to the certification of antibiotic drugs. The Administrator's order with respect to objections filed by interested parties concerning his regulations under section 507 (f) is subject to the provisions of section 701 (f) and (g) (21 U. S. C. 371 (f) and (g)). Section 701 (f) provides that the findings of the Administrator as to the facts, if supported by substantial evidence, shall be conclusive. But the bill expands the scope of review. The bill directs that the "appeal" is to be in the nature of a "trial de novo" without presumptions in favor of either party to such appeal. The concept of a "trial de novo" at the appellate level departs radically from legislation governing the review of rules and regulations issued by administrative agencies, and goes beyond the require-

ments of the Administrative Procedure Act which was intended to bring uniformity to administrative proceedings and their judicial review. The scope of judicial review now embodied in section 10 (e) of the Administrative Procedure Act is that agency action shall be upheld where it is supported by "substantial evidence," but the court is directed to review the whole record in determining whether the evidence is substantial. This provision has recently been examined by the Supreme Court in *Universal Camera Corp.* v. *National Labor Relations Board*, decided February 26, 1951. The specific provision to this effect in section 701 (f) of the Federal Food, Drug, and Cosmetic Act, and its conformity to the Administrative Procedure Act, was judicially approved in *Willapoint Oysters* v. *Ewing* (174 F. 2d 676, cert. den. 338 U. S. 860).

The proposed bill, in contrast, would extend the function of the reviewing court beyond that contemplated by the Administrative Procedure Act. The appellate court in a "trial de novo" would become a trier of facts with respect to difficult questions of drug action, questions which are not at all suited for judicial determination but which require expert scientific knowledge for informed judgment. The determination of such a question is peculiarly within the expert competence of an administrative agency yet the court would be expressly enjoined to attach no "presumptions" to its action, i. e., to give no weight to it. The Administrative Procedure Act has recognized the principle of deference to administrative expertise by providing for review as to the legal sufficiency of the evidence presented in support of a regulation, not a complete and needless retrial of the facts in an appellate court.[1]

There is serious question, moreover, as to the propriety of conferring the power to make a determination that is essentially legislative upon a "constitutional court." This was declared objectionable by the Supreme Court in *Federal Radio Commission* v. *General Electric Co.* (281 U. S. 464 (1930)) and in the cases there cited. In the General Electric case, the Radio Act of 1927 had authorized the court of appeals, after decision by the Commission, to take additional evidence, hear, review, and determine the appeal upon the record and the evidence, and alter or revise the decision appealed from—in short, a review de novo. While the opinion acknowledged that Congress may make the Court of Appeals for the District of Columbia a "superior and revising" agency, it concluded that the Supreme Court could not be invested with similar powers. In this connection, it should be noted that section 701 (f) (4) of the Food and Drug Act, which is incorporated in the bill by reference, would confer jurisdiction on the Supreme Court to review decisions of the courts of appeals. Moreover, under the bill proceedings for judicial review could be filed in the court of appeals for the circuit in which the petitioner resides or has his principal place of business, which, in most cases, would be outside the District of Columbia. Such other courts of appeals, being "constitutional courts," would be subject to the same disability in this respect as the Supreme Court.

The legislative history of the present act reveals that Congress was confronted with a similar problem as to the scope of review of administrative regulations and rejected the solution now proposed. As reported out with an amendment by the House Committee on Interstate and Foreign Commerce after passage by the Senate, S. 5, Seventy-fifth Congress, contained a special review provision in section 701 (f) permitting anyone appealing from a regulation to adduce additional evidence before a district court, and further providing that the court might take such further action as "justice may require" (H. Rept. No. 2139, 75th Cong., 3d sess., pp. 11–12). The Supreme Court, in *Federal Security Administrator* v. *Quaker Oats Co.* (318 U. S. 218 (1943)) explained the elimination of this provision:

"* * * before enactment, the conference committee substituted for these provisions those which became section 701 (f) of the act. While under that section the Administrator's regulations must be supported by findings based upon 'substantial evidence' adduced at the hearing, the Administrator's findings as to the facts if based on substantial evidence are conclusive. In explaining these changes the chairman of the House conferees stated on the floor of the House that 'there is no purpose that the court shall exercise the functions that belong to the executive or the legislative branches' (83 Congressional Record, p. 9096)."

The conference committee further noted, with respect to the review provided in section 701 (f) (S. Rept. No. 2716, 75th Cong., 3d sess.):

"The type of judicial review provided in the agreement is as broad as the Constitution permits in the case of review by a constitutional court. It is to be noted that the function of the Secretary in making regulations and orders to

---

[1] In any event, the use of the word "trial" in the bill is in itself a misnomer. In all probability the drafters intended to have a review on the record and not a trial de novo.

**22**   AMENDING THE FEDERAL FOOD, DRUG, AND COSMETIC ACT

carry them out is legislative in character * * *. Judicial review of the Secretary's action to determine if there was substantial evidence to support the finding, and of course, upon constitutional questions, may be had."

To permit a review by trial de novo at the level of the court of appeals would not only impede and hamper the enforcement program with respect to the most dangerous drugs, but would burden these courts with a legislative function which, it appears likely, they may not constitutionally be called upon to perform.

This bill also authorizes oral prescriptions which are reduced to writing and filed by the pharmacist.   It does not require that the physician confirm or agree to confirm the prescription in writing.   In this, it departs from the bill which we previously endorsed.   We believe that at the very least the physician should agree to confirm his oral prescriptions in writing within 72 hours, and that he should not be entirely freed from his responsibility to confirm because the pharmacist reduced the telephone order to writing.

We therefore recommend that the bill, with the above-suggested amendment, with the deletion of the excepting provision in lines 12–14 on page 4, and with certain clarifications and technical amendments which we should like to suggest at the appropriate time, be enacted by the Congress.

The Bureau of the Budget advises that there is no objection to the submission of this report to your committee.

Sincerely yours,

OSCAR R. EWING, *Administrator.*

---

APRIL 30, 1951.

Hon. ROBERT CROSSER,
  *Chairman, Committee on Interstate and Foreign Commerce,*
  *House of Representatives, Washington, D. C.*

MY DEAR MR. CHAIRMAN: This is in response to your request for the views of the Department of Justice concerning the bill (H. R. 3298) to amend section 503 (b) of the Federal Food, Drug, and Cosmetic Act.

Section 502 of the Federal Food, Drug, and Cosmetic Act (21 U. S. C. 352) sets forth the various circumstances under which drugs and devices will be deemed to be misbranded.   Section 503 (b) (21 U. S. C. 353 (b) ) specifies certain exemptions with respect to drugs dispensed on written prescriptions.

The bill would amend section 503 (b) so as to provide that a drug dispensed by filling or refilling a written or oral prescription shall be exempt from the requirements of section 502, except with respect to certain packaging requirements and those provisions of the section which provide that a drug shall be deemed to be misbranded if its labeling is false or misleading in any particular or if it is an imitation of another drug or if it is offered for sale under the name of another drug, and except with respect to the provisions of the act dealing with insulin and the various antibiotics covered by the statute.   The measure provides, however, that such exemption shall prevail only if the drug bears a label containing the name and address of the dispenser, the serial number and date of the prescription or of its filling, the name of the prescriber and, if stated in the prescription, the name of the patient, and the directions for use and cautionary statements, if any, contained in the prescription.

Separate provision is made if the drug is intended for use by man, and is (1) a habit-forming drug subject to the regulations prescribed under section 502 (d) (21 U. S. C. 352 (d)), or (2) has been found by the Federal Security Administrator to be unsafe or ineffective for use without the professional diagnosis or supervision of a practitioner licensed by law, or (3) if an effective new drug application under section 505 (21 U. S. C. 355) limits it to use under the professional supervision of a licensed practitioner.   In such event the exemption is to apply only if the drug is dispensed upon a written prescription or upon an oral prescription which is reduced to writing and filed by the pharmacist, or is dispensed by refilling a prescription if such refilling is authorized by the prescriber in the original prescription or the oral order and such order is reduced to writing and filed by the pharmacist. A drug which falls within the three categories mentioned immediately above will be misbranded if at any time prior to its being dispensed its label fails to bear the statement "Caution: Federal law prohibits sale or dispensing without prescription."

The bill also provides that the act of dispensing the drug contrary to the provisions of the bill shall be deemed to be an act which results in the drug's being misbranded while held for sale.   This would insert into the Federal Food, Drug, and Cosmetic Act the theory, based on regulations, pursuant to which the Food and Drug Administration has recommended prosecution of druggists who sell,

AMENDING THE FEDERAL FOOD, DRUG, AND COSMETIC ACT    **23**

without prescriptions, drugs bearing the so-called prescription legend and which have not been removed from the immediate containers in which they were shipped in interstate commerce. Such a sale by a druggist would be in violation of section 301 (k) (21 U. S. C. 331 (k)).

The bill also provides a procedure whereby any interested person may file a petition with the Federal Security Administrator proposing the addition to or deletion from the list of drugs found to be unsafe or ineffective for use in accordance with clause (2) of section 503 (b). Upon the filing of such a petition, the Administrator is required to give public notice of the proposal and a hearing thereon, and as soon as practicable thereafter shall make public his action upon such proposal. Any interested person may file objections to such action and request a public hearing upon such objections. The Administrator shall thereupon after due notice hold such public hearing and as soon as practicable thereafter by order make public his action on such objections. The order of the Administrator may within 90 days after its issuance be appealed to the court of appeals in accordance with the provisions prescribed in section 701 (f) and (g) of the Act (21 U. S. C. 371 (f) and (g)), except that such appeal shall be in the nature of a trial de novo without presumptions in favor of either party to such appeal.

The bill also provides that its provisions shall not apply to drugs now included or which may hereafter be included within the classification stated in section 3220 of the Internal Revenue Code or to marijuana as defined in section 3238 (b) thereof.

Whether the bill should be enacted involves a question of policy concerning which this Department prefers not to make any recommendation. There are certain features of the measure, however, concerning which the committee may wish to give further consideration.

The bill provides for two public hearings in connection with a proposal for the addition to or deletion from the list of drugs found to be unsafe in accordance with the provisions of clause 2. A public hearing is provided for on the original proposal, and again provided for in connection with objections to the action of the Administrator upon the proposal. It would seem that the one public hearing on the original proposal would be sufficient.

The bill also provides for an appeal from the order of the Administrator. It is assumed that the order referred to is that made after the public hearing on the objections to the previous action of the Administrator. The review proceeding is to be in accordance with the provisions of section 701 (f) and (g) of the act, except that the appeal shall be in the nature of a trial de novo. It will be noted, however, that the review proceedings in section 701 are confined to questions of law. The court is given jurisdiction to affirm the order complained of or to set it aside in whole or in part. If the order refuses to issue, amend, or repeal a regulation and such order is not in accordance with law, the court shall by its judgment order the Administrator to take action with respect to the matter, in accordance with law. In a de novo proceeding the court ordinarily has the power and function to make its own findings and judgment. Such a trial contemplates not only the record before the Administrator but the testimony of additional witnesses if desired. No such procedure is contemplated under section 701. The provision for a trial de novo would be incompatible with the review procedure provided for and leaves an ambiguity and doubt as to what the function of the appellate court would be. In addition, such a proceeding would appear to make the appellate court a revising agency and its action in the nature of an administrative decision. A question arises as to whether such a function is within the judicial power conferred upon Federal courts by the Constitution. Compare *Radio Commission v. General Electric Co.* (281 U. S. 464).

It might be desirable to consider the question of review in connection with the action of the Administrator in designating unsafe drugs under clause (2). It is believed that a review from such a determination in accordance with the procedure in section 701, would fully protect the rights of any person adversely affected since the Supreme Court has recently held that in considering the question of whether an order of this nature is supported by substantial evidence, the appellate court shall review the whole record.

The Director of the Bureau of the Budget has advised that there is no objection to the submission of this report.

Yours sincerely,

PEYTON FORD,
*Deputy Attorney General.*

**24**    AMENDING THE FEDERAL FOOD, DRUG, AND COSMETIC ACT

ADMINISTRATIVE OFFICE OF THE UNITED STATES COURTS,
*Washington 13, D. C., March 29, 1951.*

Hon. ROBERT CROSSER,
*House Office Building, Washington, D. C.*

DEAR CONGRESSMAN CROSSER: I have compared the bill about which you have written me on March 22, 1951, to amend section 503 (b) of the Federal Food, Drug, and Cosmetic Act (H. R. 3298) with the present provision of the statute. The statute deals with the exemption from the requirements of the Federal Food, Drug, and Cosmetic Act in relation to the labeling of drugs handled in interstate commerce that are dispensed on a written prescription of a licensed physician, dentist, or veterinarian. The bill would make more detailed and specific the safeguards against abuse of the exemption from the provisions of the general statute.

The only feature of the bill that my office may qualify me to discuss is the provision in the next to the last paragraph of subsection (b) of section 503 of the statute as proposed to be amended (p. 4, lines 8 to 14) and especially the last clause on lines 11 to 14 of the printed bill. This section provides for appeals from orders of the Federal Security Administrator adding to or deleting from the list of drugs promulgated by him as "unsafe or ineffective for use without the professional diagnosis or supervision of a practitioner licensed by law" (clause 2, p. 2, lines 12 to 16 of the printed bill). It defines the procedure on appeal in general by reference to section 701 (f) (g) of the statute (21 U. S. C. 371 (f) (g)). These subsections provide that appeals from the orders of the Administrator may be filed in the United States court of appeals for the circuit in which the person taking the appeal resides or has his principal place of business. The pending bill would not change the court which would have jurisdiction to review orders of the Administrator in reference to the subject matter affected. That court would continue to be the court of appeals for the circuit.

The exception at the end of the paragraph would, however, make an important change from the present statute in respect of the procedure on review. Sections 701 (f) (g) of the present statute (21 U. S. C. 371 (f) (g)) prescribe that when a review is taken the review shall be had upon a transcript of the record and proceedings before the Administrator. "The findings of the Administrator as to the facts, if supported by substantial evidence, shall be conclusive." The paragraph referred to of the pending bill would change the practice and make the appeal "in the nature of a trial de novo, without presumptions in favor of either party to such appeal."

The Judicial Conference of the United States under which I act has not considered the particular bill and, therefore, I am not in a position to express an official opinion in regard to it, although the conference is on record in opposition to the procedure of a trial de novo by a three-judge court for review of the orders of administrative agencies. I would point out that the provision that appeals from the order of the Administrator shall be in the nature of a trial de novo, reverses what has been for 20 years or more a uniform trend in the Federal Government to provide for the hearing and decision of appeals from orders of administrative agencies by the courts of appeals upon the record made before the agencies. This procedure has been repeatedly provided for by the Congress, most recently by a law passed at the end of the Eighty-first Congress and approved December 29, 1950, in relation to the review of certain orders of the Federal Communications Commission, the Secretary of Agriculture, and the United States Maritime Commission (Public Law 901 of the 81st Cong.). That law originated in a recommendation of such legislation by the Judicial Conference.

The considerations underlying the act are stated in House Report No. 2122 of the Eighty-first Congress. The report states that review by the court of appeals of orders of administrative agencies upon the record made before the agencies "has important advantages in simplicity and expedition" over a trial de novo by a three-judge court. From the report I quote pertinent portions as follows:

"First, the submission of the cases upon the records made before the administrative agencies will avoid the making of two records, one before the agency and one before the court, and thus going over the same ground twice  *  *  *."

"Second, in many cases in which hearing in the district courts by panels of three judges is now required there will be a large saving of judicial time and energy. It is generally recognized that three-judge courts are not well adapted for conducting hearings. The necessity of holding conferences whenever questions arise in the course of the proceedings, as they repeatedly do in relation to such matters as the admissibility of evidence, very much slows the trial. In addition the proceeding takes the time of three judges, whereas one would be sufficient at this

preliminary stage of the case. The method of review prescribed by the proposed bill would secure the collaboration of three judges at the stage where it is useful, namely, in the decision without consuming their time unnecessarily in the preceding phases of the case."

While the practice which was changed by Public Law 901 of the Eighty-first Congress in reference to the agencies there concerned was trial de novo by a three-judge district court and the trial de novo on appeal from orders of the Administrator in the field of the pending bill would be such a trial by three judges of a court of appeals, all the disadvantages of trial de novo by a three-judge court referred to in the report of the last Congress would apply. There would be the same going over the ground twice in two records, the same difficulty inevitable in a court of three judges in conferring upon questions of the admission of evidence and other interlocutory matters arising during the proceedings, thus slowing the trial, and the same absorption of the time of three judges where one would be sufficient. It may be added that in no case at present, with perhaps an occasional extraordinary exception does a court of appeals sit as a trial court or hear evidence. The present statute which the pending bill would change, provides that even in those instances in which the court allows the petitioner to adduce additional evidence, such evidence shall be taken before the Administrator and adduced to the court rather than taken by the court of appeals directly.

The precedent which would be set by the pending bill of having the hearing on review conducted by the court of appeals as a trial de novo would be a radical departure. It would be contrary to the general judgment in reference to the effective procedure for the review of orders of administrative agencies as expressed in the report and law of the last Congress which have been cited. Such a change of method at this time when there is serious congestion in a number of Federal courts would tend to increase the present difficulties and delays in the handling of the judicial business.

Sincerely yours,

HENRY P. CHANDLER.

———

ADMINISTRATIVE OFFICE OF THE UNITED STATES COURTS,
*Washington 13, D. C., April 12, 1951.*

Hon. ROBERT CROSSER,
*House Office Building, Washington, D. C.*

DEAR CONGRESSMAN CROSSER: In further reference to the bill to amend section 503 (b) of the Federal Food, Drug, and Cosmetic Act (H. R. 3298) about which you inquired of me on March 22, 1951, I would point out that the provision for judicial review of actions of the Administrator contained in the next to the last paragraph of subsection (b) of section 503 of the statute as proposed to be amended (p. 4, lines 11 to 14 of the bill) is in conflict with the criterion prescribed in such long-considered and deliberate enactments of the Congress as the Administrative Procedure Act approved June 11 1946 (60 Stat. 237), and the Labor Management Relations Act, 1947, commonly known as the Taft-Hartley Act approved June 23, 1947 (61 Stat. 136). The legislative policy in reference to the weight to be given to the decisions of administrative agencies by the courts and the evidence necessary to sustain them were recently considered at length by the Supreme Court of the United States and reviewed in detail in the case of *Universal Camera Corporation* v. *National Labor Relations Board* (No. 40 at the present term of the court). At the same time the court rendered a brief corollary opinion applying the same standard of review in the case of *National Labor Relations Board* v. *Pittsburgh Steamship Co.* (No. 42 at the present term of court). Briefly, the development of the standard to be applied by the courts on the review of orders of administrative agencies as set forth in the opinion in the case of the Universal Camera Corp., supra, is this:

The original National-Labor Relations Act, commonly known as the Wagner Act, provided in section 10 (e) in reference to the judicial review of decisions of the National Labor Relations Board that "The findings of the Board as to the facts, if supported by evidence, shall be conclusive" (49 Stat. 449, 454, 29 U. S. C. 160 (e)).

The Supreme Court in *Washington, V. & M Coach Co.* v. *Labor Board* (301 U. S. 142) construed "evidence" to mean substantial evidence. In the early years of application of the Wagner Act the opinion became current that on judicial review of an order of the National Labor Relations Board, if there was in the record made before the Board evidence which taken by itself would justify the Board's decision, that would be enough to satisfy the test of substantial evidence irrespec-

tive of other parts of the record.   The Supreme Court in its opinion supra stated that there were expressions in some of the opinions of that Court which were cited (*Labor Board* v. *Waterman Steamship Corp.*, 309 U. S. 206; *Labor Board* v. *Bradford Dyeing Assn.*, 310 U. S. 318; and *Labor Board* v. *Nevada Consolidated Copper Corp.*, 316 U. S. 105) that whether or not so contemplated gave color to that view.

The doctrine stated brought criticism which was reflected in the passage in 1940 of the Walter-Logan bill.   Even so, the bill adopted the test for judicial review of orders of administrative agencies which was expressed in the Wagner Act as construed by the Supreme Court, that the findings of fact by an agency could be set aside by a court if "not supported by substantial evidence."   President Roosevelt vetoed the bill partly because it limited too strictly the administrative process and partly because an experienced committee appointed by the Attorney General of the United States was then engaged in a study of the actual operation of the administrative process.   That committee submitted its final report in 1941. The majority report observed that there was dissatisfaction with the fact-finding procedures then being used by administrative bodies but concluded that it would be inadvisable to depart from the test on judicial review of substantial evidence which then applied to the review of orders of administrative agencies.   Three members of the committee, however, registered dissent on the ground that the recommendations of the committee did not go far enough to correct defects in the procedures of administrative agencies.   Among other things, the dissenting members of the committee recommended as one principle of judicial review applicable generally to administrative agencies, that review should extend to "findings, inferences, or conclusions of fact unsupported, upon the whole record, by substantial evidence."   The Supreme Court in the Camera Corp. case supra states that reference to the whole record appears for the first time in the recommendation of the minority of the Attorney General's committee.   The opinion of the Court goes on to state that this idea found its way into the Administrative Procedure Act enacted in 1946 (pp. 6 to 8 of the opinion in the Camera Corp. case supra).   So the Administrative Procedure Act in section 10 (e) provided that on judicial review the court should hold unlawful and set aside agency action if—

"(5) unsupported by substantial evidence in any case subject to the requirements of sections 7 and 8 or otherwise reviewed on the record of an agency hearing provided by statute; or (6) unwarranted by the facts to the extent that the facts are subject to trial de novo by the reviewing court.   In making the foregoing determinations the court shall review the whole record or such portions thereof as may be cited by any party, and due account shall be taken of the rule of prejudicial error" (60 Stat. 244, 5 U. S. C. 1009 (e)).

It is important to note that the statute requires that a court in determining whether or not an order of an administrative agency under review is "unsupported by substantial evidence" shall "review the whole record or such portions thereof as may be cited by any party."   In short, in adopting the Administrative Procedure Act the Congress did not do away with the presumption on review in favor of the decision of an administrative agency if supported by substantial evidence, but made it unmistakably clear that the reviewing court in determining whether there was substantial evidence to justify the conclusion must take into account the whole record, or any portions cited by any parties, which doubtless would be all the pertinent parts.

The Supreme Court in its recent opinion in the Camera Corp. case points out that the amendment of the Wagner Act by the Taft-Hartley Act adopted in effect the same standard for judicial review of decisions of the National Labor Relations Board, that was prescribed for administrative agencies generally by the Administrative Procedure Act.   The provision of the Taft-Hartley law appears in section 10 (e) that the findings of the National Labor Relations Board "with respect to questions of fact if supported by substantial evidence on the record considered as a whole shall be conclusive" (29 U. S. C., 1946 ed., Supp. III, 160 (e)).

The Supreme Court points out in the Camera Corp. case that the effect of the Administrative Procedure Act and the Labor-Management Relations Act, 1947, has been to require reviewing courts to carry the scrutiny of decisions of administrative agencies further than was thought in some legal circles to be necessary prior to the passage of the Administrative Procedure Act.   Upon this the Court said:

"Whether or not it was ever permissible for courts to determine the substantiality of evidence supporting a Labor Board decision merely on the basis of evidence which in and of itself justified it, without taking into account contra-

dictory evidence or evidence from which conflicting inferences could be drawn, the new legislation definitively precludes such a theory of review and bars its practice. The substantiality of evidence must take into account whatever in the record fairly detracts from its weight. This is the clear meaning of the reference in both statutes to 'the whole record.' Committee reports and the adoption in the Administrative Procedure Act of the minority views of the Attorney General's Committee demonstrate that to enjoin such a duty on the reviewing court was one of the important purposes of the movement which eventuated in that enactment."

The Supreme Court is careful to point out in its recent decision that it does not mean that in reviewing the decision of an administrative agency a court shall consider the record before the agency de novo and substitute its judgment for that of the agency. The court expressed its meaning upon the necessity of considering "the whole record" as follows:

"To be sure, the requirement for canvassing 'the whole record' in order to ascertain substantiality does not furnish a calculus of value by which a reviewing court can assess the evidence. Nor was it intended to negative the function of the Labor Board as one of those agencies presumably equipped or informed by experience to deal with a specialized field of knowledge, whose findings within that field carry the authority of an expertness which courts do not possess and therefore must respect. Nor does it mean that even as to matters not requiring expertise a court may displace the Board's choice between two fairly conflicting views, even though the court would justifiably have made a different choice had the matter been before it de novo. Congress has merely made it clear that a reviewing court is not barred from setting aside a Board decision when it cannot conscientiously find that the evidence supporting that decision is substantial, when viewed in the light that the record in its entirety furnishes, including the body of evidence opposed to the Board's view."

The provision of the pending bill that the review before a court of appeals of a decision of the Administrator under the Federal Food, Drug, and Cosmetic Act "shall be in the nature of a trial de novo, without presumptions in favor of either party" is plainly contrary to the policy of the Congress deliberately adopted in the Administrative Procedure Act after years of discussion and consideration and followed in the Taft-Hartley law. That policy is that the judicial review of orders of administrative agencies shall be upon the record made before the agencies and not in the nature of a second trial, and that if the action of the agency is supported by substantial evidence when considered in the light of the entire record, it shall stand. It would seem that the Congress might hesitate to change a policy based upon experience and finally crystallized in outstanding legislative acts, as the pending bill would do.

Sincerely yours,

HENRY P. CHANDLER.

# MINORITY REPORT

We do not have any objections to the provisions of the bill which give authority for the filling and refilling of oral or telephone prescriptions. The present law does not recognize oral prescriptions, and we agree with the majority that, for the benefit of the public, the physician, and the retail druggist, the filling and refilling of oral prescriptions, under proper safeguard should be permitted. We also approve restricting the refilling of prescriptions dispensing dangerous drugs, except when authorized orally or in writing by the physician. We believe that the enactment of the foregoing provisions of the bill is as far as Congress should go at this time in making changes in the present law with respect to the labeling and dispensing of drugs. The remaining provisions would make basic changes in the method of determining which drugs are dangerous and may be sold only on prescription, and which drugs are safe and may be sold over the counter. We think the present method, which leaves this determination to the courts, should be left unchanged except that a proper standard to be applied in determining whether a drug is dangerous should be incorporated in the statute.

## BASIS FOR OBJECTIONS

The most objectionable feature of the bill lies in the provision which would give the Federal Security Administrator the power to determine the category in which a drug should be placed. In other words, the Administrator would decide by the issuance of regulations the drugs which could be sold only upon prescription and, by the process of exclusion, those which could be sold over the counter without prescription. This we believe to be a dangerous delegation of authority to the Federal Security Administrator and one that is wholly unnecessary. Moreover, instead of solving the problems of the public, the retail druggist and the physician, it will add to present difficulties by increased bureaucratic regulation.

Admittedly, there is some degree of confusion today arising from labeling policies by drug manufacturers. In some instances one company will label a drug for prescription sale only, while another will label the same drug for over-the-counter use. But there is a remedy for this situation under existing law. If a drug manufacturer places a dangerous drug on the market without a proper caution label against nonprescription use, he may be prosecuted criminally, and the Government may seize his product. Similarly, if a drug manufacturer labels a harmless drug for prescription use only he may likewise be proceeded against for erroneous labeling. If a druggist dispenses a drug which the manufacturer has not properly labeled he is not subject to prosecution while acting in good faith.

Retail druggists have been told that if this bill passes they could then rely upon the label of the manufacturer and safely dispense all

drugs in accordance therewith. But such is far from being the case. Under the amended bill the druggist could not safely dispense any drug without referring to the regulations of the Federal Security Administrator. If he sold a drug contrary to the regulations of the Administrator he would be subject to prosecution and the defense of good faith would not be available to him.

### THE DRUGGISTS' DILEMMA

It is reliably estimated that if this bill became a law on its effective date approximately 30,000 drugs would be subject to regulation. This would mean that every druggist in the country would have to obtain copies of the Security Administrator's regulations from the Federal Register, and go over his entire inventory and relabel his drugs in conformity with such regulations. This initial task would be a tremendous burden to the average druggist, but his troubles wouldn't end there. Thenceforth, he would have to review the regulations in the Federal Register from day to day and week to week in order to be sure that he was complying with the Administrator's list.

We are all familiar with the problems that beset the small-business man today because of OPS and other bureaucratic regulation. For Congress to impose the additional regimentation upon the already harried and frustrated small-business man is not only unreasonable but ridiculous.

We maintain, therefore, that the present system of determining prescription drugs by judicial process on a case-by-case basis is much to be preferred over the suggested remedy, which would create more headaches than it would solve. We have been constrained to disagree with the majority and to file this report because we are convinced that the bill as reported constitutes an excessive and entirely unwarranted grant of discretionary power to the Federal Security Administrator.

### REGULATION OF THE DRUG INDUSTRY

The exemption of prescription refills and of oral prescriptions from certain labeling requirements of the Federal Food, Drug, and Cosmetic Act has been availed of for the advancement of a plan to regulate the drug industry. The bill as reported empowers the Administrator to restrict to prescription sale all articles included within the broad definition of the word "drug" which he has determined to be "safe and efficacious for use only after professional diagnosis by, or under the supervision of, a practitioner licensed by law to administer such drug."

The word "drug" as defined in the Federal Food, Drug, and Cosmetic Act, means: (1) articles recognized in the United States Pharmacopoeia, the Homeopathic Pharmacopoeia of the United States, and the National Formulary; (2) articles intended for use in the diagnosis, cure, mitigation, treatment, or prevention of disease in man or other animals; (3) articles (other than food) intended to affect the structure or any function of the body of man or other animals; and (4) articles intended for use as a component of any of the foregoing articles.

Case 1:07-cv-00668-JDB    Document 27-8    Filed 09/21/2007    Page 30 of 37

This definition includes substances, compounds, mixtures, and fabrications of all kinds and forms used, or intended to be used, for the purposes above stated. There was testimony at the hearings that there are approximately 30,000 such "drugs." Any such drug intended for use by man which "on the basis of opinions generally held among experts qualified by scientific training and experience to evaluated the safety and efficacy of such drug" the Administrator determines "to be safe and efficacious for use only after professional diagnosis by, or under the supervision of, a practitioner licensed by law to administer such drug," shall be thereby restricted to sale only on prescription.

The bill grants the Administrator authority to separate all drugs into two classes—prescription and over the counter. Notwithstanding the majority report's references to "dangerous" and "potent" drugs, this power is not confined to them. There is little, if any, uncertainty about them. This power will find its greatest exercise in the wide field of conflicting opinion. There, as the testimony shows, "there are literally thousands of different drug items." This large field was described by the Administrator, in his testimony before the committee, as the "twilight zone." The power to govern it administratively would in time, amount to an over-all control of the manufacture, distribution, and administration of drugs. And, in the exercise of it, the Administrator would have greatly to do not only with the manufacture and distribution of drugs, but with the practice of pharmacy and medicine.

### EFFICACY OF DRUGS

This control is widened by the use of the words "efficacy" and "efficacious". The majority report labors a distinction between the Administrator having the power "to determine which drugs are 'efficacious' or 'effective'" and his having the power to determine whether they "can be used efficaciously without professional diagnosis or supervision." The undersigned do not find the distinction to be as clear and as easily discernible as the majority professes. Stated either way, the power granted to the Administrator is vast in scope, and, in administrative application and interpretation, would in time become larger and embrace both statements of the authority.

The majority illustrates with the drug quinidine sulfate. More illustrative, however, is a statement in the Administrator's testimony. Asked whether there is any possibility under the bill that a prescription would be required for a refill of aspirin, the Administrator stated:

Well, as of today, I would say "No," but I think you have to recognize that under this bill you might have an Administrator who would call a hearing to put aspirin on the list of dangerous drugs. If he held that aspirin was a dangerous drug and that was appealed to the circuit court of appeals and they upheld it, then you would be in that situation.

For further illustration, attention may be drawn to the word "diagnosis." Drugs which the Administrator determines are not safe or efficacious until "after professional diagnosis" are to be restricted to prescription sale. It is well known that there are some "experts" who entertain the view that hardly any drug is either "safe" or "efficacious" without professional diagnosis; that the layman is not competent to diagnose his ailments; and that, without being able to diagnose, he is all the more unable to prescribe for himself.

## SOCIALIZED MEDICINE

In the opinion of the undersigned, there is no doubt that the bill as reported jeopardizes the traditional right of self-medication and choice of remedies. Self-medication is not confined to so-called "patent medicines." It embraces use by the public of medicaments or "drugs" which are sold over the counter and which may be purchased without prescription, whether or not they are advertised direct to the public by newspaper, magazine, and radio. The Federal Food, Drug, and Cosmetic Act, as enacted in 1938, recognized the right of self-medication, and one of the committee reports stated that it was not the purpose of the act to restrict self-medication, but to make it safe.

Thousands of articles of a medicinal or remedial nature are now lawfully available to the people and may be purchased without the expense of prescriptions—fees to doctors and prescription prices at the drug store. The undersigned believe that the bill as reported will increasingly over the years restrict the number and nature of drugs available to the public on over-the-counter sale, and thus will gradually and substantially increase the cost of medication. This bill, therefore, could very well become a handmaiden of socialized medicine in that as the costs of medical care are increased there will be a corresponding demand by the people for governmental relief.

## CONTROL BY LICENSE

No grant of administrative power as wide in scope and as far-reaching in effect and implication as that in this bill has heretofore been proposed for the regulation of the drug industry. The grant of power in this bill is such as to transform, as to drugs, the Federal Food, Drug, and Cosmetic Act from a control by statutorily defined requirements to a control by license.

This proposed control is subject only to limited, uncertain, and impracticable restraint. It is no restraint to say, as the bill does, that the Administrator is to make his determination "on the basis of opinions generally held among experts qualified by scientific training and experience to evaluate the safety and efficacy" of drugs. Rather, it is lax to permit administrative authority to be constituted and rights of citizens determined on "opinions generally held" by persons unnamed in and unknown to the statute, to be selected and qualified at later times by the Administrator himself.

Practically, this bill shifts the burden of proof from the Administrator, who would assert the authority, to the citizen, who challenges it. The bill provides that the Administrator makes his determination merely on the basis of opinions of experts. If the producer or distributor of one of the drugs whose sale is restricted challenges the Administrator's determination, the bill provides that he "may file with the Administrator a petition proposing  *  *  *  a modification of a determination made or proposed to be made by the Administrator  *  *  *." Then a sequence of time-consuming and expensive steps are begun:

(1) The Administrator gives public notice of the proposal contained in the petition and gives to "interested" persons an opportunity to present views orally or in writing;

**32**    AMENDING THE FEDERAL FOOD, DRUG, AND COSMETIC ACT

(2) Thereafter, the Administrator makes public his action on the proposal;

(3) Within 30 days after he makes such action public, any "interested" person may file with the Administrator objections to such action, stating changes proposed, grounds therefor, and requesting a public hearing "for the taking of evidence of experts who are qualified by scientific training and experience to testify on the question of whether the drug in question is safe and efficacious for use only after professional diagnosis by, or under the supervision of, a practitioner licensed by law to administer such drug";

(4) The Administrator shall then give notice and hold a public hearing;

(5) Thereafter, the Administrator shall make his determination and issue an order;

(6) The order shall then be subject to "judicial review in accordance with the provisions of section 701 (f) and (g)" of the Federal Food, Drug, and Cosmetic Act, which are (in part):

(f) A summons and petition served upon the Administrator, whereupon the Administrator must certify and file in the court the transcript of the proceedings and the record on which the Administrator based his order;

(g) A certified copy of the transcript of the record and proceedings shall be furnished by the Administrator to any interested party at his request, and payment of the cost thereof.

(7) Review of the record by a United States Court of Appeals. "The findings of the Administrator as to the facts, if supported by substantial evidence, shall be conclusive."

### CONCLUSION

We desire to affirm our support of that part of the proposed legislation referred to in the first paragraph of this report. Our objections to the remaining provisions of the bill are grounded on the tremendous grant of unnecessary power in the hands of the Federal Security Administrator.

LEONARD W. HALL,
JOSEPH P. O'HARA,
JOHN B. BENNETT.

# INDIVIDUAL MINORITY VIEW

The undersigned, while concurring in the minority report in opposition to the vast delegation of authority to the Administrator, strongly feels that if this bill is to become law there should be a provision for an appeal and a trial de novo in the United States district court.

Not having had the time to submit my individual views to the other signers of the minority report, I therefore take the responsibility of submitting these additional views.

An appellant who desires a review of the record by a United States court of appeals, is confronted with the law, with reference to the decisions of the Federal Security Administrator, as follows:

The findings of the Administrator as to the facts, if supported by substantial evidence, shall be conclusive.

The majority of the committee takes the position that the Administrator's action under the bill in listing a drug as "dangerous," thereby limiting it to prescription sale, is subject to judicial review which will assure those affected against abuse of the power granted the Administrator.

With this conclusion I vigorously disagree.

The bill provides for judicial review under the familiar "substantial evidence" rule, which permits the courts to overturn administrative action only if the abuse of administrative authority is of a most flagrant character.

In recent years there has been increasing dissatisfaction with the "substantial evidence" rule, under which the findings of fact made by the administrative agency are conclusive if supported by substantial evidence.

The following typical statements by the Supreme Court give an idea as to the limitations under which the courts have operated in reviewing administrative action under the "substantial evidence" rule:

* * * (The) court * * * will not consider the expediency or wisdom of the order, or whether, on like testimony, it would have made a similar ruling. *Int. Com. Comm.* v. *Union Pacific R. R.*, 222 U. S. 541.

The order of the Commission * * * was not arbitrary but sustained by substantial, though conflicting, evidence. The courts cannot settle the conflict nor put their judgment against that of the rate-making body * * *. *Int. Com. Comm.* v. *Louis. & Nash. R. R.* 227, U. S. 88, 100.

If the record contained any substantial evidence to support the administrative fact findings, the courts often have felt obligated to sustain the administrative action without reference to how heavily such evidence may have been outweighed by the countervailing evidence in the record. Under this limitation the courts cannot set aside administrative action even when it is clearly contrary to the manifest weight of the evidence.

The type of judicial review leaves much too large an area in which the administrative agency has a free hand to exercise, in an unfair

83

and unjust manner, the power of life and death over important elements of the economic structure of the country.

The majority report strongly suggests that recent Supreme Court decisions (*Universal Camera Corp.* v. *N. L. R. B.* and *Labor Board* v. *Pittsburgh S. S. Co.*) have made a change in the law which insures operation of the "substantial evidence" rule in such manner that full protection will be given by the courts against unjustified administrative action. These cases held that the courts, in determining whether the administrative action is supported by substantial evidence, are under a duty to make that determination after consideration of the whole record before the administrative agency. No one can say at this time whether, or to what extent, these cases will actually change anything so far as scope and character of judicial review is concerned. There is good ground for believing that they merely state what the law always has been. There is nothing in these cases to indicate that the Supreme Court would regard it as proper for a reviewing court to weigh the evidence in the record and, on the basis of its appraisal of the evidence, reach its own independent judgment as to what the administrative action should have been and take appropriate action to insure that the administrative action conforms to the judgment of the court.

Mr. Justice Frankfurter, speaking for the Court in the Universal Camera case, made the following statement which indicates the narrow limits of judicial review under the law as it is interpreted in that case:

> To be sure, the requirement for canvassing "the whole record" in order to ascertain substantiality does not furnish a calculus of value by which a reviewing court can assess evidence. * * * Nor does it mean that even as to matters not requiring expertise a court may displace the Board's choice between two fairly conflicting views, even though the court would justifiably have made a different choice had the matter been before it de novo.

In the opinion of the undersigned, these cases have no important bearing on the fundamental issue here involved.

The bill as introduced would have authorized judicial review of the Administrator's action in a proceeding in the nature of a trial de novo. In the opinion of the undersigned, that type of judicial review would afford a proper judicial check on administrative abuses.

Largely on the basis of testimony presented to the committee by Judge Stephens of the United States Court of Appeals for the District of Columbia, the committee has rejected this proposal of the introduced bill.

To the extent that the testimony criticized provision for a de novo trial in a United States court of appeals, the objections made by Judge Stephens are probably sound, but no convincing argument has been made against providing for de novo review in an appropriate United States district court. It may be true that review by district courts, if provided for in the case of administrative action of every type, would make some increase, to a limited extent, of cases in United States district courts. However, the proposal in the introduced bill did not extend to all cases of administrative action, but only to review of the action of the Federal Security Administrator, under this proposed legislation, in listing a drug as a "dangerous" drug. This would not require any increase in the number of United States district judges, in my opinion. Furthermore, even if it did, that would be a

small price to pay for judicial review which would effectively control abuses in the exercise of the vast administrative power which this bill proposes to grant to the Federal Security Administrator.

The majority report, apparently on the basis of views stated in letters from the Federal Security Administrator and the Deputy Attorney General of the United States, expresses doubts as to the constitutionality of any provision providing for judicial review of the Administrator's action in a de novo proceeding, on the ground that this would seek to have Federal "constitutional" courts exercise an improper function—that is, one which is legislative or administrative in character, and therefore "nonjudicial."

The views expressed in the letters referred to are based upon a decision rendered by the Supreme Court in the General Electric case (281 U. S. 464) which was decided in 1930. That case held that the Supreme Court (being a "constitutional" court, i. e., one which, because created under the judiciary article of the Constitution, can exercise only "judicial" powers) could not be vested with the power to act as a "superior and revising" administrative agency in reviewing a decision of the Court of Appeals of the District of Columbia (which is not a "constitutional" court) in a case, arising under the Radio Act of 1927, in which the latter court had exercised de novo review of action taken by the Federal Radio Commission. This, the court said, was because it could exercise "judicial powers only," and could not "exercise or participate in the exercise of functions which are essentially legislative or administrative."

The argument is that since United States courts of appeals and United States district courts are "constitutional" courts the principle of the General Electric case applies to them, although this specific question has never been judicially decided. However, even if this is so, de novo review of the Administrator's action would not be barred by the principle of the General Electric case. This is because of the difference in the nature of the function which the court would exercise.

In the General Electric case the basic question in issue was whether the public convenience and necessity would be served by granting an application for renewal of a broadcasting license. Under this bill, the question in issue would be whether a particular drug is—

because of its toxicity or other potentiality for harmful effect, or the method of its use, or the collateral measures necessary to its use * * * (determined) * * * on the basis of opinions generally held among experts qualified * * * to evaluate the safety and efficacy of such drug * * * to be safe and efficacious for use only after professional diagnosis by, or under the supervision of, a practitioner licensed by law to administer such drug.

It will be seen at a glance that the bill calls for the application of a standard, or test, which is not of the same character as that involved in the General Electric case. The latter case called for the exercise of broad judgment and discretion in deciding whether renewal of a broadcasting license would serve "the public convenience and necessity." It is not surprising that the Supreme Court took the view that substitution of its judgment for that of the agency on that question would have involved exercise of a nonjudicial function.

However, under the bill, no similar judgment or discretion would have to be exercised by the court. In applying the standard, or test, provided for by the bill a court would be determining whether a particular drug was or was not included within its terms. The function

**36**  AMENDING THE FEDERAL FOOD, DRUG, AND COSMETIC ACT

of the court would not be essentially different from that exercised by courts every day. It would merely call for application of a statutory standard to the facts of a particular case.

In this connection, it is important to bear in mind that the standard written into the bill is essentialy the same as that now contained in the regulation (prescribed under section 502 (f) of the act) which differentiates "dangerous" drugs (which may be sold only on prescription) from those drugs which (if they bear adequate directions for use) may be safely sold over the counter. In criminal prosecutions, and in seizure and injunction proceedings, involving alleged misbranding, the outcome of the case may depend upon the application by the court to the facts of the case of this standard prescribed in the regulation. If the courts exercise a "judicial" function in applying this standard in criminal, seizure, and injunction actions, how can it be reasonably contended that a court would be called upon to exercise a "nonjudicial" function in applying essentially the same standard in de novo review of the Administrator's action?

Furthermore, it was urged before the committee that this same standard be written into the bill as the basis for case-by-case judicial decision as to which drugs are "dangerous" and which drugs are not. No one suggested that that proposal would have required the courts to exercise a "nonjudicial" function.

The need for trial de novo is emphasized by the narrowness of review of administrative proceedings by the appellate courts. In an increasing number of cases the courts are declaring their impotence to review the findings of fact.

Particularly is this true where the administrative decision is of a quasi-judicial nature, as in the instances of appeals from the Federal Trade Commission, which is a fact-finding body. The courts have repeatedly held that they are bound by the Federal Trade Commission's judgment as to the quality and sufficiency of evidence. Such evidence may consist of biased testimony—*Segal* v. *Federal Trade Commission* (142 Fed. (2d) 255); incompetent evidence—*Bene* v. *Federal Trade Commission* (299 Fed. 468); and the testimony of selected experts—*E. Griffith Hughes, Inc.* v. *Federal Trade Commission* (77 Fed. (2d) 886). In the Segal case the court observed that a part of the testimony was "obviously biased" and said:

Even so, if the Commission wished to rely upon such testimony, we may not intervene, whatever might be our own indisposition to accept what he said.

The courts refuse on appeal to weigh the evidence. They hold that they are bound by the Commission's findings, if supported by evidence, despite the fact that the weight may be to the contrary. Thus, they need read only the Commission's side of the case and if there is evidence to support the findings, the record to the contrary may be ignored.

The principles of a trial de novo are outlined in my opinion, by Chief Justice D. Lawrence Groner of the Circuit Court of Appeals for the District of Columbia in a letter to the Attorney General—report of the Committee on Administrative Procedure, Seventy-ninth Congress, page 248:

The correct decision of this question is one of immense importance. It should, in my opinion, be considered by Congress in the light of the real and true purposes which the founders of our Government sought to achieve for themselves and their

AMENDING THE FEDERAL FOOD, DRUG, AND COSMETIC ACT    **37**

posterity. These were free action, free enterprise, free competition. They believed that equal justice between man and man and between citizen and state was one of the impartial rewards which encouraged to efforts that produced great and lasting results. Therefore, they made no provision for exemptions from legal duty. What they did provide for was that there should be no oppression, no exaction by tyranny, no spoliation of private right by public authority, and that there should be a fair, honest, effective government to maintain the things which were thought to be the prerogatives of every individual man.

As in the case of the Federal Trade Commission, the Federal Security Administrator is not only a regulator but he will adjudicate issues of fact between the Government and the citizen as a judicial tribunal. The Administrator, under this bill, will be asked to determine the question of fact of some 30,000 drug items—

because of its toxicity or other potentiality for harmful effect, or the method of its use, or the collateral measures necessary to its use * * * (determined) * * * on the basis of opinions generally held among experts qualified * * * to evaluate the safety and efficacy of such drug * * * to be safe and efficacious for use only after professional diagnosis by, or under the supervision of, a practitioner licensed by law to administer such drug.

In the light of the above-quoted section of this bill, the Administrator will be called upon to make decisions of fact "on the basis of opinions generally held among experts qualified." It may be upon the decision of one expert who is opposed by many experts, upon testimony which may be biased or unbiased; and yet, under existing decisions, even if the Administrator made his decision on testimony which was obviously biased, that decision of the Administrator, for all practical purposes, would be final without a trial de novo.

In the light of the Supreme Court decisions and the sweeping scope of the powers granted the governmental administrative agency, unless there is to be complete administrative absolutism, it is obvious that both the Government and the individual should have a "day in court."

JOSEPH P. O'HARA.

O

MEMORANDUM

DATE:        August 24, 2006

FROM:        Steven Galson, MD, MPH
             Director, Center for Drug Evaluation and Research

TO:          NDA 21-045, S-011

SUBJECT:     Plan B®

## I.    Introduction

On April 16, 2003, Barr Pharmaceuticals (Barr or the sponsor[1]) submitted a supplement to NDA 21-045 to switch Plan B®, (levonorgestrel) Tablets, 0.75 mg, to over-the-counter (OTC) status.  The supplement, S-011, submitted under section 505(b) of the Federal Food, Drug, and Cosmetic Act (the Act), was received April 23, 2003.  On May 6, 2004, I issued a Not Approvable letter because the supplement did not contain data demonstrating that the product was safe and effective for OTC use by women under age 16.

On July 21, 2004, Barr resubmitted its supplement to NDA 21-045, S-011, seeking to switch Plan B®'s prescription (Rx) status to OTC for women 16 years of age and older, and to have Plan B® remain Rx for women under 16 years of age.  This resubmission of July 21, 2004, constituted a complete response to our May 6, 2004, Not Approvable letter.  The resubmitted supplemental new drug application proposed to switch Plan B® to OTC status for women ages 16 years or greater and maintenance of prescription status for women under age 16.

On August 26, 2005, then Commissioner Lester M. Crawford, DVM, PhD, sent the sponsor a letter indicating that the Center for Drug Evaluation and Research (CDER) had completed its review of the application, as amended, and had concluded that the available scientific data are sufficient to support the safe use of Plan B® as an OTC product, but only for women who are 17 years of age and older.

The letter went on to state, however, that the Agency was unable, at that time, to reach a decision on the approvability of the application because of unresolved issues that related to the NDA.  The letter mentioned three issues:  whether the same active ingredient could be marketed both Rx and OTC based solely on the age of the individual using the drug; how, as a practical matter, an age-based distinction could be enforced; and whether the Rx and OTC versions of the same active ingredient may be marketed in a single package.  The letter also stated that the agency had decided to ask for public comments on whether we should initiate a rulemaking to codify our interpretation of section 503(b) of the Federal Food, Drug, and Cosmetic Act regarding when an active ingredient can be

---

[1] The current applicant for the Plan B sNDA is Duramed Research Pharmaceuticals, a wholly-owned subsidiary of Barr.  For ease of reference, this memo will refer to both entities as Barr.

simultaneously marketed in both a prescription drug product and an OTC drug product through an advance notice of proposed rulemaking (ANPRM) that published on September 1, 2005 (70 FR 52050). The comment period closed on November 1, 2005, and the agency received about 47,000 comments. The agency hired a contractor to summarize and categorize the comments and the contractor submitted a final report on May 19, 2006.

On July 31, 2006, Dr. Andrew von Eschenbach, Acting Commissioner of Food and Drugs, sent the sponsor a letter indicating that the agency had reviewed the comments received in response to the ANPRM and determined it was not necessary to engage in rulemaking to resolve the novel regulatory issues raised by the application and that we were now proceeding with further evaluation of the application.

CDER staff met with the sponsor on August 8, 2006, and discussed how to address the issues raised in Dr. von Eschenbach's letter regarding the restriction on OTC sales of Plan B® to ages 18 and over, the packaging of prescription and OTC Plan B® in one package, and the Convenient Access Responsible Education (CARE℠) Program.

On August 17, 18, and 23, 2006, the sponsor amended its application to propose revisions to the labeling and to the CARE℠ Program.

## II.    Approval Standards

FDA must require Rx dispensing of any drug that is not safe for use "except under the supervision of a practitioner licensed by law to administer such drug."[2] A drug sponsor may submit a supplemental application to "switch" a drug that FDA has already approved for Rx use to OTC status. FDA will grant a supplemental application to "switch" when it finds that Rx dispensing is:

> not necessary for the protection of the public health by reason of the drug's toxicity or other potentiality for harmful effect, or the method of its use, or the collateral measures necessary to its use, and . . . the drug is safe and effective for use in self-medication as directed in proposed labeling.[3]

Such switch applications generally include data from actual use and labeling comprehension studies to demonstrate that the product can be safely and effectively used without the supervision of a practitioner licensed by law to administer the drug. FDA may approve an NDA application only when, among other things, the investigations submitted in the application include adequate tests showing whether or not the drug is safe for use under the conditions prescribed, recommended, or suggested in the proposed labeling and when there is sufficient information to determine from the application whether the drug is safe for use.[4]

---

[2] 21 U.S.C. § 353(b)(1).
[3] 21 C.F.R. § 310.200(b).
[4] See 21 U.S.C. § 355(d).

### III.    Findings

I have completed my review of this application, as amended, and have concluded that adequate information has been presented to demonstrate that the drug products are safe and effective for use under the conditions set forth in the draft labeling submitted August 23, 2006.  My previous memoranda on this application (May 6, 2004, and August 25, 2005) describe my reasoning for concluding that Plan B® is safe and effective for OTC use for ages 17 and older, but, in the absence of additional data demonstrating that it is safe and effective for OTC use in women under 17, it must remain Rx for this age group.[5] This memorandum addresses the three issues raised in Dr. von Eschenbach's July 31, 2006 letter:  the age 18 restriction, the packaging of the product, and the CARE[SM] program.

#### A.  Restriction to Rx Use for Women Under 18

Regarding the restriction on OTC use to age 18 and older, Dr. von Eschenbach decided that this was the appropriate age for OTC use for the reasons described in his memorandum of August 23, 2006.  I have read that memorandum and, although I previously concluded that OTC use should be restricted to women 17 or older, I have now determined that for the reasons Dr. von Eschenbach outlines, the approval of this application should reflect a restriction to OTC use for those age 18 and older.

#### B.  Packaging

Regarding the packaging of the Rx and OTC products in a single package, Barr has proposed to package Plan B® in a package that is designed to satisfy both the Rx and OTC labeling requirements.  On the front of the package, the statement will appear:  "Rx only for age 17 and younger."  In addition, the package will have the Drug Facts box required for all OTC products, and will have space for a pharmacist to apply the standard prescription drug labeling before dispensing the product pursuant to a prescription. These proposals make it clear that the product is Rx for age 17 and younger, and OTC for ages 18 and older, satisfying the requirements of section 503(b)(4)(A) of the Act that a drug that is subject to the prescription requirement in section 503(b)(1) bear the "Rx

---

[5] As I noted in my August 26, 2005, memo, various CDER reviewers recommended that Plan B® should be switched OTC for the entire population of women who might use the product, including women under age 18.  Similar views were expressed by various CDER reviewers in this review cycle (see for example, August 22, 2006, review of the Director, Office of New Drugs, the Director, Office of Nonprescription Products (ONP), and the Acting Director, Office of Drug Evaluation III).  For the same reasons described in my August 26, 2005, memo, I do not agree with those recommendations.

I would, however, like to clarify for the record a statement in my August 25, 2005 memo.  On page 5, I stated that if Plan B® was used routinely for contraception (a use inconsistent with the labeling), the well-known risks associated with hormonal contraceptives, such as blood clots and stroke, are likely to be higher than with the use of other contraceptives. While it would be inappropriate to use Plan B® for routine contraception because this dose of levonorgestrel has not been shown to be safe and effective for such a use, the relationship between progestin-only oral contraceptives, such as levonorgestrel, and strokes and blood clots has not been fully defined. This clarification does not change my view that the sponsor did not establish that Plan B® can be used safely and effectively by women under 17 without the supervision of a licensed practitioner.

only" symbol.  Because section 503(b)(1) applies here, section 503(b)(4)(B), does not.
Section 503(b)(4)(B) states:  "A drug to which paragraph (1) does not apply shall be
deemed to be misbranded if at any time prior to dispensing the label of the drug bears the
symbol described in subparagraph (A) [the "Rx only" symbol]."

Furthermore, there are important policy reasons for approving this packaging
configuration related to implementing the restriction of the OTC product to ages 18 and
over.  Because the package will be labeled with the "Rx only" symbol, State and Federal
law will require that the packages be dispensed only by pharmacies and other healthcare
providers such as physicians and clinics authorized to dispense prescription drugs.  The
product will not be available through convenience stores and gas stations because they
will not be authorized to sell the prescription product.  As described in  the CARE$^{SM}$
program, wholesale distributors and retail chain drug stores confirmed to the sponsor that
they will distribute Plan B$^®$ only to licensed pharmacies or heath care clinics.
Furthermore, since Plan B$^®$ has both Rx and OTC labeling, pharmacies will keep Plan B$^®$
behind-the-counter, and either a prescription or government-issued proof of age will be
presented before sale of the product.

### C. The CARE$^{SM}$ Program

In its July 2004 submission, Barr submitted proposed labeling that included a consumer
information leaflet that elaborates on the information contained on the Plan B$^®$ outer
carton and inner packaging.  Among the important information that is included in the
consumer information leaflet is information about how Plan B$^®$ works, when it is
appropriate to use Plan B$^®$, how often it should be used, side effects and warnings, and
directions for use.  In addition, Barr Laboratories proposed an educational program
(Convenient Access Responsible Education Program, CARE$^{SM}$) with the following
elements:  (1) labeling, packaging, web site, and informational 24-hour toll-free number,
(2) education initiatives for healthcare providers and pharmacists, (3) distribution plans,
and (4) monitoring efforts to assess whether the Rx/OTC age distinction is understood
and adhered to.

In response to Dr. von Eschenbach's letter of July 31, 2006, describing several issues that
he asked be addressed concerning the enforceability of the age restriction, representatives
from CDER met with Barr to discuss proposed changes to the CARE$^{SM}$ program to
address these concerns.  On August 17 and 18, and 23, 2006, Barr submitted amendments
to Supplement O11 proposing changes to the CARE$^{SM}$ program.

Specifically, Barr:

- Made changes throughout the program to reflect that Plan B$^®$ would be made
  available only by prescription to women age 17 and younger and would be made
  available OTC to those age 18 and older who show a government-issued
  identification of their age.
- Clarified that wholesale distributors and chain drug companies will only distribute
  Plan B$^®$ to licensed pharmacies or other licensed healthcare clinics.
- Clarified that since Plan B$^®$ will be labeled as both Rx and OTC, pharmacies will
  keep the product behind the counter to effectuate the restriction of the OTC

product to ages 18 and older.

- Clarified that if violations of the age restriction are observed, the sponsor will increase its educational efforts regarding the age restriction and focus on improving the level of understanding among pharmacists and pharmacy staff, and will also report repeat violators to the relevant State Boards of Pharmacy.[6]
- Committed to report to FDA the results of its surveys to provide signals of program effectiveness and potential problems, and the point-of-purchase monitoring program to determine whether the Rx requirement for those ages 17 and younger is being adhered to at the point of purchase. These results will be reported to FDA at six-month intervals beginning 30 calendar days after the six-month interval commencing on the date of the approval of the amended sNDA.
- Made additional editorial and clarifying changes to the CARE[SM] program to reflect changes in packaging.

I have determined that with the changes the sponsor has proposed, the CARE[SM] program is adequate to support my finding that Plan B[®] can be safely distributed in the package configuration proposed by Barr.

To ensure that Plan B[®] will be used safely and effectively by Rx consumers age 17 and below and OTC consumers age 18 and above, the sponsor has agreed to the following activities:

- Monitor trends in the use of emergency contraception to evaluate the effectiveness of the CARE[SM] program. Specifically, the sponsor agreed to conduct a market research survey or surveys of a subset of healthcare professionals annually, and when practicable, in collaboration with established professional groups. These surveys will be designed to determine whether the Rx requirement for those ages 17 and younger is being adhered to at the point of purchase and to provide signals of program effectiveness and potential problems

---

[6] I disagree with the recommendation by the Office of Surveillance and Epidemiology (OSE) that the CARE[SM] program should require the sponsor to notify FDA instead of the State Boards of Pharmacy when pharmacists repeatedly fail to comply with the age restriction (OSE Plan B[®] CARE[SM] Program Review Team Review, August 22, 2006). The Director, ONP, accepted OSE's recommendation (Director, ONP Review, August 22, 2006). OSE explained that it believed such a measure of monitoring the compliance with the age restriction was "overly punitive" and may have a negative impact on the availability of this product OTC. OSE states that a lack of pharmacy compliance may be reflective of an inadequate education plan and this information could be used as an opportunity to improve and/or revise the CARE[SM] program. I disagree that the sponsor's proposal is overly punitive, or that it is proposed as a substitute for adequate education. The CARE[SM] program states that "findings from the [point-of-purchase] study will be communicated to the pharmacy and the corporate office, if appropriate, since education and retraining will be the first course of remedial action." (CARE[SM] Program, August 22, 2006, p. 11) The plan states that only in the case of repeat violators will the violator's State Board of Pharmacy be notified. (Id.) Furthermore, these reports to a State Board of Pharmacy do not mean that FDA will not be informed of violations. The CARE[SM] program provides that the sponsor will report to FDA periodically the findings of the point-of-purchase monitoring program. I believe the sponsor's proposed approach to monitoring will increase the likelihood that pharmacists will dispense Plan B[®] appropriately, and it is within the sponsor's discretion to propose such action.

associated with consumers' understanding of the purpose and proper use of Plan B®.

- Using relevant survey data regularly collected by others (e.g., Centers for Disease Control's Behavioral Risk Factor Safety Surveillance (CDC BRFSS), Youth Risk Behavior Safety Surveillance (YRBSS)), to monitor for potential indicators that Plan B® is being used in an inappropriate manner. Potential areas of monitoring and reporting include evaluating possible correlations between increases in sexually transmitted infections (STIs) based on geographic areas and data and trends in pregnancy and/or abortion rates based on geographic areas.

- Conduct a "Point-of-Purchase Monitoring Program" to track how Plan B® is being sold at the time of purchase, including using anonymous shoppers who will be directed to visit locations where Plan B® is available and purchase the product. Using the data collected, the sponsor will document and analyze the level of comprehension of the Plan B® prescription age requirement and how it is handled at the point of purchase. The program will be conducted twice in the first year and annually thereafter. The sponsor will report repeat violators to the relevant State Boards of Pharmacy.

- Report to FDA on the results of these activities on a six-month interval beginning 30 calendar days after the six-month interval commencing on the date of the approval of the amended sNDA.

Finally, I note and agree with the other elements of the CARE[SM] program described in the submission of August 23, 2006, which are designed to help ensure compliance with the approved labeling, and particularly the restriction of OTC use to ages 18 and older. The program includes the following elements:

- The sponsor and third party distributors, wholesalers, and chain drug companies will only distribute Plan B® to licensed pharmacies or other licensed healthcare clinics. As a result, Plan B® will not be sold at gas stations or convenience stores. Given that Plan B® will have both Rx and OTC labeling, the pharmacies will keep Plan B® behind-the-counter.

- The sponsor will conduct an education campaign that will focus initially on healthcare professionals (including prescribers and pharmacists) to raise awareness and knowledge levels about emergency contraception. The education campaign will clearly communicate the prescription age requirement and the appropriate use of emergency contraception. The campaign will include continuing education by certified professionals and educational materials (including websites and toll free numbers) that can be accessed easily and at any time.

- The sponsor will make available to State Boards of Pharmacy continuing education programs for use at annual meetings and other regional programs.

- The sponsor will provide to prescribers and healthcare professional associations materials for distribution to patients that will encourage patients to discuss any questions about emergency contraception with a healthcare professional.

- The sponsor plans to educate consumers, in part by targeting consumers ages 18 to 44 to convey critical awareness and educational messages as well as

information about product availability, time sensitivity of use, and the age requirements to obtain Plan B® as a prescription or OTC product.

I conclude that the CARE[SM] program is sufficiently rigorous to prevent young women from obtaining Plan B® over-the-counter without the supervision of a practitioner licensed by law to prescribe the drug. Monitoring of the program's effectiveness will allow FDA to assess whether further modifications will be necessary to prevent inappropriate use of Plan B®.

## IV.    Conclusion

In conclusion, I find that Barr's sNDA, as amended most recently on August 23, 2006, meets the statutory standards for approval as set forth in 21 U.S.C. 355(d).

-------------------------------------------------------------------------------------------------------
**This is a representation of an electronic record that was signed electronically and this page is the manifestation of the electronic signature.**
-------------------------------------------------------------------------------------------------------

```
 /s/
---------------------
Leah Christl
8/23/2006 07:38:08 PM
CSO
I am entering this memo into DFS for signature
by Dr. Steven Galson. My signture is for
process purposes only.


Steven Galson
8/24/2006 07:17:59 AM
MEDICAL OFFICER
```

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

_____
                                                    )
ASSOCIATION OF AMERICAN                )
PHYSICIANS & SURGEONS, INC., *et al.*,   )
                                                    )
                    *Plaintiffs*,                        )          Civil Action No. 07:0668 (JDB)
                                                    )
                        *v.*                              )
                                                    )
FOOD & DRUG ADMINISTRATION, *et al.*,   )
                                                    )
                    *Defendants.*                      )
------------------------------------------------------------)
                                                    )
DURAMED PHARMACEUTICALS, INC.,    )
                                                    )
                    *Defendant Intervenor.*              )
_____)

## PROPOSED ORDER

Upon consideration of the motion to dismiss the first amended complaint filed by

defendant intervenor Duramed Pharmaceuticals, Inc. ("Duramed"), the memorandum of points

and authorities and exhibits in support thereof, plaintiffs' memorandum of points and authorities

in opposition thereto, Duramed's reply to plaintiffs' memorandum, and all other pleadings in this

litigation, and after oral argument, it is this __ day of _____, 2007,

ORDERED that the motion to dismiss filed by defendant intervenor Duramed is hereby

GRANTED and that the First Amended Complaint is DISMISSED WITH PREJUDICE.


                                                    _____
                                                    United States District Judge

## CERTIFICATE OF SERVICE

I hereby certify that on this 21st day of September 2007, I served counsel with a copy of Duramed Pharmaceuticals, Inc.'s ("Duramed") Motion to Dismiss the First Amended Complaint, Memorandum of Points and Authorities, accompanying Exhibits, and Proposed Order, via electronic mail to:

Lawrence J. Joseph, Esq.
Law Office of Lawrence J. Joseph
1250 Connecticut Avenue, NW, Suite 200
Washington, DC 20036
Tel: 202-747-1790
Fax: 202-318-2254
Email: *ljoseph@larryjoseph.com*

*Attorney for Plaintiffs*

Jane M. Lyons, Esq.
United States Attorney's Office
555 4th Street, NW
Room E4822
Washington, DC 20530
Email: jane.lyons@usdoj.gov

Karen Schifter, Esq.
Office of the Chief Counsel
United States Food and Drug Administration
(GCF-1)
Room 6-57
5600 Fishers Lane
Rockville, MD 20857
Email: karen.schifter@fda.hhs.gov

*Attorneys for Defendants*

                                   /s/ Ana C. Reyes
                                   Ana C. Reyes