# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| ASSOCIATION OF AMERICAN PHYSICIANS & SURGEONS, INC., *et al.,* ) | |
| ) | |
| Plaintiffs, ) | |
| ) | |
| v. ) | Civil Action No. 07-0668-JDB |
| ) | |
| FOOD & DRUG ADMINISTRATION, *et al.,* ) | |
| ) | |
| Defendants, ) | |
| ) | |
| and ) | |
| ) | |
| DURAMED PHARMACEUTICALS, INC., ) | |
| ) | |
| Defendant-Intervenor ) | |

### PLAINTIFFS' OPPOSITION TO MOTIONS TO DISMISS

In opposition to the defendants' and defendant-intervenor's motions to dismiss under Rules 12(b)(1) and 12(b)(6) of the FEDERAL RULES OF CIVIL PROCEDURE and their accompanying memoranda of law, plaintiffs in this action hereby file the attached memorandum of law. Plaintiffs respectfully request an opportunity for oral argument.

A proposed order is attached.

Dated: October 17, 2007                    Respectfully submitted,


                                            /s/ Lawrence J. Joseph
                                            Lawrence J. Joseph, D.C. Bar No. 464777

                                            1250 Connecticut Ave., NW, Suite 200
                                            Washington, DC 20036
                                            Telephone: (202) 669-5135
                                            Telecopier: (202) 318-2254

                                            *Counsel for Plaintiffs*

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| ASSOCIATION OF AMERICAN PHYSICIANS & SURGEONS, INC., *et al.,* | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Civil Action No. 07-0668-JDB |
| | ) | |
| FOOD & DRUG ADMINISTRATION, *et al.,* | ) | |
| | ) | |
| Defendants, | ) | |
| | ) | |
| and | ) | |
| | ) | |
| DURAMED PHARMACEUTICALS, INC., | ) | |
| | ) | |
| Defendant-Intervenor | ) | |

### [Proposed] Order

On considering defendants' and defendant-intervenor's motions to dismiss, the memoranda in support thereof and in opposition thereto, and the absence of a record herein, the Court holds that plaintiffs have alleged cognizable injuries in fact within the Court's jurisdiction and that the Court can grant the requested relief. For the foregoing reasons, it is hereby

**ORDERED** that defendants' and defendant-intervenor's motions are denied.

Dated: _____, 2007

_____
UNITED STATES DISTRICT JUDGE

**Copy to:**

LAWRENCE J. JOSEPH
1250 Connecticut Ave., NW, Suite 200
Washington, DC 20036
*Counsel for Plaintiffs*

JANE M. LYONS
Assistant United States Attorney
555 Fourth St., N.W. - Room E4822
Washington, D.C. 20530
*Counsel for Federal Defendants*

RICHARD M. COOPER
ANA C. REYES
Williams & Connolly LLP
725 Twelfth Street, N.W.
Washington, DC 20005
*Counsel for Defendant Intervenor*

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| ASSOCIATION OF AMERICAN PHYSICIANS & SURGEONS, INC., *et al.,* | ) ) |
| Plaintiffs, | ) ) |
| v. | ) Civil Action No. 07-0668-JDB |
| FOOD & DRUG ADMINISTRATION, *et al.,* | ) ) |
| Defendants, | ) ) |
| and | ) ) |
| DURAMED PHARMACEUTICALS, INC., | ) ) |
| Defendant-Intervenor | ) |

**MEMORANDUM OF LAW IN SUPPORT OF**
**PLAINTIFF'S OPPOSITION TO MOTIONS TO DISMISS**

Lawrence J. Joseph, D.C. Bar No. 464777

1250 Connecticut Ave., NW, Suite 200
Washington, DC 20036
Telephone: (202) 669-5135
Telecopier: (202) 318-2254

*Counsel for Plaintiffs*

Dated: October 17, 2007

**TABLE OF CONTENTS**

Table of Contents ...........................................................................................................i
Preliminary Statement...................................................................................................1
Standards of Review .....................................................................................................2
   Rule 12(b)(1)...........................................................................................................2
   Rule 12(b)(6)...........................................................................................................3
   Rule 56 Conversion.................................................................................................4
   Judicial Review on Administrative Record .............................................................4
Background ...................................................................................................................5
   Statutory Background ..............................................................................................5
   Regulatory Background ...........................................................................................7
   Factual Background .................................................................................................7
Argument ......................................................................................................................8
I.   This Court Has Subject-Matter Jurisdiction ............................................................8
   A.  Standing.............................................................................................................8
      1.  Injuries in Fact.............................................................................................8
         a.  Informational Injury .............................................................................9
         b.  Safe and Efficacious Drugs ................................................................10
         c.  Competitive Injury..............................................................................10
         d.  Economic Injury and Regulatory Burden............................................11
         e.  Enforcement and Illegality .................................................................12
         f.  Procedural Injury ...............................................................................13
      2.  Zone of Interests.......................................................................................15
         a.  Intended Beneficiaries within Zone ...................................................15
         b.  Suitable Challengers within Zone ......................................................17
         c.  Zone Inapposite for *Ultra Vires* Actions ..........................................17
      3.  Members' Injuries .....................................................................................18
         a.  Consumer Injuries..............................................................................18
         b.  Physician Injuries...............................................................................18
         c.  Pharmacist Injuries ............................................................................20
      4.  Other Factors ............................................................................................21
   B.  Federal-Question Jurisdiction..........................................................................21
   C.  Judicial Review Generally ...............................................................................22
      1.  Administrative Procedure Act....................................................................22
         a.  Final Agency Action ..........................................................................22
         b.  Adequate Remedy..............................................................................23
         c.  Legally Wronged, Aggrieved, and Adversely Affected .....................24
         d.  Committed to Discretion by Law ........................................................24
      2.  Non-APA Nonstatutory Review .................................................................25
         a.  This Court's Equity Jurisdiction.........................................................25
         b.  *Ultra Vires* Action ...........................................................................26
         c.  Declaratory Judgment Act...................................................................27

D.  Judicial Review against Individual-Capacity Officers ............................................27
E.  Exhaustion of Administrative Remedies....................................................29
II.  Defendants' Dispositive Motions Lack Merit ....................................................32
A.  Political Pressure Precludes *Chevron* Step Two .....................................33
B.  Reviewing Merits without Administrative Record ...................................35
C.  FDA and Duramed Not Entitled to Dismissal.........................................36
1.  Counts II and VI: Rx-OTC Dichotomy and Procedure ...................36
a.  §310.200 Cannot Switch Regulation for Order .....................39
b.  §310.200 Did Not Switch Regulation for Order....................40
2.  Count IV: Third Category of BTC Drugs.......................................43
3.  Count V: Rulemaking for Meaningful-Difference Test..................44
Conclusion.......................................................................................................45

## PRELIMINARY STATEMENT

In this action, Plaintiffs Association of American Physicians & Surgeons, Inc. ("AAPS"), Concerned Women for America ("CWA"), Family Research Council ("FRC"), and Safe Drugs for Women ("SDW") challenge agency actions and inaction by Defendants U.S. Food & Drug Administration ("FDA") and its Commissioner, Dr. Andrew C. von Eschenbach, in his official capacity and his individual capacity under color of legal authority (collectively, hereinafter "FDA"). Specifically, Plaintiffs challenge the following actions and inaction:

(1)     FDA's approval of levonorgestrel tablets, 0.75 mg (hereinafter "Plan B") for age-bifurcated, dual prescription ("Rx") and over-the-counter ("OTC") distribution;

(2)     FDA's proceeding without required rulemakings;

(3)     FDA regulations, to the extent that they limit Plaintiffs' right to judicial review here; and

(4)     FDA's deciding, or appearing to decide, to take items (1) and (2) under improper pressure from two U.S. Senators in the form of a "hold" on Dr. von Eschenbach's confirmation as FDA Commissioner.

The Court granted a motion by Duramed Pharmaceuticals, Inc. ("Duramed") to intervene as of right pursuant to FED. R. CIV. P. 24(a)(2) to defend its interests in Plan B. This memorandum of law sets forth the applicable standards of review for FDA's and Duramed's motions to dismiss, summarizes the applicable legal and factual background, establishes this Court's jurisdiction, and rebuts the merits arguments by FDA and Duramed for dismissal of Counts II, IV, V, and VI. In summary, the First Amended Complaint ("Compl.") and this memorandum establish that Duramed repeatedly refused to provide the pediatric data required to support its product and instead relied on political pressure to short-circuit the required public process and to coerce FDA into approving Plan B via a creative, but patently illegal, regulatory shortcut.

## STANDARDS OF REVIEW

By moving to dismiss the entire complaint under Rule 12(b)(1) and four counts under 12(b)(6), FDA and Duramed contend both that this Court lacks jurisdiction to hear any of this challenge and that Plaintiffs cannot prevail as a matter of law on Counts II, IV, V, and VI. This section outlines the standards of review relevant to the FDA and Duramed motions to dismiss.

**Rule 12(b)(1)**. Motions to dismiss under Rule 12(b)(1) allege that the pleadings fail to establish subject-matter jurisdiction. FED. R. CIV. P. 12(b)(1). To assess subject-matter jurisdiction – *i.e.,* "courts' statutory or constitutional *power* to adjudicate the case," *Steel Co. v. Citizens for a Better Envt.,* 523 U.S. 83, 89-90 (1998) (emphasis in original) – courts "must assume the challenging party's view of the merits." *Ciba-Geigy Corp. v. EPA,* 801 F.2d 430, 439 (D.C. Cir. 1986) (ripeness); *City of Waukesha v. EPA,* 320 F.3d 228, 235 (D.C. Cir. 2003) (same for standing); *Sierra Club v. Gorsuch,* 715 F.2d 653, 658 (D.C. Cir. 1983) (same for final agency action). In ruling on Rule 12(b)(1) motions, courts take the plaintiff's factual allegations as true and also "presume[] that general allegations embrace those specific facts that are necessary to support the claim." *Lujan v. Nat'l Wildlife Fed'n,* 497 U.S. 871, 889 (1990); *accord Nat'l Wildlife Fed'n v. Burford,* 835 F.2d 305, 311-12 (D.C. Cir. 1987); *Kean for Congress Committee v. Federal Election Comm'n,* 398 F.Supp.2d 26, 31 (D.D.C. 2005). As FDA notes, courts may explore matters outside the pleadings to determine their jurisdiction. FDA Mot. at 4 n.2 (*citing Land v. Dollar,* 330 U.S. 731, 735 n.4 (1947)); *Herbert v. National Academy of Sciences,* 974 F.2d 192, 197 (D.C. Cir. 1992). Before going outside the pleadings, however, a court first should provide notice to the parties and an opportunity to submit affidavits and other materials. *Gordon v. Nat'l Youth Work Alliance,* 675 F.2d 356, 360 (D.C. Cir. 1982); *Herbert,* 974 F.2d at 198 ("ruling on a Rule 12(b)(1) motion may be improper before the plaintiff has had a chance to discover the facts

necessary to establish jurisdiction"). Where jurisdiction merges with the merits (*i.e.,* "where the question of jurisdiction is dependent on decision of the merits"), courts may combine the merits and jurisdictional stages. *Land,* 330 U.S. at 735; *Herbert,* 974 F.2d at 198 (if "disputed jurisdictional facts… are inextricably intertwined with the merits of the case [the court] should usually defer its jurisdictional decision until the merits are heard").

**Rule 12(b)(6).** Motions to dismiss under Rule 12(b)(6) allege that the pleadings fail to state a claim upon which relief can be granted. FED. R. CIV. P. 12(b)(6). "FED. R. CIV. P. 8(a)(2) requires only a short and plain statement of the claim showing that the pleader is entitled to relief, in order to give the defendant fair notice of what the… claim is and the grounds upon which it rests." *Bell Atl. Corp. v. Twombly,* 127 S.Ct. 1955, 1964 (2007) (citations and interior quotations omitted). "[A] complaint attacked by a Rule 12(b)(6) motion… does not need detailed factual allegations," *id.,* provided that the plaintiff alleges "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action." 127 S.Ct. at 1965. "Factual allegations must be enough to raise a right to relief above the speculative level, on the assumption that all the allegations in the complaint are true (even if doubtful in fact)." *Id.* (citations, interior quotations, and footnote omitted). With "other things… equal," courts "prefer[] adjudication of cases on their merits rather than on the basis of formalities." *Ciralsky v. CIA,* 355 F.3d 661, 674 (D.C. Cir. 2004). Under that judicial preference, such dismissals are appropriate where a "plaintiff has no claim to state," but inappropriate where the "plaintiff has imperfectly stated what *may* be an *arguable* claim." *Alley v. R.T.C.,* 984 F.2d 1202, 1208 (D.C. Cir. 1993) (emphasis added). "[O]nce a claim has been stated adequately, it may be supported by showing any set of facts consistent with the allegations in the complaint." *Twombly,* 127 S.Ct. at 1969.

**Rule 56 Conversion**. FDA and Duramed include many exhibits and internet references outside the pleadings, which could convert their Rule 12(b)(6) motions into motions for summary judgment, FED. R. CIV. P. 12(b), and thereby trigger a "reasonable opportunity to present all material made pertinent to such a motion by Rule 56." *Id.*

**Judicial Review on Administrative Record**. When a district court reviews the actions of an administrative agency, it essentially sits as an appellate court reviewing the administrative record on which the agency acted. *Marshall County Health Care Auth. v. Shalala,* 988 F.2d 1221, 1226 (D.C. Cir. 1993). Significantly, the administrative record "includes all materials compiled by the agency... that were before the agency at the time the decision was made." *James Madison Ltd. v. Ludwig,* 82 F.3d 1085, 1095 (D.C. Cir. 1996) (internal quotation marks and citations omitted).[1] As explained in Section II.B, *infra,* FDA has not yet certified its record.

Where the record in question is judicially noticeable, the "district court can consult the [administrative] record to answer the legal question before the court" without converting a motion to dismiss into a motion for summary judgment. *Id.* & n.6. In the absence of a judicially noticeable or certified record, however, a court has no basis to go beyond the pleadings. FED. R. CIV. P. 44(a)(1); *Langston v. Johnson,* 478 F.2d 915, 918 n.17 (D.C. Cir. 1973) ("well settled that a certified transcript of… administrative proceedings may be considered on a motion for

---

[1]    *See also Camp v. Pitts,* 411 U.S. 138, 142 (1973) ("focal point for judicial review should be the administrative record already in existence, not some new record made initially in the reviewing court"); *Burlington Truck Lines v. U.S.,* 371 U.S. 156, 170 (1962) ("an agency's discretionary order [will] be upheld, if at all, on the same basis articulated in the order by the agency itself"); *SEC v Chenery Corp.,* 332 U.S. 194, 196 (1947) ("a reviewing court, in dealing with a determination or judgment which an administrative agency alone is authorized to make, must judge the propriety of such action solely by the grounds invoked by the agency [, which if] inadequate or improper, the court is powerless to affirm").

summary judgment"). Without a certified or judicially noticeable administrative record, this Court cannot evaluate FDA's extra-pleading assertions about the record. *SEC v Chenery Corp.,* 318 U.S. 80, 94 (1943) ("courts cannot exercise their duty of review unless they are advised of the considerations underlying the action under review"); *accord Ballard v. C.I.R.,* 544 U.S. 40, 62 (2005) ("the reviewing court shall evaluate the 'whole record'") (*quoting* 5 U.S.C. §706).

## **BACKGROUND**

**Statutory Background**. This action involves four statutes: the Federal Food, Drug, and Cosmetic Act ("FFDCA"), its 1951 Durham-Humphrey Amendments, the Pediatric Research Equity Act of 2003 ("PREA"), and the Administrative Procedure Act ("APA").

Congress enacted FFDCA's predecessor in 1906 to ensure safe and efficacious drugs:

> A century ago many Americans relied on stories to pick their medicines, especially from snake oil salesmen. Thanks to scientific advances and to the passage of the Federal Food, Drug and Cosmetic Act (FDCA) in 1906, we now rely on rigorous scientific proof to assure the safety and effectiveness of new drugs.

Drug Enforcement Administration, *Marijuana Scheduling Petition; Denial of Petition; Remand,* 57 FR 10,499, 10,502 (Mar. 26, 1992) (citations omitted). As relevant here, FFDCA prohibits marketing and sale of a "new drug" unless it has been proven safe and effective through approval of a new drug application ("NDA") or supplemental new drug application ("SNDA"), requiring the applicant to submit an extensive battery of analytical tests, animal studies, and human clinical safety and efficacy trials. 21 U.S.C. §355(a)-(b). FDA cannot lawfully approve an NDA or SNDA that is inadequate under even one of seven FFDCA-specified "grounds for denying approval." 21 U.S.C. §§355(c)(1), 355(d)(1)-(d)(7).

Prior to the enactment of the Durham-Humphrey Amendments, *see* Act of Oct. 26, 1951, ch. 578, 65 Stat. 648 (*codified at* 21 U.S.C. §353(b)), FFDCA addressed the distinction between Rx and OTC drugs by regulation. In pertinent part, the Durham-Humphrey Amendments re-

quired that new drugs approved for Rx distribution be dispensed via written, certain oral, or refill prescriptions, 21 U.S.C. §353(b)(1), unless FDA "by regulation remove[d the drug]… from the requirements of [§503(b)(1)] when such requirements are not necessary for the protection of the public health." 21 U.S.C. §353(b)(3); H.R. REP. No. 82-700, at 16. Under §503(b)(4)(A), a drug "subject to paragraph (1)" (*i.e.,* an Rx drug) is "misbranded if at any time prior to dispensing the label of the drug fails to bear, at a minimum, the symbol 'Rx only.'" 21 U.S.C. §353(b)(4)(A). By contrast, §503(b)(4)(B) renders a "drug to which paragraph (1) does not apply… misbranded if at any time prior to dispensing the label of the drug bears the symbol described in subparagraph (A)." 21 U.S.C. §353(b)(4)(B).

For NDAs and SNDAs filed after April 1999, PREA requires data packages to include an assessment and data for each relevant pediatric age group to enable FDA (a) to assess the drug's safety and efficacy for the claimed indications in all relevant pediatric subpopulations, and (b) to support dosing and administration for each pediatric subpopulation for which the drug is safe and effective. 21 U.S.C. §355c(a)(2)(A)(i)-(ii). Significantly, PREA limits the first criterion to claimed indications, but not the second criterion. Like FDA's Pediatrics Rule, 63 Fed. Reg. 66,632 (Dec. 2, 1998), on which it is based, PREA does not specify or define rigid age ranges for pediatric subpopulations. 63 Fed. Reg. at 66,650-51 (opposing proposed rule's rigid age ranges, adopting a flexible approach, and considering pediatric populations aged up to 21 years old).

The APA requires executive agencies such as FDA to conduct notice-and-comment rulemaking when promulgating or amending certain rules. 5 U.S.C. §553(b)-(c). Although an initial interpretation of a regulatory or statutory provision often is exempt from the notice-and-comment requirements, 5 U.S.C. §553(b)(A), the APA nonetheless requires agencies to undergo notice-and-comment rulemaking when *amending* certain rules. 5 U.S.C. §551(5) ("'rule making'

means agency process for formulating, amending, or repealing a rule").

 **Regulatory Background**. This action primarily involves two sets of regulations: FDA's regulation to implement the Durham-Humphrey Amendments, 21 U.S.C. §310.200 (hereinafter, "§310.200"), and FDA's rules of administrative practice, 21 C.F.R. pt. 10. Plaintiffs describe those two regulations in detail in Sections II.C.1.b ("§310.200 *Did Not* Switch Regulation for Order") and I.E ("Exhaustion of Administrative Remedies"), *infra,* respectively.

 **Factual Background**. For purposes of a motion to dismiss, the facts are those set forth in the complaint, including any reasonable inferences from those facts. In summary, in 1999, FDA approved an Rx-only NDA for Plan B, subject to a one-time PREA waiver. In 2003, Plan B's sponsor (now Duramed) sought to switch Plan B to OTC distribution, but FDA had safety concerns about young women. In response to FDA not-approvable letters based on safety concerns for younger women, Duramed proposed age bifurcation (*i.e.,* Rx for younger women, OTC for older women). FDA found that approach to present "difficult and novel issues," on which it issued an advance notice of proposed rulemaking ("ANPRM") on which Plaintiffs and their members filed comments. Two Senators publicly announced a hold on Acting Commissioner von Eschenbach's nomination as FDA Commissioner until FDA took final action on Plan B. Because FDA could not approve Plan B for OTC distribution without additional data on younger women, and Duramed had serially declined to submit such data, FDA had only two options: approval or an extended rulemaking (delaying Senate confirmation). On the eve of the confirmation hearing, FDA suddenly and without reasoned explanation resolved the "difficult and novel issues" and approved Plan B for age-bifurcated Rx-OTC distribution. According to Duramed's sworn testimony in conjunction with its motion to intervene, Plan B sales have more than doubled since OTC distribution began, and prescription sales have declined. Niemann Dec. ¶¶46-48.

## ARGUMENT

## I.  THIS COURT HAS SUBJECT-MATTER JURISDICTION

**A.  <u>Standing</u>**. To establish standing, a plaintiff must show that: (1) the challenged action constitutes an "injury in fact," (2) the injury is "arguably within the zone of interests to be protected or regulated" by the relevant statutory or constitutional provision, and (3) nothing otherwise precludes judicial review. *Ass'n of Data Processing Serv. Org., Inc. v. Camp,* 397 U.S. 150, 153 (1970). An "injury in fact" is (1) an actual or imminent invasion of a constitutionally cognizable interest, (2) which is causally connected to the challenged conduct, and (3) which likely will be redressed by a favorable decision. *Lujan v. Defenders of Wildlife,* 504 U.S. 555, 560-62 (1992). Statutes can confer rights, the denial of which constitutes injury redressable by a court. *Warth v. Seldin,* 422 U.S. 490, 514 (1975). For injuries directly caused by agency action, a plaintiff can show an injury in fact with "little question" of causation or redressability, but when an agency causes third parties to inflict injury, the plaintiff must show more to establish causation and redressability. *Id.* Under these standards, Plaintiffs have standing.

**1.  Injuries in Fact**. Injury includes both injury and threatened injury, *Los Angeles v. Lyons,* 461 U.S. 95, 101-02 (1983), which "need not be to economic or… comparably tangible" interests, and an "identifiable trifle" suffices. *Pub. Citizen v. FTC,* 869 F.2d 1541, 1547-48 (D.C. Cir. 1989). Although an abstract or generalized interest (*e.g.,* proper government operation, getting the "bad guys") cannot *establish* standing, the mere fact that many people share an injury cannot *defeat* standing. *FEC v. Akins,* 524 U.S. 11, 23 (1998). Further, a membership organization may establish standing either in its own right or on behalf of its members. *Hunt v. Washington State Apple Adver. Comm'n,* 432 U.S. 333, 343 (1977). An association may sue on behalf of "any one" of its members, notwithstanding that that member's interest conflicts with the interests of other members. *National Lime Ass'n v. E.P.A.,* 233 F.3d 625, 636 (D.C. Cir. 2000). At the

summary disposition phase, the member's affidavit will suffice, *id.,* but at the pleadings phase a mere allegation suffices. *Burford,* 835 F.2d at 312-13.[2] Plaintiffs allege several injuries.

> **a.   Informational Injury**. By denying the public (and therefore Plaintiffs) access to FFDCA-required label information, Compl. ¶¶17-18, FDA injured Plaintiffs. *Pub. Citizen v. FTC,* 869 F.2d 1541, 1546-52 (D.C. Cir. 1989) (informational standing for product warning labels); *Pub. Citizen v. DOJ,* 491 U.S. at 449-51; *Akins,* 524 U.S. at 21 ("plaintiff suffers an 'injury in fact' when the plaintiff fails to obtain information which must be publicly disclosed pursuant to a statute"); *Sargeant v. Dixon,* 130 F.3d 1067, 1070 (D.C. Cir. 1997) ("receipt of information is a tangible benefit the denial of which constitutes an injury").[3] At the purely informational level, a party seeking statutorily required information "need show [no] more than that they sought and were denied specific agency records," *Pub. Citizen v. DOJ,* 491 U.S. at 449; *Am. Friends Serv. Comm. v. Webster,* 720 F.2d 29, 55 (D.C. Cir. 1983) (professional researchers

---

[2]      *Sierra Club v. Morton,* 405 U.S. 727 (1972), asked whether advocacy for the natural environment qualified a corporation (the Sierra Club) as the natural environment's guardian *ad litem,* without alleging that Club members would suffer injury from a proposed ski resort in the Sierra Mountains. *Morton,* 405 U.S. at 750 n.8 (Douglas, J., dissenting). Although deforestation was a "setback" to the corporate Sierra Club's "abstract social interests," nothing in *Morton* prevented the Sierra Club from establishing its standing by amending its complaint to allege that its members not only intended to visit the forest in question but also "conducted regular camping trips" there. *Morton,* 405 U.S. at 735 n.8. Because Plaintiffs seek to enforce their members concrete rights, *Morton* is inapposite here.

[3]      In *Am. Farm Bureau,* this Court held that informational standing did not create a right to the informational product of an agency's FFDCA programmatic activities, which "simply has not yet been generated." *Am. Farm Bureau v. E.P.A.,* 121 F.Supp.2d 84, 98 (D.D.C. 2000) (rejecting informational standing based on any "governmental failure to implement or enforce [a] statutory provision simply because government action creates information"). Although *Am. Farm Bureau* states that "FFDCA is not [an information-rights] statute… [because] Section 408(p) does not require EPA to share the results of the endocrine disruptor screening program with the public," *Am. Farm Bureau,* 121 F.Supp.2d at 99, that statement about FFDCA §408(p) does not (and could not) cover FFDCA §503 drug labeling. *See Pub. Citizen,* 869 F.2d at 1546-52.

and those seeking information for use in possible litigation are within the zone of interests of records-preservation statutes). Label-based informational injuries support Counts I, II, and III.

      **b.  Safe and Efficacious Drugs**. Public-safety statutes such as FFDCA (Count I), PREA (Count III), and the Durham-Humphrey Amendments (Counts II, III, and VI) create rights, the denial of which (Compl. ¶¶18, 82-95) establishes standing. *Warth,* 422 U.S. at 514; *Am. Trucking Ass'ns v. Dep't of Transp.,* 166 F.3d 374, 385 (D.C. Cir. 1999) (exposure to unsafe activity is constitutionally and prudentially sufficient for standing to challenge agency action under safety statute). Safety- and efficacy-based injuries support Counts I, II, III, and VI.

      **c.  Competitive Injury**. Under the "competitor standing doctrine… when a challenged agency action authorizes allegedly illegal transactions that will almost surely cause [a] petitioner to lose business, there is no need to wait for injury from specific transactions to claim standing." *El Paso Natural Gas Co. v. FERC,* 50 F.3d 23, 27 (D.C. Cir. 1995); *Bristol-Myers Squibb Co. v. Shalala,* 91 F.3d 1493, 1499 (D.C. Cir. 1996) ("injury claimed here is not lost sales, *per se;*… [r]ather the injury claimed is exposure to competition"); *Liquid Carbonic Indus. Corp. v. FERC,* 29 F.3d 697, 701 (D.C. Cir. 1994) ("Increased competition represents a cognizable Article III injury") (citing cases). As Duramed itself admitted, prescription sales of Plan B are down. Niemann Decl. ¶48; Joseph Decl. ¶3 (Ex. 1); *Diamond v. Charles,* 476 U.S. 54, 66 (1986) (doctors have standing to challenge state actions that financially affect their abortion practices). Here, physicians clearly have competitive standing because FDA's action (and FDA's action alone) enabled the non-physicians to dispense Plan B, and this Court's vacating the Rx-OTC switch would terminate the non-physicians' authority to compete with physicians on this issue. Compl. ¶¶19-20. Although FDA argues that exposure to *legal* competition is not an injury, FDA Mot. at 15, this competition is *illegal. See* Compl. ¶¶44, 85-86, 103, 112; *see also* Section

II.C.1, *infra* (Plan B misbranded when held for sale); *Tel. & Data Systems, Inc. v. FCC,* 19 F.3d 42, 47 (D.C. Cir. 1994) ("injurious private conduct is fairly traceable to the administrative action contested in the suit if that action authorized the conduct or established its legality"). Physicians' competitive injuries support Counts II, III, IV, VI, and VII.

       **d.   Economic Injury and Regulatory Burden**. SDW's pharmacist members suffer economic and regulatory injuries: expanded legal liability caused by removing physicians from the Rx process; expense and administrative burden of implementing the CARE program; and compelled speech and other conscience-based objections to Plan B. *See* Compl. ¶¶23-26. Regarding liability, pharmacists often have immunity from malpractice suits when they correctly fill a physician's prescription. *See, e.g., Madison v. Am. Home Products Corp.,* 358 S.C. 449, 451, 595 S.E.2d 493, 494 (S.C. 2004); David J. Marchitelli, *Liability of Pharmacist Who Accurately Fills Prescription for Harm Resulting to User,* 44 A.L.R.5th 393 (1996 & Supp. 2007). Taking the physician out of the dispensing chain not only takes away that immunity, but also imposes CARE program's additional burdens of consulting with consumers, with or without compensation. Compl. ¶25. Of course, pharmacists' economic injuries are just as justiciable as physicians' economic injuries. *Diamond,* 476 U.S. at 66.

       Similarly, the administrative burdens arbitrarily imposed on them "[c]learly... me[e]t the constitutional requirements, and... [they] therefore ha[ve] standing to assert [their] own rights," the "[f]oremost" of which is the "right to be free of arbitrary or irrational [agency] actions." *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.,* 429 U.S. 252, 263 (1977). Finally, many pharmacist members oppose Plan B on religious grounds, *e.g.,* Pontifical Academy for Life, Statement on the So-Called "Morning-After Pill" (Oct. 31, 2000) ("the proven "anti-implantation" action of the morning-after pill is really nothing other than a chemically induced abortion [and]

[a]ll who, whether sharing the intention or not, directly co-operate with this procedure are also morally responsible for it") (Ex. 2), and would prefer not to be involved with Plan B's distribution. These desires – even more than the imposition of additional administrative burden – implicate legally cognizable interests that SDW seeks to protect, *Menges v. Blagojevich,* 451 F.Supp.2d 992, 999-1002 (C.D. Ill. 2006) (pharmacists state a claim against a state contraceptive rule under First Amendment's Free Exercise clause), particularly in states (such as Washington State and Illinois) that compel pharmacists to distribute Plan B. Compl. ¶¶6, 15, 24-26. Pharmacists' economic injuries and regulatory burdens support Counts II, III, IV, VI, and VII.

       e.   **Enforcement and Illegality**. Under Plaintiffs' view of the law, Plan B is misbranded when held for sale. Section II.C.1, *infra;* Compl. ¶103. As such, pharmacists face the threat of prosecution for dispensing Plan B. *See, e.g.,* S.D. CODIFIED LAWS §36-11A-46(10); 63 PA. CONS. STAT. §390-5(a)(9)(vii); WASH. REV. CODE §§69.04.040(1), (3), .540; 410 ILL. COMP. STAT. 620/3.1, 3.3, 16. Significantly, many states would exempt Duramed – but not pharmacists – because of FDA's approval. S.D. CODIFIED LAWS §36-11A-46(10). Thus, for example, to halt the unlawful distribution of Plan B, a South Dakota prosecutor would need to prosecute a pharmacist, not Duramed. Pharmacists have standing to seek a declaration of the law, rather than risk committing criminal and professional violations. See *Diamond,* 476 U.S. at 66; *Tele. & Data Systems,* 19 F.3d at 47; *Indep. Bankers Ass'n of Am. v. Heimann,* 613 F.2d 1164, 1167 (D.C. Cir. 1979) (standing to challenge agency action that forces regulated entity to choose between more costly and otherwise illegal sales method versus risking prosecution and unethical conduct); *Planned Parenthood of Cent. Mo. v. Danforth,* 428 U.S. 52, 62 (1976) ("[person] against whom [the act] directly operate[s]… assert a sufficiently direct threat of personal detriment"). To the extent that Plaintiffs must establish a "credible threat of prosecution" to seek pre-enforcement

review, *Babbitt v. United Farm Workers Nat'l Union,* 442 U.S. 289, 298 (1979), Plaintiffs re-

quire jurisdictional discovery. Joseph Decl. ¶4. Plaintiffs contend, however, that the threat-of-

enforcement restriction does not apply with equal force to threats from administrative action as

to those from presumptively valid statutes. *See Chamber of Commerce v. FEC,* 69 F.3d 600,

603-04 (D.C. Cir. 1995) (unlike statutes, administrative action "is typically reviewable without

waiting for enforcement, [which makes] this case… *a fortiori* to the statutory cases"); *cf. Mass.

v. EPA,* 127 S.Ct. 1438, 1454 (2007) (States' interest in preserving sovereignty alters standing

analysis). Pharmacists' enforcement-based injuries support Counts I, II, III, IV, and VI.

      **f.    Procedural Injury**. "The history of liberty has largely been the history of ob-

servance of procedural safeguards." *Dart v. U.S.,* 848 F.2d 217, 218 (D.C. Cir. 1988) (*quoting

McNabb v. U.S.,* 318 U.S. 332, 347 (1943)). Plaintiffs allege FDA's failure to observe several

such safeguards, Compl. ¶¶121, 124, 125, for which "those adversely affected… generally have

standing to complain." *FEC v. Akins,* 524 U.S. 11, 25 (1998) (citing cases). Rescission and

remand may produce the same result, *id.,* but until that happens, the initial injury remains "fairly

traceable" to the agency's initial action, and redressable by an order striking the initial agency

action, *id.* Although *FEC v. Akins* did not involve a rulemaking violation, this Circuit has ex-

tended its causation and redressability rationale to such violations. *ALDF,* 154 F.3d at 444.

Plaintiffs need not show that a rulemaking will provide the desired result: "If a party claiming

the deprivation of a right to notice-and-comment rulemaking . . . had to show that its comment

would have altered the agency's rule, section 553 would be a dead letter." *Sugar Cane Growers

Co-op. of Florida v. Veneman,* 289 F.3d 89, 94-95 (D.C. Cir. 2002).

      In addition to the foregoing administrative-law procedural injuries, FDA's regulations

purportedly require Plaintiffs to file an administrative petition with FDA before filing this litiga-

tion. FDA Mot. at 32-34; Duramed Mot. at 19-21. Although Plaintiffs dispute it in Section I.E, *infra,* assuming *arguendo* that FDA's regulations indeed require Plaintiffs to file an administrative petition prior to filing this litigation, that regulatory requirement violates Plaintiffs' rights under the First Amendment to petition this Court for relief. *See Cal. Motor Transp. Co. v. Trucking Unlimited,* 404 U.S. 508, 510 (1972) ("right of access to the courts is indeed but one aspect of the right of petition"); *Int'l Primate Protection League v. Adm'rs of Tulane Educ. Fund,* 500 U.S. 72, 77 (1991) (losing the opportunity to file in the "forum of… choice" is a cognizable injury in fact); Compl. ¶37. Further, FDA's restricting Plaintiffs' ability to seek preliminary relief would violate separate-of-powers principles. *Metro. Washington Airports Auth. v. Citizens for the Abatement of Aircraft Noise,* 501 U.S. 252, 271 (1991) ("separation-of-powers principle, the aim of which is to protect…. the whole people from improvident laws") (citations and internal quotations omitted). While Plaintiffs do not doubt that *Congress* could place limits on their First Amendment rights in appropriate circumstances, *see, e.g.*, *Int'l Union v. Nat'l Right to Work Legal Def. & Ed. Found., Inc.,* 590 F.2d 1139, 1147 (D.C. Cir. 1978), Congress has neither done so here nor delegated FDA any authority to do so.

Because Plaintiffs also allege several concrete injuries, *see* Sections I.A.1.a-f, *supra,* they have standing to challenge FDA's procedural violations. *Florida Audubon Soc'y v. Bentsen,* 94 F.3d 658, 664-65 (D.C. Cir. 1996) ("procedural-rights plaintiff must show not only that the defendant's acts omitted some procedural requirement, but also that it is substantially probable that the procedural breach will cause the essential injury to the plaintiff's own interest") (*en banc*); *Defenders of Wildlife,* 504 U.S. at 571-72 & n.7 (only parties with an underlying *concrete* interest – *e.g.,* those living next to a proposed dam – can base standing on *abstract* procedural rights). Given these concrete injuries, redressability and immediacy apply to the *present proce-*

*dural violation,* which may someday injure the concrete interest, rather than to the concrete (but less certain) future injury. *Nat'l Treasury Employees Union v. U.S.,* 101 F.3d 1423, 1428-29 (D.C. Cir. 1996). In light of the existing concrete injuries on Counts I, II, III, and IV, procedural injuries support Counts V, VI, VII, and VIII.

    **2.**   **Zone of Interests**. The "zone of interest" prong of standing is a prudential doctrine that asks whether the interests to be protected *arguably* fall within those protected by the relevant statute. *Nat'l Credit Union Admin. v. First Nat'l Bank & Trust, Co.,* 522 U.S. 479, 492 (1998). Congress can waive the judiciary's prudential standing doctrines, and here FDA itself has waived it. Compl. ¶31; *cf.* Section I.E (this action complies with FDA's rules of practice). In any event, if it applies, this generous and undemanding test focuses not on Congress' intended beneficiary, but on those who in practice can be expected to police the interests that the statute protects. *Animal Legal Defense Fund v. Glickman,* 154 F.3d 426, 444 (D.C. Cir. 1998) (*en banc*); *Am. Friends Serv. Comm. v. Webster,* 720 F.2d 29, 52 (D.C. Cir. 1983) ("the relatively rigorous requirements for establishing congressional intent to create a private right of action should not be equated with the 'slight' indicia standard under the 'zone' test") (footnote omitted). To show that they are *arguably* "protected" by a statute, plaintiffs may demonstrate that they are either the statute's intended beneficiaries or "suitable challengers" to enforce the statute.

    **a.**   **Intended Beneficiaries within Zone**. For intended beneficiaries, "'slight beneficiary indicia' are sufficient to sustain standing." *Am. Friends Serv. Comm.,* 720 F.2d at 50 & n.37. Pharmacists and consumers unquestionably are at the center of Durham-Humphrey Amendments' zone of interests: "to protect the public from abuses in the sale of potent prescription drugs" and "to relieve retail pharmacists and the public from burdensome and unnecessary restrictions on the dispensing of drugs safe for use without the supervision of a physician." S.

REP. NO. 82-946, at 1; *accord* H.R. REP, NO. 82-700, at 2 (Jul. 16, 1951). Physicians also fall

within the zone: "the bill... will benefit drug manufacturers, retail druggists, medical practitio-

ners, and the public." S. REP. NO. 82-946, at 2; *accord* H.R. REP. 700, at 9 (House "committee

[was] deeply conscious of the fact that the power to determine which drugs are prescription

drugs and which are over-the-counter drugs is one which affects drug manufacturers, drug

wholesalers, retail druggists, pharmacists, physicians, and, last but not least, the general public").

In applying the zone of interests test, courts must focus on the specific statutory provision rather

than the overarching statute (*e.g.,* §503(b)(3) or PREA, rather than the entire FFDCA) and look

to the legislative history to gauge the arguable zone of interests. *Amgen, Inc. v. Smith,* 357 F.3d

103, 108-110 (D.C. Cir. 2004) ("court [incorrectly] focused on the broad purpose of the Medi-

care Act 'to provide more adequate and feasible health insurance protection for the elderly,' and

neglected the more specific interest protected by § (t)(6) itself, namely, preventing 'restricted

beneficiary access to drugs, biologicals and new technology'") (internal citations omitted, *citing*

H.R. REP. NO. 106-436(I), at 53). Because of physicians' nexus with the dispensing of drugs and

with the prescription-OTC dichotomy, their authority over prescription drugs, and their patients'

interest in safe and effective drugs, physicians fall within the relevant statutory zones of interest

as both first-party and third-party plaintiffs, as Congress recognized by making Rx-removal

proceedings an open regulation rather than a closed SNDA proceeding.[4]

---

[4]    The zone of interests can limit procedural standing, *Defenders of Wildlife,* 504 U.S. at
571-72 & n.7 (only a party with an underlying concrete interest can enforce an agency's obliga-
tion to create an environmental impact statement); *Lujan v. Nat'l Wildlife Fed'n,* 497 U.S. 871,
883 (1990) (court reporter lacks prudential standing to challenge failure to comply with a statu-
tory mandate to conduct hearings on the record), but Plaintiffs fall within the procedural zones
for the same reasons that they fall within the concrete zones. In other words, Plaintiffs' members
live near this particular dam. *Defenders of Wildlife,* 504 U.S. at 571-72 & n.7.

**b. Suitable Challengers within Zone**. Even if not intended beneficiaries, plaintiffs satisfy the zone of interests as "suitable challengers" if they have "interests… sufficiently congruent with those of the intended beneficiaries that [they] are not more likely to frustrate than to further the statutory objectives." *First Nat'l Bank & Trust Co. v. Nat'l Credit Union Admin.,* 988 F.2d 1272, 1275 (D.C. Cir. 1993); *Reytblatt v. Nuclear Regulatory Comm'n,* 105 F.3d 715, 721 (D.C. Cir. 1997) (same); *MD Pharm., Inc. v. D.E.A.,* 133 F.3d 8, 13 (D.C. Cir. 1998) (same). Thus, even if certain statutory provisions are intended to benefit only pharmacists or non-patient consumers, physicians remain a "suitable" first-party and third-party challenger because their interests and their patients' interest in safe, accurately labeled drugs "further[s]," rather than "frustrate[s the]… statutory objectives." Although Plaintiffs and FDA disagree on what the statute requires, Plaintiffs do not seek relief inconsistent with their view of what the statute requires, which this Court assumes to decide standing. *City of Waukesha,* 320 F.3d at 235.

**c. Zone Inapposite for *Ultra Vires* Actions**. Finally, even if plaintiffs are not intended beneficiaries or suitable challengers, they may challenge *ultra vires* agency action, to which the zone-of-interest test essentially does not apply. *Haitian Refugee Ctr. v. Gracey,* 809 F.2d 794, 811-12 & nn.13-14 (D.C. Cir. 1987).

> It may be that a particular constitutional or statutory provision was intended to protect persons like the litigant by limiting the authority conferred. If so, the litigant's interest may be said to fall within the zone protected by the limitation. Alternatively, it may be that the zone of interests requirement is satisfied because the litigant's challenge is best understood as a claim that *ultra vires* governmental action that injures him violates the due process clause.

*Haitian Refugee Ctr.,* 809 F.2d at 812 n.14; *accord Chiles v. Thornburgh,* 865 F.2d 1197, 1210-11 (11th Cir. 1989). Because FDA acted outside its authority (*i.e., ultra vires*) on all counts except Count I, the zone of interest test does not limit physicians' standing (except for Count I),

even if Plaintiffs fall outside the relevant statutory zones and fail as suitable challengers.

**3. Members' Injuries**. Three categories of members suffer injury: consumers, physicians, and pharmacists. All three suffer the informational injuries alleged here, consumers for their own use (or their minor children's use) and physicians and pharmacists for professional purposes. The next three sections address the other injuries to each member category.

**a. Consumer Injuries**. Contrary to Duramed's views on its product, the standing inquiry assumes the *Plaintiffs' view, City of Waukesha,* 320 F.3d at 235, under which the Plan B label is highly misleading, Compl. ¶¶67-72 (Plan B label is misleading, as Duramed's own label-comprehension study confirmed[5]). Under *Plaintiffs' view,* women patients are exposed to a drug that Plan B's sponsor falsely and misleadingly advertised, as found by FDA's Division of Drug Marketing, Advertising, and Communications, Compl. ¶71, in violation of statutory rights that FFDCA creates in these patients to non-misleading labeling. *Warth,* 422 U.S. at 514 (statutes can confer rights, the denial of which constitutes injury). Duramed repeatedly avoided preparing the pediatric data that PREA requires, which endangers adolescents – above and below 18 years of age – when they take Plan B in misplaced reliance on FDA and Duramed. Compl. ¶¶21-22. Finally, by illegally removing Plan B from prescription requirements, FDA has exposed not only adults but also minors (for whom even FDA found it unsafe) to Plan B. Compl. ¶¶70, 76, 95.

**b. Physician Injuries**. AAPS and SDW allege that their physician members face heretofore-unlawful competition from pharmacists because – prior to Plan B's switch from Rx to OTC distribution, only their physician members lawfully could provide access to Plan B, but

---

[5]    Duramed claims that its labeling changed after the label comprehension study, which renders the study inapposite to the current labeling. Duramed Mot. at 12 n.12. Neither Plaintiffs nor the Court can evaluate that claim, much less the extent of changes, without a certified record.

now pharmacists can provide that access without a physician's prescription. Compl. ¶¶19-20; Ritter Decl., ¶¶3-6 (Ex. 3). In addition, the Complaint and Dr. Ritter allege (1) a constitutional injury (namely, the foregoing exposure to otherwise-illegal competition), (2) a close relationship with patients, Compl. ¶¶21-22; Ritter Decl., ¶9, and (3) the hindrance to his patients' asserting their own rights, Compl. ¶21-22; Ritter Decl., ¶9. Based on the foregoing, Dr. Ritter as well as many more similarly situated physician-members assert injuries under the Durham Humphrey Amendments, PREA, and FFDCA.

Following *Powers v. Ohio,* 499 U.S. 400, 411 (1991), this Circuit allows third-party standing *inter alia* where the first-party has suffered a constitutional injury in fact, has a close relationship with the third party, and "some hindrance" prevents the third party's asserting its own rights. *American Immigration Lawyers Ass'n v. Reno,* 199 F.3d 1352, 1361-62 (D.C. 2000). Significantly, "unawareness of the injury" qualifies as a sufficient hindrance, *id.,* at 1363 (*citing Lepelletier v. FDIC,* 164 F.3d 37, 43 (D.C. Cir. 1999)), which applies here. *See* Ritter Decl., ¶9 ("patients tend to trust in the safety inherent in government approval generally and FDA approval specifically, these patients will neither appreciate nor even recognize the risks"). Thus, unlike the aliens in *American Immigration Lawyers Ass'n,* 199 F.3d at 1363, AAPS members' patients generally and Dr. Ritter's specifically will not know of their exposure to the statutory harm. Similarly, in *Powers,* the third party had "little incentive" to bring suit because "of the small financial stake involved and the economic burdens of litigation." 499 U.S. at 415. If patients learn about Plan B (*e.g.,* its overstated efficacy, unproven safety for repeat use, and lack of safety data for young women), they simply will avoid it. As in *Powers,* they will have little

incentive to sue.[6] As such, physicians can "by default [become] the right's best available propo-

nent." *American Immigration Lawyers Ass'n,* 199 F.3d at 1362 (quotations omitted).

      **c.   Pharmacist Injuries**. SDW alleges several injuries on behalf of pharmacist

members: expanded legal liability caused by removing physicians from the Rx process; expense

and administrative burden; and compelled speech and other conscience-based objections. Compl.

¶¶23-26. As with physicians' injuries, these pharmacists' injuries are justiciable and either

within the relevant zone of interests or imposed by FDA's *ultra vires* actions, to which no zone

of interest applies. Duramed alleges that many of these injuries, if injuries at all, are imposed by

third parties. Duramed Mot. at 19 n.16. In *Nat'l Parks Conserv. Ass'n v. Manson,* 414 F.3d 1

(D.C. Cir. 2005) ("*NPCA*"), this Circuit found standing based on federal regulations that legally

required third-party state regulators to *consider* (and to *justify* a departure from) a federal ad-

verse-impact determination. *NPCA,* 414 F.3d at 6. Even this low regulatory threshold – requiring

only *consideration* and *justification* – nonetheless "alters the legal regime" sufficiently to "un-

dermine[]" the federal government's invocation of third-party standing cases that involve inde-

pendent actors. *Id.* (*quoting Bennett v. Spear,* 520 U.S. 154, 169 (1997), *distinguishing Simon v.

E. Ky. Welfare Rights Org.,* 426 U.S. 26, 41-42 (1976)). Plaintiffs seek to establish that OTC

Plan B is misbranded when held for sale, *see* Compl. ¶103; Section II.C.1, *infra,* Plaintiffs'

prevailing here would free members from state-law (or employers') compulsion to distribute it,

---

[6]     Duramed argues that consumers would not have standing to sue because their injuries are speculative and not imminent. Duramed Mot. at 6-8 (citing *inter alia Pub. Citizen v. NHTSA,* 489 F.3d 1279, 1296 (D.C. Cir. 2007)). Further, given the prospect of jurisdictional discovery by Duramed, Plaintiffs have had difficulty finding a consumer or consumer parent affiant willing to subject their personal affairs to this litigation. Joseph Decl. ¶5. Both issues further hinder the rights-holder's bringing suit and commend third-party standing for physicians.

U.S. CONST. art. VI, cl. 2, which more than meets the *NPCA* test for establishing that relief here will protect these pharmacists from the injuries that Plan B's OTC dispensing inflicts on them.

    **4.   Other Factors**. Aside from the bases for dismissal pressed by the FDA and Duramed motions, no legal or equitable principles preclude this action.

    **B.   <u>Federal-Question Jurisdiction</u>**. Notwithstanding that the Complaint alleges various violations of FFDCA, the Durham-Humphrey Amendments, PREA, and APA, FDA cites two strands of inapposite cases to argue this action does not "arise under" federal law for 28 U.S.C. §1331: (1) state-law claims with a federal defense, and (2) an appeal to a federal court of limited jurisdiction (the Federal Circuit). FDA Mot. at 27-28. Here, by contrast, Plaintiffs allege violations of federal law in a federal court of general jurisdiction. *See Herero People's Reparations Corp. v. Deutsche Bank, A.G.,* 370 F.3d 1192, 1195 (D.C. Cir. 2004) (claim arises under federal law when the complaint alleges a violation of federal law). In 1976, Congress expanded §1331's subject-matter jurisdiction to all challenges to federal administrative agencies and officers by removing the then-applicable amount-in-controversy requirement:

> An anomaly in Federal jurisdiction prevents an otherwise competent United States district court from hearing certain cases seeking 'nonstatutory' review of Federal administrative action, absent the jurisdictional amount in controversy required by [§1331], the general 'Federal question' provision. These cases 'arise under' the Federal Constitution or Federal statutes, and the committee believes they are appropriate matters for the exercise of Federal judicial power regardless of the monetary amount involved.

*Califano v. Sanders,* 430 U.S. 99, 105 (1977) (*quoting* S. REP. NO. 94-996 at 12 (1976)) (Court's emphasis). As the Court noted, "[t]he *obvious* effect of [eliminating §1331's amount-in-controversy requirement against federal agencies and officers], subject only to preclusion-of-review statutes created or retained by Congress, is to confer jurisdiction on federal courts to review agency action, regardless of whether the APA of its own force may serve as a jurisdic-

tional predicate." *Sanders,* 430 U.S. at 107 (emphasis added). Because FDA cannot allege that a statute *precludes* review, its federal-question argument is exceptionally baseless.

**C.   Judicial Review Generally**. FDA implies that, because FFDCA has no relevant *statutory* review (*i.e.,* no FFDCA-specific provisions for judicial review applicable to Plaintiffs), Plaintiffs lack a cause of action. FDA Mot. at 27-32. FDA's argument ignores *nonstatutory* review (*i.e.,* general review from a non-FFDCA source), such as the Administrative Procedure Act ("APA") and non-APA, nonstatutory review (*e.g.,* Declaratory Judgment Act, this Court's equity jurisdiction, officer suits under *Ex parte Young*). The following two sections address APA review (including its waiver of sovereign immunity) and non-APA review, respectively.[7]

**1.   Administrative Procedure Act**. Under the APA, persons aggrieved within the meaning of a relevant statute are entitled to judicial review of *inter alia* final agency action for which the plaintiff lacks an adequate legal remedy. 5 U.S.C. §§702-704. Under the APA, courts "shall… compel agency action unlawfully withheld," "set aside agency action… found to be… arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," "in excess of statutory… authority," or "without observance of procedure required by law." 5 U.S.C. §706. Absent clear and convincing evidence of legislative intent *to preclude* review, agency action is reviewable. *Block v. Community Nutrition Inst.,* 467 U.S. 340, 345 (1984); *Abbott Labs., Inc., v. Gardner,* 387 U.S. 136, 141 (1967). Significantly, §702 waives sovereign immunity.

**a.   Final Agency Action**. FDA is an APA "agency." 5 U.S.C. §§101, 551(1),

---

[7]    In arguing against Plaintiffs' interest in the challenged agency actions, FDA appears to assume the merits of its position that §503(b)(3) and §310.200(b) allowed FDA to proceed without a *public* rulemaking, in which Plaintiffs and their members *would participate* (and in which they *did participate* with respect to the ANPRM). Compl. ¶27. This Court must conduct its jurisdictional analysis under Plaintiffs' view of the law. *See* Section I, *supra,* at 8.

701(b). Although FDA does not seriously contest it, the challenged actions are "agency action," which the APA defines to include "an agency rule, order,… or the equivalent or denial thereof, or failure to act." 5 U.S.C. §551(13). And "order" means:

> *the whole or a part of a final disposition,* whether affirmative, negative, injunctive, or declaratory in form, *of an agency in a matter other than rule making* but including licensing[.]

*Id.* §551(6) (emphasis added). In sum, the challenged actions here (*e.g.,* approval of an SNDA, failure to conduct discrete rulemakings) clearly constitute "agency action" under the APA.[8]

*Bennett v. Spear,* 520 U.S. 154, 177-78 (1997), sets a two-part test to determine whether agency action is *final:* (1) it "must mark the 'consummation' of the agency's decision making process" and not "merely tentative or interlocutory" in nature; and (2) it "must be one by which rights or obligations have been determined, or from which legal consequences will flow." All of the relevant actions and inaction here are final because FDA has concluded its deliberations (*e.g.,* approved the SNDA, without the required rulemakings), with legal consequences (*e.g.,* OTC availability of Plan B without the required public process).

    **b.    Adequate Remedy**. Under the APA, "final agency action for which there is no other adequate remedy *in a court* [is] subject to judicial review." 5 U.S.C. §704 (emphasis added). Plaintiffs lack *any* alternate remedy *in court.* Section I.E, *infra,* responds to the argument

---

[8]    FDA mischaracterizes the limits on APA's reach found in *Norton v. S. Utah Wilderness Alliance,* 542 U.S. 55 (2004) ("*SUWA*"). FDA Mot. at 31. *SUWA* found that APA inaction extends only to inaction on discrete actions that the agency was legally required to take, as distinct from programmatic inaction. *SUWA,* 542 U.S. at 62-63. Where agencies indeed act, the APA allows a programmatic challenge. *Lujan v. Nat'l Wildlife Fed'n,* 497 U.S. 871, 890 n.2 (1990) ("If there is in fact some specific order or regulation, applying some particular measure across the board to all individual classification terminations and withdrawal revocations,... it can of course be challenged under the APA... and the entire [regulatory program] insofar as the content of that particular action is concerned, would thereby be affected").

that Plaintiffs failed to exhaust *administrative* remedies.

      **c.**  **Legally Wronged, Aggrieved, and Adversely Affected**. As FDA notes, the APA provides an action when agency action causes legal wrong or aggrieves or adversely affects a person within the meaning of a relevant statute. FDA Mot. at 30 (*citing* 5 U.S.C. §702). Significantly, §702 was the predicate for the Supreme Court's initial invocation of the "zone of interests" test. *Camp,* 397 U.S. at 153-54. Accordingly, FDA's reprise of its zone-of-interests argument in its APA discussion serves no purpose. *See* FDA Mot. at 30-32. If Plaintiffs lack standing, it would not matter whether the APA applies. The opposite also is true: "[w]ant of right and want of remedy are justly said to be reciprocal" so that "[w]here… there has been a violation of a right, the person injured is entitled to an action." *Alabama Power Co. v. Ickes,* 302 U.S. 464, 479 (1938). The Attorney General cited *Ickes* as the leading case on the existing law codified by this section of the APA (now §702). Administrative Procedure Act, Legislative History, 79th Cong., S.Doc. No. 248, 79th Cong., 2d Sess., at 230 (1946) (hereinafter "APA Leg. Hist."). Because Plaintiffs are in the zone of interests, *see* Section I.A.2, *supra,* they also satisfy §702.

      **d.**  **Committed to Discretion by Law**. Under 5 U.S.C. §701(a)(2), courts will find agency actions "committed to agency discretion by law" in "those *rare instances* where statutes are drawn in such broad terms that *in a given case* there is no law to apply." *Citizens to Preserve Overton Park, Inc. v. Volpe,* 401 U.S. 402, 410 (1971) (interior citations omitted, emphasis added); *accord Heckler v. Chaney,* 470 U.S. 821, 830 (1985) ("if no judicially manageable standards are available for judging how and when an agency should exercise its discretion," then §701(a)(2) precludes review). Of course, that an agency *has discretion* does not preclude judicial review. *See* 5 U.S.C. §706(2)(A) (judicial review of *abuse of discretion*). Instead, to preclude review, discretion must be "committed to [the] agency… by law." 5 U.S.C. §701(a)(2).

No law irrevocably commits any of the challenged actions to FDA's discretion.

2. **Non-APA Nonstatutory Review**. As indicated, Plaintiffs assert several non-APA bases for judicial review here. Significantly, the APA does not limit these non-APA actions. *Nat'l Treasury Employees Union v. Campbell,* 589 F.2d 669, 673 n.7 (D.C. Cir. 1978) (Mandamus Act, APA, and other nonstatutory review are distinct, alternate causes of action) ("*NTEU*"); *Chamber of Commerce v. Reich,* 74 F.3d 1322, 1328 (D.C. Cir. 1996) (APA did not alter the pre-APA nonstatutory judicial review doctrines); *Dart v. U.S.,* 848 F.2d 217, 224 (D.C. Cir. 1988) ("[n]othing in the subsequent enactment of the APA altered [or] repeal[ed] the review of *ultra vires* actions recognized long before"). Significantly, "inquiry into whether suit lies under *Ex parte Young* does not include [merits] analysis," *Verizon Md., Inc. v. Pub. Serv. Comm'n of Md.,* 535 U.S. 635, 636-37 (2002), and thus does not allow dismissal without a merits analysis. As FDA notes, however, the Court's finding APA review would obviate the need to resort to these non-APA bases for judicial review.[9] FDA Mot. at 45.

a. **This Court's Equity Jurisdiction**. This Court long has had equity jurisdiction over federal officers that exceeds that of other district courts. *Kendall v. U.S. ex rel. Stokes,* 37

---

[9]    By contrast, as signaled by the *NTEU, Reich,* and *Dart* decisions cited above, there are numerous (and controlling) instances where a plaintiff who lacked an APA cause of action nonetheless could sue under the alternate, pre-APA modes of judicial review. *See also, e.g., Indep. Broker-Dealers' Trade Ass'n v. SEC,* 442 F.2d 132, 143 & n.18 (D.C. Cir. 1971) ("[if APA] should be given narrow reading, the action is sustainable by reference to the general equity jurisdiction of the District Court"); *Franklin v. Massachusetts,* 505 U.S. 788, 801 (1992) (equitable review of agency action that did not qualify for APA review); *Pickus v. U.S.,* 543 F.2d 240, 243-44 & n.10 (D.C. Cir. 1976) (*citing* cases); *Webster v. Doe,* 486 U.S. 592, 601-03 (1988); *cf. Texas Rural Legal Aid, Inc. v. Legal Serv. Corp.,* 940 F.2d 685, 696-97 (D.C. Cir. 1991) (non-APA agency's decisions remain "subject to the pre-APA requirement that administrative decisions be rationally based – a standard that courts have held is equivalent to the APA's requirement that agency action not be arbitrary or capricious").

U.S. (12 Pet.) 524, 580-81 (1838); *Stark v. Wickard,* 321 U.S. 288, 290 n.1 (1944); *Peoples v. Dep't of Agriculture,* 427 F.2d 561, 564 (D.C. Cir. 1970). Neither the APA nor the Mandamus Act displaced or limited this historic jurisdiction, which derives both from the court's enabling legislation and Maryland's ceding the District's territory to form the District as a federal enclave. *Peoples,* 427 F.2d at 565; *Gamen v. Heckler,* 746 F.2d 844, 851 (D.C. Cir. 1984).[10]

      **b.**   ***Ultra Vires* Action**. Plaintiffs allege that FDA acted (and continues to act) *ultra vires* its authority. Under the "*Larson-Dugan* exception," an equitable action lies against a federal officer's actions beyond the officer's constitutional or statutory authority, on the grounds that "where the officer's powers are limited by statute, his actions beyond those limitations are considered individual and not sovereign actions." *Larson v. Domestic & Foreign Commerce Corp.,* 337 U.S. 682, 689 (1949); *Dugan v. Rank,* 372 U.S. 609, 621-23 (1963); *accord Clark v. Library of Congress,* 750 F.2d 89, 102 (D.C. Cir. 1984) (citing cases). "[Agencies are] creature[s] of statute," that have "no constitutional or common law existence or authority, but only

---

[10]    The current statute confers the same jurisdiction as that on which the *Peoples* court relied. *Compare* D.C. Code §11-501 *with* D.C. Code §11-521 (1967) (Ex. 4). Both versions grant this Court "any other jurisdiction conferred *by law*" in addition to "jurisdiction as a United States district court." The "law" establishing this Court confers it with "general jurisdiction in law and equity." *See* Act of March 3, 1863, 12 Stat. 762; Act of June 25, 1936, 49 Stat. 1921. The District of Columbia Court Reorganization Act of 1970 did not repeal this jurisdiction, but instead retained the jurisdiction granted to this Court "by law," D.C. Code §11-501, which cannot impliedly repeal the prior jurisdiction. *Schlesinger v. Councilman,* 420 U.S. 738, 752 (1975) ("'repeals by implication are disfavored,' and this canon of construction applies with particular force when the asserted repealer would remove a remedy otherwise available"). Indeed, the legislative history of the 1976 statute waiving sovereign immunity for equitable relief notes that, under the then-current law, plaintiffs could escape the then-applicable $10,000 amount-in-controversy requirement by seeking to enjoin federal officers in the District of Columbia. H.R. Rep. No. 94-1656, at 15-16, *reprinted in* 1976 U.S.C.C.A.N. 6121, 6136. In other words, Congress itself recognized in 1976 that its 1970 Reorganization Act had left intact this Court's equitable jurisdiction over federal actors.

those authorities conferred upon it by Congress." *Michigan v. EPA,* 268 F.3d 1075, 1081 (D.C. Cir. 2001). Without statutory authority, the agency has none. *Id; Louisiana Pub. Serv. Comm'n v. FCC,* 476 U.S. 355, 374 (1986) (recognizing that "an agency literally has no power to act… unless and until Congress confers power upon it").

       **c.** **Declaratory Judgment Act**. The Declaratory Judgment Act, 28 U.S.C. §§2201-2202 ("DJA"), authorizes declaratory relief "whether or not further relief… could be sought." *Id.* §2201(a); *Duke Power Co.,* 438 U.S. at 70-71 n.15 ("While the [DJA] does not expand our jurisdiction, it expands the scope of available remedies" where plaintiffs sought declaratory relief that a statute was invalid, as an alternate remedy to seeking compensation for a taking). Since 1976, §1331 has authorized DJA actions against federal officers, regardless of the amount in controversy. *See* Section I.B, *supra; Sanders,* 430 U.S. at 105 (§1331's 1976 amendment authorizes DJA action against federal officers) (*citing* Pub. L. 94-574, 90 Stat. 2721 (1976)); *see also* H.R. Rep. No. 96-1461, at 3-4, *reprinted in* 1980 U.S.C.C.A.N. 5063, 5065 (§1331's 1980 amendment did not repeal its 1976 amendment); *Hurley v. Reed,* 288 F.2d 844, 848 (D.C. Cir. 1961) ("fact that another remedy would be equally effective affords no ground for declining declaratory relief" against federal officers); *Tierney v. Schweiker,* 718 F.2d 449, 457 (D.C. Cir. 1983) (same); APA Leg. Hist., at 37, 212, 276 (APA no barrier to DJA actions against federal officers). Thus, either in conjunction with, or as an alternative to, relief under other legal theories, this Court may issue the requested declaratory relief. *Nat'l Treasury Employees Union v. Nixon,* 492 F.2d 587, 616 (D.C. Cir. 1974).

       **D.** **Judicial Review against Individual-Capacity Officers**. FDA asks this Court to dismiss Dr. von Eschenbach in his individual capacity under color of legal authority. FDA does not address – much less credibly dispute – the historical fact that the blackletter, judge-made, offi-

27

cer-suit exception to the judge-made sovereign-immunity doctrine was a founding principle of this democracy and its judiciary. Compl. ¶35; Section of Administrative Law & Regulatory Practice of the American Bar Association, *"A Blackletter Statement of Federal Administrative Law,"* 54 ADMIN. L. REV. 1, 46 (2002) ("Under the longstanding officer suit fiction recognized in *Ex Parte Young,* 209 U.S. 123 (1908), suits against government officers seeking prospective equitable relief are not barred by the doctrine of sovereign immunity").[11]

Indeed, contrary to FDA's argument, Congress expressly has recognized a distinction between color-of-legal-authority and official-capacity actions for judicial-review against officers in the APA, 5 U.S.C. §702 (listing official-capacity and color-of-legal-authority actions as distinct), as well as judicial review generally. 28 U.S.C. §1391(e) (same); *cf.* 18 U.S.C. §2337(1)-(2) (same); *Stafford v. Briggs,* 444 U.S. 527, 539 (1980) ("By including the officer or employee,

---

[11]    *See* U.S. CONST. art. III, §2 ("judicial power shall extend to all cases, in law and *equity*") (emphasis added); THE FEDERALIST NO. 78, at 464-66 (Alexander Hamilton) (Clinton Rossiter ed., Signet 2003) (1961) (discussing judicial review); Robert Yates, Brutus Essay XI (1788), *reprinted in* THE ESSENTIAL ANTIFEDERALIST, at 187-90 (W.B. Allen & Gordon Lloyd, ed., 2002) (same); Judiciary Act of 1789, ch. 20, §16, 1 Stat. 72, 82 (establishing equity jurisdiction); *Atlas Roofing Co., Inc. v. Occupational Safety & Health Review Comm'n,* 430 U.S. 442, 459 n.14 (1977) (Judiciary Act's §16 was "declaratory of *existing law*" of equity in 1789) (emphasis added); Louis L. Jaffe, *Suits against Governments and Officers: Sovereign Immunity,* 77 HARV. L. REV. 1, 5-18 (1963) (describing centuries of development of various petitions and writs against the Crown's actions *with its consent* and against the Crown's officers' unlawful actions *without consent*); *Marbury v. Madison,* 5 U.S. (1 Cranch) 137, 165 (1803) ("the law... entertains no respect or delicacy [for the Crown's officers]; but furnishes various methods of detecting the errors and misconduct of those agents, by whom the king has been deceived and induced to do a temporary injustice") (*quoting* 3 WILLIAM BLACKSTONE, COMMENTARIES *255); *Osborn v. Bank of U.S.,* 22 U.S. (9 Wheat.) 738, 843 (1824) ("it would be subversive of the best established principles, to say that the laws could not afford the same remedies against the agent employed in doing the wrong, which they would afford against him, could his principal be joined in the suit"); Louis L. Jaffee, *The Right to Judicial Review I,* 71 HARV. L. REV. 401, 433 (1958) ("that the King's courts... could order his officers to account for their conduct [] was the essence of... "the rule of law." Whatever the logical contradictions between this doctrine and sovereign immunity, [it] had become firmly established [and] as much a part of the law as... sovereign immunity").

both in his official capacity and acting under color of legal authority, the committee intends… to

include also those cases where the action is nominally brought against the officer in his individ-

ual capacity even though he was acting within the apparent scope of his authority and not as a

private citizen. *Such actions are also in essence against the United States but are brought*

*against the officer or employee as an individual only to circumvent what remains of the doctrine*

*of sovereign immunity.*") (*quoting* H.R. Rep. No. 86-1936, at 3-4 (1960)) (Court's emphasis).[12]

The foregoing authorities clearly allow naming Dr. von Eschenbach individually, even under the

APA, for exceeding his official authority.

  **E.  Exhaustion of Administrative Remedies**. When challenging "final agency action," an

APA plaintiff has no duty to exhaust optional administrative remedies unless the disputed

agency action remains inoperative during that further administrative process:

> A preliminary, procedural, or intermediate agency action or ruling
> not directly reviewable is subject to review on the review of the fi-
> nal agency action. *Except as otherwise expressly required by stat-*
> *ute,* agency action otherwise final is final for the purposes of this
> section whether or not there has been presented or determined an

---

[12]  *See also Young,* 209 U.S. at 160 (officer acting without valid authority is "stripped of his
official or representative capacity and is *subjected in his person* to the consequences of his *indi-*
*vidual conduct,*" and suit is "against [him] *personally as a wrongdoer* and not against the State")
(emphasis added); *Georgia R.R. & Banking Co. v. Redwine,* 342 U.S. 299, 305 (1952) ("this
action against appellee *as an individual* is not barred as an unconsented suit against the State")
(emphasis added); *U.S. v. Lee,* 106 U.S. 196, 210 (1882) (Robert E. Lee's family's suit to eject
federal officers from Arlington National Cemetery was "against [officers], *as individuals,* to
recover possession" notwithstanding that "the officers who are sued assert no personal posses-
sion, but are holding as the mere agents of the United States") (emphasis added); *U.S. v. Bout-*
*well,* 84 U.S. (17 Wall.) 604, 607 (1873) ("[i]f he be an officer, and the duty be an official one,
still the writ is aimed exclusively against him as a person, and he only can be punished for dis-
obedience…. It is, therefore, in substance, a personal action, and it rests upon the averred and
assumed fact that the defendant has neglected or refused to perform a personal duty"); *cf. In re*
*Iraq and Afghanistan Detainees Litigation,* 479 F.Supp.2d 85, 119 (D.D.C. 2007) (declaratory
relief unavailable against individual-capacity defendants) (*dicta* because of lack of standing).

> application for a declaratory order, for any form of reconsideration, or, *unless the agency otherwise requires by rule and provides that the action meanwhile is inoperative,* for an appeal to superior agency authority.

5 U.S.C. §704 (emphasis added). Nothing in the FFDCA, Durham-Humphrey Amendments, or PREA renders FDA's actions anything other than final.

As the Supreme Court noted in *Darby v. Cisneros,* "[i]t perhaps is surprising that it has taken over 45 years since the passage of the APA for this Court definitively to address th[e] question" whether §704 "limits the authority of courts to impose additional exhaustion requirements as a prerequisite to judicial review." *Darby v. Cisneros,* 509 U.S. 137, 145 (1993). In that 1993 decision, the Court completely rejected the view put forward here by FDA and Duramed for actions *under the APA:*

> Of course, the exhaustion doctrine continues to apply as a matter of judicial discretion in cases not governed by the APA. But where the APA applies, an appeal to "superior agency authority" is a prerequisite to judicial review *only* when expressly required by statute or when an agency rule requires appeal before review and the administrative action is made inoperative pending that review. Courts are not free to impose an exhaustion requirement as a rule of judicial administration where the agency action has already become "final" under [§704].

*Darby,* 509 U.S. at 153-54 (emphasis in original).

It is perhaps *not* surprising that FDA and Duramed cite only pre-1993 and non-APA cases for their now-discredited proposition optional administrative remedies somehow displace APA review of otherwise final agency action. *See* FDA Mot. at 32-34; Duramed Mot. at 19-21. Directly or indirectly, both FDA and Duramed rely primarily on *McCarthy v. Madigan,* 503 U.S. 140 (1992), which *Darby* expressly distinguishes as a "non-APA case" just before noting that "the exhaustion doctrine continues to apply as a matter of judicial discretion in cases not governed by the APA." *Darby,* 509 U.S. at 153-54; *see also Assoc. of Flight Attendants v. Chao,* 493

F.3d 155 (D.C. Cir. 2007) (non-APA case under Declaratory Judgment Act and mandamus); *Garlic v. FDA,* 783 F. Supp. 4, 4-5 (D.D.C. 1992) (no final action); *Estee Lauder, Inc. v. FDA,* 727 F. Supp. 1, 4-6 (D.D.C. 1989) (no final action); *National Gay Rights Advocates v. HHS,* 1988 WL 43833, *1 (D.D.C.) (no final action); *American Disabled for Attendant Programs Today v. H.U.D.,* 170 F.3d 381, 389-90 (3rd Cir. 1999) (no final action and an adequate alternate remedy *in court*).[13] If Plaintiffs had brought this suit only on APA grounds, FDA's and Duramed's exhaustion arguments would be frivolous.

If it finds the APA inapposite, the Court may consider prudential exhaustion. Where it applies, prudential exhaustion serves three functions: allowing agencies the opportunity to correct their errors, affording parties and courts the benefits of the agency's expertise, and compiling an administrative record adequate for judicial review. *Avocados Plus Inc. v. Veneman,* 370 F.3d 1243, 1247 (D.C. Cir. 2004). Plaintiffs respectfully submit that the second and third functions are fully met here. Under the circumstances, moreover, the first is both inapposite and essentially futile: if FDA reverses its action, Duramed will sue; if FDA does not reverse, Plaintiffs will sue. Either way, the same questions would return to court.

In any event, the filing of this litigation is entirely consistent with, and authorized by, FDA's administrative procedures. By its express terms, FDA's exhaustion provision "applies to court review of final administrative action taken by the Commissioner, including action taken under §§10.25 through 10.40." 21 C.F.R. §10.45(a). First, the challenged FDA action and inac-

---

[13]    FDA also cites the jurisdictional dismissal in *Burt Lake Band of Ottawa & Chippewa Indians v. Norton,* 217 F. Supp. 2d 76, 78 (D.D.C. 2002) (Indian tribes must seek tribal recognition from the Bureau of Indian Affairs and cannot seek recognition directly from court), notwithstanding that FDA acknowledges that FDA's exhaustion argument is not jurisdictional. FDA Mot. at 33 & n.23.

tion clearly constitute "administrative action," which "includes every act, including the refusal or failure to act, involved in the administration of any law by the Commissioner." 21 C.F.R. §10.3(a). Second, the "administrative action" is indisputably final. *See* Section I.C.1.a, *supra*. Third, while §10.45(a) in no way limits itself to "action taken under §§10.25 through 10.40," this litigation concerns two actions under §10.25: (1) Duramed's "petition" to remove Plan B from the prescription drug requirements, *see* 10 C.F.R. §§10.25(a)(1), 310.200(b); and (2) FDA's ANPRM and its final conclusion that it could proceed without rulemaking, 10 C.F.R. §10.25(b). Given FDA's final positions on these "administrative actions," FDA's regulations do not require an "interested person" (*i.e.,* one who petitioned, commented, objected, or otherwise seeks to participate) to petition for reconsideration before seeking judicial review. 21 C.F.R. §§10.3(a), .45(e). Because all of the Plaintiffs qualify as "interested persons," *see* Compl. ¶27, they need not seek reconsideration of the final administrative actions here.[14]

## II.  DEFENDANTS' DISPOSITIVE MOTIONS LACK MERIT

In addition to challenging this Court's jurisdiction for the entire complaint, FDA and Duramed seek merits dismissal of Counts II, IV, V, and VI for failure to state a claim on which this Court can grant relief. In doing so, FDA and Duramed make arguments under both *Chevron* "Step One" and *Chevron* "Step Two":

> Under *Chevron* Step One, we always first examine the statute *de novo,* employing traditional tools of statutory construction. If the intent of Congress is clear, we accord the agency's interpretation

---

[14]    Because Plaintiffs can rely on any argument made by any commenter, *State of Ohio v. EPA,* 838 F.2d 1325, 1329 (D.C. Cir. 1988), FDA cannot argue that the Court must limit itself to arguments made during the administrative proceedings without first producing the administrative record, even under FDA's view of the law. In any event, having refused to convene a required rulemaking, FDA cannot credibly argue that the public failed to comment.

> no deference, for the court, as well as the agency, must give effect
> to the unambiguously expressed intent of Congress. But if Con-
> gress has [not] directly spoken to the precise question at issue, we
> proceed to *Chevron* Step Two. Under Step Two, [i]f Congress has
> explicitly left a gap for the agency to fill, there is an express dele-
> gation of authority to the agency to elucidate a specific provision
> of the statute by regulation. Such legislative regulations are given
> controlling weight unless they are... manifestly contrary to the stat-
> ute.

*National Ass'n of Clean Air Agencies v. E.P.A.,* 489 F.3d 1221, 1228 (D.C. Cir. 2007) (citations

and interior quotations omitted, alterations in original) ("*NACAA*"). Assuming that this Court has

jurisdiction, Plaintiffs agree that the Court can and should reach the legal merits for any counts

that the Court can decide under *Chevron* Step One (*i.e.,* where FDA's actions unambiguously

comply with or violate the relevant statute). Before rebutting the FDA and Duramed arguments

for dismissal of Counts II, IV, V, and VI, however, Plaintiffs first argue that the unquestionable

political pressure here (Count VII) and FDA's failure as yet to certify the relevant administrative

record(s) preclude dismissal under *Chevron* Step Two.[15]

**A.    Political Pressure Precludes *Chevron* Step Two**. Under *Chevron* "Step Two," a re-

viewing court defer to an agency's "reasonable interpretation," provided that "its action is not

otherwise arbitrary and capricious" and has not "relied on [improper] factors." *NACAA,* 489 F.3d

at 1228-29 (interior quotations omitted, alteration in original). Here, the plaintiffs credibly allege

that FDA buckled to improper political pressure, with a direct nexus between the pressured

defendants and the challenged agency actions and inaction. Compl. ¶¶73-77 (Plan B approval

*quid pro quo* to lift hold on Dr. von Eschenbach's Senate confirmation), 127-131 (Count VII).

---

[15]    *See* FDA Mot. at 36-39 (Count II), 39-40 (Count IV), 43(Count VI) (invoking Chevron
Step Two); Duramed Mot. at 26-34 (Count II), 45 (Count VI) (same).

Indeed, Dr. von Eschenbach testified that he was "acutely aware of the Agency's need for…

permanent leadership with a Commissioner that is not only the choice of the President but also

confirmed by the United States Senate." Compl. ¶75. That political pressure not only constitutes

an independent count of the complaint that warrants *vacatur* under Count VII, *see, e.g., District

of Columbia Fed'n of Civic Ass'ns v. Volpe,* 459 F.2d 1231, 1246 (D.C. Cir.); *Koniag, Inc.,

Village of Uyak v. Andrus,* 580 F.2d 601, 610 (D.C. Cir. 1978); *Sierra Club v. Costle,* 657 F.2d

298, 408-10 (D.C. Cir. 1981); *ATX, Inc., v. U.S. Dep't of Transp.,* 41 F.3d 1522, 1527 (D.C. Cir.

1994), but also constitutes an "improper factor" under *NACAA* that negates any deference that

*Chevron* Step Two otherwise would provide FDA on the other counts.

The political-pressure argument applies with particular force when an agency acts in an

adjudicatory fashion, reaching not only improper pressure but the appearance of improper pres-

sure.[16] *ATX, Inc.,* 41 F.3d at 1527. As indicated in Section I.E, *supra,* Plaintiffs are interested

parties for the proceedings that FDA commenced. Even if they were not interested parties, how-

ever, the underlying fairness of the proceedings requires that "a court must consider whether…

the agency's decisionmaking process was irrevocably tainted so as to make the ultimate judg-

ment of the agency unfair, either to an innocent party *or to the public interest that the agency

was obliged to protect.*" *Professional Air Traffic Controllers Organization v. F.L.R.A.,* 685 F.2d

547, 564 (D.C. Cir. 1982) (emphasis added) (*ex parte* communications).

Here, the FDA defendants acted suddenly, summarily, and without explanation on what

had been "difficult and novel issues." Compl. ¶70. Short-circuiting the agency's review of those

---

[16]     Drug approvals are adjudications. *American Bioscience, Inc. v. Thompson,* 269 F.3d
1077, 1084 (D.C. Cir. 2001); *Weinberger v. Hynson, Westcott & Dunning, Inc.,* 412 U.S. 609,
625 (1973); FDA Mot. at 41; Duramed Mot. at 26.

"difficult and novel issues" to obtain Senate confirmation is both "arbitrary and capricious" and "reli[ance] on [improper] factors." *NACAA,* 489 F.3d at 1228-29. Before this Court can defer to FDA's actions, FDA must act without a gun to its head.

**B. Reviewing Merits without Administrative Record**. "The Administrative Procedure Act and the cases require that the complete administrative record be placed before a reviewing court." *NRDC v. Train,* 519 F.2d 287, 291 (D.C. Cir. 1975) (*citing* 5 U.S.C. §706 and *Citizens to Preserve Overton Park, Inc. v. Volpe,* 401 U.S. 402, 419-21 (1971)). Under the Administrative Procedure Act ("APA") and *Overton Park,* judicial review "[is] based on the full administrative record that was before the [agency] at the time [it] made [its] decision." *Overton Park,* 401 U.S. at 419-20; *see also Walter O. Boswell Memorial Hosp. v. Heckler,* 749 F.2d 788, 792 (D.C. Cir. 1984) ("to review an agency's action fairly, [a court] should have before it neither more nor less information than did the agency when it made its decision"). Without an administrative record, "the district court [will] not have the opportunity to consider the [agency actions'] legality in terms of that record or the APA and the case law under it," *Perot v. FEC,* 97 F.3d 553, 561 (D.C. Cir. 1996), leaving this litigation "simply not in a posture to permit an important question of this sort to be properly adjudicated." *Id.* Significantly, as indicated in Section I.A, *supra,* the question of standing merges with the merits, which makes an administrative record all the more important before the Court reaches anything but the clearest of statutory issues under *Chevron* Step One.

Under the circumstances, this Court cannot rely on FDA's – much less Duramed's – unsupported views of FDA's actions or the basis for (and rationality of) those actions:

> Rather than calling for the administrative record, the district court appears to have relied on the parties' written or oral representations to discern the basis on which the FDA acted. Surely that was not sufficient.

*Am. Bioscience, Inc. v. Thompson,* 243 F.3d 579, 582 (D.C. Cir. 2001). Significantly, *American*

*Bioscience* held that the district court "should have required the FDA to file the administrative record" in order to "determine[] the grounds on which the FDA granted [the abbreviated new drug] application" before the Court assessed the plaintiff's probability of success on the merits for a preliminary injunction. *Id. A fortiori,* this Court should require an administrative record before granting a Rule 12(b)(6) motion premised on deference to FDA's reasoned actions.

   C. **FDA and Duramed Not Entitled to Dismissal**. With that background, Plaintiffs now address the arguments of FDA and Duramed against Counts II, IV, V, and VI. Because Counts II and VI are interrelated, Plaintiffs address them together.

   1. **Counts II and VI: Rx-OTC Dichotomy and Procedure**. Count II alleges that Plan B violates the Durham-Humphrey Amendments' Rx-OTC dichotomy by simultaneously bearing Rx and OTC labeling in violation of §503(b)(4)(A)-(B). Assuming *arguendo* that Plan B remains an Rx drug under §503(b)(4)(A) at all times, Count II further argues that Plan B violates the Durham-Humphrey Amendments by failing to have been removed from the Rx requirements of §503(b)(1) "by regulation" under §503(b)(3) for its OTC sales. *See* Compl. ¶¶102-103. Echoing the second charge, Count VI alleges that §503(b)(3) required a rulemaking to remove the prescription requirements for OTC sales and that – to the extent that §310.200(b) purports to allow such removal by merely approving an SNDA – that §310.200(b) is *ultra vires* FDA's authority under §503(b)(3). Compl. ¶¶124-125. FDA and Duramed argue that Plan B is at all times a prescription drug under §503(b)(4)(A), which renders §503(b)(4)(B) inapposite. FDA Mot. at 38 & n.27; Duramed Mot. at 30-31.[17] Further, FDA and Duramed argue that §310.200(b)

---

[17]    FDA and Duramed take the counter-intuitive position that Plan B's OTC version falls always under §503(b)(4)(A), never under §503(b)(4)(B), because FDA approved Plan B for duel Rx-OTC dispensing. Although Plaintiffs dispute that this bridges §503(b)(4)'s Rx-OTC dichot-

*(Footnote cont'd on next page)*

is a regulation that – consistent with §503(b)(3) – authorizes FDA to remove prescription requirements merely by approving an SNDA. FDA Mot. at 42-43; Duramed Mot. at 44-45.[18]

The following two sections demonstrate that (1) FDA's interpretation of §503(b)(3) and §310.200(b) fails at *Chevron* Step One, and (2) FDA never intended §310.200(b) to eliminate the requirement to proceed by regulation. FDA today simply has no idea what §310.200(b) meant, as promulgated in 1954 through 1976. Thus, Duramed is wrong to suggest that "federal courts do not have [the] extensive experience" needed here. *See* Duramed Mot. at 28. Quite the contrary, this Court is expert at interpreting statutes and tracing regulatory promulgations back to their sources, while agencies under improper political pressure (and powerful private interests) often sidestep required procedures to force through their narrow interests, as quickly as possible.

Before addressing the procedures required by §503(b)(3) and §310.200(b), however, Plaintiffs first address §503(b)(4)'s prohibition against dual Rx-OTC labeling.[19] When enacting the Durham-Humphrey Amendments' statutory OTC-Rx dichotomy, Congress expressly deemed

---

*(Footnote cont'd from previous page.)*

omy, it nonetheless does not save Duramed: the admission that Rx-OTC Plan B falls always under §503(b)(1) renders Plan B "misbranded while held for sale" under §503(b)(1)'s express terms because FDA never promulgated the "regulation" that §503(b)(3) requires to remove Plan B from §503(b)(1)'s prescription requirements.

[18]    Duramed claims that Plan B complies with 21 C.F.R. §201.100, Duramed Mot. at 29, but ignores the requirement that drugs "be dispensed in accordance with section 503(b)." 21 C.F.R. §201.100(a)(2). Without an FDA removal *by regulation,* Plan B is misbranded under §503(b)(1).

[19]    The various examples in the administrative record of FDA-approved drug products with an Rx and OTC version are inapposite. *See* 70 Fed. Reg. at 52,051. Those examples involve the same active ingredient (*e.g.,* ibuprofen) appearing in different drug products (*e.g.,* 400 mg. as Rx and 200 mg. as OTC). *See* Duramed Mot. at 28 n.20. Plan B involves the same drug product (*i.e.,* the identical pill and box) with simultaneous Rx and OTC distribution, which FDA had never previously approved. Compl. ¶53.

the presence or absence of the Rx legend as mutually exclusive for Rx and OTC products, respectively. The Senate Report expressed this intent:

> Paragraph (4) of the new subsection requires that, in addition to the labeling requirements of prescription drugs specified in paragraph (2) of the subsection, the interstate label on such drugs must bear the statement "Caution: Federal law prohibits dispensing without prescription." On the other hand, *over-the-counter drugs are forbidden to bear a label containing this caution statement.*

S. Rep. No. 82-946, at 10 (1951) (emphasis added). Although this history supports the clear dichotomy that §503(b)(4)(A) and §503(b)(4)(B) create, FDA and Duramed argue around it by claiming that Plan B is not an OTC drug because it is at all times subject to prescription (*i.e.,* subject only to §503(b)(4)(A)) and that Plan B's dual Rx-OTC legend is not false. FDA Mot. at 38; Duramed Mot. at 33-34.[20]

Unfortunately, FDA's contemporaneous and longstanding interpretation of the Durham-Humphrey Amendments does not support their latter-day legerdemain:

> *Prescription legend not allowed on exempted drugs.* The use of the prescription caution statement quoted in section 503(b) (4) of the act, in the labeling of a drug exempted under the provisions of this section, constitutes misbranding. Any other statement or suggestion in the labeling of a drug exempted under this section, that such drug is limited to prescription use, may constitute misbranding.

21 C.F.R. §310.200(d) (emphasis in original). Like Plaintiffs' interpretation of 21 C.F.R. §310.200(b), this regulatory interpretation goes back to 1954, 19 Fed. Reg. 7347, 7348 (Nov. 13, 1954), and clearly provides that drugs exempted under "this section" – including §310.200(b) – cannot bear the Rx legend. In other words, notwithstanding their unsupported statements to the

---

[20]    On the other hand, Duramed admits that OTC Plan B is technically a separate new drug from the former Rx-only Plan B. Duramed Mot. at 25 n.19; FDA Mot. at 39-40.

contrary, FDA consistently has interpreted the Durham-Humphrey Amendments to preclude dual Rx-OTC labeling.[21] The question of whether a label statement falsely limits a drug product to prescription use applies only to statements other than the Rx legend. 21 C.F.R. §310.200(d).

    **a.    §310.200 Cannot Switch Regulation for Order**. Plaintiffs contend that the Durham-Humphrey Amendments plainly require FDA to act "by regulation" to remove prescription requirements for a new drug. See 21 U.S.C. §353(b)(3). FDA and Duramed claim that §310.200 constitutes a "regulation" that allows FDA to remove prescription requirements by approving an SNDA. FDA Mot. at 42-43; Duramed Mot. at 44-45.

    In *Ethyl Corp. v. EPA,* 306 F.3d 1144, 1148 (D.C. Cir. 2002), this Circuit considered a similar question under a statute that provided that the agency "shall by regulation establish methods and procedures for making tests under this section." EPA had adopted "CAP 2000" to "provide[] criteria for individual automobile manufacturers to develop their own test methods and procedures, which the EPA approves in a process that does not involve rulemaking." Calling CAP 2000 "the only 'regulation' in the picture," the Court noted that it did not fulfill the statutory purpose (*i.e.,* "establish methods and procedures for making tests"). *Id.* For that reason, the D.C. Circuit held that EPA had violated the statutory command to proceed by regulation. *Ethyl Corp.,* 306 F.3d at 1150; *accord MST Express v. Dep't of Transp.,* 108 F.3d 401, 403, 406 (D.C. Cir. 1997). Like FDA and Duramed, EPA argued that "proceeding by regulation would be administratively burdensome," which court rejected because that "[o]bviously… cannot overcome

---

[21]    Although it amended the Rx legend's text in 1997, Congress did not alter the Durham-Humphrey Amendments' Rx-OTC dichotomy. Compl. ¶50; *Fourco Glass Co. v. Transmirra,* 353 U.S. 222, 227 (1957) ("it will not be inferred that Congress, in revising and consolidating the laws, intended to change their effect unless such intention is clearly expressed").

a clear congressional command." *Ethyl Corp.,* 306 F.3d at 1150.[22]

Duramed goes to some length to establish that the Durham-Humphrey Amendments improved the clarity of the Rx-OTC distinction, to the benefit of pharmacists and the public. Duramed Mot. at 31-34. All of that history equally supports Plaintiffs' views, provided that FDA follow the statutorily mandated rulemaking procedure and that the resulting drug product does not violate the statutory Rx-OTC dichotomy. Duramed also argues that Plaintiffs' view would violate §503(b)(1) and (b)(3), which require Rx distribution only when necessary and allow OTC distribution when Rx distribution is unnecessary. Duramed Mot. at 23-24; *see also id.* at 26 (rejecting this purportedly absurd result). Consistent with the statute, however, Plaintiffs merely ask that FDA proceed publicly by regulation, rather than secretly by order, and that the resulting new drug product (if approved) have labeling that complies with the statute (*e.g.,* an Rx box and an OTC box). FDA's own regulations demonstrate that such regulations have occurred often in the past, 21 C.F.R. §310.201, and nothing precludes or allows FDA to proceed differently here.

> **b.    §310.200 Did Not Switch Regulation for Order**. Even if FDA could interpret §310.200(b) to allow removing prescription requirements from new drugs, FDA did not interpret §310.200(b) that way when FDA promulgated it in 1954. To the contrary, and contemporaneously with the Durham-Humphrey Amendments' adoption, §310.200(b)'s predecessor required a rulemaking to remove prescription requirements from a new drug. Until FDA amends that origi-

---

[22]    Duramed makes the hyper-technical argument that §503(b)(3)'s divergent use of singular and plural for rulemaking and drugs somehow precludes Plaintiffs' interpretation. Duramed Mot. at 24. There is nothing inconsistent about a single rulemaking's addressing multiple, similar drugs. In any event, the Dictionary Act precludes Duramed's argument. *See* 1 U.S.C. §1 ("In determining the meaning of any Act of Congress… words importing the singular include and apply to several persons, parties, or things [and] words importing the plural include the singular"). That FDA must proceed *by rulemaking* does not limit FDA to a *single rulemaking.*

nal interpretation, both FDA and Duramed must live with (and within) it.

In 1954, FDA promulgated §310.200(b)'s first predecessor (former 21 C.F.R. §1.108(c)) expressly pursuant to §503(b)(3). 19 Fed. Reg. 7347, 7347-48 (Nov. 13, 1954). In 1963, FDA proposed and finalized §311.200(b)'s direct predecessor (former 21 C.F.R. §130.101(b)) expressly pursuant to §503(b)(1) and §503(b)(3). 28 Fed. Reg. 1449 (Feb. 14, 1963); 28 Fed. Reg. 6377 (June 20, 1963). In pertinent part, and consistent with the plain statutory text (*see* Section II.C.1.a, *supra*), the 1954 and 1963 versions both expressly required a rulemaking to remove a new drug from prescription requirements under §503(b)(1), even if the "petition" that triggered the rulemaking came to FDA via an SNDA or on FDA's own initiative. *See* 19 Fed. Reg. at 7347-48 (promulgated 21 C.F.R. §1.108(c)); 28 Fed. Reg. at 6385 (promulgated 21 C.F.R. §130.101). Specifically, in both 1954 and 1963, the final regulation provided as follows:

> A proposal to exempt a drug from the prescription-dispensing requirements of section 503(b) (1) (C) [now §503(b)(1)(B)] of the act may be initiated by the Commissioner or by any interested person. Any interested person may file a petition seeking such exemption, stating reasonable grounds therefor, which petition may be in the form of a supplement to an approved new-drug application. Upon receipt of such a petition, or on his own initiative at any time, the Commissioner will publish a notice of proposed rule making and invite written comments. After consideration of all available data, including any comments submitted, the Commissioner may issue a regulation granting or refusing the exemption[.] Whenever the Commissioner concludes… that granting or refusing the exemption requires a more thorough development of the facts than is possible in a written presentation, he may call a public hearing for that purpose…. As soon as practicable after the completion of the hearing, the final regulation granting or refusing the exemption shall be issued[.]

21 C.F.R. §130.101(b) (1964) (Ex. 5); *accord* 21 C.F.R. §1.108(c) (1955) (Ex. 6); *accord* 21 C.F.R. §310.200(b) (1976) (Ex. 7). Thus, from 1954 through 1976 at least, FDA's current interpretation of current §310.200(b) would have been untenable.

41

Before they can hold FDA to its initial regulatory interpretation of §503(b)(1), §503(b)(3), and §310.200(b), Plaintiffs must establish first that former §130.101 is current §310.200 and second that any intervening amendments did not change FDA's initial interpretation. Both tasks are quite easy. First, when it recodified its regulations in 1974, FDA plainly designated "Old section" §130.101 as "New section" §310.200. 39 Fed. Reg. 11,680 (Mar. 29, 1974) (Ex. 8). Second, since then, FDA has adopted only one substantive amendment to §310.200(b), as part of its rulemaking in the mid-1970s to adopt its uniform rules of administrative practice. 40 Fed. Reg. 40,682, 40,769 (Sept. 3, 1975) (proposed amendment to §310.200(b)); 42 Fed. Reg. 4680, 4714 (Jan. 25, 1977) (promulgated amendment to §310.200(b)).[23] As FDA's rulemaking record demonstrates, adopting the uniform rules for administrative practice did not alter the type of administrative action required to remove drugs from the Rx requirements of §503(b)(1). Instead, the notice of proposed rulemaking merely provided that "Section 310.200(b) would be revised to replace the procedure now set out in that provision with a reference to Part 2." 40 Fed. Reg. at 40,716 (Ex. 9). The mere elimination of §310.200(b)'s rulemaking process in deference to the new general-purpose Part 2 process does not suggest a *sub silentio* intent to do away with rulemakings altogether. *U.S. v. Wilson,* 290 F.3d 347, 359-60 (D.C. Cir. 2002) (drafter "unlikely to intend any radical departures from past practice without making a point of saying so"). Henceforth, FDA would simply convene §503(b)(3)'s required rulemakings under the general provisions of Part 2, not the specific provisions of §310.200(b).

---

[23]     In a 1977 recodification, FDA amended §310.200(b) to change the reference from the original rules of practice (former 21 C.F.R. pt. 2) to the recodified ones (current 21 C.F.R. pt. 10). 42 Fed. Reg. 15,673, 15,674 (Mar. 22, 1977) ("Section 310.200(b) is amended by changing the reference to 'Part 2' to read 'Part 10'"). Technical amendments in 2007 changed citations to §505(b)(1)(C) to the now-current §505(b)(1)(B). 72 Fed. Reg. 15,043 (Mar. 30, 2007).

FDA's rulemaking to add §310.200(e) on OTC-panel procedures confirms that, in 1976, FDA interpreted §310.200(b) consistently with the statute (and opposite its current position):

> [T]he Commissioner described the two procedures by which a prescription drug ingredient may lawfully be marketed for OTC use. Ingredients limited to prescription use under section 503(b)(1)(C) of the [FFDCA] may acquire OTC status by a petition submitted pursuant to the procedures set forth in § 310.200 []; the OTC drug review process provides another procedure.

41 Fed. Reg. 32,580, 32,581 (Aug. 4, 1976) (citations omitted). As indicated, "the procedures set forth in § 310.200" clearly contemplated that FDA would act "by regulation," even if the "petition" came to FDA in the form of an SNDA or if FDA acted on its own initiative. 21 C.F.R. §310.200(b) (1976). To change its interpretation of its regulation (*i.e.,* to switch the required procedures from a regulation to an order), FDA would need to undertake a rulemaking. *Motor Veh. Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.,* 463 U.S. 29, 42 (1983) (course change requires reasoned analysis beyond that required to act in the first instance); Duramed Mot. at 42 ("As to a <u>substantive regulation</u>, an agency may change its interpretation only by notice and comment where the change would constitute an <u>amendment</u> of the regulation") (emphasis in original). FDA has not taken any *lawful* final action to amend its procedures.

    **2.   Count IV: Third Category of BTC Drugs**. Count IV alleges that Plan B's dual Rx-OTC labeling, the CARE program, and the resulting requirement to maintain Plan B behind the counter ("BTC") creates an unlawful third category of drug that is neither Rx nor OTC. *See* Compl. ¶¶114-119. FDA and Duramed argue that Plan B is at all times a prescription drug under §503(b)(4)(A), FDA Mot. at 38 & n.27; Duramed Mot. at 30-31, and that FDA did not impose this BTC regime on Duramed. FDA Mot. at 40 ("FDA did not mandate specific distribution channels for Plan B… it was *Barr* that developed the CARE proposal") (emphasis in original); Duramed Mot. at 35. Of course, without the administrative record, neither Plaintiffs nor this

Court can determine whether Barr/Duramed or FDA required BTC distribution. "Surely [it is] not sufficient," however, for the Court to "rel[y] on the parties' written or oral representations to discern the basis on which the FDA acted." *Am. Bioscience,* 243 F.3d at 582.[24]

Both FDA and Duramed admit that OTC Plan B technically is a separate product from Rx Plan B. FDA Mot. at 39-40; Duramed Mot. at 25 n.19. They also claim that dual Rx-OTC Plan B is at all times an Rx drug. FDA Mot. at 38 & n.27; Duramed Mot. at 30-31. The record will make clear that one or both parties invented the dual Rx-OTC approach to evade the negative implications of OTC availability (*e.g.,* minors' access to the product). Unfortunately, the FFDCA provides only two options, and if Plan B is not safe for OTC distribution, it is not safe for OTC distribution. FDA cannot invent, or acquiesce in the invention of, a third category.

   3.   **Count V: Rulemaking for Meaningful-Difference Test**. Count V alleges that FDA amended its meaningful-difference test to add patient-related parameters, without the APA-required notice-and-comment rulemaking. *See* Compl. ¶¶120-122. FDA and Duramed argue that FDA had not previously adopted a meaningful-difference rule for its Plan B action to amend. FDA Mot. at 41-42; Duramed Mot. at 35-44. Even FDA and Duramed acknowledge, however, that "FDA has interpreted… [§503](b)(1) of the act to allow marketing of the same active ingredient in products that are both prescription and OTC, assuming some meaningful difference

---

[24]   Although FDA admits that it did not rely on 21 C.F.R. §314.520(a), it notes that that regulation allows limited distribution in some circumstances. FDA Mot. at 40 n.28. As just indicated, however, neither Plaintiffs nor the Court can know what basis FDA relied on until FDA files its administrative record. *Am. Bioscience,* 243 F.3d at 582; *cf. Burlington Truck Lines v. U.S.,* 371 U.S. 156, 170 (1962) ("an agency's discretionary order [will] be upheld, if at all, on the same basis articulated in the order by the agency itself"). Nor are FDA's examples of *prescription drugs* dispensed under limited distribution relevant to the hybrid Rx-OTC labeling (and product) that FDA approved. FDA Mot. at 40 n.28.

exists between the two that makes the prescription product safe only under the supervision of a

licensed practitioner." *See* Duramed Mot. at 35-36 (quoting 70 Fed. Reg. at 52,051); *see also*

Compl. ¶53 (meaningful-difference test interpreted both FFDCA *and FDA's regulations*).[25]

Moreover, "Plan B is the first instance of FDA approval of the 'marketing of the same active ingredient in a prescription product for one population and in an OTC product for a subpopulation' with no physical difference between the product dispensed Rx and the product dispensed OTC." Duramed Mot. at 36 (quoting 70 Fed. Reg. at 52,051). In a meeting with some of the Plaintiffs, FDA acknowledged that the Plan B approval added age as a new criterion to FDA's meaningful-difference test. Compl. ¶81. Although FDA and Duramed now quibble on whether FDA acted in a sufficiently rule-like final action, an agency can create a rule in almost any way. *See, e.g., CropLife America v. E.P.A.,* 329 F.3d 876, 881 (D.C. Cir. 2003) (statement in press release required notice-and-comment rulemaking). Here again, the administrative record would answer some of the questions that divide the parties. *Am. Bioscience,* 243 F.3d at 582.

## CONCLUSION

WHEREFORE, Plaintiffs respectfully ask this Court to deny the motions to dismiss.

---

[25]    That the meaningful-difference test interprets both the FFDCA and *FDA's regulations* renders inapposite the cases cited by Duramed for the proposition that agencies can change *statutory* interpretations without notice-and-comment rulemaking. *See* Duramed Mot. at 41-43. As Plaintiffs demonstrate in Section II.C.1.b, FDA has changed its interpretation of §310.200 on Rx-OTC switches without the required notice-and-comment rulemaking. Plaintiffs readily meet the standard of "stat[ing] adequately" and "support[ing] by showing any set of facts consistent with the allegations in the complaint" that FDA has impermissibly changed its regulatory and statutory interpretations. *Twombly,* 127 S.Ct. at 1969.

Dated: October 17, 2007                    Respectfully submitted,


                                            /s/ Lawrence J. Joseph
                                           Lawrence J. Joseph, D.C. Bar No. 464777

                                           1250 Connecticut Ave., NW, Suite 200
                                           Washington, DC 20036
                                           Telephone: (202) 669-5135
                                           Telecopier: (202) 318-2254

                                           *Counsel for Plaintiffs*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this 17th day of October 2007, I electronically filed the foregoing "Opposition to Motions to Dismiss" with the Clerk of the Court using the CM/ECF system, which I understand to have caused service of Jane M. Lyons of the U.S. Attorney's Office for the District of Columbia, on behalf of the federal defendants, and of Richard M. Cooper, on behalf of defendant-intervenor Duramed Pharmaceuticals, Inc.

/s/ Lawrence J. Joseph
Lawrence J. Joseph

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

ASSOCIATION OF AMERICAN PHYSICIANS &  )
SURGEONS, INC., *et al.,*                )
                                         )
    Plaintiffs,                          )
                                         )
        v.                               )   Civil Action No. 07-0668-JDB
                                         )
FOOD & DRUG ADMINISTRATION, *et al.,*    )
                                         )
    Defendants,                          )
                                         )
        and                              )
                                         )
DURAMED PHARMACEUTICALS, INC.,           )
                                         )
    Defendant-Intervenor                 )

E<small>XHIBITS TO</small>
M<small>EMORANDUM OF</small> L<small>AW IN</small> S<small>UPPORT OF</small>
P<small>LAINTIFF'S</small> O<small>PPOSITION TO</small> M<small>OTIONS TO</small> D<small>ISMISS</small>

Lawrence J. Joseph, D.C. Bar No. 464777

1250 Connecticut Ave., NW, Suite 200
Washington, DC 20036
Telephone: (202) 669-5135
Telecopier: (202) 318-2254

*Counsel for Plaintiffs*

Dated: October 17, 2007

## <u>TABLE OF CONTENTS</u>

1.  Declaration of Lawrence J. Joseph .......................................................................1
2.  Pontifical Academy for Life, Statement on the So-Called
    "Morning-After Pill" (Oct. 31, 2000)................................................................5
3.  Declaration of Thomas L. Ritter, M.D. ...............................................................8
4.  D.C. Code §11-521 (1967) ................................................................................13
5.  21 C.F.R. §130.101(b) (1964) ..........................................................................16
6.  21 C.F.R. §1.108(c) (1955) ...............................................................................20
7.  21 C.F.R. §310.200(b) (1976) ..........................................................................24
8.  39 Fed. Reg. 11,680 (Mar. 29, 1974) ...............................................................28
9.  40 Fed. Reg. 40,682, 40,715-17 (Sept. 3, 1975)..............................................30

# Exhibit 1

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| ASSOCIATION OF AMERICAN PHYSICIANS & SURGEONS, INC., *et al.,* ) | |
| Plaintiffs, ) | |
| v. ) | Civil Action No. 07-0668-JDB |
| FOOD & DRUG ADMINISTRATION, *et al.,* ) | |
| Defendants, ) | |
| and ) | |
| DURAMED PHARMACEUTICALS, INC., ) | |
| Defendant-Intervenor ) | |

## <u>AFFIDAVIT OF LAWRENCE J. JOSEPH</u>

I, Lawrence J. Joseph, hereby declare and state as follows:

1.    I am over the age of 18, and I reside in McLean, Virginia.

2.    I am an attorney representing plaintiffs Association of American Physicians & Surgeons, Inc., Concerned Women for America, Family Research Council, and Safe Drugs for Women (collectively "Plaintiffs") in the above-captioned action.

3.    An affidavit filed in conjunction with the defendant-intervenor's motion to intervene indicates that overall "Plan B" sales have increased, but prescription sales have decreased. Those facts suggest that Plan B could serve as an alternative product to "Plan A" contraceptives (*i.e.,* traditional, prescription contraceptive) and that physicians suffer economic loss from "over-the-counter" availability of Plan B. If the Court does not find that Plaintiffs (or at least one of them) have standing based on the pleadings and member affidavits (*i.e.,* information within Plaintiffs' control), Plaintiffs would seek jurisdictional discovery on these

issues to establish that Plan B's labeling is inadequate to dissuade consumers from using Plan B

as an alternative to Plan A and that physicians suffer economic loss, which the Court could find

relevant to Plaintiffs' standing.

4.      Plaintiffs believe that, in parts of the country where political support for

abortifacients is weak, state and/or local prosecutors would bring enforcement actions against

pharmacists holding Plan B for sale if those prosecutors became aware that Plan B (as approved

by the Food & Drug Administration) is nonetheless misbranded under 21 U.S.C. §353(b)(1), (3),

and (4). If the Court does not find that Plaintiffs (or at least one of them) have standing based on

the pleadings and member affidavits (*i.e.,* information within Plaintiffs' control), Plaintiffs would

seek jurisdictional discovery on the reasonableness of the fear of prosecution by state and/or

local prosecutors when pharmacists hold Plan B for sale.

5.      Counsel for the defendant-intervenor has advised the undersigned counsel that

defendant-intervenor will seek to defer briefing on motions by Plaintiffs for affirmative relief

(*e.g.,* summary judgment), based on defendant-intervenor's need for jurisdictional discovery of

Plaintiffs' affiants. In discussions with Plaintiffs to secure consumer affiants (*i.e.,* people who

may take Plan B or may want their minor daughter to take Plan B), the prospect of depositions

into personal lives has proved a hindrance to securing a consumer affiant willing to subject

herself, or his or her minor daughter, to that process.

6.      In my capacity as an attorney, I have obtained the document entitled "Statement

on the So-Called 'Morning-After Pill'" from the website of the Holy See (Vatican.va), attached

as Exhibit 2 to Plaintiffs' opposition to the defendants' and defendant-intervenor's motions to

dismiss. Specifically, on October 17, 2007, I located the document at the following address by

going to the "Site Map," selecting "Academy for Life ("Pontifical)," then scrolling down to the

hyperlink entitled "Pronouncement on the 'morning after' pill (October 31, 2000)," which took

my          browser          to          the          following          address:

http://www.vatican.va/roman_curia/pontifical_academies/acdlife/documents/rc_pa_acdlife_doc_

20001031_pillola-giorno-dopo_en.html (last visited October 17, 2007).

      7.     I have personal knowledge of the foregoing and am competent both to testify to it

at trial and/or to establish it by the submittal of documentary evidence at trial.

I declare under penalty of perjury that the foregoing is true and correct. Executed on this 17th day

of October, 2007.

Lawrence J. Joseph

3

# Exhibit 2



## PONTIFICAL ACADEMY FOR LIFE

## STATEMENT ON THE SO-CALLED "MORNING-AFTER PILL"

As is commonly known, the so-called *morning-after pill* recently went on sale in Italian pharmacies. It is a well-known chemical product (of the hormonal type) which has frequently - even in the past week - been presented by many in the field and by the mass media as a mere contraceptive or, more precisely, as an "emergency contraceptive", which can be used within a short time after a presumably fertile act of sexual intercourse, should one wish to prevent the continuation of an unwanted pregnancy. The inevitable critical reactions of those who have raised serious doubts about how this product works, namely, that its action is not merely "contraceptive" but "abortifacient", have received the very hasty reply that such concerns appear unfounded, since the morning-after pill has an "anti-implantation" effect, thus implicitly suggesting a clear distinction between abortion and *interception* (preventing the implantation of the fertilized ovum, i.e., the embryo, in the uterine wall).

Considering that the use of this product concerns fundamental human goods and values, to the point of involving the origins of human life itself, the Pontifical Academy for Life feels the pressing duty and definite need to offer some clarifications and considerations on the subject, reaffirming moreover already well-known ethical positions supported by precise scientific data and reinforced by Catholic doctrine.

\* \* \*

1. The *morning-after pill* is a hormone-based preparation (it can contain oestrogens, oestrogen/progestogens or only progestogens) which, within and no later than 72 hours after a presumably fertile act of sexual intercourse, has a predominantly "anti-implantation" function, i.e., it prevents a possible fertilized ovum (which is a human embryo), by now in the *blastocyst* stage of its development (fifth to sixth day after fertilization), from being implanted in the uterine wall by a process of altering the wall itself.

The final result will thus be the expulsion and loss of this embryo.

Only if this pill were to be taken several days before the moment of ovulation could it sometimes act to prevent the latter (in this case it would function as a typical "contraceptive").

However, the woman who uses this kind of pill does so in the fear that she may be in her fertile period and therefore intends to cause the expulsion of a possible new conceptus; above all, it would be unrealistic to think that a woman, finding herself in the situation of wanting to use an emergency contraceptive, would be able to know exactly and opportunely her current state of fertility.

2. The decision to use the term "fertilized ovum" to indicate the earliest phases of embryonic development can in no way lead to an artificial value distinction between different moments in the development of the same human individual. In other words, if it can be useful, for reasons of scientific description, to distinguish with conventional terms (fertilized ovum, embryo, fetus, etc.) different moments in a single growth process, it can never be legitimate to decide arbitrarily that the human individual has greater or lesser value (with the resulting variation in the duty to protect it) according to its stage of development.

3. It is clear, therefore, that the proven "anti-implantation" action of the *morning-after pill* is

Case 1:07-cv-00668-JDB    Document 29-2    Filed 10/17/2007    Page 9 of 35

Exhibits 7

really nothing other than a chemically induced abortion. It is neither intellectually consistent nor scientifically justifiable to say that we are not dealing with the same thing.

Moreover, it seems sufficiently clear that those who ask for or offer this pill are seeking the direct termination of a possible pregnancy already in progress, just as in the case of abortion. Pregnancy, in fact, begins with fertilization and not with the implantation of the blastocyst in the uterine wall, which is what is being implicitly suggested.

4. Consequently, from the ethical standpoint the same absolute unlawfulness of abortifacient procedures also applies to distributing, prescribing and taking the *morning-after pill.* All who, whether sharing the intention or not, directly co-operate with this procedure are also morally responsible for it.

5. A further consideration should be made regarding the use of the *morning-after pill* in relation to the application of Law 194/78, which in Italy regulates the conditions and procedures for the voluntary termination of pregnancy.

Saying that the pill is an "anti-implantation" product, instead of using the more transparent term "abortifacient", makes it possible *to avoid* all the obligatory procedures required by Law 194 in order to terminate a pregnancy (prior interview, verification of pregnancy, determination of growth stage, time for reflection, etc.), by practising a form of abortion that is completely hidden and cannot be recorded by any institution. All this seems, then, to be in direct contradiction to the correct application of Law 194, itself debatable.

6. In the end, since these procedures are becoming more widespread, we strongly urge everyone who works in this sector to make a firm objection of *moral* conscience, which will bear courageous and practical witness to the inalienable value of human life, especially in view of the new *hidden* forms of aggression against the weakest and most defenceless individuals, as is the case with a human embryo.

*Vatican City, 31 October 2000.*



# Exhibit 3

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| ASSOCIATION OF AMERICAN PHYSICIANS & SURGEONS, INC., *et al.,*<br>    Plaintiffs,<br><br>    v.<br><br>U.S. FOOD & DRUG ADMINISTRATION, *et al.,*<br>    Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

Civil Action No. 07-_____

## <u>DECLARATION OF THOMAS L. RITTER, M.D.</u>

I, Thomas L. Ritter, M.D., hereby declare and state as follows:

1.      I am over 18 years of age, and I am not a party to this action. I reside in Berrien Springs, Michigan, and I am a member of the Association of American Physicians & Surgeons, Inc.

2.      In 1976, I received my M.D. degree from University of Buffalo. In 1983, the State of Michigan licensed me to practice medicine. In 1990, I completed my residency in obstetrics and gynecology at the Reading Hospital and Medical Center in Reading, Pennsylvania. Since 1990, I have practiced as an obstetrician and gynecologist, and I intend to continue that practice for the next ten years.

3.      With respect to prescription and over-the-counter ("OTC") drugs, both physicians and pharmacists are directly regulated by the Federal Food, Drug and Cosmetics Act ("FFDCA") and administrative actions taken by the U.S. Food & Drug Administration ("FDA") to implement the FFDCA.

4.      I have been advised that, under Michigan law, only licensed physicians may prescribe drugs that FDA has approved as prescription drugs and, thus, Michigan pharmacists lawfully may dispense prescription drugs only pursuant to a physician's prescription. Consequently, if FDA approves a drug for OTC distribution, Michigan pharmacists may

dispense it without a physician's prescription, and if FDA approves a drug as a prescription drug, Michigan pharmacists may not dispense it without a physician's prescription.

5.      As the direct result of FDA's approving Plan B® (levonorgestrel) tablets for OTC distribution to women 18 years and older, Michigan pharmacists lawfully may dispense Plan B without a physician's prescription. If FDA's OTC approval was reversed, Michigan pharmacists no longer could dispense Plan B without a physician's prescription.

6.      As a direct result of FDA's approval of Plan B for OTC distribution, I face increased competition from pharmacists (and an increased number of competitors) in the contraceptive area of my medical practice. Both existing patients and new patients who otherwise would have come to me to obtain a contraceptive prescription instead now can obtain Plan B directly from pharmacists, without first visiting my office to obtain a prescription. When a new or existing patient calls my office to seek a contraceptive prescription, we use that request as the "carrot" to get the patient in for medical screening (described in Paragraph 8) if she is a new patient or, for existing patients, if she has not had a checkup in twelve months. Reversing Plan B's OTC status would terminate both my competition from pharmacists and my patients' ability to forego critical health-care screening by obtaining Plan B directly from pharmacists.

7.      In my practice, I annually have added new patients who come to my office for a contraceptive prescription, including both drugs and devices approved for prescription-only dispensing by FDA. My practice typically grows monthly by several new patients who come to me initially to seek contraceptive prescriptions. Similarly, in a typical month, I see several existing patients who schedule an office visit to seek contraceptive prescriptions and who undergo medical screening (described in Paragraph 8) as part of that office visit. Although my

revenue for an office visit varies based on factors such as the patient's insurance coverage, I receive in excess of $25 per office visit.

8.     This increased competition (and increase in the number of competitors) not only will cause me to lose revenue from new and existing patients, but also will remove critical health-care protection for those women who forego the doctor visit previously required for contraceptives and instead will rely on Plan B available directly from pharmacists. First, by obtaining Plan B over the counter, these women will forego direct medical advise about drug interactions, including those drugs indicated on Plan B's labeling, and medical screening for medical contraindications for the known and expected risks of oral contraceptives. Second, the office visit associated with a woman's seeking a contraceptive prescription historically has provided a critical opportunity for not only physician counseling about the various health risks associated with sexual activity, but also medical screening (*e.g.,* pap smear; breast-cancer screening; mammograms for women over 40; sexually transmitted diseases; cervical cancer; human papilloma virus prevention; cholesterol, blood pressure, and other cardiovascular screening). By foregoing the office visit associated with obtaining contraceptive prescriptions, these women will worsen their overall health care.

9.     I develop and maintain a close and confidential relationship with my patients. Because they have no formal understanding of the risks posed either by foregoing medical screening or by using Plan B without fully understanding the potential complications, my patients and prospective patients cannot adequately protect their interests in either safe access to drugs or safe medical care. Because patients tend to trust in the safety inherent in government approval generally and FDA approval specifically, these patients will neither appreciate nor even

3

recognize the risks posed or the preventative care foregone by obtaining Plan B over the counter from a pharmacist, without consulting a physician.

      10.    I have personal knowledge of the foregoing and am competent to testify to it at trial.

I declare under penalty of perjury that the foregoing is true and correct. Executed on this _1ST_ day of April, 2007.

 

Thomas L. Ritter, M.D.

# Exhibit 4

# DISTRICT OF COLUMBIA CODE

### ANNOTATED

## 1967 EDITION

CONTAINING THE LAWS, GENERAL AND PERMANENT IN THEIR NATURE,
RELATING TO OR IN FORCE IN THE DISTRICT OF COLUMBIA (EXCEPT
SUCH LAWS AS ARE OF APPLICATION IN THE DISTRICT OF
COLUMBIA BY REASON OF BEING GENERAL AND PER-
MANENT LAWS OF THE UNITED STATES),
IN FORCE ON JANUARY 9, 1967

### NOTES TO DECISIONS THROUGH DECEMBER 1966



### VOLUME ONE

TITLE 1—ADMINISTRATION

TO

TITLE 17—REVIEW

U.S. GOVERNMENT PRINTING OFFICE
WASHINGTON : 1967

935; Mar. 3, 1901, ch. 854, § 121, 31 Stat. 1209; June 30, 1902, ch. 1329, 32 Stat. 525; Mar. 4, 1923, ch. 265, 42 Stat. 1488; Apr. 24, 1926, ch. 176, 44 Stat. 322; Aug. 7, 1946, ch. 792, 60 Stat. 889; Aug. 2, 1949, ch. 383, § 5, 63 Stat. 491).

Section consolidates part of section 19–403 of D.C. Code, 1961 ed., with sections 19–404a, 19–406, 19–407, 19–408, 19–410 and 19–411 thereof. For remainder of section 19–403, see section 11–506 herein.

Sections 19–410 and 19–411 of D.C. Code, 1961 ed., which were derived from the old Maryland statutes and the Act of Congress Apr. 2, 1792, ch. 16, § 9, 1 Stat. 246, cited above, provided:

*Section 19–410:*

"No person, being register of wills shall plead as an attorney at law in any court in the District of Columbia for any person or persons, on any pretence whatsoever; and no register of wills as aforesaid shall exact, extort, demand, take, accept, or receive, from any person whatsoever, any fee or fees, gratuity, gift, or reward, for giving his advice in any matter or thing that will be transacted in the courts of the District of Columbia, under the penalty of $80, current money for every such offense".

*Section 19–411:*

"The register of wills shall not demand, take, or receive, from any person whatever any fee, gratuity, gift or reward, for giving his advice in any matter or thing relative to his office, under the penalty of $133.33, for every offense.".

The restrictions imposed in the two sections quoted above are consolidated and preserved in subsec. (c) of this revised section but the penalties are omitted as inconsistent with each other, obsolete, or in any event unnecessary. The Register of Wills is now an officer of the District Court, and subject not only to his direction and control, but also to removal by the court, in its discretion, for misconduct or any other reason. See section 11–504 herein. See, also, section 401(2) of Title 18, United States Code, under which courts of the United States may punish such contempt of their authority as misbehavior of any of their officers in their official transactions.

Words "exact", "extort", "take", and "accept" are omitted from clause (2) of subsec. (c) of this section as covered by "demand" and "receive", as the case may be; and, in subsec. (e) reference to "forfeit" is omitted as covered by "pay".

Changes are made in phraseology.

## § 11–506. Deputies and other employees under Register of Wills; duties

(a) The Register of Wills, with the approval of the court, may appoint necessary deputies, clerical assistants and other employees in such number as may be approved by the Director of the Administrative Office of the United States Courts. With the approval of the court, the Register of Wills may remove any of the personnel so appointed.

(b) The personnel appointed pursuant to this section shall be under the supervision and control of the Register of Wills, and shall perform such duties as he or the court directs. The deputies may perform acts necessary in the administration of the office of the Register of Wills and the certification of the records of the court which the Register may perform. (Dec. 23, 1963, 77 Stat. 482, Pub. L. 88–241, § 1, eff. Jan. 1, 1964.)

REVISION NOTES

Based on D.C. Code, 1961 ed., § 19–403 (Mar. 3, 1901, ch. 854, § 121, 31 Stat. 1209; June 30, 1902, ch. 1329, 32 Stat. 525; Mar. 4, 1923, ch. 265, 42 Stat. 1488; Apr. 24, 1926, ch. 176, 44 Stat. 322; Aug. 7, 1946, ch. 792, 60 Stat. 889).

Section is derived from that part of section 19–403 of D.C. Code, 1961 ed., which related to the appointment of deputies and other personnel in the office of the Register of Wills.

Section 19–403 of D.C. Code, 1961 ed., authorized the Register of Wills to appoint five deputies, and to appoint and fix the number of compensation of the employees of the "said probate court" (which was the designation of a former statutory special term of the District Court) and the office of the Register, and contained a proviso that "the employees of said office shall not be in excess of the number actually necessary for the proper conduct of the office of said register of wills". However, the Register of Wills is now an officer of the District Court, is appointed by that court, and the provisions of chapter 41 (section 601 et seq.) of Title 28, United States Code, apply to his office (see section 11–504 herein, and revision note thereunder). Chapter 41 of Title 28, United States Code, relates to the Administrative Office of the United States Courts, and section 601(a)(5) thereof provides that the Director of the Administrative Office shall fix the compensation of "clerks of court, whose compensation * * * [etc.] and other employees of the courts whose compensation is not otherwise fixed by law". Further, under section 751 of Title 28, United States Code, the regular clerk of the District Court appoints, with the approval of the court, necessary deputies (with no statutory restriction on the number, presumably because of the necessity for the court's approval), clerical assistants, "and employees in such number as may be approved by the Director of the Administrative Office of the United States Courts". Section 751 of that title also provides that the clerk may remove such deputies and other employees, with the approval of the court. That section, as stated, relates to the regular clerks of the district courts, and it does not apply to the Register of Wills, but, in view of the changed status of the office of the Register of Wills (since 1949), and the functions, under section 601 of Title 28, United States Code, of the Director of the Administrative Office, with respect to the office of the Register, it would seem that provisions similar to those of section 751 of Title 28, United States Code, relating to regular district court clerks, should apply to the Register and the deputies and other employees in his office. Therefore, the provisions of section 19–403 as herein revised, place no restriction on the number of deputies to be appointed, but make the appointments subject to approval of the court; omit the proviso prohibiting the appointment of other employees in a number in excess of the number actually necessary, and provide for approval of the number by the Director of the Administrative Office; omit the provisions which related to the fixing, by the Register, of the compensation of the employees; and provide, for the purpose of completeness, that the personnel appointed under this section shall be under the supervision and control of the Register of Wills, and shall perform such duties as he or the court directs. The section also inserts the provision that, with the approval of the court, the Register may remove any of the personnel so appointed.

Changes are made in phraseology.

For remainder of section 19–403 of D.C. Code, 1961 ed., see section 11–505 herein.

## SUBCHAPTER II.—JURISDICTION

### § 11–521. Civil and criminal jurisdiction

(a) Except in actions or proceedings over which exclusive jurisdiction is conferred by law upon other courts in the District, the United States District Court for the District of Columbia, in addition to its jurisdiction as a United States district court and to any other jurisdiction conferred by law, has all the jurisdiction possessed and exercised by it on January 1, 1964, and has original jurisdiction of all:

(1) civil actions between parties, where either or both of them are resident or found within the District, and

(2) offenses committed within the District.

(b) Except as otherwise specially provided, an action may not be brought in the District Court by original process against a person who is not resident or found within the District. (Dec. 23, 1963, 77 Stat. 482, Pub. L. 88–241, § 1, eff. Jan. 1, 1964.)

# Exhibit 5

# CODE

# OF FEDERAL

# REGULATIONS



## TITLE 21

### Revised as of January 1, 1964

CONTAINING A CODIFICATION OF DOCUMENTS OF GENERAL APPLICABILITY AND
FUTURE EFFECT AS OF JANUARY 1, 1964

*With Ancillaries*

Published by the Office of the Federal Register, National Archives and Records Service
General Services Administration, as a Special Edition of the Federal Register
Pursuant to Section 11 of the Federal Register Act as Amended

required under the provisions of section 505(j) of the act and § 130.13, of any information obtained from (1) investigations as to safety or effectiveness; or (2) investigations as to identity, strength, quality, or purity of the drug made by the applicant on the drug; or (3) investigations or experience with the drug, or any drug which is relevantly related to the drug that is the subject of the application available to the applicant from any source, if such information is pertinent to an evaluation of the safety, effectiveness, identity, strength, quality or purity of the drug, when such omission would bias an evaluation of the safety or effectiveness of the drug.

### § 130.31　Judicial review.

The Assistant General Counsel for Food and Drugs of the Department of Health, Education, and Welfare is hereby designated as the officer upon whom copies of petitions for judicial review shall be served. Such officer shall be responsible for filing in the court a transcript of proceedings and the record on which the final orders were based. The transcript and record shall be certified by the Commissioner.

### § 130.32　Confidentiality of information contained in new-drug applications.

(a) The Federal Food, Drug, and Cosmetic Act provides, in section 505(b), that any person may file with the Secretary an application with respect to any new drug, which shall include, among other things, a full list of the articles used as components and a full statement of the composition of such drug. These requirements apply to all components or ingredients of a new drug, whether or not they are therapeutically active. Fulfillment of these requirements may be met by submitting a full statement of the chemical or common or usual name and of the quantity of each component or ingredient of the drug. Such requirements may also be met through the inclusion in the new-drug application of a properly authorized reference to a previous application or other Food and Drug Administration file containing the relevant information.

(b) Section 301(j) of the act makes it an offense to divulge to unauthorized persons any information acquired from a new-drug application concerning any method or process that is a trade secret. Basic manufacturers sometimes submit data to the Food and Drug Administration in the form of so-called master files for the purpose of establishing the safety of ingredients that may be used in new drugs and authorize specified applicants to incorporate by reference such data in support of their applications. Such manufacturers may regard some of the data in such files as trade secrets and request the Food and Drug Administration to treat such information as confidential. The Food and Drug Administration will preserve the confidentiality of such data to the extent that it may properly do so. Because the applicant is legally responsible for the composition of the new drug and all its ingredients and may require information in the master file for judicial or administrative proceedings concerning the drug, the Food and Drug Administration will not withhold such information from the applicant when his need for it arises and he submits a written request for it. The Food and Drug Administration will inform the person who submitted the data of any such requests.

### § 130.33　Notice of approval.

When a new-drug application is approved, the Commissioner will publish an appropriate notice thereof in the FEDERAL REGISTER. Further, if a supplement to an approved new-drug application becomes necessary to add additional warnings, contraindications, or information about new side effects, the Commissioner may publish an appropriate notice thereof in the FEDERAL REGISTER. Publication may be delayed until an appropriate date related to the date of initial distribution of the drug.

### § 130.34　Notice of withdrawal of approval of application.

Where approval of a new-drug application is withdrawn by the Commissioner, he will give appropriate public notice of such action by publication in the FEDERAL REGISTER.

## Subpart B—Drugs Exempted From Prescription-Dispensing Requirements

### § 130.101　Prescription-exemption procedure.

(a) *Duration of prescription requirement.* Any drug limited to prescription use under section 503(b)(1)(C) of the act remains so limited until it is

§ 130.102                  Title 21—Food and Drugs

exempted as provided in paragraph (b) of this section.

(b) *Prescription-exemption procedure for drugs limited by a new-drug application.* Any drug limited to prescription use under section 503(b)(1)(C) of the act shall be exempted from prescription-dispensing requirements when the Commissioner finds such requirements are not necessary for the protection of the public health by reason of the drug's toxicity or other potentiality for harmful effect, or the method of its use, or the collateral measures necessary to its use, and he finds that the drug is safe and effective for use in self-medication as directed in proposed labeling. A proposal to exempt a drug from the prescription-dispensing requirements of section 503(b)(1)(C) of the act may be initiated by the Commissioner or by any interested person. Any interested person may file a petition seeking such exemption, stating reasonable grounds therefor, which petition may be in the form of a supplement to an approved new-drug application. Upon receipt of such a petition, or on his own initiative at any time, the Commissioner will publish a notice of proposed rule making and invite written comments. After consideration of all available data, including any comments submitted, the Commissioner may issue a regulation granting or refusing the exemption, effective on a date specified therein. Whenever the Commissioner concludes, either at the time of publication of the notice of proposed rule making or after considering the written comments submitted, that granting or refusing the exemption requires a more thorough development of the facts than is possible in a written presentation, he may call a public hearing for that purpose. The notice of such hearing shall specify the questions to be considered. As soon as practicable after completion of the hearing, the final regulation granting or refusing the exemption shall be issued, effective on a date specified therein. If the Commissioner for good cause finds (and incorporates the finding and a brief statement of the reasons therefor in a regulation) that notice and public procedure thereon are impracticable, unnecessary, or contrary to the public interest, he may issue the final regulation forthwith.

(c) *New-drug status of drugs exempted from the prescription requirement.* A drug exempted from the prescription requirement under the provisions of paragraph (b) of this section is a "new drug" within the meaning of section 201(p) of the act until it has been used to a material extent and for a material time under such conditions.

(d) *Prescription legend not allowed on exempted drugs.* The use of the prescription caution statement quoted in section 503(b)(4) of the act, in the labeling of a drug exempted under the provisions of this section, constitutes misbranding. Any other statement or suggestion in the labeling of a drug exempted under this section, that such drug is limited to prescription use, may constitute misbranding.

### § 130.102   Exemption for certain drugs limited by new-drug applications to prescription sale.

(a) The prescription-dispensing requirements of section 503(b)(1)(C) of the Federal Food, Drug, and Cosmetic Act are not necessary for the protection of the public health with respect to the following drugs subject to new-drug applications:

(1) *N*-Acetyl-*p*-aminophenol (acetaminophen, *p*-hydroxy-acetanilid) preparations meeting all the following conditions:

(i) The *N*-acetyl-*p*-aminophenol is prepared, with or without other drugs, in tablet or other dosage form suitable for oral use in self-medication, and containing no drug limited to prescription sale under the provisions of section 503(b)(1) of the act.

(ii) The *N*-acetyl-*p*-aminophenol and all other components of the preparation meet their professed standards of identity, strength, quality, and purity.

(iii) If the preparation is a new drug, an application pursuant to section 505(b) of the act is effective for it.

(iv) The preparation contains not more than 0.325 gram (5 grains) of *N*-acetyl-*p*-aminophenol per dosage unit, or if it is in liquid form not more than 100 milligrams of *N*-acetyl-*p*-aminophenol per milliliter.

(v) The preparation is labeled with adequate directions for use in minor conditions as a simple analgesic.

(vi) The dosages of *N*-acetyl-*p*-aminophenol recommended or suggested in the labeling do not exceed: For adults, 0.65 gram (10 grains) per dose or 2.6 grams (40 grains) per 24-hour period; for children 6 to 12 years of age, one-half of the maximum adult dose or dosage; for

# Exhibit 6

# CUMULATIVE POCKET SUPPLEMENT

## TO THE . . . CODE

## OF FEDERAL

## REGULATIONS

**Title 21—Food and Drugs**



AS OF JANUARY 1
1955

**For changes on and after
January 1, 1955, see the daily issues of the Federal Register**

## Chapter I—Food and Drug Administration    § 1.108

ment "Caution: For manufacturing, processing, or repacking" is immediately supplemented by the words "in the preparation of a new drug limited by Federal law to investigational use," and the delivery is made for use only in the manufacture of such new drug limited to investigational use as provided in § 1.114.

(m) *Exemption for drugs and devices for use in teaching, research, and analysis.* A drug or device subject to paragraph (b), (c), or (d) of this section shall be exempt from section 502 (f) (1) of the act if shipped or sold to, or in the possession of, persons regularly and lawfully engaged in instruction in pharmacy, chemistry, or medicine not involving clinical use, or engaged in research not involving clinical use, or in chemical analysis, or physical testing, and is to be used only for such instruction, research, analysis, or testing.

(n) *Expiration of exemptions.* (1) If a shipment or delivery, or any part thereof, of a drug or device which is exempt under the regulations in this section is made to a person in whose possession the article is not exempt, or is made for any purpose other than those specified, such exemption shall expire, with respect to such shipment or delivery or part thereof, at the beginning of that shipment or delivery. The causing of an exemption to expire shall be considered an act which results in such drug or device being misbranded unless it is disposed of under circumstances in which it ceases to be a drug or device.

(2) The exemptions conferred by paragraphs (i), (j), (k), (l), and (m) of this section shall continue until the drugs or devices are used for the purposes for which they are exempted, or until they are relabeled to comply with section 502 (f) (1) of the act. If, however, the drug is converted, compounded, or manufactured into a dosage form limited to prescription dispensing, no exemption shall thereafter apply to the article unless the dosage form is labeled as required by section 503 (b) and paragraph (b), (c), or (d) of this section.

(o) *Intended uses.* The words "intended uses" or words of similar import in paragraphs (a), (g), (i), (j), (k), and (l) of this section refer to the objective intent of the persons legally responsible for the labeling of drugs and devices. The intent is determined by such persons' expressions or may be shown by the circumstances surrounding the distribution of the article. This objective intent may, for example, be shown by labeling claims, advertising matter, or oral or written statements by such persons or their representatives. It may be shown by the circumstances that the article is, with the knowledge of such persons or their representatives, offered and used for a purpose for which it is neither labeled nor advertised. The intended uses of an article may change after it has been introduced into interstate commerce by its manufacturer. If, for example, a packer, distributor, or seller intends an article for different uses than those intended by the person from whom he received the drug, such packer, distributor, or seller is required to supply adequate labeling in accordance with the new intended uses. But if a manufacturer knows, or has knowledge of facts that would give him notice, that a drug or device introduced into interstate commerce by him is to be used for conditions, purposes, or uses other than the ones for which he offers it, he is required to provide adequate labeling for such a drug which accords with such other uses to which the article is to be put.

[17 F. R. 6818, July 25, 1952]

§ 1.108 *New drugs; definition.* [Redesignated]

Codification: Former § 1.108 was redesignated § 1.109, 17 F. R. 7815, Aug. 27, 1952.

§ 1.108 *Exemption from prescription requirements*—(a) *Exemption for certain habit-forming drugs.* The prescription-dispensing requirements of section 503 (b) (1) (A) of the act are not necessary for the protection of the public health with respect to the following drugs subject to section 502 (d):

(1) Exempt narcotic preparations described in 26 CFR 151.2 and sold as required by 26 CFR 151.180 through 151.185a.

(2) Drugs containing chlorobutanol, intended for external use only.

(3) Epinephrine solution, 1 percent, preserved with chlorobutanol and intended for use solely as a spray.

(4) Drugs containing one or more of the derivatives of barbituric acid and in addition a sufficient quantity or proportion of another drug or drugs to prevent the ingestion of a sufficient amount of barbiturate derivative to cause a hypnotic or somnifacient effect.

§ 1.109                    Title 21—Food and Drugs

(b) *Duration of prescription require-ment.* Any drug limited to prescription use under section 503 (b) (1) (C) of the act remains so limited until it is exempted as provided in paragraph (c) of this section.

(c) *Prescription exemption procedure for drugs limited by a new-drug applica-tion.* The exemption of a drug from the prescription-dispensing requirements of section 503 (b) (1) (C) of the act may be initiated by the Commissioner or by any interested person. Any interested person may file a petition seeking such exemp-tion, stating reasonable grounds there-for, which petition may be the form of a supplement to an effective new-drug ap-plication. Upon receipt of such a peti-tion, or on his own initiative at any time, the Commissioner will publish a notice of proposed rule making and invite written comments. After consideration of all available data, including any com-ments submitted, the Commissioner may issue a regulation granting or refusing the exemption, effective on a date speci-fied therein. Whenever the Commis-sioner concludes, either at the time of publication of the notice of proposed rule making or after considering the written comments submitted, that granting or refusing the exemption requires a more thorough development of the facts than is possible in a written presentation, he may call a public hearing for that pur-pose. The notice of such hearing shall specify the questions to be considered. As soon as practicable after completion of the hearing, the final regulation granting or refusing the exemption shall be issued, effective on a date specified therein. If the Commissioner for good cause finds (and incorporates the finding and a brief statement of the reasons therefor in a regulation) that notice and public procedure thereon are im-practicable, unnecessary, or contrary to the public interest, he may issue the final regulation forthwith.

(d) *New-drug status exempted from the prescription requirement.* A drug exempted from the prescription require-ment under the provisions of paragraph (c) of this section continues to be a "new drug" within the meaning of section 201 (p) of the act until it has been used to a material extent or for a material time and has become generally recognized as safe when used in accordance with the directions for use contained in its labeling.

(e) *Prescription legend not allowed on exempted drugs.* The use of the pre-scription caution statement quoted in section 503 (b) (4) of the act, in the labeling of a drug exempted under the provisions of this section, constitutes misbranding. Any other statement or suggestion in the labeling of a drug exempted under this section, that such drug is limited to prescription use, may constitute misbranding.

(Sec. 503, 52 Stat. 1051, as amended; 21 U. S. C. 353)

CODIFICATION: § 1.108 was added, 17 F. R. 6820, July 25, 1952. Subsequently, the head-note for paragraph (a) was added, para-graphs (a), (b), (c) and (d) were redesig-nated subparagraphs (1), (2), (3), and (4), and paragraphs (b), (c), (d), and (e) were added, 19 F. R. 7347, Nov. 13, 1954.

§ 1.109  *New drugs; exemption from section 505 of the act.* [Redesignated]

CODIFICATION: Former § 1.109 was redesig-nated § 1.109a, 17 F. R. 7815, Aug. 27, 1952.

§ 1.109  *New drugs; definition.* [Re-designated] (See codification note to § 1.108, *New drugs; definition.*)

§ 1.109a  *New drugs; exemption from section 505 of the act.* [Redesignated]

CODIFICATION: Former § 1.109 was redesig-nated § 1.109a, 17 F. R. 7815, Aug. 27, 1952.

IMPORTS AND EXPORTS [REVISED]

AUTHORITY: §§ 1.315 to 1.322 issued under sec. 701, 52 Stat. 1055, as amended; 21 U. S. C. 371. Interpret or apply sec. 801, 52 Stat. 1058; 21 U. S. C. 381.

SOURCE: §§ 1.315 to 1.322 appear at 16 F. R. 4929, May 25, 1951, 16 F. R. 5470, June 9, 1951, except as otherwise noted.

*Prior Amendments*

1950: 15 F. R. 584, Feb. 2; 15 F. R. 2756, May 9.

NOTE: §§ 1.315 to 1.322 supersede §§ 1.302 to 1.312.

§ 1.315  *Definitions.* For the purposes of the regulations prescribed under sec-tion 801 (a), (b), and (c) of the Federal Food, Drug, and Cosmetic Act:

(a) The term "owner" or "consignee" means the person who has the rights of a consignee under the provisions of sec-tions 483, 484, and 485 of the Tariff Act of 1930, as amended (19 U. S. C. 1483, 1484, 1485).

(b) The term "chief of district" means the chief of the district of the Food and Drug Administration having jurisdiction over the port of entry through which an article is imported or offered for import,

# Exhibit 7





# 21

# Food and Drugs

PARTS 300 TO 499

Revised as of April 1, 1976

CONTAINING
A CODIFICATION OF DOCUMENTS
OF GENERAL APPLICABILITY
AND FUTURE EFFECT

AS OF APRIL 1, 1976

*With Ancillaries*

Published by
the Office of the Federal Register
National Archives and Records Service
General Services Administration

as a Special Edition of
the Federal Register



§ 310.200                    Title 21—Food and Drugs

(4) The quantity shipped is limited to an amount reasonable for the purpose of patch testing in the normal course of the practice of medicine and is used solely for such patch testing.

(5) The new-drug substance is manufactured by the same procedures and meets the same specifications as the component used in the finished dosage form.

(6) The manufacturer or distributor maintains records of all shipments for this purpose for a period of 2 years after shipment and will make them available to the Food and Drug Administration on request.

(b) When the requested new-drug substance is intended for investigational use in humans or the substance is legally available only under the investigational drug provisions of Part 312 of this chapter, the submission of a "Notice of Claimed Investigational Exemption for a New Drug" (IND) is required. The Food and Drug Administration will offer assistance to any practitioner wishing an exemption (see § 312.1 of this chapter), and administrative procedures will be made as simple as possible.

(c) This section does not apply to drugs or their components that are subject to the licensing requirements of the Public Health Service Act of 1944, as amended. (See Subchapter F—Biologies, of this chapter.)

(Sec. 502, 52 Stat. 1053; 21 U.S.C. 352)

**Subpart C—New Drugs Exempted From Prescription-Dispensing Requirements**

§ 310.200    Prescription-exemption procedure.

(a) *Duration of prescription requirement.* Any drug limited to prescription use under section 503(b) (1) (C) of the act remains so limited until it is exempted as provided in paragraph (b) of this section.

(b) *Prescription-exemption procedure for drugs limited by a new-drug application.* Any drug limited to prescription use under section 503(b) (1) (C) of the act shall be exempted from prescription-dispensing requirements when the Commissioner finds such requirements are not necessary for the protection of the public health by reason of the drug's toxicity or other potentiality for harmful effect, or the method of its use, or the collateral measures necessary to its use, and he finds that the drug is safe and effective for use in self-medication as directed in proposed labeling. A proposal to exempt a drug from the prescription-dispensing requirements of section 503(b) (1) (C) of the act may be initiated by the Commissioner or by any interested person. Any interested person may file a petition seeking such exemption, stating reasonable grounds therefor, which petition may be in the form of a supplement to an approved new-drug application. Upon receipt of such a petition, or on his own initiative at any time, the Commissioner will publish a notice of proposed rule making and invite written comments. After consideration of all available data, including any comments submitted, the Commissioner may issue a regulation granting or refusing the exemption, effective on a date specified therein. Whenever the Commissioner concludes, either at the time of publication of the notice of proposed rule making or after considering the written comments submitted, that granting or refusing the exemption requires a more thorough development of the facts than is possible in a written presentation, he may call a public hearing for that purpose. The notice of such hearing shall specify the questions to be considered. As soon as practicable after completion of the hearing, the final regulation granting or refusing the exemption shall be issued, effective on a date specified therein. If the Commissioner for good cause finds (and incorporates the finding and a brief statement of the reasons therefor in a regulation) that notice and public procedure thereon are impracticable, unnecessary, or contrary to the public interest, he may issue the final regulation forthwith.

(c) *New-drug status of drugs exempted from the prescription requirement.* A drug exempted from the prescription requirement under the provisions of paragraph (b) of this section is a "new drug" within the meaning of section 201(p) of the act until it has been used to a material extent and for a material time under such conditions.

(d) *Prescription legend not allowed on exempted drugs.* The use of the prescription caution statement quoted in section 503(b) (4) of the act, in the labeling of a drug exempted under the provisions of this section, constitutes misbranding. Any other statement or suggestion in the labeling of a drug ex-

14

empted under this section, that such drug is limited to prescription use, may constitute misbranding.

§ 310.201  Exemption for certain drugs limited by new-drug applications to prescription sale.

(a) The prescription-dispensing requirements of section 503(b) (1) (C) of the Federal Food, Drug, and Cosmetic Act are not necessary for the protection of the public health with respect to the following drugs subject to new-drug applications:

(1) N-Acetyl-p-aminophenol (acetaminophen, p-hydroxy-acetanilid) preparations meeting all the following conditions:

(i) The N-acetyl-p-aminophenol is prepared, with or without other drugs, in tablet or other dosage form suitable for oral use in self-medication, and containing no drug limited to prescription sale under the provisions of section 503 (b) (1) of the act.

(ii) The N-acetyl-p-aminophenol and all other components of the preparation meet their professed standards of identity, strength, quality, and purity.

(iii) If the preparation is a new drug, an application pursuant to section 505 (b) of the act is approved for it.

(iv) The preparation contains not more than 0.325 gram (5 grains) of N-acetyl-p-aminophenol per dosage unit, or if it is in liquid form not more than 100 milligrams of N-acetyl-p-aminophenol per milliliter.

(v) The preparation is labeled with adequate directions for use in minor conditions as a simple analgesic.

(vi) The dosages of N-acetyl-p-aminophenol recommended or suggested in the labeling do not exceed: For adults, 0.65 gram (10 grains) per dose or 2.6 grams (40 grains) per 24-hour period; for children 6 to 12 years of age, one-half of the maximum adult dose or dosage; for children 3 to 6 years of age, one-fifth of the maximum adult dose or dosage.

(vii) The labeling bears, in juxtaposition with the dosage recommendations, a clear warning statement against administration of the drug to children under 3 years of age and against use of the drug for more than 10 days, unless such uses are directed by a physician.

(viii) If the article is offered for use in arthritis or rheumatism, the labeling prominently bears a statement that the beneficial effects claimed are limited to the temporary relief of minor aches and pains of arthritis and rheumatism and, in juxtaposition with directions for use in such conditions, a conspicuous warning statement, such as "Caution: If pain persists for more than 10 days, or redness is present, or in conditions affecting children under 12 years of age, consult a physician immediately".

(2) Sodium gentisate (sodium-2, 5-dihydroxybenzoate) preparations meeting all the following conditions:

(i) The sodium gentisate is prepared, with or without other drugs, in tablet or other dosage form suitable for oral use in self-medication, and containing no drug limited to prescription sale under the provisions of section 503 (b) (1) of the act.

(ii) The sodium gentisate and all other components of the preparation meet their professed standards of identity, strength, quality, and purity.

(iii) If the preparation is a new drug, an application pursuant to section 505 (b) of the act is approved for it.

(iv) The preparation contains not more than 0.5 gram (7.7 grains) of anhydrous sodium gentisate per dosage unit.

(v) The preparation is labeled with adequate directions for use in minor conditions as a simple analgesic.

(vi) The dosages of sodium gentisate recommended or suggested in the labeling do not exceed: For adults, 0.5 gram (7.7 grains) per dose of 2.0 grams (31 grains) per 24-hour period; for children 6 to 12 years of age, one-half of the maximum adult dose or dosage.

(vii) The labeling bears, in juxtaposition with the dosage recommendations, a clear warning statement against administration of the drug to children under 6 years of age and against use of the drug for a prolonged period, except as such uses may be directed by a physician.

(3) Isoamylhydrocupreine and zolamine hydrochloride (N, N-dimethyl-N'-2-thiazolyl-N'-p-methoxybenzyl - ethylenediamine hydrochloride) preparations meeting all the following conditions:

(i) The isoamylhydrocupreine and zolamine hydrochloride are prepared in dosage form suitable for self-medication as rectal suppositories or as an ointment and containing no drug limited to pre-

# Exhibit 8

11680

## RULES AND REGULATIONS

Title 21—Food and Drugs

CHAPTER I—FOOD AND DRUG ADMINISTRATION, DEPARTMENT OF HEALTH, EDUCATION, AND WELFARE

SUBCHAPTER D—DRUGS FOR HUMAN USE

[Recodification Docket No. 5]

### Reorganization and Republication

The Commissioner of Food and Drugs, for the purposes of establishing an orderly development of informative regulations for the Food and Drug Administration, furnishing ample room for expansion of such regulations in years ahead, and providing the public and affected industries with regulations that are easy to find, read, and understand, has initiated a recodification program for Chapter I of Title 21 of the Code of Federal Regulations.

This is the fifth document in a series of recodification documents that will eventually include all regulations administered by the Food and Drug Administration.

The volume of regulatory material for human drugs under Subchapter C—Drugs requires that these regulations be recodified in two documents. This, the fifth document, recodifies drug regulations in current Parts 130, 131, 164, 165, and 167. Another, a sixth document, pertaining to procedural regulations and individual drug monographs for antibiotic drugs for human use, will be published in the FEDERAL REGISTER prior to the revision of the annual volume of the Code of Federal Regulations relating to Parts 141 through 599, which is scheduled for May 1, 1974.

Regulations for human drugs formerly under Parts 130, 131, 164, 165, and 167 of Subchapter C—Drugs have been reorganized into a new Subchapter D—Drugs for Human Use in an effort to provide greater clarity and convenience to the user. The following table shows the relationship of the CFR section numbers under Subchapter C prior to this republication to their redesignation reflected in the new Parts 310, 312, 314, 328, 329, 330, 369, and 429 of Subchapter D:

| Old section | New section |
|---|---|
| 130.1 | 310.3 |
| 130.2 | 310.4 |
| 130.3 | 312.1 |
| 130.3a | 312.9 |
| 130.3b | 312.10 |
| 130.4 | 314.1 |
| 130.5 | 314.110 |
| 130.6 | 314.100 |
| 130.7 | 314.6 |
| 130.8 | 314.7 |
| 130.9 | 314.8 |
| 130.10 | 314.105 |
| 130.11 | 314.9 |
| 130.12 | 314.111 |
| 130.13 | 310.300 |
| 130.13a | 310.301 |
| 130.13b | 314.13 |
| 130.14 | 314.200 |
| 130.15 | 314.201 |
| 130.16 | 314.202 |
| 130.17 | 314.203 |
| 130.18 | 314.204 |
| 130.19 | 314.220 |
| 130.20 | 314.221 |
| 130.21 | 314.222 |
| 130.22 | 314.205 |
| 130.23 | 314.206 |
| 130.24 | 314.230 |
| 130.25 | 314.231 |
| 130.26 | 314.232 |
| 130.27 | 314.115 |
| 130.28 | 314.120 |
| 130.29 | 314.121 |
| 130.30 | 314.12 |
| 130.31 | 314.235 |
| 130.32 | 314.11 |
| 130.33 | 314.10 |
| 130.34 | 314.116 |
| 130.35 | 310.302 |
| 130.36 | 310.101 |
| 130.37 | 310.102 |
| 130.38 | 310.9 |
| 130.39 | 310.100 |
| 130.40 | 310.6 |
| 130.41 | 310.103 |
| 130.44 | 310.505 |
| 130.45 | 310.501 |
| 130.46 | 310.504 |
| 130.47 | 310.303 |
| 130.48 | 310.304 |
| 130.49 | 310.503 |
| 130.50 | 310.502 |
| 130.51 | 310.500 |
| 130.101 | 310.200 |
| 130.102 | 310.201 |
| 130.103 | 314.300 |
| 130.301(a)(1) through (12) | 330.10 |
| 130.301(a)(13) | 330.11 |
| 130.301(b) | 330.5 |
| 130.302 | 330.1 |
| 130.303 | 330.12 |
| 131.1 | 369.1 |
| 131.2 | 369.2 |
| 131.3 | 369.3 |
| 131.4 | 369.4 |
| 131.5 | 369.5 |
| 131.6 | 369.6 |
| 131.7 | 369.7 |
| 131.8 | 369.8 |
| 131.9 | 369.9 |
| 131.10 | 369.10 |
| 131.15 | 369.20 |
| 131.16 | 369.21 |
| 131.17 | 369.22 |
| 131.25 | 369.30 |
| 164.1 | 429.3 |
| 164.2 | 429.40 |
| 164.3 | 429.41 |
| 164.4 | 429.45 |
| 164.5 | 429.10 |
| 164.6 | 429.11 |
| 164.7 | 429.12 |
| 164.8 | 429.60 |
| 164.9 | 429.47 |
| 164.10 | 429.55 |
| 164.11 | 429.25 |
| 164.12 | 429.26 |
| 164.13 | 429.30 |
| 164.14 | 429.50 |
| 165.1 | 329.1 |
| 165.2 | 329.10 |
| 165.5 | 329.20 |
| 165.6 | 328.3 |
| 167.1 | 328.10 |
| 167.3 | 328.30 |
| 167.4 | 328.4 |
| 167.5 | 328.34 |
| 167.6 | 328.35 |
| 167.7 | 328.20 |

The changes being made are nonsubstantive in nature and for this reason notice and public procedure are not prerequisites to this promulgation. For the convenience of the user, the entire text of Parts 310, 312, 314, 328, 329, 330, 369, and 429 of Subchapter D are set forth below.

Dated: March 27, 1974.

SAM D. FINE,
*Associate Commissioner
for Compliance.*

Therefore, 21 CFR is amended by redesignating Parts 130, 131, 164, 165, and 167 of Subchapter C as Parts 310, 312, 314, 328, 329, 330, 369, and 429 of Subchapter D—Drugs for Human Use, and republished to read as follows:

### Subchapter D—Drugs for Human Use

Part
310 New Drugs.
312 New Drugs for Investigational Use.
314 New Drug Applications.
328 In Vitro Diagnostic Products.
329 Habit Forming Drugs.
330 Over-the-Counter (OTC) Human Drugs Generally Recognized as Safe and Effective and Not Misbranded.
369 Interpretative Statements Re Warnings on Drugs and Devices for Over-the-Counter Sale.
429 Drugs Composed Wholly or Partly of Insulin.

### PART 310—NEW DRUGS

Subpart A—General Provisions

Sec.
310.3 Definitions and interpretations.
310.4 Biologics; products subject to license control.
310.6 Applicability of Drug Efficacy Study Implementation Notices and Notices of Opportunity for Hearing to identical, related, and similar drug products.
310.9 Designated journals.

Subpart B—Specific Administrative Rulings and Decisions

310.100 New-drug status opinions; statement of policy.
310.101 FD&C Red No. 4; procedure for discontinuing use in new drugs for ingestion; statement of policy.
310.102 Consent for use of investigational new drugs (IND) on humans; statement of policy.
310.103 New-drug substances intended for hypersensitivity testing.

Subpart C—New Drugs Exempted From Prescription-Dispensing Requirements

310.200 Prescription-exemption procedure.
310.201 Exemption for certain drugs limited by new-drug applications to prescription sale.

Subpart D—Records and Reports

310.300 Records and reports concerning experience on drugs for which an approval is in effect.
310.301 Reporting of adverse drug experiences.
310.302 Records and reports on new drugs and antibiotics for use by man for which applications or certification forms 5 and 6 became effective or were approved prior to June 20, 1963.
310.303 Continuation of long-term studies, records, and reports on certain drugs for which new-drug applications have been approved.
310.304 Drugs that are subjects of approved new-drug applications and that require special studies, records, and reports.

Subpart E—Requirements for Specific New Drugs or Devices

310.500 Digoxin products for oral use; conditions for marketing.
310.501 Oral contraceptive preparations; labeling directed to the patient.
310.502 Certain intrauterine devices for human use for the purpose of contraception.

# Exhibit 9

NOTE: For another document from the Food and Drug Administration on this matter see 40 FR 40520, in this issue.

# DEPARTMENT OF HEALTH, EDUCATION, AND WELFARE

## Food and Drug Administration

[ 21 CFR Parts 1, 2, 5, 6, 8, 10, 11, 80, 90, 100, 102, 121, 202, 310, 312, 314, 328, 330, 429, 430, 431, 433, 511, 514, 601, 701, 1003, 1004, 1210 ]

[Docket No. 75N-0001]

## ADMINISTRATIVE PRACTICES AND PROCEDURES

### Notice of Proposed Rule Making

The Commissioner of Food and Drugs is proposing rules governing the administrative practices and procedures of the Food and Drug Administration. The regulations proposed herein were the subject of a notice of rule making, published in the FEDERAL REGISTER of May 27, 1975 (40 FR 22950), which the Commissioner is revoking elsewhere in this issue of the FEDERAL REGISTER.

The May 27th order specified that the regulations would become effective on July 28, 1975, except for two provisions that were to become effective on November 24, 1975, and invited public comment on the regulations on or before July 28, 1975, for the purpose of making subsequent modifications as appropriate. In a notice published in the FEDERAL REGISTER of June 20, 1975 (40 FR 26027), the Commissioner extended the comment period to August 27, 1975.

On July 23, 1975, the American College of Neuropsychopharmacology brought suit in the United States District Court for the District of Columbia to enjoin the effectiveness of the regulations, contending that section 553 of the Administrative Procedure Act (5 U.S.C. 553) requires that they be proposed for comment prior to publication in the FEDERAL REGISTER as a final rule. Pursuant to request of the Court, the Food and Drug Administration agreed to delay the effectiveness of the regulations pending a decision on the plaintiff's motion for a preliminary injunction. This action was announced in a notice published in the FEDERAL REGISTER of July 28, 1975 (40 FR 31605), staying the effectiveness of the regulations until August 4, 1975.

On July 31, 1975, the District Court issued an Order permanently enjoining the Commissioner from issuing the regulations "without complying, as a condition precedent, with the requirements of section 553 of the Administrative Procedure Act, 5 U.S.C. 553." *American College of Neuropsychopharmacology* v. *Weinberger, et al.*, Civil Action No. 75-1187. Accordingly, in a notice published in the FEDERAL REGISTER of August 4, 1975 (40 FR 32750), the Commissioner stayed the effectiveness of the regulations until further notice. Pursuant to the Court's Order, the Commissioner had the Court's Findings of Fact, Conclusions of Law, and Order published in the FEDERAL REGISTER of August 6, 1975 (40 FR 33063).

The Commissioner is of the opinion that the Court's action is in error. The legal basis and justification for issuing the rules governing Food and Drug Ad-

ministration administrative practices and procedures as final regulations were set forth in the preamble to the regulation of May 27 and in the Memorandum of Points and Authorities in Opposition to Plaintiff's Motion for a Preliminary Injunction filed in the court proceeding. Nevertheless, the Commissioner has concluded that the regulations should immediately be issued as proposed rules with additional opportunity for comment. The delays and uncertainties involved in attempting to obtain reversal of the decision of the District Court make it impractical to pursue any other course.

The Order of the District Court enjoins the promulgation of the regulations "as final," subject to compliance with the rule making provisions of the Administrative Procedure Act. The regulations incorporate many practices and procedures that were being followed within the Food and Drug Administration prior to May 27; many that are unavoidable in the Commissioner's discharge of the various statutory responsibilities vested in him; and many that apply exclusively to the internal processes of the agency. The Commissioner does not interpret the Court's Order as foreclosing observance of a particular practice or procedure simply because it is codified in the regulations, e.g., the requirement in § 2.22 (21 CFR 2.22) that certain agency officials maintain public calendars. Were the Order to be given that effect, the agency would be literally incapable of operating. Rather, the Commissioner views the Order as preserving the status quo, and as therefore permitting the agency to follow the procedures that it had previously observed, or could have observed, in carrying out its activities without the regulations. The Commissioner has no intention of taking any action in contravention of the Court's Order. Necessarily, the decision whether a particular procedure may be followed will require the exercise of judgment of those agency officials immediately involved.

The regulations proposed herein retain §§ 2.23(b) and 2.320(b) (2) (ii), which were indefinitely stayed, for reasons unrelated to the action of the District Court, in an order published in the FEDERAL REGISTER of July 25, 1975 (40 FR 31234). The Commissioner recognizes that these provisions are controversial and could, if implemented, pose problems for, respectively, associations desiring to participate in agency proceedings and individuals invited to serve as liaison members of advisory committees. Their retention in the proposed regulations does not reflect a commitment to adopt them in final form. The Commissioner desires to receive additional comment on both provisions, and particularly encourages the submission of other possible regulations that would address the problems that those provisions attempt to solve.

To avoid controversy about the manner in which this rule making is conducted, the Commissioner has concluded that the contents of the May 27th notice of rule making should be republished, including the bulk of the preamble. The introductory statement and the

discussion under the heading "Effective Date" in the preamble are omitted to prevent confusion. Other references in the preamble that were originally phrased to indicate action already taken have been changed to refer to action proposed. The paragraph describing the nature of the action announced in the document and the authority under which it is taken has been modified to reflect that the rules that follow are proposed and not final. The final paragraph of the May 27th regulation, relating to the effective date, is omitted.

Several minor changes are also incorporated in this republished document to correct typographical errors, inadvertent omissions, and incorrect cross-references.

The Commissioner has concluded that 30 days should be allowed for public comment on these proposed regulations. Their full text has been publicly available in the FEDERAL REGISTER since May 27, 1975. It is widely known that individuals and groups concerned with Food and Drug Administration activities have been actively preparing written comments for submission by August 27, the last day of the extended comment period. Any interested individuals or groups that did not originally plan to submit comments must necessarily have been acquainting themselves with the regulations during the more than 2 months since their initial publication in order to be in a position to comply with, or take advantage of, the regulations as of the original effective date of July 28. Any such individuals and groups will have 30 additional days in which to record and submit any comments on the proposed regulation which they may now wish to make. Comments submitted in response to the invitation of May 27 will be deemed comments on this proposal, and need not be submitted.

When issued as a final rule, the proposed regulations will have an effective date of 30 days after publication in the FEDERAL REGISTER. Although the regulations are proposed in a single, comprehensive document, the Commissioner may issue them as final regulations either as one document or as several documents published at different times. The latter course will permit regulations about which there is little controversy, or that are essential to the efficient functioning of the agency, to be put into effect without unnecessary delay.

This notice proposes administrative practices and procedures governing activities of the Food and Drug Administration. It includes the procedures under which citizen petitions would be submitted to and considered by the agency, the justification for and conduct of formal evidentiary public hearings, public hearings before a Public Board of Inquiry, public hearings before a public advisory committee, public hearings before the Commissioner, regulatory hearings before the Food and Drug Administration, and standards of conduct and conflicts of interest. It would amend existing agency regulations to conform them to the proposed regulations governing practices and procedures.

The present administrative practices and procedures of the Food and Drug

section of employees throughout the agency on them. On the one hand, it is widely recognized that all citizens share a moral obligation to help enforce legal requirements. On the other hand, it is equally recognized that basic civil liberties must be respected, and that the rights of both the accuser and the accused must be fully protected. The Commissioner is of the opinion that the provisions in this section strike an adequate balance between these valid concerns. No one would be required to report violations, but all would be encouraged to do so. Only those reports which a person was willing to put in writing would be regarded as sufficiently serious to pursue. Those written records would be carefully safeguarded, so that there would be no concern about their improper release to persons who were not required to review them in the course of their duties.

PERMANENT DISQUALIFICATION OF FORMER EMPLOYEES (§ 2.620)

Proposed § 2.620 states the provisions of current law, 18 U.S.C. 207(a), with respect to permanent disqualification of former Food and Drug Administration employees on particular matters involving a specific party or parties in which the former employee participated personally and substantially. It is the intention of the Commissioner that this statutory language be supplemented in the future by interpretive regulations to give better guidance to former employees with respect to permissible and impermissible activity.

TEMPORARY DISQUALIFICATION OF FORMER EMPLOYEES (§ 2.621)

Proposed § 2.621 similarly summarizes the provisions of 18 U.S.C. 207(b) with respect to the 1-year disqualification of a former Food and Drug Administration employee on any matter which was under his official responsibility within 1 year preceding termination of such responsibility. Again, additional interpretive regulations will be issued to clarify this statutory disqualification.

CONFORMING CHANGES IN OTHER FOOD AND DRUG ADMINISTRATION REGULATIONS

The new procedures proposed in Part 2 of the regulations would require corresponding changes in numerous other existing agency regulations in Title 21 of the Code of Federal Regulations. The following is a brief summary of these changes. The Commissioner recognizes that other conforming changes might also be appropriate, and invites comment suggesting further amendments to the agency regulations.

EXEMPTION FROM REQUIRED LABEL STATEMENTS

Section 1.1a would be revised to provide that exemptions from required label statements shall be adopted pursuant to Part 2.

EXEMPTION FROM FOOD LABELING INFORMATION REQUIREMENTS

Section 1.8d(f) would be revised to state that a petition requesting an ex-

emption from the food labeling information requirements in that section shall be submitted pursuant to Part 2.

DELEGATIONS OF AUTHORITY AND ORGANIZATION

Former Subparts H and M of Part 2 would be recodified as a new Part 5. References to the Assistant General Counsel for Food and Drugs, Office of General Counsel, Department of Health, Education, and Welfare would be revised to reflect that he now has the additional title of Chief Counsel for the Food and Drug Administration.

COLOR ADDITIVE ADVISORY COMMITTEES

Section 8.12 would be revised to cross-reference the new provisions relating to color additive advisory committees in §§ 2.360 through 2.364; prior provisions in §§ 8.12 through 8.14 would be revoked.

EXEMPTION FROM COLOR ADDITIVE CERTIFICATION

Section 8.18 would be revised to state that a petition for exemption from certification for a color additive shall be submitted pursuant to Part 2.

OBJECTIONS AND HEARINGS RELATING TO COLOR ADDITIVE REGULATIONS

The existing provisions in §§ 8.19 through 8.21 would be revoked, and a new § 8.19 would provide that objections and hearings relating to color additive regulations shall be governed by Part 2.

COLOR ADDITIVE CERTIFICATION REFUSAL

Section 8.27(b) would be amended to add a sentence stating that a person who wishes to contest a refusal to certify a batch of a color additive has an opportunity for a regulatory hearing pursuant to Subpart F. No opportunity for a hearing now exists.

CERTIFICATION SERVICE REFUSAL

Section 8.28(b) would be revised to provide that a person who wishes to contest refusal of certification service has an opportunity for a regulatory hearing pursuant to Subpart F of Part 2. The current provisions, which would be revoked, provide for a formal evidentiary public hearing. The Commissioner is of the opinion that the statute does not require an opportunity for a formal evidentiary public hearing, and that a regulatory hearing is more appropriate for this type of proceeding..

INVESTIGATIONAL USE OF COLOR ADDITIVES

Section 8.33(a) would be amended to add a new sentence providing an opportunity for a regulatory hearing pursuant to Subpart F upon a refusal to permit the use of food derived from animals on which investigational color additives are used. No opportunity for a hearing now exists.

FOOD STANDARDS

Section 10.2 would be revised to state that the procedure for establishing a food standard shall be governed by Part 2. The provisions now contained in this section would be superseded by the more detailed provisions of Part 2.

FOOD STANDARD TEMPORARY PERMITS

A new paragraph (l) would be added to § 10.5 to provide that a person who wishes to contest denial, modification, or revocation of a temporary permit to vary from a standard of identity has an opportunity for a regulatory hearing pursuant to Subpart F of Part 2. No opportunity for a hearing exists.

STANDARDS OF QUALITY

Section 11.1(e) would be revised to state that standards of quality for foods for which there are no standards of identity may be established pursuant to Part 2 and to delete the reference to a former provision in Part 2 that would be revoked by the proposed regulations.

SPECIAL DIETARY FOODS

Section 80.1(b) (4) would be revised to delete the reference to a former provision in Part 2 that would be revoked by the proposed regulations.

EMERGENCY PERMIT CONTROL

Section 90.2(a) would be revised to refer to the provisions in Part 2 and to delete the reference to a former provision in Part 2 that would be revoked by the proposed regulation.

NUTRITIONAL QUALITY GUIDELINES FOR FOODS

Section 100.2 would be revised to refer to the provisions in Part 2 and to delete the reference to a former provision in Part 2 that would be revoked by the proposed regulations.

COMMON OR USUAL NAMES FOR NONSTANDARDIZED FOODS

Section 102.2(a) and (b) would be revised to refer to the provisions in Part 2 and to delete the reference to a former provision in Part 2 that would be revoked by the proposed regulations.

FOOD ADDITIVES

Sections 121.40(c) (1), 121.41(b) (1), and 121.4000(c) would be revised to refer generally to the new procedures contained in Part 2 rather than to procedures now used.

Section 121.55 would be revised to state that objections and hearings relating to food additive regulations shall be governed by Part 2. All of the previous procedural provisions relating to food additives in Part 121 would be revoked.

Section 121.74 would be revised to state that the procedure for amending and repealing food additive regulations would be governed by Part 2.

APPROVAL OF PRESCRIPTION DRUG ADVERTISEMENTS

Section 202.1(J) (5) would be added to state that a regulatory hearing pursuant to Subpart F of Part 2 is available with respect to any determination that prior approval is required for advertisements concerning a particular prescription drug, or that a particular advertisement is not approvable. No opportunity for a hearing now exists.

PRESCRIPTION EXEMPTION PROCEDURE FOR NEW DRUGS

Section 310.200(b) would be revised to replace the procedure now set out in that provision with a reference to Part 2.

PHASE IV CLINICAL STUDIES

Section 310.303(b) would be revised to state that a proposal to require additional or continued studies for a new drug shall be pursuant to Part 2.

INVESTIGATIONAL NEW DRUGS

Section 312.1 (c) (1) and (4) and (d) would be revised to state that any person who wishes to contest any issue arising out of disqualification of an investigator and his work, and termination of an IND, has an opportunity for a regulatory hearing pursuant to Subpart F of Part 2. This would replace the current procedure which is similar in nature but not specified in detail.

These provisions would also be revised to state that an IND plan may be terminated immediately upon a finding of a danger to health, rather than requiring an imminent hazard to health, in order to conform them to proposed § 2.511(e). Section 505(i) of the act does not require the Commissioner to find an imminent hazard to health before an IND plan may be terminated.

LABORATORY RESEARCH ON INVESTIGATIONAL NEW DRUGS

Section 312.9(c)(2) would be revised to state that any person who wishes to contest termination of an investigational exemption for use of a new drug in laboratory research animals or in vitro tests has an opportunity for a regulatory hearing pursuant to proposed Subpart F of Part 2. Now, a conference is permitted but there is no opportunity for a hearing.

HEARINGS INVOLVING NEW DRUGS

Section 314.200 would be revised to delete material that is duplicative of requirements contained in proposed Subpart B of Part 2.

Section 314.201 would be added to state that hearings relating to new drugs shall be governed by Part 2. All of the prior procedural provisions relating to new drug hearings would be revoked.

Section 314.235 would be revised to conform it to the provisions of proposed Subpart B by deleting duplicative material.

IN VITRO DIAGNOSTIC PRODUCTS FOR HUMAN USE

Section 328.30(a) would be revised to refer to Part 2 and to delete the reference to a provision in Part 2 which would be revoked by the proposed regulations.

OTC DRUG REVIEW

Section 330.10(a) (12) would be revised to state that a petition to amend or repeal any OTC drug monograph shall be submitted pursuant to Part 2.

INSULIN

Section 429.50 would be revised to state that, upon suspension of insulin certifi-

cation service, a person shall have an opportunity for a regulatory hearing pursuant to Subpart F of Part 2. Now, a formal evidentiary public hearing is provided. The Commissioner is of the opinion that a formal evidentiary public hearing is not required by statute and that a regulatory hearing pursuant to Subpart F is more appropriate for this type of proceeding.

ANTIBIOTIC REGULATIONS

Section 430.20(a) would be revised to state that the procedures for the issuance, amendment, or repeal of antibiotic regulations shall be governed by proposed Part 2. The remaining procedural provisions relating to antibiotic hearings would be revoked.

Section 430.20(d), relating to requests for hearings with respect to the failure to issue an antibiotic regulation, or amendment or repeal of such a regulation, would be revised to make the same modifications that have been proposed in § 314.200 for new drugs, to conform it to the provisions in Subpart B.

CERTIFICATION OF ANTIBIOTIC DRUGS

Section 431.52 would be revised to state that, upon suspension of certification service, a person shall have an opportunity for a regulatory hearing pursuant to Subpart F of Part 2. Now, suspension of certification service is subject to a formal evidentiary public hearing. The Commissioner is of the opinion that the statute does not require a formal evidentiary public hearing under these circumstances and that Subpart F provides a more appropriate procedure for this type of proceeding.

EXEMPTIONS FROM ANTIBIOTIC CERTIFICATION AND LABELING REQUIREMENTS

A number of specific sections in Part 433, relating to exemptions from antibiotic certification and labeling requirements, would be revised to provide that a person who wishes to contest adverse action by the Food and Drug Administration shall be subject to an opportunity for a regulatory hearing pursuant to Subpart F of Part 2. Now, these provisions state only that such action is subject to a hearing, without specifying the type of hearing, or do not specify that any hearing is permitted.

The current provisions state that such exemptions can in some instances be revoked only after notice and opportunity for hearing. The proposed cross-reference to the provisions governing a regulatory hearing under Subpart F of Part 2 would mean that the Commissioner could make any such revocation effective immediately if he found that this was necessary to protect the public health, pursuant to § 2.511(e).

NEW ANIMAL DRUGS

A number of specific provisions in Parts 511 and 514 relating to investigational and marketed new animal drugs would be revised in the same way as their counterpart provisions relating to investigational and marketed new drugs, to refer to the new procedural provisions

in Part 2. The prior procedural provisions relating to hearings would be revoked.

LICENSING OF BIOLOGICALS

The procedural provisions in Part 601 relating to licensing of biologicals, revocation and suspension of a license, and hearings on such matters would be substantially revised, consolidated, and simplified. Hearings on denial, revocation, or suspension of a biologics license would be governed by Part 2. The procedural requirements for new drugs in § 314.200 would be incorporated by reference. Previous procedural provisions relating to biologics would be revoked.

COSMETIC LABELING

Section 701.3 (b) and (e) would be revised to refer to the provisions in Part 2 and to delete the reference to a provision in Part 2 that would be revoked by the proposed regulations.

NOTIFICATION OF DEFECTS IN ELECTRONIC PRODUCTS

Section 1003.11(a) would be amended and § 1003.31(d) would be added to include a provision stating that a person who wishes to contest a determination that a product fails to comply or has a defect, and a denial of an exemption from the notification provisions, has an opportunity for a regulatory hearing pursuant to Subpart F of Part 3. Now, no opportunity for a hearing exists.

REPURCHASE, REPAIRS, OR REPLACEMENT OF ELECTRONIC PRODUCTS

Section 1004.6 would be amended to add a new provision stating that, upon denial of a plan with respect to repurchase, repair, or replacement of an electronic product, a person shall have an opportunity for a regulatory hearing pursuant to Subpart F of Part 2. Now, no opportunity for a hearing exists.

HEARINGS UNDER THE FEDERAL IMPORT MILK ACT

Section 1210.30 would be revised to state that a person who wishes to contest denial, suspension, or revocation of a permit has an opportunity for a regulatory hearing pursuant to Subpart F of Part 2. All of the prior procedural provisions would be revoked.

Therefore, pursuant to provisions of the Federal Food, Drug, and Cosmetic Act, (Sec. 201 et seq., 52 Stat. 1040; 21 U.S.C. 321 et seq.), the Public Health Service Act (sec. 1 et seq, 58 Stat. 682, as amended; 42 U.S.C. 201 et seq.), the Comprehensive Drug Abuse Prevention and Control Act of 1970 (sec. 4, 84 Stat. 1241; 42 U.S.C. 257a), the Controlled Substances Act (sec. 301 et seq., 84 Stat. 1253; 21 U.S.C. 821 et seq.), the Federal Meat Inspection Act (sec. 409(b), 81 Stat. 600; 21 U.S.C. 679(b)), the Poultry Products Inspection Act (sec. 24(b), 82 Stat. 807; 21 U.S.C. 467f(b)), the Egg Products Inspection Act (sec. 2 et seq., 84 Stat. 1620; 21 U.S.C. 1031 et seq.), the Federal Import Milk Act (44 Stat. 1101; 21 U.S.C. 141 et seq.), the Tea Importation Act (21 U.S.C. 41 et seq.), the Federal Caustic Poison Act (44 Stat. 1406; 15