UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| ASSOCIATION OF AMERICAN PHYSICIANS AND SURGEONS, INC., *et al*., | ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | Civil Action No. 07-668 (JDB) |
| FOOD & DRUG ADMINISTRATION, *et. al*., | ) ) ) | |
| Defendants, | ) ) | |
| and | ) ) | |
| DURAMED PHARMACEUTICALS, INC. | ) ) | |
| Intervenor-Defendant. | ) ) ) | |

## FEDERAL DEFENDANTS' REPLY IN SUPPORT OF MOTION TO DISMISS

Plaintiffs' submissions to the Court demonstrate that they oppose OTC access to Plan B and hold restrictive views of the function of the Food and Drug Administration ("FDA") in making drug approval decisions. They are challenging FDA's approval of Intervenor Barr-Duramed's amended supplemental new drug application ("SNDA") and seek an order from this Court preventing OTC distribution of Plan B to women who are not parties to this lawsuit. However, because political views and values, special interest in a subject, and strong disagreement with government decision-making alone fail to establish the threshold grounds to challenge an agency decision, this lawsuit should be dismissed.

## I.    PLAINTIFFS HAVE FAILED TO ESTABLISH STANDING.

Plaintiffs have failed to effectively respond to the government's arguments regarding the deficiencies in their standing allegations. Even in the face of defendants' substantial standing

challenges, plaintiffs continue to rely on abstract and theoretical standing allegations unsupported by facts or evidence. Although plaintiffs assert that "at the pleading phase a mere allegation suffices," Plaintiffs' Opposition to Motion to Dismiss ("Opp.") at 9, even at this stage of the litigation, standing cannot be "inferred argumentatively from averments in the pleadings," but rather plaintiffs "must allege facts essential to show jurisdiction." *FW/PBS, Inc. v. City of Dallas*, 493 U.S. 215, 231 (1990) (citations omitted). Further, the D.C. Circuit has instructed that "a petitioner whose standing is not self-evident should establish its standing by the submission of its arguments and any affidavits or other evidence appurtenant thereto at the first appropriate point in the review proceeding." *Public Citizen, Inc. v. Nat'l Highway Traffic Safety Admin.*, 489 F.3d 1279, 1289 (D.C. Cir. 2007) (citation omitted).[1]

In any event, plaintiffs' standing allegations are insufficient as a matter of law because they fail to satisfy the well established requirements of the standing doctrine.

A.    **Plaintiffs Have Failed to Establish Standing Based on Alleged Informational Injury Under the FDCA.**

As explained in the government's opening brief, the FDCA "does not confer a broad, legally enforceable right to information," and therefore does not "creat[e] a basis for informational standing." *American Farm Bureau v. EPA*, 121 F.Supp.2d 84, 99 (D.D.C. 2000). In their opposition, plaintiffs have cited no authority for the proposition that an informational standing theory can be sustained under

---

[1]  Plaintiffs have submitted only one declaration, and that relates to their attenuated allegation of a physician's alleged competitive injury. With respect to their consumer-based standing theory, they admit that they cannot find in their membership any prospective Plan B consumer, or a parent of a consumer, who is willing to supply a declaration in this lawsuit. Opp. at 20 n.6; Opp. Ex. 1 ¶ 5. Even if such an affidavit is not required at *this* stage of the litigation, it would be required were this case to progress beyond the instant motions. "[P]arties invoking jurisdiction at summary judgment may not rest on mere allegations, but must set forth by affidavit or other evidence specific facts demonstrating standing." *See Shays v. FEC*, 414 F.3d 76, 84 (D.C. Cir. 2005) (citation and internal quotation marks omitted); *see Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992) ("[s]ince they are not mere pleading requirements but rather an indispensable part of the plaintiff's case, each [standing] element must be supported in the same way as any other matter on which the plaintiff bears the burden of proof, *i.e.*, with the manner and degree of evidence required at the successive stages of the litigation."). Thus, if this case were to survive the instant motion, plaintiffs' continued inability to find an affiant would likely soon be fatal to its consumer-based standing theory.

the FDCA and instead rely on cases decided under other statutes. *See* Opp. at 9-10. However, the

D.C. Circuit has explained that "standing jurisprudence defies pat generalities . . . . [A]n inquiry into

standing is a highly case-specific endeavor." *Public Citizen v. FTC*, 869 F.2d 1541, 1546 (D.C. Cir.

1989) (citation and quotation marks omitted). This is particularly true with respect to informational

standing: "Informational standing arises 'only in very specific statutory contexts' where a statutory

provision has 'explicitly created a right to information.'" *American Farm Bureau*, 121 F.Supp.2d at

97 (quoting *Animal Legal Def. Fund, Inc. v. Espy*, 23 F.3d 496, 502 (D.C. Cir. 1994)).

For example, in *Havens Realty Corp. v. Coleman*, a leading case on informational standing,

the Supreme Court explained that Section 804(d) of the Fair Housing Act

> states that it is unlawful for an individual or firm covered by the Act "[to] represent to
> *any person* because of race, color, religion, sex, or national origin that any dwelling is
> not available for inspection, sale, or rental when such dwelling is in fact so available,"
> 42 U. S. C. § 3604(d) (emphasis added), a prohibition made enforceable through the
> creation of an explicit cause of action in § 812(a) of the Act, 42 U. S. C. § 3612(a).
> Congress has thus conferred on all "persons" a legal right to truthful information about
> available housing.

455 U.S. 363, 373 (1982) (emphasis in original). The Court found informational standing because

"[t]he actual or threatened injury required by Art. III may exist solely by virtue of statutes creating

legal rights, the invasion of which creates standing. Section 804(d), which . . . establishes an

enforceable right to truthful information concerning the availability of housing, is such an enactment."

*Id*. at 373 (citations and quotation marks omitted). Similarly, in *Public Citizen v. DOJ*, the Supreme

Court explained that, because the Freedom of Information Act ("FOIA") and the Federal Advisory

Committee Act ("FACA") specifically provide that the public may seek information, the denial of

information requested under those Acts constitutes injury. 491 U.S. 440, 449-50 (1989).

The FDCA, however, does not contain any comparable provision that "explicitly" grants

enforceable rights to information to members of the general public. *See American Farm Bureau*, 121 F.Supp.2d at 99.[2] Although plaintiffs allege a statutory "right" to information, Am. Compl. ¶ 17, they fail to cite any provision of the FDCA that establishes such a right.[3] The provisions of the FDCA and FDA regulations governing the labeling of drug products require the manufacturer to submit proposed labeling to FDA for approval, but nothing in the statute provides the public with a right of action for disclosure against FDA. *See* 21 U.S.C. § 355(b)(1)(F) (a sponsor who files an application for drug approval must include specimens of the proposed labeling); 21 U.S.C. § 355(d)(7) (FDA may refuse to approve an application if the labeling is false or misleading); 21 C.F.R. part 201 (specifying content of labeling); 21 C.F.R. § 314.50(e)(2)(ii) & (l)(1)(i) (submission and format of proposed labeling); 21 C.F.R. § 314.125(b)(6) (FDA refusal to approve an application if the labeling is false or misleading). There is nothing in these provisions that is comparable to the language in the Fair Housing Act that "conferred on all 'persons' a legal right to truthful information about available housing," *Havens Realty Corp.*, 455 U.S. at 373, or that established a mechanism for members of the public to seek information from the government similar to FOIA or FACA. Thus, because plaintiffs have failed to identify an explicit legally enforceable right to information under the FDCA, their informational standing allegation is unsustainable as a matter of law.

---

[2] Plaintiffs contend that the Court should ignore the holding of *Am. Farm Bureau* because the case involved a different provision of the FDCA than the provision involved in this case. Plf. Opp. at 9 n.3. However, plaintiffs have failed to cite *any* case permitting informational standing under the FDCA. Plaintiffs rely instead principally on *Public Citizen v. FTC*, 869 F.2d 1541 (D.C. Cir. 1989), which involved an action against the FTC under the Smokeless Tobacco Health Education Act of 1986. Although that case involved product labeling, the specific statutory context differed from FDCA's drug labeling provisions in terms of the statutory language, scope and purposes. *See id*. at 1542-45.

[3] A "right" has been defined as "a power, privilege, or immunity secured to a person by law." Black's Law Dictionary 1347 (8th ed. 2004).

**B.    Plaintiffs' Vague and Hypothetical Public Safety Allegations are Insufficient to Confer Standing.**

With little articulation and no elaboration, plaintiffs claim that public safety statutes create rights, and their allegations of safety- and efficacy-based injuries confer standing.  Opp. at 10.  Plaintiffs first cite *Warth v. Seldin*, which states: "Congress may create a statutory right or entitlement the alleged deprivation of which can confer standing to sue."  422 U.S. 490, 514 (1975).  However, the Supreme Court there continued, "No such statute is applicable here."  *Id*.  Here, too, plaintiffs fail to identify any provision of the FDCA that allegedly creates a "statutory right or entitlement" of plaintiffs.

Plaintiffs also cite *American Trucking Ass'ns, Inc. v. DOT,* 166 F.3d 374, 385 (D.C. Cir. 1999), for the proposition that alleged exposure to unsafe activity is sufficient to challenge agency action under a safety statute.  Opp. at 10.  In contrast to plaintiffs' broad interpretation of the limited holding of *American Trucking*, the D.C. Circuit has recently provided a more comprehensive analysis (and a narrower view) of consumer standing in public safety cases.  *See Public Citizen, Inc. v. Nat'l Highway Traffic Safety Admin.*, 489 F.3d 1279, 1291-92 (D.C. Cir. 2007).  The court explained that, because of "delicate separation of powers concerns" raised by such challenges, the well established limitations on standing apply equally to public safety cases – that the alleged injury must be "an invasion of a legally protected interest" that is "concrete in both a qualitative and temporal sense," "particularized," "distinct and palpable, as opposed to merely abstract," and "actual or imminent, not conjectural or hypothetical."  *Id*. at 1292 (citations omitted).  Plaintiffs' allegation that women "run the risk of using Plan B without an appreciation of the limitations in Plan B's safety and efficacy and its comparability with analogous drugs," Am. Compl. ¶ 17, fails to meet the standard of a concrete, actual and palpable

-5-

injury.

Plaintiffs' safety allegations fail also because they do not allege that women members have suffered injuries in the past; only that women are "at risk" of some speculative injury in the future. *See* Am. Compl. ¶ 18 (women will "forego[] the office visit associated with obtaining contraceptive prescriptions" and therefore "will worsen their overall health care"). However, speculative allegations of future developments do not establish standing. As the D.C. Circuit has repeatedly made clear:

> Allowing a party to assert . . . remote and speculative claims to obtain federal court jurisdiction threatens . . . to eviscerate the Supreme Court's standing doctrine. As we have previously stated: "Were all purely speculative increased risks deemed injurious, the entire requirement of actual or imminent injury would be rendered moot, because all hypothesized, nonimminent injuries could be dressed up as increased risk of future injury."

*Public Citizen, Inc. v. NHTSA*, 489 F.3d at 1294 (quoting *NRDC v. EPA*, 464 F.3d 1, 6 (D.C. Cir. 2006) (quoting *Ctr. for Law & Educ. v. Dep't of Educ.*, 396 F.3d 1152, 1161 (D.C. Cir. 2005)).[4]

Plaintiffs assert that their standing allegations are sufficient because the Court must accept "Plaintiffs' view" at this stage of the litigation. Opp. at 18. Plaintiffs, however, overstate the degree to which the Court must accept plaintiffs' allegations on a motion to dismiss for lack of standing. The D.C. Circuit has held that, even in that procedural posture, courts should reject as "overly speculative . . . predictions of future events (especially future actions to be taken by third parties) and . . . predict[ions of] a future injury that will result from present or ongoing actions." *United Transp. Union v. ICC*, 891 F.2d 908, 912 (D.C. Cir. 1989). Thus, plaintiffs' allegations – that women are at risk of using Plan B without appreciating its limitations and may forego doctors' office visits that may worsen

---

[4] Plaintiffs cite paragraphs 82-95 of the Amended Complaint in support of their standing assertion, in which plaintiffs describe their disagreements with FDA's labeling review. However, none of those paragraphs directly allege any injuries to plaintiffs. *See FW/PBS, Inc.*, 493 U.S. at 231 (standing cannot be "inferred argumentatively from averments in the pleadings").

their overall health care – are overly speculative predictions of future events and future injuries that this Court should reject. *See id*.

    **C.**    **Plaintiffs Cannot Establish Standing Based on Alleged Competitive Injuries That are Antithetical to the Purposes of the FDCA.**

Plaintiffs failed to address, let alone rebut, the government's well supported argument that their alleged competitive injuries must fall within the zone of interests of the FDCA. *See Investment Co. Inst. v. FDIC*, 815 F.2d 1540, 1543-44 (D.C. Cir. 1987); Gov. Br. at 14-19. A physician's economic interest in preventing OTC approval to increase his revenue from visits to obtain prescriptions is not within the zone of interests to be protected by the OTC switch provisions of the FDCA. *See* S. Rep. No. 82-946, at 1 (1951) (purpose of provisions was to promote safe and convenient dispensing of Rx and OTC drugs). Further, plaintiffs are not permitted to assert one interest for purposes of the injury requirement and another interest for the zone of interest requirement. *Mountain States Legal Found. v. Glickman*, 92 F.3d 1228, 1232 (D.C. Cir. 1996). Here, plaintiffs impermissibly advance physicians' economic injury for Article III purposes, and a physicians' alleged interest in the safe dispensing of drugs for zone of interest purposes. Opp. at 15-16. Plaintiffs have failed to reconcile this conflict; indeed, they do not acknowledge this issue or even mention *Mountain States Legal Found. v. Glickman*. *See* Opp. at 10-11, 15-16.

The cases that plaintiffs cite in their "competitive injury" section do not undermine those propositions. *See* Opp. at 10-11. In *Liquid Carbonic Industries Corp. v. FERC*, the court held that, although plaintiff had demonstrated Article III injury through competitive standing, it failed to establish that it was in the zone of interest, and the case was therefore dismissed. 29 F.3d 697, 701, 704-06 (D.C. Cir. 1994). In *El Paso Natural Gas Co. v. FERC*, the court found that plaintiff lacked

standing because it failed to allege an Article III injury and therefore did not reach the zone of interest requirement, and the cases it relied upon as the "competitive standing cases" recognized the applicability of the zone of interest test. *See* 50 F.3d 23, 28 (D.C. Cir. 1995).

*Bristol-Myers Squibb Co. v. Shalala* is simply one in a series of cases recognizing competitor standing under a different provision of the FDCA: courts have permitted a drug manufacturer to challenge the approval of a competitor's drug application for a different version of the first manufacturer's product. 91 F.3d 1493 (D.C. Cir. 1996). In *Bristol-Myers*, the court recognized that "[t]he purpose of [21 U.S.C.] § 355(j) [the generic drug approval provision] is to promote competition." *Id.* at 1495. Thus, the court found the zone of interests met: "where, as here, a statutory provision reflects a legislative purpose to protect a competitive interest, the protected competitor has standing to require compliance with that provision." *Id.* at 1497. The generic drug approval provision, however, was enacted in different legislation and for different purposes than the Rx-OTC switch provisions. There is no legislative purpose in the Durham Humphrey Amendments to protect a doctor's competitive interest in revenues from doctor's visits to obtain prescriptions.[5]

Although plaintiffs also cite *Diamond v. Charles*, 476 U.S. 54 (1986), for the proposition that doctors have standing to challenge government actions that affect them financially (Opp. at 10), the holding of that case undermines plaintiffs' standing theory. The Supreme Court discussed the types of regulations that would and would not confer standing on doctors: a direct regulation of an OBGYN's practice, by, for example, criminalizing abortions or eliminating funding for abortions,

---

[5] In addition, in *Bristol-Myers Squibb Co.*, the plaintiff was in direct competition with the regulated entity and therefore found to be a "protected competitor." Here, however, the physicians are not in competition with Barr-Duramed, the regulated entity with the approved drug application, and instead are asserting that they are in competition with pharmacists. Both physicians and pharmacists, however, have a more incidental and attenuated connection to the drug application at issue than a direct competitor of Barr-Duramed.

would confer standing; the alleged indirect effects of a regulation on a practice, by, for example, increasing or decreasing the size of "the pool of potential fee-paying patients," would not confer standing. 476 U.S. at 66. The Supreme Court found, on allegations similar to those here, that Dr. Diamond lacked standing based on the indirect effects of a government decision on the size of the pool of the fee-paying patients.

Plaintiffs' *only* attempt to distinguish the government's zone of interest argument is to assert that the argument does not apply to unlawful competition and that here the competition is unlawful because FDA improperly approved the OTC switch for Plan B. Opp. at 10. That argument is meritless for two reasons. First, plaintiffs have cited no authority that would allow them to circumvent the zone of interest requirement merely by alleging that FDA's conduct was illegal (which, of course, is the typical posture of challenges to agency action). Second, even assuming *arguendo* that FDA's approval of the SNDA was unlawful, it is uncontested that FDA has approved Plan B for OTC distribution to adults (*see* Am. Compl. ¶¶ 78-79) and, until that decision is overturned, it is legal for a pharmacist to dispense it to adults without a prescription. Thus, the pharmacists are currently engaging in legal activity in dispensing Plan B, irrespective of whether FDA's approval decision will be overturned in the future.[6]

### D.    The Alleged Economic Injuries and Regulatory Burden on Pharmacists Fail to Meet Several of the Requirements of Standing.

Plaintiffs have failed to address the bulk of the arguments in the government's opening brief that established that the pharmacists' alleged injuries are too speculative and hypothetical, attenuated

---

[6] Plaintiffs' remaining arguments regarding intended beneficiaries, suitable challengers and ultra vires actions (Opp. at 14-17) were anticipated and rebutted in the government's opening brief. Gov. Br. at 16-19. In addition, plaintiffs' suggestion that the views of an FDA commissioner stated in a preamble in 1975 can waive any of the legal requirements of standing, Opp. at 15, Am. Compl. ¶ 31, is unsupported by any relevant legal authority.

from FDA's SNDA approval decision, and removed from the zone of interests under the OTC switch provisions, to satisfy the requirements of standing. Gov. Br. at 21-24. Plaintiffs make a few limited arguments that do little to advance their assertions of pharmacist standing. First, plaintiffs' statement that pharmacists often have immunity from malpractice suits when they correctly fill a physician's prescription (Opp. at 11) does not establish anything more than speculation that they will be sued for dispensing Plan B OTC or, if they were, that there would be a sufficiently direct causal connection between their injury and FDA's SNDA decision (as opposed to the act of the third party filing suit). Second, plaintiffs' allegation that Barr-Duramed's CARE program imposes "burdens of consulting with consumers" (Opp. at 11) does not establish either a concrete injury that is anything more than de minimus or a sufficiently direct causal connection to FDA's SNDA approval decision. Third, despite plaintiffs' selective quotation from *Village of Arlington Heights v. Metropolitan Housing Development Corp.*, 429 U.S. 252 (1977), that decision, finding that the denial of a zoning application constitutes injury in fact, has no conceivable relevance to plaintiffs' pharmacist standing theory.

Fourth, plaintiffs assert that some pharmacists have religious objections to Plan B. Opp. at 11-12. However, it is well established that religious objections in themselves do not confer standing. *See, e.g., Diamond*, 476 U.S. at 67 ("claim of conscientious objection . . . does not provide a judicially cognizable interest").[7/] Nor have plaintiffs alleged a direct causal connection between FDA's SNDA approval decision and the pharmacists alleged "prefer[ence] not to be involved with Plan B's distribution" (Opp. at 11), because FDA does not require any individual pharmacists to stock or sell Plan B. This deficiency is only underscored by their citation to *Menges v. Blagojevich* (*see* Opp. at

---

[7/] It should be noted that the nature of the religious objections, as described in plaintiffs' brief, do not depend on whether the product is prescription or OTC.

11), where the court found that pharmacists with religious objections had standing to challenge a *state law that pharmacists "must dispense" Plan B* when presented with a valid prescription. 451 F. Supp. 2d 996 (C.D. Ill. 2006). FDA has no "must dispense" requirement. Indeed, plaintiffs' religious objection standing theory fails to satisfy the additional standing requirement that the injury is redressable by the relief sought by the complaint. The relief being sought – overturning the partial OTC approval for Plan B – would not redress pharmacist's religious objection to mandatory dispensing of Plan B, particularly where a state law requires them to dispense *prescription* Plan B as in *Menges v. Blagojevich*.

### E.  Plaintiffs' Speculative Predictions of Future Prosecutions Do Not Confer Standing.

Plaintiffs assert that, under their view of law, Plan B is misbranded as currently distributed because FDA was not permitted to authorize any OTC distribution without notice and comment rulemaking. Opp. at 12; Am. Compl. ¶ 103. They maintain that, as a result, pharmacists face the threat of prosecution for dispensing it. Plaintiffs do not allege that any member pharmacists have been actually threatened with prosecution.

Even accepting plaintiffs' view of law that FDA's SNDA approval was improper, that leads only to the conclusion that FDA's decision could at some future date be vacated. It does not change the undisputed fact that Plan B is approved for OTC distribution to adults. *See* Am. Compl. ¶¶ 78-79. This Court is not compelled to accept plaintiffs' speculative allegation that state governments will prosecute pharmacists for distributing an FDA approved product in the approved manner. As noted, the D.C. Circuit has explained that, even when accepting a plaintiff's allegations for purposes of evaluating standing, a court should still reject as "overly speculative . . . predictions of future events

(especially future actions to be taken by third parties) and . . . predict[ions of] a future injury that will result from present or ongoing actions." *United Transp. Union*, 891 F.2d at 912. Plaintiffs' far-fetched predictions of future prosecutions must be rejected. *See O'Shea v. Littleton*, 414 U.S. 488, 497 (1974) ("attempting to anticipate whether and when these respondents will be charged with crime . . . takes us into the area of speculation and conjecture"); *Juidice v. Vail*, 430 U.S. 327, 333 n.9 (1977) ("[S]tanding cannot be based on such speculative conjectures which are neither alleged nor proved. Since the complaint does not allege the likelihood, or even the possibility, of future contempt orders, none of the appellees . . . have standing."); *D.L.S. v. Utah*, 374 F.3d 971, 974 (10th Cir. 2004) (plaintiff "has failed to show a sufficient likelihood of his future prosecution under the statute to support standing.").[8]

F.     **Plaintiffs' Alleged Procedural Injuries Do Not Establish Standing.**

As the government's opening brief demonstrated, Gov. Br. at 24-27, plaintiffs' allegations that they were denied the opportunity to participate in notice and comment rulemaking regarding the Plan B switch do not establish standing because plaintiffs cannot show either that they have suffered a procedural violation or that the procedural violation "resulted in an invasion of their concrete and particularized interest." *Ctr. for Law & Educ.*, 396 F.3d at 1159. First, plaintiffs have not suffered a procedural violation. Gov. Br. at 24-26. In particular, it is undisputed that plaintiffs failed to avail themselves of the procedural right that was available to them: to "petition the Commissioner . . . to take or refrain from taking any . . . form of administrative action." 21 C.F.R. § 10.25. Thus, any claim

---

[8] Plaintiffs suggest that, were the Court to require more than plaintiffs' alleged fear of prosecution, they would engage in "jurisdictional discovery." Opp. at 12-13; Joseph Decl. ¶ 4. Of course, any such information about future state prosecutions would not be in the possession of the federal government, and plaintiffs are free to seek information from third parties informally.

that plaintiffs have been stymied in expressing their views to the agency rings hollow.  Plaintiffs' only response to this point is to assert the requirement that members of the public exhaust administrative remedies through this citizen petition process violates plaintiffs' rights to directly petition the court. Opp. at 14.  That argument is nonsensical in the context of arguing that plaintiffs have been injured by not having the opportunity to present comments to the agency.

Second, plaintiffs cannot establish that the alleged procedural violation caused them a concrete harm.  *See* Gov. Br. at 26-27.  The parties essentially agree that this element is a requirement for this standing theory, and refer the Court to the other portions of its standing analysis to determine whether any concrete injury has been established.  *See id.*; Opp. at 14-15.  Because, as shown above, plaintiffs have not suffered any concrete injury sufficient to confer standing, they necessarily cannot show any alleged procedural injury caused them harm.[9]

### G.    Plaintiffs Cannot Maintain Third-Party Standing.

Plaintiffs cannot rely on third-party standing to cure the deficiencies in their standing allegations.  It is black letter law that a plaintiff cannot rest his claim to standing on the rights and interests of third-parties.  *Lujan*, 504 U.S. at 562; *Simon v. Eastern Ky. Welfare Rights Org.*, 426 U.S. 26, 44-45 (1976); *Warth*, 422 U.S. at 499.  A litigant who seeks to assert the rights of third-parties must first establish its own standing.  *Powers v. Ohio*, 499 U.S. 400, 414 (1991).  Even then, the Supreme Court has made clear, "we have not looked favorably upon third-party standing."  *Kowalski v. Tesmer*, 543 U.S. 125, 130-133 (2004).  Plaintiffs have not surmounted this threshold bar.

Even were the Court to consider third-party standing, the government in its opening brief

---

[9]  Plaintiffs attempt to make this 'concrete injury' limitation on standing into a basis for expanding the scope of standing.  They assert: "In light of the existing concrete injuries on Counts I, II, III and IV, procedural injuries support Counts V, VI, VII and VIII."  They fail to cite authority that would allow them to do so.

established that plaintiffs have failed to establish its other required elements. Gov. Br. at 20-21.

Plaintiffs turn the case law on its head in asserting that they may bring this case on behalf of a

hypothetical group of patients who do not know that they have been injured and have little incentive

to sue. Opp. at 19. These allegations are insufficient to establish that these potential Plan B consumers

have rights that are "truly at stake" and face a "genuine" obstacle in bringing the claim themselves.

*Singleton v. Wulff*, 428 U.S. 106, 116 (1976).

## II.    PLAINTIFFS CANNOT CHALLENGE FDA'S APPROVAL OF BARR-DURAMED'S AMENDED SNDA UNDER THE APA.

The sections of plaintiffs' opposition brief on federal question jurisdiction and judicial review

encompasses several issues that need not be decided by this Court. In fact, the briefs demonstrate that

the parties agree on certain points that render much of the argument superfluous. First, the parties

agree that nothing in the FDCA provides either jurisdiction or a cause of action for plaintiffs to

challenge FDA's Plan B decision. Opp. at 22; Gov Br. at 28-30. Second, the parties agree that the

only other basis for statutory review is the APA. Opp. at 22; Gov. Br. at 30-32. A plaintiff seeking

review of agency action under the APA must have "suffer[ed a] legal wrong because of agency action,

or [been] adversely affected or aggrieved by agency action within the meaning of a relevant statute."

5 U.S.C. § 702. Under this standard, "[t]he failure to establish Article III standing is separately fatal

to plaintiffs' ability to state a claim for review under the APA, which has its own standing

requirement." *Friends of the Earth v. United States DOI*, 478 F. Supp. 2d 11, 22 n.13 (D.D.C. 2007).

The parties essentially agree that the test under section 702 of the APA is substantially the same as the

test for standing. *See* Gov. Br. at 30-31; Opp. at 24.

Thus, the question of whether plaintiffs can allege a cause of action under the APA rises and

falls with its standing argument. It is therefore inconsequential at this juncture whether plaintiffs can establish a cause of action under another theory. If the government is correct that plaintiffs lack standing, that deficiency would result in the dismissal of the entire case, regardless of the subject matter jurisdiction and causes of action alleged. If, on the other hand, plaintiffs are correct that they have standing, they will have also satisfied section 702 of the APA, and the Court need not evaluate, for purposes of the government's pending motion to dismiss, any alternate bases for establishing a cause of action.[10/]

## III.    THE INDIVIDUAL CAPACITY CLAIMS SHOULD BE DISMISSED.

The federal defendants' opening brief established that challenges to agency action seeking declaratory and injunctive relief can be brought against the FDA Commissioner only in his official capacity, not in his individual capacity. *See* Gov. Br. at 43-45. Plaintiffs have conceded that they are not challenging any action that Dr. von Eschenbach took in his personal capacity, nor do they seek any relief that could be granted by Dr. von Eschenbach in his personal capacity. *Id.* Indeed, to the extent the Amended Complaint could possibly be construed to seek such relief, plaintiffs have failed to meet the threshold requirements for overcoming qualified immunity held by such officials. *Id.* at 44-45. Plaintiffs in their opposition have failed to address or respond to any of these arguments or authority establishing that, in cases seeking relief against the agency for official agency actions, the individual capacity claims should be dismissed. *See Feit v. Ward*, 886 F.2d 848, 858 (7th Cir. 1989) ("individual capacity claims properly dismissed where "the equitable relief [plaintiff] requests -- a declaration that the policy is unconstitutional and an injunction barring the defendants from implementing the policy

---

[10/] Although federal defendants do not believe it is necessary to address all of plaintiffs argument at this juncture, the government does not concede the validity of any of plaintiffs' arguments, some of which may need to be reached at a later date should this litigation continue.

in the future -- can be obtained only from the defendants in their official capacities, not as private individuals").

Plaintiffs' only rejoinder is to discuss an ancient legal fiction designed to overcome assertions of sovereign immunity. *See* Opp. at 27-29. Although plaintiffs have extensively briefed nineteenth century case law, they have failed to establish any purpose to be served by including a "color of legal authority" claim in this case. As noted in our opening brief, the APA contains a waiver of sovereign immunity for any suit seeking non-monetary relief against a United States agency or officer acting in an official capacity even if the cause of action is not under the APA. *See Chamber of Commerce v. Reich*, 74 F.3d 1322, 1328 (D.C. Cir. 1996).

Because there is no purpose in having Dr. von Eschenbach subjected to suit in his individual capacity for his official actions, the Court should dismiss the individual capacity designation.

## IV.    PLAINTIFFS HAVE FAILED TO EXHAUST ADMINISTRATIVE REMEDIES.

There can be no question that plaintiffs have failed to comply with the exhaustion requirement contained in FDA regulations:  a party must use the citizen petition process to "request that the Commissioner take or refrain from taking any form of administrative action," and that request must "be the subject of a final administrative decision based on [the citizen petition] . . . before any legal action is filed in a court." 21 C.F.R. § 10.45(b). Plaintiffs have undisputedably failed to file a citizen petition. Contrary to plaintiffs' assertions that *Darby v. Cisneros* made this provision inoperable in cases under the APA, the Court held that "the exhaustion doctrine continues to exist under the APA to the extent it is required by statute or *by agency rule* as a prerequisite to judicial review." 509 U.S.

137, 153 (1993) (emphasis added).[11/]

Contrary to plaintiffs' assertions, the further holdings of *Darby* do not apply here. The Court held that courts could not require an administrative "appeal to 'superior agency authority' . . . as a rule of judicial administration." *Id.* at 154. In this case, however, because plaintiffs never filed a citizen petition, they never received an administrative decision on their arguments that could be appealed. *See Darby*, 509 U.S. at 146 ("When *an aggrieved party has exhausted all administrative remedies expressly prescribed by statute or agency rule, the agency action is 'final for the purposes of this section'* and therefore 'subject to judicial review' under [5 U.S.C. § 704]") (emphasis added).

Plaintiffs argue that they are excused from the exhaustion requirement because FDA issued an "indisputably final" decision on Barr-Duramed's SNDA, and any required exhaustion would be an appeal of that decision. Opp. at 32; *see also* Opp. at 29-30. However, that decision was made on Barr-Duramed's application, not on a petition submitted by plaintiffs; FDA did not necessarily even consider the arguments that plaintiffs would have made. Moreover, as members of the public with no direct role in the SNDA proceeding, plaintiffs have no rights under the FDCA, APA, or FDA regulations to directly "appeal" or "seek reconsideration" of FDA's SNDA decision. Thus, the holding in *Darby* that a plaintiff is generally not required to "appeal" an agency decision to a "superior agency authority" does not apply to plaintiffs. As the D. C. Circuit has recently explained:

> [E]xhaustion ensures that imminent or ongoing administrative proceedings are seen through to completion. But *the exhaustion rule does not contain an escape hatch for litigants who steer clear of established agency procedures altogether*. To the contrary, exhaustion is especially important where allowing the litigants to proceed in federal court would deprive the agency of any opportunity to exercise its discretion or apply its expertise. *See McCarthy*[*v. Madigan*], 503 U.S. [140,] 145 [(1992)] ("exhaustion

---

[11/] Plaintiffs' entire discussion of "prudential exhaustion" that is created by the courts where no statute or rule provides for exhaustion, *see* Opp. at 29-32, is irrelevant, because here exhaustion is required by agency regulation.

principles apply with special force when 'frequent and deliberate flouting of administrative processes' could weaken an agency's effectiveness by encouraging disregard of its procedures" (quoting *McKart* [*v. United States*], 395 U.S. [185,] 195 [(1969)].

*Ass'n of Flight Attendants-CWA, AFL-CIO v. Chao*, 493 F.3d 155, 158-59 (D.C. Cir. 2007) (emphasis added).

## V.    THE COURT SHOULD DISMISS COUNTS II, IV, V AND VI FOR FAILURE TO STATE A CLAIM.

In its opening brief, the government established that, based on the uncontested facts, the Court should dismiss Counts II, IV, V and VI in Plaintiffs' Amended Complaint for failure to state a claim. In these counts, plaintiffs espouse an erroneously narrow view regarding FDA's drug approval authority. Plaintiffs' contentions are contrary to FDA's long established practices and, if found to be correct, would radically change the way FDA conducts its business and slow at least certain aspects of FDA's drug application process to a virtual standstill. However, because plaintiffs' positions on these four counts are contrary both to the language of the statutes and principles of administrative law, these counts may be appropriately dismissed at this time.

As an initial matter, plaintiffs contend that their allegations that FDA's SNDA decision was influenced by political pressure precludes the application of *Chevron* Step 2, under which the Court does not "impose its own construction on the statute," but instead determines if the agency's interpretation is based on "a permissible construction of the statute." *Chevron U.S.A., Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837, 843, 866 (1984). Plaintiffs have cobbled together an argument citing authority discussing other questions, but they have not cited any authority that directly supports their proposition. They primarily rely on the D.C. Circuit's recent opinion in *National Ass'n of Clean Air Agencies v. EPA*, in which the court recognized the unremarkable proposition that an agency action

-18-

may be independently challenged as both arbitrary and capricious and contrary to the language of the statute. 489 F.3d 1221, 1228-29 (D.C. Cir. 2007). Here, too, plaintiffs have brought a separate count alleging that FDA's action was arbitrary and capricious because of political pressure, which the Court may consider at a later stage if this litigation continues. However, nothing in *National Ass'n of Clean Air Agencies* suggests that the arbitrary and capricious claim should be subsumed in the *Chevron* analysis. *See id.*

Plaintiffs also assert with vague generalities that the Court must make its determination on the full administrative record. Opp. at 35-36. In fact, defendants moved to dismiss only the counts that could be evaluated based on the language of the relevant provisions of statutes and regulations either alone or only with reference to undisputed facts. And, indeed, plaintiffs have indicated that they concur with defendants on two of the four counts. *See* Plaintiffs' Motion to Certify Administrative Record ("P's Cert. Mot.") at 3 n.1 (stating that Counts II and VI can be decided without reference to the administrative record). On the remaining two, their assertions of fact issues are so conclusory to be meaningless. Opp. at 43-45.

Counts II and IV are essentially the same – plaintiffs allege that the FDCA does not permit FDA to approve a drug for dual ℞-OTC marketing. Plaintiffs allege in Count II that the result is a misbranded prescription drug and in Count IV that FDA has unlawfully attempted to create a third-class of drug. The government's brief established that the FDCA permits dual-status approval: there can be simultaneous marketing of ℞-only and non-℞ versions of the same drug so long as there is a distinction between the two versions – *e.g.* intended use, strength, route of administration, dosage form, or patient population – that requires professional supervision for one version of the drug, but does not require such supervision for the other version. Gov. Br. at 36-38.

In Counts V and VI, plaintiffs contend that FDA was required to complete notice and comment rulemaking before issuing its decision on the SNDA.  However, all parties to this case agree that "[d]rug approvals are adjudications."  *See* Opp. at 34 n.16.  Nothing in the FDCA, APA, or FDA regulations mandates that, to approve an Rx-OTC switch, FDA deviate from its standard drug approval practices of adjudicatory decision-making – that is, issuing a decision to the applicant – to instead use notice and comment rulemaking.

More specifically, plaintiffs' arguments fail, as a matter of law, for the following reasons:

**A.    The FDCA Does Not Prohibit Dual Rx-OTC Labeling.**

In Count II, plaintiffs allege that the FDCA "authorizes approval of a drug product for one of two mutually exclusive modes of distribution and labeling: OTC and Rx," which FDA violated in approving the amended SNDA.  Am Compl. ¶ 102.  In its opening brief, the government explained how dual status approval is consistent with the language of the FDCA and the legislative purpose of the OTC switch provision, as well as supported by established agency practice.  For these reasons, the approval should be upheld under *Chevron* Step 1 or, at the very least, Step 2.  Gov. Br. at 36-39.

In their opposition, plaintiffs assert that there is a "clear dichotomy" between prescription and non-prescription drugs, and that dichotomy prohibits Plan B's dual Rx-OTC legend.  Opp. at 37-39.  In doing so, plaintiffs virtually ignore the thrust of the government's main argument in its opening brief.  When the Durham Humphrey Amendments to the FDCA were enacted in 1951, manufacturers were deciding on their own how to label their products, and the result was a muddle in which the same drug products by different manufacturers were labeled inconsistently.  H.R. Rep. No. 82-700, at 3-6 (1951).  The intent of the amendments was to eliminate confusion by requiring clear and accurate labeling.  *Id.*  Contrary to plaintiffs' arguments, there is no indication that Congress, as part of that

effort, was contemplating or prohibiting FDA approval of a dual-status product.

As we explained, nothing in the literal language of the statute prohibits a dual Rx-OTC legend that accurately reflects the approval status of the product. Gov. Br. 38-39. Under 21 U.S.C. § 353(b)(4)(A), a prescription drug must "bear, at a minimum, the symbol 'Rx-only'." That subsection does not contain any other prohibition or restriction, and therefore does not preclude FDA approval of a dual Rx-OTC product that bears the symbol 'Rx-only' for a certain population, and other instructions for another population. By contrast, section 353(b)(4)(B) prohibits products that are only OTC (that are not subject to the prescription limitations of paragraph (1) of section 353) from bearing the legend "Rx-only." Because Plan B remains a prescription product in part, section 353(b)(4)(B) does not apply. Further, FDA construes 21 C.F.R. § 310.200(d) consistently with those statutory provisions – that the prohibition on using the "Rx-only" labeling applies to OTC-only products, not dual-labeled products. Plaintiffs' contention that FDA's application of the statute "fails at *Chevron* Step One" (Opp. at 37) is simply wrong – there is no prohibition on dual Rx-OTC approval in the language of the statute, and the Plan B labeling satisfies the requirements of section 353(b)(4)(A).

The government's interpretation of these labeling provisions is consistent with Congress' purpose in enacting these provisions and the public health purposes of the FDCA as a whole. As noted, Congress intended to create uniform labeling requirements so that the resulting labeling would be accurate, truthful and clear. By requiring Plan B to bear labeling that accurately reflects its dual status and, at the same time, complies with the literal requirements of section 353(b)(4)(A), FDA's application of section 353 is consistent with that intent. By contrast, plaintiffs' overly technical and restrictive reading serves no purpose other than advancing plaintiffs' litigation objectives.

Plaintiffs attempt to read into the language of the statute and the regulation meanings that are

not literally there.  *See* Opp. at 38-39.  Plaintiffs cite legislative history and an FDA regulation that state that products that are OTC-only cannot bear labeling stating that they are "℞-Only."  Instead of accepting that these provisions are simply prohibiting inaccurate and misleading labeling, plaintiffs maintain that these provisions were intended to prohibit truthful dual-status labeling.  However, there is no indication that Congress or FDA intended to prohibit FDA approval of dual-status packaging or intended to bar a dual-marketing arrangement of the type approved for Plan B.

### B.    FDA Did Not Create a Third Class of Drugs.

Count IV is nothing more than a thematic variation on Count II.  As FDA explained in its opening brief and above, FDA has reasonably construed the FDCA to permit approval of both an ℞-only version and a non-℞ version of a product with the same active ingredient when there is a material distinction between the two versions of the drugs.  Gov. Br. at 36-37.  Because the product continues to comply with all relevant statutory requirements for ℞ and non-℞ products, the physical location of the product within the pharmacy does not convert it into a "third class of drug."  In addition, nothing in the FDCA prohibits FDA from approving an application for a product for which the sponsor proposes marketing restrictions.  Gov. Br. at 40.  Thus, FDA's approval of the dual marketing of Plan B was permissible under the FDCA as a matter of law.

Plaintiffs have failed to assert any coherent response to this argument.  First, they assert that review of the administrative record is necessary to demonstrate that "one or both parties invented the dual ℞-OTC approach to evade the negative implications of OTC availability (*e.g.* minors' access to the product)."  Opp. at 44.  Putting aside plaintiffs' loaded language, FDA has consistently maintained since 2004, in publicly disclosed documents that are summarized in the Amended Complaint, that there were insufficient data presented to the agency to conclude that minors could use Plan B OTC,

and that a bifurcated marketing approach might be a feasible way to obtain OTC approval for a specific patient population. Thus, it is uncontested that the impetus for the dual-status approach for Plan B was FDA's finding regarding the lack of data on minors. Plaintiffs' assertion that full record review is needed on this issue is a red herring.

Second, plaintiffs assert without any discussion or support that the FDCA provides only two options – OTC and Rx. Opp. at 44. This is a question that can be decided as a matter of law on a motion to dismiss. FDA has explained why it is permitted to approve dual status products. Plaintiffs offer nothing more in response than a bald, unsupported assertion to the contrary. That is not sufficient to continue litigation on this count.

C.    **FDA is Not Required under the APA to Engage in Rulemaking to Approve an SNDA regarding Rx-OTC Status.**

Plaintiffs in Count V again assert an erroneously restrictive view of permissible agency action in maintaining that FDA cannot approve a dual-marketing approach without first engaging in APA rule making to authorize it. It is beyond question that an agency can proceed through adjudication, as opposed to rule making, and all parties to this case, as well as the D.C. Circuit, agree that a drug application is an adjudication. *See* Opp. at 34 n.16. Plaintiffs have not identified any codified rule that FDA has issued regarding when dual marketing can be approved that would require rule making to amend. Instead, FDA has made a series of adjudicatory decisions, in which FDA has found dual marketing to be appropriate, and now the Plan B decision simply represents one more precedent in that series. Plaintiffs' skimpy opposition on this point fails to offer any coherent argument or explanation of how or why the APA prohibits such an adjudicatory decision or why review of the administrative record is necessary on this question. *See* Opp. at 44-45.

-23-

**D.    FDA is Not Required Under the FDCA or FDA Regulations to Engage in Rulemaking to Approve an ℞-OTC Switch.**

Contending that they know FDA law and procedures better than FDA, plaintiffs assert that FDA is required to engage in rulemaking to issue an OTC switch decision, based on permissive language in the statute and the language of an FDA regulation in effect from 1954 to 1976.  Opp. at 41.  As FDA explained in its opening brief, there are two mechanisms for approving an ℞-OTC switch: 1) FDA may issue a regulation approving a switch, 21 U.S.C. § 353(b)(3); and 2) FDA may approve a supplement to a drug application, 21 U.S.C. § 355(c) & (d) (FDA authority to approve and reject drug applications); 21 C.F.R. § 314.71(c) (NDA approval procedures apply to supplements).  The rulemaking language of section 353(b)(3) is permissive:  "The Secretary *may* by regulation remove drugs [approved for ℞-only distribution] from the requirements of [℞-only restrictions] when such requirements are not necessary for the protection of the public health." 21 U.S.C. § 353(b)(3) (emphasis added).  In contrast, plaintiffs rely on *Ethyl Corp. v. EPA*, 306 F.3d 1144, 1148 (D.C. Cir. 2002), in which the relevant statutory language provided that the agency "*shall* by regulation . . . ." *See* Opp. at 39.

As noted above, drug applications are adjudicatory proceedings, and nothing in the permissive language of 21 U.S.C. § 353(b)(3) (or anything else in the FDCA) mandates that FDA proceed by rulemaking in issuing a decision on a drug application requesting an OTC switch.  Thus, when a drug sponsor requests an ℞-OTC switch through an SNDA, FDA decides that application as part of the SNDA process without conducting rulemaking.  That has been FDA's consistent practice, over a period of four decades and covering close to one hundred ℞-OTC switch decisions.[12]

---

[12] Although 21 C.F.R. § 310.201 reflects that FDA has sometimes proceeded by regulation, that has by no means been FDA's exclusive or regular practice.

FDA regulations in their current form acknowledge these different switch mechanisms without any mention of the need to conduct rulemaking regarding an SNDA. 21 C.F.R. § 310.200(b). Plaintiffs, however, cite an earlier version of that regulation which appears to provide for rulemaking even when the request for a switch is made through a supplemental new drug application. Opp. at 41-42. However, as plaintiffs admit, that language was deleted more than 30 years ago. *Id.* As set forth in plaintiffs' exhibits, FDA amended that regulation in 1976 to "*replace the procedure* now set out in that provision." 40 Fed. Reg. 40682, 40716 (Sept. 3, 1975)(Pls.' Ex. 9). In the preamble to the comprehensive set of procedural changes which included that change, FDA explained:

> Many . . . practices and procedures [in FDA regulations] have been developed over the years on an ad hoc basis, to meet immediate needs, without systematically integrating them into the agency's overall practices and procedures. . . . [FDA] has concluded that a thorough review of agency practices and procedures should be undertaken, and that comprehensive regulations should be adopted to codify existing requirements, establish new requirements where none currently exist, and conform present regulations so that practices and procedures will be applied consistently throughout the agency."

40 Fed. Reg at 40683 (this particular page was excluded in Pls.' Ex. 9). Thus, FDA's deletion of the rulemaking practice for all R-OTC switch applications was neither "sub silentio" or accomplished without rulemaking, as plaintiffs assert. Opp. at 42-43.[13] Thus, the operative language upon which plaintiffs rely was deleted more than thirty years ago as part of a comprehensive overhaul of FDA's administrative procedures that was accomplished through notice and comment rule making. The deleted language does not describe FDA's current practice and is not binding on FDA.

Dated: November 15, 2007.

---

[13]    In addition, plaintiffs cite a comment from another preamble around the same time which states that an OTC switch may be accomplished through the procedures set forth in section 310.200. Although plaintiffs interpret the language to "clearly contemplate" that FDA would proceed by rulemaking, that is not in the text. In any event, a vaguely worded, thirty-year old preamble does not create law.

Respectfully submitted,

_____

JEFFREY A. TAYLOR, D.C. BAR # 498610
United States Attorney

 /s/
_____

RUDOLPH CONTRERAS, D.C. BAR # 434122
Assistant United States Attorney

 /s/
_____

JANE M. LYONS, D.C. Bar. # 451737
Assistant United States Attorney
555 Fourth St., N.W. - Room E4822
Washington, D.C.  20530
Phone: (202) 514-7161

OF COUNSEL:
DANIEL MERON
General Counsel

GERALD F. MASOUDI
Associate General Counsel, Food and Drug Division

ERIC M. BLUMBERG
Deputy Chief Counsel, Litigation

KAREN E. SCHIFTER
Associate Chief Counsel, Litigation
U.S. Dept. of Health & Human Services
Office of the General Counsel