## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

_____
ASSOCIATION OF AMERICAN                          )
PHYSICIANS & SURGEONS, INC., *et al.*,           )
                                                 )
          *Plaintiffs*,                          )          Civil Action No. 07:0668 (JDB)
                                                 )
              *v.*                               )
                                                 )
FOOD & DRUG ADMINISTRATION, *et al.*,            )
                                                 )
          *Defendants.*                          )
-------------------------------------------------------------)
                                                 )
DURAMED PHARMACEUTICALS, INC.,                   )
                                                 )
          *Defendant Intervenor.*                )
_____)

## REPLY MEMORANDUM IN SUPPORT OF
## DURAMED PHARMACEUTICALS, INC.'S MOTION
## TO DISMISS FIRST AMENDED COMPLAINT

Richard M. Cooper (# 92817)
Ana C. Reyes (# 477354)
WILLIAMS & CONNOLLY LLP
725 Twelfth Street, N.W.
Washington, DC  20005
(tel.) (202) 434-5466
(fax) (202) 434-5470
rcooper@wc.com
areyes@wc.com

*Counsel for Defendant Intervenor,*
*Duramed Pharmaceuticals, Inc.*

Dated:  Nov. 15, 2007

## TABLE OF CONTENTS

TABLE OF AUTHORITIES .................................................................................................. iii

TABLE OF ABBREVIATIONS ........................................................................................... vii

TABLE OF EXHIBITS ...................................................................................................... viiii

ARGUMENT ........................................................................................................................ 1

I.    PLAINTIFFS IGNORE THE LAW OF REPRESENTATIONAL STANDING. ...................................................................................................... 1

    A.    Plaintiffs Fail To Show Standing Plaintiff by Plaintiff and Count by Count. ........................................................................................................ 1

    B.    The FAC Fails To Allege the Bases for Representational Standing. ..................... 1

    C.    The FAC Fails To Identify Any Member Who Has Suffered Injury in Fact. ...................................................................................................... 3

    D.    The FAC Fails To Allege Concrete Injury. ...................................................... 4

        1.    The FAC Fails To Allege a Concrete Injury to Consumers. ...................... 4

        2.    The FAC Fails To Allege a Concrete Injury to Physicians. ...................... 8

        3.    The FAC Fails To Allege a Concrete Injury to Pharmacists. ................... 9

    E.    Plaintiffs Do Not Have Prudential Standing. .................................................. 11

        1.    Plaintiffs' Claims on Behalf of Physicians and Pharmacists Are Outside the Zone of Interests of § 353(b). ................................................. 11

        2.    Plaintiffs Are Not "Suitable Challengers" Within the Zone. ................... 14

        3.    The *Ultra Vires* Doctrine Does Not Apply Here. ................................... 16

        4.    Plaintiffs Cannot Sue on Behalf of Their Members' Patients or Consumers Generally, or Other Third Parties. .......................................... 17

        5.    The FAC's Allegations of Procedural Injury Are Deficient. ................... 19

    F.    Conclusion: Plaintiffs Lack Standing as to Any Count. ..................................... 19

II.    PLAINTIFFS MUST EXHAUST FDA'S MANDATORY REMEDY. .......................... 20

III.    PLAINTIFFS FAIL TO SAVE COUNTS II AND IV-VI. ............................................ 22

    A.    Count IV Should Be Dismissed: Plan B Is Not a "Third Class" of Drug. ...................................................................................................... 22

    B.    Count V Should Be Dismissed: No Rulemaking Is Needed for an Agency To Change Its Interpretation of a Statute. .............................................. 23

    C.    Counts II and VI Should Be Dismissed: Plaintiffs Misconstrue § 353(b)(3). .................................................................................................... 23

D.     Plaintiffs' Argument that No Deference Is Owed the FDA Decision at
       *Chevron* Step 2 Fails Because No Improper Political Pressure Is
       Alleged. ........................................................................................................... 24

CONCLUSION ............................................................................................................... 25

# TABLE OF AUTHORITIES

## FEDERAL CASES

*Allen v. Wright*, 468 U.S. 737 (1984) ............................................................9

*American Chemical Council v. Department of Transportation*, 468 F.3d 810
(D.C. Cir. 2006) ..................................................................................3, 4

*American Friends Service Committee v. Webster*, 720 F.2d 29 (D.C. Cir. 1983) ........12

*American Immigration Lawyers Association v. Reno*, 199 F.3d 1352 (D.C. Cir. 2000) ...........17

*American Legal Foundation v. FCC*, 808 F.2d 84 (D.C. Cir. 1987) ................................1

*American Trucking Associations v. Department of Transportation*,
166 F.3d 374 (D.C. Cir. 1999) ....................................................................15

*Amgen, Inc. v. Smith*, 357 F.3d 103 (D.C. Cir. 2004) ..........................................13, 14

*ATX, Inc. v. Department of Transportation*, 41 F.3d 1522 (D.C. Cir. 1994)................25

*Avocados Plus Inc. v. Veneman*, 370 F.3d 1243 (D.C. Cir. 2004)................................22

*Bell Atlantic Corp. v. Twombly*, 127 S. Ct. 1955 (2007) ......................................3, 7

*Bennett v. Spear*, 520 U.S. 154 (1997) .........................................................10

*Calumet Industries, Inc. v. Brock*, 807 F.2d 225 (D.C. Cir. 1986) ................................13

*Chevron U.S.A. Inc. v. NRDC*, 467 U.S. 837 (1984) ..............................................24

*Chiles v. Thornburgh*, 865 F.2d 1197 (11th Cir. 1989) .........................................16

*Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402 (1971) .................12, 13

*Clarke v. Securities Industries Association*, 479 U.S. 388 (1987)............................12, 14

*Conley v. Gibson*, 355 U.S. 41 (1957) ............................................................3

*Croplife America v. EPA*, 329 F.3d 876 (D.C. Cir. 2003) ........................................23

*D.C. Federation of Civic Associations v. Volpe*, 459 F.2d 1231 (D.C. Cir. 1972).....................25

*Darby v. Cisneros*, 509 U.S. 137 (1993).....................................................17, 20, 21

*Diamond v. Charles*, 476 U.S. 54 (1986) .........................................................13

*Eisenstadt v. Baird*, 405 U.S. 438 (1972) .......................................................18

*Ethyl Corp. v. EPA*, 306 F.3d 1144 (D.C. Cir. 2002) ....................................................24

*First National Bank & Trust Co. v. National Credit Union Admin.*,
    988 F.2d 1272 (D.C. Cir. 1993) .................................................................13, 14

*Florida Audubon Society v. Bentsen*, 94 F.3d 658 (D.C. Cir. 1996) (*en banc*) ............................19

*Fund Democracy, LLC v. SEC*, 278 F.3d 21 (D.C. Cir. 2002) ........................................................1

*Goodman v. FCC*, 182 F.3d 987 (D.C. Cir. 1999).......................................................................18

*Grand Council of the Crees v. FERC*, 198 F.3d 950 (D.C. Cir. 2000).....................................1, 15

*Haitian Refugee Center v. Gracey*, 809 F.2d 794 (D.C. Cir. 1987) ..........................................1, 16

*Hazardous Waste Treatment Council v. EPA*, 861 F.2d 277 (D.C. Cir. 1988) .............................13

*Hazardous Waste Treatment Council v. Thomas*, 885 F.2d 918 (D.C. Cir. 1989) .......................14

*Hershey Foods Co. v. Department of Agriculture*, 293 F.3d 520 (D.C. Cir. 2002).......................21

*Humane Society of the U.S. v. Hodel*, 840 F.2d 45 (D.C. Cir. 1988) ...............................................2

*Hunt v. Washington State Apple Advertising Commission*, 432 U.S. 333 (1977) .....................1, 2

*Koniag, Inc., Village of Uyak v. Andrus*, 580 F.2d 601 (D.C. Cir. 1978).....................................25

*Kowalski v. Tesmer*, 543 U.S. 125 (2004) ...................................................................................17

*Larson v. Domestic & Foreign Commerce Corp.*, 337 U.S. 682 (1949)......................................16

*Liquid Carbonic Industries Corp. v. FERC*, 29 F.3d 697 (D.C. Cir. 1994) ..........................12, 15

*Lujan v. Defenders of Wildlife*, 504 U.S. 555 (1992) ..............................................................4, 19

*McCarthy v. Madigan*, 503 U.S. 140 (1992) ...............................................................................22

*McKinney v. Department of Treasury*, 799 F.2d 1544 (Fed. Cir. 1986).................................3, 4, 8

*Menges v. Blagojevich*, 451 F. Supp.2d 992 (C.D. Ill. 2006) ...................................................10, 11

*Michigan v. EPA*, 268 F.3d 1075 (D.C. Cir. 2001).......................................................................16

*MST Express v. Department of Transportation*, 108 F.3d 401 (D.C. Cir. 1997).........................24

*Mussington v. St. Luke's-Roosevelt Hospital Center*, 824 F. Supp. 427 (S.D.N.Y. 1993),
    *aff'd*, 18 F.3d 1033 (2d Cir. 1994) .............................................................................15

*National Maritime Union v. Commander, Military Sealift Command*,
    824 F.2d 1228 (D.C. Cir. 1987) ..............................................................................10

*National Credit Union Administration v. First National Bank & Trust Co.*,
    522 U.S. 479 (1998)................................................................................................12

*National Lime Association v. EPA*, 233 F.3d 625 (D.C. Cir. 2000) ..............................14

*National Parks Conservation Association v. Manson*,
    414 F.3d 1 (D.C. Cir. 2005) ....................................................................................11

*National Treasury Employees Union v. United States*,
    101 F.3d 1423 (D.C. Cir. 1996) ................................................................................4

*National Wildlife Federation v. Burford*, 835 F.2d 305 (D.C. Cir. 1987) ..................3, 4

*National Wrestling Coaches Association  v. Department of Education*,
    366 F.3d 930 (D.C. Cir. 2004) ................................................................................11

*Ohio v. EPA*, 838 F.2d 1325 (D.C. Cir. 1988) ..............................................................21

*Petro-Chem Processing, Inc. v. EPA*, 866 F.2d 433 (D.C. Cir. 1989) ............................9

*Public Citizen, Inc. v. National Highway Traffic Safety Administration*,
    489 F.3d 1279 (D.C. Cir. 2007) ................................................................................5

*Renal Physicians Association v. DHHS*, 489 F.3d 1267 (D.C. Cir. 2007) ....................19

*Roe v. Wade*, 410 U.S. 113 (1973)................................................................................18

*Sargeant v. Dixon*, 130 F.3d 1067 (D.C. Cir. 1997) ......................................................6

*Sierra Club v. Costle*, 657 F.2d 298 (D.C. Cir. 1981) ..................................................25

*Sierra Club v. EPA*, 292 F.3d 895 (D.C. Cir. 2002) ....................................................13

*Sierra Club v. Morton*, 405 U.S. 727 (1972) ................................................................4

*Stormans, Inc. v. Selecky*, No. C07-5374RBL (W.D. Wash. Nov. 8, 2007)..................10

*Tileston v. Ullman*, 318 U.S. 44 (1943) ......................................................................18

*United States v. An Article . . . Consisting of 216 Cartoned Bottles*,
    409 F.2d 734 (2d Cir. 1969)......................................................................................8

*United States v. Lane Labs-USA Inc.*, 427 F.3d 219 (3d Cir. 2005)................................8

*United States v. Wilson*, 290 F.3d 347 (D.C. Cir. 2002)................................................24

*Warth v. Seldin*, 422 U.S. 490 (1975) ......................................................................3, 4

*Woodford v. Ngo,* 126 S. Ct. 2378 (2006) ...........................................................20, 22

## STATE CASES

*Bichler v. Willing,* 397 N.Y.S.2d 57 (App. Div. 1977)....................................................9

## OTHER AUTHORITIES

5 U.S.C. § 704 (2000) .............................................................................11, 20, 21

21 U.S.C. § 337 (2000) ...................................................................................9

21 U.S.C. § 352(a) (2000)...............................................................................7

21 U.S.C. § 353(b) (2000) ...................................................................... *passim*

21 U.S.C. § 355(c) (2000 & Supp. IV 2005) .......................................................23, 25

28 U.S.C. § 516 (2000) ..................................................................................12

21 C.F.R. § 10.25 (2007) ...............................................................................20

21 C.F.R. § 10.45 (2007) ...........................................................................20, 21

21 C.F.R. § 10.85 (2007) .................................................................................7

21 C.F.R. § 310.200 (2007) ...........................................................................23

42 Fed. Reg. 4680 (Jan. 25, 1977) ...................................................................24

**TABLE OF ABBREVIATIONS**

AAPS          Association of American Physicians and Surgeons, Inc.

APA           Administrative Procedure Act

CWA           Concerned Women for America

Duramed       Duramed Pharmaceuticals, Inc.

EPA           Environmental Protection Agency

FAC           First Amended Complaint

FDA           Food and Drug Administration

FDCA          Federal Food, Drug, and Cosmetic Act

FRC           Family Research Council

Mem.          Memorandum of Points and Authorities in Support of Duramed Pharmaceuticals,
              Inc.'s Motion to Dismiss First Amended Complaint

Opp.          Memorandum of Law in Support of Plaintiff's [sic] Opposition to Motion to
              Dismiss

OTC           Over-the-counter

PREA          Pediatric Research Equity Act

Rx            Prescription or by prescription

SDW           Safe Drugs for Women

sNDA          Supplemental new drug application

WCC           Women's Capital Corporation

**TABLE OF EXHIBITS**

Ex. 1     Mutual Agreement and Understanding among Walgreens Co. and the Illinois Department of Financial and Professional Regulation, filed in *Menges v. Blagojevich*, No. 05-3077 (C.D. Ill. 2007); Mutual Agreement and Understanding between the individual plaintiffs and the defendants in *Menges v. Blagojevich*, No. 05-3077 (C.D. Ill. 2007).

Ex. 2     Order Granting Preliminary Injunction, issued in *Stormans, Inc. v. Selecky*, No. C07-5374RBL (W.D. Wash. Nov. 8, 2007).

Ex. 3     Fifth Amended Complaint, filed in *Tummino v. Von Eschenbach*, No. 05-366 (E.D.N.Y. 2007).

## ARGUMENT

## I.    PLAINTIFFS IGNORE THE LAW OF REPRESENTATIONAL STANDING.

### A.    Plaintiffs Fail To Show Standing Plaintiff by Plaintiff and Count by Count.

Plaintiffs' First Amended Complaint ("FAC")[1] and Opposition to the Motions to Dismiss

("Opposition" or "Opp.") fail to address the requirement that standing be shown separately for

each plaintiff.  *See, e.g.*, *Haitian Refugee Ctr. v. Gracey*, 809 F.2d 794, 799-800 (D.C. Cir. 1987)

(opinion of Bork, J., part of which is for the court, *see id.* at 796 n.1) (considering standing of

each plaintiff separately).  They also fail to address the requirement that standing be shown

separately for each Count or claim.  *See, e.g.*, *Grand Council of the Crees v. FERC*, 198 F.3d

950, 954 (D.C. Cir. 2000) ("[W]e address their standing to bring each claim in turn[.]").

### B.    The FAC Fails To Allege the Bases for Representational Standing.

The FAC fails to allege injury to plaintiff organizations' own interests.  Even as to

alleged procedural injury (Counts V-VII), concrete injury to the organizations is necessary.  *See*

Memorandum of Points & Authorities in Support of Duramed Pharmaceuticals, Inc.'s Motion to

Dismiss First Amended Complaint ("Mem.") 4 n.5.  The FAC fails to allege it.  Thus, the only

basis for standing for any of the plaintiffs is that it has at least one member with standing in his

or her "own right."  *Hunt v. Wash. State Apple Adver. Comm'n*, 432 U.S. 333, 343 (1977).

CWA and FRC.  CWA and FRC lack representational standing as to all Counts because

each fails to allege that it is a membership organization and has members.  *See* FAC ¶¶ 4-5; *Fund*

*Democracy, LLC v. SEC*, 278 F.3d 21, 25 (D.C. Cir. 2002) (organization with no alleged

members lacks representational standing); *American Legal Found. v. FCC*, 808 F.2d 84, 90

(D.C. Cir. 1987) (no standing for organization that did not serve a "discrete, stable group of

persons with a definable set of common interests," and whose supporters did not play a role in

---

[1] As used herein, "FAC" refers to the First Amended Complaint, along with the declarations and other exhibits attached by plaintiffs to their Opposition.

selecting its leadership or guiding or funding its activities).  CWA also fails to allege any

organizational purpose, and so fails to satisfy the germaneness requirement for representational

standing, *Hunt*, 432 U.S. at 343, however flexible it may be, *see Humane Soc'y of the U.S. v.

Hodel*, 840 F.2d 45, 55-59 (D.C. Cir. 1988).[2]

SDW.  Although FAC ¶ 6 refers to "members" of SDW, it alleges that SDW is a

corporation, not a membership organization.  *Compare* FAC ¶ 6, *with id.* ¶ 3.  It is not alleged

that SDW's "members" have "all of the indicia of membership" relied on in *Hunt*, 432 U.S. at

344.  Also, FAC ¶ 6 defines "SDW Members" as "members and its members' members," and

does not allege that SDW has any member who is an individual (rather than an organization).

Thus, SDW's own "members" may all be organizations.  Yet *Hunt* did not find organizational

standing to represent members of members.  That would be not *jus tertii,* but *jus quarti*.  The link

between the litigant and the party allegedly injured would be too attenuated.  Absent any alleged

injury to a member of SDW, the FAC fails to allege a basis for SDW standing as to any Count.

AAPS.  AAPS has standing to assert the interests of its physician members only if they

would have standing in their own right.  *Hunt*, 432 U.S. at 343.  AAPS has not alleged any

concrete injury to any member physician.  *See* Mem. 14-19; *infra* p. 8.  Plaintiffs cite, and we

have found, no decision that allows an organization of physicians to assert the interests of

patients of its members.  *See infra* pp. 17-19.  Further, the FAC does not allege that AAPS's

members include consumers or pharmacists or any other category of individuals who might have

standing.  Therefore, AAPS lacks standing as to all Counts.

---

[2] FAC ¶ 4's allegation that CWA performs lobbying activities is not an allegation of an organizational purpose germane to the claims in this lawsuit.  FAC ¶ 4's allegation that CWA "represents" women is not an allegation that women are members of CWA; lobbying organizations routinely "represent" people who are not their members.

### C.     The FAC Fails To Identify Any Member Who Has Suffered Injury in Fact.

The FDA Decision took effect on August 24, 2006.  FAC ¶ 59.  Since then, plaintiffs have had three opportunities – their original Complaint, the FAC, and the Opposition – to allege an injury any member has suffered, or is in imminent danger of suffering, from that decision. They have failed to do so.  No plaintiff alleges that it has as a member even one consumer who has bought Plan B, or has obtained less healthcare information as a result of its Rx/OTC status, or has been confused by its labeling.  No plaintiff alleges that it has as a member a pharmacist who has incurred or been threatened with liability relating to Plan B, has been forced to act contrary to religious beliefs, or has suffered new administrative burdens.  The declaration of AAPS's member physician, Dr. Thomas Ritter ("Ritter Decl."), Opp. Ex. 3, fails to provide a basis for standing for AAPS.  Dr. Ritter nowhere says that he has ever prescribed Plan B or plans to do so, that he has lost any revenue, or that he has experienced fewer patient visits.

Under settled law, each plaintiff must identify at least one member for whom it sues:

> [A]n organization bringing a claim based on associational standing must show that at least one specifically-identified member has suffered an injury-in-fact.  It is not enough to show . . . a substantial likelihood that at least one member may have suffered an injury-in-fact. Our standard has never been that it is *likely* that at least one member has standing. At the very least, the identity of the party suffering an injury in fact must be firmly established.

*American Chem. Council v. Department of Transp.*, 468 F.3d 810, 820 (D.C. Cir. 2006) ("*ACC*").  This level of specificity is required in a complaint.  *See, e.g.*, *Warth v. Seldin*, 422 U.S. 490, 508, 516 (1975); *McKinney v. Department of Treasury*, 799 F.2d 1544, 1553-54 (Fed. Cir. 1986).  The argument that "general allegations" suffice, Opp. 8-9, is supported only by cases that relied directly or indirectly on *Conley v. Gibson*, 355 U.S. 41, 45-46 (1957).  *Conley* has been undermined on this very point by *Bell Atlantic Corp. v. Twombly*, 127 S. Ct. 1955 (2007).[3]

---

[3] *National Wildlife Federation v. Burford*, 835 F.2d 305, 311-15 (D.C. Cir. 1987), cited at Opp. 9, is not to the contrary.  Cases like *National Wildlife* can be distinguished on the basis that there

### D. The FAC Fails To Allege Concrete Injury.

To survive a motion to dismiss for lack of standing, a plaintiff "must allege specific, concrete facts demonstrating that the challenged [governmental action] harm[s] him, and that he personally would benefit in a tangible way from the court's intervention." *Warth*, 422 U.S. at 508. "A certain degree of specificity in delineating the injury . . . is a prerequisite to Article III standing." *McKinney*, 799 F.2d at 1553-54 (citations omitted). The FAC fails this test.

### 1. The FAC Fails To Allege a Concrete Injury to Consumers.

The fatal flaw in the FAC's allegations of consumer harm is the lack of any allegation that any woman or girl whom plaintiffs claim to represent has used or will use Plan B. Plaintiffs allege only that the women or girls "would consider taking" Plan B. *See* FAC ¶ 15. That allegation is inadequate. *Cf. Sierra Club v. Morton*, 405 U.S. 727, 735 (1972) ("The alleged injury will be felt directly only by those who <u>use</u> Mineral King . . . ." (emphasis added)). Thus, a concrete injury is only to those who actually use or intend to use the thing affected by the challenged governmental action (or would use it but for that action) – not to those who merely "would consider" using it. *Lujan v. Defenders of Wildlife* commented as to testimony of an intent to visit Sri Lanka "[i]n the future": "Such 'some day' intentions – without any description of concrete plans, or indeed even any specification of *when* the some day will be – do not support a finding of the 'actual or imminent' injury that our cases require." 504 U.S. 555, 564 (1992). Here, FAC ¶ 15's allegation that some members' members wish "to review and compare contraceptive options generally," FAC ¶ 15, is far weaker than the testimony in *Lujan* because

---

the injury "was sufficiently established through affidavits or other evidence." *ACC*, 468 F.3d 820-21; *see also National Wildlife*, 835 F.2d at 313 (holding that lack of specificity, if relevant, was cured through later-filed affidavits). Here, plaintiffs have filed declarations, but have not cured the failure to identify any injured member(s). Moreover, a court need not accept a party's "speculative conclusion" of a causal linkage between governmental action and alleged injury. *National Treasury Employees Union v. United States*, 101 F.3d 1423, 1430 (D.C. Cir. 1996).

(apart from other deficiencies) it fails to allege not only imminence but also even an actual <u>intent</u> to use Plan B.  The "review and compar[ison]" may be entirely academic.

Allegation that Plan B Is Unsafe OTC.  Plaintiffs do not allege that Plan B, the drug, is in any way unsafe.  They do not allege that a single identifiable consumer <u>has been or will be</u> harmed by it, even when obtained OTC.  *See* Mem. 6-8.[4]  What plaintiffs argue is that the FDA Decision may increase consumers' <u>risk of harm</u> from a source other than Plan B, *e.g.*, it will lead to fewer medical visits, which may, in turn, lead to worsened healthcare.  FAC ¶ 18.  The D.C. Circuit has flatly <u>rejected</u> plaintiffs' theory that "'increased risk' is, *itself*, concrete, particularized, and *actual* injury for standing purposes."  *Public Citizen, Inc. v. National Highway Traffic Safety Admin.*, 489 F.3d 1279, 1297 (D.C. Cir. 2007) (emphasis in original). Instead, an organization challenging agency action establishes standing only if "the agency action causes an individual or individual members . . . to face an increase in the risk of harm that is 'substantial,' and the ultimate risk of harm also is 'substantial.'"  *Id.* at 1296.  The standard is "<u>very strict</u>."  *Id.* (emphasis added).  Glaringly, the Opposition ignores the standard completely; and the FAC fails to make the allegations needed to satisfy it.

The FAC's various theories of injury to consumers all fail, as a matter of law.

Allegation that the FDA Decision Deprives Consumers of Information.  Plaintiffs argue

---

[4] Plaintiffs' claim of standing under the Federal Food, Drug, and Cosmetic Act ("FDCA"), the Pediatric Research Equity Act ("PREA"), and the Durham-Humphrey Amendments because those statutes create a right to safety, which plaintiffs have been denied, is therefore unsupported by the FAC.  In particular as to the PREA, the FAC fails to allege that any member or child of a member is within the pediatric population, has used Plan B or intends to use it imminently, and is adversely affected by the sNDA.  Moreover, Plan B's labeling, Mem., Ex. 2, states:  "This product is not intended for use in pediatric (premenarcheal) populations . . . ."  No woman under age 18 is adversely affected by the sNDA because such a woman still needs a prescription.  Any woman under age 18 who obtains it without a prescription could have done so only in an unlawful transaction involving the woman and one or more other parties not before the Court.  Thus, her use of Plan B is not directly traceable to the FDA Decision, and she lacks standing.

that the FDA Decision somehow deprives consumers of information they are, by statute, entitled to receive. *See* Opp. 8-9; FAC ¶¶ 17, 18. Plaintiffs cite *Sargeant v. Dixon*, 130 F.3d 1067, 1070 (D.C. Cir. 1997), for the proposition that "receipt of information is a tangible benefit the denial of which constitutes an injury." Standing, however, was denied in *Sargeant* for failure to allege any cognizable injury. *Id.* at 1070. *Sargeant* also is distinguishable. It involved a denial of information specifically requested from the Government by a plaintiff under the Freedom of Information Act. Here, there has been no such request, and no statute <u>entitles</u> consumers to information from physicians. There also is no allegation that the FDA Decision prohibits, limits, or even burdens physician-patient relationships, or that women age 18 or older who obtain Plan B OTC cannot request and obtain relevant information from physicians or pharmacists.

Nothing in 21 U.S.C. § 353(b) or in a prescription limitation requires a visit to a doctor or provision of information by a doctor. Section 353(b)(1)(B)(ii) permits an "oral" prescription: a patient may request a prescription by a telephone call to a doctor's nurse, and the doctor may transmit the prescription to a pharmacist by telephone, with no patient-doctor interaction. Thus, § 353(b) does not create any legal right to the healthcare information referred to in FAC ¶ 18. Moreover, even if prescriptions could be obtained only in office visits, any failure of a buyer of Plan B OTC to obtain information from a doctor would result from independent decisions by the patient and/or the doctor, and would not be caused by the FDA Decision. Mem. 12. Finally, even if the FDA Decision were overturned and Plan B were available only Rx, there would be no assurance that doctors would provide patients with specific types of information. Thus, this theory of injury fails all three requirements of Article III: concrete injury, causation, and redressability.

Plaintiffs also claim injury on the basis that "women are exposed to a drug that Plan B's

sponsor falsely and misleadingly advertised." Opp. 18; FAC ¶ 89. This theory is irrelevant mudslinging. The letter referred to in FAC ¶ 89 was not to Duramed, but to Women's Capital Corp. ("WCC") – the sponsor of Plan B in <u>2002</u>, when it was available only Rx. The letter did not represent the formal position of the FDA. *See* 21 C.F.R. § 10.85(k) (2007). The FAC does not allege that the challenged advertising reached consumers, or that WCC continued it after 2002; and the FAC provides no factual basis to believe that the 2002 advertising continues to have effect in 2007 on doctors or consumers or any member of a plaintiff, or that any such effect is redressable by overturning the FDA Decision. Plaintiffs also do not allege that anyone at the FDA has ever accused <u>Duramed</u> of false or misleading advertising as to Plan B at any time. FAC ¶ 90 does not allege that the advertising referred to therein related to Plan B.

  <u>Allegation that Plan B's Labeling Is Misleading</u>. FAC ¶ 17 alleges that the FDA injured consumers by denying them FDCA-required labeling information. First, the only consumers so injured are users of Plan B, and the FAC does not allege that any member of any plaintiff has used or intends to use Plan B. Second, the appropriate remedy is to petition the FDA to change the labeling. Mem. 8-9. Overturning the FDA Decision would not redress this alleged injury. Third, the very information plaintiffs claim should be in the labeling <u>is already there</u>. *Id.* 11-12.

  Plaintiffs' claim that, on a motion to dismiss, their view of the labeling, not Duramed's, must be taken as true, Opp. 18, is wrong. An allegation that labeling is "misleading" is a legal conclusion, *see* 21 U.S.C. § 352(a); and, on a motion to dismiss, legal conclusions are not assumed to be true, *see Twombly*, 127 S. Ct. at 1965. Moreover, in assessing plaintiffs' allegations as to what the labeling states, the Court may look at the labeling. Mem. 3, n.4. Because the labeling already includes the very language plaintiffs demand, there is no injury.[5]

---

[5] Plaintiffs also rely on the Label Comprehension Study. Opp. 18. The Study shows, however,

## 2.    The FAC Fails To Allege a Concrete Injury to Physicians.

<u>Alleged Competitive Injury</u>.  Plaintiffs' Opposition fails to clarify what competitive injury physicians allegedly face.  Unexplained competitive injury does not support standing. "[A]ppellants have done nothing more than allege competitive injury in the abstract.  Article III requires more specific allegations of competitive injury . . . ."  *McKinney*, 799 F.2d at 1555. Physicians and pharmacists provide different services.  The FAC fails to allege any fact to show that physicians compete with pharmacists, *e.g.*, that any member physician dispenses Plan B.

The FDA Decision has been in effect for more than a year, so any actual economic injury or decrease in patient visits would by now be evident.  Yet the Opposition and its exhibits fail to allege any facts as to any loss of revenue or decrease in visits traceable to the FDA Decision. Moreover, any potential fees lost by doctors (due to decisions by individual consumers, an independent causal factor), would be retained by consumers.  "A primary purpose of the [FDCA] is the protection of the ultimate consumer's economic interests."  *United States v. An Article . . . Consisting of 216 Cartoned Bottles*, 409 F.2d 734, 740 (2d Cir. 1969).  *See also United States v. Lane Labs-USA Inc.*, 427 F.3d 219, 227 (3d Cir. 2005).  Thus, protecting doctors' fees <u>at the expense of consumers</u> would be contrary to the purposes of the FDCA, including those of § 353(b).

Dr. Ritter's declaration fails to establish standing for AAPS.  He does not state that any woman has ever asked him to prescribe Plan B, that he has ever prescribed it or intends to do so, or that he has ever gained a patient due to Plan B's Rx status.  As far as his declaration states, he may have had no prior experience with Plan B.  Further, his statements about loss of revenue are merely conclusory.  He does not even say he charges for prescriptions.  *See* Ritter Decl. ¶¶ 8-9.

---

that the labeling is not misleading.  Mem. Ex. 5.  Moreover, Plan B's labeling was changed after the Study was issued, and so the Study could not support the allegations concerning the current labeling.  Plaintiffs argue that they need the administrative record to confirm the change.  Opp. 18, n.5.  They do not.  The labeling studied is in the Study report.  Mem. Ex. 5, at 347.  One need only compare that with the current labeling, Mem. Ex. 2, to see the (many) differences.

### 3.   The FAC Fails To Allege a Concrete Injury to Pharmacists.

Alleged Threat of Prosecution.  Plan B has been marketed with its current labeling for more than a year, yet the FAC fails to allege an actual or threatened prosecution of any pharmacist relating to Plan B.  Hence, this theory of standing fails under the cases cited at Mem. 22.[6]  Plaintiffs' claim that, to establish a "credible threat of prosecution," they need jurisdictional discovery from state and local prosecutors, Affidavit of Lawrence J. Joseph ¶ 4 ("Joseph Decl.") (Opp., Ex. 1); Opp. 12-13, is frivolous.  It is inconceivable (i) that any state would prosecute a pharmacist under state law[7] for dispensing a drug with FDA-approved labeling, and (ii) that this Court would permit discovery of the prosecutorial intentions of state or local prosecutors.

Plaintiffs' claim that OTC status increases pharmacists' risk of civil liability by limiting their immunity to civil claims is also frivolous.  To qualify for the immunity, a pharmacist must fill a prescription correctly.  *See, e.g.*, *Bichler v. Willing,* 397 N.Y.S.2d 57, 59-60 (App. Div. 1977).  To sell Plan B OTC properly, a pharmacist or clerk must confirm that the consumer is age 18 or older.  The FAC fails to allege any actual or threatened civil liability for dispensing Plan B OTC, and fails to provide any factual basis to believe that OTC dispensing is more difficult to perform correctly or carries any greater risk of liability than Rx dispensing.  Also, any liability would be self-inflicted, and so would have no causal link to the FDA Decision.

Alleged Conscience-Based Objection.  The allegation that, as to Plan B, the FDA Decision "establishes the obligations of pharmacists" and "alters the legal regime applicable to pharmacists, physicians, and their patients," FAC ¶ 10, is incorrect.  The FDA Decision is not the

---

[6] *See also Allen v. Wright*, 468 U.S. 737 (1984) (plaintiffs lack standing to challenge law enforcement practices where there was no allegation of a threat that the plaintiffs would be subjected to such practices); *Petro-Chem Processing, Inc. v. EPA*, 866 F.2d 433 (D.C. Cir. 1989) (Ruth Bader Ginsburg, J.) (rejecting claim that risk of liability provided a basis for standing).

[7] Only the United States can enforce the FDCA.  21 U.S.C. § 337(a).

source of any burden on the religious or conscientious scruples of pharmacists. The source is state law or private arrangements. The FDA Decision does not require that any pharmacy stock, or that any pharmacist dispense, Plan B. The expression, "alters the legal regime," appears in *Bennett v. Spear*, 520 U.S. 154, 169 (1997). There, however, the Court referred to agency action that has a "determinative or coercive effect upon the action of someone else." *Id.* The FDA Decision has no such effect on anyone. It does not determine (i) that any consumer will use Plan B or obtain it without first consulting a physician; (ii) that any physician will prescribe it; or (iii) that any pharmacy will sell it, or that any pharmacist will have anything to do with it.

Two recent lawsuits show that this attack on the FDA Decision is misguided. In *Menges v. Blagojevich*, 451 F. Supp.2d 992 (C.D. Ill. 2006), pharmacists alleged that an Illinois rule requiring them to dispense Rx emergency contraceptives violated their religious beliefs. *See id.* at 996. The lawsuit was settled by an agreement under which a pharmacist opposed to filling a prescription for an emergency contraceptive may have another pharmacist or pharmacy do so. *See* Ex. 1. Similarly, a district court has held, on a motion for preliminary injunction, that pharmacists have a right to refuse to sell Plan B if they refer consumers to a nearby source. *See Stormans, Inc. v. Selecky*, No. C07-5374RBL (W.D. Wash. Nov. 8, 2007) (Ex. 2).

These lawsuits confirm that pharmacists are not harmed by the FDA Decision. First, because the Illinois rule applied to Plan B only as an Rx drug, the FDA Decision reduced the problem the rule presented to the plaintiff pharmacists, as *Menges* noted, 451 F. Supp.2d at 996 n.1. Thus, the relief sought here, a return of Plan B to Rx status for all women, would worsen the problem the Illinois pharmacists sued about. *See Nat'l Maritime Union v. Commander, Military Sealift Command*, 824 F.2d 1228, 1231 n.4 (D.C. Cir. 1987) (denying standing where the asserted interest would be harmed by the relief sought). Thus, the assertion that "[p]laintiffs'

prevailing here would free members from state-law (or employers') compulsion to distribute it," Opp. 20, is wrong. Second, neither lawsuit involved the FDA Decision in any way. The cases show that States, not FDA, regulate pharmacists. Third, the Illinois settlement, Walgreens's accommodation policy, *see Menges*, 451 F. Supp.2d. at 998, and the Washington injunction show that religious objections can be accommodated while the FDA Decision remains in effect.[8]

*National Parks Conservation Ass'n v. Manson*, 414 F.3d 1 (D.C. Cir. 2005), cited at Opp. 20, 21 is distinguishable, and so does not support standing for pharmacists here. There, a state agency was <u>required</u> by federal law to consider a federal determination and to justify any decision to reject it. The plaintiffs alleged impropriety in the federal determination.[9] Here, the FDA Decision does not impose any mandate or burden on any state agency or private party. It does not require pharmacies to stock Plan B or individual pharmacists to dispense it.

<u>Alleged Administrative Burden</u>. Plaintiffs claim increased administrative burdens, but neither the FAC nor the Opposition, nor any of its exhibits, identifies those burdens or explains why dispensing Plan B OTC is more burdensome than dispensing it Rx.

**E.     Plaintiffs Do Not Have Prudential Standing.**

**1.     Plaintiffs' Claims on Behalf of Physicians and Pharmacists Are Outside the Zone of Interests of § 353(b).**

Plaintiffs' contention that the FDCA furthers the interests of physicians and pharmacists, as well as consumers, Opp. 15-16, does not support their zone-of-interest argument. Plaintiffs

---

[8] Thus, even if pharmacists had standing on this ground, they could not sue under the APA because they have an alternative legal remedy – bringing private suits to challenge requirements that they dispense Plan B. *See National Wrestling Coaches Ass'n v. Dep't. of Educ.*, 366 F.3d 930, 945 (D.C. Cir. 2004) (availability of private cause of action constitutes an adequate remedy under section 704 of the APA, and therefore bars judicial review.

[9] It was <u>undisputed</u> in *National Parks* that the plaintiffs' members had suffered injury. 414 F.3d at 4. Here, Duramed disputes plaintiffs' unsupported allegation that "members" have suffered injury.

must, but cannot, show that § 353(b) protects the <u>particular interests</u> of physicians and pharmacists asserted here. "The proper inquiry is simply whether <u>the interest sought to be protected by the complainant</u> is arguably within the zone of interests to be protected . . . by the statute." *National Credit Union Admin. v. First Nat'l Bank & Trust Co.*, 522 U.S. 479, 492 (1998) (emphasis and internal quotations omitted; emphasis added); *American Friends Serv. Comm. v. Webster*, 720 F.2d 29, 52 (D.C. Cir. 1983) ("It is now the settled law of this circuit that 'the "zone" test is supposed to focus on "the interest asserted by a party in the particular instance."').[10] Section 353(b) does not protect the economic interest of physicians in obtaining fees from consumers or the interests of pharmacists in avoiding increased risk of liability, involvement with particular drugs they find objectionable, and administrative burdens.

Section 353(b) seeks (i) a balance between consumers' interest in access OTC where medical supervision is unnecessary and their interest in access Rx where such supervision is necessary, and (ii) clarity in labeling as to when a drug is to be dispensed Rx or OTC. On behalf of physicians and pharmacists, plaintiffs allege entirely different interests (maximization of physicians' fees; for pharmacists, avoidance of liability, involvement with drugs they object to, and administrative burdens). Plaintiffs systematically favor Rx over OTC availability – regardless of the need for medical supervision in the use of Plan B. Thus, all of the interests plaintiffs assert here on behalf of physicians or pharmacists are outside the interests protected by § 353(b) and other relevant FDCA provisions. Those asserted interests are not "relevant factors," for decision-making under § 353(b). *See Citizens to Preserve*

---

[10] Prudential standing requirements apply to cases brought under APA § 702. *See, e.g.*, *Clark v. Securities Indus. Ass'n*, 479 U.S. 388, 394-96 (1987); *Liquid Carbonic Indus. Corp. v. FERC*, 29 F.3d 697, 702 (D.C. Cir. 1994) (dictum). Contrary to Opp. 15, the FDA has no authority to waive jurisdictional requirements created by the courts, or even to file a brief in court (where it must be represented by the Department of Justice, 28 U.S.C. § 516, which has not tried to waive the requirements for prudential standing).

*Overton Park, Inc. v. Volpe*, 401 U.S. 402, 416 (1971) (when reviewing agency action under

the "arbitrary [and] capricious" standard, "the court must consider whether the decision was

based on a consideration of the relevant factors").[11]

     *Hazardous Waste Treatment Council v. EPA*, 861 F.2d 277 (D.C. Cir. 1988) (*per*

*curiam*), rejected a theory of prudential standing indistinguishable from the FAC's theory as to

physicians.  There, a trade association alleged that "EPA's regulations [we]re not comprehensive

and strict enough to comply fully with the controlling statute, RCRA."  *Id.* at 280.  Certain of

plaintiffs' members "claim[ed] that the asserted laxity of the regulations will diminish the market

for their high-tech control services."  *Id.* at 281.  The court rejected the claim under the zone-of-

interest test because there was no evidence of congressional intent to improve the competitive

position of recyclers, and "[a] firm has no common law interest, much less a constitutional one,

in having government drive business its way."  *Id.* at 285; *see also Sierra Club v. EPA*, 292 F.3d

895, 903 (D.C. Cir. 2002) (similar analysis); *Calumet Indus., Inc. v. Brock*, 807 F.2d 225 (D.C.

Cir. 1986) (same).  Similarly here, on behalf of physicians, plaintiffs assert that the FDA should

regulate Plan B more strictly by keeping it Rx for all users, and that the FDA's doing so will

drive business their way.  However, "one cannot base standing on one's mere status as an

economic beneficiary of government regulation of others."  *First Nat'l Bank & Trust Co. v.*

*National Credit Union Admin.*, 988 F.2d 1272, 1278 (D.C. Cir. 1993).  *Cf. Diamond v. Charles*,

476 U.S. 54 (1986) (pediatrician lacks standing to defend abortion law on theory it would lead to

more patients).

     *Amgen, Inc. v. Smith*, 357 F.3d 103 (D.C. Cir. 2004), cited at Opp. 16, weighs against

prudential standing here.  There, the court held that the zone-of-interests test excludes "only

---

[11] Plaintiffs' allegations of consumer interests fail the test for Article III standing for the reasons
stated at pp. 4-7, *supra*.

those parties whose interests are not consistent with the purposes of the statute in question."
*Amgen*, 357 F.3d at 109 (internal quotations omitted).  The interests of physicians and pharmacists asserted here are excluded by that test.  "[T]he concern that the plaintiff be 'reliable' carries over to the 'zone of interest' inquiry, which seeks to exclude those plaintiffs whose suits are more likely to frustrate than to further statutory objectives."  *Clarke v. Securities Indus. Ass'n*, 479 U.S. 388, 397 n.12 (1987); *First Nat'l Bank & Trust Co.*, 988 F.2d at 1275.  Because they are systematically biased against OTC status, the claims for physicians and pharmacists are likely to frustrate statutory objectives, and these plaintiffs are not "reliable."

### 2. Plaintiffs Are Not "Suitable Challengers" Within the Zone.

Plaintiffs argue that, even if they are not intended beneficiaries, they are "suitable challengers."  Opp. 17.  They are not.  The test for "suitable challenger[]" status is whether the interests asserted "are sufficiently congruent with those of the intended beneficiaries that the litigants are not more likely to frustrate than to further the statutory objectives."  *First Nat'l Bank & Trust Co.*, 988 F.2d at 1275 (internal quotations omitted).  Plaintiffs fail this test.  They oppose the interest of consumers in avoiding unnecessary obstacles, delays, and medical costs in obtaining Plan B.  Their bias against OTC status would distort the balance between Rx and OTC status § 353(b) is intended to protect.  Plaintiffs also claim to represent what they regard as conflicting interests among physicians, pharmacists, and consumers.  These conflicting interests make plaintiffs less than reliable private attorneys general with respect to the interests to be served by the relevant provisions of the FDCA.  *See Hazardous Waste Treatment Council v. Thomas*, 885 F.2d 918, 923-27 (D.C. Cir. 1989).[12]

---

[12] Plaintiffs cite *National Lime Ass'n v. EPA*, 233 F.3d 625 (D.C. Cir. 2000), for the proposition that "[a]n association may sue on behalf of any one of its members, notwithstanding that that member's interest conflicts with the interests of other members."  Opp. 8.  The conflict here, however, is much more serious than the one in *National Lime*.  There, the association asserted on

A fortuitous coincidence of plaintiffs' interests and those intended to be served by Section 353(b) does not make plaintiffs suitable challengers. "A party is a suitable challenger if its interests align systematically, not fortuitously, with the interests of those whom Congress intended to protect." *Liquid Carbonic Indus. v. FERC*, 29 F.3d 697, 705 (D.C. Cir. 1994).

FRC's interests in "valuing human life from conception until natural death and upholding the institutions of the family, including parental oversight of children's health care," FAC ¶ 5, are not even arguably protected by § 353(b). Similarly, the interests of "private medicine" and the other alleged interests of AAPS, FAC ¶ 3, are also not among those protected by § 353(b). AAPS's economic interests on behalf of physicians are <u>contrary</u> to the interest of § 353(b) in making available OTC those drugs that can be used safely and effectively without a prescription. Any coincidence between FRC's or AAPS's interests and those protected by § 353(b) would be fortuitous. Therefore, they are not appropriate parties to "police the interests that the statute protects," *Grand Council of the Crees*, 198 F.3d at 958. SDW's interest in "rational and safe health-care policies," is too general to be a basis for standing. *See American Trucking Ass'ns v. Dep't of Transp.*, 166 F.3d 374, 386 (D.C. Cir. 1999) (no standing where organizational interest in "just and efficient administration of federal highway safety statutes" was too general); *Mussington v. St. Luke's-Roosevelt Hosp. Ctr.*, 824 F. Supp. 427, 431 (S.D.N.Y. 1993) ("[T]wo of the organizations have purposes too broad to confer standing . . . ."), *aff'd*, 18 F.3d 1033 (2d Cir. 1994). Moreover, SDW's pharmacists' religious objections to Plan B cannot be congruent with the interests to be served by § 353(b) because, if they were, § 353(b) would be intended to serve a religious interest, in violation of the Establishment Clause. The FAC fails to allege any

---

behalf of some of its members a position that might harm the interests of other members. Here, the same lawyer is advocating <u>in this case</u> the mutually conflicting interests of physicians, pharmacists, and consumers. Nothing in *National Lime* supports that posture.

organizational interests of CWA.  FAC ¶ 4.

In sum, the FAC's allegations do not make any plaintiff here a "suitable challenger."

### 3.    The *Ultra Vires* Doctrine Does Not Apply Here.

Plaintiffs argue that they need not show prudential standing because the FDA Decision was *ultra vires*.  Opp. 17-18, 26-27.  Plaintiffs, however, cite no constitutional or statutory law that limits the FDA's jurisdiction in order to protect them (and thus give them prudential standing).[13]  Also, the FAC does not allege that the FDA Decision is *ultra vires*.  It alleges that FDA committed factual, legal, and procedural errors, but not that the FDA asserted jurisdiction over a subject matter as to which it has none.  *Michigan v. EPA*, 268 F.3d 1075, 1080 (D.C. Cir. 2001), cited at Opp. 27, is distinguishable.  There, Michigan claimed that the EPA had asserted jurisdiction over an area – Indian country status – that was alleged to be outside its jurisdiction.

In *Larson v. Domestic & Foreign Commerce Corp.*, 337 U.S. 682, 689 (1949), cited at Opp. 26, the question was whether the district court had jurisdiction.  The Court held that, even though the lawsuit was nominally against the administrator, the relief sought was actually against the United States, and therefore the district court lacked jurisdiction.  The Court stated that an officer's action is *ultra vires* if the officer "lack[ed] delegated power" to take the action.  *Id.* at 689-90.  Allegations that an officer acted "illegally" and that his action was "unauthorized" were not allegations of "lack of delegated power."  *Id.* at 691.  "There is . . . nothing in the law of agency which lends support to the contention that an officer's tortious action is *ipso facto* beyond his delegated powers."  *Id.* at 695.  In sum, mere illegality (other than a lack of delegated power)

---

[13] Plaintiffs misread the dictum in *Haitian Refugee Ctr.*, 809 F.2d at 811 n.14, quoted at Opp. 17. The court stated merely that the zone of interests relevant to an *ultra vires* challenger is that of the constitutional or statutory provision the challenger claims was violated, not that of the provision the government claims authorized the action challenged.  The court held that all the challengers lacked prudential standing.  *Id.* at 796 n.1, 807-16.  *Chiles v. Thornburgh*, 865 F.2d 1197, 1210-11 (11th Cir. 1989), cited at Opp. 17, follows the analysis in *Haitian Refugee Center*.

does not render an agency's action *ultra vires*.

Thus, the general allegations that the FDA's regulations requiring exhaustion "exceed Defendants' authority," FAC ¶¶ 133, 134, do not allege that the regulations are *ultra vires*. There is no allegation that the FDA lacks delegated power to prescribe regulations relating to exhaustion. Plaintiffs cite no support for the view that a federal agency lacks power to classify a remedy it provides as mandatory or optional for purposes of exhaustion, as plainly contemplated in *Darby v. Cisneros*, 509 U.S. 137, 146 (1993) ("the doctrine of exhaustion of administrative remedies [is limited] to that which the statute <u>or rule clearly mandates</u>" (emphasis added)).

Finally, even an allegation of *ultra vires* action could not make inapplicable the requirements for Article III standing, which plaintiffs fail to satisfy, *see* pp. 1-11, *supra*.

### 4. Plaintiffs Cannot Sue on Behalf of Their Members' Patients or Consumers Generally, or Other Third Parties.

AAPS's effort to sue on behalf of its members' patients fails. Plaintiffs cite, and we have found, no case that upholds standing for an organization to sue not on behalf of its own members (where they lack standing in their own right) but on behalf of parties related in some way to the members. Moreover, plaintiffs cannot bring a claim on behalf of unnamed, hypothetical claimants, particularly women who allegedly incur harm because they do <u>not</u> establish, or do <u>not</u> maintain, a patient-doctor relationship with member physicians. *American Immigration Lawyers Ass'n v. Reno*, 199 F.3d 1352, 1357 (D.C. Cir. 2000) (no standing where organization sought "to vindicate the rights of unnamed third parties" who were not its members). Although, in some very limited circumstances, a litigant has *jus tertii* standing to sue on behalf of someone else – namely, where the litigant has a special relationship with the person whose right the litigant seeks to assert <u>and</u> that person is unlikely to be able to assert the right on her own, *see Kowalski v. Tesmer*, 543 U.S. 125, 130 (2004) – those circumstances are not present here.

17

First, plaintiffs and member physicians have <u>no</u> relationships with <u>potential</u> patients of the members. Plaintiffs also have no direct relationship with any patients. As to this lawsuit, current patients of members are not third, but fourth, parties (and parents of patients are fifth parties). Even an individual physician could not make the claims made here on behalf of patients. *See Tileston v. Ullman*, 318 U.S. 44 (1943) (*per curiam*), discussed in *Eisenstadt v. Baird*, 405 U.S. 438, 443 n.4 (1972). Physicians have "close and confidential relationships" with their patients. Ritter Decl. ¶ 9. Those patients have no injury because in that relationship the physicians can give their patients whatever information the patients need. The FDA Decision does not prevent them from doing so. Finally, plaintiffs cite, and we have found, no case upholding a right of vendors to assert the interests of consumers where the vendors sought legal compulsion of consumers to patronize the vendors in order to obtain a good or service.

Second, as to consumers' ability to assert their own rights, plaintiffs' claim that the prospect of being deposed makes them unwilling to sue, Joseph Decl. ¶ 5, is insufficient. The test is not whether consumers are <u>unwilling</u> to assert their rights, but whether they are <u>unable</u> to. *See Goodman v. FCC*, 182 F.3d 987, 992 (D.C. Cir. 1999) ("some hindrance to the third party's ability to protect his or her own interests" (quotations omitted)). If consumers can sue to assert abortion rights, *see, e.g.*, *Roe v. Wade*, 410 U.S. 113 (1973), they can sue as to Plan B.

Plaintiffs also claim that individuals will have "little incentive" to bring suit because of the "small financial stake involved." Opp. 19. That claim is flatly contradicted by the fact that a number of individuals have filed suit against the FDA regarding the FDA Decision – without any financial gain to be had – in the Eastern District of New York. *See Tummino v. Von Eschenbach*, No. 05-366, Fifth Amended Complaint (E.D.N.Y. 2007) (Ex. 3). As is common in such cases, the individuals are represented by public interest law firms, presumably *pro bono*. *See id.*

18

Plaintiffs' argument that some consumers may not be aware of their potential injuries also fails. Opp. 19. If member physicians have "close and confidential" relationships with their patients, the members can impart the necessary information through that relationship.

### 5. The FAC's Allegations of Procedural Injury Are Deficient.

Plaintiffs' alleged procedural injury is insufficient for standing because the FAC fails to allege a concrete injury in fact. *See* Mem. 4 n.5. *Lujan v. Defenders of Wildlife*, quoted at Opp. 13, made plain that the showing of injury necessary for a procedural-rights plaintiff to have standing must include "a 'particularized injury' resulting from the government's substantive action that breached the procedural requirement." *Florida Audubon Soc'y v. Bentsen*, 94 F.3d 658, 668-69 (D.C. Cir. 1996) (*en banc*); *see also Lujan*, 504 U.S. at 573 n.8. "[T]hough the plaintiff in a procedural-injury case is relieved of having to show that proper procedures would have caused the agency to take a different substantive action, the plaintiff must still show that the agency action was the cause of some redressable injury to the plaintiff." *Renal Physicians Ass'n v. DHHS*, 489 F.3d 1267, 1279 (D.C. Cir. 2007).

It is not enough for plaintiffs to allege that they would have participated in a rulemaking had the FDA conducted one. That claim could be made by any member of the public. Instead, as to each plaintiff, the FAC must allege that the FDA Decision caused the plaintiff (or a member) a particularized concrete injury that is redressable by the relief sought. The FAC fails to do that.

### F. Conclusion: Plaintiffs Lack Standing as to Any Count.

Only consumers of Plan B who suffer concrete injury would have standing as to Count I ("Unsafe for OTC Distribution"), and the FAC fails to allege that any plaintiff has such a consumer as a member. The FAC fails to allege that anyone has suffered a concrete injury that is relevant to Count I, Count II ("Unlawful Dual Rx/OTC Approval"), III ("Unlawful Bifurcation

by Age"), or IV ("Unlawful Third Class of Drug"). For example, there is no allegation that anyone has been injured, or is in imminent danger of being injured, by the simultaneous availability of Plan B Rx to one age group and OTC to another. The FAC fails to allege any concrete injury to anyone that allegedly suffered a procedural injury within the scope of Count V ("Failure to Convene APA Rulemaking"), VI ("Failure to Convene FFDCA Rulemaking"), or VII ("Unlawful Political Pressure"). Moreover, no plaintiff was a party to the proceeding to which Count VII relates. Finally, the FAC fails to allege any concrete injury to these plaintiffs that is relevant to Count VIII ("Unauthorized Administrative Exhaustion"). In sum, when standing is analyzed plaintiff by plaintiff and Count by Count, these plaintiffs lack both Article III and prudential standing.

## II.    PLAINTIFFS MUST EXHAUST FDA'S MANDATORY REMEDY.

The rule that there is "no duty to exhaust optional remedies unless the disputed agency action remains inoperative during that further administrative process," Opp. 29, is irrelevant here because the remedy plaintiffs bypassed is mandatory. Plaintiffs were not parties to the proceeding that led to the FDA Decision. To non-parties, FDA offers a mandatory remedy to challenge prior agency action: a citizen petition, 21 C.F.R. §§ 10.25(a), 10.45(b) (2007). Plaintiffs must exhaust that remedy. *Woodford v. Ngo,* 126 S. Ct. 2378, 2384-85 (2006) ("The doctrine of exhaustion . . . is well established in the jurisprudence of administrative law. The doctrine provides that no one is entitled to judicial relief for a supposed or threatened injury until the prescribed administrative remedy has been exhausted." (citation and quotations omitted)).

The quotation from 5 U.S.C. § 704, Opp. 29, concerns only the requirement of exhaustion by a <u>party</u> to an administrative proceeding. Section 704 does not apply here – to non-parties that seek to challenge a prior agency action, and does not exempt them from the requirement to exhaust the remedy an applicable agency rule mandates. *Darby*, 509 U.S. at 146. Section 704 is

irrelevant to the question whether plaintiffs, strangers to the proceeding that led to the FDA

Decision, can obtain judicial review of it without exhausting the remedy mandated by the FDA.

The purposes of the exhaustion requirement and the proper functioning of agencies would be

undermined if non-parties could go directly to court with new arguments challenging agency

decisions in proceedings in which they were not parties.  The orderly conduct of agency business

would be disrupted, agencies would have no opportunity to address the new arguments, and the

courts would have no record reflecting application of the agency's expertise to those arguments.

   *Darby*, discussed at Opp. 30, does not help plaintiffs.  The Darby parties had been parties

in the administrative proceeding that led to the agency action they challenged in court, but they

had bypassed an opportunity for further agency review that the agency's regulations made

optional.  The Court held merely that such parties could not be required to exhaust an <u>optional</u>

remedy.  "<u>When an aggrieved party has exhausted all administrative remedies expressly</u>

<u>prescribed</u> by statute or agency rule, the agency action is 'final for the purposes of [§ 704]' and

therefore 'subject to judicial review' . . . ."  509 U.S. at 146 (emphasis added) (quoting § 704).

Here, plaintiffs were <u>not parties</u> to the proceeding that led to the FDA Decision, and have not

exhausted <u>any</u> administrative remedy.  *Darby* also held that § 704 "has limited the availability of

the doctrine of exhaustion of administrative remedies to that which the statute or rule clearly

mandates."  *Id.* at 146.  The APA's exhaustion requirement plainly survives *Darby*.  *See Hershey*

*Foods Co. v. Dep't of Agric.*, 293 F.3d 520, 527 (D.C. Cir. 2002).  As *Darby* contemplates, 21

C.F.R. § 10.45(b) "clearly mandates" exhaustion by non-parties such as plaintiffs.[14]

---

[14] *Ohio v. EPA*, 838 F.2d 1325 (D.C. Cir. 1988), cited at Opp. 32 n.14, holds only that an
exception to the exhaustion requirement applies where the issues the plaintiff raises in court were
previously raised by other parties, and the agency had an opportunity to consider them in the
administrative proceeding that led to the decision the plaintiff challenges.  Here, that exception is
inapplicable because plaintiffs seek to raise new issues.  No administrative record is needed to

Plaintiffs' reliance on *Avocados Plus Inc. v. Veneman*, 370 F.3d 1243 (D.C. Cir. 2004), Opp. 31, is also misplaced. None of the three purposes of exhaustion, 370 F.3d. at 1247, has been satisfied here. The FDA has not had an opportunity to correct the errors plaintiffs allege or to apply its expertise to the new arguments plaintiffs advance here for the first time, and no administrative record of the FDA's consideration of those arguments exists. The current administrative record is of the proceeding on the sNDA. There is no administrative record on plaintiffs' challenges for the Court to review because plaintiffs have never submitted those challenges to the FDA.

Plaintiffs' argument that the exhaustion requirement should be waived because litigation will ensue however the FDA decides, Opp. 31, also fails. There is no way to predict whether the controversy would survive further FDA review. "[E]ven where a controversy survives administrative review, exhaustion of the administrative procedure may produce a useful record for subsequent judicial consideration." *McCarthy v. Madigan*, 503 U.S. 140, 145 (1992).[15]

## III.    PLAINTIFFS FAIL TO SAVE COUNTS II AND IV-VI.

### A.    Count IV Should Be Dismissed:  Plan B Is Not a "Third Class" of Drug.

Plaintiffs' allegation that Plan B is a third category of drug is wrong. That Plan B is available only in pharmacies and other medical facilities and is kept behind the counter rather than on open shelves accessible to consumers is fully explained by the fact that, at all times, it is subject to a prescription limitation under § 353(b)(1). In this respect, it is like all other drugs

---

determine that plaintiffs seek to raise new issues: it is inconceivable that the FDA or Duramed (the only parties to the administrative proceeding on Duramed's sNDA) would have argued, *e.g.*, that a separate rulemaking is required for every Rx-to-OTC switch, that improper political pressure was applied to the FDA, or that the FDA's exhaustion regulations are invalid).

[15] *Woodford*, which reaffirmed the exhaustion doctrine last year, shows that plaintiffs' argument that the doctrine violates the First Amendment is frivolous. No one is denying plaintiffs their right to petition the courts; they must first exhaust an available administrative remedy.

subject to such a limitation.  There is no third class of drugs at issue here.

**B.    Count V Should Be Dismissed:  No Rulemaking Is Needed for an Agency To Change Its Interpretation of a Statute.**

Count V is contrary to the settled rule that no rulemaking is needed for an agency to change its interpretation of a statute.  *See* Mem. 41-43.  *Croplife Am. v. EPA*, 329 F.3d 876 (D.C. Cir. 2003), cited at Opp. 45, is not to the contrary.  That an EPA directive in a press release can amount to a regulation is irrelevant to whether the FDA's use of the term "meaningful difference" in interpreting Section 353(b)(1) amounts to a regulation.  The FDA's use of "meaningful difference" is merely interpretive, and binds no one.  *See* Mem. 43-44.

**C.    Counts II and VI Should Be Dismissed:  Plaintiffs Misconstrue § 353(b)(3).**

Plaintiffs argue that, under § 353(b)(3), the FDA may remove a drug from Rx status only "by regulation."  Opp. 39-40.  That provision does not apply here, however, because, at all times and as to every unit – even one dispensed OTC – Plan B remains subject to "the requirements of paragraph (1)" in that it is not to be dispensed without a prescription to a consumer under age 18.  Because the FDA has not "remove[d Plan B] from the requirements of paragraph (1)," § 353(b)(3), that provision does not require a rulemaking.[16]

Section 353(b)(1)(B) provides for limitation to Rx status by an approved application.  Applications are approved without regulations.  *See* 21 U.S.C. § 355(c).  Nothing in the statute requires a regulation for a change in an approved application (*e.g.*, a change as to Rx status).  The FDA decision changed Plan B's Rx-OTC status by changing its approved application.

Even if § 353(b)(3) applied here and required a regulation, it would not support Counts II

---

[16] Plaintiffs' argument that Plan B is misbranded is based on a misapplication of 21 C.F.R. § 310.200(d), which provides that a prescription legend is not allowed on exempted (*i.e.*, OTC drugs).  Plan B – the "drug" – has <u>not</u> been exempted; only dispensing of it to a subclass of potential users (those age 18 or older) has been exempted.  The prescription caution statement in Plan B's labeling is entirely true and not misleading.  Therefore, there is no misbranding.

and VI. Title 21 C.F.R. § 310.200 would be the required regulation. Mem. 24-26. The cases cited at Opp. 39 are distinguishable. In each, the agency failed to do what a statute required. *See Ethyl Corp. v. EPA*, 306 F.3d 1144, 1149 (D.C. Cir. 2002); *MST Express v. Dep't of Transp.*, 108 F.3d 401, 402 (D.C. Cir. 1997)    Here, the FDA has complied with § 353(b)(3).

Plaintiffs argue that § 310.200 is insufficient because the FDA must conduct a separate rulemaking every time it removes a drug from the requirements of § 353(b)(1). Nothing in the statute's text or legislative history mandates that result. Plaintiffs rely on a version of § 310.200 in effect before 1977. The FDA amended § 310.200, however, by deleting, in a rulemaking, the provisions plaintiffs rely on. *See* 42 Fed. Reg. 4680, 4714 (Jan. 25, 1977). Count VI cannot be upheld on the basis of provisions deleted from a regulation more than 30 years ago.

The FDA may change its interpretation of a <u>statute</u> without notice and comment. Mem. 41-43 (citing authorities). Agencies are encouraged to change their interpretations of statutes as new circumstances may warrant. *See*, *e.g.*, *Chevron U.S.A. Inc. v. NRDC*, 467 U.S. 837, 863-64 (1984). FDA did not, as argued at Opp. 43, change its interpretation of a <u>regulation:</u> it changed the regulation, itself. During the ensuing decades, FDA has applied its statutory interpretation in removing hundreds of drugs from the requirements of § 353(b)(1) by approving sNDAs without rulemakings. Mem. 45. Were plaintiffs' argument to prevail, the legal status of those drugs would become uncertain; and the confusion § 353(b) was intended to end would be recreated.[17]

### D.    Plaintiffs' Argument that No Deference Is Owed the FDA Decision at *Chevron* Step 2 Fails Because No Improper Political Pressure Is Alleged.

Plaintiffs' statutory counts should be dismissed because they fail at step one of *Chevron*. Mem. 23-26. At step two, the FDA's interpretation also prevails. Plaintiffs argue against

---

[17] *United States v. Wilson*, 290 F.3d 347, 359 (D.C. Cir. 2002), cited at Opp. 42, is distinguishable. There, the court was interpreting an ambiguous statute. Here, there is no ambiguity: FDA in 1977 deleted the provisions that plaintiffs now rely on.

deference at step two because the FDA Decision resulted from political pressure.  They are

wrong.  Duramed filed an amended sNDA on July 21, 2004.  FAC ¶ 70.  The FDA was required

to act on the sNDA within 180 days, *i.e.*, by January 17, 2005.  *See* 21 U.S.C. § 355(c)(1).  When

the FDA had not done so, in March 2006, two U.S. Senators placed a hold on the nomination of

a new FDA Commissioner until the FDA made a decision on the sNDA.  FAC ¶¶ 73-74.  The

FAC does not allege that the Senators sought to influence the substance of the decision.

The cases cited at Opp. 34 do not support a refusal to defer here.  In each one, a Member

of Congress attempted to influence the <u>substance</u> of the agency decision.[18]  Even then, *Sierra*

*Club* and *ATX* found no impropriety.  "We are concerned [only] when congressional influence

shapes the agency's determination of the merits."  *ATX*, 41 F.3d at 1528.  The FAC does not

allege that such "shap[ing]" occurred, or was even attempted, here.

## CONCLUSION

For the foregoing reasons, the Court should dismiss the FAC with prejudice.

Respectfully submitted,

  /s/ Richard M. Cooper
Richard M. Cooper (# 92817)
Ana C. Reyes (# 477354)
WILLIAMS & CONNOLLY LLP
725 Twelfth Street, N.W.
Washington, DC  20005
(tel.) (202) 434-5466
(fax) (202) 434-5470
rcooper@wc.com
areyes@wc.com

*Counsel for Defendant Intervenor,*
Dated:  Nov. 15, 2007                    *Duramed Pharmaceuticals, Inc.*

---

[18] *See D.C. Fed'n of Civic Ass'ns v Volpe*, 459 F.2d 1231, 1245 (D.C. Cir. 1972); *Koniag, Inc.,*
*Vill. of Uyak v. Andrus*, 580 F.2d 601, 610 (D.C. Cir. 1978); *ATX, Inc. v. Dep't of Transp.*, 41
F.3d 1522, 1527 (D.C. Cir. 1994); *Sierra Club v. Costle*, 657 F.2d 298, 409 (D.C. Cir. 1981).

EXHIBIT
1
JOINT MOTION TO STAY

IN THE UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF ILLINOIS
SPRINGFIELD DIVISION

JOHN MENGES, GAYLORD RICHARD )
QUAYLE, CAROL MUZZARELLI, KELLY )
HUBBLE, MELANIE ANTUMA, JIM LYNCH )
and AMANDA VARNER, )
                                    )
         Plaintiffs, )
                                      )       No. 05-3307
WALGREENS, )
                                      )
         Intervenor-Plaintiff, )
                                      )
     -vs- )
                                      )
ROD R. BLAGOJEVICH, Governor; )
DEAN MARTINEZ, Secretary of the Illinois )
Department of Financial and Professional )
Regulation; and DANIEL E. BLUTHARDT, )
Director of the Illinois Division of Professional )
Regulation, in their official capacities, )
                                      )
         Defendants. )

## MUTUAL AGREEMENT AND UNDERSTANDING

         This Mutual Agreement and Understanding ("Agreement") is entered into by and among Walgreen Co. ("Walgreens"), and the Illinois Department of Financial and Professional Regulation (the "Department"), on behalf of itself and, in their official capacities, of Dean Martinez, Secretary of the Department, Daniel Bluthardt, Director of the Department's Division of Professional Regulation, and Governor Rod Blagojevich, in his official capacity (hereinafter jointly referred to as the "Parties" and each as a "Party").

         WHEREAS, the Department promulgated a Rule pursuant to the Illinois Pharmacy Practice Act of 1987, 225 ILCS 85/1, codified at 68 Ill. Admin. Code § 1330.91(j) (the "Rule"), which states in relevant part that: "Upon receipt of a valid, lawful prescription for a contraceptive, a pharmacy must dispense the contraceptive, or a suitable alternative permitted by the prescriber, to the patient or the patient's agent without delay, consistent with the normal time frame for filling any other prescription";

         WHEREAS, the Department has filed two administrative complaints against Walgreens, No. 2005042531 and No. 2005049071, for alleged violations of the Rule in the dispensing of Plan B emergency contraception (the "Administrative Actions");

WHEREAS, John Menges, Gaylord Richard Quayle, Carol Muzzarelli, Kelly Hubble, Melanie Antuma, James Lynch and Amanda Varner (collectively, the "Individual Plaintiffs") filed an action against the Department and certain other State defendants (collectively, the "Defendants") in the United States District Court for the Central District of Illinois captioned <u>Menges, et al. v. Blagojevich, et al.</u>, No. 05-3307, alleging violations of rights protected by the laws of the United States, which action Walgreens joined as a Third-Party Plaintiff/Intervener (the "Federal Action");

WHEREAS the Defendants have denied that said Rule and their promulgation thereof violated any of Walgreens' or the Individual Plaintiffs' rights;

WHEREAS, recent action taken by the Food and Drug Administration permits the over-the-counter sale of Plan B emergency contraception to individuals age 18 and older without a prescription, which changes the manner in which such emergency contraceptives are distributable to the public in the vast majority of circumstances;

WHEREAS, the Parties desire to work towards a long-term solution that would: (i) facilitate the dispensing of emergency contraception within a reasonable timeframe, (ii) ensure the safety of the public, and (iii) address the concerns that the Department's Rule be applied without conflict with applicable laws;

WHEREAS, to avoid further expense and in recognition of the positions of the Parties as stated herein and in the Federal Action and Administrative Actions (hereinafter collectively referred to as the "Pending Actions"), the Parties desire to reach an agreement to settle and compromise their claims against each other in the Pending Actions, thereby terminating their claims in the Pending Actions; and

WHEREAS, contemporaneously with the Parties' execution of this Agreement, the Individual Plaintiffs and the Defendants are entering into a Mutual Agreement and Understanding (the "Individual Plaintiffs' Agreement") pursuant to which the Individual Plaintiffs are settling and dismissing the Federal Action as well as another action that the Individual Plaintiffs filed against certain Defendants in the Circuit Court of Sangamon County, Illinois, captioned <u>Menges, et al. v. Blagojevich, et al.</u>, No. 06 MR 242, which makes similar allegations under state law to those in the Federal Action (the "Springfield State Action");

NOW, THEREFORE, in consideration of the mutual promises and agreements herein and for other good and valuable consideration, the sufficiency of which is hereby acknowledged, the Parties agree as follows:

## I. COVENANTS BY DEFENDANTS

Promptly following execution of this Agreement, the Department shall dismiss the Administrative Actions against Walgreens with prejudice and without attorneys' fees, costs or expenses. The Department hereby releases Walgreens, its affiliates and their respective employees, agents, attorneys, predecessors, successors and assigns, from all claims, damages and other amounts arising out of the Administrative Actions. The Department further agrees from the date of this Agreement and until January 10th, 2011, to exercise its discretion not to file any

2

action(s) against Walgreens or any of its affiliates for alleged violation of the Rule in any case or instance in which it complies with the procedures in this Agreement.

The Defendants covenant that, within 30 days of the execution of this Agreement, they will file first notice of an Amendment to the aforementioned Rule such that the Rule, as so amended, provides as follows:

*j) Duty of Retail Pharmacy to Dispense Contraceptives*

*1)      Upon receipt of a valid, lawful prescription for a contraceptive, a retail pharmacy serving the general public must dispense the contraceptive, or a suitable alternative permitted by the prescriber, to the patient or the patient's agent without delay, consistent with the normal timeframe for filling any other prescription, subject to the remaining provisions of this subsection (j).  If the contraceptive, or a suitable alternative, is not in stock, the pharmacy must obtain the contraceptive under the pharmacy's standard procedures for ordering contraceptive drugs not in stock, including the procedures of any entity that is affiliated with, owns, or franchises the pharmacy. However, if the contraceptive, or a suitable alternative, is not in stock and the patient prefers, the prescription must be transferred to a local pharmacy of the patient's choice under the pharmacy's standard procedures for transferring prescriptions for contraceptive drugs, including the procedures of any entity that is affiliated with, owns, or franchises the pharmacy.  Under any circumstances an unfilled prescription for contraceptive drugs must be returned to the patient if the patient so directs.*

*2)      Each retail pharmacy serving the general public shall use its best efforts to maintain adequate stock of emergency contraception to the extent it continues to sell contraception (nothing herein prohibits a pharmacy from deciding not to sell contraception). Whenever emergency contraception is out-of-stock at a particular pharmacy, the pharmacist or another pharmacy employee shall attempt to assist the patient, at the patient's choice and request, in making arrangements to have the emergency contraception prescription filled at another pharmacy under the pharmacy's standard procedures for transferring prescriptions for contraceptive drugs, including the procedures of any entity that is affiliated with, owns, or franchises the pharmacy.*

*3)      Dispensing protocol -- In the event that a licensed pharmacist who objects to dispensing emergency contraception (an "Objecting Pharmacist") is presented with a prescription for emergency contraception, the retail pharmacy serving the general public shall use the following dispensing protocol:*

*(a)      All other pharmacists, if any, then present at the location where the Objecting Pharmacist works (the "Dispensing Pharmacy") shall first be asked to dispense the emergency contraception (any pharmacist that does not object to dispensing such medications referred to as a "Non-Objecting Pharmacist").*

*(b)      If there is an Objecting Pharmacist and no Non-Objecting Pharmacist is then available at the Dispensing Pharmacy, any pharmacy (the "Remote Pharmacy") or other Non-Objecting Pharmacist shall provide "remote medication order processing" ("RMOP") to the Dispensing Pharmacy.  RMOP includes any and*

3

*all services that a licensed pharmacist may provide as well as authorizing a non-pharmacist employee at the Dispensing Pharmacy, such as a pharmacy technician or manager, to dispense the emergency contraception to the patient under the remote supervision of a Non-Objecting Pharmacist. For purposes of this subsection (j) and the Pharmacy Practice Act, 225 ILCS 85/1 et seq., a registered pharmacy technician is authorized to engage in RMOP involving emergency contraception.*

(1) *All Remote Pharmacies and other Non-Objecting Pharmacists providing RMOP shall be licensed by the State of Illinois.*

(2) *There shall be a secure, HIPAA-compliant, electronic communication system that shall include, but not necessarily be limited to, telephone and/or facsimile connections that allows communication between the Remote Pharmacy or other Non-Objecting Pharmacist and the Dispensing Pharmacy. Any electronic communication system allowing the Remote Pharmacy or other Non-Objecting Pharmacist providing RMOP to access a patient's emergency contraception prescription information and the National Drug Code number for the emergency contraception being dispensed shall constitute and be considered a sufficient communication system that is compliant with this subsection (j) and the Pharmacy Practice Act for purposes of RMOP involving emergency contraception. RMOP shall not be considered, or be subject to the requirements applicable to, telepharmacy as defined in the Pharmacy Practice Act or Department rules.*

(3) *Nothing in this Paragraph shall otherwise relieve the pharmacist-in-charge of each participating Remote Pharmacy and Dispensing Pharmacy, or other Non-Objecting Pharmacist, of compliance with the Pharmacy Practice Act and the Administrative Code, provided that compliance with the protocols in this section shall be considered by the Department to be in compliance therewith.*

(4) *Recordkeeping Requirements -- A policy and procedure manual (which may be maintained in electronic form) shall be maintained by each participating Dispensing and Remote Pharmacy that is accessible to each Non-Objecting Pharmacist pertaining to the pharmacy's or pharmacist's (as applicable) operations with respect to RMOP. Such RMOP policies and procedures need not be contained in a stand-alone manual applicable solely to RMOP, but rather may be incorporated as part of any existing pharmacy policy and procedure manual that any pharmacy or pharmacist performing RMOP can access. The manual shall:*

(i) *Be accessible to each participating Dispensing and Remote Pharmacy's staff, or other Non-Objecting Pharmacists, who are involved in RMOP and dispensing;*

4

(ii)     Be available for inspection by the Department;

(iii)    Outline the responsibilities of the Dispensing Pharmacy staff and
         the Remote Pharmacy staff, or other Non-Objecting Pharmacists,
         who are involved in RMOP;

(iv)     Include a process to identify the name, address, telephone number,
         and license number of each Pharmacist involved in RMOP; and

(v)      Be reviewed by the owner or operator of the pharmacies on a
         regular basis; and

(vi)     Include policies and procedures for:

         1)     Protecting the confidentiality and integrity of patient
                information;

         2)     Ensuring that pharmacists at the Remote Pharmacy, or
                other Non-Objecting Pharmacists, performing prospective
                drug utilization review have access to appropriate drug
                information resources;

         3)     Ensuring that staff at the Dispensing Pharmacy understand
                how to contact a Pharmacist who can perform RMOP;

         4)     Maintaining records to identify the name, initials, or
                identification code of each Pharmacist who performs any
                RMOP function for a medication order; and

         5)     Complying with federal and state laws and regulations.

(5)  Every pharmacist providing RMOP service at a Remote Pharmacy or
     otherwise shall ensure that the following information is recorded on the
     order, in the computer system, or on another appropriate, unalterable,
     uniformly maintained and readily retrievable record for every drug order
     or prescription for emergency contraception processed by the Remote
     Pharmacy or other Non-Objecting Pharmacist on behalf of a Dispensing
     Pharmacy:

     (i)      The name, initials or other unique identifier of the Non-Objecting
              Pharmacist who verifies the drug order or prescription;

     (ii)     The name of the patient;

     (iii)    The dose, dosage form, route of administration, and dosing
              frequency of the drug;

     (iv)     The date and time of verification; and

5

(v)     The name of the prescribing/ordering physician.

(6)     The pharmacist(s)-in-charge of the Dispensing Pharmacies shall maintain and have access to the following records for a minimum of 5 years:

(i)     Records of emergency contraception medication orders processed;

(ii)    Records of the electronic communication system maintenance, if any.

(7)     Staffing of the Remote Pharmacies

(i)     The responsibilities of the pharmacist-in-charge at each participating Remote Pharmacy, or other Non-Objecting Pharmacist, providing RMOP shall include (except to the extent otherwise set forth in this Section 1330.91(j) as to Objecting Pharmacists):

1)     Supervision of all the activities of all employees as they relate to the practice of pharmacy.

2)     Establishment and supervision of the recordkeeping system for all the documents, electronic communication and all the transfers of information between the Dispensing and Remote Pharmacies or other Non-Objecting Pharmacist participating in RMOP.

3)     The operation of the pharmacy and maintenance of security provisions for the records and the electronic communication system of the pharmacy or other location from which a Non-Objecting Pharmacist engages in RMOP. The owner of the pharmacy shall be equally responsible.

4)     Within 30 days after the change of a pharmacist-in-charge, the Department shall be so notified in writing by the departing pharmacist-in-charge or by the owner of the pharmacy.

(ii)    All pharmacies participating in RMOP shall be licensed in Illinois.

(iii)   Only licensed pharmacists shall conduct the drug utilization evaluation or review and validation of any order processed.

4)     A retail pharmacy that serves the general public is responsible for ensuring either that there is a Non-Objecting Pharmacist scheduled at all times such pharmacy is open, or that there is a licensed pharmacist available to perform RMOP for emergency contraception at all

*times such retail pharmacy is open and no Non-Objecting Pharmacist is available at such retail pharmacy.*

*5)    For the purposes of this subsection (j), the term "contraceptive" shall refer to all FDA-approved drugs or devices that prevent pregnancy.*

*6)    Nothing in this subsection (j) shall interfere with a pharmacist's screening for potential drug therapy problems due to therapeutic duplication, drug-disease contraindications, drug-drug interactions (including serious interactions with nonprescription or over-the-counter drugs), drug-food interactions, incorrect drug dosage and duration of drug treatment, drug-allergy interactions, or clinical abuse or misuse, pursuant to 225 ILCS 85/3(q).*

The Defendants will use their best efforts to obtain adoption of said Amendment as a Permanent Amendment to the Rule pursuant to the ordinary regulatory process followed for rendering rulemaking permanent. The Parties acknowledge that legislative proceedings relating to the anticipated passage of an amended Illinois Pharmacy Practice Act may affect the timing of such regulatory process.

No liability (including without limitation any retroactive liability at any time) shall apply to Walgreens or any of its affiliates for any act done or omitted in conformity with the Rule or this Agreement, notwithstanding that after such act or omission has occurred, a rule, regulation or provision of the Pharmacy Practice Act or of this Agreement is amended, rescinded or determined by judicial or other authority to be invalid for any reason. It is the intent of the parties to provide a Safe Harbor for Walgreens' and its affiliates' actions or omissions conducted in conformity with this Agreement at any point prior to the time, if any, the General Assembly, the Judiciary or the Department, in each case under a future administration, deems such acts or omissions allowed by this Agreement and or the Rule to be invalid on a prospective basis. Without limiting the foregoing in any way, the Department agrees that RMOP shall not be considered, or be subject to the requirements applicable to, telepharmacy as defined in the Pharmacy Practice Act or Department rules.

In the event that any provision of this Agreement or the Rule, as amended by the Permanent Amendment, is found to be inconsistent or in conflict in any respect with the Pharmacy Practice Act, as in effect or amended, or this Agreement is otherwise found to be invalid in any respect, the Department shall exercise its enforcement discretion and shall not file any action(s) against Walgreens or any of its affiliates for alleged violations of the Rule or the Pharmacy Practice Act, as in effect or amended, in any case or instance which occurred prior to the finding of an inconsistency or conflict, in which Walgreens or its affiliates followed the protocols set forth in subsection (j) above in this Agreement.

Defendants further represent and warrant that a true and correct execution copy of the Individual Plaintiffs' Agreement is attached as Exhibit A hereto.

## II. COVENANTS BY WALGREENS

Walgreens will consent to a stay of the Federal Action until March 3, 2008 while the Defendants promulgate or cause to be promulgated the foregoing Amendment to the Rule. Upon promulgation by the Defendants of the aforesaid Amendment to the Rule, and the

completion of rulemaking pursuant to the Administrative Procedure Act by March 3, 2008, the complete execution of the Individual Plaintiffs' Agreement by all parties thereto within 10 days after the date hereof, and the Individual Plaintiffs' dismissal with prejudice of their claims in the Federal Action and the Springfield State Action, and subject to the provisions of this Agreement, Walgreens will dismiss its claims against Defendants in the Federal Action with prejudice, and without attorney's fees and costs. Effective only upon such dismissal with prejudice, if any, Walgreens, its heirs, successors and assigns, release and forever discharge, the Department and the State of Illinois, their agents, former and present employees, successors, heirs and assigns (hereinafter collectively referred to as "Releasees") from all actions, claims, demands, setoffs, suits, causes of action, controversies, disputes, equitable relief, compensatory and punitive damages, attorney's fees, costs, and expenses which arose from Walgreens' claims made against Defendants in the Federal Action, which Walgreens owns, has or may have against the Releasees, whether known or unknown, from the beginning of time until the effective date of this Agreement.

If, but only if, the Amendment to the Rule is not promulgated as described herein, or the Permanent Amendment is not adopted as provided herein by the Department by March 3, 2008, or an amended Pharmacy Practice Act is not enacted by March 3, 2008 that is consistent with this Agreement and the Permanent Amendment and permits the RMOP and other protocols set forth herein, or any of the Individual Plaintiffs or Defendants fails or refuses to execute the Individual Plaintiffs' Agreement within 10 days after the date hereof or fails or refuses to comply therewith including without limitation by dismissing their claims in the Federal Action and the Springfield State Action with prejudice as described therein and herein, then this Agreement may be voided by any Party as follows: (1) notice of intent to void this Agreement must be mailed to each Party to this Agreement and to the Office of the Attorney General postmarked no later than March 10, 2008, (2) following provision of such notice by a Party, the Parties shall, with reasonable promptness, re-initiate mediation proceedings through Magistrate Judge Byron Cudmore or, if Judge Cudmore declines to serve as a mediator, through such other mediator to which the Parties may agree, and shall mediate in good faith to determine whether the Parties can secure compliance with this Agreement or agree to an alternative solution for a period of not more than ninety days, and (3) if, and only if, the Parties do not achieve a mutually agreeable resolution through such good faith mediation, then this Agreement shall be deemed void upon the termination of mediation proceedings by the mediator. In the event this Agreement is voided by any Party, Walgreens may reinstate the Federal Action and continue to prosecute the litigation. The time frames set forth herein may be extended only by the written agreement of the Parties and the Attorney General.

## III. EFFECT OF SETTLEMENT

Except as otherwise provided in this Agreement, each of the Parties expressly reserves any and all rights, defenses, claims, demands and causes of action which such Party may have with respect to any matter, transaction or occurrence relating to any person not a Party hereto.

Neither this Agreement nor any term or provision hereof shall be construed as an admission by any Party to this lawsuit or the State of Illinois of the merits or viability of any claims or defenses asserted by any Party or by the Individual Plaintiffs. Walgreens, Defendants

8

and the State of Illinois specifically deny each and every one of the allegations of liability, wrongdoing, unlawful conduct and damages. It is expressly understood and agreed that this Agreement is being entered into solely for the purpose of amicably resolving all disputes between the State of Illinois and Walgreens in the Federal Action. This Agreement does not, in any way, embody, reflect, or imply any wrongdoing on the part of Walgreens, Defendants, the State of Illinois or any of their respective affiliates, directors, officers, employees, attorneys, insurers or agents. Nothing in this Agreement is intended to or shall be construed as an admission by any Party that it violated any law, interfered with any rights, breached any obligation or otherwise engaged in improper or illegal conduct. Each of the Parties expressly denies any such improper or illegal conduct for purposes of this Agreement.

The Parties further agree that, by entering into this Agreement, no Party or its attorney waives any right to assert any claims or defenses asserted in the Federal Action on behalf of any Party (or its heirs, successors or assigns) or other person against any person, including without limitation any of the Releasees, in any subsequent action based upon the application after the effective date of this Agreement of the current Rule, the Permanent Amendment or the Pharmacy Practice Act, each as in effect or amended. Without limiting the generality of the foregoing, Defendants acknowledge and agree that Walgreens and its affiliates are not parties to or bound by the Individual Plaintiffs' Agreement, and that nothing in the Individual Plaintiffs' Agreement precludes any argument by Walgreens or any of its affiliates that a pharmacy can comply with the Rule only through the actions of its pharmacists.

This Agreement shall be construed and interpreted in accordance with the laws of the State of Illinois, without regard to the principles of conflict of laws. This Agreement shall not be construed to constitute a waiver of the sovereign immunity of the State of Illinois.

Effective only upon the dismissal with prejudice, if any, of Walgreens' claims against Defendants in the Federal Action and the Springfield State Action, Walgreens and its attorneys release, waive, and relinquish any claims or rights to attorney's fees, expenses, and costs from the Defendants allegedly incurred or due in carrying out the terms of this Agreement or incurred or due in the Federal Action pursuant to 42 U.S.C. §1988, or under any other statute, rule, or common law provision.

This Agreement contains the entire, complete, and integrated statement of each and every term and provision agreed to by the Parties and the State of Illinois, and is not subject to any condition not provided for in this Agreement. The Parties enter into this Agreement as a free and voluntary act with full knowledge of its legal consequences. The Parties have not relied on any information or representations which are not contained in this Agreement.

There shall be one original of this Agreement and it may not be executed in multiple counterparts. The original of this Agreement shall be retained by the Office of the Illinois Attorney General, with copies to be provided to each of the other Parties.

All Parties to this Agreement acknowledge that they participated in the drafting of this document.

The Parties further agree that, except as otherwise expressly provided herein, this Agreement is intended to confer rights, benefits and obligations solely on the Parties hereto and on their affiliates, predecessors, successors and, in the case of Walgreens and its affiliates, assigns, and is not intended to confer any right or benefit upon any other person or entity. Except as otherwise expressly provided herein, no such other person or entity shall have any legally enforceable right under this Agreement, and no action taken pursuant to this Agreement shall relieve or be construed as relieving any person or entity, other than the Parties hereto, of any financial or other obligation it had, presently has, or may have in the future.

## IV.  MODIFICATIONS

This Agreement shall not be modified or amended except by mutual written consent of all Parties and the Office of the Attorney General.  No waiver by any Party of any breach of this Agreement shall be binding unless set forth in writing and signed by a duly authorized representative of such Party.

## V.  REPRESENTATIVE AUTHORITY

Each undersigned representative of the Parties to this Agreement certifies that he or she is fully authorized by the Party or Parties whom he or she represents to enter into and execute the terms and conditions of this Agreement, and to legally bind such Party to this Agreement.  By their respective representatives' signatures below, the Parties agree to this Agreement.

[Signature page follows]

| ILLINOIS DEPARTMENT OF FINANCIAL AND PROFESSIONAL REGULATION, on behalf of itself and, in their official capacities, DEAN MARTINEZ, SECRETARY AND DANIEL BLUTHARDT, DIRECTOR OF DIVISION OF PROFESSIONAL REGULATION<br><br>By: _____<br><br>Title: _____<br><br>Date: _____ | WALGREEN CO.<br><br>By: _____<br><br>Title: _____<br><br>Date: _____ |
| APPROVED BY:<br><br>ILLINOIS ATTORNEY GENERAL<br><br>By: _____<br><br>Title: _____<br><br>Date: _____ | ROD BLAGOJEVICH, GOVERNOR<br><br>By: _____<br><br>Title: _____<br><br>Date: _____ |

CHI 3904767



IN THE UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF ILLINOIS
SPRINGFIELD DIVISION

JOHN MENGES, GAYLORD RICHARD ) 
QUAYLE, CAROL MUZZARELLI, )
KELLY HUBBLE, MELANIE ANTUMA, )
JIM LYNCH, and AMANDA VARNER, )
　　　　　　　　　　　　　　　)
Plaintiffs, )
　　　　　　　　　　　　　　　)
-vs- )　　　No. 05-3307
　　　　　　　　　　　　　　　)
ROD R. BLAGOJEVICH, Governor; )
DEAN MARTINEZ, Acting Secretary of )
the Illinois Department of Financial and )
Professional Regulation; and DANIEL E. )
BLUTHARDT, Director of the )
Illinois Division of Professional )
Regulation, in their official capacities, )
　　　　　　　　　　　　　　　)
Defendants. )

## MUTUAL AGREEMENT AND UNDERSTANDING

THIS MUTUAL AGREEMENT AND UNDERSTANDING is entered into between the

individual plaintiffs, John Menges, Richard Quayle, Carol Muzzarelli, Kelly Hubble, Melanie

Antuma, Jim Lynch, and Amanda Varner, and the defendants Rod R. Blagojevich, Governor of

Illinois, Dean Martinez, Secretary of the Illinois Department of Financial and Professional

Regulation, and Daniel E. Bluthardt, Director of the Illinois Department of Financial and

Professional Regulation, in their official capacities, only.  Reference herein to "the plaintiffs"

refers to the aforementioned individual plaintiffs only.  References to "the Parties" refer to the

individual plaintiffs and defendants only.

WHEREAS the plaintiffs John Menges, Richard Quayle, Carol Muzzarelli, Kelly Hubble,

Melanie Antuma, Jim Lynch, and Amanda Varner, each of whom is a pharmacist registered in

the State of Illinois, have filed this action alleging that the defendants have violated their rights

1

under the Constitution and laws of the United States by promulgating a certain regulation under the Pharmacy Practice Act of 1987, 2265 Ill. Comp. Stat. 85/1, codified at 68 Ill. Admin. Code § 1330.91(j) (the "Rule"); and

WHEREAS the defendants have denied that said Rule and their promulgation thereof violated any of plaintiffs' rights, and

WHEREAS on July 31, 2007, the Hon. Jeanne Scott, U.S.D.C., the presiding judge in the instant matter, ruling in a separate case arising out of the promulgation of the Rule, noted that the Rule requires Division I pharmacies — not each licensed pharmacist — to dispense Emergency Contraceptives without delay. See *Vandersand v. Walmart Stores, Inc.*, 2007 U.S. Dist. LEXIS 55250; and

WHEREAS, the defendants have, throughout this and related litigation, taken the position that the Rule governs the duties of Division I Pharmacies, not individual pharmacists, and that the Rule is not directed at individual pharmacists; and

WHEREAS it is the intention of the defendants to continue to interpret and apply the Rule in this manner; and

WHEREAS, so as to avoid further expense and in recognition of the positions of the parties as stated herein, the parties desire to reach an agreement to settle and compromise the pending action;

NOW THEREFORE, in consideration of the mutual promises and agreements herein and for other good and valuable consideration, the sufficiency of which is hereby acknowledged, the individual plaintiffs and the defendants agree as follows:

### CONVENANTS BY PARTIES

The defendants covenant that they will continue to interpret the Rule as governing the

2

duty of Division I pharmacies only, and not individual pharmacists, and will apply the Rule accordingly.

The defendants further covenant that they will interpret and apply in the same manner as aforesaid the amended version of the Rule described in the defendants' separate Mutual Agreement and Understanding with intervenor-plaintiff Walgreens, dated _____.

Plaintiffs hereby covenant that, within ten (10) days of the execution of this Mutual Agreement and Understanding they will execute Stipulations of Dismissal dismissing with prejudice any and all claims they have or could have asserted in this action against the defendants and/or in their action against the defendants captioned Menges, et al. v. Blagojevich, et al., No. 06 MR 242, pending in the Circuit Court of Sangamon County, Illinois. Each of the parties will bear its own costs and attorney's fees.

### EFFECT OF SETTLEMENT

Each of the parties expressly reserves any and all rights, defenses, claims, demands and causes of action that each party may have with respect to any matter, transaction or occurrence relating to any person not a party hereto.

Neither this Agreement nor any terms or provision hereof shall be construed as an admission by any party to this lawsuit of the merits or viability of any claims or defenses asserted by any party.

The parties further agree that by consenting to this Agreement no party or its attorney waives any rights to assert any claims or defenses asserted in the present action on behalf of any party in any subsequent action based upon the application of the current Rule or the Amendment to the Rule described in the defendants' separate Mutual Agreement and Understanding with plaintiff Walgreens.

This Agreement shall not be construed to constitute a waiver of the sovereign immunity of the State of Illinois.

The Parties further agree that this Agreement is intended to confer rights, benefits and obligations solely on the parties hereto, and is not intended to confer any rights or benefits upon any other person or entity. No such other person or entity shall have any legally enforceable right under this Agreement, and no action taken pursuant to this Agreement shall relieve or be construed as relieving any person or entity, other than the Parties hereto, of any financial or other obligation it had, presently has, or may have in the future.

The Parties acknowledge and agree that Walgreens is not a party to or bound by this Mutual Agreement and Understanding, and that nothing in this Mutual Agreement and Understanding precludes any argument by Walgreens that a pharmacy can comply with the Rule only through the actions of its pharmacists.

| | |
|---|---|
| **ILLINOIS DEPARTMENT OF FINANCIAL AND PROFESSIONAL REGULATION, on behalf of itself and, in their official capacities, DEAN MARTINEZ, SECRETARY AND DANIEL BLUTHARDT, DIRECTOR OF DIVISION OF PROFESSIONAL REGULATION**<br><br>By: _____<br><br>Title: _____<br><br>Date: _____ | **PLAINTIFFS**<br><br>By: _____<br><br>Title: _____<br><br>Date: _____ |
| **APPROVED BY:**<br><br>**ILLINOIS ATTORNEY GENERAL**<br><br>By: _____<br><br>Title: _____ | **ROD BLAGOJEVICH, GOVERNOR**<br><br>**By:** _____<br><br>**Title:** _____<br><br>**Date:** _____ |

Date: _____

HONORABLE RONALD B. LEIGHTON

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

STORMANS, INCORPORATED, doing
business as RALPH'S THRIFTWAY;
RHONDA MESLER; and MARGO
THELEN,

Plaintiffs,

v.

MARY SELECKY, ACTING SECRETARY
OF THE WASHINGTON STATE
DEPARTMENT OF HEALTH, et al,

Defendants.

Case No. C07-5374RBL

ORDER GRANTING PRELIMINARY
INJUNCTION

THIS MATTER comes before the Court on Plaintiffs' Motion for Preliminary Injunction. Plaintiffs are two pharmacists and one corporate pharmacy. They seek to enjoin the enforcement of regulations making it sanctionable for a pharmacy to permit a pharmacist-employee to refuse to fill a lawful prescription because of religious or moral objections. Specifically, they ask the Court to enjoin enforcement of provisions contained within certain regulations as applied to "Plan B" contraceptives, also known as the "morning after" pill.

Plaintiffs' faith informs them that life begins at conception, when an egg from the female is fertilized by the sperm from the male. Plan B prevents the fertilized egg from adhering to the wall of the uterus, one result attained when the morning after pill is administered within 72 hours after unprotected sex. Plaintiffs believe that it is wrong to terminate that life. They claim a right of conscience to refuse to dispense Plan B, and to instead refer the patient to a nearby pharmacy that will dispense the drug. This practice is known as "refuse and refer."

1   Defendants are appointed government officials in Washington state who fall into two categories.

2   One group is charged with the promulgation, interpretation and enforcement of the recently adopted

3   regulations, WAC 246-863-095 and 246-869-010.  The other group of defendants is responsible for

4   enforcing the Washington Law Against Discrimination, RCW 49.60 et. seq.

5   The Court has granted a motion to intervene [Dkt. #50] allowing participation by seven individuals:

6   five women who claim to have been affected by the conduct of pharmacists opposed to Plan B

7   contraceptives and two HIV positive individuals who express concerns about access to vital medicines they

8   need to survive.

9   The Court has reviewed the materials submitted by the parties and participated in extensive oral

10  argument with counsel and for the following reasons **GRANTS** limited relief as more particularly

11  described in the body of this Order.

12  ## FACTUAL BACKGROUND

13  **I.    Regulating Authority.**

14  The Washington State Board of Pharmacy (the "Board") regulates the practice of pharmacies and

15  pharmacists in the State of Washington pursuant to RCW 18.64 et. seq.  The Board is charged with

16  enforcing all laws placed under its jurisdiction, establishing the qualifications of pharmacists, and

17  promulgating "rules for the dispensing, distribution, wholesaling, and manufacture of drugs and devices

18  and the practice of pharmacy for the protection and promotion of the public health, safety and welfare."

19  RCW 18.64.005.  Pharmacies are required to be licensed under RCW 18.64.020.  The Board is authorized

20  to take disciplinary action against a pharmacy license per RCW 18.64.165.  The Uniform Disciplinary Act

21  provides procedures for disciplining health care providers, including pharmacists, who violate standards of

22  professional conduct.  RCW 18.130 et. seq.

23  **II.    Existing Laws Regarding Discrimination and Conscience.**

24  Beginning as early as 1957, the people of Washington have been subject to a comprehensive law

25  against discrimination.  RCW 49.60 et. seq.  In an exercise of the police power for the protection of the

26  public welfare, health, and peace of the people, the legislature recognized and codified a right to be free

27  from discrimination because of race, creed, color, national origin, or sex.  RCW 49.60.010 and .030.  This

28  law is known as the Washington Law Against Discrimination (WLAD).

1    In 1987, the state Legislature adopted the Health Care Access Act. RCW 70.47 et. seq. In 2002,

2   the people, by referendum, passed amendments aimed at further improving the health of low-income

3   children and adults by expanding access to basic health care. RCW 70.47.002. One group targeted to

4   benefit from the act was low-income pregnant women. RCW 70.47.010(2)(c). As a part of the Health

5   Care Access Act, the legislature expressed the recognition "that every individual possesses a fundamental

6   right to exercise their religious beliefs and conscience." RCW 70.47.160(1). The Legislature further

7   acknowledged that "in developing public policy, conflicting religious and moral beliefs must be respected."

8   RCW 70.47.160(1). Accordingly, the Legislature provided that "no individual health care provider,

9   religiously sponsored health carrier, or health care facility may be required by law or contract in any

10  circumstances to participate in the provision of or payment for a specific service if they object to so doing

11  for reason of conscience or religion." RCW 70.47.160(2)(a). No person may be discriminated against in

12  employment or professional privileges because of such objections. RCW 70.47.160(2)(a). The right of

13  conscience, however, is not intended to result in a patient being denied timely access to any service

14  included in the basic health plan. RCW 70.47.160(2)(b).

15    An identical right of conscience was included within the Insurance Reform Act adopted by the

16  Legislature in 1995. RCW 48.43.065.

17  **III.    Development of Regulations.**

18    According to the Final Significant Analysis for Rule Concerning Pharmacists' Professional

19  Responsibilities (WAC 246-863-095) and Pharmacies' Responsibilities (WAC 246-869-010) (Exh. K to

20  Decl. of Kristen Waggoner, Dkt. #11), in 2004, the media began reporting incidents occurring nationwide

21  in which pharmacists refused to dispense prescriptions for moral, religious and personal reasons. Since

22  2004, complaints were filed with the Board of Pharmacy (Board) concerning some pharmacists refusing to

23  fill prescriptions. In 2005, the Board began to receive calls and emails inquiring into the Board's position

24  on pharmacists refusing to dispense drugs and devices for moral or ethical objections. Board staff

25  concluded that Washington State Pharmacy laws and rules were silent on the issue.

26    The Washington State Pharmacy Association (WSPA) informed the Board that it had formed an ad

27  hoc committee to develop its position on the issue and requested an opportunity to present the

28  Committee's findings to the Board. WSPA made its presentation to the Board in January of 2006,

1  recommending that pharmacists be allowed to refuse to fill a prescription on religious or moral grounds but

2  that the pharmacist "respect the autonomy of the patient, and not impede the patient's right to seek the

3  service being requested." (Exh. D to Decl. of Kristen Waggoner, Dkt. #11). Consistent with RCW

4  70.47.160(2)(a) and RCW 48.43.065, the proposed rule would have permitted the "refuse and refer"

5  response to a lawful prescription.

6      Planned Parenthood and the Northwest Women's Law Center also made presentations to the Board

7  (March 2006), advocating against the right of a pharmacist or pharmacy to "refuse and refer" based on

8  religious objection to Plan B. (Exh. D to Decl. of Lisa Salmi, Dkt. #45). In April 2006, the Board filed a

9  notice to initiate the rulemaking process in order to examine a pharmacist's responsibilities to dispense

10  lawful prescribed drugs or devices. (Exh. K to Decl. of Kristen Waggoner, Dkt. #11). The Board has

11  acknowledged that while issues of access and conscience applied to several types of medications, public

12  attention and comment during the rulemaking process focused on Plan B and other prescription birth

13  control products.[1]

14      On April 17, 2006, in a letter directed to the Pharmacy Board, the Washington State Human Rights

15  Commission offered its opinion on the subject of the right of conscience and access to Plan B:

16          It is the position of the WSHRC that allowing pharmacists to discriminate,
           based on their personal religious beliefs, against women and others trying to
17          fill lawful prescriptions would be discriminatory, unlawful, and against good
           public policy and the public interest. It is also WSHRC's position that
18          allowing a practice of 'refuse and refer' as a means of addressing this issue,
           allows and perpetuates discriminatory behavior.

19
(Exh. J to Decl. of Kristen Waggoner, Dkt. #11). The Commission further opined that the Washington

20
Law Against Discrimination (WLAD) would be violated if the pharmacy/pharmacist (a) refused to stock

21
Plan B, (b) refused to dispense Plan B and instead referred to a nearby pharmacy, or (c) refused to dispense

22
Plan B and instead referred the request to another pharmacist working in the same store on the same shift.

23
The Commission also suggested that the Board of Pharmacy itself would violate the WLAD if it adopted a

24
regulation that included the right of conscience. *Id.*

25

26

27          [1]Plan B was available only by prescription from 2003 to late 2006. In December 2006, the U.S. Food and Drug
Administration approved Plan B for over-the-counter distribution (stocked behind the counter) for women 18 and older. Plan B
28  remains available to women under 18 by prescription only. No party has suggested that the FDA's decision in any way changes
the issues currently before this Court.

The Board reviewed Washington laws related to conscience clauses and discrimination. It also referred to regulations adopted in other states. Ultimately, on June 1, 2006, The Board unanimously voted to pursue a draft rule that allowed a pharmacist to refuse to dispense a medication but required that no pharmacy or pharmacist obstruct a patient's effort to obtain lawfully prescribed drugs or devices. (Exh. C to Decl. of Kristen Waggoner).

Reaction to the Board action was immediate. That same day, Governor Gregoire sent a letter to the Chairman of the Pharmacy Board stating her strong opposition to the draft rule. The Governor emphasized that "no one should be denied appropriate prescription drugs based on the personal, religious or moral objection of individual pharmacists." (Exh. E to Decl. of Kristen Waggoner, Dkt. #11). At a press conference later that week the Governor acknowledged that she could remove the entire Board with the legislature's consent but she would prefer not to take such a drastic step. (Exh. F to Decl. of Kristen Waggoner, Dkt. #11).

On August 28, 2006, Governor Gregoire submitted to the Board an alternative rule that required pharmacies to dispense lawfully prescribed drugs and prevented pharmacists from refusing to dispense a medicine or medical device for religious or moral reasons. (Exh. G to Decl. of Kristen Waggoner, Dkt. #11). The Board voted to reconsider its position on a conscience clause. On April 2, 2007, the Board voted unanimously in favor of adopting the substantive provisions of the rule proposed by the Governor. The regulations adopted by the Board became effective on July 26, 2007. They provide as follows:

> WAC 246-863-095
> Pharmacist's professional responsibilities.
>
> (1) A pharmacist's primary responsibility is to ensure patients receive safe and appropriate medication therapy.
>
> (2) A pharmacist shall not delegate the following professional responsibilities:
>
> (a) Receipt of a verbal prescription other than refill authorization from a prescriber.
>
> (b) Consultation with the patient regarding the prescription, both prior to and after the prescription filling and/or regarding any information contained in a patient medication record system provided that this shall not prohibit pharmacy ancillary personnel from providing to the patient or the patient's health care giver certain information where no professional judgment is required such as dates of refills or prescription price information.

(c) Consultation with the prescriber regarding the patient and the patient's prescription.

(d) Extemporaneous compounding of the prescription, however, bulk compounding from a formula and IV admixture products prepared in accordance with chapter 246-871 WAC may be performed by a pharmacy technician when supervised by a pharmacist.

(e) Interpretation of data in a patient medication record system.

(f) Ultimate responsibility for all aspects of the completed prescription and assumption of the responsibility for the filled prescription, such as: Accuracy of drug, strength, labeling, proper container and other requirements.

(g) Dispense prescriptions to patient with proper patient information as required by WAC 246-869-220.

(h) Signing of the poison register and the Schedule V controlled substance registry book at the time of sale in accordance with RCW 69.38.030 and WAC 246-887-030 and any other item required by law, rule or regulation to be signed or initialed by a pharmacist.

(i) Professional communications with physicians, dentists, nurses and other health care practitioners.

(j) Decision to not dispense lawfully prescribed drugs or devices or to not distribute drugs and devices approved by the U.S. Food and Drug Administration for restricted distribution by pharmacies.

(3) Utilizing personnel to assist the pharmacist.

(a) The responsible pharmacist manager shall retain all professional and personal responsibility for any assisted tasks performed by personnel under his or her responsibility, as shall the pharmacy employing such personnel. The responsible pharmacist manager shall determine the extent to which personnel may be utilized to assist the pharmacist and shall assure that the pharmacist is fulfilling his or her supervisory and professional responsibilities.

(b) This does not preclude delegation to an intern or extern.

(4) It is considered unprofessional conduct for any person authorized to practice or assist in the practice of pharmacy to engage in any of the following:

(a) Destroy unfilled lawful prescription;

(b) Refuse to return unfilled lawful prescriptions;

(c) Violate a patient's privacy;

(d) Discriminate against patients or their agent in a manner prohibited by state or federal laws; and

(e) Intimidate or harass a patient.

WAC 246-869-010
Pharmacies' responsibilities.

(1) Pharmacies have a duty to deliver lawfully prescribed drugs or devices to patients and to distribute drugs and devices approved by the U.S. Food and Drug Administration for restricted distribution by pharmacies, or provide a therapeutically equivalent drug or device in a timely manner consistent with reasonable expectations for filling the prescription, except for the following or substantially similar circumstances:

(a) Prescriptions containing an obvious or known error, inadequacies in the instructions, known contraindications, or incompatible prescriptions, or prescriptions requiring action in accordance with WAC 246-875-040.

(b) National or state emergencies or guidelines affecting availability, usage or supplies of drugs or devices;

(c) Lack of specialized equipment or expertise needed to safely produce, store, or dispense drugs or devices, such as certain drug compounding or storage for nuclear medicine;

(d) Potentially fraudulent prescriptions; or

(e) Unavailability of drug or device despite good faith compliance with WAC 246-869-150.

(2) Nothing in this section requires pharmacies to deliver a drug or device without payment of their usual and customary or contracted charge.

(3) If despite good faith compliance with WAC 246-869-150, the lawfully prescribed drug or device is not in stock, or the prescription cannot be filled pursuant to subsection (1)(a) of this section, the pharmacy shall provide the patient or agent a timely alternative for appropriate therapy which, consistent with customary pharmacy practice, may include obtaining the drug or device. These alternatives include but are not limited to:

(a) Contact the prescriber to address concerns such as those identified in subsection (1)(a) of this section or to obtain authorization to provide a therapeutically equivalent product;

(b) If requested by the patient or their agent, return unfilled lawful prescriptions to the patient or agent; or

(c) If requested by the patient or their agent, communicate or transmit, as permitted by law, the original prescription information to a pharmacy of the patient's choice that will fill the prescription in a timely manner.

(4) Engaging in or permitting any of the following shall constitute grounds for discipline or other enforcement actions:

(a) Destroy unfilled lawful prescription.

(b) Refuse to return unfilled lawful prescriptions.

(c) Violate a patient's privacy.

(d) Discriminate against patients or their agent in a manner prohibited by state or federal laws.

(e) Intimidate or harass a patient.

## IV. Agency Interpretation of Regulations.

In a post-adoption letter interpreting the new regulations to Washington's pharmacists and pharmacy owners, the Board acknowledged that the regulations responded to the perceived need to "define standards of patient care and professional conduct when a pharmacist's personal objections conflicted with the patient's access to legally prescribed medications." (Exh. B to Decl. of Rima Alaily, Dkt. #50-4). In resolving the issue, the Board took a pro-patient position. To the pharmacy, no right of conscience was allowed because under the Board's interpretation of the regulations, "the pharmacy business must meet the patient's needs onsite unless one or more of the exceptions described in the rule are present."[2] *Id.* Stated another way, the Board informed the regulated public that "the rule does not allow a pharmacy to refer a patient to another pharmacy to avoid filling the prescription due to moral or ethical objections." *Id.* A narrow right of conscience was allowed to the pharmacist, if the pharmacist worked with another pharmacist on shift who would dispense the medication in place of the conscientious objector. *Id.*

## V. Response to the Regulations.

The regulations became effective on July 26, 2007. This lawsuit was filed on the prior day. Plaintiff Rhonda Mesler alleges that she will be fired from her position as pharmacy manager because her employer cannot afford to hire another pharmacist to work with her. Only by hiring a second pharmacist to work side-by-side with Ms. Mesler will her employer be able to comply with 246-869-010.[3] (Decl. of Rhonda Mesler, Dkt. #12). Plaintiff, Margo Thelen, was also informed that her employer could not hire another pharmacist to work with her or remain on call. She was told that her employer could not

---

[2]The exceptions are: "National or state emergencies; potentially fraudulent prescriptions; unavailability of the drug despite a good faith effort to comply with the Board's rule on adequate stock; lack of equipment or expertise to store a particular pharmaceutical; lack of payment."

[3]During the Board meeting of December 14, 2006, Board member Donna Dockter, RPh expressed concern that the then-draft rule was impractical in today's market "where in most situations there is only one pharmacist on staff at a given time." (Exh. O to Decl. of Lisa Salmi, Dkt. #45).

accommodate her religious beliefs and that "it would not work" for her to remain employed there. In order to find a job where there would be two or more pharmacists on duty, she found employment with a hospital some distance away for less money. (Decl. of Margo Thelen, Dkt. #13).

Prior to the adoption of the regulations, Storman's Stores had been the object of a boycott organized by persons protesting Storman's refusal to stock Plan B. Both the store and the pharmacy manager were investigated by the Board for allegedly failing to maintain an adequate stock of medicines. (Decl. of Kevin Stormans, Dkt. #14). The Board initiated an additional investigation in response to allegations that Storman's Inc. has violated WAC 246-869-010 by not stocking Plan B. (Def. Amended Notice of New Investigation, Dkt. #84).

## VI.    Intervenors.

The intervenors are persons concerned about access to lawful medications in Washington. Two intervenors, Judith Billings and Dr. Jeffrey Schouten, are HIV-positive and both have prominent leadership positions in matters of policy affecting the HIV-community. Ms. Billings has been diagnosed with AIDS since 1995. Dr. Schouten is HIV-positive but does not disclose for how long. He treats persons with HIV but does not indicate whether he receives treatment related to HIV. Neither Dr. Schouten nor Ms. Billings claims that he or she has ever been denied access to HIV- or AIDS-related therapies in the State of Washington. They do express the concern that some patient in the future "might face denial or harassment when attempting to fill prescriptions." *See generally*, Declaration of Judith Billings, Dkt. #51 and Declaration of Jeffrey Schouten, M.D., Dkt. #53.

The remaining five intervenors are women of child bearing age who provide personal accounts of their attempts to obtain Plan B and/or express their support for the subject regulations. Rhiannon Andreini needed access to Plan B in late 2005 while visiting her parents in the Edmonds/Mukilteo area. The pharmacist at the Albertson's grocery store was friendly at first but turned "cold" and "appeared disapproving" when she asked for Plan B. The store did not carry Plan B and the pharmacist suggested she try a nearby Bartell Drug Store. He indicated generally where the store was located but did not provide detailed directions. Ms. Andreini was upset and cut her visit short by two days to return to Bellingham and a pharmacy with which she was familiar. Declaration of Rhiannon Andreini, Dkt. #52.

Molly Harmon presented a prescription for Plan B to a pharmacist at Bartell Drugs in the University Village shopping center in Seattle sometime in 2003. The pharmacist told Ms. Harmon that Plan B was not a form of birth control and that she would provide Ms. Harmon with information about available forms of birth control. Ms. Harmon was extremely upset and asked to speak to the head pharmacist who apologized and filled Ms. Harmon's prescription. Declaration of Molly Harmon, Dkt. #54.

Catherine Mossman has used Plan B on two occasions, once following a sexual assault. In both instances, she chose to obtain Plan B from Planned Parenthood because she has "heard numerous accounts of pharmacists who refuse to fill emergency contraception prescriptions or otherwise act in a hostile or harassing manner to those seeking such prescriptions." Declaration of Catherine Mossman, Dtk, #55.

Emily Schmidt has not used Plan B but has participated in a Planned Parenthood testing program designed to identify pharmacists who were and were not stocking and willing to distribute Plan B. In the Wenatchee area, Ms. Schmidt could obtain Plan B at two of five pharmacies. At two pharmacies the pharmacist indicated an unwillingness to dispense Plan B. The record does not indicate why the fifth pharmacy did not have Plan B. Declaration of Emily Schmidt, Dkt. #56.

Finally, Tami Garrard has never used Plan B. She, like the others, would like to participate in this litigation "to help ensure that . . . all women in Washington, can get timely access to emergency contraception to prevent an unintended pregnancy without harassment or hostility." Declaration of Tami Garrard, Dkt. #57.

## DISCUSSION

### I.    Preliminary Injunction Standard.

The standard for granting a preliminary injunction balances the plaintiff's likelihood of success on the merits against the hardship to the parties. To prevail on a motion for preliminary injunction, a party must demonstrate either: (1) a likelihood of success on the merits and the possibility of irreparable injury; or (2) that serious questions going to the merits were raised and the balance of hardships tips sharply in the moving party's favor. These alternatives do not represent separate tests but rather represent extremes of a single continuum. The greater the relative hardship to the moving party, the less probability of success must be shown. *Clear Channel Outdoor Inc. v. City of Los Angeles*, 340 F.3d 810, 813 (9th Cir.

1  2003).

2      A party seeking preliminary injunctive relief in a First Amendment context can establish irreparable

3  injury sufficient to merit the grant of relief by demonstrating the existence of a colorable First Amendment

4  claim. *Warsoldier v. Woodford*, 418 F.3d 989 (9th Cir. 2005).

5  **II.    Nature of the Claims.**

6      Plaintiffs contend that the enforcement of the subject regulations violates their right to freely

7  exercise their religion as guaranteed under the First Amendment to the United States Constitution.   They

8  also assert that the regulations violate the Equal Protection Clause of the Fourteenth Amendment and the

9  Due Process Clause of the Fourteenth Amendment.  In addition, plaintiffs allege that the regulations are

10 invalid because they conflict with federal anti-discrimination law and are therefore preempted under the

11 Supremacy Clause of the Constitution.

12     Those defendants affiliated with the Human Rights Commission argue that, as to them, there is no

13 case or controversy ready for resolution.  Citing a lack of ripeness, they ask the Court to deny plaintiffs'

14 motion.

15 **III.    Ripeness.**

16     The HRC defendants challenge the timing of plaintiffs' action as to them and assert that no case or

17 controversy exists under the ripeness doctrine.  These defendants point out that the HRC has taken no

18 action nor stated any intent to take action against the plaintiffs.  They also claim that the HRC has adopted

19 no agency policy or directive that has any force of law.  They argue that the April 2006 letter from the

20 Executive Director of the HRC to the Executive Director of the Pharmacy Board did not constitute a

21 threat to prosecute pharmacists, pharmacies or even the Board, and that even if it was a threat, it could

22 not be actualized until an investigation and conciliation process had occurred.  The HRC defendants ask

23 that the motion for preliminary injunction be denied as to them.

24     Ripeness is peculiarly a question of timing intended to prevent courts, through avoidance of

25 premature adjudication, from entangling themselves in abstract disagreements.  *New Mexico for Bill*

26 *Richardson v. Gonzales*, 64 F.3d 1495, 1499 (10th Cir. 1995).  Here, the HRC Executive Director wrote

27 a letter which plaintiffs perceive to be a threat to prosecute them, and others like them, for discriminating

28 on the basis of sex.  Regarding the threat of prosecution, courts in this circuit look to three factors when

1   determining ripeness: (1) whether plaintiffs have articulated a concrete plan to violate the law in question;

2   (2) whether the prosecuting authorities have communicated a specific threat to initiate proceedings; and

3   (3) the history of past prosecutions or enforcement under the challenged statute. *Thomas v. Anchorage*

4   *Equal Rights Comm.*, 220 F.3d 1134, 1139 (9th Cir. 2000), *cert. denied*, 531 U.S. 1143 (2001).

5        Plaintiffs argue that the April 2006 letter was "official" and that its continued presence on the HRC

6   website is intended as a direct threat to pharmacists, and to the pharmacies who employ them, that the

7   anti-discrimination laws of the State of Washington will be enforced against them if they refuse to dispense

8   Plan B to a qualified patient.

9        The Court is convinced that the controversy before it is much more than a mere abstraction.  All

10  plaintiffs have refused to obey the law.  By posting the April 2006 letter on its website the HRC has

11  continued to express its intent to pursue those who violate the WLAD.  Significantly, the HRC does not

12  disavow an intention to enforce the WLAD against plaintiffs.  The history of the HRC is to aggressively

13  pursue violators of the WLAD.  Nothing in the HRC's words or deeds related to this issue suggest they

14  will act differently here.  Under these circumstances, the Court is convinced that the matter is ripe for

15  resolution and plaintiffs' action is not premature.  *See Canatella v. State of Cal.*, 304 F.3d 843, 852 (9th

16  Cir. 2002) (as amended on denial of rehearing).

17       Beyond the threat of HRC enforcement, this matter is ripe for the additional reason that

18  enforcement as to individual pharmacists will apparently be accomplished, not by direct agency action but,

19  indirectly, by pressuring pharmacies to either accommodate or terminate objecting pharmacists.

20  Accommodation appears to result only by a pharmacy hiring a second pharmacist, at an estimated cost of

21  $80,000 annually, to work side-by-side with the objecting pharmacist.[4]  It is not speculation for the Court

22  to observe that such accommodation presents more than a *de minimis* expense and therefore constitutes an

23  undue hardship on the employer.[5]  No employer can be expected to accommodate in this manner.  Given

24  the evidence now before this Court, termination is the outcome that any Board member could reasonably

25

26       [4]According to the "Final Significant Analysis" concerning these regulations, the estimated cost to hire an additional

27  pharmacist is $80,000 annually.  (Exh. K, p. 5, to Decl. of Kristen Waggoner, Dkt. #11).

28       [5]To require more than a *de minimis* cost be incurred by an employer imposes an undue hardship on an employer and
     relieves that employer from the obligation to accommodate religious practices or beliefs. *TWA v. Hardison*, 432 U.S. 63, 81-84
     (1977).

ORDER
Page - 12

1    have expected when promulgating these regulations.  According to Margo Thelen, the regulations have

2    already resulted in her termination.  Rhonda Mesler advises the Court that she too will be terminated if

3    these regulations are enforced against her employer.  Given the organized effort to pursue objecting

4    pharmacies and pharmacists in this and other states, it is inconceivable to the Court that these regulations

5    would not be enforced against offenders sooner than later.  *See Vandersand v. Wal Mart*, 2007 U.S. Dist.

6    LEXIS 55250 (C.D.Ill., 2007), and Decl. of Kevin Stormans, Dkt. #14.

7    **IV.    Free Exercise of Religion, Under the First Amendment.**

8         The principle that government may not enact laws that suppress religious belief or practice is so

9    well understood that few violations are recorded in United States Supreme Court opinions.  *Church of the*

10   *Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 523 (1993).  The Free Exercise Clause of the

11   First Amendment provides that "Congress shall make no law respecting an establishment of religion, or

12   prohibiting the free exercise thereof . . .."  The First Amendment has been made applicable to the states

13   through the Fourteenth Amendment.  *See Cantwell v. Connecticut*, 310 U.S. 296, 303 (1940).  Religion

14   means all aspects of religious observance and practice, as well as belief, whether or not they are acceptable

15   to others.  *Thomas v. Review Bd. of Indiana Employment Security Div.*, 450 U.S. 707, 714 (1981).

16        State laws intending to discriminate against individuals because of their religious practices and

17   beliefs are subject to strict scrutiny.  The state must demonstrate in such cases that the laws serve a

18   compelling state interest and are narrowly tailored to advance that compelling interest.  *Lukumi*, 508 U.S.

19   at 533.  In contrast, if the law is neutral on the subject of religion and is of general applicability, it need not

20   be justified by a compelling governmental interest even if the law has the incidental effect of burdening a

21   particular practice.  *Employment Div. Dept. of Human Resources of Ore. v. Smith*, 494 U.S. 872 (1990).

22   Neutrality and general applicability are interrelated.  Failure to satisfy one requirement is a likely indication

23   that the other has not been satisfied.  *Lukumi*, 508 U.S. at 531.

24        **A.    Neutrality.**

25        The Court will first examine whether the regulations are intended to be neutral as to religion.  To

26   determine the object of a law, the Court must first look to the text to see whether the law discriminates

27   against religious practice on its face.  A law lacks facial neutrality if it refers to a religious practice without

28   a secular meaning discernable from the language or context.  *Lukumi*, 508 U.S. at 533.  A review of the

1   subject ordinances reveals no mention of religion or any intention to burden the religious practices of

2   others.  The ordinances are facially neutral.

3       The Court's inquiry does not end with a review of the text of the applicable law.  The Free

4   Exercise Clause, like the Establishment Clause, extends beyond facial discrimination.  The Clause "forbids

5   subtle departures from neutrality," *Gillette v. United States*, 401 U.S. 437, 452 (1971) and "covert

6   suppression of particular religious beliefs," *Bowen v. Roy*, 476 U.S. 693, 703 (1986).  "The Free Exercise

7   Clause protects against government hostility which is masked, as well as overt." *Lukumi*, 508 U.S. at 534.

8   According to Justice Harlan, "the Court must survey meticulously the circumstances of governmental

9   categories to eliminate, as it were, religious gerrymanders." *Walz v. Tax Comm'n of New York City*, 397

10  U.S. 664, 696 (1970).

11      Relevant evidence in the inquiry includes, at a minimum, the historical background of the decision

12  under challenge, the specific series of events leading to the enactment of the subject law(s), and the

13  legislative or administrative history, including contemporaneous statements made by members of the

14  decision-making body. *Arlington Heights v. Metropolitan Housing Development Corp.*, 429 U.S. 252,

15  267-68 (1977).  In addition, the effect of a law in its real operation is strong evidence of its object and

16  purpose. *Lukumi*, 508 U.S. at 535.

17      Although a law targeting religious beliefs as such is never permissible, *McDaniel v. Paty*, *supra*,

18  435 U.S. at 626, *Cantwell v. Connecticut, supra*, 310 U.S. at 303-04, if the object of a law is to infringe

19  upon or restrict practices because of their religious motivations, the law is not neutral, and it is invalid

20  unless it is justified by a compelling interest and is narrowly tailored to advance that interest. *Lukumi*, 508

21  U.S. at 533.

22      What then is the object of the regulations that are at the heart of this dispute?  Defendants frame

23  the issue in terms of timely access to all medications lawfully prescribed.  Plaintiffs see the regulations in

24  far more nefarious terms.  They claim the object of the regulations is to eliminate from the practice of

25  pharmacy, or at least a significant segment of the practice, those pharmacists who, for religious reasons,

26  object to the delivery of lawful medications, specifically Plan B.

27      Defendants argue that plaintiffs cannot establish a free exercise claim because the challenged

28  regulations are facially neutral and apply generally to all pharmacies, regardless of the religious beliefs of

ORDER
Page - 14

their owners or employees. It is argued that the final regulations represent the Board's best judgment about how to deal with its overriding concerns for the health and safety of all patients who need valid prescriptions filled in a timely fashion. (Def. Selecky et al memo 10:12-15, Dkt. #43). They point to a potential conflict between the interests of pharmacists and those related to the health of the patients. The interest in having prescriptions filled promptly and patients treated fairly are, to defendants, compelling interests that outweigh any alleged harm to plaintiffs. (Def. Selecky et al memo 10:16-22, Dkt. #43).

Defendants further assert that the regulations are not specific to Plan B or any other prescription medication. Defendants argue that pharmacies must ensure the timely delivery of all valid prescriptions to patients and that pharmacists are not required to dispense any medication in violation of their religious beliefs. (Def. Selecky et al memo 7:5-11, Dkt. #43). To the extent adherence to these regulations creates conflicts between a pharmacy and its pharmacist(s), the defendants say such conflicts should be resolved according to the tenets of the WLAD. If the employer cannot accommodate the objecting pharmacist by hiring another pharmacist to work with him/her, then "at most, . . . the regulations may require a licensed pharmacist to occasionally fill a prescription for a medication whose intended use offends the pharmacist's religious beliefs." (Def. Selecky et al memo 9:17-19, Dkt. #43).

Plaintiffs argue that all relevant evidence touching on the enactment of the regulations makes clear that the regulations are about Plan B and the target of the regulations is any pharmacist or pharmacy who objects to Plan B for religious reasons. Plaintiffs maintain that the very press release announcing the adoption of the rules acknowledged that they "were sparked by complaints that some pharmacists and pharmacies refused to fill prescriptions for emergency contraceptives - also known as morning after pills or Plan B." (Exh. I to Decl. of Kristen Waggoner, Dkt. #11).

Plaintiffs assert that all who participated, formally or informally, in the development of these rules knew the process was about Plan B and the right of conscience.

In a letter evaluating issues relating to the Board's rulemaking effort, the HRC identified, from its perspective, the object of the rulemaking process:

> The WSHRC understands that the Board of Pharmacy (the Board) is currently dealing with issues arising from some pharmacists in the state refusing to fill or desiring to deny filling some legal prescriptions for emergency contraception and other prescriptions for women, based on the pharmacists' asserted religious and moral beliefs . . .. As we understand it, the drug at the center of this issue is Plan B, an emergency contraceptive.

1  (Exh. J to Decl. of Kristen Waggoner, pp. 1-2, 12, Dkt. #11).

2      The prominent role played by Planned Parenthood and the Northwest Women's Law Center, in

3  both the rulemaking process before the Board and in the Governor's ad hoc effort to develop an

4  alternative approach to the Board's draft rule allowing conscience, offers further proof to the plaintiffs

5  that Plan B and religious objection were the focus of the rulemaking process.  (Plaintiffs' Reply Brief 7:17-

6  8:19, Dkt. #66).

7      Finally, plaintiffs cite the Governor's words and deeds as evidence of the narrow objective of these

8  regulations.  The Governor immediately expressed her opposition to any rule that allowed a pharmacist to

9  refuse to fill a prescription based on conscience.  She convened a group of stakeholders including the

10  Board of Pharmacy, the University of Washington School of Pharmacy, the Washington State Pharmacy

11  Association, the Department of Health and representatives from Planned Parenthood and the Northwest

12  Women's Law Center to draft an alternative rule eliminating conscience as a basis for refusing to fill a

13  lawful prescription.  The Governor also threatened to replace the members of the Board unless they

14  reversed course on this issue.  Plaintiffs ask the Court to take a common sense view of this evidence and

15  conclude that the Governor's focus was on Plan B and her target was pharmacists who oppose that drug

16  on religious grounds.

17      The evidence thus far presented to the Court strongly suggests that the overriding objective of the

18  subject regulations was, to the degree possible, to eliminate moral and religious objections from the

19  business of dispensing medication.  Defendants argue that the objective was to keep pharmacists from

20  imposing their religious or personal views upon the treating public.  Defendants deny that there is any

21  affirmative duty imposed upon the pharmacist other than to do what he or she was trained to do.  In actual

22  operation, however, the regulations appear designed to impose a Hobson's choice for the majority of

23  pharmacists who object to Plan B: dispense a drug that ends a life as defined by their religious teachings,

24  or leave their present position in the State of Washington.  The evolution of these regulations, as currently

25  described to the Court, convinces the Court that these regulations targeted the religious practices of some

26  citizens and are therefore not neutral.

27      **B.    General Application.**

28      The Court next considers whether the regulations are applied generally.

ORDER
Page - 16

> The principle that government, in pursuit of legitimate interests, cannot in a selective manner impose burdens only on conduct motivated by religious belief is essential to the protection of the rights guaranteed by the Free Exercise Clause.

*Lukumi*, 508 U.S. at 543.  The Supreme Court instructs that the essence of the test on general applicability of a law is that "inequality results when a legislature decides that the governmental interests it seeks to advance are worthy of being pursued only against conduct with a religious motivation." *Lukumi*, 508 U.S. at 542-43.  Intervenors take this to mean that in evaluating general applicability, courts examine the law's means and the law's ends: if the means fail to match the ends, the statute likely targets religious conduct and is therefore not generally applicable.  Applying the test as thus articulated, the Court is persuaded that, when viewed in context, the totality of the evidence supports the conclusion that the subject regulations are not laws of general applicability.

From the very beginning of this issue, it appears that the focus of the debate has been on Plan B and on religious objection to dispensing that drug.  All who have participated in the formulation of these regulations have fixed their attention and crafted their response to that issue.  Media coverage of the controversy has centered on Plan B.  Defendants' efforts to broaden the perspective by articulating a concern for universal or unfettered access to all lawfully prescribed drugs are unconvincing.  First, as to Plan B, there has been no evidence presented to the Court that access is a problem.  It is available at all but a few licensed pharmacies in Washington state and can be accessed through physicians offices, certain government health centers, hospital emergency rooms, Planned Parenthood and the internet.  (Decl. of Kristen Waggoner, para. 3, Dkt. #11).  A survey of approximately 135 pharmacies conducted by the Board during the rulemaking process (October 2006) revealed that of the 121 respondents, 93 typically stocked emergency contraceptives while 28 did not.  Of those who did not, 18 cited low demand and three relied on an "easy alternative source."  Only two pharmacies said they did not stock emergency contraceptives because of religious or personal reasons.  (Exh. A to Decl. of Kristen Waggoner, Dkt. #11).

The Court has been presented no evidence establishing that anyone in the State of Washington, including intervenors, has ever failed to obtain Plan B within the 72-hour window of effectiveness because one or more pharmacists/pharmacies refused to fill a lawful prescription for Plan B or refused to stock and/or dispense Plan B as an over-the-counter drug.

In contrast, in a letter to the Governor, the Chief Executive Officer of the Washington State Pharmacy Association touted the wide-spread accessibility of Plan B throughout Washington due, in large part, to the efforts of pharmacists and their innovative, pharmacy-based program which is a national model of collaboration in an effort to improve public health.  (Exh. E to Decl. of Kristen Waggoner, Dkt. #11). The Court accepts the letter as some evidence that as of June 5, 2006, the WSPA did not see access to Plan B as a significant issue.

The fact that the Pharmacy Board initially proposed a draft rule permitting a pharmacist/pharmacy to not fill a lawful prescription for reasons of conscience is some further evidence, within the focused debate over Plan B, that the Board did not view access to Plan B as a current problem.  At a minimum, to the Board,  the problem was not of such gravity that a health care provider's right of conscience had to be sacrificed.

Expanding the inquiry beyond Plan B, there is some evidence to support defendants' claim that the regulations are about optimal access to all medicines, not just emergency contraceptives.  The Governor's various messages on the subject were not limited to Plan B and the "Final Significant Analysis" prepared for these regulations briefly mentions HIV as another condition requiring timely drug therapy.  (Exh. K to Decl. of Kristen Waggoner, Dkt. #11).  Beyond these limited factors, however, the history of these regulations thus far presented to the Court is directed entirely at Plan B.

As in the case of Plan B, the evidence presented to the Court does not suggest that access to HIV medicines is a problem.  Neither of the two intervenors who are either HIV-positive or have AIDS have been refused medications by a pharmacist, for religious reasons or otherwise.  (Decl. of Judith Billings, Dkt. #51 and Decl. of Jeffrey Schouten, Dkt. #53).  A review of complaints referred to the Board from 1995 to 2007 does not indicate a problem with access to HIV-related medications, or any other medications for that matter.  No one has been identified as having been denied access to HIV medicines

because a pharmacist refused to dispense them.[6]  It is certainly plausible that some pharmacist in the State of Washington could, as intervenors fear, deny distribution of needed HIV-medicine because of personal disdain for a homosexual lifestyle.  No party to this lawsuit has attempted to defend such conduct as Free Exercise of Religion and in the context of the case before it, this Court will not opine on such a hypothetical situation.

To summarize, the evidence presented to the Court does little to support the argument that expanded access to all medications was the "end" which these regulations were written to achieve. Nevertheless, for purposes of further analysis, the Court will, for the time being, accept defendants broader expression of an end result they aspired to attain.  That "end" will be more thoroughly tested against the chosen "means" adopted by the regulators.

The exemptions incorporated into these regulations do not appear designed to materially change the system by which medicines are delivered in Washington state.  They excuse a pharmacy from filling a lawful prescription for logistical reasons such as a national or state emergency or the lack of expertise or specialized equipment needed to deal with a particular medicine.  They also excuse the pharmacy/pharmacist from filling a lawful prescription whenever, in the exercise of professional judgment, an obvious or known error in the prescription is detected or other inadequacies or contraindications are present.  A potentially fraudulent prescription likewise does not have to be filled.

Finally, the regulations exempt pharmacies/pharmacists from filling legal prescriptions where the medicine is not in stock despite good faith compliance with regulations advising pharmacies to maintain an adequate stock of medicines.

These exemptions all reflect legitimate, time-honored reasons for not filling a prescription immediately upon presentation by a patient.  Their inclusion within the regulations reflects the Board's intention to continue, as usual, the basic means and methods by which pharmacies and pharmacists stock and dispense drugs in the State of Washington.  As for the vast majority of drugs legally available to the public, market conditions will continue to guide the decision whether or not to stock.  The means adopted

---

[6]The one example where a pharmacist did refuse to dispense hypodermic needles to a young man because of his appearance, seemingly would not run afoul of these regulations which protect a pharmacist's ability to refuse to fill a prescription due to suspected or potential fraud (WAC 246-869-010(a)(d)).  The individual was diabetic and needed the needles for insulin shots.

ORDER
Page - 19

by the Board to accomplish its desired outcome thus does nothing to increase access to lawful prescription medicines generally. Rather, the enforcement mechanism of the new law appears aimed only at a few drugs and the religious people who find them objectionable.

The Court next turns its attention to the conduct the rulemakers determined to be sanctionable under the regulations. Both the Pharmacy regulation and the Pharmacist regulation focus on the same list of five proscribed actions:

1) Destroying unfilled lawful prescriptions;

2) Refusing to return lawful prescriptions;

3) Violating a patient's privacy;

4) Discriminating against patients or their agent in a manner prohibited by state or federal laws; and

5) Intimidating or harassing a patient.

Under the Pharmacist's regulation (WAC 246-863-095) such conduct is described as unprofessional and presumably sanctionable under the Uniform Disciplinary Act, RCW 18.130 et. seq. The Pharmacies' regulation prohibits the same activity by threatening "discipline or other enforcement actions." WAC 246-869-010.

No party now before this Court objects to those provisions which condemn actions described in Sections 1, 2, 3 or 5 above. It is the catch-all use of the anti-discrimination law to prevent "refuse and refer" with respect to Plan B that plaintiffs seek to enjoin. The Court is therefore focused principally on Plan B and those pharmacists and/or pharmacies that refuse to stock or dispense that drug. Currently, the Court has no evidence before it which explains the Board's chosen reliance on state and federal anti-discrimination laws to define when refusal to dispense is or is not allowed. These laws come with their own exemptions that hint towards at least some potential to further limit the subject regulations' ability to increase access to lawful medicines. For example, the WLAD excludes small employers and religious/sectarian organizations from the definition of "employer," seemingly inoculating such entities from discrimination claims. *See* RCW 49.60.040. While this definition does not appear to impact entities involved in public accommodation, such as pharmacies, the unexplored nature of the interplay between the WLAD and the instant regulations leads to serious questions about the Board's choice of weapons. The

Board clearly chose not to require pharmacies or pharmacists to dispense lawful medications without delay every time they are requested. Instead they chose to invoke the laws against discrimination. At oral argument, questions posed by the Court touching on the obligation of a pharmacy operated by a Catholic hospital to dispense Plan B or other contraceptives went unanswered. The Court's expressed doubts about enforcement action directed at religious hospitals, particularly in light of established statutory protections for such institutions, while unchallenged at this point in the proceeding, at least suggest the new regulations are underinclusive and therefore not generally applicable.

The evidence now before the Court convinces it that the "means" used by the rulemakers do not square with the "end" currently espoused by the defendants. The regulations do not appear to the Court to be of general application. Rather, the regulations appear to target religious practice in a way forbidden by the Constitution. The regulations are neither neutral as to religion nor are they generally applicable. Because the regulations appear to intentionally place a significant burden on the free exercise of religion for those who believe life begins at conception, the regulations must be subjected to strict scrutiny analysis.

## C.     Strict Scrutiny.

Defendants argue that even if strict scrutiny applies, the regulations are justified by a compelling interest and are narrowly tailored to accomplish their intended purpose. They assert that the Board has a compelling interest in ensuring that all parties are treated equally and respectfully by pharmacies and their employees. (Def. Selecky et al memo 15:5-6, Dkt. #43). They rely on two interests served by the regulations as written: (1) promoting health by ensuring access to Plan B (and other medications) in a timely manner and (2) preventing sex discrimination. (Def. Selecky et al memo, pp. 10, 15-16, Dkt. #43 and Def. Friedt et al memo, p. 11, Dkt. #46).

A law burdening religious practice that is not neutral or not of general application must undergo the most rigorous of scrutiny. *Wisconsin v. Yoder*, 406 U.S. 205, 215 (1972). A law that targets religious conduct for distinctive treatment or advances legitimate governmental interests only against conduct with a religious motivation will survive strict scrutiny only in rare cases. *Lukumi*, 508 U.S. at 546. Although promoting the health, welfare and peace of the people might ordinarily present a compelling state interest

1  for First Amendment analysis, the Court has previously indicated why the regulations do not advance the

2  cause of general access to Plan B and other medicines as advocated by defendants.

3       The evidence provided by the parties, including the intervenors, convinces the Court that the

4  interests promoted by the regulations have more to do with convenience and heartfelt feelings than with

5  actual access to certain medications.  Patients understandably may not want to drive farther than the

6  closest pharmacy and they do not want to be made to feel bad when they get there.  These interests are

7  certainly legitimate but they are not compelling interests of the kind necessary to justify the substantial

8  burden placed on the free exercise of religion.  While it is obviously conceivable that a patient in need of

9  Plan B could ultimately be denied access to the drug during its time of effectiveness, that eventuality is just

10  as likely to occur for reasons that are wholly acceptable under the regulations: lack of money, the drug is

11  not in stock, no one has previously requested it, or the store is closed on Sunday.  In short, lack of access

12  to Plan B has thus far not been demonstrated, and the concerns that have been expressed about availability

13  are not compelling.

14       Nor is preventing discrimination on the basis of gender, within the context of this case, a

15  compelling state interest.  The United States Supreme Court has recognized that reasonable people

16  disagree over when life begins, and the refusal to participate in an act that one believes terminates a life

17  has nothing to do with gender or gender discrimination.  *Bray v. Alexandria Women's Clinic*, 506 U.S.

18  263, 271-74 (1993).  Federal and state law provide a clear right to health care providers to not participate

19  in abortion procedures.  *See, e.g.,* 42 U.S.C. §300a - 7(c)(i) and RCW 9.02.150.  Washington's legislature

20  has, on separate occasions, conferred upon health care providers, including pharmacists, a fundamental

21  right to not participate in a health care service to which they have a moral or religious objection.  Whether

22  or not Plan B acts as an abortifacient or terminates a pregnancy, to those who believe that life begins at

23  conception, the drug is designed to terminate a life.  The Supreme Court's ruling and reasoning in *Bray*

24  applies with equal vitality here.  The plaintiffs' objection to Plan B is not about gender, it is about the

25  sanctity of life as defined by their religious teachings.

26       On the evidence now before it, the Court cannot say that the subject regulations advance a

27  compelling state interest and they are narrowly tailored to accomplish their announced purpose.

28

ORDER
Page - 22

1    The evidence before the Court causes it to conclude that plaintiffs have demonstrated that, as to

2  their constitutional right to free exercise of religion, the criteria for imposition of a preliminary injunction

3  have been met.  The facts presented show, to the Court's satisfaction, a likelihood of success on the merits

4  and the possibility of irreparable injury.  In reaching this conclusion, the Court has attempted to compare

5  the facts of this case, not just against the platitudes enunciated by established precedent but also to the

6  facts and circumstances of prominent cases providing to this Court both binding and persuasive guidance.

7    In *Employment Div., Dept. of Human Resources of Oregon v. Smith*, 494 U.S. 872 (1990) the

8  Controlled Substances law at issue was adopted by the Oregon legislature without a thought being given

9  to the religious practices of some who might use hallucinogenic drugs in their ceremonies.  The sole

10  purpose of the law was to prevent the illicit use and abuse of mind-altering, addictive drugs while

11  preserving legitimate uses taken under the care of a doctor.  The law was applied to all persons who did

12  not have a medical prescription for the drug.  The exemption for medical use was wholly consistent with

13  the general purpose of preventing addiction to drugs.  The law was facially neutral, of general application

14  and the legislative history revealed no intent to target religion.  That is not this case.

15    In *Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520 (1993), the

16  regulations adopted by the City were intentionally targeted only at the practice of sacrificing animals in a

17  religious ceremony performed by the Santeria church.  The laws were not neutral on their face and were

18  certainly not applied generally to similar activities of others, whether secular or religious in nature.

19  Although this case does not present such extensive gerrymandering in order to further the intent to target

20  religious practices, the ultimate objective of the subject regulations may be similar to *Lukumi*.  *Smith* and

21  *Lukumi* represent the two extremes when analyzing laws for neutrality or general applicability.

22    Applying these same precedents, the Third Circuit speaking through then-Circuit Judge Alito

23  explained:

24         A law fails the general applicability requirement if it burdens a category of
        religiously motivated conduct but exempts or does not reach a substantial
25         category of conduct that is not religiously motivated and that undermines the
        purposes of the law to at least the same degree as the covered conduct that is
26         religiously motivated.

27  *Blackhawk v. Commonwealth of Pennsylvania*, 381 F.3d 202 (3rd Cir. 2004).  In *Blackhawk*, the Court

28  was confronted with a Game and Wildlife permit fee that was obviously adopted with no intent to target

1  religious practices.  The exemptions to the fee requirement, however, benefitted secular activities but not

2  religious conduct of a similar kind.  The Court concluded that the fee requirement was not generally

3  applicable because its exemptions allowed zoos and "nationally recognized circuses" to keep animals in

4  captivity without paying a fee but required a fee from those keeping animals for religious purposes.  Strict

5  scrutiny analysis therefore applied.

6          In the case now before the Court, the extent and impact of exempted conduct allowed by the

7  subject regulations and the WLAD has not been fully developed.  Nevertheless, the evidence that has been

8  introduced suggests that secular reasons for delaying or denying access to lawfully prescribed medicines

9  undermine the stated purpose of the law to a degree similar to the plaintiffs' conduct that is religiously

10  motivated.

11         Following oral argument, Defendant-Intervenors directed the Court's attention to a recent Third

12  Circuit opinion, *Anspach v. City of Philadelphia, Department of Public Health,* 2007 WL 2743446 (CA 3

13  Pa. Sept. 21, 2007).  There, the Court faced issues of Due Process and Free Exercise of Religion arising

14  out of a city health center acceding to the request of a 16-year-old unemancipated daughter to be provided

15  an emergency contraceptive.  The district court dismissed the action, and the appellate court affirmed.

16  With respect to plaintiffs' (parents and daughter) claim that their right to free exercise of religion was

17  abridged by the conduct of health center personnel, the Court reiterated the requirement that, in order to

18  establish a substantial burden on religious expression, plaintiffs must allege state action that is either

19  compulsory or coercive in nature.  This statement of law is neither new nor remarkable.  Government

20  compulsion either to do or refrain from doing an act forbidden or required by one's religion is the evil

21  prohibited by the Free Exercise Clause.  According to the Court, the concept is a simple one:  the state

22  may not compel an individual to act contrary to his religious beliefs.  *Id.* at *15, citing *Arnold v. Bd. of

23  Educ.,* 880 F.2d 305, 314 (11th Cir. 1989).  Since no compulsion or coercion was imposed upon the young

24  woman, there was no violation of the right to freely exercise one's religion.

25         Here, the situation is much different.  By seemingly intentionally creating an immutable conflict

26  between a pharmacy that cannot refuse and a pharmacist that cannot dispense, the regulations impose

27  more than incidental effects having the tendency to coerce individuals into acting contrary to their

28  religious beliefs.  At this stage in the proceedings, the evidence suggests that the burden on the religious

1    practices of plaintiffs is intentional not incidental, and substantial not minimal.

2        Finally, the Court considered a case arising out of the same national controversy reflected in the

3    case at bar.  In *Menges v. Blagojevich*, 451 F. Supp. 2d 992 (D.C. Ill, 2006), the District Court was called

4    upon to resolve motions to dismiss brought by defendants state officials against complaints filed by certain

5    state pharmacists and by third-party plaintiff Walgreen Pharmacy.  Like the case here, the plaintiffs were

6    pharmacists who had either lost their jobs or were threatened with termination over their refusal to

7    dispense Plan B.  Walgreen's claimed that the regulation requiring a pharmacy to dispense emergency

8    contraceptive upon request without delay forced it to terminate objecting pharmacists who previously

9    were protected by Walgreen's "Referral Pharmacist Policy."  The policy allowed Walgreen pharmacists

10   nationwide to decline to fill a prescription based on moral or religious objections as long as the

11   prescription could be filled by another pharmacist or at a nearby pharmacy.

12       Accepting as true the factual allegations of the Amended Complaint and Third Party Complaint,

13   and drawing all inferences in the light most favorable to the plaintiffs, the Court held that the pharmacists

14   stated a claim for Free Exercise Clause violations as well as Title VII federal preemption.  Walgreen's

15   request for declaratory judgment that its policy complied with state law was barred by the Eleventh

16   Amendment.

17       As in the case at bar, plaintiffs alleged specific expressions of religious animus issued by state

18   officials during the process of enacting the subject laws.  Like the Washington regulations, the Illinois law

19   directly compelled the pharmacy, not the pharmacist, to dispense the drug.  Unlike the Washington law,

20   however, the Illinois law was directed only at emergency contraceptives, not all lawful prescriptions.

21       The factual similarities between this case and *Menges* appear to be substantial.  Although the

22   Court's decision in that case was compelled by a different standard of review than that which guides this

23   Court, the fact that a Free Exercise violation was stated by the allegations in the *Menges* Complaint is

24   persuasive authority which is supportive of the Court's conclusion here.

## CONCLUSION

26       On the issue of Free Exercise of Religion alone, the evidence before the Court convinces it that

27   plaintiffs, individual pharmacists, have demonstrated both a likelihood of success on the merits and the

28   possibility of irreparable injury.  The Court cannot afford protection to individual pharmacists without

1    including pharmacies within the ambit of the injunctive relief to be afforded.  Therefore, the Court

2    **GRANTS** the Plaintiffs' Motion for Preliminary Injunction as follows:

> The defendants are enjoined from enforcing WAC 246-863-095 (4)(d) and
> WAC 246-869-010 (4)(d) (the anti-discrimination provisions) against any
> pharmacy which, or pharmacist who, refuses to dispense Plan B but instead
> immediately refers the patient either to the nearest source of Plan B or to a
> nearby source for Plan B.

6    This injunction will remain in place pending trial of this matter or until further proceedings result in a

7    modification or dissolution of this preliminary injunction.

8          No bond will be required.  See *Borbach v. Reno*, 219 F.3d 1087, 1092 (9th Cir. 2000).

9          The Court has, for the time being, left unresolved the question of whether the corporate plaintiff is

10   a "person" or whether the right of free exercise of religion is a "purely personal" constitutional guarantee

11   unavailable to corporations.  Given the Court's interpretation of the enforcement mechanism built into the

12   subject regulations, it is necessary to extend the injunction to corporate pharmacies as well as to

13   individuals operating pharmacies in order to provide the needed protection for pharmacists.  For that

14   reason, it is not necessary for the Court to resolve these questions at this time.

15         Given the Court's analysis of the facts of this case under the Free Exercise clause, it is not

16   necessary at this time to evaluate plaintiffs' remaining theories: Equal Protection, Due Process or Title VII

17   and preemption.  Those theories will be addressed at trial.

18         As the Court looks forward to trial of the merits several factual and legal issues are of continuing

19   interest.

20         1.    Are there patients who have failed to access Plan B within the 72-hour "window of

21   effectiveness" due to the conduct of Washington pharmacies/pharmacists opposed to Plan B for moral or

22   religious reasons?

23         2.    Did the Board intend that the subject regulations be enforced against religiously-affiliated

24   health care facilities?

25         3.    Should one or more questions of state law be certified to the Washington State Supreme

26   Court to include, for example; a) does the fundamental right of health care providers to refuse to perform

27   services as to which they have a religious objection extend beyond the basic health care and insurance

28   systems, b) does the State Board of Pharmacy have the power to take away protections previously

bestowed by the Legislature upon pharmacists as health care providers, and c) does the statutory right of conscientious objection extend to pharmacies that are one component of a larger "health care facility" such as a hospital?  (The parties should confer immediately and inform the Court whether the certification process should be invoked in this case.)

**IT IS SO ORDERED.**

DATED this 8th day of November, 2007.

RONALD B. LEIGHTON
UNITED STATES DISTRICT JUDGE

ORDER
Page - 27

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NEW YORK

----------------------------------------------------------------------X

ANNIE TUMMINO, in her individual capacity, as Vice-Chair
of the Women's Liberation Birth Control Project, as
Coordinator of the Morning-After Pill Conspiracy, and on
behalf of women who need Emergency Contraception;
ERIN T. MAHONEY, in her individual capacity, as Chair of
the Women's Liberation Birth Control Project, as
Coordinator of the Morning-After Pill Conspiracy, and on
behalf of women who need Emergency Contraception;
CAROL GIARDINA, in her individual capacity, as                        CV-05-0366 (ERK/VVP)
Coordinator of the Morning-After Pill Conspiracy, and on
behalf of women who need Emergency Contraception;
KELLY MANGAN, in her individual capacity, as President of
the University of Florida Campus Chapter of the National
Organization for Women, as Coordinator of the Morning-
After Pill Conspiracy, and on behalf of women who need
Emergency Contraception; STEPHANIE SEGUIN, in her
individual capacity, as Chair of the Florida National
Organization for Women Young Feminist Task Force, as
Coordinator of the Morning-After Pill Conspiracy, and on
behalf of women who need Emergency Contraception;
LORI TINNEY, in her individual capacity, as President of the
Gainesville Chapter of the National Organization for
Women, as Coordinator of the Morning-After Pill
Conspiracy, and on behalf of women who need Emergency
Contraception; JENNIFER BROWN, in her individual
capacity, as Coordinator of the Morning-After Pill
Conspiracy, and on behalf of women who need Emergency
Contraception; CANDACE CHURCHILL, in her individual
capacity, as Coordinator of the Morning-After Pill
Conspiracy, and on behalf of women who need Emergency
Contraception; and FRANCIE HUNT, in her individual
capacity, as Coordinator of the Morning-After Pill
Conspiracy, and on behalf of women who need Emergency
Contraception; ASSOCIATION OF REPRODUCTIVE HEALTH
PROFESSIONALS, on its own behalf and on behalf of its
members and women who need Emergency Contraception;
and NATIONAL LATINA INSTITUTE FOR REPRODUCTIVE

HEALTH, on its own behalf and on behalf of women who
need Emergency Contraception; ROBERT JAFFE; AURORA
DEMARCO; ANGELICA JAFFE; CATHERINE LEDERER-
PLASKETT; ALIZA LEDERER-PLASKETT; JONATHAN MARKS;
GABRIELLE MARKS,

                   Plaintiffs,

v.

ANDREW C. VON ESCHENBACH, in his official capacity as
acting commissioner of the Food and Drug Administration,

                   Defendant.

------------------------------------------------------------------------X

## FIFTH AMENDED COMPLAINT

     Plaintiffs, by and through their undersigned attorneys, bring this complaint against the

defendant, his agents and successors in office, and in support thereof aver the following:

     1.   This is a challenge under the Administrative Procedures Act (APA) and the United

States Constitution to the denial by the Food and Drug Administration (FDA) of a Supplemental

New Drug Application (SNDA) and a citizen petition ("citizen petition") seeking to switch the

emergency contraception ("EC") drug Plan B from prescription-only availability to unrestricted

over-the-counter status[1] ("OTC switch") and to the establishment by the FDA of an age-

restricted, behind-the-pharmacy-counter, dual prescription/nonprescription regime for Plan B

("BTC regime").  Plaintiffs claim that the BTC regime and the denial of the OTC switch violate

their rights and the rights of women who need Plan B to privacy and equal protection under the

Fifth Amendment, and that the BTC regime and the denial of the OTC switch violate their rights

---

[1] Plaintiffs will use the term "unrestricted OTC status" to mean over-the-counter availability without a requirement
that the drug be kept behind the pharmacist's counter, without a restriction on the types of venues where the product
may be distributed, and without an age restriction.  In other words, "unrestricted status" is used to mean the status of
numerous other drugs and devices, such as aspirin, condoms, dextromethorphan, ibuprofen, acetaminophen, etc.

and the rights of women who need Plan B because it exceeds the statutory authority of the FDA

and is arbitrary and capricious.  Plaintiffs seek injunctive relief requiring the defendant to

approve the OTC switch for women of all ages, or such other equitable relief as the Court may

deem appropriate, and a declaratory judgment that the FDA's denial violates the APA and

violates the constitutional rights of women who need Plan B.


**I.    Jurisdiction and Venue**

2.   This Court has jurisdiction under 28 U.S.C. § 1331 because this case arises under the

Constitution and laws of the United States.

3.   Venue is proper in this district under 28 U.S.C. § 1391(d) because one of the

plaintiffs resides in this district and the defendant is an officer of the United States acting in his

official capacity.

**II.    The Parties**

**A.    Plaintiffs**

4.   Plaintiff Annie Tummino is a resident of Brooklyn, New York.  She sues on her own

behalf, in her individual capacity as Vice-Chair of the Women's Liberation Birth Control Project

and as Coordinator of the Morning-After Pill Conspiracy ("MAP Conspiracy"), and on behalf of

women who need Plan B.

5.   Plaintiff Erin T. Mahoney is a resident of New York, New York.  She sues on her

own behalf, in her individual capacity as Chair of the Women's Liberation Birth Control Project

and as Coordinator of the MAP Conspiracy, and on behalf of women who need Plan B.

6.   Plaintiff Carol Giardina is a resident of New York, New York.  She sues on her own behalf, in her individual capacity as Coordinator of the MAP Conspiracy, and on behalf of women who need Plan B.

7.   Plaintiff Kelly Mangan is a resident of Gainesville, Florida.  She sues on her own behalf, in her individual capacity as President of the University of Florida Campus Chapter of the National Organization for Women, as Coordinator of the MAP Conspiracy, and on behalf of women who need Plan B.

8.   Plaintiff Stephanie Seguin is a resident of Gainesville, Florida.  She sues on her own behalf, in her individual capacity as Chair of the Florida National Organization for Women Young Feminist Task Force and as Coordinator of the MAP Conspiracy, and on behalf of women who need Plan B.

9.   Plaintiff Lori Tinney is a resident of Gainesville, Florida.  She sues on her own behalf, in her individual capacity as President of the Gainesville Chapter of the National Organization for Women, Gainesville, FL and as Coordinator of the MAP Conspiracy, and on behalf of women who need Plan B.

10. Plaintiff Jennifer Brown is a resident of Gainesville, Florida.  She sues on her own behalf, in her individual capacity as Coordinator of the MAP Conspiracy, and on behalf of women who need Plan B.

11. Plaintiff Candace Churchill is a resident of Gainesville, Florida.  She sues on her own behalf, in her individual capacity as Coordinator of the MAP Conspiracy, and on behalf of women who need Plan B.

12. Plaintiff Francie Hunt is a resident of Nashville, Tennessee.  She sues on her own behalf, in her individual capacity as Coordinator of the MAP Conspiracy, and on behalf of women who need Plan B.

13. The MAP Conspiracy is a coalition of feminist organizations leading the grassroots movement to make the Morning-After Pill an over-the-counter drug by raising public consciousness about the ways that women have to conspire to obtain it.  Since February 2004, the MAP Conspiracy has organized speak-outs where women publicly testify from their own experience about their need for the Morning-After Pill and the obstacles they face obtaining it.  Members of the MAP Conspiracy also testified at the December 2003 FDA public hearings on the Barr application for approval of over-the-counter status for Plan B.

14. Each of the individual plaintiffs listed in paragraphs 4-13 above has access to one or more doses of Plan B, and each of them intends, plans, and has pledged to provide Plan B to friends or other women of any age -- including women under the age of 18 and women over 18 who lack government issued identification or who lack timely access to a pharmacy or health clinic -- whom they learn need Plan B to prevent pregnancy.  None of the individual plaintiffs listed in paragraphs 4-13 above is licensed or authorized by law in any state to prescribe or dispense drugs.  Consequently, unless unrestricted OTC status for Plan B is implemented, each of the individual plaintiffs listed in paragraphs 4-13 above risks violating federal and state criminal statutes if she carries through on her plan to provide Plan B to women of all ages who need it to prevent pregnancy.  *See*, *e.g.*, 21 U.S.C. §§ 353(b)(1), 333(a), 333(b) (2005);  § 465.015, Fla. Stat. (2004).

15. Each of the individual plaintiffs listed in paragraphs 4-13 above objects to the requirement contained in the BTC regime that she must disclose her name, address and age to a

pharmacist and/or pharmacy employee in order to obtain Plan B.  In addition, each individual

plaintiff listed in paragraphs 4-13 above objects to the disclosure of information to third parties

about her personal sexual activity that will occur because, in order to obtain Plan B without a

prescription, she is required to present identification to a pharmacist or pharmacy employee.

16. Plaintiff Association of Reproductive Health Professionals (ARHP) is a non-profit

membership association composed of experts in reproductive health. These professionals include

physicians, advanced practice clinicians (nurse practitioners, nurse midwives, physician

assistants), researchers, educators, pharmacists, and other professionals in reproductive health,

some of whom have authority to prescribe drugs and some of whom do not.  ARHP and its

members provide reproductive health services and education, conduct reproductive health

research, and influence reproductive health policy.  Specifically, ARHP works to improve the

reproductive health of women by reducing the number of unintended pregnancies among

women.   ARHP, along with Princeton University's Office of Population Research (OPR),

manages the *Emergency Contraception Hotline* (1-888-Not-2-Late) and *Website* (www.not-2-

late.com), which aim to prevent unintended pregnancy by providing women of all ages and their

partners information about, and rapid access to, emergency contraception.  Both the *Hotline* and

*Website* are highly utilized tools, currently receiving an average of 60,000 calls and 650,000

unique website visits per year.  These calls and visits include calls and visits by women under the

age of 18, women over 18 who lack government issued identification, and women who lack

timely access to a pharmacy or health clinic.  The *Hotline* is an automated, toll-free, 24-hour,

confidential service available in both English and Spanish that gives callers general emergency

contraception information and a list of the five emergency contraception providers nearest to

them (including a list of pharmacists in states where pharmacists are permitted by state law to

dispense Plan B to those who require a prescription). It is available from any phone in the United States, Puerto Rico, U.S. Virgin Islands, British Columbia, and the Yukon Territory. The *Website*, available in English, French, Spanish, and Arabic, is the most comprehensive emergency contraception clearinghouse in the world available to anyone via the World Wide Web. It features frequently asked questions about emergency contraception, a publications bibliography, a Plan B materials database, and a searchable database of Plan B providers across the country, Puerto Rico, Guam, U.S. Virgin Islands, and British Columbia. The full directory of providers can be searched by city, state, area code, and zip code. The NOT-2-LATE database also lists pharmacists in Alaska, California, Washington State, New Mexico, and British Columbia. ARHP and OPR work closely with local pharmaceutical associations to sign up pharmacists who dispense Plan B behind the counter. Vermont has recently become the ninth state—joining Alaska, California, Hawaii, Maine, Massachusetts, New Hampshire, New Mexico, and Washington—to allow direct dispensation of Plan B by pharmacists. FDA admitted on June 9, 2006 that it had denied ARHP's petition to the FDA to switch Plan B to OTC status for women of all ages. The BTC regime and the denial of unrestricted OTC status interfere with ARHP's ability to educate health care providers and the public about emergency contraception, interfere with ARHP's efforts to reduce the number of unintended pregnancies and its efforts to use the *Emergency Contraception Hotline* and *Website* to achieve that goal, and interfere with its members' ability to accomplish the goal of improving the reproductive health of women. ARHP sues on its own behalf, on behalf of its members who lack prescribing authority and their patients and clients who seek Plan B who are under 18, are over 18 and lack government issued identification, lack timely access to a pharmacy or health clinic, or are over 18 and object to

showing identification in order to obtain Plan B, and on behalf of the women who utilize the Hotline and Website to obtain access to Plan B.

17. Plaintiff National Latina Institute for Reproductive Health (NLIRH) is a non-profit organization formed under section 501(c)(3) of the Internal Revenue Code.  NLIRH conducts a Plan B education and outreach project which seeks to educate providers of Plan B and potential users of Plan B about what Plan B is, how to use it, and how to obtain it and, for providers, how to incorporate it into their practice.  NLIRH has conducted such an education and outreach project in the Bronx, and plans additional such projects at several locations in Brooklyn and the Bronx through June of 2005.  NLIRH's Plan B education outreach projects are impeded by the age-restricted behind-the-counter dual prescription/nonprescription status for Plan B.  If Plan B is switched to OTC for women of all ages, NLIRH will be able to improve access to Plan B by enhancing its Plan B educational programs for both the health care providers and the public participants involved in those projects.  NLIRH sues on its own behalf and on behalf of the women participants in its Plan B projects who are of childbearing age, including women who are under 18, are over 18 and lack government issued identification, lack timely access to a pharmacy or health clinic, or are over 18 and object to showing identification in order to obtain Plan B.

18. Plaintiff Robert Jaffe is a resident of Brooklyn, New York and is the father of a 13-year-old daughter, Angelica Jaffe.  He sues on behalf of himself and his daughter because he wants his daughter to be able to obtain Plan B without a prescription and without any restriction on its point of sale so as to maximize the likelihood that she will avoid unwanted pregnancy.

19. Plaintiff Aurora DeMarco is a resident of Brooklyn, New York and is the mother of a 13-year-old daughter, Angelica Jaffe.  She sues on behalf of herself and her daughter because she

wants her daughter to be able to obtain Plan B without a prescription and without any restriction on its point of sale so as to maximize the likelihood that she will avoid unwanted pregnancy.

20. Plaintiff Angelica Jaffe is a resident of Brooklyn, New York and is a 13-year-old young woman. She sues on her own behalf because she wants to be able to obtain Plan B without a prescription and without any restriction on its point of sale so as to maximize the likelihood that she will avoid unwanted pregnancy.

21. Plaintiff Catherine Lederer-Plaskett is a resident of Hartsdale, New York and is the mother of a 16-year-old daughter, Aliza Lederer-Plaskett. She sues on behalf of herself and her daughter because she wants her daughter to be able to obtain Plan B without a prescription and without any restriction on its point of sale so as to maximize the likelihood that she will avoid unwanted pregnancy.

22. Plaintiff Aliza Lederer-Plaskett is a resident of Hartsdale, New York and is a 16-year-old young woman. She sues on her own behalf because she wants to be able to obtain Plan B without a prescription and without any restriction on its point of sale so as to maximize the likelihood that she will avoid unwanted pregnancy.

23. Plaintiff Jonathan Marks is a resident of Brooklyn, New York and is the father of a 13-year-old daughter, Gabrielle Marks. He sues on behalf of himself and his daughter because he wants his daughter to be able to obtain Plan B without a prescription and without any restriction on its point of sale so as to maximize the likelihood that she will avoid unwanted pregnancy.

24. Plaintiff Gabrielle Marks is a resident of Brooklyn, New York and is a 13-year-old young woman. She sues on her own behalf because she wants to be able to obtain Plan B

without a prescription and without any restriction on its point of sale so as to maximize the likelihood that she will avoid unwanted pregnancy.

25. Each woman who is (1) under 18 years of age and needs Plan B; (2) over 18 but lacks adequate proof of age to obtain Plan B without a prescription; (3) over 18 but lacks timely access to a pharmacy or health clinic so as to maximize the effectiveness of Plan B; or (4) must present identification including proof of age to a pharmacist or health clinic and thereby disclose at least her name and possibly her address to third-parties to obtain Plan B, is irreparably injured as a direct result of the FDA's age-restricted behind-the-counter dual prescription/nonprescription regime for Plan B.  Each of the Plaintiffs listed in paragraphs 4-13, 16, and 17 above wants to and intends to try to make Plan B available to women in each of these categories, and asserts third-party standing to assert their interests.

26. Each of the plaintiffs is aggrieved on a continuing and ongoing basis by the FDA's rejection of the OTC switch of Plan B for women of all ages.

27. Each of the plaintiffs is injured on a continuing and ongoing basis by the FDA's rejection of the OTC switch for women of all ages, and the FDA's rejection is the cause of that injury.

28. The relief sought in this complaint will redress the injury suffered by each of the plaintiffs that is caused by the FDA's rejection of unrestricted OTC status for Plan B.

### B.    Defendant

29. Andrew C. von Eschenbach is the acting commissioner of the FDA.  Von Eschenbach is responsible for protecting the public health by assuring the safety, efficacy, and security of human and veterinary drugs, biological products, medical devices, our nation's food supply, cosmetics, and products that emit radiation.  He is also responsible for advancing the public

health by helping to speed innovations that make medicines and foods more effective, safer, and more affordable; and helping the public get the accurate, science-based information they need to use medicines and foods to improve their health.  He is sued in his official capacity.

## III.    Statutory and Regulatory Background

30. Under FDA regulations, "[a]ny drug limited to prescription use . . . shall be exempted from prescription-dispensing requirements when the Commissioner finds such requirements are not necessary for the protection of the public health by reason of the drug's toxicity or other potentiality for harmful effect, or the method of its use, or the collateral measures necessary to its use, and he finds that the drug is safe and effective for use in self-medication as directed in proposed labeling."  21 C.F.R. § 310.200(b) (2005); *see also* 21 U.S.C. § 353(b)(3) (2005) ("The Secretary may by regulation remove drugs subject to sections 352(d) and 355 of this title from the requirements of paragraph (1) of this subsection when such requirements are not necessary for the protection of the public health.").

31. The FDA views OTC status as the "default" status for drugs.  *See* http://www.fda. gov/cder/Offices/OTC/FDA-CHPA%20seminar%20Oct%202/tsld013.htm (attached as Exhibit U).

32. An approved drug is suitable for OTC use when: (1) the drug is safe for self-medication, 21 C.F.R. § 310.200(b); 21 C.F.R. § 330.10(a)(4)(i); (2) the drug is effective when self-administered, 21 C.F.R. § 310.200(b); 21 C.F.R. § 330.10(a)(4)(ii); (3) the condition to be treated is self-diagnosable; and (4) the drug's labeling is tailored to self-administration, 21 C.F.R. § 310.200(b); 21 C.F.R. § 330.10(a)(4)(v).

33. The FDA has developed its own internal criteria for assessing OTC switch applications, known as the "Peck criteria" after former CDER Director Carl Peck.  These criteria

are: 1.) Does the product have an acceptable margin of safety based on prior prescription marketing experience; 2.) Does the product have low misuse and abuse potential; 3.) Can the condition be adequately self-recognized and successfully self-treated with minimal health care provider intervention; 4.) Do the benefits from the switch to non-prescription status clearly outweigh the risks; and 5.) Is the self-treatment product safe and effective during consumer use. Plan B meets each of these criteria.

34. By statute, the manufacturer of a prescription drug may file a supplemental new drug application with the FDA seeking to switch the drug to OTC status. 21 U.S.C. § 355(b). Such an application must be acted upon by the FDA within 180 days of its filing. 21 U.S.C. § 355(c).

35. In addition, FDA regulations explicitly authorize the use of a citizen's petition to seek a switch from prescription to OTC status: "A proposal to exempt a drug from the prescription-dispensing requirements of section 503(b)(1)(C) of the act may be initiated by . . . any interested person . . . fil[ing] a petition . . . pursuant to Part 10 of this chapter . . . ." 21 C.F.R. § 310.200(b). Once a citizen's petition has been filed, the FDA is required by its regulations to either approve the petition, deny the petition, or "[p]rovide a tentative response, indicating why the agency has been unable to reach a decision on the petition, e.g., because of the existence of other agency priorities, or a need for additional information." 21 C.F.R. § 10.30(e)(2).

36. During the process of considering an application for an OTC switch, the FDA typically receives the advice of the FDA's OTC advisory committee meeting together with the FDA's advisory committee that has specific expertise in the product under consideration. In the case of Plan B, the latter committee is the Advisory Committee for Reproductive Health Drugs. These advisory committees are authorized by, *inter alia*, 21 U.S.C. § 355(n) (2005).

37. The FDA lacks the statutory authority to restrict the types of businesses that can sell OTC drugs.

38. Dispensing a prescription drug other than by prescription is an act of "misbranding" under federal law. 21 U.S.C. § 353(b)(1). Introducing a misbranded drug into interstate commerce is a "prohibited act," 21 U.S.C. § 331(a), punishable by not more than one year imprisonment or a fine of up to $1000 or both. 21 U.S.C. § 333(a)(1).

## IV.    Factual Allegations

### A.    Making Plan B Available OTC to Women of All Ages Would Improve the Public Health and Enable Women to Reduce their Risk of Unplanned Pregnancies.

39. Unintended pregnancy is a significant public health problem in the United States. The United States has one of the highest rates of unintended pregnancy compared to other developed countries. The rate of teen pregnancy in the United States is also one of the highest among developed countries. Wider access to Plan B will reduce unintended pregnancies, including among teenagers.

40. The risks of pregnancy and childbirth, including maternal death, can be serious and far exceed the risks associated with Plan B.

41. Plan B is a drug used only by women, and every woman of childbearing age is a potential user of Plan B.

42. Plan B (Levonorgestrel) is an emergency contraceptive drug in tablet form that can be used to prevent pregnancy following an act of intercourse in which no contraceptive was used or the contraceptive method used failed.

43. When taken within 72 hours of unprotected intercourse, Plan B reduces the risk of pregnancy by approximately 89 percent after a single act of unprotected sex. As the interval

between intercourse and the start of treatment increases, Plan B's effectiveness declines, and the risk of pregnancy increases. Plan B does not interfere with an established pregnancy.

44. Switching Plan B to OTC status for women of all ages will promote public health because Plan B is only effective for a short time after unprotected sex, and it works most effectively if used within twenty-four hours of unprotected sex. Because contacting a physician and obtaining and filling a prescription hinder women from obtaining Plan B in a timely fashion, making Plan B available OTC will allow more women to use the treatment, and enable more women to prevent unwanted pregnancies, to the benefit of public health.

45. Limiting Plan B to prescription use is not necessary for the protection of public health.

46. Plan B is safe for self-medication because it is not toxic to the woman (or to the embryo or fetus if a pregnancy had been previously established in the woman).

47. Plan B has a low risk of abuse or overdose, and if overdose occurs is unlikely to lead to serious consequences.

48. Plan B's side effects are well-known and minor.

49. Plan B is effective when self-administered. Its administration is simple and relies only on assessments as to time elapsed since sexual intercourse that can be independently made by the woman, and any interaction between Plan B and other drugs would be nonfatal and unlikely to seriously affect Plan B's efficacy.

50. The condition Plan B treats — contraceptive failure or failure to use contraception during intercourse — is one that is readily diagnosable by a woman.

51. Plan B has no contraindications that would pose a danger to the patient.

52. The existing patient labeling for Plan B is tailored to self-administration in that it is simple, clear, comprehensive and easy to follow.

53. The American Medical Association and the American College of Obstetricians and Gynecologists both support switching Plan B to OTC status for women of all ages.  *See* Dec. 5, 2000 Statement of American Medical Association; February 14, 2001 Statement of the American College of Obstetricians & Gynecologists.  In addition, the American Academy of Pediatrics supports switching Plan B to OTC status for women of all ages.  (Attached hereto as Exhibit T).

**B.    Public Health Organizations Filed Two Citizen Petitions with the FDA Seeking to Increase Access to Emergency Contraception.**

54. On November 23, 1994, the Center for Reproductive Law and Policy (now the Center for Reproductive Rights) submitted a Citizen Petition (Docket No. 94P-0427) on behalf of the American Women's Health Association, the American Public Health Association, and Planned Parenthood of New York City, asking the FDA to require two drug manufacturers to amend the labeling and package inserts of certain of their oral contraceptive products to include information regarding the use of these products as emergency contraception.  On May 22, 1995, the FDA issued an "interim response" indicating that the request was "still under consideration" and that the agency required more time to "thoroughly evaluate[] the issues raised" in the petition and to finalize its decision.  (Letter of Janet Woodcock, M.D., Director, CDER, dated May 22, 1995 (attached hereto as Exhibit A).)

55. On May 9, 1996, the FDA issued a letter denying the 1994 Citizen Petition because "[a]lthough FDA agrees in principle that it has discretion to require that certain conditions of use be included in a product's labeling . . . we decline to exercise our discretion to require the relabeling of these products in the manner you suggest."  (Letter of Janet Woodcock, M.D., Director, CDER, dated May 9, 1996 (attached hereto as Exhibit B).)  However, the agency

determined "that it would be appropriate to discuss the issue of the safety and effectiveness of oral contraceptives for postcoital emergency use with the Reproductive Health Drugs Advisory Committee at its June 28, 1996 meeting. [The Center for Reproductive Law and Policy] will be invited to present [its] views at that meeting." *See id*.

56. On February 24, 1997, the Center for Reproductive Law and Policy received notice from FDA Deputy Commissioner Mary K. Pendergast that "today the Food and Drug Administration placed on public display a Federal Register notice concluding that certain combined oral contraceptives . . . are safe and effective for use as postcoital emergency contraception. The notice requests submission of new drug applications for this use . . . ." (Letter of Mary K. Pendergast, Deputy Commissioner, Senior Advisor to the Commissioner, FDA, dated February 24, 1997 (attached hereto as Exhibit C); *see also* Prescription Drug Products; Certain Combined Oral Contraceptives for Use as Postcoital Emergency Contraception (Docket No. 96N-0492) (attached hereto as Exhibit D).)

57. FDA Federal Register Notice stated that "[t]his notice is intended to encourage manufacturers to make this additional contraceptive option available." Ex. D at 1. The agency agreed with the unanimous conclusion of the Advisory Committee, which met on June 28, 1996 to consider this issue, that several regimens of oral contraception were safe and effective for postcoital emergency contraception. *Id*. at 3. The agency concluded that "[b]ecause of the publicly available safety and effectiveness data documenting the drugs' use, the safety and effectiveness requirements of § 314.50 may be met by citing the published literature listed in the references in section III. of this document." *Id.* at 8.

58. In 1999, the FDA approved Plan B as a prescription drug. Since that date, Plan B has been prescribed many thousands of times.

59. On February 14, 2001, a group of citizen organizations, including Plaintiff ARHP, filed a petition ("the Citizen Petition") with FDA asking the agency to switch Plan B (and another drug, Preven, that has since been removed from the market for reasons unrelated to safety and effectiveness) to OTC status for women of all ages.

60. The FDA's consideration of the Citizen Petition was inextricably intertwined with its consideration of the application by the manufacturer of Plan B to switch Plan B to OTC status, described below.

61. On June 9, 2006, the FDA issued a letter directly prompted by this lawsuit in which it acknowledges that it has denied the Citizen Petition. (*See* Exhibit V.)

62. In that letter, the FDA alleges: "Soon after [the] petition was filed, [FDA] made a preliminary determination that your petition and its supporting information did not provide sufficient data to satisfy the statutory requirements to approve an OTC switch for emergency contraceptives, as documented in memoranda dated February 28, 2001 and April 12, 2001." (*See* Exhibit V at 1.) However, this determination was not communicated to the petitioners until June 9, 2006. Rather, the FDA gave a tentative response to the Citizen Petition on September 6, 2001, stating the FDA "has not yet resolved the issues raised in your Citizen Petition because it raises significant issues requiring extensive review and analysis by Agency officials."

**C.    Barr Laboratories Filed a Supplemental New Drug Application Seeking OTC Status for Plan B, Which Was Not Approved by the FDA Contrary to the Overwhelming Consensus of the Review Staff and Advisory Committee in Support of Approving the Application.**

63. On April 16, 2003, Women's Capital Corporation, the former owner of Plan B, filed a supplemental new drug application (SNDA) asking the agency to approve Plan B for OTC sale. Plan B was subsequently sold to Barr Laboratories, which maintained the SNDA. The SNDA

contains no scientific data whatsoever on the safety or effectiveness of Plan B for any medically approved use for men.

64. On April 21, 2003, FDA Commissioner McClellan held a teleconference with Jay Lefkowitz, Deputy Assistant to the President for Domestic Policy at the White House, regarding WCC's submissions to the FDA on Plan B. Commissioner McClellan continued to have periodic discussions with White House staff regarding the Plan B SNDA.

65. Prior to the submission of the manufacturer's OTC switch application, but after the FDA became aware of the manufacturer's intent to file such an application, three new members were appointed to the Advisory Committee for Reproductive Health Drugs at the insistence of the FDA Commissioner's Office and despite strongly voiced concerns from FDA's career scientists about their qualifications. In addition, despite the usual practice by which members of the advisory committees are proposed by career scientists with relevant expertise, these three members were proposed by political appointees. Each of the three voted contrary to the majority vote of the Committee on one or more votes taken regarding Plan B.

66. On December 16, 2003, FDA's Non-prescription Drugs Advisory Committee and Advisory Committee for Reproductive Health Drugs held a joint session to discuss possible OTC status for Plan B.

67. The advisory committees, comprised of 28 members, voted as follows:

(1) Does the Actual Use Study (AUS) demonstrate that consumers used [Plan B] as recommended in the proposed labeling?

Yes – 27        No – 1

(2) Are the AUS data generalizable to the overall population of potential non-Rx users of Plan B?

Yes – 27        No – 1

(3) Based on the AUS and literature review, is there evidence that non-Rx availability of Plan B leads to substitution of emergency contraception for the regular use of other methods of contraception?

Yes – 0          No – 28

(4) Do the data demonstrate that Plan B is safe for use in the non-prescription setting?

Yes – 28          No – 0

68. According to the Manual of Policies and Procedures (MAPP) of the FDA's Center for Drug Evaluation and Research (CDER), the authority to approve a product for initial OTC marketing and for initial Rx-to-OTC switch for the first in a class of products is delegated to the office director level.  MaPP 6020.5 at 13 (MaPP 6020.5 is attached hereto as Exhibit S).  The authority to not approve an OTC switch for a drug is the responsibility of the "Specific Subject Matter Review Division" that approved it as a prescription drug.  MaPP 6020.5 at 15.  The FDA violated these policies in its actions regarding the Plan B SNDA and the Citizen Petition.

69. The composition of the Joint Advisory Committee was likewise determined in a manner that departed from the normal process because nominations to the Committee were made by FDA political appointees rather than FDA career scientists.

70. During late December of 2003 or early January of 2004, Drs. Janet Woodcock (Director of CDER and acting Deputy Commissioner of the FDA) and Steven Galson (acting Director of CDER) informed Drs. John Jenkins and Sandra Kweder (Director and Deputy Director of CDER's Office of New Drugs) that Commissioner McClellan had made a determination that the Plan B SNDA would not be approved.  This decision also constructively denied the Citizen Petition.

71. The FDA decided by January 2004 at the latest to require an age restriction in any possible nonprescription approval for Plan B.

72. The determination by the Commissioner described in ¶ 70 that the Plan B SNDA would not be approved was made by the Commissioner (1) without attending the Joint Advisory Committee meeting; (2) before scientific reviews of the Plan B SNDA were completed by the FDA's scientific review staff; and (3) without any direct discussions with the FDA's scientific review staff conducting the review of the Plan B SNDA.

73. On January 15, 2004, Dr. Galson informed FDA scientists conducting the agency's review of the Plan B SNDA that the Commissioner's position was that the application could not be approved.  At this same meeting Dr. Galson conveyed that one option that might lead to approval was an age restriction on Plan B that would keep it as a prescription drug for women under 18, even though he only invoked alleged deficiencies in data for women under 16.  This option was proposed before scientific reviews of data submitted with the Plan B SNDA were complete.

74. On or about January 16, 2004, Dr. Woodcock informed the Director of the Office of Drug Evaluation III that the non-approval action directed by Commissioner McClellan was the only course of action that would appease the Presidential administration's constituents and that might lead eventually to approval.

75. On February 19, 2004 Dr. Janet Woodcock stated at a meeting that both she and the Commissioner were concerned about the possibility of OTC Plan B acquiring 'urban legend' status and leading to extreme promiscuous behaviors, such as the development of sex based cults centered around the use of Plan B.  At that meeting, Dr. Galson indicated that he shared Dr. Woodcock's concerns.

76. All but one scientific staff member below the Center Director level within CDER who reviewed the OTC switch application expressed the view based on scientific and medical

data that the OTC switch should be approved for women of all ages. The one staff member who disagreed believed the application was "approvable."

77. By memorandum dated April 22, 2004 and signed electronically on April 28, 2004, Dr. John Jenkins wrote a memorandum summarizing his "review, conclusions, and recommendations regarding" the OTC switch for Plan B (attached hereto as Ex. E) ("the Jenkins memorandum"). This memorandum states: "[The FDA] has not heretofore distinguished the safety and efficacy of Plan B and other forms of hormonal contraception among different ages of women of childbearing potential and I am not aware of any compelling scientific reason for such a distinction in this case." (Ex. E at 30898.) After a review of the record evidence supporting OTC use by women of all ages, the Jenkins memorandum accordingly concludes "that the available data clearly support a conclusion that Plan B meets the statutory and regulatory requirements for availability without a prescription for all age groups. Such a conclusion is consistent with how the Agency has made determinations for other OTC products, including other forms of contraception available without a prescription." (*Id.* at 30899.)

78. The Jenkins memorandum further states that "[o]ther senior officials within the Agency, including the former Commissioner (Dr. McClellan) and the Acting Center Director (Dr. Galson), have expressed concerns about the potential for unsafe, ineffective, or inappropriate use of Plan B by adolescents if it were to be made available without a prescription. These concerns appear to have been based primarily on the limited number of adolescent women included in the sponsor's label comprehension and actual use studies." (*Id.* at 30897.)

79. Though Jenkins said that he "[is] sensitive to and respect[s] the concerns that some may have regarding non-prescription access to Plan B by adolescents," (*Id.* at 30898), he stated that "[p]roducts that are indicated for uses related to sexual activity in adolescents raise concerns

for some people that go beyond a finding based on clinical trial data that the product is safe and effective for its intended use in adolescents.  These concerns derive from individual views and attitudes about the morality of adolescent sexual behavior and also overlap with concerns about the role for parents and health care professionals in decisions about contraceptive use in adolescents." (*Id*. at 30898-99.)  He concluded: "While OTC access to Plan B for adolescents may be controversial from a societal perspective, I cannot think of any age group where the benefit of preventing unplanned pregnancies and abortion is more important and more compelling." (*Id*. at 30899.)

80. On May 6, 2004, CDER Acting Director Steven Galson issued a "non-approvable" letter (attached hereto as Ex. F) ("the Galson letter") to Barr rejecting the OTC switch for Plan B. That action also constructively denied the Citizen Petition.

81. The Galson letter asserts that Barr's SNDA could not be approved because Barr had "not provided adequate data to support a conclusion that Plan B can be used safely by young adolescent women for emergency contraception without the professional supervision of a practitioner licensed by law to administer the drug." (Ex. F at 10796.)  This assertion is not supported by the agency record.

82. In November of 2004, FDA's Office of Counter-Terrorism and Pediatric Drug Development concluded that the data submitted by the manufacturer reflected the age distribution, including among younger adolescents, of actual prescription users of the product.

83. In about January 2005, Steven Galson was prepared to approve Plan B for OTC status for women ages 17 and over, but his authority to do so was removed by the Commissioner of the FDA.   Indeed, Dr. Galson had asked the Director of the Office of New Drugs to draft approval letters for him.

84. At least one of the FDA scientists who supported OTC status for Plan B fears

retaliation from the Agency for her truthful testimony in this lawsuit.

85. Dr. Galson was concerned that if he did not implement or disagreed with the decision

of the Office of the Commissioner to reject unrestricted OTC status for Plan B, his career at the

FDA would be jeopardized.


D.    **Barr Laboratories Filed an Amended Supplemental New Drug Application Seeking Age-Restricted OTC Status for Plan B, Which Also Was Not Approved, Contrary to the Overwhelming Consensus among Agency Reviewers in Favor of Approving the Application.**

86. On July 22, 2004, Barr filed an amended SNDA seeking the OTC switch only for

women aged 16 and higher.  By statute, the defendant was required to act on Barr's amended

SNDA within 180 days after it was filed.  *See* 21 U.S.C. § 355(c)(1).  On January 21, 2005, the

FDA announced a delay of its decision on Barr's application beyond this statutory time limit.

87. The reviewing divisions and offices of FDA reviewed Barr's amended application

and examined the concerns raised by senior officials to support their decision to issue a non-

approvable letter for OTC use of Plan B, but found that scientific evidence did not support these

concerns.  (Excerpts from Mem. of Donna J. Griebel, M.D., dated January 12, 2005 (attached

hereto as Exhibit G) at 31033.)

88. In its review of Barr's amended SNDA, the FDA review staff unanimously agreed

that despite Barr's application for limited OTC status for Plan B for women 16 and older, that the

drug was suitable for -- and thus should be approved for -- full OTC access for women of all

ages.  (Review of Complete Response by Daniel Davis, M.D., dated January 12, 2005 (attached

hereto as Exhibit H) at 1; Mem. Add. of Curtis J. Rosebraugh, M.D., dated January 12, 2005

(attached hereto as Exhibit I) at 2; Ex. G at 31031-33; Mem. of John Jenkins, M.D., dated

January 14, 2005 (attached hereto as Exhibit J) at 31096-98; *see also* Mem. of Steven Galson, M.D., dated August 26, 2005 (attached hereto as Exhibit K) at 1.)

89. The Director and Deputy Director of the Division of OTC Drug Products and the Director of the Office of Drug Evaluation V stated that Plan B meets the criteria for unrestricted OTC access, that data to the contrary was lacking, and that because of the strength of the data before the agency, it is "unclear what additional data could be provided on adolescent use that would be sufficient to lift the age restriction in the future." (Ex. I at 205.) Under the FDA's own policies, these FDA employees would ordinarily have made the final decision to approve the OTC switch.

90. FDA documents indicate that prior to January 21, 2005, the review staff at FDA were actively reviewing Barr's application for split-label access to Plan B. FDA has disclosed approximately sixteen documents that were placed in the Plan B docket during the month of January 2005. After January 21, 2005 and prior to August 2005, only two additional documents were submitted.

91. On July 13, 2005, the Secretary of Health and Human Services Michael O. Leavitt assured United States Senator Michael Enzi that "the FDA will act on this application [regarding OTC status for Plan B] by September 1, 2005." (*See* Letter of M. O. Leavitt, dated July 13, 2005 (attached hereto as Exhibit L).) Counsel for the Government submitted the Leavitt letter to the Court and requested that the Court delay the judicial proceedings: "[g]iven the agency's commitment to take action on the pending Plan B application within the next 45 days, we respectfully submit that the most appropriate course of action would be to suspend the current briefing schedule and stay this case until the FDA takes the anticipated action. . . ." (Def.'s Letter to the Court, dated July 25, 2005 (attached hereto as Exhibit M), at 2.)

92. Instead of the promised action, on August 26, 2005, FDA Commissioner Lester Crawford issued a letter to Joseph A. Carrado, stating that "the Agency is unable at this time to reach a decision on the approvability of the application because of unresolved issues that relate to your NDA . . . ." (*See* Letter of Lester Crawford, M.D., dated August 26, 2005 (attached hereto as Exhibit N) at 5.)  The letter indicated that "[t]he Center for Drug Evaluation and Research (CDER) has completed its review of this application, as amended, and has concluded that the available scientific data are sufficient to support the safe use of Plan B as an OTC product, but only for women who are 17 years of age and older." (*Id.*)  In this letter, FDA further stated that age-restricted OTC access would not be available for Plan B before the agency reaches a decision on "unresolved issues" regarding the feasibility of approving split-label access. (*Id.*)

93. At or around the time of the August 26, 2005, Crawford decision, Deputy Commissioner Woodcock expressed her concern that the agency's handling of Plan B had the potential to damage her professional credibility.

94. United States Senator Enzi wrote to Commissioner Crawford after Crawford's August 26, 2005, letter, stating that he was "deeply disappointed that your announcement did not comport with the agreed-upon deadline for a decision."

95. FDA sought public comment on "whether we should initiate a rulemaking to codify our interpretation of section 503(b) regarding when an active ingredient can be simultaneously marketed in both a prescription drug product and an OTC drug product." (Ex. N at 2.)

96. The FDA made the unusual decision to outsource to a private contractor the task of collecting and reviewing comments submitted to the FDA regarding Plan B.

25

97. On August 31, 2005, Dr. Susan F. Wood, assistant FDA commissioner for women's health and director of the Office of Women's Health announced that she was resigning from her post in reaction to the agency's decision to continue to limit access to Plan B, stating: "I can no longer serve as staff when scientific and clinical evidence, fully evaluated and recommended for approval by the professional staff here, has been overruled." *See* Marc Kaufman, *FDA Official Quits Over Delay on Plan B*, WASH. POST., Sept. 1, 2005, at A08 (attached hereto as Exhibit O) at 1 (quoting Susan F. Wood).

98. On September 27, Dr. Wood appeared on the ABC television news program *Nightline* to discuss the failure of the agency to act in accordance with the scientific consensus in favor of approving Plan B for OTC use. *See* ABC News transcript, dated September 27, 2005 (attached hereto as Exhibit P) at 4-6 (citing "consensus . . . amongst the scientists and health professionals there that it should be approved," and the fact that "all of the scientific and professional staff who normally are the part of the decision-making at the agency . . . were cut out of the decision.").

99. Dr. Wood also stated that she was concerned about the lengthy delay that she anticipated as a result of the upcoming rule-making:

> Dr. Wood: . . . But I would argue that the decision to delay approval of this product over-the-counter is, in fact, a denial. And this is, again, in part why I resigned. Because by couching it as a delay and a non-decision, in fact denied women of all ages, not just teens but women of all ages access to timely use of this product.
>
> Ted Koppel: (Off Camera) If you had thought that it was a brief delay, in other words, if you thought it was only going to be a delay of a couple of months, you wouldn't have resigned.
>
> Dr. Wood: Probably not.
>
> Ted Koppel: (Off Camera) So, you obviously think that what we're talking about here is not really a delay but a way of shelving it and not dealing with the issue.

<u>Dr. Wood</u>: Right.  The mechanism is a rather bureaucratic one to potentially open it up to rulemaking.  Which, to make a long story short, means opening up to a process that usually takes many months to years, if in fact that's the way they go.

(*See* Ex. P at 6-7.)

100.    Dr. Frank Davidoff, a member of the Advisory Committee for Reproductive Health Drugs, which considered the OTC switch application for Plan B, resigned from the advisory committee due to the FDA's lack of "rational science-based decision-making."  He is the only person ever to resign from an FDA advisory committee in protest of an agency action.

**E.    The Government Accountability Office Investigated FDA's May 2004 Decision Not to Approve Plan B for Full OTC Status and Found that the FDA's Review Process Regarding Plan B Was "Unusual."**

101.    The Government Accountability Office commenced an investigation for the United States Congress into why the FDA rejected the OTC switch on May 6, 2004.

102.    On November 14, 2005, the Government Accountability Office issued a report to members of Congress examining the FDA's May 6, 2004 issuance of a "non-approvable" letter with regard to Barr Laboratory's SNDA request that Plan B be made available over-the-counter. (attached hereto as Exhibit Q, also available at http://www.gao.gov/new.items/d06109.pdf).

103.    The report, titled "Food and Drug Administration Decision Process to Deny Initial Application for Over-the-Counter Marketing of the Emergency Contraceptive Drug Plan B Was Unusual," found that FDA's review process was "unusual" in four aspects:

> ***First***, the Directors of the Offices of Drug Evaluation III and V, who would normally have been responsible for signing the Plan B action letter, disagreed with the decision and did not sign the not-approvable letter for Plan B. The Director of the Office of New Drugs also disagreed and did not sign the letter. ***Second***, FDA's high-level management was more involved in the review of Plan B than in those of other OTC switch applications. … ***Third***, … there are conflicting accounts of whether the decision to not approve the application was made before the reviews were completed. ***Fourth***, the rationale for the Acting Director of CDER's decision was novel and did not follow FDA's traditional

27

practices. Specifically, the Acting Director was concerned about the potential
impact that the OTC marketing of Plan B would have on the propensity for
younger adolescents to engage in unsafe sexual behaviors because of their lack of
cognitive maturity compared to older adolescents. He also stated that it was
invalid to extrapolate data from older to younger adolescents in this case. FDA
review officials noted that the agency has not considered behavioral implications
due to differences in cognitive development in prior OTC switch decisions and
that the agency has considered it scientifically appropriate to extrapolate data
from older to younger adolescents. [Emphasis added]

(Ex. Q at 5.)

104.    In summary, the GAO found that the decision-making process was "not typical,"

was unlike all of the 67 other OTC switch applications filed between 1994 and 2004, and that the

Plan B OTC switch application was the only one during that 10 year time period that "was not

approved after the joint committee voted to recommend approval of the application." *Id.* The

GAO Report concludes that the FDA's decision-making process was unusual and that high-level

officials were reported to be involved in the decision-making process.

105.    Former FDA Commissioner Mark McClellan provided only an evasive and non-

responsive written statement to detailed written questions submitted by the GAO regarding the

decision to issue a non-approvable letter to Barr in May 2004 (questions and non-response

attached as Exhibit W).

106.    Former FDA Commissioner Mark McClellan improperly deleted electronic

correspondence related to the OTC application for Plan B. *See* Letter of United States

Congressman Henry Waxman, dated November 15, 2005 (attached hereto as Exhibit R).

107.    Former FDA Commissioner Lester Crawford also declined to be interviewed by

the GAO in conjunction with their report.

**F.    Government Documents Confirm the Findings of the GAO Report that Upper Level Management Were Unusually Active in the Decision-Making Process Regarding the OTC Switch Application for Plan B, and that Upper Level Management Overrode the Recommendations of the Review Staff.**

108.    The administrative record compiled by the agency confirms that as early as January 15, 2004, upper level management at FDA had decided that the OTC switch for Plan B would not be approved, and that this decision was made before the scientific review of the OTC switch application was complete.

109.    The administrative record compiled by the agency confirms that the Office of the Commissioner was involved in the agency's review of the OTC switch application for Plan B since at least December 10, 2003, and that the concerns about adolescent use of Plan B expressed by Dr. Galson in his May 2004 non-approvable letter, as well as the concerns about adolescent use of Plan B expressed by Dr. Galson in his August 26, 2005 memorandum, echo and reflect the concerns of the Office of the Commissioner expressed in January of 2004.

110.    Documents show that both the Commissioner of the FDA and the Deputy Commissioner of Operations played an unusually active role in the decision to issue a non-approvable letter, as well as in subsequent agency action on Plan B.  The Directors of the Offices of Drug Evaluation III and V told GAO investigators that they were asked by high level management to draft and sign a non-approvable letter for Plan B, but that they declined to do so because they did not agree with that action.  The Director of the Office of New Drugs was then asked to review the Plan B application.  Involving the Director of the Office of New Drugs in issuing such a letter is very rare and, according to FDA policy and procedure manuals, is limited to situations where there is disagreement between the two reviewing offices.  (Ex. Q at 20).  The Director of the Office of New Drugs also declined to sign a non-approvable letter based on his disagreement with the decision.  *Id.*

111.    The FDA's Deputy Director of the Office of Drug Evaluation V stated in a

memorandum that the issues raised by FDA political appointees concerning adolescents' access

to Plan B "spuriously raise the review standard for approval of this product and indeed any

contraceptive product," and are not supported by the data nor the medical literature.

112.    In the past ten years, except in the case of Plan B and certain nicotine-related

drugs, the FDA has never requested additional data regarding adolescents to be submitted by

manufacturers seeking OTC switches.

113.    The non-approvable letter in May 2004 and the August 26, 2005 decision to

further withhold approval of Plan B for OTC use were opposed by the scientific review staff that

would normally be responsible for making decisions approving drugs for OTC use.  CDER

reviewers in the Divisions of Reproductive and Urologic Drug Products and the Division of

Over-the-Counter Drug Products, the Deputy Directors of the Offices of Drug Evaluation III and

V, and the Director of the Office of New drugs all recommended that Plan B should be switched

OTC for women of all ages.

**G.    Barr Laboratories Was Asked to File Another Amended Supplemental New Drug
        Application Seeking Further Arbitrary Age-Restricted OTC Status for Plan B,
        which Resulted in Plan B Remaining Behind-the-Counter and Available Without a
        Prescription Only For Some Persons 18 and Older.**

114.    On July 31, 2006, the day before Dr. Andrew von Eschenbach's Senate

confirmation hearing, the FDA announced that it would work with Barr Pharmaceuticals to allow

for OTC sales to persons 18 and older, hoping to "wrap[] up the process in a matter of weeks."

(FDA Statement, dated July 31, 2006, http://www.fda.gov/bbs/topics/NEWS/2006/

NEW01421.html).

115.    Also on July 31, 2006, von Eschenbach wrote to Barr Pharmaceuticals and stated

that while he would not approve Barr's request for OTC sales for those 16 and over, he would

reconsider allowing nonprescription sale of Plan B to persons 18 and older if the company met certain restrictions.  This letter offered no explanation for the scientific or policy reasoning to support the line being drawn at the age of 18.  (Letter from Andrew von Eschenbach M.D. to Joseph A. Carrado, dated July 31, 2006, http://www.fda.gov/oc/planb/duramed073106.html).

116.    On August 8, 2006, personnel from the Center for Drug Evaluation and Research met with Barr to discuss the restrictions outlined in von Eschenbach's July 31 letter, specifically with regard to nonprescription packaging for purchasers 18 and over.

117.    On August, 17, 18 and 23, 2006, Barr amended its application to reflect changes in compliance with von Eschenbach's proposed restrictions, specifically with regard to labeling and the Convenient Access Responsible Education (CARE) Program.

118.    In light of Barr's revised SNDA, the FDA again reviewed Plan B and again its medical reviewers confirmed that an age restriction for Plan B as an OTC drug is medically and scientifically unsupported.

119.    On August 22, 2006, Julie Beitz, M.D., Acting Director of the Center for Drug Evaluation and Research, stated: "This memo documents my view that there are sufficient data on the safety and effectiveness of Plan B to approve its use in the OTC setting without age-restriction.  In the absence of new data to support an age-restriction, my conclusions as stated in my previous memos, dated April 2, 2004, and January 12, 2005, remain unchanged."

120.    On August 22, 2006, Charles J. Ganley, M.D., Director of the Office of Nonprescription Products (ONP), stated: "Previous reviews from the Division of Over-the-Counter Drug Products (DOTCDP) and Office of Drug Evaluation V (ODE V), signed by Dr. Rosebraugh and Dr. Bull, recommended the sale of Plan B over-the-counter without restrictions. DOTCDP and ODEV have evolved into the ONP.  No new data was provided to suggest the

restriction based on age is necessary.  Based on the previous findings . . . ONP continues to

believe that restriction on access is not necessary."

122.    On August 22, 2006, John K. Jenkins, M.D., Director of the Office of New Drugs,

stated: "As documented in my reviews dated April 28, 2004, and January 18, 2005, I believe the

available data are adequate to support a conclusion that Plan B can be safely and effectively

marketed as a nonprescription product for all women of child-bearing potential . . . I am not

aware of any new data that supports an age restriction for OTC marketing of Plan B . . . I

continue to recommend that Plan B be approved for OTC marketing without an age restriction."

122.    On August 23, 2006, von Eschenbach issued a memorandum that outlined his

conclusions regarding the appropriateness of 18 as a cut-off age for OTC usage of Plan B.

123.    The August 23, 2006 von Eschenbach memorandum begins by stating that Barr

Pharmaceuticals amended its SNDA to make the OTC switch applicable only to those 18 and

older.

124.    The August 23, 2006 von Eschenbach memorandum states that in response to "the

difficulty of enforcing an age-based restriction . . . I have concluded that 18 (rather than 17) is

the more appropriate cutoff point . . ."

125.    There are no scientific or health related reasons for choosing 18 as a cutoff age.

The only asserted basis for choosing 18 is because dispensers of Plan B " . . . (as well as society

as a whole) are more familiar with 18 as a cutoff age."

126.    The August 23, 2006 memorandum purports to justify the 18 year old age cutoff

by analogy to tobacco products.   Tobacco products have proven and severe harmful health

effects, including hundreds of thousands of deaths annually, on persons of all ages.  There is no

scientific evidence that Plan B has any serious side effects whatsoever, nor is any such evidence cited in this or any other FDA memorandum.

127.    The August 23, 2006 memorandum also purports to justify the 18 year old age cutoff by analogy to products containing pseudoephedrine.  Such products have a demonstrated record of abuse, specifically as a compound used by illegal drug traffickers to manufacture methamphetamines, which are controlled substances.  There is no evidence or even plausible scientific basis to believe that Plan B can be or is used to manufacture controlled substances, or that Plan B is abused in any way by any women, nor is any such evidence cited in this or any other FDA memorandum.

128.    On August 24, 2006, Steven Galson issued an approval letter to Barr, granting limited approval for nonprescription sales of Plan B to those who could provide government issued proof that they are 18 years of age or older, and adopting von Eschenbach's stated rationale for the age 18 cutoff.

129.    The FDA has therefore at long last admitted that it has rejected OTC status for Plan B.

130.    In March 1991, the FDA stated: "Some health professional organizations have petitioned FDA to establish a third class of drugs that would be available without prescription, but only through a pharmacist.  Pharmacists would advise consumers about proper use of the drug and serve to identify problems that might arise.  In 1974, in connection with an FDA monograph on OTC antacids, some pharmacy organizations commented that such a third class of drugs should be created.  Others, including the Department of Justice, objected to a third class of drugs, stating that it would restrain competition, inconvenience the consumer, depart from U.S. economic policy, and cause price increases for the consumer with no attending benefit.  FDA

concluded that 'no controlled studies or other adequate research data have been supplied to support the position that any class of OTC drugs must be dispensed only by pharmacists in order to ensure their safe use. . . . There is at this time no public health concern that would justify the creation of a third class of drugs to be dispensed only by a pharmacist or in a pharmacy." *See* "Rx to OTC: The Switch Is On," http://www.fda.gov/bbs/topics/CONSUMER/CN00012c.html.

131.    In its review of Barr's amended SNDA for limited OTC status for Plan B for women 16 and older, the FDA review staff, in addition to finding that the scientific data supported full OTC access for women of all ages, expressed strong concern over the regulatory precedent that approval of a dual prescription/nonprescription regime for Plan B would set and the possible unintended consequences of such a regime. (Ex. I at 31026-27; Ex. G at 31031-32; Mem. of Julie Beitz, M.D., dated January 12, 2005 (attached hereto as Exhibit X) at 31085-31087; Ex. J at 31096-98).

132.    Plan B is the only nonprescription drug required by the FDA to be kept behind the pharmacy counter. Prior to August 24, 2006, "behind-the-counter" status was not mandated by the FDA for any drug. Thus, Plan B is the first nonprescription drug the FDA has ever mandated to be kept behind the counter.

133.    In Canada, where levonorgestrel is available behind-the-counter from pharmacists, some pharmacists exploited the behind-the-counter status of the drug to ask women invasive questions about their sexual activity before providing the drug.

134.    Numerous over-the-counter drugs available off the shelf in gas stations, convenience stores, drug stores, supermarkets and other points of sale have established records of misuse, abuse (including use as a means of committing suicide by overdose), and serious side effects. In no case does the FDA mandate age-restricted sales or proof of age.

135.    Nicotine-replacement products are restricted as nonprescription products to persons over the age of 18, yet even these products, with proven harmful effects and serious side effects for certain high-risk populations, are not kept behind the pharmacy counter.

136.    Contrary to the stated policy concerns regarding enforceability of an age cutoff, the requisite labeling included in a package of Plan B, which states the actual scientific findings of the FDA, makes clear that there is no data evidencing a danger of overdosage or drug dependence with regard to Plan B.  (FDA Labeling, dated August 24, 2006, http://www.fda.gov/cder/foi/label/2006/021045s011lbl.pdf).

137.    The labeling for Plan B states:  "Pediatric Use: Safety and efficacy of progestin-only pills have been established in women of reproductive age for long-term contraception. Safety and efficacy are expected to be the same for postpubertal adolescents under the age of 16 and for users 16 years and older.  Use of Plan B & emergency contraception before menarche is not indicated."  (FDA Labeling, dated August 24, 2006, http://www.fda.gov/cder/foi/label/2006/021045s011lbl.pdf).

**H.    FDA's Failure to Approve Plan B for Full OTC Use Constitutes Bad Faith and Improper Agency Action, and Treats Plan B Differently than Other Drugs Without Any Medical or Scientific Basis for that Differential Treatment.**

138.    The FDA applied a different and higher standard to Plan B's OTC switch than it has applied to OTC switches of other drugs.

139.    In the past ten years, Plan B is the only drug as to which the FDA has rejected advisory committee recommendations in favor of approving a drug for OTC status.

140.    In the past ten years, Plan B is the only drug as to which the FDA has requested additional data regarding adolescents.

141.    In the past five years, the FDA has approved several OTC switch applications without any label comprehension studies or actual use studies that included adolescents.

142.    There is no medical or scientific basis for the FDA's application of a different and higher standard to Plan B's OTC switch for women of all ages.

143.    The FDA's failure to approve Plan B for OTC use by women of all ages is based in part on outmoded stereotypes of women and girls.

144.    For example, the FDA routinely extrapolates from data from one age group to draw conclusions about another age group.  Indeed, prior to the manufacturer's 2003 submission of its OTC switch application, FDA informed the manufacturer that it would not obtain an extension of its patent for Plan B by conducting extra pediatric studies, for such studies were rendered unnecessary because information about adolescents could be extrapolated from data for adults.  But Galson and his supervisors refused to implement this routine method as to Plan B.

145.    In addition, the FDA rejected the manufacturer's pediatric exclusivity for Plan B, specifically informing the manufacturer in April of 2002 that it could conduct its "proposed trials [of Plan B] in the adult population and the results extrapolated to the postmenarcheal pediatric population."  The FDA's subsequent rejection of extrapolation from studies in adult populations constitutes improper and bad faith agency action.

146.    The FDA's application of a different and higher standard to Plan B's OTC switch was the result of factors that fall outside the FDA's statutory mandate, including impermissible ideological factors, such as appeasement of the President's constituents.

147.    The FDA's rejection of the OTC switch for women of all ages is not supported by medical or scientific evidence and not supported by the agency record.

148.    The fact that upper-level management at FDA removed the decision of whether to approve Plan B's OTC application from the hands of the professional review staff, that upper-level management dictated the outcome of the review process, and that upper-level management

36

deviated from the standard practices and policies set forth in their own manuals and handbooks, suggests that the FDA impermissibly held the Plan B OTC switch application to a higher standard than other drugs, and that doing so constitutes bad faith and improper agency action.

149.    Where upper level agency management made decisions regarding the status of the Plan B application before the scientific review process has been completed, such premature decision-making constitutes bad faith and improper action by an agency dedicated to promoting and protecting public health.

150.    The former FDA Commissioner Mark McClellan's destruction of email correspondence and refusal to cooperate with the GAO's investigation constitute bad faith and improper agency action.

151.    The record indicates that Barr's application was not actively reviewed after January of 2005, causing the seven month delay between the conclusion of the scientific review and any further agency action.  This was unreasonable and constituted bad faith and improper agency action.

152.    The fact that the Secretary of Health and Human Services (HHS) submitted a letter to the Senate assuring Senators that FDA would act on the OTC application for Plan B by September 1, 2005, but that the only action subsequently taken by the agency was to invite public comment on a proposed rulemaking proceeding, constitutes bad faith and improper agency action.

153.    The FDA's June 9, 2006 letter denying the Citizen Petition is evidence of bad faith and improper agency behavior.  First, it asserts that the FDA made a determination in 2001 that the Citizen Petition could not be approved, but this determination was never communicated to the petitioners.  Second, it asserts that the Citizen Petition filers cannot use evidence submitted

by Barr to support their Petition, but then relies on the Barr submissions extensively.  Third, the letter contradicts statements made to the Court in December of 2005 by counsel for the Defendant to the effect that the Citizen Petition was still under active consideration by the FDA. Fourth, the letter is on its face a litigation document issued in direct response to this lawsuit rather than agency action taken in the ordinary course of agency business.  For these and other reasons, the June 9, 2006, letter admitting denial of the Citizen Petition is evidence of improper and bad faith agency action.

154.    The FDA's decision imposing "behind-the-counter" status for Plan B and controlling the point of sale of Plan B is unprecedented and discriminates against Plan B because it is a contraceptive drug and because it is used only by women without serving any compelling, significant, or even legitimate governmental interest.  Indeed, by comparison to numerous OTC drugs available off the shelf and without any point-of-sale restriction, the FDA's restrictions on Plan B are invidious and contrary to public health.  The selective imposition of a behind-the-counter regime for Plan B demonstrates improper agency action and bad faith.

155.    The assertion by the Defendant that the FDA was adopting the "infrastructure" used by states to regulate tobacco products and applying it to Plan B demonstrates improper agency action and bad faith both because this adoption lacks any scientific or medical basis, and because the FDA's restrictions on Plan B have nothing other than the age of 18 in common with the infrastructure of state regulation of tobacco products.

156.    The FDA's requirement of a prescription for Plan B for women aged 17 demonstrates improper agency action and bad faith because it lacks any scientific or medical basis and contradicts prior public statements by the FDA acknowledging the safety of Plan B as an OTC drug for women 17 and over.

157.    The FDA's August 24, 2006, action rejecting OTC status for Plan B and instead imposing the BTC regime for Plan B specifically permits men 18 and over to buy Plan B without a prescription even though there is no FDA-approved use of Plan B for men, and no scientific data whatsoever about actual use or label comprehension by men is contained in the agency record.  Permitting men 18 and over to buy Plan B without a prescription, even though there is no medical evidence supporting any use by men of Plan B, while denying nonprescription status for women under 18 despite extensive supporting scientific data, demonstrates that the FDA's August 24, 2006 decision is based on stereotypes of young women and is utterly irrational.  It also demonstrates that the FDA's recent action establishing an age-restricted behind-the-counter dual prescription/nonprescription regime for Plan B is improper and was done in bad faith.

158.    The behind-the-counter regime is demeaning to and discriminates invidiously against women of all ages because it poses unique barriers to access for a very safe drug that can be used safely and effectively without a prescription by all women of childbearing age while numerous other over-the-counter drugs are not subject to any such barriers, including many for which use without a prescription is discouraged for persons below a certain age because safe over-the-counter use by such younger age groups has never been established.

159.    No drug used only by men and no drug used by both sexes is subject to the same behind-the-counter regime as Plan B.

160.    The timing of the FDA's August 24, 2006 age-restricted behind-the-counter dual prescription/nonprescription regime for Plan B to coincide with the Senate confirmation hearing of the acting commissioner of the FDA evinces improper and bad faith agency action.

161.    At his Senate confirmation hearing on August 1, 2006, the Defendant demonstrated improper agency behavior and bad faith by misleading the Senate Committee on

Health, Education, Labor and Pensions in testifying that the age 18 cutoff he was requiring for

Plan B was based on inadequate data about OTC use of Plan B for 17-year-olds and based on

public comments submitted in response to the advanced notice of proposed rulemaking. His

August 23, 2006 memorandum and a review of the comments submitted contradict these bases

for the age 18 cutoff.


## V.    Causes of Action

### FIRST CAUSE OF ACTION: ARBITRARY AND CAPRICIOUS

162.    Plaintiffs hereby incorporate by reference ¶¶ 1-161 above.

163.    FDA's denial of the OTC switch for women of all ages and imposition of the

BTC regime are arbitrary, capricious, an abuse of discretion and otherwise not in accordance

with law, in violation of 5 U.S.C. § 706(2)(a) (2005) in that the FDA required evidence of safety

and efficacy beyond that required for approval of any other drugs and was improperly motivated

by factors other than medicine and science, and because the evidence of safety and efficacy

before the FDA demonstrates that it should be made available without prescription without any

further restriction.


### SECOND CAUSE OF ACTION: EXCEEDS STATUTORY AUTHORITY

164.    Plaintiffs hereby incorporate by reference ¶¶ 1-163 above.

165.    FDA's denial of the OTC switch for women of all ages and its imposition of the

BTC regime exceed its statutory authority in violation of 5 U.S.C. § 706(2)(c) in that they were

improperly motivated by factors other than medicine and science and in that the FDA lacks

authority to control the point of sale of nonprescription drug products.

## THIRD CAUSE OF ACTION: RIGHT TO PRIVACY

166.     Plaintiffs hereby incorporate by reference ¶¶ 1-165 above.

167.     FDA's denial of the OTC switch for women of all ages and its imposition of the BTC regime violate the Fifth Amendment to the United States Constitution and 5 U.S.C. § 706(2)(b) in that it infringes the right to privacy of women who need Plan B without serving or being tailored to serve any compelling, significant, or legitimate governmental interest.

## FOURTH CAUSE OF ACTION: EQUAL PROTECTION

168.     Plaintiffs hereby incorporate by reference ¶¶ 1-167 above.

169.     FDA's denial of the OTC switch for women of all ages and its imposition of the BTC regime violate the Fifth Amendment to the United States Constitution and 5 U.S.C. § 706(2)(b) in that it discriminates on the basis of sex without serving or being tailored to serve any compelling, significant, or legitimate governmental interest.

170.     FDA's denial of the OTC switch for women of all ages and its imposition of the BTC regime violate the Fifth Amendment to the United States Constitution and 5 U.S.C. § 706(2)(b) in that it discriminates on the basis of the exercise of the fundamental right to privacy to obtain contraception and to keep certain personal information private without serving or being tailored to serve any compelling, significant, or legitimate governmental interest.

## FIFTH CAUSE OF ACTION: INFORMATIONAL PRIVACY

171.     Plaintiffs hereby incorporate by reference ¶¶ 1-170 above.

172.    FDA's denial of the OTC switch for women of all ages and its imposition of the BTC regime violate the right to informational privacy for women who are required by the government to disclose their name, age, and address to private parties in order to obtain Plan B. This requirement does not serve and is not tailored to serve any compelling, significant, or legitimate governmental interest.

## VI.    Prayer for Relief

WHEREFORE, Plaintiffs ask this Court:

A.  To issue an injunction ordering Defendant to approve Plan B as an over-the-counter drug without age or point of sale restriction for women of all ages;

B.  To enter judgment declaring the denial of OTC status of Plan B to women of all ages in violation of the United States Constitution and 5 U.S.C. § 706; and

C.  To grant such other and further relief as this Court should find just and proper, including attorneys' fees and costs.

Dated: October 10, 2006.                    Respectfully submitted,

/s Simon Heller
SIMON HELLER (SH-8760)
NAN STRAUSS (NS-3501)
VIVIEN LABATON (VL-1747)
SANFORD COHEN (SC-6601)
Center for Reproductive Rights
120 Wall Street, 14th Fl.
New York, NY 10005
Telephone: (917) 637-3600
Facsimile: (917) 637-3666

ATTORNEYS FOR ALL PLAINTIFFS

ANDREA COSTELLO (AC-6197)*
SHELBI D. DAY (SD-2627)*
Southern Legal Counsel
1229 N.W. 12th Avenue
Gainesville, FL 32601
(352) 271-8890

ATTORNEY FOR PLAINTIFFS
TUMMINO, MAHONEY, GIARDINA,
MANGAN, SEGUIN, TINNEY, BROWN,
CHURCHILL AND HUNT

*Admitted pro hac vice

## <u>CERTIFICATE OF SERVICE</u>

I, Simon Heller, hereby certify that on October 10, 2006, I electronically filed the

foregoing with the Clerk of the Court using the CM/ECF system, which sent notification

via electronic mail to F. Franklin Amanat.

Dated: October 10, 2006.                    Respectfully submitted,

                                            /s Simon Heller
                                            SIMON HELLER (SH-8760)
                                            NAN E. STRAUSS (NS-3501)
                                            VIVIEN LABATON (VL-1747)
                                            SANFORD COHEN (SC-6601)
                                            Center for Reproductive Rights
                                            120 Wall Street, 14th Floor
                                            New York, NY 10005
                                            (917) 637-3600

                                            ATTORNEYS FOR ALL PLAINTIFFS

                                            ANDREA COSTELLO (AC-6197)*
                                            SHELBI D. DAY (SD-2627)*
                                            Southern Legal Counsel, Inc.
                                            1229 N.W. 12th Avenue
                                            Gainesville, FL 32601
                                            (352) 271-8890

                                            ATTORNEY FOR PLAINTIFFS
                                            TUMMINO, MAHONEY, GIARDINA,
                                            MANGAN, SEGUIN, TINNEY, BROWN,
                                            CHURCHILL AND HUNT

                                            *Admitted pro hac vice

## CERTIFICATE OF SERVICE

I hereby certify that on this 15th day of November 2007, I served counsel with a copy of

the Reply Memorandum in Support Duramed Pharmaceuticals, Inc.'s Motion To Dismiss First

Amended Complaint, and accompanying Exhibits, via electronic mail to:

> Lawrence J. Joseph, Esq.
> Law Office of Lawrence J. Joseph
> 1250 Connecticut Avenue, NW, Suite 200
> Washington, DC 20036
> Tel: 202-747-1790
> Fax: 202-318-2254
> Email: *ljoseph@larryjoseph.com*
>
> *Attorney for Plaintiffs*
>
> Jane M. Lyons, Esq.
> United States Attorney's Office
> 555 4th Street, NW
> Room E4822
> Washington, DC 20530
> Email: jane.lyons@usdoj.gov
>
> Karen Schifter, Esq.
> Office of the Chief Counsel
> United States Food and Drug Administration
> (GCF-1)
> Room 6-57
> 5600 Fishers Lane
> Rockville, MD 20857
> Email: karen.schifter@fda.hhs.gov
>
> *Attorneys for Defendants*

> _____/s/ Ana C. Reyes_____
> Ana C. Reyes