## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| ASSOCIATION OF AMERICAN PHYSICIANS & SURGEONS, INC., *et al.*, | ) ) ) ) | |
| Plaintiffs, | ) | |
| v. | ) | Civil Action No. 07-0668-JDB |
| FOOD & DRUG ADMINISTRATION, *et al.*, | ) ) | |
| Defendants, | ) | |
| and | ) | |
| DURAMED PHARMACEUTICALS, INC., | ) ) | |
| Defendant-Intervenor | ) | |

### NOTICE OF SUPPLEMENTAL AUTHORITY

Plaintiffs file this notice to advise the Court of the attached unpublished decision on standing in litigation between plaintiff Association of American Physicians & Surgeons, Inc. ("AAPS") and defendant Food & Drug Administration ("FDA") in *AAPS v. FDA,* No. 00-2898-HHK (D.D.C.). On February 10, 2008, the undersigned counsel located this decision and promptly sent a copy to opposing counsel via electronic mail.[1] Although they reserve the right to question the attached decision's relevance to these proceedings, opposing counsel indicated on February 12, 2008, that they do not oppose plaintiffs' filing a notice of supplemental authority to advise the Court of this decision.

---

[1]    The reported decisions in the prior *AAPS v. FDA* litigation do not mention the attached decision denying FDA's motion to dismiss, *see, e.g., AAPS. V. FDA,* 226 F.Supp.2d 204 (D.D.C. 2002), and the attached decision does not appear on Westlaw as an unpublished decision. The undersigned counsel found the decision via the Court's electronic case filing system on February 12, 2008. Prior to finding this decision, the undersigned counsel had assumed that – consistent with the FDA policy cited in Paragraph 31 of plaintiffs' First Amended Complaint – FDA had not challenged standing in *AAPS v. FDA,* No. 00-2898-HHK (D.D.C.).

Mutual collateral estoppel applies when a court decides "an issue of fact or law necessary to its judgment" in prior litigation between the parties or their privies. *See U.S. v. Mendoza,* 464 U.S. 154, 158 (1984) (citing *Montana v. U.S.,* 440 U.S. 147, 153 (1979)). The prior *AAPS v. FDA* litigation decided issues of fact and law on (1) the standing of plaintiff AAPS to challenge FDA's decisions on drug approvals, (2) the germaneness of such challenges to "AAPS's objective of protecting the practice of medicine by limiting interference with the physician-patient relationship and by ensuring that physicians can provide the best medical care possible," and (3) the suitability of AAPS members, as prescribers of drugs, to enforce the Food, Drug & Cosmetic Act's interest in protecting consumer safety. *See AAPS v. FDA,* No, 00-2898-HHK (D.D.C. Oct. 25, 2001), at 10, 13, 16.

Dated: February 12, 2008              Respectfully submitted,

                                       /s/ Lawrence J. Joseph
                                      Lawrence J. Joseph, D.C. Bar No. 464777

                                      1250 Connecticut Ave., NW, Suite 200
                                      Washington, DC 20036
                                      Telephone: (202) 669-5135
                                      Telecopier: (202) 318-2254

                                      *Counsel for Plaintiffs*

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that on this 12th day of February 2008, I electronically filed the foregoing "Notice of Supplemental Authority" and its attachments with the Clerk of the Court using the CM/ECF system, which I understand to have caused service of Jane M. Lyons of the U.S. Attorney's Office for the District of Columbia, on behalf of the federal defendants, and of Richard M. Cooper, on behalf of defendant-intervenor Duramed Pharmaceuticals, Inc.

/s/ Lawrence J. Joseph
Lawrence J. Joseph

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

ASSOCIATION OF AMERICAN,
PHYSICIANS AND SURGEONS, INC.,
et al.,

                Plaintiffs,

                v.

UNITED STATES FOOD AND DRUG
ADMINISTRATION, et al.,

                Defendants.

Civil Action 00-02898 (HHK)

**FILED**

OCT 2 5 2001

NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

**MEMORANDUM OPINION AND ORDER**

Plaintiffs bring this lawsuit seeking declaratory and injunctive relief pursuant to the

Administrative Procedure Act ("APA"), 5 U.S.C. § 551 *et seq.* Plaintiffs Association of American

Physicians and Surgeons ("AAPS"), Competitive Enterprise Institute ("CEI") and Consumer Alert

challenge the authority of the United States Food and Drug Administration ("FDA") to

promulgate "Regulations Requiring Manufacturers To Assess the Safety and Effectiveness of

New Drugs and Biological Products in Pediatric Patients" ("Pediatric Rule"), 21 C.F.R. §§ 201,

312, 314, 601, 63 Fed. Reg. 66,632 (1998). Plaintiffs claim that the FDA's decision to issue the

rule was in excess of its statutory authority as well as arbitrary, capricious, and an abuse of

discretion. Claiming that plaintiffs do not have standing to challenge the rule and that this case is

not ripe for adjudication, defendant moves to dismiss this case under Federal Rule of Civil

Procedure 12(b)(1). Upon consideration of the motion, the opposition thereto, and the record of

1




this case, this court concludes that defendant's motion to dismiss should be denied.

## I. FACTUAL BACKGROUND

The Federal Food Drug and Cosmetic Act ("FDCA"), 21 U.S.C. § 321 *et seq.* provides a systematic scheme for approval of new drugs and new drug formulations intended to be marketed for use in interstate commerce. According to the Act, a new drug product cannot be marketed unless the FDA approves the product and determines that it is safe and effective for its intended use. *See* 21 U.S.C. § 355(a). When the FDA approves drugs, it approves them only for the particular uses for which they were tested. The FDCA, however, does not regulate the nature in which doctors prescribe drugs after they have been approved. Thus, a physician can take a drug that has been tested and approved for adult use only, and prescribe it to pediatric patients as well.

Because of the expense and difficulty in finding substantial pediatric populations to undergo tests, along with the ethical complications associated with testing new drugs on children, many drugs are tested for safety and effectiveness in adults only. As a result, even though there are many diseases and ailments that are common to both children and adults, physicians with pediatric patients often find their treatment options limited. Some physicians, forced "to choose between prescribing drugs without well-founded dosing and safety information or utilizing other, potentially less effective, therapy" respond by prescribing adult-approved drugs to children, but in a smaller dose, simply because they have few other available options. *See* 62 Fed. Reg. 43,900, 43,900 (1997). Concerned about the continued use by children of drugs unapproved for pediatric populations, the FDA studied the issue and concluded that the physiological and pharmokinetic differences between adults and children could cause adult-approved drugs to have dangerous

2

effects on children, even when administered in smaller doses. *See, e.g.*, 62 Fed. Reg. 43,900, 43,901 (1997).

In 1997, Congress passed the Food and Drug Administration Modernization Act ("FDAMA"), part of which established a voluntary incentive scheme to encourage pediatric drug-testing. Drug manufacturers that conducted pediatric tests and studies could receive temporary market exclusivity for their products under specific circumstances. *See* 21 U.S.C. § 355a(a). Finding that the voluntary incentive provisions of FDAMA did not increase pediatric testing as much as the FDA had hoped, the FDA issued the "pediatric rule" in 1998. *See* 63 Fed. Reg. 66,634 (1998). The pediatric rule gives the FDA the authority to require drug manufacturers to test new drugs, new indications, new drug doses, new drug regimens, or new routes of administration for safety and effectiveness on pediatric patients. *See* 21 C.F.R. § 314.55. While there is a presumption that all new drug applications ("NDAs") will be subject to the pediatric rule, drug manufacturers can bypass the rule's requirements by obtaining (1) a waiver, or (2) a deferral of the rule from the FDA under certain circumstances. For example, a drug manufacturer may qualify for a waiver if it can show that the drug in question will not provide a meaningful therapeutic benefit for children and that the product is unlikely to be used in a substantial number of pediatric patients. *See* 21 C.F.R. § 314.55(c)(2). In addition to a waiver, drug manufacturers can seek a deferral of pediatric testing requirements until after the FDA approves the product for adult use. *See* 21 C.F.R. § 314.55(b). Among other reasons, one of the grounds for deferral mentioned in the rule is that the drug is ready for adult approval even though pediatric studies have not been completed. *See id.*

In 1999, plaintiffs filed a citizen petition with the FDA, challenging the FDA's authority to

3

issue the rule and asking the agency to revoke the rule.  The FDA denied the petition in 2000.

This suit, brought under the judicial review provisions of the Administrative Procedure Act

("APA"), 5 U.S.C. § 551 *et seq.*, followed.

Plaintiffs are the American Association of Physicians and Surgeons ("AAPS"), Consumer

Enterprise Institute ("CEI"), and Consumer Alert.  According to plaintiffs' complaint, AAPS is an

organization of around 4,000 physicians and surgeons, and is devoted "to preserv[ing] the

practice of private medicine and . . . the sanctity of the patient-physician relationship."  Pls.'

Compl. ¶ 2.  According to plaintiffs' complaint, CEI is a nonprofit public policy organization with

the objective of promoting "the principles of free enterprise and limited government."  Pls.'

Compl. ¶ 3.  In addition, plaintiffs allege in their complaint that Consumer Alert is an organization

devoted to "enhanc[ing] understanding and appreciation of the consumer benefits of a free

market."  Pls.' Compl. ¶ 4.

Plaintiffs allege that they will suffer several types of harm as a result of the rule.  First,

they contend that by requiring pediatric testing of drugs even when drug manufacturers only seek

to have their drugs approved for adult use will delay the eventual approval of such drugs because

of the need to conduct pediatric testing.  Plaintiffs have supplied affidavits from two physicians

claiming that the FDA's exercise of the pediatric rule will reduce the number of drugs available to

them for treatment and therefore inhibit the physicians' ability to practice medicine effectively.

Additionally, plaintiffs allege that the members of CEI and Consumer Alert will suffer harm

because the pediatric rule will delay the approval of drugs for adult use and therefore will reduce

the number of drugs available to them.  Plaintiffs have supplied several examples of suitability

petitions for new drug dosages or forms that have been denied based on the pediatric rule.

4

## II. DISCUSSION

### A. Standard of Review

A motion to dismiss for lack of subject matter jurisdiction under Federal Rule of Civil Procedure 12(b)(1) should not prevail "unless plaintiffs can prove no set of facts in support of their claim which would entitle them to relief." *Kowal v. MCI Comm. Corp.*, 16 F.3d 1271, 1276 (D.C. Cir. 1994); *Beverly Enterprises, Inc. v Herman*, 50 F. Supp. 2d 7, 11 (D.D.C. 1999). Additionally, at the dismissal stage, the plaintiffs' complaint must be construed liberally, and plaintiffs should receive the benefit of all favorable inferences that can be drawn from the alleged facts. *See Equal Employment Opportunity Commission v. St. Francis Xavier Parochial Sch.*, 117 F.3d 621, 624 (D.C. Cir. 1997).

### B. Standing

The core basis for the standing doctrine arises from Article III's requirement of a case or controversy. *See Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992). The party invoking federal jurisdiction bears the burden of demonstrating standing. *See id.* at 562. Because "standing is an indispensable part of the plaintiff's case, it must be supported in the same way as any other matter upon which the plaintiff has the burden of proof, i.e. with the manner and degree of evidence required at the successive stages of the litigation." *Id.* at 561. Thus, "[a]t the pleading stage general factual allegations of injury resulting from the defendant's conduct may suffice, for on a motion to dismiss, we 'presum[e] that general allegations embrace those specific facts that are necessary to support the claim." *Id.* at 561, (*quoting Lujan v. National Wildlife Fed'n*, 497 U.S. 871, 889 (1990)). Like the general standard of review for motions to dismiss,

"[f]or purposes of ruling on a motion to dismiss for want of standing, both the trial and reviewing courts must accept as true all material allegations of the complaint, and must construe the complaint in favor of the complaining party." *Warth v. Seldin*, 422 U.S. 490, 501 (1975); *see Pennell v. San Jose*, 485 U.S. 1, 7 (1988); *Chavous v. District of Columbia*, 154 F. Supp. 2d 40, 44 (D.D.C. 2001) (holding that the trial court must accept the complainants pleaded legal theory). As a result, plaintiffs need only allege facts "that 'demonstrate a realistic danger of [the plaintiffs] sustaining a direct injury.'" *Bristol-Myers Squibb v. Shalala*, 91 F.3d 1493, 1497 (D.C. Cir. 1996), (*quoting Babbitt v. United Farm Workers Nat'l Union*, 442 U.S. 289, 298 (1979)).  Thus, as long as the plaintiff can allege facts that, if true, would result in a legally cognizable injury, the court should not dismiss the complaint for want of standing.

Plaintiffs claim standing as associations seeking to sue on behalf of their members.[1]  "[A]n association has standing to bring suit on behalf of its members when: (a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation fo individual members in the lawsuit." *Hunt v. Washington State Apple Adver. Comm'n*, 432 U.S. 333, 343 (1977).

## 1. Standing of the Organizations' Members

---

[1] The original complaint failed to clarify whether plaintiffs claimed injuries to the organizations themselves or whether the organizations claimed that their members suffered injuries.  In fact, as defendant points out, plaintiffs' complaint never discusses CEI's membership at all and appears to claim only that CEI's interests as an association will be harmed.  Because plaintiffs, in their opposition motion, only argue that the organization's members suffer harm, the court will assume that the plaintiffs are only arguing for standing to sue on behalf of their members and therefore the court will only address the issue of representational standing.

In order to meet the constitutional requirements of standing, plaintiffs must show (1) that they suffered an "injury in fact", which is a violation of a legally protected interest that is both concrete and particularized, and actual and imminent as opposed to conjectural or hypothetical; (2) that there is a causal connection between the challenged action and the plaintiff's injury; and (3) that the injury would likely be redressed by a favorable judicial decision. *Lujan*, 504 U.S. at 560-61; *National Lime Ass'n v. EPA*, 233 F.3d 625, 636 (D.C. Cir. 2000). Although a party cannot fulfill its standing burden merely by alleging that harm will occur "someday" in the future without knowing how or when that harm will occur, *see id.* at 564, in the context of a facial challenge to a rule that may be applied multiple times, plaintiffs can meet their burden by showing that the rule is likely to be applied in the future in a way that would harm them. *See, e.g., Pennell v. San Jose*, 485 U.S. 1, 8 (1988) (holding that landlords could lodge a facial challenge to a rule that was likely to reduce the amount of rent they could collect).

Decreased consumer choice of products constitutes a concrete and particularized injury in fact. In *Competitive Enterprise Institute (CEI) v. National Highway Traffic Safety Administration (NHTSA)*, the D.C. Circuit found that two of the same plaintiffs as in the present case had standing to challenge NHTSA's increased fuel efficiency standards because the heightened standards would have the effect of reducing CEI's and Consumer Alert's members' ability to purchase large passenger vehicles. *See Competitive Enterprise Institute (CEI) v. National Highway Traffic Safety Admin.*, 901 F.2d 107, 112-13 (D.C. Cir. 1990). The court specifically found that reduced consumer choice of products fulfilled the Article III injury in fact standard. *See id.* at 113 ("We determined that a lost opportunity to purchase vehicles of choice is sufficiently personal and concrete to satisfy Article III requirements."); *see also Center for Auto*

*Safety (CAS) v. National Highway Traffic Safety Admin.*, 793 F.2d 1322, 1332 (D.C. Cir. 1986) (finding that decreased opportunity to purchase fuel-efficient vehicles constituted injury in fact). In a similar case, *Center for Auto Safety (CAS) v. National Highway Traffic Safety Administration*, which also involved a challenge to fuel-efficiency regulations, the plaintiffs did not allege that the fleet of available trucks had already changed based on the new fuel-efficiency standards, but only that the available fleet of fuel-efficient vehicles would decline in the future as a result of the rule. *See CAS*, 793 F.2d at 1332. Additionally, in *CEI*, although plaintiffs submitted affidavits alleging that members of their organizations could not find large-size automobiles within their price range, they did not allege that the higher fuel-efficiency standards would preclude them from purchasing any particular make and model of car. They simply claimed that the overall selection of large-size automobiles, such as station wagons, would decline. *See CEI*, 901 F.2d at 113.

Furthermore, this court has found that drug consumers have standing to challenge FDA decisions regarding drug availability. *See Cutler v. Kennedy,* 475 F. Supp. 838 (D.D.C. 1979), *overruled on other grounds by Cheney v. Heckler*, 718 F.2d 1174 (D.C. Cir. 1984), *rev'd on other grounds*, 470 U.S. 821 (1985). In *Cutler*, several drug consumers challenged the FDA's decision to allow the continued marketing of a number of over-the-counter (OTC) drugs whose safety and effectiveness had not yet been proven. *See id.* at 846-47. Although plaintiffs did not allege that the specific over-the-counter drugs they consumed were unsafe or ineffective, nor did they allege that they consumed any of the particular OTC drugs falling within the classification challenged by the plaintiffs, the court held that the plaintiffs had suffered a concrete injury because the FDA's policy increased the risk that they would consume unsafe or ineffective drugs in the

future. *See id.* at 848. Additionally, the court found that the marketing of drugs that had not yet been proven safe and effective increased the risk to plaintiffs' health, even though it might be the case that the drugs ultimately turned out to be safe and effective. *See id.* at 848.[2]

Plaintiffs have suffered, and are likely to continue to suffer, an injury in fact. First, plaintiffs have alleged in their complaint, in affidavits, and in their answer to defendant's motion that their members would suffer harm as a result of delay in drug approvals. The pediatric rule will delay the approval of drugs by requiring pediatric testing of the drugs before approval can take place.[3] During the period of delay, both physicians and drug consumers will find that their ability to obtain prescription drugs will decrease because fewer drugs will be available than would be without the rule. With a reduced availability of drugs and drug products, physicians will not be able to provide, and consumers will not receive, as effective medical care as they would be able to otherwise. In addition to alleging that both doctors and consumers will be adversely affected by the rule, plaintiffs also allege that the FDA has applied the pediatric rule to justify the denial of

---

[2]Also important is the fact that in *CAS*, *CEI*, and *Cutler*, the court found that plaintiffs had standing even though the regulated party was not the party challenging the rule. In *CAS* and *CEI*, plaintiffs' injury depended on how auto manufacturers responded to new fuel-efficiency standards, and in *Cutler*, the plaintiffs' injury stemmed from how drug companies responded to FDA policy rather than from the FDA policy itself.

[3] In cases where the FDA waives or defers the pediatric rule, adults would find that the availability of drugs would not decrease. This is because, in the case of waiver, drug manufacturers would not have to conduct pediatric testing, and in the case of deferral, drugs would be approved for adult use when tests demonstrated safety and effectiveness for adults before pediatric testing had been completed. Thus, if the FDA set a policy of always waiving or deferring the pediatric testing requirements when sufficient evidence of adult safety and effectiveness existed, plaintiffs would presumably not suffer injury in fact. Defendant contends that this in fact is the FDA's policy, but the examples of denied suitability petitions contained in the plaintiffs' opposition motion suggest otherwise, as they appear to apply the pediatric rule to suitability petitions without mentioning either waiver or deferral.

several suitability petitions.[4] Even though plaintiffs' allegations are somewhat vague, they provide

enough facts, if true, to demonstrate a legally cognizable injury. Plaintiffs' allegations detail how

application of the pediatric rule would delay drug approval, and also detail how delayed drug

approval would limit their opportunity to use the drugs of their choice. Although the plaintiffs do

not allege that they use the particular drugs affected by the pediatric rule, they are still harmed by

the overall decrease in availability of prescription drugs.

The court's decision in *Cutler* also suggests that plaintiffs have standing to challenge the

pediatric rule. In *Cutler* the court held that consumers had standing to challenge the FDA's

decision to allow the marketing and sale of drugs that had not been proven to be safe and

effective. *See Cutler*, 475 F.Supp. at 848. If consumers have standing to challenge the FDA's

decision to allow drugs onto the market even though they have not been proven safe, then

plaintiffs also have standing to challenge the FDA's decision not to approve a drug or drug

variation that has been proven safe in adults. The unavailability of safe, effective drugs that may

treat or cure particular ailments can inflict as much harm on patients as the consumption of

potentially unsafe drugs. Additionally, the court held that even if the plaintiffs were not using the

specific OTC drugs that the FDA placed in the category of drugs challenged by plaintiffs, allowing

drugs not proven safe to be marketed increased the risk that the plaintiffs would consume unsafe

drugs in the future. *See id.* Similarly, in this case, even though the members of plaintiffs'

organizations may not consume the drugs currently affected by the pediatric rule, future

application of the rule increases the risk that they will be harmed by decreased drug availability,

---

[4] According to defendant, a suitability petition is a petition allowing a drug manufacturer
to submit an Abbreviated New Drug Application ("ANDA"). An ANDA is an application to
approve a variation of a product that is already approved and on the market.

and therefore plaintiffs have suffered a concrete injury.

Defendant argues that the denials of suitability petitions do not harm plaintiffs because the suitability petitions only affect variations of drugs already on the market and therefore do not prevent any particular class of drug from reaching the market.  Decisions affecting the number and types of drug variations that reach the market, however, impact consumer choice in the same manner as decisions affecting the availability of different classes of drugs.  Just because one variation remains available does not mean that a particular consumer might not receive a greater benefit from a different variation, or dose, of the drug.  Presumably, the fact that different people respond differently to different drug variations explains why drug manufacturers develop new variations of old drugs.  Additionally, defendant devotes significant space in its motion to dismiss to a discussion of how some dosage sizes that are beneficial for adults can cause adverse affects on children.  Thus, delaying the approval of dosage variations or drug variations by denying suitability petitions can cause injury just as delaying the approval of new drug products can cause injury.

Defendant also argues that plaintiffs cannot demonstrate a causal connection between the denial of a suitability petition and reduced drug choice because approval of a suitability petition only allows a drug manufacturer to file an ANDA and does not guarantee that the drug ultimately will be approved.  However, when the FDA denies a suitability petition pursuant to the pediatric rule, plaintiffs cannot even gain permission to file an ANDA until they undergo the required pediatric testing, which would further delay the approval of any drug that might be approved through the ANDA process.  Furthermore, defendant's argument would make the denial of suitability petitions essentially unreviewable.  According to defendant, because the approval of a

11

suitability petition only leads to future administrative decisions and does not lead directly to drug approval, the approval or denial of suitability petitions does not cause direct harm to plaintiffs. If defendant's reasoning were correct, the only administrative decision that would be reviewable would be the last stage of ANDA approval. However, if a drug manufacturer's suitability petition is denied, then the drug manufacturer can never get to the final stage of ANDA approval and thus would never be able to seek review of an FDA denial that occurred prior to the final stage of approval. The fact that the approval of a suitability petition would not guarantee approval of a new drug variation should not preclude plaintiffs from seeking to redress their injuries.

## 2. Germaneness

The second prong of *Hunt's* representational standing test demands that the interests the organization seeks to protect through the lawsuit be germane to the organization's purpose. *See Hunt v. Washington State Apple Adver. Comm'n*, 432 U.S. 333, 343 (1977). After the Supreme Court's decision in *UAW v. Brock*, 477 U.S. 274 (1986) reaffirming the benefits of representational standing, the D.C. Circuit has read the germaneness requirement broadly and has held that it should not be used to restrict standing. *See Humane Society v. Hodel*, 840 F.2d 45, 55-56 (1988) (recognizing "the importance of a reading of the germaneness requirement that does not unduly confine the occasions on which associations may bring legal actions on behalf of members"). As a result, the D.C. Circuit held that germaneness "require[s] only that an organization's litigation goals be pertinent to its special expertise and the grounds that bring its membership together." *Id.* at 56; *see National Lime Ass'n v. EPA*, 233 F.3d 625, 636 (D.C. Cir. 2000) ("This requirement of germaneness is 'undemanding'; 'mere pertinence between litigation

12

subject and organizational purpose' is sufficient." (*quoting Hodel*, 840 F.2d at 58)). "An association's litigation interests must be truly unrelated to its organizational objectives before a court will declare that those interests are not germane." *American Ins. Ass'n v Selby*, 624 F. Supp. 267, 271 (D.D.C. 1985).

The purposes of the three plaintiff organizations are germane to the goals of this litigation. The purpose of the litigation is to improve public health by challenging allegedly burdensome government regulations that could impair the practice of medicine. That purpose is clearly germane to CEI's and Consumer Alert's objectives of promoting free market solutions by reducing unnecessary governmental influence. The litigation also is germane to AAPS's objective of protecting the practice of medicine by limiting interference with the physician-patient relationship and by ensuring that physicians can provide the best medical care possible. By attempting to show that the FDA must work within the statutory framework set forth by Congress, the litigation may enhance the understanding and appreciation of the free market.

While CEI and Consumer Alert may not have particular expertise in the field of public health, they have expertise in challenging federal regulations, making them especially qualified to raise this specific legal challenge. Defendant misapplies the germaneness standard by arguing that the purposes of CEI and Consumer Alert are not germane to the purpose of the FDCA and the particular injury suffered by the organizations' members. The appropriate question is not whether the organizational purpose is related to the challenged statute, or even to the suffered injury, but whether the purpose of the organization is related to the goals of the litigation. The purpose of the germaneness requirement is to ensure that organizations do not engage in lawsuits in which their members have no interest. *See Hodel*, 840 F.2d at 57. Just because the members may not

have joined the two organizations because they were specifically concerned about public health does not mean that the members have no interest in challenging what they perceive to be an unnecessary and detrimental agency rule. The members of CEI and Consumer Alert may not have been peculiarly interested in fuel efficiency standards when they joined CEI or Consumer Alert, but that did not prevent the D.C. Circuit from determining that a challenge to NHTSA's statutory authority to issue fuel-efficiency rules was germane to the organizations' purpose of promoting appreciation for the free market. *See CEI*, 901 F.2d at 111-12. In fact, the court in *CEI* did not even find it necessary to examine whether or not the organizations' members were interested in issues of fuel-efficiency. The mere connection between NHTSA's rule and the organization's interest in promoting appreciation of the free market was sufficient to demonstrate germaneness. *See id.* Because plaintiffs have alleged sufficient facts to show injury in fact, because the purposes of the three plaintiff organizations are pertinent to the goals of the litigation, and because the participation of the individual members of the organizations is unnecessary for resolution of the dispute,[5] the court finds that the plaintiffs have met the constitutional requirements of standing.

### 3. Zone of Interests

In addition to meeting constitutional requirements, plaintiffs must meet an additional prudential requirement in order to demonstrate standing. Those challenging agency action under the APA must show that they fall within the "zone of interests" to be protected by the relevant statute. *See Association of Data Processing Serv. Orgs. v. Camp*, 397 U.S. 150, 153 (1970); *Federation for Am. Immigration Reform v. Reno*, 93 F.3d 897, 900 (D.C. Cir. 1996) ("A party

---

[5] Defendant does not argue that plaintiffs fail to meet the third prong of the *Hunt* test.

meets that standard if it is 'arguably within the zone of interests' that Congress sought to protect or regulate under the statute in question."). "The essential inquiry is whether Congress 'intended for [a particular] class [of plaintiffs] to be relied upon to challenge agency disregard of the law.'" *Clarke v. Securities Indus. Ass'n*, 479 U.S. 388, 399 (1987) (*quoting Block v. Community Nutrition Inst.*, 467 U.S. 340, 367 (1984)). The Supreme Court has emphasized that "[t]he test is not meant to be especially demanding; in particular, there need be no indication of congressional purpose to benefit the would-be plaintiff." *Clarke*, 479 U.S. at 399-400. A plaintiff simply must "show that its interest is among those 'arguably . . . to be protected' by the statute." *Mova Pharm. Corp. v. Shalala*, 140 F.3d 1060, 1075 (D.C. Cir. 1998) (*quoting National Credit Union Admin. v. First Nat'l Bank & Trust Co.*, 522 U.S. 479, 492 (1998)).

Even when the petitioning party is not directly regulated under the challenged statute or rule, the party can still fall within the zone of interests by showing that Congress intended the plaintiffs to be 'beneficiaries' of the statute or that Congress thought that plaintiffs would be 'suitable challengers' of the statute. *See Federation for Am. Immigration Reform*, 93 F.3d at 900. Again, the test is not meant to be demanding. Plaintiffs who are not the object of contested agency action fail the zone of interests test only if their "interests are so marginally related or inconsistent with the purposes implicit in the statute that it cannot reasonably be assumed that Congress intended to permit the suit." *Clarke*, 479 U.S. at 399. In order to demonstrate that they are suitable challengers, plaintiffs need only show that their "interests are sufficiently congruent with those of the intended beneficiaries that the litigants are not 'more likely to frustrate than to further . . . statutory objectives.'" *Mova Pharm. Corp.*, 140 F.3d at 1075.

Plaintiffs fall within the zone of interests of the FDCA and FDAMA. The crucial question

15

is not whether the plaintiff organizations fall within the zone of interests but whether the organizations' members, on whose behalf the organizations have filed suit, fall within the zone of interests. *See Federation of Am. Immigration Reform*, 93 F.3d at 900 (analyzing the zone of interests test from the standpoint of the interests of the members of plaintiff organization). The FDCA seeks to protect consumers of drugs by promoting a safer and more efficient system of medicine. *See, e.g., Cutler*, 475 F. Supp at 848 (finding that the "principal beneficiaries" of the FDCA "are obviously the nation's drug consumers"); *cf. Chaney v. Heckler*, 718 F.2d 1174, 1176 (D.C. Cir. 1984), *rev'd on other grounds*, 470 U.S. 821 (1985) (holding that the FDA's jurisdiction to enforce the FDCA should be "analyzed in terms of 'consumer protection'"). Thus, the members of the plaintiff organizations, as both the prescribers and consumers of drug products, are the intended beneficiaries of the FDCA and would not frustrate the statute's objectives by bringing suit to challenge the pediatric rule.

Defendant argues that plaintiffs do not fall within the zone of interests because the statute is designed to promote public health and safety, and plaintiffs seek to invalidate a rule that would encourage drug safety by allowing the FDA to require pediatric testing.[6] While the FDCA may be a public health statute, the Act creates a complex statutory scheme that is designed to promote

---

[6]Defendant's characterization of the FDCA is exceedingly narrow. According to defendant, because the FDCA's main purpose is to promote public health by ensuring that drugs available to the public are safe and effective, the only people who would fall within the statute's zone of interests would be individuals complaining that the FDA let unsafe drugs on the market. Defendants argues that the plaintiffs in this case do not fall within the zone of interests because they seek to prevent the FDA from requiring additional tests of safety and effectiveness, and therefore their interests run counter to the interests protected by the statute. The logical extension of defendant's characterization is that consumers only would have standing to challenge the FDA's decision to approve a drug and would not have standing to challenge FDA decisions to deny approval of particular drugs because denials of applications would not adversely affect drug safety. Thus, defendant's reasoning would make FDA denials unreviewable.

16

·

public health both by preventing unsafe drugs from reaching the marketplace and by establishing a

mechanism to ensure that safe and effective drugs reach the market without undue delay. Section

355(c)(1) of the Act, for example, requires that within 180 days of the filing of an application, the

FDA must either approve the application or give the applicant notice and opportunity for a

hearing. *See* 21 U.S.C. § 355(c)(1); S. Rep. 87-1744, *reprinted in* 1962 U.S.C.C.A.N. 2884. In

passing the 1962 Drug Amendments to the FDCA, Congress emphasized that the purpose of the

180 day provision was to

> strike[] a balance between the need for governmental control to assure that new
> drugs are not placed on the market until they have passed the relevant tests and the
> need to insure that governmental control does not become so rigid that the flow of
> new drugs to the market, and the incentive to undergo the expense involved in
> preparing them for the market, become stifled.

S. Rep. 87-1744, *reprinted in* 1962 U.S.C.C.A.N. 2884. Thus, Congress expressed an interest in

making sure that consumers not only were protected from unsafe drugs, but also that they would

not be prevented from accessing safe and effective drugs. Both goals protect public health, as

consumers can suffer from serious health problems if they cannot gain access to necessary and

valuable drug treatments. Because the FDCA seeks to protect a consumer's interest in both

accessing safe drugs and avoiding unsafe drugs, plaintiffs fall within the zone of interests to be

protected by the statute.

The physician members of AAPS also fall within the zone of interests protected by the

statute. One purpose of the FDCA is to protect drug consumers by minimizing interference with

the physician-patient relationship. Because new uses for drugs are often discovered after the initial

approval process, Congress decided that it did not want to prevent doctors from taking advantage

of the new uses by requiring additional testing, and also decided that it did not want to limit a physician's ability to determine how to treat his or her patients. *See, e.g., Cheney*, 718 F.2d at 1179-80 & nn.13-16; *see also Buckman Co. v. Plaintiffs' Legal Comm.*, 531 U.S. 341, 121 S.Ct. 1012, 1018 (2001) ("Indeed, a recent amendment to the FDCA expressly states in part that '[n]othing in this chapter shall be construed to limit or interfere with the authority of a health care practitioner to prescribe or administer any legally marketed device to a patient for any condition or disease within a legitimate health care practitioner-patient relationship.'"). A physician's interest in promoting the safe and effective treatment of their patients is consistent with the goals of the FDCA and would not frustrate the Act's purposes. Because the statute seeks to ensure physicians retain substantial discretion over how they treat their patients, physicians seeking to maximize their available drug treatment options also fall within the zone of interests protected by the statute.

## C. Ripeness

Defendant argues that the court should refrain from reviewing the present case because it has not ripened. Challenges under the APA to rules promulgated pursuant to the FDCA are presumptively reviewable. *See Abbott Labs. v. Gardner*, 387 U.S. 136, 140-42 (1967). There is also a presumption of reviewability when evaluating ripeness claims as well. *See Ciba-Giegy Corp. v. EPA*, 801 F.2d 430, 434 (D.C. Cir. 1986) ("Courts confronted with close questions of ripeness are appropriately guided by the presumption of reviewability.").

The ripeness doctrine developed as a way to prevent courts from deciding abstract cases where the full effect of administrative action is unclear.

> [The] basic rationale [of the ripeness doctrine] is to prevent the courts, through
> avoidance of premature adjudication, from entangling themselves in abstract
> disagreements over administrative policies, and also to protect the agencies from
> judicial interference until an administrative decision has been formalized and its
> effects felt in a concrete way by the challenging parties.

*Abbott Labs.*, 387 U.S. at 148; *see also American Trucking Ass'n, Inc. v. Interstate Commerce Comm'n*, 747 F.2d 787, 790-91 (D.C. Cir. 1984) ("The former purpose, however – that of avoiding our entanglement in abstract disagreements - serves the function not merely of protecting the agency, but of protecting ourselves in two respects:  First, protecting us from adjudicating matters that are not sufficiently 'fleshed out' that we may see the concrete effects and implications of what we do.  And second, protecting us from adjudicating matters that in fact make no difference and are a waste of resources.").  Recognizing that courts seek to balance the plaintiff's interest in obtaining judicial review with the administrative agency's and the court's interest in delaying review, the Court in *Abbott Labs* held that ripeness analysis required "evaluat[ing] both the fitness of the issues for judicial decision and the hardship to the parties of withholding court consideration." *Id.* at 149; *see also Ohio Forestry Ass'n, Inc. v. Sierra Club*, 523 U.S. 726, 733 (1998) (listing the relevant ripeness factors as (1) whether delayed review would cause hardship to the plaintiff, (2) whether judicial action would inappropriately interfere with future administrative activity, and (3) whether the courts would benefit from further factual clarification).  Ripeness is determined by engaging in a pragmatic balancing of the interests for and against immediate review. *See, e.g., Better Gov't Ass'n v. Department of State*, 780 F.2d 86, 92 (D.C. Cir. 1986).

In determining whether the case is fit for judicial review, courts examine three factors.

19

First, if the dispute is purely legal in nature, then it is presumptively suitable for judicial review

because no further factual clarification would be needed in order to resolve the controversy. *See,*

*e.g.*, *Cronin v. FAA*, 73 F.3d 1126, 1131 (D.C. Cir. 1996). However, claims that are purely legal

in nature can still be unripe if the controversy depends on further administrative action or

additional factual developments. *See, e.g.*, *Toilet Goods Ass'n v. Gardner*, 387 U.S. 158 (1967);

*American Trucking Ass'n*, 747 F.2d at 789. Second, courts look to see if the agency's challenged

policy has "sufficiently crystallized" so that the effect of the agency's policy is clear. *See Cronin*,

73 F.3d at 1131. When it is unclear whether or not discretionary regulations actually will be

applied, or when a regulatory standard is so vague that a court cannot determine its scope and

effect without considering a concrete application, then agency policy may not be sufficiently

crystallized to warrant review. *See Payne Enterprises, Inc. v. United States*, 837 F.2d 486, 493

(D.C. Cir. 1988); *Pfizer v. Shalala*, 182 F.3d 975, 978 (D.C. Cir. 1999) (holding that dispute was

not ripe for review because further administrative proceedings might eliminate the harm giving

rise to the controversy). Third, if the court needs further factual development in order to resolve

the dispute, then the legal issues may not be ripe for judicial resolution. *See Cronin*, 73 F.3d at

1131; *National Ass'n of Manufacturers v. Department of Labor*, 1996 WL 420868 at *10

(D.D.C. 1996) (holding that dispute was ripe for review when no additional facts were needed).

Defendant fails to demonstrate that the present dispute is not ripe for judicial review.

Plaintiffs' claim is purely legal, as they argue that the FDA acted beyond the scope of its authority

in promulgating the pediatric rule. Plaintiffs argue that regardless of the specific facts surrounding

application of the rule, defendant's conduct violated the law. Defendant has failed to overcome

the presumption of reviewability that accompanies purely legal disputes.

Nor has defendant provided any additional facts necessary for resolution of the dispute, or explained how additional facts would aid the court's resolution of the matter. There appears to be no dispute over the scope and meaning of the rule and no uncertainty or vagueness regarding the agency's regulatory standards. Because the rule already is clear, defendant has not shown that further fact finding is necessary to define the scope of the rule in a way that would assist in resolving the dispute.[7]

While defendant maintains that the FDA may decide to defer or waive the pediatric rule requirements so that no drugs experience approval delays, the manner in which the FDA has already begun to apply the pediatric rule suggests that defendant's contention is not correct. If, as plaintiffs allege, the rule is being applied in a way that forces drug manufacturers to conduct pediatric testing, then the FDA has engaged in the type of concrete action that can be reviewed by a court. Because at the motion to dismiss stage plaintiffs' allegations must be accepted as true, plaintiffs' characterization of how the pediatric rule has been applied makes this dispute ripe for review.

In contrast to defendant's argument, this dispute is not one in which plaintiffs may never suffer harm because the agency may decide not to enforce its rule. *See, e.g., Toilet Goods*, 387 U.S. at 163-64 (holding case unripe because of the possibility that the FDA may never enforce its

---

[7]Additionally, defendant does not explain how the court would benefit from delaying review. Defendant merely alleges that a more concrete setting is necessary "to determine whether the pediatric regulation will cause the harm alleged by plaintiffs." Def's. Reply at 6. However, the appropriate question is whether additional facts are needed in order to resolve the dispute, not whether additional facts are needed to determine the extent of the harm suffered by plaintiffs. Otherwise, defendant's ripeness argument simply dissolves into its standing argument, and because the court has determined that plaintiffs have suffered an injury in fact, there is a sufficient controversy to avoid dismissal.

rule).  In the present case, although the pediatric rule is discretionary, the agency's policy has

crystallized, as the FDA has already begun enforcing the rule in ways that may cause delays in

drug approvals.  Furthermore, unlike in *Toilet Goods*, where the Court held that the specific

manner in which the challenged rule was enforced would shed light on whether or not the FDA

had breached its statutory authority, *see Toilet Goods* 387 U.S. at 163-64, defendant has failed to

explain how the manner of enforcement in the current case would impact the court's

determination of whether or not the agency had the statutory authority to issue the pediatric rule.

This case is distinguishable from *Ohio Forestry Ass'n v. Sierra Club*, 523 U.S. 726

(1998), which defendant cites in its reply brief.  In *Ohio Forestry*, the Supreme Court held that

the Sierra Club's challenge to the Forest Service's land resource management plan was not ripe

because the issuance of the plan would not in itself authorize the cutting of trees.  *See Ohio*

*Forestry Ass'n*, 523 U.S. at 729.  Before logging could be authorized, the Forest Service was

required to undergo a series of additional administrative procedures.  *See id.* at 729-30.  In the

instant case, however, once the pediatric rule is issued, drug manufacturers must comply in order

have their products approved, unless they receive a waiver or deferral.  Although the FDA can

decide, in its discretion, to provide a waiver or deferral of the rule, the FDA need not take

additional action in order for the rule to affect behavior.  In *Ohio Forestry*, the agency had to take

additional affirmative action in order for the challenged action to take place.  In the present case,

no affirmative steps are needed for the rule to take effect, but instead drug manufacturers must

take affirmative steps if they wish to escape the rule's requirements.  Additionally, even if

additional action by the FDA was required, the plaintiffs have shown that the FDA has taken

additional steps, as the agency has denied at least one request from a drug manufacturer to waive

22

the pediatric rule. Because the issuance of the rule is sufficient to cause harm, and because the

FDA has already enforced the pediatric rule in several circumstances, the FDA's policy is

"sufficiently crystallized" to allow judicial review of the present dispute.

The second prong of the ripeness test involves examination of the hardship that

compliance with the challenged rule would inflict on the plaintiffs. In examining hardship, courts

determine whether or not "the impact of the administrative action could be said to be felt

immediately by those subject to it in conducting their day-to-day affairs." *Better Gov't Ass'n*, 780

F.2d at 92 (*quoting Toilet Goods*, 387 U.S. at 164. "The purpose of the 'hardship to the parties'

analysis is to ascertain if the harm that deferring review will cause the petitioners outweighs the

benefits it will bring the agency and the court." *Eagle-Picher Indus. v. United States*, 759 F.2d

905, 918 (D.C. Cir. 1985). Because the hardship prong is part of an overall balancing test, the

D.C. Circuit has ruled that courts need not find hardship in order to find a case ripe for review if

there are no institutional interests favoring delay. *See, e.g., Rio Grande Pipeline Co. v. FERC*,

178 F.3d 533, 540-41 (D.C. Cir. 1999) ("The Commission is quite wrong in its implicit suggestion

that Rio Grande's petition must be dismissed absent a showing of 'hardship' for, 'under the

ripeness doctrine, the hardship prong of the test is not an independent requirement divorced form

the consideration of the institutional interest of the court and agency." (internal citation omitted));

*Action for Children's Television v. FCC*, 59 F.3d 1249, 1258 (D.C Cir. 1995) ("Under the law of

this circuit, once we have determined that an issue is clearly fit for review, there is no need to

consider 'the hardship to the parties of withholding court consideration.'"); *Askins v. District of

Columbia*, 877 F.2d 94, 98 (D.C. Cir. 1989) ("Where there are no significant agency or judicial

interests militating in favor of delay, 'hardship' cannot tip the balance against judicial review, or

alternatively, when a case is clearly 'fit' to be heard, the 'hardship' factor is irrelevant in applying the ripeness doctrine." (internal citation omitted)).  Because this court has determined that the issues in the case are fit for judicial resolution, and that the plaintiffs have suffered an Article III injury, the court finds that the present dispute is ripe for review regardless of the hardship experienced by plaintiffs.

## IV. CONCLUSION

For the foregoing reasons, it is this 25th day of October, 2001, hereby

**ORDERED** that the FDA's motion to dismiss is **DENIED**.


Date: _10/25/01_                                            Henry H. Kennedy, Jr.
                                                            United States District Judge